# Tab A

UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MASSACHUSETTS
SPRINGFIELD, MA.
Civil Action No. 3:17-CV-30174-MAP

THOMAS FORBES, as he is the Personal Representative of the Estate of GEORGE J. FORBES,

PLAINTIFF

v.

GREGORY TRUCKING COMPANY, INC.;
WILEY LENUE HOOKS, JR.;
GREGORY LEASING COMPANY, INC.;
B S G LEASING, INC.;
B&C TIMBERS LLC; and
BB&S ACQUISITIONS CORP.,

DEFENDANTS

V I D E O T A P E D

30(B)(6)

D E P O S I T I O N

CECIL GREGORY - VOL 1
30(b)(6) Gregory Trucking

TAKEN AT:
THE HILTON GARDEN INN
1017 Gateway Crossing Drive
Statesville, North Carolina 28677

Wednesday April 24, 2019
2:03 P.M.

Heather L. Smith
Court Reporter

Wyatt Legal Services, LLC
3936 Elizabeth Glen Way
Jamestown, NC 27282
(336) 510-8515

ATTORNEY NOTES

| PAGE LINE | SUBJECT MATTER | RELATES TO | ACTION |
|---|---|---|---|

APPEARANCES OF COUNSEL

Dino M. Tangredi, Esquire
LAW OFFICE OF DINO M. TANGREDI
106 Mount Auburn Street
Watertown, Massachusetts 02472
Matthew R. O'Connor, Esquire
MORRISON MAHONEY LLP
250 Summer Street
Boston, Massachusetts 02210

Thomas P. Schuler, Esquire
LAW OFFICES OF STEVEN B. STEIN
PO Box 2903
Hartford, Connecticut 06104
L. Jeffrey Meehan, Esquire
DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.
1414 Main Street, Suite 1900
Springfield, Massachusetts 01144

T. Dean Amos, Esquire
LAW OFFICES OF AMOS & KAPRAL, LLP
1331 North Center Street
Hickory, North Carolina 28601
OTHER APPEARANCES
Herman Wyatt, Videographer

INDEX

STIPULATIONS 7
EXAMINATION
By Mr. Tangredi 10

ADJOURNMENT 204
REPORTER CERTIFICATE 205
WITNESS CERTIFICATION 206
WITNESS ADDENDUM 207

EXHIBITS

| Name | Offered By | Identified |
|---|---|---|
| Exhibit Number One (Audio-Visual Deposition Subpoena F.R.C.P. 30(b)(6), 30(b)(5), and 45) | Mr. Tangredi | 8 |
| Exhibit Number Two (March 15, 2019 Letter) | Mr. Tangredi | 10 |
| Exhibit Number Three (Motor Carrier Identification Report) | Mr. Tangredi | 23 |
| Exhibit Number Four (Handwritten Log) | Mr. Tangredi | 29 |
| Exhibit Number Five (September 14, 2016 Purchase Order) | Mr. Tangredi | 36 |
| Exhibit Number Six (Gregory Trucking Company Web site printout) | Mr. Tangredi | 39 |
| Exhibit Number Seven (G&G Forest Products Web site printout) | Mr. Tangredi | 43 |
| Exhibit Number Eight (Gregory Trucking Company, Inc.'s Supplemental Response to Plaintiff's Request for Production of Documents Number 15) | Mr. Tangredi | 59 |

EXHIBITS (Cont.)

| Name | Offered By | Identified |
|---|---|---|
| Exhibit Number Nine (Gregory Trucking Company, Inc.'s Supplemental Response to Plaintiff's Request for Production of Documents Number 84) | Mr. Tangredi | 59 |
| Exhibit Number Ten (Gregory Trucking Company, Inc.'s Supplemental Response to Plaintiff's Request for Production of Documents Number 106) | Mr. Tangredi | 65 |
| Exhibit Number Eleven (Federal Motor Carrier Safety Administration Form OP-1 Application for Motor Carrier and Broker Authority) | Mr. Tangredi | 100 |
| Exhibit Number Twelve (Gregory Trucking Company, Inc.'s Supplemental Response to Plaintiff's Request for Production of Documents Number 95) | Mr. Tangredi | 114 |
| Exhibit Number Thirteen (April 7, 2017 Letter) | Mr. Tangredi | 129 |
| Exhibit Number Fourteen (April 7, 2017 Letter) | Mr. Tangredi | 130 |
| Exhibit Number Fifteen (April 7, 2017 Letter) | Mr. Tangredi | 132 |
| Exhibit Number Sixteen (April 7, 2017 Letter) | Mr. Tangredi | 133 |
| Exhibit Number Seventeen (Gregory Trucking Company, Inc.'s Supplemental Response to Plaintiff's Request for Production of Documents Number 39) | Mr. Tangredi | 134 |
| Exhibit Number Eighteen (Photograph) | Mr. Tangredi | 140 |
| Exhibit Number Nineteen (G&G Forest Products August 22, 2016 Receipt Number 7990) | Mr. Tangredi | 150 |
| Exhibit Number Twenty (Gregory Trucking Company, Inc. Invoice Number 4449) | Mr. Tangredi | 167 |
| Exhibit Number Twenty-One (BB&S Treated Lumber of New Eng A/P History Sorted by Date Vendor: GRE097 Gregory Trucking Company, Inc. From 01/01/14 | Mr. Tangredi | 169 |

Page 6

to 12/31/17)

EXHIBITS (Cont.)

| Name | Offered By | Identified |
|---|---|---|
| Exhibit Number Twenty-Two (Rate and Load Confirmation Load Number 7299) | Mr. Tangredi | 173 |
| Exhibit Number Twenty-Three (Gregory Trucking Company, Inc.'s Supplemental Response to Plaintiff's Request for Production of Documents Number 19) | Mr. Tangredi | 192 |
| Exhibit Number Twenty-Four (Gregory Trucking Company, Inc.'s Supplemental Response to Plaintiff's Request for Production of Documents Number 94) | Mr. Tangredi | 194 |

Page 7

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Heather L. Smith, Notary Public in and for the County of Cabarrus, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

Page 8

THE VIDEOGRAPHER: We're on the record. The time now is 2:03. This is the 30(b)(6) video deposition of Mr. Cecil Gregory taken in the matter of Thomas Forbes, as he is the personal representative of the Estate of George J. Forbes, Plaintiff, versus Gregory Trucking Company, Incorporated; Wiley Lenue Hooks, Jr.; Gregory Leasing Company, Incorporated; B S G Leasing Company, Incorporated; B&C Timers LLC; and B&S Acquisition Corporation, Defendants, being heard in the jurisdiction of the United States District Court in the Western District of Massachusetts in Springfield, Mass., civil action 3:17-CV-30174-MAP. This deposition is being held at the Hilton Garden Inn located at 1017 Gateway Crossing Drive in Statesville, North Carolina. Today is Wednesday, April the 24th, 2019. My name is Herman Wyatt. I'm a certified legal video specialist, Wyatt Legal Services, LLC. The court reporter, also with Wyatt Legal Services, is Heather Smith. Would counsel, please, introduce themselves for the record.

MR. TANGREDI: Dino Tangredi. And I represent the plaintiff.

MR. O'CONNOR: Matt O'Connor. And

Page 9

I represent Gregory Trucking Company; Wiley Lenue Hooks, Jr.; Gregory Leasing Company; and B S G Leasing.

MR. SCHULER: Thomas Schuler. I represent BB&S Acquisitions.

MR. MEEHAN: Go ahead.

MR. AMOS: Dean Amos. I represent B&C Timbers LLC.

MR. MEEHAN: Jeffrey Meehan. I represent B&C Timbers LLC, as well.

THE VIDEOGRAPHER: The court reporter may swear the witness and we may begin.

The witness, CECIL STUART GREGORY, being first duly sworn to state the truth, the whole truth, and nothing but the truth, testified as follows:

(2:03 p.m.)

MR. TANGREDI: The first thing I'd like to do is mark a copy of the deposition notice.

(DEPOSITION EXHIBIT NUMBER ONE WAS MARKED FOR IDENTIFICATION)

MR. TANGREDI: Madam Court Reporter, is that One?

Page 10

COURT REPORTER: Yes, sir.
MR. TANGREDI: Okay. And I'd also like to mark a copy of a letter from my office to Attorney O'Connor, dated March 15th, 2019.
(DEPOSITION EXHIBIT NUMBER TWO WAS MARKED FOR IDENTIFICATION)
MR. TANGREDI: And, for the record, Exhibit Number Two, the letter dated March 15th, 2019, to Attorney O'Connor, as counsel for Gregory Trucking, requested two weeks prior to today's deposition that the deponent be identified. And, for the record, said deponent was never identified until just now. The letter also requested that if anybody besides the deponent had information, that an affidavit should be provided indicating that that person has information about the deposition topics set out in Exhibit Number One.
EXAMINATION
BY DINO M. TANGREDI:
Q. Sir, could you tell us your name.
**A. Cecil Gregory.**
Q. Mr. Gregory, have you ever given a deposition before?
**A. Yes.**

Page 11

Q. Okay. So you might remember some of the helpful rules to make it work better. The woman on your right is taking down everything that is said in this room. So any of your responses I would ask should be oral, spoken, so that she can hear you and then record it properly. Okay?
**A. Yes.**
Q. If I ask you a question and you answer it, I'm going to presume you understood my question; is that fair?
**A. Yes.**
Q. If you don't understand a question -- it's probably my fault -- will you let me know?
**A. Yes.**
Q. Thank you. And, lastly, I don't want this to be physically painful for you in any way. So if for some reason you need to take a break, you want to go to the men's room, you need a cigarette, you have a bad back and you need to stretch, tell me.
**A. All right.**
Q. I don't want you to suffer. That's not the -- our intention. Okay?
**A. Okay. That's fine.**
Q. Wonderful. Now, I just want to put this

Page 12

on the record, that unlike a typical conversation, your answers today are under oath. Your answers here are just like in a court of law. And under the United States Code Section 1621, anyone who has taken an oath in any case who willfully states any matter which he does not believe to be true is guilty of perjury and subject to the penalties, which include fines and/or imprisonment for up to five years. Do you understand that?
**A. Yes.**
Q. And, also, 18 United States Code Section 1501 says that any corrupt interference with the orderly administration of law and justice, especially by influencing or furnishing false information, is punishable by imprisonment. Do you understand that?
**A. Yes.**
Q. Okay. Sir, in front of you are a couple of documents. And you'll notice that there are stickers on the front.
**A. Uh-huh.**
Q. One is called Exhibit One and one is called Exhibit Two. Okay?
**A. Yes.**
Q. And that's how we're going to refer to

Page 13

documents as we go through this deposition. All right?
**A. Yes.**
Q. Now, Exhibit Number One, could I ask you to take a look at that?
**A. Okay.**
Q. And have you seen that before?
**A. Yes.**
Q. Okay. And it's multiple pages. Have -- have you been through it all? And please feel free to look at it to make sure you have.
**A. It looks about like what I went through. Yes.**
Q. Okay. Now, there are 39 topics listed that we're going to discuss today. And it may have subparts, but there are 39 listed. Have you been over all 39?
**A. Well, I've looked through them. Yes.**
Q. And are you the person able to give the testimony on behalf of Gregory Trucking on all of those topics?
**A. Yes.**
Q. Okay. Were there any topics in this document, Exhibit Number 1, that you weren't -- that you aren't able to give testimony about today

Page 14

on behalf of Gregory Trucking?
**A. Do I want to --**
Q. Are there any that you can't give testimony about today?
**A. I don't think -- now, you know, I'll have to say when we get to that one particular one, if I have a problem, I'll tell you.**
Q. Well, I appreciate that. And -- and I'm sure you will. But I kind of need to know that ahead of time.
**A. Okay.**
Q. All right. Are there any that you've gone over that you don't think you can address?
**A. I will address them for you. Yes.**
Q. Okay. Very good. What have you done to prepare for you deposition today?
**A. Well, I just -- you know, I've tried to read this. And, you know, I'm familiar with what's happened and what's going on, so --**
Q. Okay. Did you meet with your attorney --
**A. Did I meet --**
Q. -- to prepare?
**A. Yes. I --**
Q. Okay. And that's Attorney O'Connor?

Page 15

**A. Yes.**
Q. When's the first time you met Attorney O'Connor in person?
**A. Monday.**
Q. Monday. This past Monday?
**A. Yes.**
Q. Today being Wednesday?
**A. Yes.**
Q. Okay. Did you go over any documents besides Exhibit One in front of you?
**A. Well, we went over several --**
Q. Excellent.
**A. -- different documents. Yes.**
Q. Okay. So, for example, do you know if you saw the police report about the crash that happened up in Dalton, Mass.?
**A. I don't -- I have not seen the -- the police report, no.**
Q. Have you seen any of the witness statements? The people who saw the crash and came forward.
**A. Well, I -- I -- I heard, you know, through different conversations of it, yes, about --**
Q. Okay. But you haven't seen the

Page 16

statements?
**A. No.**
Q. Have you seen any of the photographs of the crash scene?
**A. Yeah, I seen some pictures. Yes.**
Q. Okay. Have you seen any of the medical records of the deceased, Mr. Forbes?
**A. I just knew that he had some complications from that accident, yes. You know, as far as the details of it, I really don't know.**
Q. And -- and by complications, we -- we mean death?
**A. Yes, you know. But when it first happened, they said it was -- his leg needed surgery or something. And then -- then the next day or -- or day after that he had passed away.**
Q. Did you see the autopsy report and the cause of death in any of the documents you looked at?
**A. No.**
Q. Okay. Could you tell us the position you hold with Gregory Trucking.
**A. President.**
Q. I'm sorry. President?
**A. Yes.**

Page 17

Q. I didn't know if you said "present" or "president."
**A. President.**
Q. I'm going to get your accent.
**A. Okay.**
Q. I'll pick it up eventually. So let's talk a little bit about the business of Gregory Trucking Company. Is Gregory Trucking Company a -- a for-profit North Carolina corporation?
**A. Well, I wish it was a profit one, yes.**
Q. Okay. I didn't ask if it was making profit.
**A. Okay. Yes.**
Q. Okay. But it is a for-profit North Carolina corporation?
**A. Yes.**
Q. Okay. What is the nature, in -- in very general terms, of Gregory Trucking's business?
**A. Well, we freight lumber. And then -- well, to start with, you know, we start -- had trucks under G&G Lumber when we first started in '73. And then we got a little bit concerned about as the business growed we might ought to separate our trucks from the lumber company. So we got with our accountant and his -- got an attorney and**

Page 18

**we separated them. And during that process, they came up with Gregory Leasing for that separation. And so it's proceeded since then, you know. And the drivers is just been passed on down the line from there, you know.**
Q. Okay. So fair to say the nature of Gregory Trucking, the business, is motor carrier --
**A. Yeah.**
Q. -- trucking --
**A. Motor carrier, yes.**
Q. Okay.
**A. Flatbed, yes.**
Q. And a couple of times you said "we." Who are you referring to when you --
**A. Cecil. That's just the nature of speech, I guess.**
Q. Okay. And how many locations does Gregory Trucking Company, Incorporated, have?
**A. One.**
Q. And where is that?
**A. 147 Lumber Drive, Union Grove --**
Q. Excellent.
**A. -- or, no, it would be Harmony, I guess, the physical address.**

Page 19

Q. Okay. Does Gregory Trucking deliver all across the United States?
**A. No.**
Q. What is its geographic area?
**A. Most -- Florida to Maine. And then we go as -- east. We don't go near the Mississippi in other -- just up and down the east coast.**
Q. Okay. Anything into Canada?
**A. No.**
Q. Anything into Mexico?
**A. No.**
Q. Do you know how many overall transportation miles that Gregory Trucking drove in 2016?
**A. No. I mean, I could take a guess versus on the trucks. But, you know, I do try to keep up with look just to try to keep up with the -- if they're averaging good diesel mile per gallon, you know, how many miles and all, but -- you know. And I know about what they should run and all. But I couldn't give you a specific number, no.**
Q. Okay. Can you give me an approximate number of total miles in two --
**A. I'd have to know how many trucks. And I couldn't tell you how many trucks I was running at**

Page 20

**that particular time.**
Q. Okay.
**A. But you could say probably between -- some of them around 100,000 and some of them 150,000 miles per year.**
Q. Okay. Is it fair to say somewhere in the neighborhood of a million miles a year, give or take?
**A. Well, possibly if I had ten trucks -- or eight to 10. You know, I'd have to look and see. But, yes, we -- I mean, it's -- could be that.**
Q. Okay. How about in 2017, do you know how many miles your trucks drove, approximately?
**A. I mean, that's -- well, right now I think they're running better than 10,000, so it could be like a million two or something, you know.**
Q. Approximately?
**A. Approximately.**
Q. I understand. Could you explain to the jury what a tractor in the trucking business is?
**A. Well, it's the unit that's got the -- that -- you know, it's the power unit. It's the truck. It's got the motor and all this in it. And it's -- it's what does the pulling and all.**

Page 21

Q. Okay. Did Gregory Trucking own any tractors in 2016?
**A. Did Gregory Trucking, no.**
Q. Okay. How about in 2017?
**A. No. It's -- Gregory Trucking has never owned them. Never.**
Q. Never owned a tractor?
**A. Never owned a -- the tractors. No, sir.**
Q. Okay.
**A. That would be Gregory Leasing.**
Q. Got it. Did Gregory Trucking own any trailers in 2016?
**A. No.**
Q. Okay. How about 2017?
**A. No.**
Q. Has it ever -- has Gregory Trucking ever owned a trailer?
**A. No.**
Q. Okay. How many drivers of tractor-trailer trucks did Gregory employ in 2016?
**A. I'd have to look and see. I mean, it's over here. If it's in here.**
Q. I can suggest that --
**A. Huh?**
Q. -- I can suggest the answer is not going

Page 22

to be in that document --
**A. Well, I mean, I --**
Q. -- but you're free to look.
**A. -- I'd have to think to know how many I had. Probably six or eight in that year.**
Q. In 2016?
**A. Yes.**
Q. And I think I asked the question how many drivers did Gregory have. And I know there are several Gregory -- there's Gregory Leasing and there's Gregory Trucking. So I want to make sure I say --
**A. Okay.**
Q. -- Gregory Trucking --
**A. Okay.**
Q. -- so as not to confuse you or me or anyone else. So in 2016, do you know how many tractor-trailer truck drivers Gregory Trucking employed?
**A. Well, I mean, probably it could be six, and then six months later it could have been eight or something, you know, at that particular time.**
Q. Okay.
**A. It's -- it's -- we've growed one or two since then I think.**

Page 23

Q. The same question for 2017, how many drivers did Gregory Trucking employ?
**A. Probably seven or eight.**
Q. Okay. Sir, we're going to hand you what's been marked as Document Exhibit Number Three. Could you take a look at that and let me know when you're done looking at it. And it's just the front side. I don't need you to look at the back. I'm sorry. You're looking at the proper side.
(DEPOSITION EXHIBIT NUMBER THREE WAS MARKED FOR IDENTIFICATION)
**A. Okay.**
Q. Do you recognize that document?
**A. No. I mean, I don't know which one this is for. Okay.**
Q. What is Exhibit Number Three?
**A. Okay.**
Q. What is it?
**A. It's a motor carrier identification report.**
Q. Okay. And is it an application to get a Department of Transportation number?
**A. I don't know. You know what? I never**

Page 24

**did any of this.**
Q. Well, as the -- as the person being presented on behalf of Gregory Trucking --
**A. Yes.**
Q. -- it isn't just your personal information that I can ask you about. Are you saying you've never seen anything like Document Number 3 before?
**A. No. I've seen these. But -- but this -- so this is Linda Stroud in here now. And it -- it says it's for a hire, so it -- it's the application, I guess, that they keep in their truck.**
Q. So up at the top where it says "motor carrier identification report" --
**A. Yeah.**
Q. -- and in parentheses "application for U.S." --
**A. "DOT number."**
Q. -- "DO2" --
**A. Yes.**
Q. -- "DOT number." So is -- is this an application filed by Gregory Trucking --
**A. Yes.**
Q. -- for a DOT number?

Page 25

**A. Yes.**
Q. Okay. So you see Block Number 1 at the top? High -- I highlighted it in yellow to help you. At the top.
**A. Yes. Gregory Trucking Company.**
Q. Name of motor carrier. It says --
**A. Yes.**
Q. -- Gregory Trucking Company. And Box Number 21; do you see that box?
**A. Yes.**
Q. And it asks for carrier mileage for the year 2017.
**A. Okay.**
Q. And how many miles does it say the carrier drove in 2017?
**A. I don't know if that's -- what is that? Is that ninety -- 938,940? Yes.**
Q. 938,940 miles?
**A. Okay.**
Q. Would -- would that be approximately how many miles --
**A. Yes.**
Q. Okay. And in Box Number 20 there's an email address. Could you read that?
**A. Gandgforest -- let's see.**

Page 26

GandgforestProducts.com.
Q. Linda --
**A. Linda --**
Q. -- at --
**A. Linda@gandg, yes.**
Q. Okay. Who is Linda?
**A. She's the lady in the office.**
Q. Okay. And if we look down at Box 26; do you see that one?
**A. 26. 26. Yes.**
Q. It says the number of vehicles that can be operated in the U.S. at the top.
**A. Yes.**
Q. And it asks how many are owned?
**A. Okay.**
Q. And the number one appears in straight truck -- under straight trucks, correct?
**A. Yes. That's the small one for us.**
Q. And then in the second box, truck tractors, it says 11.
**A. Yes.**
Q. So this seems to indicate that there are 11 truck tractors owned by Gregory Trucking.
**A. Yes.**
Q. Did I read that right?

Page 27

**A. Yes.**
Q. Is that actually true?
**A. Yes. That would be how many. But, you know, most of the time we've got some sitting because we don't have drivers.**
Q. Okay. So I want to -- I want to make sure we're clear because I'm a little confused. Are these truck tractors owned by Gregory Trucking or owned by Gregory Leasing?
**A. Gregory Leasing.**
Q. Okay. But this form is for Gregory Trucking, right?
**A. Yes.**
Q. Okay. So it indicates that Gregory Trucking owns 11 truck tractors, but that's incorrect?
**A. That is incorrect, yes. It's by Gregory Leasing.**
Q. Okay.
**A. I -- I couldn't tell you how that's like that.**
Q. Well, that --
**A. Okay.**
Q. You explained it earlier. Okay. Now, in Box 27; do you see that box?

Page 28

**A. Yes.**
Q. Over -- a little more than halfway over it asks the total drivers.
**A. Yes.**
Q. And it says nine, correct?
**A. Yes.**
Q. All right. And this application at the bottom, the date it was filed -- or the date on the application is September 24th, 2018, correct?
**A. Yes.**
Q. Okay. Do you have to reapply for a DOT number every year at Gregory Trucking?
**A. No. I think we keep the same number.**
Q. Okay. Do you have to reapply every year?
**A. No.**
Q. Okay. Do you know why this application was filled out in September of 2018?
**A. No.**
Q. Did you have a DOT number before September of two thousand --
**A. Yes. We've had DOT numbers since day one, I guess.**
Q. And it hasn't been the same number?
**A. I don't know if it's the same number or not.**

Page 29

Q. Okay. Mr. Gregory, I'm going to ask you to look at the document we're calling Exhibit Number Four. And you'll let me know when you're done looking at that, please.
(DEPOSITION EXHIBIT NUMBER FOUR WAS MARKED FOR IDENTIFICATION)
**A. Okay.**
Q. Do you recognize that document?
**A. Well, I know what it is. Yes.**
Q. What is it?
**A. It's got different places we haul and different customers' names.**
Q. Okay. And do you recognize the handwriting?
**A. It looks like Martha. I don't -- I couldn't tell you really.**
Q. Okay. But it's not yours, is it?
**A. No, it's not mine.**
Q. Now, is this some kind of a -- an accounting record?
**A. Well, this -- this is the loads -- I would say this is the loads that Gregory Trucking moved. I don't know if that -- well, it says in**

Page 30

**August 2'16. And that was the pay rate on each side.**
Q. Okay. So, for example, up -- up at the top --
**A. Yes.**
Q. -- the top one, does it say Hagerstown, Maryland?
**A. Hagerstown, Maryland, yes.**
Q. And there's a number to the left of it. Does it say 1,100?
**A. I thought it said '16, but --**
Q. Okay.
**A. -- you know, I may not be right.**
Q. So the -- the --
**A. We pulled two up there that month.**
Q. Okay. So the first number in the left-hand column is the amount charged?
**A. Yes.**
Q. And the next item is the destination hauled to?
**A. Yeah. That would be '16 because it says "two."**
Q. Okay.
**A. And then -- yeah. Go ahead. I'm sorry.**
Q. That's all right. And then on the right

Page 31

side of the entry it'll indicate how many trips were made to that destination?
**A. Yes.**
Q. Okay. And this is for August of 2016, correct?
**A. Yes.**
Q. Okay. Now, can you see on this document where Gregory Trucking made it -- any trips to a BB&S? And if I could suggest, maybe six lines --
**A. Davisville, Rhode Island.**
Q. Very good. And it seems to indicate there were three trips made to Davisville, Rhode Island; is that right?
**A. Yes.**
Q. And there was a charge of $7,200, correct?
**A. Let's see -- where -- I can't -- $7,200, yes.**
Q. Okay. So -- so this is how you keep track -- how Gregory Trucking keeps track --
**A. Yes.**
Q. -- of loads it delivers and money --
**A. Yeah.**
Q. -- it's owed?
**A. Uh-huh. For B&C. It doesn't reflect**

Page 32

**backhauls or if we freight for other people.**
Q. This is only for B&C?
**A. This is only for B&C. We -- we don't do a hundred percent for them.**
Q. Okay. There might be another one of these for somebody else you haul for?
**A. Well, you know, anywhere we go, we try to pick up something coming back. Yes. And that would be different from this because it's not -- B&C would not be paying for it. And -- so yes.**
Q. Okay. So how many other companies do you transport goods for? And let's say back in 2016, and let's say August, if you know.
**A. Gosh. Well, I know that like in Davisville, she would have probably brought back -- used cross-eyes for Universal Forest delivering to different Home Depots or Lowe's or places like that. Most of the time that's what we do up in there. Very seldom we get some hard -- if we go to -- like, if we go up to Hagerstown, we'll run up the road there and pick up -- or most of the time maybe White Plains, Maryland, pick up over at BY Lumber and come back to Maiden or somewhere. I mean, we try to pick up something to help on the freight charges, you know? I mean, they're to pay**

Page 33

**for the truck and all. If you just go and come back, you're backing up most of the time.**
Q. An empty truck.
**A. Don't do nothing.**
Q. Don't want -- don't want an empty truck. I get it. On Exhibit Number Four, at the bottom right corner there's a figure of $94,700. Is that the figure that this Exhibit Number Four adds up to?
**A. Yes. That was what would have been charged to B&C or G&G Forest should owe for that month's freight bills. Yes.**
Q. And -- and, I'm sorry, is there another document that includes a record like Exhibit Four for other companies that you deliver for?
**A. Yeah. I mean, there would be -- a bill of lading of some type, yes. And then where we invoiced for the -- the freight on it, you know.**
Q. Okay. Would there be a handwritten document, like Exhibit Number Four, for other companies besides --
**A. Well, I mean, yes, there would be something written down there. But, you know, they -- this here is a month's thing for us on them. But we bill weekly anybody, you know. So it -- it**

Page 34

**wouldn't be extensive like a month here.**
Q. I get it.
**A. You know, sometime -- I mean, we try to bill as quick as we can.**
Q. Who are the officers at Gregory Trucking?
**A. Me and my wife, Sylvia.**
Q. What is your title?
**A. The president.**
Q. What is hers?
**A. I guess vice president.**
Q. Okay. Who is Martha Somers?
**A. My sister. But she was head secretary for G&G for 46 years, all the way through.**
Q. When it was G&G Lumber?
**A. Yes. And then they went to -- there was some bad times and -- and they went to B&C Timbers.**
Q. Okay. Did Martha Somers ever work for Gregory Trucking?
**A. Her job, you know, was the secretary. And she did everything for years until we got to where we needed one or two more. And then when we took the trucks away from G&G Lumber, they transferred over to Gregory Trucking, and she just**

Page 35

**assumed [sic] what she was doing. But she's always been paid through the lumber company.**
Q. B&C Lumber?
**A. G&G and then B&C. Yes.**
Q. Has she done work over the years or Gregory Trucking, Incorporated?
**A. Yes.**
Q. Okay. So she's a secretary in the office and does a little bit of work for --
**A. Yes.**
Q. -- whoever might need it in the office?
**A. Uh-huh.**
Q. Is that fair?
**A. Yes.**
Q. And I understand the office consists of Gregory Trucking, Gregory Leasing, B S G, and B&C Timbers; is that right?
**A. Yes. It's all separated. And it's got the -- got their different filing and their different buildings we keep the stuff in. Yes. But it is took care of inside that office.**
Q. And does that building have a name, that structure?
**A. No. It's just a building. Office.**
Q. The office.

Page 36

**A. But there's nothing over it that says "office." We just know it.**
Q. All right. Very good. Mr. Gregory, if you'd look at -- if you'd look at document called Exhibit Number Five.
(DEPOSITION EXHIBIT NUMBER FIVE WAS MARKED FOR IDENTIFICATION)
**A. Yes.**
Q. Do you -- do you know what that is?
**A. Yes. It's an invoice to BB&S -- well, it's -- it's shipped to BB&S. We sold it to Yellow Pine. We do not deal direct with BB&S. We go through a broker.**
Q. "We" being who?
**A. The lumber -- B&C deals with Yellow Pine. And then they tell us at G&G, which is me -- I mean, Gregory Trucking -- and we haul this load to them.**
Q. Is it fair to say that Exhibit Number Five is an order from BB&S to Yellow Pine for some lumber?
**A. Yes.**
Q. And is it fair to say Yellow Pine filled that order with B&C Timbers' --

Page 37

**A. Yes.**
Q. -- lumber?
**A. That's what happened.**
Q. And that B&C Timbers hired Gregory Trucking to deliver it to BB&S up in Rhode Island?
**A. Yes.**
Q. Okay. And what's the date on that?
**A. 9/14/206 -- 2'16.**
Q. So BB&S continued to do business with B&C Timbers and Yellow Pine and Gregory Trucking after George Forbes was killed on August 24th, 2016?
**A. Yes.**
**MR. O'CONNOR: Objection.**
Q. [By Mr. Tangredi] Okay. And on Exhibit Number Five, was that one truckload up to BB&S?
**A. Yes.**
Q. And the amount charged by Gregory Trucking -- I'm sorry. The total amount charged was $9,752.40?
**A. Yes. And out of that would come our freight charge. But we would bill -- Gregory Trucking will bill B&C Timbers for that freight bill.**
Q. Okay. So is -- who paid -- on Exhibit

Page 38

Number Five --
A. **Yes.**
Q. -- who paid $9,752.40?
A. **Yellow Pine paid us. And then I do not know what they charged BB&S, but there had to be an upcharge, you know.**
Q. Okay. And when you say Yellow Pines billed us, who would --
A. **Yellow Pine Trading -- that's a company that B&C works with. I -- Brandon, he could -- you know, he deals with the -- Doug McGuire, that's who --**
Q. So Exhibit Number Five is a bill from Yellow Pine to B&C Timbers?
A. **This looks like -- no. This looks like to the -- the -- the ticket that would have been -- the shipping ticket.**
Q. What does that mean?
A. **This may be a shipping ticket. Then they -- in other words, B&C would have had billed Yellow Pine that 9,400 -- 9,752.40.**
Q. So this is a bill from B&C Timbers to Yellow Pine?
A. **It -- it -- yes, I'd say that. Yes. You know, I don't do the billing. They give me a**

Page 39

**ticket when the load is loaded and that's it, you know.**
Q. Can you tell from Exhibit Number Five whether or not Gregory Trucking was involved?
A. **No, you can't tell from this.**
Q. Do you know if Gregory Trucking was involved in delivering --
A. **Oh, I know we hauled it.**
**(DEPOSITION EXHIBIT NUMBER SIX WAS MARKED FOR IDENTIFICATION)**
Q. Mr. Gregory, we've put Exhibit Number Six in front of you. Could you look at that and tell me when you're done looking at it.
A. **Okay.**
Q. What is that?
A. **I'd say it's a Web site for Gregory Trucking.**
Q. Excellent. Is -- do you know when this Web site first went up --
A. **No.**
Q. -- for Gregory Trucking? Okay.
A. **You know, I don't know. And I don't -- I could tell you I probably haven't seen it. I don't use a computer. I don't turn one on or off.**

Page 40

**And Flattop or -- I forget what his first name is -- he does all of ours. And he was talking to me one day about he wanted to do it and he told me he could do it for "X" and "X" and "X." And I just said do it. So I don't -- I couldn't tell you anything.**
Q. Did you -- did you help him with any of the information --
A. **No.**
Q. -- that went into it?
A. **No. I'd say he talked within the office there and got that. But he's done all of it since we've had a computer. He give me my first raise in 1991. It was '83 when he took it over, so I know.**
Q. Okay. So have you ever been -- have you ever looked G -- Gregory Trucking's Web site before today?
A. **No, I haven't.**
Q. I'm going to ask you to take a minute and look it over.
A. **Well, I mean, it's the right information because we did used to run, like, 26 states. It may be the same thing now, you know, as far as what was put up for the career opportunities and**

Page 41

**the different things I don't know about --**
**MR. O'CONNOR: And, Dino, I don't know if you can -- some sort of offer of proof on this. I don't know where it came from or what the date is. And I wouldn't know that the topic in the 30(b)(6) is Gregory Trucking's Web site on the date of the accident. So I don't know if you can represent where this comes from for the witness.**
Q. [By Mr. Tangredi] So we've established this is the Gregory Trucking Web site.
A. **Yes.**
Q. Okay. And I've asked you to look at it.
A. **Yes.**
Q. And you've looked it over.
A. **Yeah, I seen it.**
Q. And can you -- and can you state whether or not the contents of it is accurate as far as you know --
MR. O'CONNOR: Objection.
Q. -- on behalf of Gregory Trucking?
A. **Yes. Okay.**
Q. [By Mr. Tangredi] Is there anything on Exhibit Number Six, the Web site, that is not accurate?
A. **We don't do no team drivers. No.**

Q. Okay. Could you direct me to what you're looking at?
**A. It says on the -- the last page --**
Q. Yeah.
**A. -- founded in 19 -- that should be '92 -- well, it shows '92 there. As read, [as read] "This company is operated with team drivers, top of the line drivers" -- there's no team drivers. No.**
Q. Okay. What's a team driver?
**A. It would be two to a truck.**
Q. Has Gregory Trucking ever had team drivers?
**A. Well, they's -- probably over the years. When we first started going a pretty good distance sometimes we'd send two. But we hadn't probably in the last 30 years.**
Q. Fair enough. So do you -- did you say somebody named Flattop created this Web site?
**A. Flattop. That -- that's what his name is. He does all of our computer work.**
Q. Okay. And do you know when Flattop did this initially?
**A. No.**
Q. Know each time he ever did it?

**A. I can't -- no, I don't. He just said he wanted to do one. I think it's been fairly recent. I'm not sure.**
Q. Okay. But other than team drivers, is everything else --
**A. Yeah. It seems to be in order there. Yeah.**
Q. And --
**A. I mean --**
Q. -- please allow me to finish my question.
**A. All right.**
Q. And then you can answer. I know it's hard. Is everything in Exhibit Six accurate, except for the team drivers?
**A. Yes.**
Q. And is everything in Exhibit Number Six accurate since 2016 to the present, except for team drivers?
**A. Yes.**
**(DEPOSITION EXHIBIT NUMBER SEVEN WAS MARKED FOR IDENTIFICATION)**
Q. Mr. Gregory, we're handing you Exhibit Number Seven. Will you take a look at that and

let me know when you're done looking at it.
MR. O'CONNOR: And I would just make an objection to the line of questioning that I assume is coming. Again, this is a Web site not of Gregory Trucking. I mean, any questions you want to ask him about reviewing the document is fine. But not on the topics listed itself and it's not the company being deposed Web site.
**A. Well, it says here it started out with a little wood mizer. That -- that's not right. Little wood mizer sawmill, that was -- that's incorrect. That would be on the back of the second page.**
Q. [By Mr. Tangredi] So before we get into its contents and -- and what's in it, I just want you to look at it and let me know when you're done looking at it because I want to ask you if you recognize what it is. And then we'll perhaps talk about what's in it.
**A. I would assume that this right here is a G&G Forest Products' Web site.**
Q. Okay. What is G&G Forest Products?
**A. Well, that's B&C. The same thing.**
Q. It's the same as B&C Timbers LLC?
**A. No. But it's B&C doing business as G&G**

**Forest Products.**
Q. Okay. They're interchangeable, G&G and B&C?
**A. Yes. They want -- we wanted to keep the G&G. We had to let go of the lumber company, they -- because that was already G&G because we had a long history. And we -- we were able to pick up most of our customers and everything after the bankruptcy stuff.**
Q. And does the G&G stand for Gregory & Gregory?
**A. Yes.**
Q. And is that Cecil Gregory and Brandon Gregory?
**A. No.**
Q. No.
**A. Cecil Gregory and Vance Gregory, my dad.**
Q. What was your dad's name?
**A. Vance.**
Q. Vance. Got it.
**A. That started in 1973.**
Q. Okay. And how about B&C Timbers, is the "B" for Brandon and the "C" for Cecil?
**A. No. It was for Brandon and Chester at that time. We was trying to get something started**

Page 46

back in -- at that time, we was -- the -- trying to get the funding to preserve what I lost in 40 years when I went out and built the big mill in Hickory, expanded and -- and borrowed a lot of money and -- and run out. Things just changed and I lost it. And we were trying to get -- save part of the company because I've got kids and I've got grandkids. And -- and Chester Godfrey -- that's where that name -- name comes from -- the "C." They -- they was several trying to help us. But before anything ever happened, Salem Investment Partners came in out of Charlotte. And they worked with my son, Brandon, in order to keep Union Grove. I lost Hickory total. And -- and me and my wife lost everything. We had to go out personally and all. But, you know, being able to keep the little trucking going to help us. And then we're freighting that for the lumber company up there -- freight for that and then the others. But, like I say, right now we've not been able to keep the drivers or nothing else to do it all, so they are using that -- some outside stuff too. But that -- that "C" was that. But they had done registered, I think, in the state of North Carolina or something, so it had to be there.

Page 47

They tried several different names, but a lot of them was gone. But we do have a good, strong history. So they done the B&C doing business as that, you know. And I'm there. And I try to do everything I can to help if he has questions or anything. But trucking is basically what I had.

Q. Okay. So G&G is Gregory and Gregory for you and your dad?

A. Yes.

Q. Originally it was G&G Lumber.

A. Yes.

Q. That went bankrupt?

A. Yes.

Q. But you kept it on as G&G Forest Products --

A. No, we didn't keep it on. I'd say we start -- it was gone. And then they stepped up after we got the financing. And they were able to -- Carolina Farm Credit had me. Well, they worked with my son and Salem Investment Partners to preserve the Union Grove facilities. I mean, I lost it. But at least that -- and now we do have some kind of income now.

Q. Okay. I want to ask you some questions about transportating -- transporting goods by

Page 48

tractor-trailer. Okay?

A. Okay.

Q. Do you believe that transport -- transportation of goods by tractor-trailer can be dangerous if it is not done carefully?

MR. O'CONNOR: Objection.

A. Yes. Any truck on the road if -- if it's not done carefully is bad.

Q. [By Mr. Tangredi] Who could it be bad to?

A. It could be bad to the -- the truck driver and bad to anybody else that's on the road. But whether it be lumber, steel, dry box, or whatever, you know, yes.

Q. What could happen to people --

MR. O'CONNOR: Objection.

BY MR. TANGREDI:

Q. -- if the truck driver -- tractor-trailer truck driver isn't careful?

MR. O'CONNOR: Objection.

A. Well, there could be accidents, yes.

Q. [By Mr. Tangredi] What kind of injuries could people get?

MR. O'CONNOR: Objection.

A. Well, from a small injury to death.

Page 49

Q. [By Mr. Tangredi] And everything in between, right?

A. Yes.

Q. Okay. Do you believe that transportation of goods by tractor-trailer can be dangerous if not done safely?

MR. O'CONNOR: Objection.

A. Yes.

Q. [By Mr. Tangredi] Okay. Do you believe that transportation of goods by tractor-trailer can be dangerous if not done competently?

MR. O'CONNOR: Objection.

A. Yes.

Q. [By Mr. Tangredi] Do you believe that a motor carrier must choose a competent driver to drive its trucks?

A. Yes.

Q. Do you believe a motor carrier must choose a qualified driver to drive its trucks?

A. Yes.

Q. And do you believe that a motor carrier must choose a safe driver to drive its trucks?

MR. O'CONNOR: Objection.

A. Yes.

Q. [By Mr. Tangredi] True or false:

Page 50

Single tractor-trailers when fully loaded can weigh as much as 80,000 pounds?

**A. Yes. That's the gross limit that DOT or Federal regulations allow you is 80,000 pounds.**

Q. And what happens if a truck is overloaded?

**A. You get a ticket if you get caught.**

Q. Do you know why there's an 80,000 pound limit?

**A. Well, they -- evidently there was research and all kind of run through that -- that they came up with that. At one time, it was 72,300 in the '70s and the early '80s. And then they increased it to 80,000 sometime in there. So they must have thought that time and things was better, better made, better brakes, better a lot of things, you know.**

Q. Should a motor carrier entrust a tractor-trailer truck to a driver it knows or should know it regularly violates Federal trucking safety regulations?

**A. No.**

**MR. O'CONNOR: Objection.**

Q. [By Mr. Tangredi] True or false: Before choosing a driver to drive a tractor-

Page 51

trailer truck, a motor carrier should consider all available safety information about the driver before allowing that driver to drive a tractor-trailer truck?

MR. O'CONNOR: Objection.

**A. A driver does -- true.**

Q. [By Mr. Tangredi] Why?

**A. Well, the -- I think the driver needs to be vetted, you know, and checked and his driver's record checked and all. We use our insurance carrier, you know, to do all of that. And we don't put nobody behind the wheel that they won't approve.**

Q. Okay. True or false: A motor carrier should check the driving record of a tractor-trailer driver it employs on a regular basis?

**A. Well, I guess that would mean -- true, but it depends on what the "regular" is, the time period in there, you know. But I think that -- go -- sorry. Go ahead.**

Q. It's a fair comment. How about yearly?

**A. Well, most of the time, you'll -- you know during that year's time what the driver's done. And if they get to anything outside of when they're in our vehicle, we're going to know it**

Page 52

**through our insurance carrier. They will know, so --**

Q. So let me try the question again then. True or false: A motor carrier, like Gregory Trucking, should check the driving record of a tractor-trailer truck driver it employs on a yearly basis?

MR. O'CONNOR: Objection.

**A. Should you? Is that what the question was?**

Q. [By Mr. Tangredi] Should.

**A. Yes. I'll say yes to that. Yeah.**

Q. How about must check it on a yearly basis?

**A. Well, must -- I don't know if you're -- if you're having good service all the way through and you know -- I mean, you know, what's going on during that year with your drivers, you know. And -- but we have to turn them in. And our insurance company, I'm sure, checks them, you know, before they issue us again. And they will go over it with us, you know. Currently, we've got a -- a new company and -- and they've got their own rep -- rep that will come out and do safety for us. And they help us in -- in all the new stuff and**

Page 53

**everything that's going out and -- and get our safety record in the mode it should be in.**

Q. So I want to distinguish between a motor carrier, like Gregory Trucking --

**A. Yes.**

Q. -- and Gregory Trucking's insurance agent. Okay? So do you believe that a motor carrier, like Gregory Trucking, should check the driving record of a tractor-trailer truck driver it employs on a yearly basis?

MR. O'CONNOR: Objection. Asked and answered.

**A. Well, I'd say I don't know that we do that. No. I mean, we check all of our drivers out good -- we can pull the records up ourself. And then when somebody comes in and they fill out a form, and we get their health card, and we get their license and all, then we send them off. But we've already looked at their -- their driving -- previous driving record if it's somebody -- and anybody that we'll have for over a year -- and you're asking about a year -- we've done checked be -- and know everything before we put them in there. And we know everything that's happened during that year. But -- but we'll say, yes, to**

Page 54

the year question.
Q. Do I understand you to say that Gregory Trucking has access to somebody's driving history on a computer in the office?
**A. Well, you can pull up -- you can go in there and pull my record up or anybody's record up if -- if you got their license number and their driver's license, yes.**
Q. Okay. How long has Gregory Trucking been able to do that from the office on a computer?
**A. I don't know. I honestly don't.**
Q. Would it be since at least 2014?
**A. Well, I mean, I'm saying that -- that if you -- if you've got that, you know, you -- that information on somebody's driver's record and you can check it or either your insurance carrier can send it to you. You know, I -- I may be -- I'm not saying which one is -- if it's through the insurance company, they get it, or us. But I know that if I give them my license now, they can pull up my history. When that came about, I do not know.**
Q. Okay. So does Gregory Trucking check its drivers' driving histories through the

Page 55

computer in its office or do they re -- does Gregory Trucking rely on its insurance carrier?
**A. Both.**
Q. Okay. When was Wiley Lenue Hooks, Jr. first hired by Gregory Trucking?
**A. I'd say probably -- his dad drove for us for years. And then he had trucks leased through us. But I know that they was both driving for us back in the '90s some. And -- and they may have been -- I don't think senior was, but Wiley may have been when we got down from "X" amount of trucks to two in 2014 or 2013, whenever it was. And we started climbing back. So -- but I do know he did it. And Wiley was a good driver. And he -- and he would run good.**
Q. And was Wiley Lenue Hooks, Jr. a full-time employee at Gregory Trucking in -- in the '90s?
**A. Yes. He drove -- when his dad was on his own, then he did help him some. But he did drive for us on a permanent base, yes.**
Q. Okay.
**A. I couldn't tell you how many years.**
Q. When did that employment of Wiley Lenue Hooks, Jr. end?

Page 56

**A. I don't know. Probably in the -- I don't really know. I was busy in Catawba County up there in Newton. You know, one of the -- in 2010, '11, '12. It was a monstrous nightmare. And a lot of that going on, I don't really know the time period.**
Q. Did Wiley Lenue Hooks, Jr. get re-hired by Gregory Trucking in 2014?
**A. Yes. He came back to drive.**
Q. Okay. And was that in 2014?
**A. I would say.**
Q. Okay. And did he drive for Gregory Trucking for the -- in the year 2014?
**A. Well, whenever he come back, he drove for us. I don't -- I couldn't give you a specific date when he was hired, you know. But he had driven all the way up to the accident, yes, for us.**
Q. So he was hired again sometime in 2014. And he remained employed with Gregory Trucking until the date of the crash --
**A. Yes.**
Q. -- in Dalton, Mass. --
**A. Yeah.**
Q. -- is that right? And was he a

Page 57

full-time employee during that period of time?
**A. Yes. He was full-time.**
Q. And that period of time being 2014 to -- to the date of the crash?
**A. [Witness nods head up and down.]**
Q. Okay. Did Wiley Lenue Hooks, Jr. have a specific job?
**A. Well, he -- he -- he was a truck driver. That was his main thing.**
Q. Did he have any other jobs at Gregory Trucking?
**A. No. I don't know of anything he did.**
Q. So he was strictly a truck driver?
**A. Yes.**
Q. At Gregory Trucking?
**A. Yes.**
Q. Did he ever do any work for Gregory Leasing?
**A. No. There's nothing to do with Gregory Leasing.**
Q. Did he ever do any work for B&C Timbers?
**A. No.**
Q. Could Wiley Lenue Hooks hire anybody for Gregory Trucking?
**A. No. He could recommend somebody maybe.**

Page 58

Q. Could Wiley Lenue Hooks, Jr. fire anybody at Gregory Trucking?

**A. No.**

Q. Could Wiley Lenue Hooks make his own schedule at Gregory Trucking?

**A. No. I mean, we -- some of them we -- we give them some choices in loads that's -- that's available. You know, they had a little bit of flexibility there of where it went. Yes.**

Q. Okay. Did Wiley Lenue Hooks -- in the period of 2014 until the date of the crash, did he have the ability to bind Gregory Trucking to a contract?

**A. No.**

Q. Could he sign contracts?

**A. No. He signed the tickets when he'd get his load. All the drivers have to do that, that they have received that load and then they'll know their destination.**

Q. Could he bind the company to a financial commitment?

**A. No.**

**MR. O'CONNOR: Objection.**

Q. [By Mr. Tangredi] Okay. Could he spend company funds?

Page 59

**A. No.**

Q. Okay.

**A. Now, they do have fuel cards and breakdown cards if they've got something out on the road, you know. Or they call in if they're having some problems.**

Q. Okay. We're just going to mark that as Exhibit Number Eight.

(DEPOSITION EXHIBIT NUMBER EIGHT WAS MARKED FOR IDENTIFICATION)

Q. Mr. Gregory, but you don't have to look at it. We're going to skip that for now and we're going to go to the next one.

COURT REPORTER: This one has writing on it.

MR. TANGREDI: Oh. Thank you.

(DEPOSITION EXHIBIT NUMBER NINE WAS MARKED FOR IDENTIFICATION)

Q. So, Mr. Gregory, I'd like you to look at what's been marked as Exhibit Number Nine for me. And let me know after you've had a chance to look through it.

**A. Okay.**

Page 60

Q. Do you recognize that document?

**A. Well, it's a -- a -- what the drivers, I guess, would get for a safety program.**

Q. Okay. Is it -- if -- and if you look at the -- the bottom of the pages, it's Bates-stamped GT Fleet and then there's page numbers. Do you see those at the bottom?

**A. Yes.**

Q. So I may refer to a page number or you may want to refer to a --

**A. Okay.**

Q. -- page number. And that'll help us all understand where we're at. So is it fair to say that this is Gregory Trucking, Incorporated's Fleet Safety Program?

**A. Yes.**

Q. Okay. And was this policy in effect while Wiley Lenue Hooks was driving between 2014 up until the date of the crash?

**A. Yes.**

Q. Does it still apply today?

**A. Yes. I mean, we -- we've got the safety program and a manual. Yes.**

Q. Good. So could you look at Page Number 1,000?

Page 61

**A. Okay.**

Q. And it just starts at 1,000. It doesn't mean there are a thousand -- 999 pages before it. We just numbered it --

**A. Okay.**

Q. -- starting with 1,000. Will you look at that? Do you see where it says "Scope"?

**A. Yes.**

Q. Could you read the first sentence under "Scope"?

**A. [As read] "The objective of this program is to strive to reduce or eliminate motor vehicle accidents and associated injuries by following the safety practices established in this program. This program is integrated into our company's written safety and health programs, collaborative efforts that include all employees."**

Q. Thank you. Is this fleet safety program a mandatory program for drivers?

**A. Well, I mean, I'd say there's probably several you could get out there or whatever, but this is one that we choose.**

Q. Okay. Could you read the first sentence of the next paragraph for us?

**A. [As read] "Compliance with this program**

**is mandatory for all company commercial drivers."**
Q. So is it fair to say that this policy is mandatory for all the drivers of Gregory Trucking?
**A. Yes.**
Q. All right. It's not an optional policy, is it?
**A. No.**
Q. All right. Can we go to Page 1,002?
**A. Okay.**
Q. Do you see where it says "Hiring Process" at the top?
**A. Yes.**
Q. Could I ask you to read just the first sentence out loud, please.
**A. [As read] "Gregory Trucking, Incorporated employment hiring process is designed to ensure that the safest individual is hired to operate a motor vehicle."**
Q. Thank you.
MR. O'CONNOR: And in addition to the Bates-stamping, the highlighting is -- is your doing on the exhibit, correct?
MR. TANGREDI: To assist Mr. Gregory as to where we are referring.
MR. O'CONNOR: Just for the record.

MR. TANGREDI: Yeah.
Q. [By Mr. Tangredi] Let's talk a little bit about the Gregory Trucking hiring process. Do you know what a driver qualifications file is?
**A. I know -- yes, I know what the qualifications for drivers are. Yes.**
Q. Okay. Let me ask you to look at Exhibit Number Nine that's in front of you, Page 1,005, if you would.
**A. And I'm -- oh, 1,005. Okay.**
Q. And down near the bottom it talks about qualification files --
**A. Yes.**
Q. -- do you see that?
**A. Yes.**
Q. And do you see the last sentence? It says, [as read] "The following information is required for each driver."
**A. Uh-huh.**
Q. Does it say that?
**A. Yes.**
Q. Okay. And it lists nine items; is that correct?
**A. Yes.**
Q. And I'll read them. Number One, driver

application for employment. Number Two, copy of driver's license. Number Three, hire date. Four, inquiry of previous employers in the past three years. The next one, inquiry to state agencies. Medical examiner's certificate. Number Seven, driver's road test examination results. Number Eight, certificate of road test. And, nine, annual MVR and review of driving record. Did I read that --
**A. Yes.**
Q. -- accurately? And it continues on to 106, I'm sorry. There's two more. Number Ten, annual driver's certificate of violations. And the last one, annual review of driving record. Did I read those accurately?
**A. Yes.**
Q. Okay. Now, as part of this lawsuit I've requested that Gregory Trucking provide me with a copy of the driver's qualification file for Wiley Lenue Hooks. Are you aware of that?
**A. No. I mean, I don't know what you asked for as far as with him. No.**
Q. In preparing for your deposition today as the representative of Gregory Trucking, are you aware that I had asked for a copy of the driver's

qualification file?
**A. Well, I read through most of these papers, you know. I'm not -- I don't know what all you've got there.**
Q. Well, let's take a look. So Exhibit Number 10 is being placed in front of you. And this is Gregory Trucking's initial response to plaintiff's request for certain documents. Do you see that on the front page?
(DEPOSITION EXHIBIT NUMBER TEN WAS MARKED FOR IDENTIFICATION)
**A. Yes.**
Q. And Request Number 106 asks for the dryer's -- driver's qualification file of Wiley Lenue Hooks, Jr. since 2014, as required by 49 CFR Section 391.51(a). Do you see that on the front page of Exhibit Ten, Number 106?
**A. Okay. Yes.**
Q. Okay. And the response was to see documents attached as Exhibit One. Do you see that?
**A. Yes.**
Q. All right. And do you see Exhibit One is attached to Exhibit Number Ten. Do you see

Page 66

that?
**A. Yes.**
Q. Okay. And do you see at the bottom we have Bates-stamped them with numbers that start with GT DQ Page 1,000 --
**A. Yes.**
Q. -- through 1,031. Do you see that?
**A. Yes.**
Q. Okay. So this would be what Gregory Trucking has produced as the driver's qualification file; is that correct?
**A. Yes.**
Q. And did Gregory Trucking include everything that it had regarding the driver's qualification file of Wiley Lenue Hooks, Jr.?
**A. I would say if they had anything, it's here. Yes.**
Q. All right. So going back through Exhibit Number Nine, Page 1,005 -- and Exhibit Number Nine is --
**A. Yes.**
Q. -- once again, Gregory Trucking's Fleet Safety Program. And Page 1,005 talks about the qualification files. And it says, [as read] "The following information is required for each

Page 67

driver." And it listed 11 items, correct, that we went over?
**A. Yes.**
Q. Okay. So the items that should be -- that are required to be in the Gregory Trucking qualification file of Mr. Hooks, there should be, number one, a driver application for employment, correct?
**A. Yes.**
Q. Do you see in Exhibit Number Ten anywhere the driver application for employment of Mr. Wiley Lenue Hooks?
**A. Now, you're talking about where you fill out an application?**
Q. Well, the Gregory Trucking Fleet Safety Program, under qualification file, says, [as read] "The following information is required for each driver. Number one, driver application for employment."
**A. Well, when he came back, I would say that, you know, I had hired him previously. And then we had checked his driver's record, so he was eligible to drive. And so he was hired back.**
Q. So do you see his driver's application for employment anywhere --

Page 68

**A. No.**
Q. -- in the documents that were produced? No?
**A. No.**
Q. Item Number Three asks for the hiring date to be in the driver's qualification file. Do you see anything that indicates the hiring date of Wiley Lenue Hooks in Exhibit Number Ten?
**A. Well, I mean, I'd say they -- you know, they've got a date there when we hired him back, whatever his first week of his paycheck, you know.**
Q. Could you point out the document that -- that shows that?
**A. No, I cannot.**
Q. Does it exist?
MR. O'CONNOR: Objection.
**A. Well, I'm sure there's one. I mean, I'm sure there's a -- a date that he was hired back. Yes.**
Q. [By Mr. Tangredi] But can you find it anywhere in what's been presented by Gregory --
**A. Well --**
Q. -- Trucking to be the driver's --
**A. -- no, I can't. I can't see it. No. But I'm sure I can get you a date.**

Page 69

Q. Is it in the document Exhibit Number Ten anywhere?
**A. Well, I don't know. I don't see one. No.**
Q. Okay. Let's go back to the driver qualification file requirements in Exhibit Nine, Item Number Five -- I'm sorry -- Four. [As read] "Inquiry to previous employers in the past three years." Can you show us in the driver's qualification file, Exhibit Nine, where that is?
**A. No. But he had been driving for his daddy --**
Q. Okay.
**A. -- for those years.**
Q. So there's no inquiry to his previous employers for the past three years?
**A. Well, I mean, you know, his -- his daddy, I think, came over there with him and asked us to hire him back because he was shutting down. His health was bad. And he's deceased now.**
Q. So if you look at the Gregory Trucking Fleet Safety Policy on Page 1,005, at the bottom, it says the following information is required for each driver. Is it optional to have this?
**A. Well, it -- no.**

Page 70

Q. It's required?
**A. Yes. I mean -- but, I guess, since Wiley had already been working with us, you know, he -- he wasn't considered a new employee, I mean, to me.**
Q. But it doesn't say new employees. It says, [as read] "The following information is required for each driver." Right?
**A. Yes.**
**MR. O'CONNOR: Objection.**
Q. [By Mr. Tangredi] All right. So we're talking about an inquiry to the previous employers in the past three years, correct?
**A. Yes.**
Q. And --
**A. That would be --**
Q. -- Mr. Hooks had not worked for Gregory Trucking --
**A. He had not.**
Q. -- for many, many years, correct?
**A. No. He was working for Wiley Hooks Trucking.**
Q. And there's no inquiry to Wiley Lenue Hooks, Sr.'s trucking company?
**A. He didn't have one. His dad did.**

Page 71

Q. The next one on the list, Number Five, inquiry to state agencies. Could you show me in Mr. Hook's driver's qualification file where that is?
**A. The state what?**
Q. So if you look at Page 1,005 --
**A. Yes.**
Q. -- on Exhibit Number Nine, the fifth one down -- do you see it --
**A. Yes.**
Q. -- inquiry to state agencies? Could you show me where in Mr. Hooks' driver's qualification file that is?
**A. What is the inquiry to state agencies? What does that --**
Q. Well, it's Gregory Trucking's policy. Perhaps you can tell us.
**A. No. I -- I'd like -- for the state, you know, I mean, we're -- he's checked out. Yes.**
Q. If he's checked out, does it exist in the driver's qualification file?
**A. No, I do not find it in here.**
Q. Okay. Number Seven, driver's road test examination results. Do you see where it says that?

Page 72

**A. No. But he has had that -- has been rode with, yes.**
Q. So let's -- let's just back up and -- and take it one step at a time. On Page 1,005 --
**A. Yes.**
Q. -- do you see where Gregory Trucking's Fleet Safety Policy requires a driver's road test examination result?
**A. I do not see that in this file.**
Q. Do you see it on Page 1,005?
**A. I see that.**
Q. Okay.
**A. Yes.**
Q. So now let's go to the driver's qualification file. Is the driver's road test examination result in the driver qualification file that's been provided by Gregory Trucking?
**A. No. Like I said, he had driven for us prior and we knew his qualifications.**
Q. But we're not talking about qualifications. If we go back to Page 1,005 on Exhibit Number Nine, sir --
**A. Yes.**
Q. -- we're talking about the driver's road test examination results. Is that anywhere in his

Page 73

driver's qualification --
**A. No.**
Q. Okay. The next item requires that in his driver's qualification file there's a certificate of road test. Do you see where it says that on Page 1,005? Second from the bottom.
**A. No.**
Q. You don't see that?
**A. Well, I see that. Yes.**
Q. Okay.
**A. But I don't see it in here.**
Q. Okay. So -- so now I want to ask you the next question, which is do you see a copy of the certificate of road test in the driver's qualification file that was provided by Gregory Trucking?
**A. No.**
Q. Okay. And the last item on Page 1,005, annual MVR and review of driving record. Do you see where it says that on page --
**A. Yes.**
Q. What is MRV -- MVR? I'm sorry.
**A. Motor vehicle record.**
Q. Okay. Annual motor vehicle record and review of driving record. Do you see -- can you

Page 74

point --
**A. It's not in here, but I know that it's checked. And our insurance checks it, so.**
Q. So let -- let me ask you. Can you point out in the driver's qualification file provided by Gregory Trucking where the annual motor vehicle record and review of driving record is?
**A. No. No.**
Q. Okay. So if we go back to Page 1,005, sir, in just that last item, it says, [as read] "Annual motor vehicle record and the review of driving record." Is that actually two separate documents or is that just one?
**A. I don't know.**
Q. So would there be an annual motor vehicle record and then a review of that driving record?
**A. Well, I mean, if you get the driver's record, then you'd go over it. I guess there's a review made of it, you know.**
Q. Okay. But that document, the annual motor vehicle review, is not in the driver's qualification file provided by Gregory Trucking?
MR. O'CONNOR: Objection. Asked and answered.

Page 75

Q. [By Mr. Tangredi] It's not there, sir?
**A. Huh?**
Q. It's not there?
MR. O'CONNOR: You can answer the question.
Q. [By Mr. Tangredi] Is it in the driver's --
**A. No.**
Q. -- qualification file?
**A. No.**
Q. Thank you. If we go to Page 1,006 --
**A. Okay.**
Q. -- the last item, annual review of driving record. Do you see -- if you look at the driver's qualification file provided by Gregory Trucking, do you see that annual review of driving record for Wiley Lenue Hooks --
**A. No.**
Q. -- anywhere? Okay. I want you to look at Gregory Trucking's fleet safety program. It's Exhibit Number Nine at Page 1,005.
**A. 1,005. Okay.**
Q. And do you see about maybe a third of the way down it talks about motor vehicle records? Do you see where it says that?

Page 76

**A. Uh-huh.**
Q. Do you see where it says that, sir?
**A. Yes, I see it.**
Q. Could you read that first sentence out loud?
**A. [As read] "Motor vehicle records. Gregory Trucking will check the motor vehicle records MVR" --**
**MR. O'CONNOR: Can I ask that you just finish reading the sentence?**
Q. Please finish --
**A. Oh.**
Q. -- the sentence.
**A. -- [as read] "of all authorized commercial drivers on the annual basis."**
Q. And does an annual basis mean yearly?
**A. Yes.**
Q. So is it fair to say that if Mr. Hooks was hired in 2014 and worked until August of 2016, should there be three annual motor vehicle records in Mr. Wiley Lenue Hooks' driver's qualification file?
**A. Yes.**
Q. And is it fair to say we have been provided with zero?

Page 77

**A. Yes.**
Q. Let's go back to the fleet safety policy, Exhibit Number Nine, Page 1,001. Do you see on Page 1,001 where it says commercial driver qualification criteria at the top?
**A. Yes.**
Q. In the first sentence, does it say, [as read] "Commercial driver applicants will not be considered for employment unless they meet the minimum requirements listed below." Does it say that?
**A. Yes.**
Q. And if we go -- skip down to four, highlighted in green, could you read the fourth one?
**A. [As read] "Possess a current and valid commercial driver's license or a chauffeur's license and proper endorsements for the type of commercial vehicle to be driven."**
Q. Can you go to Exhibit Number Ten, which is the driver's qualification file. Do you see that?
**A. Yes.**
Q. Do you have that in front of you?
**A. Yes.**

Page 78

Q. And those are Bates stamped. Would you look at Page 1,021?
**A. Okay.**
Q. What is on Page 1,021?
**A. It's his driver's license.**
Q. Whose driver's license?
**A. Wiley Hooks.**
Q. Junior, correct?
**A. Yes.**
Q. And can you see when it says it expires?
**A. Yes.**
Q. What date is it?
**A. It's 2/12/16.**
Q. Okay. Did Gregory Trucking ever get a copy of his license after this one expired on 2/12/16?
**A. Yes.**
Q. Okay. Do you know where it is?
**A. It's in the office somewhere.**
Q. Okay. Do you know why it wasn't provided?
**A. No.**
**MR. O'CONNOR: I have a copy of it. I can provide it now.**
Q. [By Mr. Tangredi] Did you ever verify

Page 79

with the North Carolina Department of Motor Vehicles he had a valid license --
**A. Yes, we did.**
Q. Let me -- let me finish. I've got more. I should ask shorter questions, but let me finish. Did you ever verify with the North Carolina Department of Motor Vehicles that he had a valid license after this one expired on 2/12/16?
**A. Yes.**
Q. Okay. How did you do that?
**A. We sent that thing through the -- we went through our insurance agency and they checked it and had the DMV in Raleigh, you know, and -- and they verified everything.**
Q. And am I correct that Gregory Trucking has access to the registry of motor vehicles and could have checked on it also? Is that right?
**A. Excuse me?**
Q. Am I correct that you said earlier that Gregory Trucking has access to the registry of motor vehicles and could check the validity --
**A. Yes. And we probably did, but we wanted to make sure so we done a follow-up.**
Q. And when you say you -- you had your insurance company do it, did they provide you with

Page 80

any documentation?
**A. Well, I think after they checked everything, they probably -- I know that they sent some stuff up there saying it was okay -- he was okay.**
Q. So there would be the information that your insurance company sent you, correct --
**A. Yes.**
Q. -- about Mr. Hooks and his license?
**A. Yes.**
Q. And you have a copy of Mr. Hooks' license --
**A. Yes.**
Q. -- also? And is it fair to say neither one of those items have been provided to us?
**A. Well, I think -- yes, we got a copy of it.**
Q. Okay. But in the driver's qualifications file that we went over previously, right -- we're talking about Exhibit Number Ten -- were either of those documents, either the insurance company records or a copy of Mr. Hooks' license after it -- the expiration on 2/12/16, were they included?
MR. O'CONNOR: Objection.

Page 81

**A. No. But I don't know why they wasn't because we had a copy. It just --**
Q. [By Mr. Tangredi] Are you aware that Wiley Lenue Hooks, Jr. did not possess a current and valid CDL license since February of 2016?
MR. O'CONNOR: Objection.
**A. Well, I -- I -- I knew that there was a lapse in there, but it -- he got his license back. But there was a -- I know that there was like a 30-day period there that Wiley was doing the process, now whatever they done. No, he did not.**
Q. [By Mr. Tangredi] Are you aware that his registry of motor vehicle records would have indicated that he did not have a valid CDL license as of February 2016?
**A. Well, when we checked everything, it -- he had it. I mean, what -- the information we got says he did. If it says it didn't, we did -- we did not get that information.**
Q. Is it fair to also say that you didn't get his driving motor vehicle history for three years when he was employed between 2014 and the date of the crash in 2016?
MR. O'CONNOR: Objection.
**A. Did I what?**

Page 82

Q. [By Mr. Tangredi] Is it fair to say Gregory Trucking did not get his motor vehicle record from the registry during his employment between 2014 and 2016?
**A. If he didn't have any kind of --**
**MR. O'CONNOR: Objection.**
**A. -- violations, no.**
Q. [By Mr. Tangredi] Okay. And is it fair to say that Gregory Trucking's own fleet safety policy requires Gregory Trucking to do that on an annual basis?
MR. O'CONNOR: Objection.
**A. According to this right here, yes, it does.**
Q. [By Mr. Tangredi] Okay. And it wasn't done; is that right?
**A. No.**
Q. Let's go back to the Gregory Trucking Fleet Safety Program, Page 1,001, requirements for employment as a driver for Gregory Trucking. Page 1,001; do you have that in front of you?
**A. Yes.**
Q. And Page 1,001 is the commercial driver's driver qualification criteria, right?
**A. Yes.**

Page 83

Q. And it say, [as read] "Commercial driver applicants will not be considered for employment unless they meet the minimum requirements listed below." Correct?
**A. Yes.**
Q. And down below, it says, [as read] "Has not been convicted of any of the following violations within the previous five years." Do you see where it says that?
**A. Yes.**
Q. And then it lists a bunch of violations, correct?
**A. Yes.**
Q. The first one is driving under the influence of alcohol and/or drugs. Do you see that?
**A. Yes.**
Q. And the second one is reckless driving or speed contests.
**A. Yes.**
Q. All right. And then if we skip down to the seventh one, it says, [as read] "Improper or erratic lane changing." Do you see those?
**A. Yes.**
Q. So if someone who wanted a job driving for Gregory Trucking had a con -- a violation of one of those offenses in the last five years, they wouldn't be qualified to drive for Gregory Trucking; is that accurate?
**A. That's what it says there in five years, yes.**
Q. And that's the Gregory Trucking Company policy?
**A. If this is our -- whatever it is here -- form, yes.**
Q. And it is your form, isn't it?
**A. Yes. It says Gregory Trucking Fleet Safety Program.**
Q. Okay. So are you aware that on July 27th, 2013, Wiley Lenue Hooks was convicted of reckless driving in Catawba County, North Carolina?
**A. Where?**
MR. AMOS: Catawba.
MR. O'CONNOR: Catawba.
MR. TANGREDI: Catawba.
**A. No.**
Q. [By Mr. Tangredi] You're not aware of that?
**A. I mean, if -- unless it was on that record when they came in, but --**
Q. Are you aware that that information is on his driving record?
**A. I -- I haven't seen his driving record in a long time, so, no.**
Q. So you didn't check it before hiring Mr. Wiley Lenue --
**A. Well --**
Q. -- Hooks?
**A. -- like I said, I --**
**MR. O'CONNOR: Objection.**
**A. He had worked for us for years previous to that.**
Q. [By Mr. Tangredi] But he hadn't worked for you for years previous to 2014, right?
**A. Yes.**
Q. How many years approximately?
**A. I could -- I don't know.**
Q. More than five?
**A. No, I doubt that.**
Q. More than three?
**A. Probably -- I don't know. I don't know what -- when he -- when he left or came back.**
Q. But there was a gap?
**A. They were [sic] a gap, yes.**

Page 86

Q. Are you aware that on January 11th, 2014, Wiley Lenue Hooks, Jr. was convicted of an erratic lane change in Iredell County?
**A. Iredell.**
Q. Iredell. Were you aware of that?
**A. No.**
Q. Are you aware that that information was on his Department of Motor Vehicle driving record? Are you aware of that?
**A. No.**
Q. Are you aware that on March 8th, 2015, Wiley Lenue Hooks, Jr. was convicted of failing to reduce speed in Forsyth County, North Carolina?
**A. Well, I probably knew of the speeding ticket. Yes. I mean, we've -- we've not gotten -- we have had some speeding tickets over the years, as every -- all of them have.**
Q. If you're aware of it, is there any kind of action that Gregory Trucking takes when a driver --
**A. Well, I'll talk to him just --**
Q. If you let me finish, Mr. Gregory.
**A. Okay.**
Q. I'm sorry. I -- I know you're anticipating my question. Is there any action

Page 87

that Gregory Trucking Corporation takes if a driver is issued a speeding ticket?
**A. Yes. We -- well, I talk to them about it, yes, and tell them, you know, we don't need that. And they don't need it too because we don't pay them. And, you know, after they get so much, they could lose their CDLs, you know. And on any kind of a violation, we -- we do sit down with them -- or I do.**
Q. And other than talking with them about it, is there -- are there any other repercussions?
**A. Well, if it continues, then they would -- it could be terminated, yes.**
Q. Did you say a minute ago that they don't get paid?
**A. We won't pay for their ticket, you know. Just like for a log book violation or anything that's -- that they failed to do. If it's something that we done, then we have to if they was --**
Q. Are you aware that on January 31st, 2003, in Iredell County Wiley Lenue Hooks refused a chemical test?
**A. No.**
Q. Are you aware that on July 23rd, 2004,

Page 88

in Preble, Ohio, Wiley Lenue Hooks was cited for an overloaded tractor-trailer truck?
**A. Well, yeah. I could I say that we've had overweight tickets before. Yes.**
Q. Are you aware of that one in Ohio?
**A. Not in 2005. I mean --**
Q. 2004.
**A. Four. I couldn't tell you that.**
Q. Are you aware that that's on his driving record?
**A. I do know that overweights go on them, yes. We don't need that, no.**
Q. Are you aware that on November 23rd, 2004, in Missouri Wiley Lenue Hooks was cited for operating with a radar detector?
**A. No.**
Q. Are you aware that's on his driving record?
**A. No.**
Q. Are you aware that on July 25th, 2005, in Patrick, Virginia, Wiley Lenue Hooks had no record of duty status or no log book?
**A. No.**
Q. Are you aware that that's on his driving record?

Page 89

**A. Well, I mean, I've probably seen -- if it was a log book or overweights or anything like that, yes, I see them.**
Q. Are you aware that on October 3rd, 2007, Wiley Lenue Hooks was cited for speeding in Wisconsin?
**A. I mean, I -- that far back, you know, I may have seen the speeding tickets. I don't know.**
Q. Are you aware that would be on his driving record in 2014 if it -- if you saw it?
**A. Well, it may have been on there. But that would have been like eight or 10 years too.**
Q. Are you aware that on June 1st, 2008, in Iredell County Mr. Hooks was cited for driving with a revoked license?
**A. No. He wouldn't have been driving for us then if that's the case.**
Q. Are you aware that that's on his driving record?
**A. Well, I probably seen that. Yes.**
Q. Are you aware that on October 1st, 2008, in Iredell County, North Carolina, Mr. Hooks was cited for driving with a revoked license and no inspection sticker? Are you aware of that?
**A. No.**

Page 90

Q. Are you aware --
**A. I mean, I --**
Q. -- that that's on his driving record?
**A. If it's on his driving record, I've seen it. Yes.**
Q. Are you aware that on September 8th, 2009, in Iredell County, Mr. Hooks was cited for driving with a revoked license and no inspection sticker and an expired registration? Are you aware of that?
**A. No.**
Q. Are you aware that that's included on his official driving record?
**A. I can say I would have seen these. Yes.**
Q. Are you aware that Wiley Lenue Hooks, Jr. has numerous criminal convictions on his record before the crash that killed George Forbes?
MR. O'CONNOR: Objection.
**A. Criminal now. What -- when you criminal, what?**
Q. [By Mr. Tangredi] Well, are you aware that on May 19th, 1990, in Wilkes County, he pled guilty to driving while impaired? Are you aware of that?
**A. Huh-uh.**

Page 91

Q. I'm sorry, can you --
**A. No.**
Q. Are you aware that that's on his official driving record?
**A. Well, I would have knowed when, you know, nothing. But if it was on his driving record, I had probably seen it. Yes.**
Q. Are you aware that on July 22nd, 1990, in Wilkes County Wiley Lenue Hooks pled guilty to driving while impaired? So we have two of them --
**A. No.**
Q. -- in Wilkes County.
**A. Yes.**
Q. May of two thousand -- in 1990 and then July of 1990. Are you aware of those?
**A. Huh-uh.**
Q. You need to say --
**A. No.**
Q. Are you aware that that's on his official driving record?
**A. No.**
Q. Okay. Are you aware that on January 31st, 2003, in Iredell County Wiley Lenue Hooks pled guilty to driving while impaired?
**A. There were some -- some years that he**

Page 92

**wouldn't have. I can say back 18 or 19 years ago, you know.**
Q. Are you aware of them -- that in 2003?
**A. In '03? No.**
Q. Are you aware that that's on his driving record?
**A. I probably seen it when I looked at it. But he probably -- he done drove for us prior to all that though. He wasn't driving during that time.**
Q. Are you aware that on July 23rd, 2013, in Catawba -- what county is that?
**A. Catawba?**
Q. -- Catawba --
**A. Catawba.**
Q. -- County Wiley Lenue Hooks was arrested for the fourth time for operating while impaired?
MR. O'CONNOR: Objection.
**A. When?**
Q. [By Mr. Tangredi] July 23rd, 2013.
**A. No.**
Q. Are you aware that that would be on his official driving record in 2014?
**A. Well, it would have been on there, I guess. Yes.**

Page 93

Q. All right. Are you aware that on January 31st, 2003, in Iredell County he -- Wiley Lenue Hooks possessed marijuana and pled guilty?
**A. Huh-uh. No.**
Q. Are you aware that that's on his driving record?
**A. No.**
Q. Was Gregory Trucking aware that on August 1st, 2016, that Wiley Lenue Hooks, Jr. had prior crashes with a tractor-trailer?
MR. O'CONNOR: Objection.
**A. No.**
Q. [By Mr. Tangredi] Was Gregory Trucking aware on August 1st, 2016, that Wiley Lenue Hooks had prior crashes while driving his personal vehicles?
**A. No. I -- I mean, I don't know if it was -- when was it?**
Q. August 1st of 2016. Now, that's when it was. But as of August 1st, 2016, was Gregory Trucking aware that Wiley Lenue Hooks had prior crashes while driving his personal vehicles?
**A. No.**
Q. And on August 1st, 2016, was Gregory Trucking aware that Wiley Lenue Hooks had failed a

Page 94

medical test to get his CDL license?
MR. O'CONNOR: Objection.
**A. Had failed the med -- we -- we didn't have any prior stuff to that. No.**
Q. [By Mr. Tangredi] Okay. Are you aware that the failure of his medical test for his CDL license was on -- is on his official driving record?
MR. O'CONNOR: Objection.
**A. Well, we had a valid CDLs and everything that -- and then he was vetted good, so.**
Q. [By Mr. Tangredi] Are you aware that it was on his official driving record that he had failed the medical test?
**A. No. He couldn't have gotten his CDLs if he had --**
Q. Well, are you aware he didn't have a CDL after February in 2016?
MR. O'CONNOR: Objection. Asked and answered.
**A. No. That was during that period of these two licenses, so.**
Q. [By Mr. Tangredi] Are you aware that Wiley Lenue Hooks had a driver's license in both Florida and California?

Page 95

**A. No. I knew he lived in California for a while in his younger time. Now, I do know that so he probably did have one there.**
Q. Did Gregory Trucking ever discipline Wiley Lenue Hooks, Jr. while he was employed by Gregory Trucking?
**A. I disciplined him several times verbally, yes, and talked to him about things, yes.**
Q. What kind of discipline, for what reasons?
**A. Well, when I -- I felt like it -- he may have been pushing it a little bit or, you know, like I said if -- speeding or any of them things. You know, I'd tell him we just could not have it.**
Q. Was there ever any official paperwork created about the discipline taken against Wiley Lenue --
**A. It wasn't written down, no.**
Q. Do you agree that Wiley Lenue Hooks was not a qualified tractor-trailer truck driver since at least 2013?
MR. O'CONNOR: Objection.
**A. That he was what?**
Q. [By Mr. Tangredi] Not a qualified

Page 96

tractor-trailer truck driver since at least 2013?
MR. O'CONNOR: The same objection.
**A. No.**
Q. [By Mr. Tangredi] You don't agree?
**A. He was -- he was a -- he -- he was a good truck driver.**
Q. I didn't ask you if he was a good truck driver. I asked you if he was a qualified truck driver?
**A. He was a qualified --**
**MR. O'CONNOR: Objection.**
**A. -- CDL license holder, yes.**
Q. [By Mr. Tangredi] By what criteria was he qualified?
**A. Well, he had driven for years. And, you know -- I mean he -- yes, he'd had some troubles, but he -- he could drive. He was a good driver.**
Q. But you'd have to agree he didn't meet the requirements set out in the Gregory Trucking Fleet Safety Program, right?
**A. No. He didn't --**
**MR. O'CONNOR: Objection.**
**A. -- some of these things he didn't do, yes.**
Q. [By Mr. Tangredi] And the Gregory

Page 97

Trucking Fleet Safety Program requires that you not have those problems to be hired; is that right?
**A. Well, it's -- you know, I hire the drivers. And I -- all of them I know and I -- I vet them. And I know they're -- what they're capable of and what they're not. Wiley's been driving a long time. Well, yeah. Buster, I mean. I'm sorry.**
Q. Do you agree that Wiley Lenue Hooks' past driving and criminal history made it foreseeable he would be involved in a crash?
MR. O'CONNOR: Objection.
MR. SCHULER: Objection.
**A. Repeat that.**
Q. [By Mr. Tangredi] Do you agree Wiley Lenue Hooks' past driving and criminal history made it foreseeable he would be involved in a crash?
**A. No.**
**MR. O'CONNOR: The same objection.**
Q. [By Mr. Tangredi] Do you agree that in early August of 2016 it was foreseeable that Wiley Lenue Hooks, Jr. was going to hurt someone while driving a tractor-trailer?

Page 98

A. No.
MR. O'CONNOR: Objection.
Q. [By Mr. Tangredi] Why not?
MR. O'CONNOR: Objection.
A. Well, he -- you know, accidents will happen. But he was a -- you know, he knew how to drive a tractor-trailer, you know. And he wasn't out there to do an accident, no.
Q. [By Mr. Tangredi] Could you tell me what an accident means to Gregory Trucking?
MR. O'CONNOR: Objection.
A. Well, it's -- it's a bad thing. You don't need accidents.
Q. [By Mr. Tangredi] What does "accident" mean?
A. An accident means that they've been a -- some trouble on the road, you know, a turnover or a -- you know, more than maybe one vehicle involved. Lots of things.
Q. I'd like you to go back to Exhibit Number Six. And that would be the Gregory Trucking Web page. And I want you to go to the third page. Do you have that in front of you?
A. Yes.
Q. And could you read that highlighted

Page 99

portion in its entirety?
A. [As read] "Our --
MR. O'CONNOR: The same objection as to the date and the Web site. You can read it.
A. [As read] "Our drivers are carefully screened before being hired, are request to be -- to be drug free. We stress during their employment they be courteous, polite to all of our customers."
Q. [By Mr. Tangredi] And just for the record, I want to read it again. I think you -- you read it accurately. It just could have been hard to hear with the air conditioning going. [As read] "Our drivers are carefully screened before being hired and are required to be drug free. We stress during their employment that they be courteous and polite to all our customers." Is that what it says?
A. Yes.
Q. And do you believe that Wiley Lenue Hooks was carefully screened before being hired?
MR. O'CONNOR: Objection.
A. Yes. I mean, I knew him for all my life. And I knew he was a good driver. He drove --

Page 100

Q. [By Mr. Tangredi] And he may be a great driver. He may be able to maneuver a tractor-trailer truck. I'm not asking about his skills as a driver. I'm asking about his qualifications. Was he qualified to drive when he was hired in 2014?
MR. O'CONNOR: Objection.
A. Yes.
Q. [By Mr. Tangredi] Okay. All right. Let's do one more exhibit, then we're going to take a break because we're running out of film.
MR. TANGREDI: What number was that?
COURT REPORTER: Eleven.
MR. TANGREDI: Thank you
(DEPOSITION EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION)
Q. [By Mr. Tangredi] Mr. Gregory, can you look at Exhibit Number 11 for us?
A. Yes.
Q. Do you recognize Exhibit Number 11?
A. It's a Federal Motor Carrier Safety Administration form.
Q. Called an OP-1, correct?

Page 101

A. Yes.
Q. And it -- it's an application by Gregory Trucking for motor carrier authority -- motor carrier authority; is that right?
A. Yes.
Q. If you look at the last page -- and they've been numbered with the prefix INV -- Pages 1,704 through 1,708. If you look at Page 1,708 --
A. Okay.
Q. -- at the bottom, who -- who signed for this motor carrier authority?
A. It says Martha's down there.
Q. Okay. And is Martha Somers somebody who had authorization to --
A. Yes.
Q. -- fill out this application --
A. Yes.
Q. -- for Gregory Trucking?
A. Yes.
Q. Okay. And it's -- if you look above her signature at the top, does it indicate -- indicate it's signed under oath and subject to the pains and penalty of perjury?
A. Yes.
Q. Okay. And this application was

Page 102

submitted to the Federal Motor Carrier Safety Administration?
**A. Yes.**
Q. Okay. And do you know what the primary mission is of the Federal Motor Carrier Safety Administration?
MR. O'CONNOR: Objection.
**A. You said we was trying to get authority, right?**
Q. [By Mr. Tangredi] Yeah.
**A. Yes.**
Q. That's what this application is --
**A. Yes.**
Q. -- right? And you're applied to the Federal Motor Carrier Safety Administration; is that what --
**A. Yes.**
Q. Okay. Do you know what the mission of the Federal Motor Carrier Safety Administration is?
MR. O'CONNOR: Objection.
**A. No, I've not read it.**
Q. Okay.
**A. Where is it?**
Q. [By Mr. Tangredi] It's not on that

Page 103

document. Do you agree that the Federal Motor Carrier Safety Administration regulates the trucking industry?
**A. Yes.**
Q. As a result of submitting this application, was Gregory Trucking granted authority to operate as a motor carrier?
**A. I mean, we've got authority. I don't -- I don't know how far that authority goes as far as --**
Q. Okay.
**A. -- a motor carrier. Yes.**
MR. TANGREDI: Okay. This is probably a good place to take a break so we can change the film.
THE VIDEOGRAPHER: All right. One moment, please. We're going off the record. The time now is 3:58.
[Recess from 3:58 p.m. to 4:12 p.m.]
THE VIDEOGRAPHER: We are back on the record. The time now is 4:12.
MR. TANGREDI: Good, Mr. Wyatt?
Q. [By Mr. Tangredi] Mr. Gregory, I want to just finish up with Exhibit Number 11 that's in

Page 104

front of you. And, again, Exhibit Number 11 being an application by Gregory Trucking for motor carrier authority; is that right?
**A. Yes.**
Q. If you look at Page 1,706. And that would be Section IV at the top. Does that say Safety Certification for Motor Carrier Applicants Only?
**A. On one-seven -- where is that at?**
Q. Page 1,706.
**A. Application Motor Carrier and Broker Authority.**
Q. And -- and in the left hand margin, it says Section IV?
**A. Yes.**
Q. And it says Safety Certification (Motor Carrier Applicants Only); is that right?
**A. I must be -- what -- what page? Oh, yeah. Okay. Wait a minute. Five?**
Q. Page 1,706. Do you have it?
**A. 1,706. Okay. All right.**
Q. And up top it says Section IV in Roman numerals.
**A. Yes.**
Q. Do you see that? Okay. And underneath,

Page 105

it says Safety Certification (Motor Carrier Applicants Only); is that right?
**A. Yes.**
Q. And Gregory Trucking was a motor carrier applicant only, right?
**A. Yes.**
Q. So Section IV applies, correct?
**A. Yes.**
Q. And the second paragraph in Section IV says, [as read] "Applicant has access to and is familiar with all applicable U.S. Department of Transportation regulations relating to the safe operation of commercial vehicles and the safe transportation of hazardous materials and will comply with these regulations." Did I read that right?
**A. Yeah.**
Q. It goes on to say, [as read] "In so certifying, applicant is verifying that at a minimum it, number one, has in place a system and an individual responsible for ensuring overall compliance with Federal Motor Carrier safety regulations." Did I read that properly?
**A. Yes.**
Q. Does Gregory Trucking have in place a

Page 106

system and an individual responsible for ensuring overall compliance with Federal Motor Carrier safety regulations?

**A. Yes. Linda does all of that now.**

Q. Okay. And did they have somebody in place in 2016?

**A. No, I wouldn't think they had -- well, I don't know. Only Martha was in there in '16.**

Q. Was there a system in place and an individual responsible for ensuring overall compliance with Federal Motor Carrier safety regulations in 2016?

MR. O'CONNOR: Objection.

**A. Yes, it would have been Martha.**

Q. [By Mr. Tangredi] Okay. Number Two, [as read] "The applicant can produce a copy of the Federal Motor Carrier safety regulations and the hazardous materials transportation regulations." Could Gregory Trucking produce a copy of the Federal Motor Carrier safety regulations --

**A. There was a copy of the --**

Q. -- in 2016?

**A. Well, I don't know what happened in '16 as far as this.**

Q. Well, you're here to tell us about 2016,

Page 107

on behalf of Gregory Trucking. We're looking at Number Two in that section.

**A. Well, I know we have all of the Federal regulations and stuff. So, you know --**

Q. Okay.

**A. -- I'd say yes.**

Q. Okay. Number Three, [as read] "Has in place a driver safety training orientation program." Did Gregory Trucking have in place a driver safety training program in 2016?

**A. Just my verbal from me.**

Q. Did you say "verbal"?

**A. Yeah. When I'd talked to them or either George would ride with them or something, you know, to check them out.**

Q. Number Four, [as read], "Has prepared and maintains an accident register." Did Gregory Trucking maintain an accident register in 2016?

**A. I don't know.**

Q. Okay. Number Five, [as read] "The applicant is familiar with Department of Transportation regulations governing driver qualifications and has in place a system for overseeing driver qualification requirements." Did Gregory Trucking have a -- have a -- was

Page 108

Gregory Trucking familiar with DOT regulations governing -- governing driver qualifications and had in place a system for overseeing driver qualification requirements?

**A. Yes. We were familiar with DOT regulations.**

Q. And did they have a system in place for overseeing driver qualification requirements in 2016?

**A. They was probably not -- nothing set up. No.**

Q. Number Six, [as read] "The applicant has in place policies and procedures consistent with DOT regulations governing driving and operational safety of motor vehicles, including drivers' hours of service and vehicle inspection, repair, and maintenance." Did Gregory Trucking have policies and procedures?

**A. Yes.**

Q. Okay.

**A. We have that, yes.**

Q. And the last one, [as read] "The applicant is familiar with and will have in place on the appropriate effective date a system for complying with the United States Department of

Page 109

Transportation regulations governing alcohol and controlled substances testing requirements."

**A. Yes.**

Q. And this document -- this OP-1 is signed under oath by Martha Somers, correct?

**A. Yes.**

Q. And Martha Somers had authorization on behalf of Gregory Trucking --

**A. Yes.**

Q. -- to sign that and make that application?

**A. Yes.**

Q. Thank you. Sir, is there a greater danger on our highways and roads than a fully loaded tractor-trailer?

MR. O'CONNOR: Objection.

**A. Repeat, please.**

Q. [By Mr. Tangredi] Sure. Is there a greater danger on the highways and roads than a fully loaded, unsafe tractor-trailer?

MR. O'CONNOR: Objection.

**A. Yes, I'd say there are some things.**

Q. [By Mr. Tangredi] Like what?

**A. Well, a drunk, meth head. Cell phones is terrible out there, you know. I mean, a**

Page 110

**tractor-trailer is a large unit. And it, you know, can do it. But -- you look at what's cell phones and texts does. And that's why I never did learn to text.**

Q. If Gregory Trucking determined that a tractor-trailer truck driver had a track record for being unsafe, would Gregory Trucking hire that driver?

MR. O'CONNOR: Objection.

**A. If a driver come in there to -- and I sat down with him, and I talked with him one -- and then his driver's records came up, no. You know, if I send them off to the insurance company and they okay them, then -- but no.**

Q. [By Mr. Tangredi] Is Gregory Trucking a safe motor carrier?

MR. O'CONNOR: Objection to form.

**A. Yes.**

Q. [By Mr. Tangredi] Does Gregory Trucking exercise reasonable care in selecting people to drive its tractor-trailer trucks?

**A. Yes.**

**MR. O'CONNOR: Objection.**

Q. [By Mr. Tangredi] Back in August of 2016, did anyone at Gregory Trucking have

Page 111

responsibility to determine if a driver was properly licensed before putting them in a tractor-trailer truck?

**A. Yes.**

Q. Who?

**A. Well, our -- the girls there in the office. But our insurance carrier wouldn't let us put nobody in there if they didn't vet them and check them, you know. We couldn't.**

Q. Back in August of 2016, did anyone at Gregory Trucking have responsibility to perform any kind of background check on the tractor-trailer truck drivers before putting them in a tractor-trailer truck?

**A. Yes. We would check them and -- and have our -- and our insurance company done most all of that because they got access to a whole lot more.**

Q. Would Gregory Trucking have a designated person to check the driving history themselves of a truck driver at Gregory Trucking?

**A. Yes.**

Q. Who was that?

**A. Well, now it's Linda Stroud.**

Q. Who was it in 2016?

Page 112

**A. Martha.**

Q. Martha Somers?

**A. Yes.**

Q. Did anybody perform criminal background checks at Gregory Trucking of its truck drivers?

**A. Only what would show up on their license.**

Q. Okay. Are you aware that 4,600,000 people were injured in motor vehicle crashes in 2016?

MR. O'CONNOR: Objection.

**A. No.**

Q. [By Mr. Tangredi] Do you know that information is readily available online for free?

**A. Well, I can't get it.**

Q. Do you know the National Safety Council puts that information out?

**A. Well, I mean, I -- I get paperwork all the time through motor carriers and through what they pull off, you know, for me. And I look at that. Yes.**

Q. Do you know that over 4,300 people were killed in crashes involving large trucks in 2016 according to the National Highway Traffic Administration?

Page 113

**A. No.**

**MR. O'CONNOR: Objection.**

Q. [By Mr. Tangredi] Do you know that that information is readily available?

**A. Well, I -- yes, evidently it is. I -- I haven't seen it. I mean, only what I can get, but I don't see them numbers. No.**

Q. Do you wish you knew that number back in August of 2016?

MR. O'CONNOR: Objection.

**A. Well, knowing that number, yes. I mean --**

Q. [By Mr. Tangredi] Is safety important at Gregory Trucking?

**A. Yes.**

Q. On a scale of one to ten, how important is it?

MR. O'CONNOR: Objection.

**A. Well, it's -- it's -- it's num -- high, you know. I mean, we want the best safety out there, you know.**

Q. [By Mr. Tangredi] So can you quantify it on a scale of one to ten?

**A. Nine, ten.**

Q. 19?

Page 114

**A. Yeah.**
Q. Okay. Good. In fact, Gregory Trucking claims in its corporate employee handbook that safety is a priority, correct?
**A. Yes.**
**(DEPOSITION EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION)**
Q. Mr. Gregory, Exhibit Number 12 was just placed in front of you. If I could direct your attention perhaps to the third page in. Could you tell us what Exhibit Number 12 is?
**A. Supplement Exhibit 95.**
Q. That's -- that's correct. Could you go one more page in to the third page?
**A. Okay.**
Q. Could you tell us what this document is?
**A. It's a handbook -- employee handbook.**
Q. For Gregory Trucking Company --
**A. Yes.**
Q. -- is that right? Have you seen this before?
**A. Yes.**
Q. Okay. Is this the current employee handbook at Gregory Trucking?

Page 115

**A. I would think so, yes.**
Q. Did this exist in 2016?
**A. Yes.**
Q. Okay. Could you look at Page 10 of 26?
**A. Ten?**
Q. Ten of 26, yeah, on Exhibit 12.
**A. All right.**
Q. Do you see at the top where it says safety and accident rules?
**A. Yes.**
Q. Could you read the first sentence there?
**A. [As read] "Safety is a priority at company."**
Q. Is there a higher priority than safety at Gregory Trucking, Mr. Gregory?
**A. No. Safety is a big thing.**
Q. Does Gregory Trucking Company have a safety officer?
**A. Well, George at -- at that particular time in 2'16 was -- yes.**
Q. So George was the safety officer in 2016?
**A. Well, he kept up with and made sure that they knew about them, yes.**
Q. And does George have a last name?

Page 116

**A. Campbell.**
Q. Campbell?
**A. Campbell. Campbell.**
Q. Campbell. Thank you. Does Gregory --
**A. But I -- I mean, myself, too.**
Q. You consider yourself a safety officer at Gregory Trucking?
**A. Yeah. I mean, they look to me.**
Q. Okay. Does Gregory Trucking offer any crash prevention courses to its tractor-trailer drivers presently?
**A. No.**
Q. Did it offer any crash prevention courses to its drivers in 2016?
**A. No. I mean, you know, don't want them having accidents. I don't know what you're really trying to say. I mean, about driving into the wall down here or something or what?**
Q. Do you know what a crash prevention program is?
**A. Well, avoiding the accidents. Yes.**
Q. So does Gregory Trucking offer any kind of crash prevention training to its tractor-trailer truck drivers --
**A. No.**

Page 117

Q. -- in 2016?
**A. No.**
**MR. O'CONNOR: Objection.**
Q. [By Mr. Tangredi] How about in 2015?
MR. O'CONNOR: Objection.
**A. No.**
Q. [By Mr. Tangredi] How about 2014?
MR. O'CONNOR: Objection.
**A. No.**
Q. [By Mr. Tangredi] Is Gregory Trucking aware that there are businesses out there that provide crash prevention training to tractor-trailer truck drivers?
**A. We know of -- yes, we do.**
Q. Okay. Does Gregory Trucking offer any kind of defensive driving courses to its tractor-trailer truck drivers presently?
**A. No.**
Q. Did it in 2016?
**A. No.**
Q. Did it in 2015?
**A. No.**
Q. Did it in 2014?
**A. No.**
Q. Does Gregory Trucking conduct driver

Page 118

safety meetings now presently?

**A. Yes.**

Q. Did it in 2016?

**A. We had meetings, yes. But it was -- most of the time it would be individually. We didn't have that many at that particular time. And they -- when they came in and out, I took care of it.**

Q. Okay. Was there any kind of written instruction that went along with it?

**A. No.**

Q. Any kind of textbook that went along with it?

**A. I didn't have a textbook. No.**

Q. Okay. Any other kind of material that was given to truck drivers?

**A. Not -- no, only the -- the handbook and then what -- the DOTs would send in stuff to give them and for them to go over.**

Q. So in the driver safety meetings conducted by Gregory Trucking, were these mandatory meetings?

**A. Oh, yes.**

Q. And was attendance kept?

**A. Yes. I mean, it may take a few days to**

Page 119

**get through them all, you know.**

Q. Okay. Do you know what kind of topics were covered at any of the safety meetings?

**A. Mostly maintenance kept up, doing their checklists on the log books was big. We knew if there was a problem and all and they would -- and, you know, they'd have to more or less do a pre -- pre-trip inspection of everything. And -- and if there's a problem, they have to tell us, see if -- you know. If there is a problem, they don't go out till it's corrected.**

Q. Were these safety meetings held in 2016?

**A. Yes. There would have some held.**

Q. How does Gregory Trucking monitor its drivers while they're out on the road?

**A. Well, we -- they call in periodically. Or, like, Linda, she calls them every morning and checks them off. And we do have an outside agency now that comes in and does all this stuff for us.**

Q. Who is that?

**A. It's a company that our insurance agent sent. It's an independent guy that goes around and does it for different motor carriers.**

Q. Do you know the name of the business?

**A. No. I can get it for you.**

Page 120

Q. That would be helpful. Why did you hire somebody to come around and do that?

**A. Well, it -- so it could improve.**

Q. Did Gregory Trucking see a need to improve?

MR. O'CONNOR: Objection.

**A. Well, I mean, I'd say everybody does in anything.**

Q. [By Mr. Tangredi] Is Gregory Trucking improving?

**A. Yes.**

Q. Are you aware that some trucking companies have installed speed governing devices to keep their tractor-trailer trucks from going over a certain speed?

**A. Yes.**

Q. Has Gregory Trucking installed the -- these speed governing devices on its tractor-trailer trucks?

**A. Well, we've not installed them. But we've -- we've got -- we're fixing some to where they can't exceed a certain amount -- limit, you know.**

Q. As of when have you started to do that?

**A. Well, there's -- half of them got it on**

Page 121

**them now probably. I don't know. You know, whenever we have an overhead run or something done to a truck, we'll have them, you know, make sure it's -- can't do but so much.**

Q. Did Gregory Trucking have any of the speed governing devices in its tractor-trailer trucks in 2016?

**A. It could have. I don't know if Wiley's did or not.**

Q. Are you aware some -- some trucking companies have installed -- installed forward facing cameras in their tractor-trailer trucks?

**A. We do not have them.**

Q. Are you aware that that technology exists?

**A. Well, I know that -- yes.**

Q. And Gregory Trucking has not installed any forward facing cameras in its trucks?

**A. No.**

Q. Why not?

**A. Well, probably cost right now. I -- we haven't looked into that. I mean, we've got -- we did have tracking on them, you know, where we could see where they were or parked or that, you know.**

Page 122

Q. Are you aware some truck companies have installed lane departure warning devices in their tractor-trailer trucks?

**A. No. I've not seen those.**

Q. Okay. Are you aware some trucking companies have installed blind spot detection equipment in their tractor-trailer trucks?

**A. No, I didn't. We do have blind spot mirrors and stuff on our trucks, yes.**

Q. What technology has Gregory Trucking used to improve the safety of their tractor-trailer truck drivers?

**A. Well, we're trying to make sure that we vet them a lot better, you know. The -- and the insurance companies -- we changed -- changed. And the -- the two guys that are, are really, really good. And they're working with us pretty daily on everything.**

Q. But as far as technology goes for the trucks, any technology been put into the trucks?

MR. O'CONNOR: Objection.

**A. Well, some trucks has got -- you know, they -- they got these electronic logs, but they've got these tracking devices and stuff. And we -- most of them has got some GPS stuff that**

Page 123

**helps them out there and -- you know.**

Q. [By Mr. Tangredi] And is any of that for safety?

**A. Well, yeah. All of it would -- pertains to safety.**

Q. How do the electronic -- what did you call it, the electronic --

**A. The -- the logs, you know, where you don't use a paper log anymore. It does it. And it goes direct on in to the -- they see it down at the DMV in Raleigh all the time, you know, and that. But you've got -- but them daily log sheets and the back sheet, trip sheet, and the checklist is one of your main things. If they're doing that, you're in pretty good shape. You've got one and it's not checked, and you find something that is out, then you can go through there and correct it and discipline them on it.**

Q. Could I ask you to pick up Exhibit Number 12, again, please? Do you have that?

**A. Yes.**

Q. Could you look at Page 5 of 26? Do you have that in front of you?

**A. I don't know what's going on here.**

Q. Five of 26.

Page 124

**A. Okay. No -- okay. Yeah.**

Q. Do you see where it says mission statement?

**A. Yes.**

Q. Could you read that out loud to us?

**A. [As read] "To responsibly meet the needs, wants, and desires of society via providing the highest quality logistic service available."**

Q. Did you help write that mission statement?

**A. No.**

Q. Do you know where it came from?

**A. No, I don't know where they -- you know, it's something they found or implemented or whatever. I don't know where it come from. No.**

Q. Is that the mission statement of Gregory Trucking Company, Incorporated?

**A. Yes. It would be good. Yes.**

Q. Do you believe that Gregory Trucking has responsibly met the needs, desires, and wants of society?

MR. O'CONNOR: Objection.

**A. Well, every time we go out there, yes, we're -- we're doing that. They -- we may not have all the best there is on it now, but we're**

Page 125

**working towards that.**

Q. [By Mr. Tangredi] Do you believe Gregory Tru --

**A. But what we've got is safe.**

Q. Okay. Do you believe Gregory Trucking Company has responsibly met the needs, desires, and wants of society when it put Wiley Lenue Hooks, Jr. behind the wheel of a tractor-trailer truck in August of 2016?

MR. O'CONNOR: Objection.

**A. Well, yes. He was a -- he was a qualified CDL driver.**

Q. [By Mr. Tangredi] According to who?

**A. Well, the DMV gave him his license.**

Q. When was Gregory Trucking formed?

**A. 1992.**

Q. And where is its principal office located?

**A. 147 Lumber Drive, Harmony.**

Q. Does it have a mailing address that's different?

**A. I'd say yes.**

Q. What is it?

**A. It's in Union Grove.**

Q. What's the mailing address?

A. **I think it's P.O. Box 53 or -- yes.**
Q. Does Gregory Trucking have corporate meetings?
A. **Yes.**
Q. When was the last one?
A. **I don't know. Probably a year, maybe two years ago.**
Q. Did you attend it?
A. **Yes.**
Q. Where was it held?
A. **There at the office.**
Q. Who was there?
A. **Me and Martha and Sylvia.**
Q. What business was discussed at the last corporate meeting?
A. **Well, just things that was happening in it, and how we were doing, and mostly talked about how we could improve the balance sheet.**
Q. Were minutes kept at the corporate meeting?
A. **I think they -- yeah. I'm sure they was minutes took. Yes.**
Q. And are they kept in a -- a location -- a specific location?
A. **Yeah.**

Q. Where are they kept?
A. **They're in the file somewhere in the office.**
Q. Okay. Has there been a corporate meeting every year since 1992?
A. **No.**
Q. How many corporate meetings do you think you've had? How often do you have them?
A. **I -- I don't know. Two or three. One or two -- I mean, every two or three years. Let me put it that way.**
Q. Okay. Does Gregory Trucking pay dividends?
A. **No.**
Q. Does Gregory Trucking have a checking account?
A. **Yes.**
Q. Does Gregory Trucking pay a salary to Cecil Gregory?
A. **I get some out at times. I'm not a regular salaried person, no.**
Q. What was your personal income in 2017?
MR. O'CONNOR: Objection.
A. **I couldn't -- I couldn't tell you.**
Q. [By Mr. Tangredi] How about 2016?

A. **I couldn't tell you no year till I got my tax -- I mean, till I looked at what the accountant got done with. I turn -- I just handed them to Sylvia. And I think she had to write a little check for something, you know.**
Q. Who owns the property at 147 Lumber Drive?
A. **B&C. It used to be G&G Lumber.**
Q. So if I had an -- an assessor's certificate that said that Cecil Gregory and Sylvia Gregory owned 147 Lumber Drive, would that be accurate?
A. **Probably four -- four acres in there, yes. But as far as where the lumber company is, there's 53 acres there with B&C. Yes.**
Q. Okay. So how much property does Cecil Gregory have an interest in at 147 Lumber Drive?
MR. O'CONNOR: Objection.
A. **That four acres.**
Q. [By Mr. Tangredi] What's on that four acres?
A. **Just there's one old building on it. And then there's some equipment, some trucks. One logging outfit keeps their stuff there. And we -- we use it in conjunction with the other, you know,**

**if we need the space. It's -- it's not got a primary use.**
**COURT REPORTER: 13.**
**(DEPOSITION EXHIBIT NUMBER 13 WAS MARKED FOR IDENTIFICATION)**
Q. Mr. Gregory, I want you to look at a document we've marked as Exhibit Number 13. And it consists of eight pages, double-sided. Could you just take a look at that?
A. **What? Yes. Okay.**
Q. Would you agree with me that that's a letter from my office to Gregory Trucking dated April 7th, 2017?
A. **I guess. I mean, I -- I'm -- I don't know if I've seen it or not.**
Q. Well, let's look at the inside page -- the first page, the inside.
A. **Okay.**
Q. Is that a letter from my office dated April 7th, 2017, addressed --
A. **Yes.**
Q. -- to Gregory Trucking?
A. **Yes.**
Q. Is the address on the letter correct?

Page 130

**A. Yes.**
Q. And if you look at the front page, the cover page, do you see that it was sent by certified mail?
**A. Uh-huh.**
Q. Is that a yes?
**A. Yes.**
Q. And is it addressed properly to Gregory Trucking?
**A. Gregory Tru -- yes.**
Q. And is it signed for? Is that your signature?
**A. Yes, that's my signature.**
Q. Okay. Do you recall seeing this letter?
**A. No. I mean, I signed for it. I probably took it to the office and then we looked at it or something, you know.**
**(DEPOSITION EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION)**
Q. Mr. Gregory, we're going to look at the next one called Number Four -- 14, rather. Would you take a look at that and let me know when you're done.
**A. Okay.**

Page 131

Q. If we look at the inside first page --
**A. Yes.**
Q. -- do you agree that it's a letter from my office to Gregory Leasing dated April 7th, 2017?
**A. Yes.**
Q. Is it the proper address for Gregory Leasing?
**A. Yes.**
Q. If you look at the cover -- the front page, do you see that this letter -- bless you -- do you see that this letter was sent certified mail?
**A. Yes.**
Q. And was it properly addressed on the -- on the front page to Gregory --
**A. Yes.**
Q. -- Leasing?
**A. Yes.**
Q. And is that your signature receiving this letter?
**A. It is.**
Q. And it's -- you -- it was received on 4/10/2107?
**A. Okay.**

Page 132

Q. Is that right?
**A. Yes.**
Q. Okay. I'm going to ask you to look at the next one. It's marked Exhibit Number 15. Let me know when you're done looking at that.
(DEPOSITION EXHIBIT NUMBER 15 WAS MARKED FOR IDENTIFICATION)
**A. Yes.**
Q. Do you see on the inside front cover that this is a letter from my office dated April 7th, 2017, to B&C Timbers?
**A. Yes.**
Q. Is that the proper address for B&C Timbers?
**A. Yes.**
Q. If you'll look at the front page, the cover page --
**A. Yes.**
Q. -- do you see that it was sent by certified mail?
**A. Uh-huh.**
Q. And do you see that it was properly addressed to B&C Timbers?
**A. Yes.**

Page 133

Q. And do you see who signed for it?
**A. Yes.**
Q. Who signed for it?
**A. I did.**
Q. And what date?
**A. 4/10.**
Q. 2017?
**A. Yes.**
**(DEPOSITION EXHIBIT NUMBER 16 WAS MARKED FOR IDENTIFICATION)**
Q. Okay. I'd ask you to please look at Exhibit Number 16.
**A. Okay.**
Q. If you look at the inside front cover of Exhibit 16, do you agree --
**A. Yes.**
Q. -- that that's a letter from my office dated April 7th, 2017, to B S G Leasing, Incorporated?
**A. Yes.**
Q. Is that letter properly addressed?
**A. Yes.**
Q. If you'll look at the front cover page --

Page 134

**A. Yes.**
Q. -- do you see that it was sent by certified mail?
**A. Yes.**
Q. And the address was to B S G Leasing, Incorporated?
**A. Yes.**
Q. And who signed for that certified --
**A. I did. I did.**
Q. On what date?
**A. 4/10/17.**
Q. Thank you. Do you recall at any time reading this letter?
**A. I read one of them, yes. But it's -- it's been, you know, a long time ago. Did I see it? Yes.**

**(DEPOSITION EXHIBIT NUMBER 17 WAS MARKED FOR IDENTIFICATION)**

Q. I'd like you to look at Exhibit we've marked as Number 17. Take a look at it and let me know when you're done looking --
**A. 17 or 39?**
Q. It's Exhibit 17, the sticker that the -- the woman puts on it -- front --

Page 135

**A. Oh, yeah.**
Q. And I'll represent that this is Gregory Trucking's response to a request for documents. And Document Request 39 asks for documents evidencing a lease, rental, or borrowing agreement for the tractor and/or trailer involved in the crash on August 24th, 2016, in Dalton, Mass. And the response is to see the lease agreement attached as Exhibit 39. Do you see that lease --
**A. Yes.**
Q. -- agreement? Could you take a look at that?
**A. Yes.**
Q. Have you seen it before today?
**A. Well, I seen it -- well, I -- I've signed it. Yes.**
Q. Okay. What's it dated up in the upper right-hand corner?
**A. January 1, 2016.**
Q. Could you tell us what this document is?
**A. It's where, I guess, we added the road tractor back to the -- back to the trucking company.**
Q. Who is "we?" And what's a road tractor?
**A. "We" is me, Cecil.**

Page 136

Q. Okay. Okay.
**A. The road tractor is, like I say, the power unit.**
Q. So is it fair to say this is a lease agreement for the tractor that was involved in the crash in Dalton, Mass. on --
**A. Yes.**
Q. -- August 24th, 2016? And who is this lease agreement between?
**A. It's Gregory Leasing to Gregory Trucking.**
Q. And just explain it to us, please.
**A. Well, Gregory Leasing owns the vehicles. And so it's leasing it back to Gregory Trucking.**
Q. And when you say --
**A. Gregory Trucking has to carry all of the insurances and stuff on it.**
Q. Okay. So your signature appears there on behalf of Gregory Trucking Company; is that correct?
**A. Yes.**
Q. Did anybody sign this on behalf of Gregory Leasing?
**A. Well, I don't know. I don't get a -- I don't see no form in front of me here, so I don't know.**

Page 137

Q. Who created this -- this document; do you know?
**A. I don't know if the -- whoever does them for us there at the trucking company or the leasing company. I don't know who.**
Q. Okay. So this -- this is a document that memorializes an agreement between Gregory Leasing and Gregory Trucking --
**A. Yes.**
Q. -- is that right? And Gregory Leasing is leasing a truck that Gregory Leasing owns to Gregory Trucking?
**A. Yes.**
Q. And this is for the truck that was in the crash?
**A. Yes.**
Q. Okay. And it's notarized by Martha Somers --
**A. Yes.**
Q. -- is that correct? And is it fair to say that Martha Somers was an employee of Gregory Trucking at the time?
**A. No.**
Q. No. Was she an employee of Gregory

Page 138

Leasing at the time?
**A. No.**
Q. Who was she employed by --
**A. Well, she's employed -- or paid through B&C.**
Q. Did Gregory Trucking do anything to this tractor after it leased it?
**A. Do anything to it? Well --**
Q. To --
**A. -- we made sure it was roadworthy. Yes. If -- we checked it over and done all the -- the prepping on it it takes to -- to get you a tag and get on the road.**
Q. Do you know if they -- if Gregory Trucking had to do any repairs to it?
**A. I do not know.**
Q. Do you know if --
**A. You know, I know it was okay when it was parked. But, you know, I'm sure they done a good service and an oil change and --**
Q. When was --
**A. -- tire check, our lights, you name it, you know, the whole thing.**
Q. When you say you're sure they did, who --

Page 139

**A. Yes.**
Q. -- who are you refer -- who is "they"?
**A. George would have done that down at -- at the shop -- run it through the shop, you know.**
Q. And -- and is George an employee of Gregory Trucking?
**A. Yes.**
Q. Okay. So after it was leased, somebody from Gregory Trucking checked out the vehicle?
**A. Yes.**
Q. Okay. And if any repairs were necessary, they were made?
**A. They would have done them. Yes.**
Q. If any maintenance was necessary, that would have been done?
**A. That would have been took care of. If we -- if he couldn't have done it, he would have took it somewhere.**
Q. Does Gregory Trucking paint the vehicles or put any decals on it?
**A. Well, yeah. They'll have -- you have to do that. And you have to have a number on them, and you have to have a FM and a -- and a DOT number on it. All that's on there. I mean, it's --**

Page 140

Q. Was it on there before this vehicle was leased to Gregory Trucking?
**A. When it was retagged, all of it would have had to have been re-verified. But, yes, it was running previously. And as far as Number 23, it kept that number. And I'd say the same numbers would have been on the truck. Yes.**
Q. Okay. So are all the trucks given a number?
**A. Yes.**
Q. Okay. Is there any significance to the number they're given?
**A. Well, it's just a number. You know, you pick one out.**
Q. Out of -- randomly or do they go sequen -- in order?
**A. Well, we were going in order, yes. We did.**
Q. Okay.
**A. So in the course of time, I'd say that Truck Number 23 was the 23rd one we bought.**
**(DEPOSITION EXHIBIT NUMBER 18 WAS MARKED FOR IDENTIFICATION)**
Q. Take a look at Exhibit Number 18. Have

Page 141

you ever seen Exhibit 18 before today?
**A. I had seen a picture of this. Yes.**
Q. Okay. What is that a picture of?
**A. It's a picture of the accident.**
Q. Is that the crash in Dalton, Massachusetts on August 24th, 2016?
**A. Yes.**
Q. And does this depict the -- the tractor-trailer truck involved in the crash?
**A. Yes.**
Q. And is that Truck Number 23?
**A. Yes. I -- you know, I -- that's one -- I think, that's the number of it.**
Q. Do you see the number 23 on the truck?
**A. I can't see it. I mean, you know, but I'm pretty sure it was 23. But that -- that is the truck that was involved in it. Yes.**
Q. Okay. Now, I understand there was a trailer attached to the truck pictured in Exhibit 18.
**A. Yes.**
Q. We just can't see it in Exhibit 18; is that right?
**A. Yes.**
Q. It's attached to the tractor, right?

Page 142

**A. I can see just a little bit of it.**
Q. Okay. Fair enough. Did Gregory Trucking own the trailer that was attached to the --
**A. No.**
Q. -- tractor in Exhibit 18?
**A. No.**
Q. Who owned the trailer?
**A. B S G.**
Q. Okay. Was there a lease between B S G and Gregory Trucking for the trailer?
**A. Yes.**
Q. Okay. Was it in writing?
**A. I'm sure that there is in writing. Yes.**
Q. Now, I understand that Gregory Trucking has an insurance policy for this case for $1 million with Wilshire Insurance Company; is that right?
**A. Yes.**
Q. Have you talked with Wilshire about this case?
**A. Well, I mean when it happened, yes, we had to turn everything in. Yes.**
Q. Okay. Have -- has anybody from Gregory Trucking had any dealings with Wilshire since

Page 143

initially reporting it?
**A. Yes. I'd say that everyone kept in contact with it.**
Q. Okay. Is there any correspondence, anything in writing between Gregory Trucking and Wilshire Insurance that you're aware of?
**A. I didn't -- I didn't do any of the paperwork involved in it. No.**
Q. Have you seen any of it?
**A. Well, I -- they have showed me different things, you know. But I can't remember if I seen some specific just from Wilshire. But I do know that they knew about it and -- and they -- the insurance was taking care of everything.**
Q. Are you aware that the plaintiff is asking for punitive damages in this case?
MR. O'CONNOR: Objection.
**A. Yes.**
Q. [By Mr. Tangredi] Do you know what punitive damages are?
MR. O'CONNOR: Objection.
**A. No, not really.**
Q. [By Mr. Tangredi] Okay. Has anybody made you aware of what punitive damages are?
MR. O'CONNOR: Objection.

Page 144

**A. No. I mean, I'm -- I mean, I'm -- I know that -- that evidently there's -- they're asking for more than the insurance. Okay. Is that -- is that what it is?**
Q. [By Mr. Tangredi] The -- the demand is more than the insurance. You're right about that. Has anybody made you aware that punitive damages might not be covered under your insurance policy?
MR. O'CONNOR: Just -- object. Don't answer discussions with counsel regarding damages.
MR. TANGREDI: I'm not asking him for the source of it. It's a fact. He can answer.
MR. O'CONNOR: Repeat the question.
Q. [By Mr. Tangredi] Has anybody told Gregory Trucking that punitive damages might not be covered under their insurance policy?
**A. Well, I don't know what's -- if they're covered through it or not.**
Q. Have you had any discussions with your insurance company about --
**A. I haven't. No.**
Q. Okay. Why not?
**A. Well, I -- mainly, I've -- I've always**

Page 145

**let Martha take care of the insurance end of it.**
Q. I understand she -- she no longer works at the office; is that true?
**A. She'll -- she'll come in a day now and then. Yes.**
Q. Is she still handling the insurance issues?
**A. No. Linda does a lot of that now.**
Q. But Martha doesn't work for Gregory Trucking, does she?
**A. No.**
Q. So why would she do work -- insurance issues for Gregory Trucking?
**A. I'm not saying that she's doing them. You know, I don't -- I've not talked to Brookshire -- I mean, Wilshire about it lately. No.**
Q. Are you aware that you're represented by the same attorney that represents Mr. Hooks?
**A. Yes.**
Q. Do you understand that the insurance company for Gregory Trucking is paying for that attorney?
**A. Yes.**
Q. Do you know you can ask the insurance company for your own attorney?

Page 146

**A. No.**
Q. Has anybody made you aware of any conflict of interest that you may have with Wiley Lenue Hooks in this litigation?
MR. O'CONNOR: Objection.
**A. Yes. You know, I've not had any kind of dealings with him.**
Q. [By Mr. Tangredi] Okay. What's your understanding of the conflict?
**A. Well, I mean, I don't --**
**MR. O'CONNOR: Objection.**
**A. -- I don't know. I mean, I thought that everybody was -- that we know that Wiley was a driving it. And -- and then the insurance has come in there. So I don't -- I don't know what else -- how to answer that.**
Q. [By Mr. Tangredi] Do you know you can reach out to your insurance company and talk to them about these issues?
**A. Yes.**
Q. Okay. How did Gregory Trucking get the job to deliver lumber to BB&S in Rhode Island?
**A. Well, Gregory Trucking pulls lumber out of B&C Timbers. And that load came up and so we got it.**

Page 147

Q. And -- and I'm talking about in general, not the specific date of August 23rd for the load that went up to Rhode Island. But how did Gregory Trucking get to deliver to BB&S?
**A. How did we start hauling up there?**
Q. Yeah.
**A. They sold lumber up there.**
Q. Who sold lumber?
**A. Well, Brandon sold lumber through Yellow Pine. And Yellow Pine sold it up there. And it was quoted delivered. And he'd get a freight rate from me. And it'd come up with a number on it. And then if it worked, then he got the load. If it didn't, he didn't, you know.**
Q. Okay.
**A. He didn't get everything he quoted. No.**
Q. Let's talk about the specific load that was taken from North Carolina on August 22nd, 2016, to BB&S in Rhode Island.
**A. Okay.**
Q. How did Gregory Trucking get that job?
**A. Well, that load came ready. And I was told, you know, they needed a truck to take that load up there. So Wiley was at -- come in or something, so I scheduled him for it.**

Page 148

Q. Okay. Who told you they needed a transport?
**A. Probably Brandon or either somebody there in the office.**
Q. Okay. How much notice would you have gotten, do you know, if the truck left on August 22nd, 2016, for Rhode Island?
**A. Well, I mean, they could -- it could have come in -- the load just come ready. Or it could have come ready two days earlier and I didn't have a truck. He couldn't find nobody. Then I put one under it, you know.**
Q. When you use the phrase "comes ready," what -- what does that mean?
**A. The load was -- had finished up. You know, it was ready to roll -- ready to ship, ready to go to the customer.**
Q. Does that mean it's on -- on a trailer?
**A. No. It means it's in the planer shed. So he would pull down there and it would be loaded.**
Q. But it couldn't get loaded until you had a truck available?
**A. Yes.**
Q. And on the 22nd you had a truck

Page 149

available?
**A. Yes.**
Q. And you had a driver available?
**A. Yes.**
Q. Did you have more than one driver available?
**A. They was probably all out or either Wiley signed up for that maybe -- or Buster.**
Q. Would BB&S in Rhode Island have any input as to who delivered the lumber?
**A. No.**
Q. Do you know why BB&S might say that they did?
**A. They --**
MR. SCHULER: Object to the form.
**A. -- Yellow Pine -- they probably didn't even know where it was coming from, you know. I mean, they could have. We do ship a lot up there through there. But, you know, we didn't deal with BB&S, nor did B&C. So it would have been through Yellow Pine. And all that would have been took place, you know. And BB&S would look at that order number. And when it went in, you know, it -- what it goes to.**
Q. So the -- the load of lumber that went

Page 150

from B&C Timbers to BB&S on August 22nd, could Yellow Pines have designated Gregory Trucking to be the delivery?
**A. No.**
Q. It had to come from B&C Timbers; is that right?
**A. Yes. I mean, you know, we -- we're the carrier out of there if we are available. Yes.**
Q. And if not, B&C Timbers has other carriers they can use as backup?
**A. Well, yes, if -- they can use other people. And then some people pick their own product up.**
Q. Fair enough. Take a look at Exhibit Number 19.
(DEPOSITION EXHIBIT NUMBER 19 WAS MARKED FOR IDENTIFICATION)
**A. Yes.**
Q. Do you recognize that?
**A. Yes.**
Q. What is it?
**A. It's a delivery ticket.**
Q. What is a delivery ticket?
**A. Well, it's like a bill of lading.**

Page 151

Q. Do you recognize the handwriting on it?
**A. I know -- it looks like Buster signed it down there.**
Q. Okay. And when would this be created?
**A. Well, let's go back to -- when 8/22 was, what day of the week or whatever it was. You know, probably one of the girls from the office.**
Q. Okay. And is -- is this essentially a bill of sale from G&G Forest Products to Yellow Pine?
**A. Yes. And it says ship to there, to BB&S.**
Q. Up in Rhode Island?
**A. Yes.**
Q. Okay. So let me see if I understand the whole -- the process for this load.
**A. Okay.**
Q. BB&S in Rhode Island calls Yellow Pine and says we need some lumber?
**A. Or either Yellow Pine called them trying to sell them something. He's a broker.**
Q. It works that way too?
**A. Yeah.**
Q. There's communication between Rhode Island and Yellow Pine?

Page 152

**A. Yes.**
Q. Somebody sells --
**A. Yeah.**
Q. -- someone --
**A. Either the -- the buyer may have called him hunting it, or either Yellow Pine was seeing what their needs was and they told then. And then he checks with B&C.**
Q. Okay. So as a result of that conversation, Yellow Pines needs to get some lumber for BB&S?
**A. Yes.**
Q. Yellow Pines reaches out to B&C Timbers?
**A. Yes.**
Q. B&C Timbers agrees they can fill the order?
**A. Well -- well, they give them a -- what they would deliver it for. And then I guess it was accepted.**
Q. Okay. They make a quote?
**A. Yeah. Made the quote, yes.**
Q. Yellow Pines accepts it?
**A. Well, he goes back. Then BB&S probably had to accept it.**
Q. And the price might have changed --

Page 153

**A. Yes.**
Q. -- going to BB&S? Okay.
**A. Our price to Yellow Pine and all would be different than up there. I don't know what kind of prices it would be, you know.**
Q. Okay. Well, regardless, a deal is made and B&C Timbers is going to sell some lumbar to Yellow Pine?
**A. Yes.**
Q. And B&C Timbers contacts Gregory Trucking to deliver it?
**A. Yes.**
Q. Gregory Trucking, when it gets the order, has to put together a tractor and a trailer --
**A. Yeah.**
Q. -- and a driver?
**A. Yes.**
Q. And that was done?
**A. Yes.**
Q. The tractor was owned by Gregory Leasing, right?
**A. Yes.**
Q. On lease to Gregory Trucking?
**A. Yes.**

Page 154

Q. The trailer was owned by B S G, correct?
**A. Yes.**
Q. On lease to Gregory Trucking. Gregory Trucking connects tractor to trailer and puts Wiley Lenue Hooks in as the driver. The truck is loaded and driven to Rhode Island.
**A. Yes.**
Q. Excellent. And do you know how much Gregory Trucking got paid to transport this lumber from North Carolina to Rhode Island?
**A. $1,800.**
Q. Okay. How much did Gregory Trucking pay Gregory Leasing for leasing the vehicle?
**A. It's not been able to pay them anything.**
Q. Didn't pay them anything?
**A. No. No. We haven't in a while. We'd like to get started -- it'd be good -- but we haven't been able to.**
Q. So Gregory Leasing Company leased a tractor to Gregory Trucking for about a year for no compensation?
**A. Yes, it has.**
Q. Did Gregory Trucking pay B S G anything for leasing the trailer?
**A. His -- no, not yet.**

Page 155

Q. Okay. So B S G entered into a lease agreement with Gregory Trucking to lease Gregory Trucking a trailer for one year for no compensation; is that correct?
MR. O'CONNOR: Objection to form.
**A. Well, they -- there is a -- a price. And when -- when B S G was first done, they was -- everybody was compensated. But after the bankruptcy, we have not dug out enough to where we can start doing it again.**
Q. [By Mr. Tangredi] And the bankruptcy, was it back like in 2013 or so?
**A. Yeah. Somewhere in there.**
Q. So at the time that B S G leased a trailer to Gregory Trucking in 2016, Gregory Trucking did not pay any compensation for that?
**A. No.**
Q. Okay. And they haven't since that time; is that --
**A. No.**
Q. Tell me how it came about that Gregory Trucking Company transported lumber from Rhode Island -- BB&S in Rhode Island to L P Adams in Dalton on August 23rd, 2016.
**A. Well, Wiley -- or Buster, he had a**

Page 156

**backhaul already set up from us at Gregory Trucking. And he had previously picked up some short hauls from BB&S where it worked into where it didn't hurt the time period. In other words, he could get that and then it was extra money. Extra money for him. And he'd still get everything done in the same amount of time. And so, you know, we did not know that he had taken that until the accident. He had done it one other time. And it's not a policy either. But when he was with his dad and then his mother, they did all this brokering -- or -- and he -- he -- he could find backhauls. He was good with stuff like that. If we had a little problem, he could tell us where there was one at. He had ways of getting on sites. But he had hauled some for BB&S on that. And then it was a little extra money. So they -- when -- after he unloaded, I guess they said that they had a short haul. And, you know, it -- it wasn't a direct thing going towards the backhaul, but I guess it was somewhere it didn't hurt.**
Q. So you used some -- some terms, backhaul and short haul. I don't know what those mean. Could you -- could you explain backhaul and short haul?

Page 157

**A. Well, they had -- had one that's -- it was maybe go within a 100 miles of their facility. And so -- and it -- you know at 450, that was a good freight rate. And then Wiley, he made some extra money there. And then it helped us on our expenses up there and back. And then -- and then after he unloaded, he was going on to pick up his backhaul coming back home.**
Q. Okay. So let's -- let's back it up to August 22nd when Mr. Hooks is in the tractor-trailer truck in North Carolina with a load of lumber for BB&S on it.
**A. Yes.**
Q. He's still in -- on Lumber Drive. He hasn't left yet. His instructions -- or his mission is to drive the load to BB&S in Rhode Island, correct?
**A. Yes.**
Q. And when he left North Carolina on the 22nd of August, after that delivery, was he supposed to do something?
**A. He was -- well, he had a backhaul already scheduled when he left North Carolina. Yes.**
Q. On the 22nd?

Page 158

**A. Yes.**
Q. Tell me about the backhaul that was scheduled when he left on the 22nd of August.
**A. I don't really know where it was at because I -- that was already taken care of. But I know it was for -- I think for a load of rail ties -- I ain't sure -- or maybe some Canadian lumber out -- out of one of their drop-offs. I don't know. But, anyhow, she ha already had it -- and I'm pretty sure it was for Universal because he said it was in Monson. So, yes, he -- he -- when he left there, he knew where he was to be going. But after he offloaded, I guess they asked him if he could do that short run. And -- and he thought it would -- he could work it in and it wasn't going to affect the -- the other haul, you know.**
Q. So I need to move a lot slower than you on this.
**A. Okay.**
Q. So we're back in North Carolina on the 22nd. And Mr. Hooks is going to go to Davisville, Rhode Island and drop off lumber.
**A. Uh-huh.**
Q. Is that a yes?

Page 159

**A. Yes.**
Q. And on the 22nd, his understanding, Mr. Hooks, after he drops off the lumber in Rhode Island, he's supposed to go to Monson empty -- from Rhode Island to Monson --
**A. Yes.**
Q. -- and pick something up in Monson to drive it back to North Carolina?
**A. Yes.**
Q. That was what everybody thought was going to happen on August 22nd --
**A. Yes.**
Q. -- 2016.
**A. When he left, that was the way it was.**
Q. Okay. And that was all that Gregory Trucking had told him to do; is that right?
**A. Yes.**
**MR. O'CONNOR: Objection.**
Q. [By Mr. Tangredi] Okay. Got it. So now, Mr. Hooks makes his delivery in Rhode Island, unloads the truck, and his truck is empty; is that right?
**A. Yes.**
Q. What happened then?
**A. My understanding is their traffic**

Page 160

**coordinator --**
Q. "Their" -- "their" who? I'm --
**A. BB&S's --**
Q. Thank you.
**A. -- traffic guy said -- said we've got this what we call a short haul, you know. And Wiley took it.**
Q. Okay. And BB&S asked Mr. Hooks, "Are you interested in driving some lumber to L P Adams in Dalton." Is that what you're calling the short haul?
**A. Yes.**
Q. Okay. And did -- Mr. Hooks, before agreeing to accept that short haul, did he communicate with anybody at Gregory Trucking about it?
**A. No. We didn't know it till later, you know. Like I said, he had done it before. And it -- and he would send us his paperwork. And then we'd invoice them. But I think he did call that first time. But I don't know -- he didn't the second time. He just accepted the load and went on. And he made "X" amount and we did.**
Q. So this was not the first time that Mr. Hooks had agreed to do one of these short hauls?

Page 161

MR. O'CONNOR: Objection.
**A. Yes.**
Q. [By Mr. Tangredi] And specifically a -- this isn't the first time Mr. Hooks agreed to do a short haul for BB&S?
**A. No. He had done one -- some before.**
Q. And Gregory Trucking was aware of the first one?
**A. Yes. And we -- you know, we invoiced it just like we invoiced the second one --**
Q. Okay.
**A. -- and all.**
Q. And does Gregory Trucking give Mr. Hooks authority to do that?
MR. O'CONNOR: Objection.
**A. Well, he wasn't -- we didn't say take it. You know, I'm sure if he'd called the office, we would have said yes. I mean, there -- it was nothing that was out of the ordinary or anything. And, you know, it was an extra 450 for the truck, you know. And he'd get 25 percent of that, so that would help on that. And then -- and then he'd have his freight back in, you know.**
Q. [By Mr. Tangredi] Why does he get 25 percent of that?

Page 162

**A. Well, we got rates going from Union Grove to the different places, but all backhauls pay them a percentage.**
Q. And who determines the price for the backhaul?
**A. Most of the time the shipper.**
Q. And the shipper in this case would have been who?
**A. Huh?**
Q. And the shipper in this case would have been who? And by "this case," I mean on August 23rd, 2016.
**A. Well, I knew what we was going to get going up. It varies coming back, you know. There at Monson I don't know exactly what that load paid coming back. But then if it had went to New Windsor or if it had went other places -- we have several places that we go to and backhaul from.**
Q. Who determines the price for the backhaul from Rhode Island to Dalton?
**A. Most of the time it's the shipper from up there.**
Q. And the shipper in this case would be who?
**A. Well, the shipper in this case was out**

Page 163

**of Monson. I think it would have been Universal Forest. I'm not sure.**
Q. Okay.
**A. I'm -- you know, it should be in the record there. But we had to call and cancel that one.**
Q. So, I'm sorry. I'm not being clear. When Mr. Hooks is in Rhode Island with an empty truck --
**A. Oh, okay.**
Q. -- and he's -- accepts a back -- a short haul to L P Adams in Dalton --
**A. Okay.**
Q. -- who determines the cost of that, the price that Gregory Trucking is going to --
**A. BB&S set it.**
Q. And is BB&S considered the shipper in that case?
MR. O'CONNOR: Objection.
**A. He would -- yes.**
Q. [By Mr. Tangredi] Is -- is that accurate?
**A. Well, they would -- yes. I mean, they -- it was their bill of lading going to Beam or wherever it went. Yes.**

Page 164

Q. L P Adams in --
**A. L P Adams. I'm sorry.**
Q. And BB&S determines that price?
**A. Yes. They probably got their set ones like we do, you know.**
Q. And it's okay with Gregory Trucking for Mr. Hooks to do this?
MR. O'CONNOR: Objection.
**A. Yes.**
Q. [By Mr. Tangredi] Who would be the dispatcher for this short haul?
**A. I don't know who it would be. It would be their traffic person that looks after all their shipments.**
Q. Okay. But Mr. Hooks never reached out to anybody at Gregory Trucking to get authority before making the trip from Rhode Island to Dalton; is that right?
MR. O'CONNOR: Objection.
**A. We did not know about -- we did not know that he had taken that load till he called in that morning after -- when they had the accident. And then we asked why he was there. And then he told us.**
Q. [By Mr. Tangredi] Now, I get the

Page 165

impression you're not familiar with the geography between Rhode Island, Monson, and Dalton, or are you?
**A. No.**
Q. Okay. After Mr. Hooks made his delivery to Dalton for BB&S --
**A. Uh-huh.**
Q. -- and unloaded the truck there, was there any communication with Gregory Trucking?
MR. O'CONNOR: Objection.
**A. I don't know if he called and made -- told them that he was on his way to his backhaul or not. You know, I don't think so.**
Q. [By Mr. Tangredi] And the --
**A. I mean, we just assumed that he was going to pick up his backhaul.**
Q. And the first that Gregory Trucking ever learned that there was a short haul is after the crash?
**A. Yes.**
Q. Okay. Is there anybody that would have learned about the short haul before the crash?
**A. Not unless he called in and told us.**
Q. Okay. And being the representative here today from Gregory Trucking, are you aware of

Page 166

anybody that Mr. Hooks called?
A. No.
Q. Have you checked with anybody or everybody?
A. **Well, yes. I mean, I've talked to people. I mean, but -- they have -- and when they told us, you know, we -- and we figured out where he was to where he was supposed to be. Now, when we found out that he had taken another load, a short haul, you know, then we knew.**
Q. Did BB&S pay Gregory Trucking for the short haul for the delivery from Rhode Island to Dalton, Mass.?
A. **They paid for the delivery over to Adam, yeah. But to go to Monson, no.**
Q. To -- to L P Adams --
A. **Yeah.**
Q. -- in Dalton --
A. **Yes. They did pay their invoice, yes.**
Q. Okay. Did Gregory Trucking send an invoice to BB&S for that short haul?
A. **I'm sure we did.**
Q. Okay. But Gregory Trucking didn't learn about the short haul until after it was completed?
A. **Yes.**

Page 167

Q. Do you know how much Gregory Trucking -- and I'm sorry if I asked you this -- how much Gregory Trucking was paid by BB&S for that short haul delivery?
A. **I think it was 450 bucks.**
Q. And then did Gregory Trucking give 25 percent of that to Mr. Hooks?
A. **Oh, I'm sure we paid what we're supposed to. Yes.**
Q. Okay. Had Gregory Trucking ever delivered for BB&S prior to the incident -- strike that. Has Gregory Trucking ever been hired by BB&S to deliver anything besides the delivery on August 23rd?
A. **They had been another -- one delivery before that one. I don't know how -- if it was a week, two weeks or how long. But they -- they had done one before. And I don't know if it went to the same place or not.**
Q. Okay. And did that involve Mr. Hooks as well?
A. **Yes. I mean, he -- he got them.**
Q. Would you look at Exhibit Number 20, please?
(DEPOSITION EXHIBIT

Page 168

NUMBER 20 WAS MARKED FOR IDENTIFICATION)
A. **Yes.**
Q. And there's a front and a back to it. So I'd ask you to please look at the back as well. What is Exhibit Number 20?
A. **Okay.**
Q. What is it?
A. **It's an invoice to BB&S for that --**
Q. From --
A. **-- for a load haul.**
Q. Who is it from?
A. **It's from BB&S Treated -- no. It's from Gregory Trucking.**
Q. And it's a bill to BB&S; is that fair?
A. **Yes. It's an invoice.**
Q. And it's for $450?
A. **Yes.**
Q. And is this for the -- for what we've been calling the short haul from BB&S in Rhode Island to L P Adams in Dalton on August 24th?
A. **Yes. Let's see. You said what date on it?**
Q. Well, I believe Mr. --
A. **This is 9/8, so that might have been the**

Page 169

**first one.**
Q. This is September 1st, 2016, this invoice.
A. **Okay.**
Q. So this would be after the crash?
A. **Okay.**
Q. The invoice.
A. **Okay. Yes, okay.**
Q. This would be approximately a week after the crash.
A. **Okay.**
Q. Is that fair to say?
A. **Yes.**
Q. So does this bill represent the charge --
A. **Yes.**
Q. -- Gregory Trucking charged BB&S for the delivery from Rhode Island to Dalton, Mass.?
A. **Yes.**
Q. Okay. I'm asking you to look at Exhibit marked as Number 21, please.
(DEPOSITION EXHIBIT NUMBER 21 WAS MARKED FOR IDENTIFICATION)
A. **Okay.**

Page 170

Q. Do you recognize what that is?
**A. It's a BB&S Lumber of New Eng history sorted by date. Yes.**
Q. And are these deliveries that Gregory Trucking made on behalf of BB&S?
**A. Yes, it is. I see where they -- they was evidently three that was taken over there at some time because there's three 450s and a 600.**
Q. So there are a few dates at the top. There's an I-N-V date, a due date, and a post date. Do you see those?
**A. Where?**
Q. At the top.
**A. Yeah. Post date, yeah.**
Q. And to the left of that, due date and then I-N-V date. Perhaps invoice date.
**A. Yes.**
Q. Do any of those reflect when things were delivered?
**A. Now, that's a -- I guess the -- when they -- I -- I don't do the invoicing, so I really can't say. But I'd say either we delivered them or we invoiced them on that post date and then the due date is behind it.**
Q. Okay. But does this document reflect

Page 171

that BB&S hired Gregory Trucking four different times between 2015 and 2016?
**A. Yes, it would.**
Q. That reflects four different deliveries for BB&S?
**A. Yes.**
Q. Okay. Do you agree that the only reason Gregory Trucking and Wiley Lenue Hooks were in Massachusetts on 8/24/2016 was to deliver lumber for BB&S --
MR. O'CONNOR: Objection.
MR. SCHULER: Objection.
Q. -- to L P Adams?
MR. O'CONNOR: Objection.
**A. Yes.**
Q. [By Mr. Tangredi] Do you agree that Gregory Trucking and/or Wiley Lenue Hooks would not have been in Dalton, Massachusetts on August 24th, 2016, except for having to deliver BB&S's lumber to L P Adams?
MR. SCHULER: Objection.
**A. I -- I don't really know the -- the route or what, you know, that it would take to do. But, yes, he delivered that load. And I ain't familiar of the route he would take from there to**

Page 172

**Monson.**
Q. [By Mr. Tangredi] Okay. If Dalton --
**A. But he was going to be in there somewhere, yes.**
Q. If I were to suggest to you that Dalton does not lie within -- between Davisville, Rhode Island and Monson --
**A. Uh-huh.**
Q. -- would you agree with me that Mr. Hooks and Gregory Trucking would not have been in Dalton except to deliver BB&S's lumber?
MR. O'CONNOR: Objection.
MR. SCHULER: Objection.
MR. TANGREDI: You can answer that.
MR. O'CONNOR: You can answer.
**A. Yes.**
Q. [By Mr. Tangredi] You agree with that.
MR. SCHULER: Objection.
Q. [By Mr. Tangredi] Do you know Gregory Lumber Company in Java, Virginia?
**A. Yes.**
Q. You do. How do you know them?
**A. They bring a lot of lumber down to B&C. They're a sawmill up in Java. No relation.**
Q. Just coincidental names?

Page 173

**A. Just coincidental. We've known them. But they're really good and they supply a lot of lumber.**
Q. And they supply a lot of lumber to B&C Timbers?
**A. Yes.**
Q. And does Gregory Trucking do any hauling for Gregory Lumber Company out of Java, Virginia?
**A. They do not do it for Gregory Lumber Java. They do it for B&C. B&C -- if we pick up up there, B&C pays the freight. If they deliver, then B&C pays them for the whole amount, for the lumber plus their freight.**
MR. TANGREDI: Bless you. There's two there.
(DEPOSITION EXHIBIT NUMBER 22 WAS MARKED FOR IDENTIFICATION)
Q. [By Mr. Tangredi] Would you let me know when you're done looking at Exhibit Number 22.
**A. Okay.**
Q. Do you know what Exhibit Number 22 is?
**A. It's -- I guess a load we picked up.**
Q. Who is "we?" And picked up from where?
**A. Gregory Trucking.**

Page 174

Q. Okay. And a load that Gregory Trucking picked up from who and where?
**A. It says Sitka Forest Products out of Montreal, Canada. But I'd say we didn't pick it up there. We had to pick it up at a relay store.**
Q. Okay. Do you see where it says Shipper Number One in --
**A. Yes.**
Q. -- in the document?
**A. Yes.**
Q. Who's Shipper Number One? Who is -- who is listed?
**A. Eagle Logistics.**
Q. And where are they located?
**A. Monson, Mass.**
Q. So is this the backhaul that was scheduled when Wiley Lenue Hooks left North Carolina on August 22nd, 2016?
**A. Yes.**
Q. Okay. And I'm assuming because of the crash this was never picked up?
**A. No.**
Q. Did it ever get brought down to --
**A. I'm -- yeah. I'm sure somebody got it picked up within a day or so. They may have done**

Page 175

**it that very day, you know, somebody.**
Q. So this -- is it fair to say that this backhaul from Exhibit Number 22, Gregory Trucking was going to get $700 for --
**A. Yes.**
Q. -- that backhaul?
**A. Yes.**
Q. But that never happened?
**A. No.**
Q. Okay. Does Exhibit Number 22 tell us anything about when this backhaul was arranged?
**A. No. But I'm sure if he already knew it before he left, it was done that day or the day before maybe. I don't know.**
Q. Do you see in the top right corner where it talks about today's date and shipment date?
**A. Yeah.**
Q. Both dates are the same, August 23rd, 2016; is that correct?
**A. Yes.**
Q. So does that mean that Mr. Hooks was supposed to be in Monson on --
**A. He was supposed to be there, I guess, on the 23rd.**
Q. And that was the -- was supposed to be

Page 176

the date it was to be shipped?
**A. That he would have been picking his load up, yes.**
Q. From Monson, shipped back down to North Carolina?
**A. Yes.**
Q. But on the 23rd, he was in transit between Rhode Island and L P Adams in Dalton, correct?
**A. Yes.**
Q. And he delivered his load -- the load for BB&S in Dalton on the morning of the 24th, correct?
**A. Yes. On the 24th?**
Q. And then he --
**A. Monday night -- okay.**
Q. -- and then he was on his -- Mr. Hooks was on his way from Dalton to Monson --
**A. Yes.**
Q. -- to pick up his backhaul? But he was originally supposed to be in Monson on the 23rd, correct?
MR. O'CONNOR: Objection.
**A. Well, it says the 23rd. I -- I -- I don't know how that -- how that works. I do know**

Page 177

**if you're not there by two o'clock on the previous day -- I mean, the -- that day, you have to wait over. They're -- they close at dinnertime, about --**
Q. [By Mr. Tangredi] Okay.
**A. -- but --**
Q. And it's the testimony of Gregory Trucking that when Mr. Hooks left North Carolina on the 22nd this backhaul was already arranged?
**A. Yes. He did have a backhaul arranged.**
Q. Regarding the truck that Mr. Hooks was driving on the date of the crash, was Gregory Trucking aware that there were any problems mechanically with the truck?
**A. No.**
Q. Any problems with the brakes?
**A. No.**
Q. Any problems with the steering?
**A. No.**
Q. The exhaust?
**A. No.**
Q. Any problems with the fuel system?
**A. No.**
Q. The lighting system?
**A. No.**

Page 178

Q. Suspension?
**A. No.**
Q. Any problem with the tires?
**A. No. When he left North Carolina --**
**MR. O'CONNOR: Just wait for his --**
**A. -- to haul that --**
**MR. O'CONNOR: -- just wait for a question. You're fine.**
Q. [By Mr. Tangredi] Was the crash investigated by Gregory Trucking?
**A. No. The insurance company. The DOT.**
Q. Did anybody from Gregory Trucking do any investigation?
**A. No.**
Q. Okay. Let's go back to the Gregory Trucking Fleet Safety Program. And I think we might be Exhibit Number -- anybody? A little help?
MR. O'CONNOR: Nine.
Q. [By Mr. Tangredi] Nine. Exhibit Number Nine. Do you have it?
**A. Oh, okay. Yes.**
Q. Could you go to Page 1,008 of Exhibit Number Nine?
**A. Okay.**

Page 179

Q. Do you have that?
**A. 1,002?**
Q. 1,008.
**A. Oh. Yes.**
Q. And does that -- at the -- around the middle of the page -- talk about Gregory Trucking's Fleet Safety policy regarding vehicle accident reporting and investigation plan? Is that what it says?
**A. Where at now?**
Q. Page 1,008 --
**A. Vehicle accident reporting and investigation plan. Yes.**
Q. Okay. So is -- is that Gregory Trucking's Fleet Safety Program --
**A. Yes.**
Q. -- vehicle accident reporting and investigative plan? Is that what that is?
**A. Yes.**
Q. Okay.
**A. Now, we did send three guys up there to pick up. And they told us not to -- they told us to pick the truck up. We brought it back. They told us not to do nothing till the DOT comes in. And our insurance company asked us to not get**

Page 180

**involved in doing any research on it.**
Q. So this policy on Page 1,008, this talks about what a driver is supposed to do when they're in an accident; is that right?
**A. Yes.**
Q. Okay. And does it state that [as read] "The following steps will be followed in the event of a vehicle accident/incident." Does it say that?
**A. Yes.**
Q. And these aren't optional, are they? These are -- these are steps that must be followed, is that right --
MR. O'CONNOR: Objection.
Q. -- according to the fleet safety policy of Gregory Trucking?
**A. Yes.**
Q. [By Mr. Tangredi] Okay.
**A. According to that. But when you're told not to do certain things by our -- the DOT and/or the insurance company, that stops some of this.**
Q. Okay. But at the scene of the crash, nobody had told anybody not to do anything, right?
MR. O'CONNOR: Objection.
**A. No.**

Page 181

Q. [By Mr. Tangredi] Okay. So this would apply to what Mr. Hooks should have done after the crash if he was following the Gregory Trucking fleet safety program, correct?
**A. Yes.**
Q. And if we look down, it says he should call the police, correct?
**A. Yes.**
Q. Do you know if he did that?
**A. Yes. I'm sure that that was taken care of.**
Q. How do you know that happened?
**A. They had showed up.**
Q. But do you know if Mr. Hooks called the police?
**A. I -- I -- my understand is he did dial the 911 or whatever to get some assistance.**
Q. Where do you -- where do you get that from -- that information from?
**A. Where did he get that information?**
Q. Where do you get that information from? Why do you -- how do you know that?
**A. Well, I was told that he did. Now, I -- I did not talk to Wiley --**
Q. Okay.

Page 182

**A. -- about it.**
Q. Who -- who told you he did?
**A. I heard it in the office. Who told me, I don't know.**
Q. Okay. Another thing the driver is supposed to do is locate witnesses and get important information from them, including names, addresses, and phone numbers. Is that something a driver is supposed to do after a crash?
**A. Yes. My understanding was that they were witnesses that they came up and was there. Yes.**
Q. And did Mr. Hooks provide Gregory Trucking with a list of the witnesses and their -- including their names and addresses and phone numbers?
**A. No.**
Q. Okay. There's another requirement saying to take photos of the accident. Did Mr. Hooks take any photos of the accident?
**A. Yes. They were some photos sent back from his phone.**
Q. He took some phone -- photos?
**A. Uh-huh.**
Q. Do you know if he took those photos?

Page 183

**A. Well, I seen them. Let me put it that way. Who took them, but I guess they came from him.**
Q. Do you know if they've been provided in this case?
**A. No.**
Q. No, you don't know or, no, they weren't?
**A. I don't know that they have or not.**
Q. Have you -- do you know if those photos still exist?
**A. No. But I'd say they are, yes.**
Q. That they do still exist?
**A. I would think so.**
Q. Were they sent from Mr. Hooks' cell phone?
**A. I don't know. I can't say for sure.**
Q. Do you know who they were sent to?
**A. I just seen them in the office. And I -- you know, I can't -- I just don't know.**
Q. And a -- a requirement is that the driver fill out a vehicle accident report form. Did Mr. Hooks fill out a vehicle accident report form?
**A. No. The -- the police did.**
Q. Okay. But Mr. Hooks is supposed to fill

Page 184

one out, right?
**A. Well, yes.**
Q. And it's -- actually there's an appendix to the Gregory Trucking Fleet Safety Program that would be that form, right?
**A. Yes.**
Q. And Mr. Hooks did not fill one out?
**A. No, he didn't.**
Q. And Gregory Trucking did not require him to fill one out; is that correct?
**A. No.**
Q. If we go to Page 1,009, do you see where it says -- and it's highlighted in green -- [as read] "The goal of this reporting and investigation process is not to find fault, but to determine the root cause so that corrective actions can be made in order to eliminate future accidents or incidents." Do you see where it says that?
**A. Yes.**
Q. And is that the policy of Gregory Trucking at the time of this crash?
**A. Yes. We do not want to have accidents and we try to avoid them and --**
Q. What was the root cause of this crash?

Page 185

MR. O'CONNOR: Objection.
**A. He says the -- Wiley -- that the sun blinded him and he didn't catch that light. That there was a dog that ran over in front or something. That's -- that's what I heard.**
Q. [By Mr. Tangredi] Okay. Who did you hear that from?
**A. I don't know.**
Q. Was it Mr. Hooks?
**A. That's what Mr. Hooks said. Whether it come from him, I don't know. I -- I didn't talk to him after that, no.**
Q. What's your def -- what's the definition -- Gregory Trucking's definition of a root cause?
**A. A root cause?**
Q. Well, it's in your policy. I -- what does it mean?
**A. Where is that -- where is that? Which number is that?**
Q. If you -- Page 1,009.
**A. Yes.**
Q. Is it highlighted in green on yours? [As read] "The goal of this reporting and investigation process is not to find fault, but to determine the root cause so that corrective action

Page 186

can" --

**A. Yes. Okay.**

Q. -- "be made." What does root cause mean at Gregory Trucking?

**A. What caused the accident.**

Q. Okay. What caused this crash?

MR. O'CONNOR: Objection.

**A. Wiley didn't make the -- he -- the sun was in his eyes from what I heard, that -- and he -- the light changed on him and he didn't get it in time.**

Q. [By Mr. Tangredi] Is there something else about a dog?

**A. Yeah. They said that a dog run. That's -- I heard that, but, you know --**

Q. As far as you know there was nothing wrong with the tractor or the trailer that Mr. Hooks was driving --

**A. No.**

Q. -- before the crash? After Mr. Hooks left North Carolina driving the tractor and trailer on August 22nd, 2016, did he call back to Gregory Trucking to report any problems with the truck, the tractor or the trailer?

**A. I didn't hear of any.**

Page 187

MR. TANGREDI: Okay. How's our time?

MR. MEEHAN: It's on the record -- oh, it's -- it's five of six -- 5:55 or thereabouts.

MR. TANGREDI: And we're going to run out of tape and have to change it at 6:12-ish, right? That'll be two hours?

THE VIDEOGRAPHER: At -- we are at 1:37, so -- right now at run time. You've got about 20 minutes.

Q. [By Mr. Tangredi] After the crash in Dalton, Mass., did Gregory Trucking make any changes at Gregory Trucking because of the crash?

MR. O'CONNOR: Objection.

**A. Well, I talked to each and every driver there about it, yes, and that, you know, we was going to have to get to the cause of it -- like you say, the root cause -- and -- and do our best to avoid anything like that.**

Q. [By Mr. Tangredi] And -- and did Gregory Trucking ever get to the root cause?

**A. We know what the accident report does and what our insurance investigating did.**

Q. And it's Gregory Trucking's position

Page 188

that the root cause was sun and a dog and a light changing?

**A. I don't know what the -- how the police report wrote it up, you know.**

Q. But I'm asking what Gregory Trucking's --

**A. They said that the sun blinded him coming in there that morning or whenever.**

Q. But I'm looking for Gregory Trucking's opinion on what the --

MR. O'CONNOR: Objection.

Q. -- root cause was --

MR. O'CONNOR: Objection.

Q. -- like it says in their policy.

**A. I don't know.**

Q. [By Mr. Tangredi] Was a root cause analysis ever done by Gregory Trucking after this crash?

**A. Not written, no. But, verbally, I did have conversations on it.**

Q. Was Mr. Hooks ever disciplined by Gregory Trucking after this crash?

**A. Well, he never -- no longer had a job, no.**

Q. Well, is that because of anything

Page 189

Gregory Trucking did?

**A. Yes. And it's -- well, you know, he was incarcerated for a long time too. But prior to that, yes, we -- we -- term -- we terminated him till we got everything done and knew what was happening. And now it's been going on for a long time. So he has not worked for us since then, no.**

Q. Was he terminated after the crash or was he suspended after the crash?

**A. Terminated.**

Q. And do you know when he was terminated?

**A. Well, he didn't go out no more, so it was that day or the -- when he got back.**

Q. How was he terminated?

**A. I just told him he -- we weren't going to let him drive no more till we -- till things -- till I knew what happened and what was going on and we'd have to go through some -- check with our insurance company.**

Q. How did that conversation take place?

**A. There on the yard in the office.**

Q. In North Carolina?

**A. In North Carolina, yes.**

Q. So after the crash, Mr. Hooks was arrested and charged and then got back to North

Carolina?
**A. Yes.**
Q. And you had that conversation in person?
**A. Yes.**
Q. And would you characterize that as a termination of Mr. Hooks at that time?
MR. O'CONNOR: Objection.
**A. Yes, I would.**
Q. [By Mr. Tangredi] Did you tell him he was terminated?
MR. O'CONNOR: Objection.
**A. He knew that he was terminated or he wasn't going to do anything till that. But Wiley was upset about everything. He was tore up, especially when that man died. He -- he had a hard time.**
Q. [By Mr. Tangredi] How was it relayed to Mr. Hooks that he was terminated?
MR. O'CONNOR: Objection.
**A. I just told him he wouldn't be driving anymore.**
Q. [By Mr. Tangredi] Was there any condition on that pending the investigation or was it --
**A. No.**

Q. -- clear as that; it was over?
**A. No. I just told him that, you know, it would -- till everything was done. And then if there was anything, we would talk. Nothing, you know.**
Q. So it was possible Gregory Trucking would take him back?
**A. No. Well --**
**MR. O'CONNOR: Objection.**
**A. -- no. No.**
Q. [By Mr. Tangredi] Was he terminated with any kind of written document?
**A. No.**
Q. Was he ever sent anything in writing telling him he's --
**A. No.**
Q. -- done at the company?
**A. No.**
Q. It was all done orally?
**A. Orally.**
Q. Was there any --
**A. He come by and he was fine with it.**
Q. -- was there any closing paperwork to ending his employment relationship with Gregory Trucking?

MR. O'CONNOR: Objection.
**A. Was there any what?**
Q. Closing paperwork.
**A. No. Other than just pay him what we owed him.**
Q. Which included money for that short haul from BB&S to L P Adams?
**A. Whatever we owed him, yes.**
Q. He got 25 percent of that?
**A. That and then his trip up, yes.**
**(DEPOSITION EXHIBIT NUMBER 23 WAS MARKED FOR IDENTIFICATION)**
Q. Sorry. Would you take a look at the next exhibit, which I think is Number 23?
**A. [Witness reviews document.]**
Q. Do you recognize what those documents are in Exhibit Number 23?
**A. They're driver's daily logs.**
Q. And would these be the driver logs for Mr. Hooks?
**A. Yes.**
Q. And would they be from July 25th, 2016, to August 24th, 2016?
**A. Yes.**

Q. Does Gregory Trucking review the logs of its drivers after they're completed?
**A. Yes. We have -- we go through them.**
Q. And did Gregory Trucking review all of these logs contained within Exhibit Number 23?
**A. Well, I'm sure we did because we have to file them and everything. And then we have to send them off, you know.**
Q. And --
**A. Copies.**
Q. -- have these documents been determined to be accurate within Exhibit Number 23?
**A. Yes.**
Q. If they were not accurate, how would we know?
**A. Well, if they weren't accurate, they would -- you have to run these things and do your down time, your breaks, everything. And -- and these all look in order.**
Q. So Gregory Trucking looked through all of these and they're in --
**A. Yes. We go through all of our drivers' logs.**
Q. And there isn't a problem with any of these logs?

Page 194

A. **No.**
Q. Okay. I'd like you to take a look at Exhibit --
(DEPOSITION EXHIBIT NUMBER 24 WAS MARKED FOR IDENTIFICATION)
MR. TANGREDI: You can put the sticker right over that. Thank you.
Q. [By Mr. Tangredi] I'd ask you to take a look at Exhibit Number 24, Mr. Gregory.
A. **Okay. Oh, 24, oh. Okay. Page 24 there.**
Q. Can you tell us what Exhibit Number 24 is?
A. **Drug and alcohol information packet.**
Q. And is that the drug and alcohol information packet for Gregory Trucking Company?
A. **Yes.**
Q. So Gregory Trucking has a drug and alcohol policy?
A. **I mean, we -- they have to comply with and take a drug test, yes, and pass it. And then they're rand -- randomly checked. Yes.**
Q. But this Exhibit Number 24 is Gregory Trucking's --

Page 195

A. **Yes.**
Q. -- drug and alcohol policy?
A. **Yes.**
Q. And was this the policy in 2016?
A. **Yes.**
Q. Will you look at Page 2 of the drug policy?
A. **Yes.**
Q. Do you see the second paragraph from the top?
A. **Yes.**
Q. Does it say, [as read] "A critical part of the company's program is compliance with the Federal Motor Carrier Safety Regulations, CFR 49 Part 382"? Does it say that?
A. **Yes.**
Q. And does Gregory Trucking comply with the Federal Motor Carrier Safety Regulations CFR 49 Part 382?
A. **Yes, we comply with the Federal Motor Carrier's stuff. Yes.**
Q. And do you see the next paragraph where it says, [as read] "The designated employer contact is" --
A. **Yes.**

Page 196

Q. Do you see where it says, [as read] "Cecil Gregory is the company's designated person for providing information on the controlled substance program"? Does it say that?
A. **Yes.**
Q. And is that accurate?
A. **Well, the -- it's done and it comes back to the office there. I think Jim Staley is the one that -- when they -- they've got to have somebody where -- that they can send if it's negative or positive to. But I see them all.**
Q. Okay. If you'll look at Page 3, at the top it says, [as read] "Types of testing." Correct?
A. **Yes.**
Q. Do you see subheading B, post accident?
A. **Yes.**
Q. Does it say, [as read] "Administered as soon as practical following an accident involving a commercial motor vehicle if there is a fatality or if the driver is cited for a moving traffic violation. (We must test for alcohol within eight hours of the accident and controlled substances within 32 hours.)"
A. **Yes.**

Page 197

Q. Does it say that?
A. **Yes.**
Q. And is that the policy of Gregory Trucking?
A. **Yes. And --**
Q. And was it the policy in 2016?
A. **Yes.**
Q. And did Gregory Trucking arrange and have a post-accident drug test or alcohol test for Mr. Wiley Lenue Hooks after the crash in Dalton, Mass. --
A. **I don't know if he did it when he came back down here, but Wiley wanted one while he was -- before he ever left up there, while he was up there, to make sure. Now, whether or not -- you know, I -- I don't know if he was -- that they give him one or not when they went to the hospital.**
Q. Did Gregory Trucking arrange for a post-accident drug or alcohol test?
A. **Did we arrange for it? Yes, we'll send them to the -- to get a drug test. Yes.**
Q. Excuse me. After the crash in Dalton, Massachusetts, did Gregory Trucking arrange for a post-accident drug and/or alcohol test of Mr.

Page 198

Hooks?
**A. I'm sure he did when he got back.**
Q. Did Gregory Trucking arrange --
**A. No. I don't know. Let me put it that way.**
Q. All right. Your policy requires Gregory Trucking to arrange for a --
**A. Yes.**
Q. -- an alcohol or drug test, doesn't it?
**A. Yes.**
Q. Did Gregory Trucking arrange for one within eight hours after the crash in Dalton, Mass.?
**A. He could have had a drug test when he was up there during that eight hours. I don't know. But, you know, he was like 20 hours away from us down here.**
Q. But do you agree that the policy of Gregory Truck --
**A. Yes, I agree with this policy.**
Q. And it requires Gregory Trucking to arrange for the -- the alcohol or drug test, right?
**A. Yes.**
Q. Did Gregory Trucking arrange for one?

Page 199

MR. O'CONNOR: Objection.
**A. No.**
Q. [By Mr. Tangredi] Could Gregory Trucking have arranged for one?
MR. O'CONNOR: Objection.
**A. I'm sure we got him one when he got back down here. I don't know about up there. No.**
Q. [By Mr. Tangredi] Could you arrange for one for any driver anywhere while he's out on the road after a crash?
MR. O'CONNOR: Objection.
**A. I'd say that they -- the authorities would have all that done there.**
Q. [By Mr. Tangredi] Are you aware that the Federal Motor Carrier Safety Regulations require the motor carrier to arrange for it?
**A. No.**
Q. Okay. Are you aware that a drug test can be arranged within several hours of a crash anywhere, any time?
MR. O'CONNOR: Objection.
**A. Yes, I'm sure they can be.**
Q. [By Mr. Tangredi] Okay. Is there a reason why Gregory Trucking didn't arrange for one?

Page 200

**A. Well, I figured when he had -- he went to the hospital or wherever, that they did one. And I figured the authorities took care of that.**
Q. Do you know if he went to the hospital?
**A. No. I mean, I -- they all have to after that.**
Q. I'm sorry?
**A. All of them -- I always thought that they all go anyway, whether they want to or not. You know, I don't know. I don't know.**
Q. Do you agree that a trucking company must use only qualified drivers to prevent crashes and protect all of us from injury and death?
MR. O'CONNOR: Objection.
**A. I agree that all drivers need to be qualified. Yes.**
Q. [By Mr. Tangredi] Okay. Why?
**A. Well, you -- that's why they got CDLs. If -- if they can't pass or prove that they could run, then they cannot get a CDL license.**
Q. Do you agree that an unqualified driver could cause horrible crashes --
MR. O'CONNOR: Objection.
Q. -- on the highways?
**A. I would --**

Page 201

**MR. O'CONNOR: Objection.**
**A. -- an unqualified driver could cause a lot of trouble, yes.**
Q. [By Mr. Tangredi] Do you believe that a shipper must choose a competent and careful trucking company to ship its goods on the highways?
**A. Yes.**
**MR. O'CONNOR: Objection.**
MR. SCHULER: Objection.
MR. MEEHAN: Objection.
Q. [By Mr. Tangredi] Why?
**A. Well, you want -- you want to know that you can -- you're capable of picking up a load and -- and delivering it, you know.**
Q. Do you agree that B&C Timbers was a shipper using Gregory Trucking to transport its load to Rhode Island?
**A. Yes.**
Q. Do you agree that BB&S was a shipper using Gregory Trucking to transport its load to Dalton, Massachusetts?
**A. Yes.**
Q. Do you agree that tractor-trailer drivers must follow the safety rules of the road

Page 202

to prevent crashes and protect all of us from injury and death?

MR. O'CONNOR: Objection.

**A. Yes.**

Q. [By Mr. Tangredi] Why?

**A. Well, we all have to go by the -- whatever the law requires out there on the road.**

Q. Sir, what is a compliance review?

**A. It's meeting all of -- to see about meeting whatever you're in -- what you're asking for.**

Q. I'm sorry. I don't understand.

**A. Compliance is for -- it could be in compliance for anything. I don't understand what your question is.**

Q. Fair enough. Does the Federal Motor Carrier Safety Administration conduct periodic compliance reviews of motor carriers?

**A. They do. And they send people by too.**

Q. They send people to the motor carrier, correct?

**A. Yes. They will come by.**

Q. And an agent comes by and looks at your records, correct?

**A. Yeah. They will come by and do record**

Page 203

**checks.**

Q. What -- what is the purpose of a compliance review?

**A. Well, they check to make sure you're doing your logs, your -- your -- your fuelage. They keep up with any kind of -- anything that's going on within your -- your trucking company, you know, making -- making sure you're complying, you know.**

Q. And these compliance reviews are conducted by agents from the federal government, correct?

**A. Yes. By outside agencies, yes.**

Q. Outside or internal?

**A. They --**

Q. Federal agents.

**A. -- they send them in, you know, the -- they're federal, I guess.**

Q. And they're employees of the Department of Transportation?

**A. Yes.**

Q. And Gregory Trucking had one -- a compliance review -- on February 8th, 2011, correct?

**A. Well, I know we had one. And I can't**

Page 204

**tell you the exact date, no.**

Q. Okay.

THE VIDEOGRAPHER: We've got about three minutes left.

MR. TANGREDI: Okay. It might be a good time to take a break.

THE VIDEOGRAPHER: We're going off the record. The time now is 6:09.

[Off the record discussion.]

WHEREUPON at 6:09 p.m., the deposition was adjourned.

Page 205

CERTIFICATION

I, Heather L. Smith, Notary Public in and for the County of Cabarrus, State of North Carolina at Large, do hereby certify:

That there appeared before me the foregoing witness at the time and place herein aforementioned;

That the said witness was sworn by me to state the truth, the whole truth, and nothing but the truth, in said cause;

That the testimony was taken before me and recorded by Stenomask, thereafter reduced to typewriting under my direct supervision, and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in anywise associated with any of the parties to said cause of action, nor their counsel, and that I am not interested in the event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this the 10th day of May, 2019.

HEATHER L. SMITH
NOTARY #:19932170009

WITNESS CERTIFICATION

I, CECIL STUART GREGORY, do hereby certify,

That I have read and examined the contents of the foregoing pages of record of testimony as given by me at the times and place herein aforementioned;

And that to the best of my knowledge and belief, the foregoing pages are a complete and accurate record of all the testimony given by me at said time, except as noted on the attached here (Addendum A).

I have ____, Have not ____, made changes/corrections to be attached.

______________________________ (Signature)

I, ______________________________, Notary Public for the County of ____________, State of ____________, do hereby certify:

That the herein above named personally appeared before me this the _____ day of ______________, 20_____;

And that I personally witnessed the execution of this document for the intents and purposes herein above described.

________________________

NOTARY PUBLIC

My Commission Expires: (SEAL)

ADDENDUM A

Upon the reading and examination of my deposition testimony as herein transcribed, I note the following changes and/or corrections with accompanying reason(s) for said change/correction:

************************

| Page | Line | Is Amended to Read |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |