# Tab B

UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MASSACHUSETTS
SPRINGFIELD, MA.
Civil Action No. 3:17-CV-30174-MAP

THOMAS FORBES, as he is the          )
Personal Representative of the       )
Estate of GEORGE J. FORBES,          )
                                     )
                  PLAINTIFF          )
                                     )     V I D E O T A P E D
v.                                   )
                                     )          30(B)(6)
                                     )
GREGORY TRUCKING COMPANY, INC.;      )     D E P O S I T I O N
WILEY LENUE HOOKS, JR.;              )
GREGORY LEASING COMPANY, INC.;       )
B S G LEASING, INC.;                 )
B&C TIMBERS LLC; and                 )
BB&S ACQUISITIONS CORP.,             )
                                     )
                  DEFENDANTS         )
                                     )
-------------------------------------


CECIL GREGORY - Vol 2
30(B)(6) GREGORY TRUCKING CO.


TAKEN AT:
THE HILTON GARDEN INN
The Dobbs Boardroom
1017 Gateway Crossing Drive
Statesville, NC  28677

Thursday, April 25, 2019
9:04 A.M.

Brenda Carter
Court Reporter

Wyatt Legal Services, LLC
3936 Elizabeth Glen Way
Jamestown, NC 27282
(336) 510-8515

## Page 2

ATTORNEY NOTES

| PAGE LINE | SUBJECT MATTER | RELATES TO | ACTION |
|-----------|----------------|------------|--------|
| | | | |

## Page 4

INDEX

STIPULATIONS  5
EXAMINATION
 By Mr. Dino Tangredi  7
 By Mr. Matthew O'Connor  55
 By Mr. Thomas Schuler  61
 By Mr. Jeffrey Meehan  64
ADJOURNMENT  71
REPORTER CERTIFICATE  72
WITNESS CERTIFICATION  73
WITNESS ADDENDUM  74

EXHIBITS

| Name | Offered By | Identified |
|------|-----------|-----------|
| EXHIBIT 25 | Mr. Tangredi | 9 |
| (List of violations) | | |
| EXHIBIT 26 | Mr. Tangredi | 16 |
| (Compliance review) | | |
| EXHIBIT 27 | Mr. Tangredi | 17 |
| (Letter from Gregory Trucking to United States Department of Transportation dated March 8, 2011) | | |
| EXHIBIT 28 | Mr. Tangredi | 20 |
| (Settlement agreement) | | |
| EXHIBIT 29 | Mr. Tangredi | 23 |
| (Compliance Review 3/27/2017) | | |
| EXHIBIT 30 | Mr. Tangredi | 40 |
| (Bill of lading) | | |
| EXHIBIT 31 | Mr. Tangredi | 45 |
| (Driving record) | | |

## Page 3

APPEARANCES OF COUNSEL

Dino M. Tangredi, Esquire
THE MILES PRATT HOUSE
106 Mount Auburn Street
Watertown, MA  02472
Attorney for Plaintiff

Thomas P. Schuler, Esquire
LAW OFFICES OF STEVEN B. STEIN
P.O. Box 2903
Hartford, CT  06104-2903
Attorney for Defendant BB&S Acquisition Corp.

Matthew O'Connor, Esquire
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA  02210
Attorney for Defendants Gregory Trucking Company, Inc.,
Gregory Leasing Company, Inc., and B S G Leasing, Inc.
L. Jeffrey Meehan, Esquire
DOHERTY, WALLACE, PILLSBURY, MURPHY
1 Monarch Place, Suite 1900
Springfield, MA  01144-1900
Attorney for Defendant B&C Timbers, LLC
T. Dean Amos, Esquire
AMOS & KAPRAL, LLP
1331 N. Center Street
Hickory, NC  28601
Attorney for Defendant B&C Timbers, LLC
OTHER APPEARANCES
Herman Wyatt, Videographer

## Page 5

STIPULATIONS

    Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Brenda Carter, Notary Public in and for the County of Alamance, State of North Carolina at Large.

    Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

    It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

    Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

## Page 6

1          THE VIDEOGRAPHER: We're on the
2    record. The time now is 9:04. This is Volume 2
3    in the continuation of the 30(b)(6) deposition of
4    Mr. Cecil Gregory, taken in the matter of Thomas
5    Forbes, as he is the Personal Representative of
6    the Estate of George J. Forbes, Plaintiff, versus
7    Gregory Trucking Company; Wiley Lenue Hooks, Jr.;
8    Gregory Leasing Company, Incorporated; B S G
9    Leasing, Incorporated; B&C Timbers LLC; and BB&S
10   Acquisition Corporation, Defendants, being heard
11   in the jurisdiction of the United States District
12   Court in the Western District of Massachusetts,
13   Springfield, Mass., and the Civil Action Number is
14   3:17-CV-30174-MAP.
15          This deposition is being held at The
16   Hilton Garden Inn located at 1017 Gateway Crossing
17   Drive in Statesville, North Carolina.  Today is
18   Thursday, April the 25th, 2019.
19          My name is Herman Wyatt.  I'm a
20   certified legal video specialist with Wyatt Legal
21   Services, LLC.  The court reporter, also with
22   Wyatt Legal Services, is Brenda Carter.  Would
23   counsel please introduce themselves for the
24   record?
25          MR. TANGREDI:  Attorney Dino

## Page 7

1    Tangredi representing the plaintiff.
2          MR. O'CONNOR:  Matt O'Connor for
3    Gregory Trucking Company, Gregory Leasing Company,
4    B S G Leasing, and Wiley Lenue Hooks, Jr.
5          MR. SCHULER:  Tom Schuler for BB&S
6    Acquisitions Corp.
7          MR. AMOS:  Dean Amos for B&C
8    Timbers, LLC.
9          MR. MEEHAN:  Jeffrey Meehan for B&C
10   Timbers, LLC.
11          THE VIDEOGRAPHER:  The court
12   reporter may swear the witness and we may begin.
13          The witness, CECIL GREGORY, being first
14   duly sworn to state the truth, the whole truth,
15   and nothing but the truth, testified as follows:
16          (9:04 a.m.)
17          EXAMINATION
18   BY MR. DINO TANGREDI:
19   Q.  Good morning, Mr. Gregory.
20   A.  Morning.
21   Q.  I'd like to talk about the United States
22   Department of Transportation compliance review
23   conducted of Gregory Trucking back in February of
24   2011, okay?
25   A.  Yes.

## Page 8

1    Q.  You recall that event?
2    A.  I know about it, yes.
3    Q.  Tell me what happens when the United
4    States Department of Transportation comes to your
5    business to do a compliance review.
6    A.  Well, it's on a random selection and
7    they'll come in and then they'll go through all
8    your records.
9    Q.  Someone -- an actual person comes in to
10   the office --
11   A.  They come in, yes.
12   Q.  -- and you have to provide them with all
13   the information they request?
14   A.  Yes.
15   Q.  Okay.  So, that actually happened in
16   this particular case?
17   A.  Yes.
18   Q.  An agent came in from the federal
19   government --
20   A.  Yes.
21   Q.  -- to Gregory Trucking?
22   A.  Yes.
23   Q.  And he came in to the office?
24   A.  Yes --
25   Q.  And he --

## Page 9

1    A.  -- for several days.
2    Q.  He was in the office for several days?
3    The same office where Gregory Leasing is?
4    A.  Yes.
5    Q.  The same office where B S G is?
6    A.  Yes.
7    Q.  And the same office where B&C Timbers
8    is?
9    A.  Yes.
10   Q.  Very good.
11          (DEPOSITION EXHIBIT
12          NUMBER 25 WAS MARKED
13          FOR IDENTIFICATION)
14   Q.  Mr. Gregory, I'm going to ask you to
15   take a look at the next exhibit which is Number
16   25, and if you'll notice down at the bottom
17   they're Bates stamped INV and then in sequential
18   order beginning with page 1542 and ends at 1546.
19   Do you see that?
20   A.  Where at now?  At the top?
21   Q.  I'm sorry?
22   A.  I didn't understand there.
23   Q.  Okay.  So, Exhibit Number 25 is numbered
24   at the bottom --
25   A.  Yes.

| Page 10 | Page 12 |
|---|---|
| 1     Q.  -- and it's numbered with the prefix INV<br>2  and then page 1542 to start and it ends at 1546.<br>3  Do you see that?<br>4     A.  Yes.<br>5     Q.  Do you have all those pages?<br>6     A.  Yes.<br>7     Q.  And what is this document?<br>8     A.  It's Part V, it says.  It's some<br>9  violations.<br>10     Q.  Okay.  And up top it says, "Gregory<br>11  Trucking, Incorporated, formerly G&G Lumber,"<br>12  right?<br>13     A.  (Witness reviews document.)<br>14     Q.  Up at the very top of that first page?<br>15     A.  Well, it's on my second page.<br>16     Q.  Okay.  Is it cut off of your first page?<br>17     A.  Yeah --<br>18     Q.  Okay.<br>19     A.  -- but I know what it is.<br>20     Q.  And do you see it says, "U.S. Department<br>21  of Transportation Number 94749"?<br>22     A.  Yes.<br>23     Q.  Is that the Department of Transportation<br>24  number for Gregory Trucking?<br>25     A.  Yes. | 1     A.  Yes, I --<br>2     Q.  -- in violation of?<br>3     A.  I asked about that and the boy rode with<br>4  a driver on a 80-mile run and then he went and<br>5  tested and we never hired him though.<br>6     Q.  So, that was a violation against --<br>7     A.  Yes.<br>8     Q.  -- Gregory Trucking?  Okay.  Let's look<br>9  at the next one that I highlighted.  Failing to<br>10  conduct post-accident alcohol testing on driver<br>11  following a reportable crash.  Was Gregory<br>12  Trucking found in violation of that?<br>13     A.  It says that.  I don't recall that one<br>14  period there.  I don't --<br>15     Q.  Then we'll go to the next page and the<br>16  next highlighted violation, number 9, failing to<br>17  investigate drivers' backgrounds.  Gregory<br>18  Trucking was found in violation of that, correct?<br>19     A.  Yes.<br>20     Q.  Number 11, failing to investigate the<br>21  drivers' alcohol and controlled substances history<br>22  for the previous three years.  Gregory Trucking<br>23  was found in violation of that by the U.S.<br>24  Department of Transportation?<br>25     A.  Yes. |

| Page 11 | Page 13 |
|---|---|
| 1     Q.  Okay.  So, this document, is this -- do<br>2  you see in the far right top corner, it says,<br>3  "Review Date"?<br>4     A.  2/08 to 2/11.<br>5     Q.  Okay.  And is this the compliance review<br>6  list of violations for Gregory Trucking as a<br>7  result of that review?<br>8     A.  I've seen them, but I guess this is the<br>9  same thing, probably not the very same paper or<br>10  something, but I did look at them.  I was in<br>11  Newton in Catawba County for three or four years<br>12  there and, you know, I knew this was going on, but<br>13  I was not there when all this was taking place.<br>14     Q.  Let's go over a few of the violations,<br>15  okay?<br>16     A.  Yes.<br>17     Q.  If you see at the top, and I think I've<br>18  highlighted it for you, number 1, it says,<br>19  "Description," and it says, "Using a driver before<br>20  the motor carrier has received a negative pre-<br>21  employment control substance test result."  Is<br>22  that what it says?<br>23     A.  Yes.<br>24     Q.  And is that what Gregory Trucking was<br>25  found -- | 1     Q.  And number 12, failing to make an<br>2  inquiry into the driving record of each driver to<br>3  the appropriate state agencies in which the driver<br>4  held a commercial motor vehicle operator's license<br>5  at least once every 12 months.  Gregory Trucking<br>6  was found in violation of that?<br>7     A.  I'll say yes.  I mean, I know that we<br>8  were cited on three different violations.  That's<br>9  what they -- you know, there's more here than what<br>10  they fined us for, yes.<br>11     Q.  I'm just going over a few of them.<br>12  Let's look at number 14, the next highlighted one.<br>13  Failing to review the driving record of each<br>14  driver to determine whether that driver meets<br>15  minimum requirements for safe driving or is<br>16  disqualified to drive.  Gregory Trucking was found<br>17  in violation of that by the United States<br>18  Department of Transportation, correct?<br>19     A.  Yes.<br>20     Q.  The next one, failing to maintain a list<br>21  or certificate relating to violations of motor<br>22  vehicle laws and ordinances required by Section<br>23  391.27, and Gregory Trucking was found in<br>24  violation of that, correct?<br>25     A.  Yes. |

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                4/25/2019

5  (Pages 14 to 17)

---

Page 14

1      Q.  All right.  Let's go to the last page,
2  page number 1546 of this document, and again this
3  is the review date, if you look in the top right
4  corner, of February 8th, 2011, correct?
5      A.  Yes.
6      Q.  Does it indicate how many miles Gregory
7  Trucking drove at this point?
8      A.  1,956,248.
9      Q.  Thank you.  And in the next box below
10 that, it says, "Our proposed safety rating is
11 'Unsatisfactory.'"  Do you see that?
12     A.  Yes.
13     Q.  And when it -- our proposed safety
14 rating, that refers to the safety rating the
15 United States Department of Transportation
16 proposed to give Gregory Trucking after this
17 review, correct?
18     A.  Yes.
19     Q.  Tell us what an unsatisfactory rating
20 is.
21     A.  Well --
22         MR. O'CONNOR:  Objection.
23     A.  -- we failed to maintain some of these
24 things and then they made a list for us to correct
25 and we corrected all of them.  Uh-huh (yes).

---

Page 15

1      Q.  Now, what would an unsatisfactory rating
2  by the United States Department of Transportation
3  mean to Gregory Trucking?
4         MR. O'CONNOR:  Objection.
5      A.  I don't know how the criteria is.  I
6  think there's three levels and that -- until we
7  did some and they take place to some of this
8  category.
9      Q.  An unsatisfactory rating would shut down
10 Gregory Trucking, wouldn't it?
11     A.  If it says it's shut down, but we
12 weren't shut down, no.
13     Q.  I know.  If you got an unsatisfactory --
14     A.  Oh --
15     Q.  -- rating --
16     A.  -- okay.  Okay.  Yes.
17     Q.  -- Gregory Trucking would have to shut
18 down operations, right?
19     A.  Yes.
20     Q.  Unsatisfactory is fatal --
21     A.  Yeah.
22         MR. O'CONNOR:  Objection.
23     Q.  -- to a motor carrier, isn't it?
24         MR. O'CONNOR:  Objection.
25         (DEPOSITION EXHIBIT

---

Page 16

1         NUMBER 26 WAS MARKED
2         FOR IDENTIFICATION)
3      Q.  We've just marked Exhibit Number 26, Mr.
4  Gregory.  Could you take a look at that and let me
5  know when you're done looking at it?
6      A.  (Witness reviews document.)  Yes.
7      Q.  Do you recognize that document?
8      A.  Yes, it was the fines.
9      Q.  And when you say "the fines," the fines
10 for what?
11     A.  Well, there was three different things
12 they fined us for.
13     Q.  Who is "they" fined you for?
14     A.  The U.S. Department of Transportation.
15     Q.  And what is the date on this document?
16     A.  March 7th.
17     Q.  So, is it fair to say the United States
18 Department of Transportation came into Gregory
19 Trucking's offices and performed a compliance
20 review in February of 2011 and as a result the
21 Department of Transportation sent this letter to
22 Gregory Trucking on March 7th, 2011?
23     A.  Yes.
24     Q.  And this letter essentially says that
25 Gregory Trucking was found in violation of several

---

Page 17

1  federal regulations and there's a fine proposed to
2  be paid, correct?
3         MR. O'CONNELL:  Objection.
4      A.  Yes.
5      Q.  Okay.  And does this letter also
6  indicate that Gregory Trucking would be rated
7  unsatisfactory?
8      A.  I don't see that.
9      Q.  Was it your understanding Gregory
10 Trucking was going to be rated unsatisfactory?
11     A.  If we didn't correct, yes.
12     Q.  And Gregory Trucking did some things --
13     A.  Yes.
14     Q.  -- to satisfy the Department of
15 Transportation?
16     A.  Yes.
17     Q.  Let me ask you to take a look at the
18 next exhibit.
19         (DEPOSITION EXHIBIT
20         NUMBER 27 WAS MARKED
21         FOR IDENTIFICATION)
22     Q.  Take a look at Exhibit Number 27.
23     A.  Yes.
24     Q.  It might be two-sided.  Sir, what is
25 Exhibit Number 27?

---

## Page 18

1    A.  It's a letter I guess we sent to the
2   USDOT.
3       Q.  And "we," it's a letter from Gregory
4   Trucking --
5       A.  Yes.
6       Q.  -- to the United States Department of
7   Transportation and it's dated March 8th, 2011,
8   correct?
9       A.  Yes.
10      Q.  This is the day after Gregory Trucking
11  received a letter from the United States
12  Department of Transportation fining it --
13      A.  Yes.
14      Q.  -- and telling Gregory Trucking it may
15  be rated unsatisfactory?
16      A.  Yes.
17      Q.  Okay.  Who sent the letter, Exhibit
18  Number 27, dated March 8th to the Department of
19  Transportation?
20      A.  I'd say Martha.
21      Q.  And then, on the back of Exhibit Number
22  27, it's signed by Martha Somers?
23      A.  Yes.
24      Q.  And it says "Controller" underneath her
25  signature, correct?

## Page 19

1       A.  Yes.
2       Q.  What is a controller?
3       A.  She has -- she can look after or has
4   authority to make some decisions on this.
5       Q.  On behalf of Gregory Trucking?
6       A.  Yes.
7       Q.  Now, could you -- it appears as though
8   this letter says you were requesting a waiver of
9   all penalties; is that right?
10      A.  Yes.
11      Q.  And you proposed -- Gregory Trucking
12  proposed some corrective actions that they would
13  take --
14      A.  Yes.
15      Q.  -- correct?  And as a result of Gregory
16  Trucking's letter that they sent the Department of
17  Transportation, was Gregory Trucking able to avoid
18  an unsatisfactory rating?
19      A.  Yes.
20      Q.  And what rating did Gregory Trucking get
21  in 2011?
22      A.  I think it was conditional.
23      Q.  And what is a conditional rating?
24      A.  Sort of in the middle, I guess.  It
25  still needs improvement.

## Page 20

1       (DEPOSITION EXHIBIT
2       NUMBER 28 WAS MARKED
3       FOR IDENTIFICATION.)
4       Q.  Take a look at the next exhibit, Number
5   28, please.
6       A.  (Witness reviews document.)
7       Q.  Do you recognize that document, Mr.
8   Gregory?
9       A.  Yes, I have seen it.
10      Q.  Okay.  What is it?
11      A.  It's a settlement agreement.
12      Q.  And a settlement agreement between who?
13      A.  The federal motor carriers and the --
14  Gregory Trucking.
15      Q.  And if you look at the back page, the
16  last page, who signed this agreement on behalf of
17  Gregory Trucking?
18      A.  Martha.
19      Q.  And after her name, it's got some other
20  writing.  Can you tell me what that says?
21      A.  I guess it says "Assistant Secretary"
22  maybe.  I don't know.
23      Q.  And it's dated March 29th, 2011?
24      A.  Yes.
25      Q.  Ms. Somers had authority to enter into

## Page 21

1   this settlement agreement on behalf --
2       A.  Yes.
3       Q.  -- on behalf of Gregory Trucking?
4       A.  Yes.
5       Q.  Thank you.  And I'd like you to look at
6   -- if you look at the bottom of the page, they're
7   numbered INV and then 1620 through 1625.
8       A.  Yes.
9       Q.  Would you look at page 1622?
10      A.  Twenty-two.
11      Q.  Sixteen twenty-two.
12      A.  Okay.
13      Q.  Number 6?
14      A.  All right.
15      Q.  Does the first sentence say that the
16  parties stipulate the claims set forth in the
17  above-described notice of claim is valid?  Does it
18  say that?
19      A.  Yes.
20      Q.  And if you look at number 9 on the next
21  page -- you see that one?
22      A.  Yes.
23      Q.  Could you read what it -- the first
24  sentence of number 9?
25      A.  "Execution of this settlement agreement

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                                    4/25/2019

Page 22

1    will constitute admission of the violation(s) set
2    forth in this agreement and these violations shall
3    constitute prior offense under 49 U.S.C.
4    521(b)(2)(D) and/or 14901© and all of 1523© which
5    will lead to higher penalties in the future,
6    enforcement actions, and adverse future Safe-Stat
7    ranking."
8        Q.  So, this was the finalization of the
9    Department of Transportation's compliance review
10   of Gregory Trucking in 2011, correct?
11       A.  Yes.
12       Q.  And have you ever been told what a
13   conditional safety rating on a motor carrier
14   means?
15       A.  I've never -- no one has said, no.
16       Q.  Have you ever looked it up?
17       A.  No.
18       Q.  The United States Department of
19   Transportation conducted another compliance review
20   in April of 2017 of Gregory Trucking, true?
21       A.  Yes.
22       Q.  Same kind of situation, a federal
23   representative comes in to the office?
24       A.  Yes.
25       Q.  They go through your records?  Gregory

Page 23

1    Trucking has to produce anything that they're
2    asked for?
3        A.  Yes.
4        Q.  What was the result of the 2017
5    compliance review of Gregory Trucking?
6        A.  There was some fines over, I think, some
7    log books, I believe.  I don't -- I haven't read
8    them all or seen them.  I can't remember.
9        Q.  But you're aware that there were
10   violations found and Gregory Trucking was again
11   fined, correct?
12       A.  Yes.
13       Q.  Do you remember how much the fine was
14   for the first time after the 2011?
15       A.  You mean in 2017?
16       Q.  The first one, in 2011.  The one
17   before --
18       A.  Four thousand.
19       Q.  Four thousand?
20       A.  Yeah.
21       Q.  Okay.  If I were to suggest 4,060 --
22       A.  Yes.
23           (DEPOSITION EXHIBIT
24           NUMBER 29 WAS MARKED
25           FOR IDENTIFICATION)

Page 24

1        Q.  Okay.  So, now in 2017, the United
2    States Department of Transportation fined Gregory
3    Trucking again.  Do you remember how much that
4    fine was?
5        A.  I thought it was 5,000, but this says
6    77.
7        Q.  Seven thousand seven hundred, correct?
8        A.  Yes.
9        Q.  All right.  And after the United States
10   Department of Transportation's compliance review
11   in 2017, what was the safety rating of Gregory
12   Trucking?
13       A.  After this?
14       Q.  After the 2017 compliance review?
15       A.  Conditional.
16       Q.  Conditional?  This was after the truck
17   crash that killed George Forbes, correct?
18       A.  Yes.
19       Q.  I want to talk about -- go back and talk
20   about BB&S in Rhode Island and the arrangements
21   between BB&S in Rhode Island and Mr. Hooks to
22   transport a load of lumber from Rhode Island to
23   L.P. Adams in Dalton, Mass.  Okay?
24       A.  Yes.
25       Q.  Did anyone at BB&S communicate with

Page 25

1    anyone at Gregory Trucking in North Carolina prior
2    to that transaction about hiring Gregory Trucking
3    to deliver the lumber to L.P. Adams in Dalton?
4        A.  No.
5        Q.  No communications by telephone?
6        A.  No.
7        Q.  No communications by e-mail?
8        A.  No.
9        Q.  Nobody from BB&S contacted --
10       A.  Not that I'm aware of, no.
11       Q.  Okay.  Well, you're here as the person
12   from Gregory Trucking, correct?
13       A.  Yes.
14       Q.  You're the person who has to check into
15   all these things?
16       A.  Well, I got the girls there in the
17   office, yes, but, you know, my understanding was
18   we knew about it after the accident.
19       Q.  And you've checked with everybody and
20   nobody knew about it before the crash?
21       A.  No.
22       Q.  Okay.  No, you --
23       A.  No.
24       Q.  Did you check with everyone in the
25   office about who knew what before the crash?

336-510-8515                                                                hdwyatt@gmail.com

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                    4/25/2019

Page 26

1     A.  No, I did not ask each one of them, no.
2     Q.  You haven't?
3     A.  No.  I was told about it after the
4  accident.
5     Q.  And what were you told?
6     A.  That he -- about the accident and then
7  found out that he was some -- off the beaten path
8  to go where --, but then I heard that he had taken
9  a short haul load for them.
10    Q.  And is it your understanding that nobody
11  at Gregory Trucking knew anything about the short
12  haul to L.P. Adams?
13    A.  Not until after the accident.  He told
14  him that he had -- he had picked up a load.
15    Q.  Okay.  At any time, has Gregory Trucking
16  had communications with anybody at BB&S in Rhode
17  Island, at any time?
18    A.  I don't know.
19    Q.  Have you?
20    A.  I haven't.
21    Q.  You have not?
22    A.  (Witness indicates negatively.)
23    Q.  Okay.  Do you know if anyone at BB&S has
24  ever communicated with anybody at Gregory Trucking
25  about its conditional safety rating before hiring

Page 27

1  Gregory Trucking?
2     A.  I do not know.
3     Q.  Do you know who would know?
4     A.  I don't know if -- I doubt if they'd
5  checked on that, no, but we hauled in there
6  regularly, and we had hauled some previous loads
7  for them.
8     Q.  So, when you say "regularly," can you
9  tell us how often, in general?
10    A.  One to two, three loads a week.
11    Q.  For BB&S?
12    A.  Not for BB&S.
13    Q.  Okay.
14    A.  For Yellow Pine or Double L.  We have
15  took some up there for them.
16    Q.  I'm talking about hauling for BB&S.
17  That's what I --
18    A.  We don't -- no.  We just -- we have
19  hauled some short ones, because yesterday there
20  was four trips made.
21    Q.  We have a record that Gregory Trucking
22  has transported on four occasions for BB&S,
23  correct?
24    A.  Yes.
25    Q.  Two times in 2015 and twice in 2016; is

Page 28

1  that correct?
2     A.  I don't know the dates.
3     Q.  The dates were on the documents.  Do you
4  remember seeing that?
5     A.  Well, I remember seeing the documents,
6  yes.
7     Q.  You remember there were four trips?
8     A.  Yes.
9     Q.  Do you have any knowledge of BB&S ever
10  inquiring of Gregory Trucking in writing, orally,
11  by phone, by e-mail about Gregory Trucking's
12  conditional safety rating?
13    A.  No.
14    Q.  Okay.  After the initial -- the first
15  compliance review by the federal government back
16  in 2011 --
17    A.  Yes.
18    Q.  -- what steps did Gregory take to
19  improve their safety?
20    A.  Well, they went over all the -- what the
21  motor carrier person wrote up and asked us for a
22  correction and they started implementing them.  I
23  mean, I was not there.  I don't know.
24    Q.  Okay.  Who was in charge if you weren't
25  there?

Page 29

1     A.  Well, they took care of the -- the
2  office, you know, would let everyone know what
3  kind of loads was coming up and the drivers come
4  in, they would check.  It would've been Martha or
5  Gayle at that particular time, but we were going
6  through an extremely hard time at that time, there
7  and up at the -- Newton.  So, you know, we was all
8  stretched out pretty much and it -- and there was
9  several trucks, but, you know, then it dwindled
10  down to none, or two.
11    Q.  When did it dwindle to two?
12    A.  Between around '12, 2012, down to two-
13  fourteen.  I think there was two when we started
14  running back some.
15    Q.  Despite the efforts made by Gregory
16  Trucking to improve their safety after the 2011
17  compliance review, the 2017 compliance review
18  revealed safety violations, correct?
19    A.  Uh-huh (yes).
20    Q.  Is that right?
21    A.  Yes.
22    Q.  Does Wiley Lenue Hooks still work for
23  Gregory Trucking?
24    A.  No.
25    Q.  If Gregory Trucking needed to hire a

Case 3:17-cv-30174-MGM   Document 110-3   Filed 01/07/20   Page 10 of 21

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                    4/25/2019

9  (Pages 30 to 33)

## Page 30

1 tractor trailer driver today or at any time in the
2 past, would Gregory Trucking hire a driver that it
3 knew had one conviction for OUI?
4          MR. O'CONNOR:  Objection.
5     A.  For what?
6     Q.  For driving under the influence.
7     A.  Well, it depends on how long had it been
8 and if they'd be cleared or not, but, you know, we
9 would check that out pretty stiff on a DUI, but it
10 depends on the -- if they'd had it and they had
11 overcome it and was cleared of it and all, you
12 know.
13     Q.  How old would it have to be?
14          MR. O'CONNOR:  Objection.
15     A.  Well, that's a question I don't know.
16 I'd have to look at it and see and then sit down
17 with the driver itself.
18     Q.  If Gregory Trucking --
19     A.  But then, you know, I'd -- we'd have to
20 vet it through our insurance company and they'd
21 have to tell us anyway.
22     Q.  If Gregory Trucking needed to hire a
23 tractor trailer driver today or at any time in the
24 past, would Gregory Trucking hire a driver that it
25 knew had two convictions for driving while

## Page 31

1 impaired?
2          MR. O'CONNOR:  Objection.
3     A.  Well, if it was in a tractor, no, road
4 tractor, and then, like I said, that'd be -- if it
5 was in his automobile and it -- I don't know the
6 time, but I'd say I'd look at that hard, yes,
7 before I did.
8     Q.  If Gregory Trucking needed to hire a
9 tractor trailer driver today or at any time in the
10 past, would Gregory Trucking hire a driver that it
11 knew had three convictions for driving while
12 impaired?
13          MR. O'CONNOR:  Objection.  Object
14 to form.
15     Q.  You can answer.
16     A.  No.
17     Q.  That's an absolute no?
18     A.  Yes.
19     Q.  If Gregory Trucking needed to hire a
20 tractor trailer driver today or at any time in the
21 past, would Gregory Trucking hire a driver that it
22 knew had convictions for reckless driving?
23          MR. O'CONNOR:  Objection.
24     A.  Well, if I seen it, you know, if I
25 pulled up the record and it was showing it, that

## Page 32

1     -- you know, I'd just have to take that and look
2 at it and study it and the driver, the person his
3 self and all.  But, you know, you can be pulled
4 for a lot of things and it's not -- it just
5 depends on the situation.
6     Q.  If Gregory Trucking needed to hire a
7 tractor trailer driver today or any time in the
8 past, would Gregory Trucking hire a driver that it
9 knew had his license suspended previously?
10          MR. O'CONNOR:  Objection.
11     A.  Again, it's -- that's a situation.
12 Depends on the suspension and the time and if
13 they're back and they're vetted and the insurance
14 company will say yes, then, you know --
15     Q.  You rely an awful lot on your insurance
16 company?
17     A.  Well, they're the ones that's doing it
18 and backing it and furnishing the insurance and we
19 want them to be satisfied with it, and that is one
20 of the requirements, too.
21     Q.  Does Gregory Trucking provide its
22 insurance agent with a list of all its drivers?
23     A.  Oh, yeah, they got a list of all of them
24 and their records and all, I guess.  I mean,
25 they'll send us a record if we -- you know, and

## Page 33

1 tell us or whatever.
2     Q.  When you say a record, you're talking
3 about the driving record?
4     A.  Yes.
5     Q.  But Gregory Trucking also can do that
6 from Gregory Trucking's office, correct?
7     A.  I think it can pull up if they've got
8 the license number and all that and all.  Maybe
9 they can.  I -- you know, I'm not so sure about
10 that -- on that, but I do know that our insurance
11 company, they'll send us a whole thing on them.
12     Q.  If Gregory Trucking needed to hire a
13 tractor trailer driver today or any time in the
14 past, would Gregory Trucking hire a driver that it
15 knew used marijuana?
16          MR. O'CONNOR:  Objection.
17     A.  It just depends on if it -- how old he
18 was when he used it, I guess, you know.
19     Q.  Is Gregory Trucking a member of any
20 trucking safety organizations?
21     A.  Just the federal motor regulation that
22 come.  You have to have it posted on your walls
23 and stuff.
24     Q.  But that's not an organization you join,
25 that's an organization --

Wyatt Legal Services, LLC

336-510-8515                                          hdwyatt@gmail.com

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                    4/25/2019

| Page 34 |
|---|
| 1    A.  No. |
| 2    Q.  -- that governs motor carriers? |
| 3    A.  Yeah.  No. |
| 4    Q.  But there are organizations for motor |
| 5  carriers, correct? |
| 6    A.  Our current insurance agent has their |
| 7  own they send around now and he schedules when he |
| 8  -- to come up here -- or come to Union Grove. |
| 9    Q.  I don't understand. |
| 10    A.  He's supposed to be an expert on |
| 11  trucking and safety and everything, and he's |
| 12  coming to do classes and stuff for us. |
| 13    Q.  So, that sounds like some kind of |
| 14  consultant?  Is that what that is? |
| 15    A.  I don't -- yes, I guess it is. |
| 16    Q.  So, as a trucking company, is Gregory |
| 17  Trucking a member of, say, the Association |
| 18  Trucking of America -- the Associated Truckers of |
| 19  America? |
| 20    A.  No. |
| 21    Q.  Are they a member of any trucking |
| 22  organization? |
| 23    A.  If we are, I don't know it. |
| 24    Q.  Who would know it? |
| 25    A.  I guess there in the office.  You'd |

| Page 35 |
|---|
| 1  probably have to pay some kind of membership or |
| 2  something, you know. |
| 3    Q.  Is paying a membership to join any of |
| 4  these clubs a problem? |
| 5    A.  If we do, I don't know.  I don't do any |
| 6  of that paperwork. |
| 7    Q.  Have you ever heard of The American |
| 8  Trucking Association? |
| 9    A.  I have, yes. |
| 10    Q.  What do you know about them? |
| 11    A.  Just the name. |
| 12    Q.  You ever hear of The Transportation |
| 13  Intermediaries Association? |
| 14    A.  No. |
| 15    Q.  Truckload Carriers Association? |
| 16    A.  No. |
| 17    Q.  The National Safety Council? |
| 18    A.  I've heard of different organizations, |
| 19  yes.  Those particular ones, I don't know. |
| 20    Q.  Have you heard of The Insurance |
| 21  Institute for Highway Safety? |
| 22    A.  I may have seen something or heard.  I |
| 23  mean, we get magazines all the time from all these |
| 24  people, a lot of people in the trucking industry. |
| 25    Q.  Which magazines do you get? |

| Page 36 |
|---|
| 1    A.  I don't know the name of them. |
| 2    Q.  Do you know the name of the person that |
| 3  died in the crash? |
| 4    A.  Mr. Forbes. |
| 5    Q.  Do you know his first name? |
| 6    A.  George. |
| 7    Q.  Do you know the town where the crash |
| 8  happened? |
| 9    A.  I can't think of the name of it.  I |
| 10  mean, I've heard it and seen it, yes. |
| 11    Q.  Do you know the street names where the |
| 12  crash happened? |
| 13    A.  No. |
| 14    Q.  Do you know what street Mr. Hooks was |
| 15  driving on? |
| 16    A.  I don't know the road he was on, no. |
| 17    Q.  Do you know what kind of car George |
| 18  Forbes was driving? |
| 19    A.  It was a pickup. |
| 20    Q.  Do you know what time the crash |
| 21  occurred? |
| 22    A.  Early morning. |
| 23    Q.  How early? |
| 24    A.  I don't know the exact time. |
| 25    Q.  Do you know how old George Forbes was |

| Page 37 |
|---|
| 1  when he died? |
| 2    A.  Not exact date, no.  I think -- |
| 3    Q.  Do you know how long he lived after the |
| 4  crash? |
| 5    A.  Two days. |
| 6    Q.  Do you know the cause of death of George |
| 7  Forbes? |
| 8      MR. O'CONNOR:  Objection. |
| 9    A.  My understanding, to start with, it was |
| 10  his legs was broken or crushed or something and |
| 11  they had to operate on him. |
| 12    Q.  When did Gregory Trucking learn of |
| 13  George Forbes' death? |
| 14    A.  I would say right after the -- his |
| 15  death. |
| 16    Q.  How did Gregory Trucking learn -- |
| 17    A.  I don't know who -- |
| 18    Q.  -- of the death? |
| 19    A.  -- called it in or told them. |
| 20    Q.  And what investigation did Gregory |
| 21  Trucking do once they learned of his death? |
| 22    A.  We informed our -- I don't know if the |
| 23  insurance done that and they take -- took care of |
| 24  everything and told us to go on, let's leave it be |
| 25  and they would do the work on it. |

## Page 38

1    Q.  Does Gregory Trucking believe it played
2  any role in George Forbes' death?
3        MR. O'CONNOR:  Objection.
4    A.  Any what?
5    Q.  Any role in his death.
6    A.  Well, we --
7        MR. O'CONNOR:  Objection.
8    A.  It was our vehicle, so -- you know, it
9  was an accident, but it was our truck.
10    Q.  Did anyone from Gregory Trucking reach
11  out to the Forbes family after it learned that
12  George Forbes died?
13    A.  No.
14    Q.  Are you aware that the Dalton public
15  schools were in session on August 24th, 2016?
16        MR. O'CONNOR:  Objection.
17    A.  No, I didn't check into the schools, no.
18    Q.  Are you aware school buses with children
19  inside them passed through the intersection where
20  George Forbes was killed at 7 a.m.?
21        MR. O'CONNOR:  Objection.
22    A.  No.
23    Q.  Are you aware there's a school bus stop
24  within 300 feet of the intersection?
25        MR. O'CONNOR:  Objection.

## Page 39

1    A.  No.
2    Q.  Are you aware pedestrians use the
3  crosswalks at the intersection where George Forbes
4  was killed every morning?
5    A.  No --
6        MR. O'CONNOR:  Objection.
7    A.  -- but I'm familiar with all of these
8  things, these --
9    Q.  Are you aware that there's a public
10  transportation bus that travels through this
11  intersection daily at around 7 a.m.?
12        MR. O'CONNOR:  Objection.
13    A.  No, I'd say that was the first time that
14  we were there.
15    Q.  Are you aware hundreds of cars and
16  trucks pass through the intersection where George
17  Forbes was killed in the early morning hours?
18    A.  No.
19    Q.  That there are people going through that
20  intersection on their way to work --
21        MR. O'CONNOR:  Objection.
22    Q.  -- are you aware of that?
23    A.  Well, I'm aware of people traveling and
24  going back and forth to work, school, and all
25  this, yes.

## Page 40

1    Q.  School, church, work?
2    A.  Yes.  I mean, that happens in Union
3  Grove, out here, everywhere.
4        (DEPOSITION EXHIBIT
5        NUMBER 30 WAS MARKED
6        FOR IDENTIFICATION)
7    Q.  Sir, would you take a look at Exhibit
8  Number 30 for us and let me know when you're done
9  looking at it?
10    A.  (Witness reviews document.)  Okay.
11    Q.  Do you recognize what that is?
12    A.  No.  Well, I know what it is, but, you
13  know, I don't recognize it.
14    Q.  What is it?
15    A.  It's a bill of lading for that load of
16  lumber.
17    Q.  Which load of lumber?
18    A.  I'm saying -- I reckon this is what
19  Buster took to L.P. Adams.  I never -- this is the
20  first time I've ever seen what he hauled over
21  there.
22    Q.  What does it tell you about the load
23  that Gregory Trucking hauled?
24    A.  Well, it told the dimensions of
25  everything it done and the delivery hour -- I

## Page 41

1  mean, let's see.  The address we was delivering
2  and all.
3    Q.  And this is a load that Gregory Trucking
4  got paid for, correct?
5    A.  Yes.
6    Q.  And if you look at the bottom of all
7  three pages, do you see a signature?
8    A.  Yes.
9    Q.  Whose signature is that?
10    A.  It's Wiley Hooks'.
11    Q.  Does Exhibit Number 30 appear to be one
12  trip?
13    A.  I'd -- well, yeah, it has to be one
14  trip.
15    Q.  Why does it have to be?
16    A.  Well, he just went there with a load and
17  then he went on from there, so I mean I guess this
18  was all that was on that one particular load.
19    Q.  In regards to Exhibit Number 30, that
20  load, do you agree Gregory Trucking was
21  transporting this load in furtherance of the
22  business of Gregory Trucking?
23    A.  In what?
24    Q.  In furtherance of the business of
25  Gregory Trucking?

## Page 42

1      A. What does that mean?
2      Q. It means for the benefit of Gregory
3  Trucking?
4      A. Yes.
5          MR. SCHULER: Objection.
6          MR. O'CONNOR: Objection.
7      Q. Do you agree that Gregory Trucking
8  profited from the delivery to L.P. Adams?
9          MR. SCHULER: Objection.
10     A. Well, I'd say it made some on it, yes,
11 on the freight.
12     Q. And do you agree that Gregory Trucking
13 was transporting the load in Exhibit Number 30 in
14 furtherance of the business of BB&S also?
15         MR. SCHULER: Objection.
16     A. Yes.
17     Q. And do you agree the transportation of
18 this load in Exhibit 30 to L.P. Adams by Gregory
19 Trucking on August 23rd, 2016, was within the time
20 and the space imposed on Gregory Trucking by BB&S?
21         MR. SCHULER: Objection.
22         MR. O'CONNOR: Objection.
23     A. Was it -- I didn't understand that.
24     Q. Okay. This load in Exhibit Number 30 --
25     A. Yes.

## Page 43

1      Q. -- was this transported at the direction
2  of BB&S for a certain time frame?
3          MR. SCHULER: Objection.
4      A. I don't -- I didn't have anything to do
5  with that. I do not know -- I mean, I'd say when
6  he picked it up he knew about what time he could
7  get there and unload, yes.
8      Q. Do you agree that BB&S and Gregory
9  Trucking profited from the delivery of the load in
10 Exhibit Number 30?
11         MR. SCHULER: Objection.
12     A. Well, you know, I'd say that, but you
13 don't make on everything you do, but if there was
14 no problems or anything, and I don't know what
15 they had in their lumber. I can't talk for them.
16     Q. Fair enough. Can you tell us three
17 things that could've been done differently to have
18 prevented the death of George Forbes?
19         MR. O'CONNOR: Objection.
20     A. Well, I -- the accident, we didn't want
21 no accident to happen, so I mean, you know, I
22 don't know how to comment on that, you know.
23 They're happening every day and I hate it, and I
24 hate it for them, but, you know it was nothing
25 intentional that we did for that accident, so, you

## Page 44

1  know, I don't know how to comment on that.
2      Q. Well, have you had a chance since the
3  death to reflect on the circumstances of how it
4  happened?
5          MR. O'CONNOR: Objection.
6      A. Well, I know that it was a work day and
7  he was moving lumber and he was going to pick up a
8  load and, you know, when he got to that particular
9  intersection -- you know, I wasn't there so I
10 can't tell you just what happened or how. It's
11 just through what I heard or read or seen.
12     Q. Do you think if Gregory Trucking had a
13 little more investigation about Mr. Hooks they
14 would've discovered that he didn't have a driver's
15 license and he wasn't safe to put on the roads?
16         MR. O'CONNOR: Objection.
17     A. Well, I mean, there again, that's our
18 insurance cover and we -- he had license, you
19 know. They -- you know, it says that they were
20 suspended February, but then he -- it wasn't just a
21 day or two there, but when we found that out we
22 jerked him until he got them -- his license back,
23 you know, in compliance, so, you know, I don't
24 know the circumstances at 2/11. I mean, in
25 February.

## Page 45

1      Q. I'm going to ask this to be marked --
2  this is the driving record of Wiley Lenue Hooks.
3  I only have one copy and I'm sorry, but it's
4  previously been provided.
5          (DEPOSITION EXHIBIT
6           NUMBER 31 WAS MARKED
7           FOR IDENTIFICATION)
8          MR. MEEHAN: Thirty-one?
9          MR. TANGREDI: It is Number 31.
10         MR. O'CONNOR: Yeah. I just want
11 to look over -- this is in your initial
12 disclosures, right?
13     A. (Witness reviews document.)
14     Q. Sir, did you have a chance to look at
15 Exhibit --
16     A. Yes.
17     Q. -- Number 31? Do you know what this is?
18     A. The North Carolina Division of Motor
19 Vehicles driving record.
20     Q. Have you ever seen that document before?
21     A. I've not seen this document before, no.
22     Q. Have you ever seen a document like it
23 before for someone -- for a different individual?
24     A. I've seen my own.
25     Q. Okay. Who is that the driving record

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                                    4/25/2019

## Page 46

1    of?
2        A.  Wiley Hooks.
3        Q.  How many pages is it?
4        A.  (Witness reviews document.)  Seven -- or
5    eight.  Yeah, page 8.
6        Q.  And you've never seen that document
7    yourself before?
8            MR. O'CONNOR:  Objection.
9        A.  I've not seen this document, no.
10       Q.  Have you ever seen a driving record of
11   Wiley Lenue Hooks at any time that Gregory
12   Trucking ever used Mr. Hooks as a driver?
13       A.  Well, I have -- I know when he came back
14   and they sent his license off and all and they
15   sent his record back and his CDLs and -- they said
16   he could drive, so -- but -- and then we had
17   worked him in previous times, you know, and he'd
18   always done a good job, so --
19       Q.  I want to go back to the delivery
20   between Rhode Island and Dalton for a question or
21   two.  Did BB&S hire Gregory Trucking for that
22   delivery?
23       A.  Yes.
24       Q.  I want to ask you a hypothetical
25   question.  Let's say Gregory Trucking sends a

## Page 47

1    truck from North Carolina loaded with lumber to
2    New York, and then that truck has to come back
3    empty to North Carolina.  Is that considered one
4    trip?
5            MR. O'CONNOR:  Objection.
6        A.  Yes.
7        Q.  When is that trip complete?
8        A.  When he gets back to the yard.
9        Q.  Why isn't it complete when he makes the
10   delivery?
11       A.  Well, I mean it is completed when the
12   load is delivered, but as far as that particular
13   load that's on it, but, you know, then if he's in
14   New York we try to load him back because expenses
15   and stuff.
16       Q.  But if the mission ahead of time is just
17   North Carolina to New York and then come back,
18   that trip is complete when he gets back to North
19   Carolina?
20       A.  Well, it'd be --
21           MR. O'CONNOR:  Objection.
22       A.  -- complete when he drops his load and
23   then we'll try hard to find him something when he
24   gets back.
25       Q.  But assuming you don't find anything --

## Page 48

1        A.  Well, he has to come back empty.
2        Q.  He has to -- comes back empty and
3    that's --
4        A.  -- not a very good run.
5        Q.  It's hypothetical, thank goodness, huh?
6        A.  Do what?
7        Q.  It's hypothetical?
8        A.  Yes.
9            MR. O'CONNOR:  Objection.
10       Q.  So, why is it only complete when he gets
11   back?
12           MR. O'CONNOR:  Objection.
13       A.  Why?
14       Q.  Is that the nature of the trucking
15   business sometimes?
16       A.  Well, at times, you do have to do some
17   deadheading, yes, and it's, you know -- if he goes
18   -- wherever he goes, he's got to get back, yes.
19       Q.  Do you know what the address 3110 Valway
20   Road, Boone, North Carolina is?
21       A.  What?
22       Q.  Do you recognize the address 3110 Valway
23   Road, Boone, North Carolina?
24       A.  No.  What is it?
25       Q.  Have you ever been to Boone, North

## Page 49

1    Carolina?
2        A.  I've been to Boone several times.
3        Q.  What do you do in Boone?
4        A.  Well, Appalachian State University's
5    there.  My daughter went there four and a half
6    years and then --
7        Q.  Okay.
8        A.  You know, it's a nice little mountain
9    town, you'll drive up there.
10       Q.  I understand you have your commercial
11   driver's license; is that right?
12       A.  I have commercial, yes.  I do not have
13   CDLs.
14       Q.  And you live at 1041 Sloans Mill Road in
15   Olin, North Carolina?
16       A.  Yes.
17       Q.  What connection do you have to 603 South
18   Ocean Boulevard, North Myrtle Beach, South
19   Carolina?
20           MR. O'CONNOR:  Objection.
21       A.  Repeat that address, please.
22       Q.  What connection do you have to 603 South
23   Ocean Boulevard, North Myrtle Beach, South
24   Carolina?
25       A.  That is a condo.

Page 50

1      Q.  That's an oceanfront condo on the ninth
2   floor, isn't it?
3            MR. O'CONNOR: Objection.
4      A.  Well, it's not oceanfront, no.  It's a
5   ocean view.
6      Q.  Ocean view?
7      A.  Yes.
8      Q.  And what's your relationship to that
9   condominium?
10           MR. O'CONNOR: Objection.
11     A.  Me and my wife purchased it.
12     Q.  Purchased it in 2017?
13     A.  No, it was back when it was being built.
14  We bought it as a spec and we was unable to
15  sell it when the crash come and we've never been
16  able to get rid of it yet.
17     Q.  Well, that's not the first condominium
18  you had in South Carolina, is it?
19     A.  No.
20           MR. O'CONNOR: Objection.
21     Q.  What was the other one?
22     A.  Margate, but Carolina Farm Credit took
23  it.
24     Q.  What's Mar Vista?
25     A.  That's the 603.

Page 51

1      Q.  That's the condominium?
2      A.  Yes, but the Margate was one that
3   Carolina Farm -- that was the one we always used
4   and the other one was for a spec at that
5   particular time.
6      Q.  Does the South Carolina condominium have
7   a balcony outside?
8      A.  Well, it's got a --
9            MR. O'CONNOR: Objection.
10     A.  -- balcony, yes.
11     Q.  Looks out over the ocean?
12     A.  No, it -- you can look up the wall and
13  see it, yes.
14     Q.  You can see the ocean but you have to
15  look somewhere else?
16           MR. O'CONNOR: Objection. This
17  whole line of questioning is --
18     A.  I mean, I got one down there --
19           MR. O'CONNOR: Cecil.
20     A.  -- yes.
21           MR. O'CONNOR: Just for second,
22  stop. I mean, we litigated this in front of the
23  judge. The judge didn't allow you to explore any
24  documents in regards to personal finances. I
25  don't -- I mean, I would assume the same ruling

Page 52

1   would come down in terms of proportionality of
2   this type of testimony.  He's here for Gregory
3   Trucking.  His personal, financial, and property
4   stuff was outside the scope of the judge's
5   permission able discovery on documents.  We'd
6   argue the same at deposition.  I'd object to this
7   line of questioning.
8      Q.  Could you tell us what you paid for the
9   condominium in South Carolina?
10           MR. O'CONNOR: Objection.
11           MR. TANGREDI:  You can answer.
12     A.  I think it was 400-and-some, but that
13  was back when they were -- started building them
14  in two-five or something like that or two-six and
15  we put in to be on the drawing and we got it and
16  we did it for spec.  It was a year and something
17  of them building.
18     Q.  How often do you go to South Carolina?
19     A.  Once or twice a year.
20     Q.  Sir, I don't have any additional
21  questions, but I want to ask you, did you
22  understand all of my questions?
23     A.  Yes.
24     Q.  Did I give you a fair opportunity to
25  answer all of my questions?

Page 53

1            MR. O'CONNOR: Objection.
2      A.  Yes.
3      Q.  Did I give you a chance to complete
4   every answer you wanted to provide?
5      A.  Yes.
6      Q.  Is there any question I've asked you or
7   anything we've talked about that you want to go
8   back to and clarify or talk about?
9      A.  No.
10     Q.  Do you stand by all the answers you've
11  given?
12           MR. O'CONNOR: Objection.
13     A.  Yes.
14     Q.  Is there anything you want to talk about
15  that we didn't talk about?
16     A.  No.
17     Q.  One last little inquiry.  Gregory
18  Trucking is involved in the transportation system;
19  is that right?
20     A.  Yes.
21     Q.  What would you say makes up the
22  transportation system?
23           MR. O'CONNOR: Objection.
24     A.  Well, we're in a flatbed and we haul
25  whatever can go on a flatbed, you know, moving

## Page 54

1    goods from one place to another.
2       Q.  Whose goods?
3       A.  Anyone that would hire us, I guess, for
4    that, but I mean right now we try to move as much
5    lumber for B&C Timbers, and that's what we try to
6    stick to on our back hauls.
7       Q.  So, is it fair to say people manufacture
8    things in a location and then they have to get
9    them delivered to other locations?
10      A.  Yes.
11      Q.  And Gregory Trucking provides the
12   transportation --
13      A.  Yes.
14      Q.  -- from one place to another?  There are
15   shippers in the transportation system?
16      A.  You know, I don't know how every -- how
17   everybody works or how they name their positions
18   or stuff, you know, but -- some places, they'll
19   say, "Our supervisor will take care of this" or
20   whatever, you know, but, you know, they're
21   shipping from one place to another, yes.
22      Q.  What percentage of Gregory Trucking's
23   business comes from B&C Timbers?
24      A.  Probably 60 to 70 percent, somewhere in
25   there.

## Page 55

1          MR. TANGREDI:  Thank you, Mr.
2    Gregory.  That's all I have for you.  There might
3    be other questions.
4          MR. O'CONNOR:  Yeah.
5             EXAMINATION
6    BY MR. MATTHEW O'CONNOR:
7       Q.  Mr. Gregory, so before coming to the
8    deposition today, we -- you prepared for this
9    deposition by speaking to other people in the
10   office, right?
11      A.  (Witness indicates affirmatively.)
12      Q.  Is that a yes?
13      A.  No.  Ask that again, please.
14      Q.  I said prior to coming to the deposition
15   today, you prepared by speaking to other people in
16   the office at Gregory Trucking?
17      A.  Yes, and I tried to read some documents
18   that they put in front of me.
19      Q.  And that includes speaking to Martha?
20      A.  Yes.
21      Q.  Does it include speaking to Gayle?
22      A.  Yes (witness indicates affirmatively).
23      Q.  And so, sometimes today in your
24   deposition you said, "I don't know," but that is
25   that you don't know after talking to those people?

## Page 56

1    Is that fair to say?
2       A.  Yes.
3       Q.  So, at points when you give answers and
4    say, "I don't know" or "I think" this, that's on
5    behalf of Gregory Trucking Company --
6       A.  Yes.
7       Q.  -- as a whole, right?
8       A.  Uh-huh (yes).  Yes.
9       Q.  Yes?  Can I -- do you have Exhibit Three
10   in front of you?  Do you have yesterday's
11   exhibits?
12      A.  No.
13      Q.  Okay.
14      A.  She gave them to the guy without them.
15      Q.  Yeah.  So, this is marked as Exhibit
16   Three.  It says, "Motor Carrier Identification
17   Report" on the top?  Do you see that?
18      A.  Yes.
19      Q.  And just below that header, there's some
20   boxes that says, "Reason for Filing"?  Do you see
21   that?
22      A.  Yes.
23      Q.  And the box checked there is a biannual
24   update or changes?  Do you see that?
25      A.  What number are we on there?  Where at?

## Page 57

1       Q.  So, just below the top of -- above the
2    highlighted, at the top.  See where there are
3    check boxes?
4       A.  Yeah.
5       Q.  And is the box that says "Biannual
6    Update or Changes" checked?
7       A.  (Witness reviews document.)  Biannual
8    what?
9       Q.  Is that the right -- it's right next to
10   the exhibit sticker, so if you look --
11      A.  Right here?  Yeah, I see that.
12      Q.  Okay.
13      A.  Name of the motor carrier?
14      Q.  Yes, and right above that, there's a box
15   that says, "Biannual Update or Changes"?
16      A.  Yes.  Yes, yes.
17      Q.  Yes?  Okay.  That's all I -- it's your
18   understanding that Gregory Trucking has had a DOT
19   number since 1992 when it was founded, right?
20      A.  Yeah.
21      Q.  And so, this form, Exhibit Three, is a,
22   as it says, an update that you have to give
23   biannually, correct?
24      A.  Yes.
25      Q.  And then, down towards where it says,

Page 58

1    "Number 26," there's some boxes there?  It's also
2    been highlighted by the --
3        A.  Yes.
4        Q.  -- other attorney?  And so we talked
5    about Gregory Trucking Company doesn't own any
6    truck tractors, correct?
7        A.  No.
8        Q.  Okay.  So, would it be fair to say that
9    where it says "11" in the Owned section, would it
10   be more accurate to be 11 in the Term Leased box
11   on that form?
12       A.  Yes.  Well, that'd be total now where it
13   says, "Lease," one and 11, yes.
14       Q.  Okay.  I want to give him Exhibit --
15   let's try that.
16           MR. MEEHAN:  Seven?
17       Q.  Exhibit 10.  And so, Exhibit 10 has some
18   Bates stamping on the bottom, the numbers?  So, if
19   you could turn a couple -- it's third page in on
20   the back, on the third page.
21       A.  Third page?
22       Q.  Yeah.  It says, "DQ1001" at the bottom?
23       A.  I don't have that.  (Witness reviews
24   document.)  Oh.
25       Q.  So, you were asked some questions

Page 59

1    earlier, yesterday, about this form and when Mr.
2    Hooks was first hired.  Do you remember those
3    questions?
4        A.  Yes.
5        Q.  Do you see the -- so, it's in the middle
6    of the page there right above the signature block?
7    It says the --
8        A.  Yes.
9        Q.  -- the employee's first date of
10   employment, and it says -- it looks like 8/14?
11   Does that look correct?
12       A.  (Witness reviews document.)  Yes.
13       Q.  So, would it be fair to say Mr. Hooks
14   started working for Gregory Trucking when he got
15   hired back would be August of 2014?
16       A.  August 14th, yes.
17       Q.  Gregory Trucking doesn't do any
18   hazardous material transport --
19       A.  No.
20       Q.  -- right?
21       A.  No.
22       Q.  Have you ever heard of a company called
23   Lone Wolf Trucking?
24       A.  Who?
25       Q.  Lone Wolf Trucking?

Page 60

1        A.  Lone -- yes, I've heard that name.
2        Q.  What is that company?
3        A.  I don't know.  I -- we may have used
4    them to haul something before.
5        Q.  But Gregory Trucking has never been
6    known as Lone Wolf Trucking --
7        A.  No.
8        Q.  -- right?  And yesterday, we looked at
9    some letters.  They're Exhibits 13 through 16?  Do
10   you remember they were -- on the first page was
11   certified mail --
12       A.  Yes.
13       Q.  -- receipts, and on the four that we
14   looked at, you had signed for several letters --
15       A.  Yes.
16       Q.  -- directed to the office?  Is -- what
17   is the policy for accepting mail at the office?
18       A.  Well, I mean, we've been going up there
19   for 40-some years and most of the time I do that
20   now.  I run up to -- my wife done it for years and
21   then I'll -- but I always -- if I'm there or
22   around, I'll go up there and, you know, the
23   postmaster and all.  If there's something in the
24   box that says you got to sign for it, you know, I
25   can do it.

Page 61

1        Q.  And does anyone else go to the post
2    office and pick up from the box?
3        A.  Sometimes Gayle, and maybe Brandon.
4        Q.  So, it's possible that Gayle or Brandon
5    could've signed for --
6        A.  If they would've went that day, yes.
7            MR. O'CONNOR:  That's all the
8    questions I have.
9            MR. SCHULER:  A few questions for
10   you, Mr. Gregory.
11           THE WITNESS:  Yes.
12           EXAMINATION
13   BY MR. THOMAS SCHULER:
14       Q.  First, a couple things, just to go back
15   to the short haul that was done by Mr. Hooks --
16       A.  Yes.
17       Q.  -- and Mr. Hooks was doing that as an
18   employee of Gregory Trucking, correct, when he
19   made that short haul delivery?
20       A.  Repeat, please.
21       Q.  Sure.  We've heard testimony, you've
22   seen some documents --
23       A.  Yes.
24       Q.  -- and we have an invoice that you saw
25   there on Exhibit Number -- I think it's 29, the --

Page 62

1    A. Yes.
2    Q. -- BBS invoice. And do you have that
3  invoice in front of you, sir?
4    A. I will get it, yeah.
5    Q. Or Number 30, I'm sorry.
6    A. It's which one? Yes. I got it.
7    Q. Okay. And that's an invoice that
8  documents that Mr. Hooks delivered a short haul
9  for BB&S to L.P. and Adams, correct?
10   A. Yes.
11   Q. And we know that the delivery was
12  completed because we have Mr. Hooks' signature on
13  the bottom of the three pages there?
14   A. Yes.
15   Q. And is the policy at Gregory Trucking to
16  have its employees sign at the bottom of an
17  invoice such as this document to confirm or to
18  document that the delivery was made?
19   A. Yes.
20   Q. That's why he signs it? And Mr. Hooks
21  was doing that as an employee of Gregory Trucking,
22  correct, when he made that delivery?
23   A. Yes.
24   Q. And in fact, Gregory Trucking was paid
25  $450 for that short haul --

Page 63

1    A. Yes.
2    Q. -- that was done by Mr. Hooks? And is
3  it your understanding, sir, that after Mr. Hooks
4  made that delivery and signed off on this invoice
5  the business that Gregory Trucking had with BB&S
6  for that short haul delivery was over and
7  completed once that delivery was made?
8    A. Yes.
9    Q. The transaction?
10   A. Yes.
11   Q. The transaction was over once the
12  delivery was made?
13       MR. O'CONNOR: Objection.
14   A. Yes.
15   Q. Okay. And the fact that you received --
16  or you billed an -- or invoiced $450 for that
17  transaction, that shipment of that short haul,
18  correct?
19   A. Yes.
20   Q. Okay. And I think we -- I think you
21  told us, and I think we learned from some of the
22  other exhibits, that Mr. Hooks was to pick up a
23  load in Monson for -- at Eagle Logistics?
24   A. Yes.
25   Q. Remember telling us about that

Page 64

1  yesterday? And was Mr. Hooks on his way to pick
2  up that load in Monson at Eagle Logistics when
3  this unfortunate accident with Mr. Forbes took
4  place?
5    A. Yes, he was going to pick his back haul
6  up.
7    Q. Okay. And that was after he'd completed
8  the work that he'd done delivering a load to L.P.
9  and Adams, correct?
10   A. Yes.
11   Q. He'd finished at L.P. and Adams,
12  finished that job, and now he was going to do this
13  other job, this other haul load? He was going to
14  Eagle Logistics in Monson to do that, correct?
15   A. Yes.
16       MR. SCHULER: I don't have any
17  other questions. Thank you.
18       MR. MEEHAN: A couple, Mr. Gregory.
19       EXAMINATION
20  BY MR. JEFFREY MEEHAN:
21   Q. With regard to the lumber that was
22  delivered by Gregory Trucking on behalf of B&C or
23  Yellow Pine up to Rhode Island, what kind of
24  lumber was that?
25   A. It was yellow pine. It was 6x6s, 10s

Page 65

1  and 12s, I think was on that ticket.
2    Q. And similarly, when Mr. Hooks delivered
3  B&C's lumber or the lumber that it sold to Yellow
4  Pine --
5    A. Yeah.
6    Q. -- in Rhode Island, was that transaction
7  completed?
8    A. Yes.
9    Q. Do you know whether or not B&C uses
10  other motor carriers besides Gregory Trucking to
11  deliver its products?
12   A. Yes.
13   Q. Can you name some of those other
14  carriers?
15   A. Oh. I don't know. I think Western. I
16  know they used some last year to run some into
17  Kentucky, but -- I don't really -- can't really
18  name some names, but there is some trucks that --
19  well, they use Tadmore right now some. They're
20  out of South Carolina somewhere down there, but
21  they're like a broker and they may have 50
22  different truck lines that they use, you know. I
23  know that they have sent some in there. Plus,
24  they have given Gregory Trucking back hauls in
25  places, but --

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                          4/25/2019

Page 66

1    Q.  Tadmore has?
2    A.  Tadmore, yes.  They're out -- I can get
3  you their -- but I know they're -- they use them,
4  and then TMC has been in there.  It was one
5  company I know they said they used.  There could
6  be a big difference between the numbers.  One may
7  say they'll do it for 2,000, the other one'd be
8  2800, you know.  They have to be within line, but
9  I can get you some names.
10   Q.  Is TMC a broker or a --
11   A.  No --
12   Q.  -- carrier?
13   A.  -- they got a -- it's -- that is a truck
14  line itself.
15   Q.  Tadmore's a freight broker?
16   A.  Tadmore is just an office, about like
17  Yellow Pine.  They just broker.
18   Q.  I see.  They don't have their own
19  vehicles?
20        MR. O'CONNOR:  Objection.
21   A.  No.
22   Q.  And Western, is that a broker or a
23  carrier?
24   A.  Western -- I forget where I know that
25  they used them to haul several loads last year.

Page 67

1    Q.  You indicated a little while ago that
2  Gregory Trucking delivers approximately 60 or 70
3  percent of B&C Timbers' products; is that so?
4    A.  Yes.
5    Q.  I take from that the remaining 40 or 30
6  percent of its products are delivered by other
7  entities?
8    A.  Yes.  It's picked up by other outside
9  carriers or the customer chose to pick it up.
10   Q.  Okay.  I'd like to direct your attention
11  back to the BB&S Treated Lumber of New England
12  invoice, Exhibit Number 30.  Is that in front of
13  you?
14   A.  Yes.
15   Q.  Can you tell from being in this business
16  what sort of material this is?
17   A.  Well, its dimensional lumber.  The first
18  few items is like 2x6s 10, 2x8s 16, 2x10s 20,
19  2x12s -- that's all dimensional lumber, and you
20  got 4x4s 8 and 12.  The 5/4x6 and all, that's
21  decking lumber.  And then --
22   Q.  What is -- go ahead.
23   A.  And then, them 5x5s, that's -- you know,
24  some people will want that instead of like a 4x4
25  or 6x6.  Most of that's posts and stuff, I'd say.

Page 68

1    Q.  What does the term "micro" mean?
2    A.  Huh?
3    Q.  What does the term "micro" --
4    A.  That's the treatment.  It's -- you know,
5  you can get a CCA or you can a micro.
6    Q.  Well, for us who are not in the lumber
7  business, can you speak in layman's terms what
8  micro is?
9    A.  Okay.  For years, it was called CCA,
10  dark green, you know, treated lumber, it was dark
11  green, and then they decided they, you know, they
12  wanted different -- a lighter color and stuff, so
13  they come up with this micro and it's supposed to
14  be a little bit -- it's a lighter color, that
15  micro is.
16   Q.  What do they treat the lumber with?
17   A.  Well, it's different chemicals mixed
18  together, you know, for preservative --
19   Q.  I see.
20   A.  -- and make it preserve, and like CCA
21  most time, now if you do that it's -- most of the
22  time it'll be ground contact or something.  This
23  right here, well, you've got the C -- you've the
24  GC, that says ground contact.  Every bit of that
25  was done for ground contact.

Page 69

1    Q.  But what is the purpose of treating the
2  lumber?
3    A.  Give it more life, last longer.
4    Q.  Does it repel --
5    A.  The elements out here, you know, most of
6  the time it's something that's going to be on the
7  outdoors, either in the ground or above the
8  ground.  If it was above ground, it'd be AC, you
9  know.
10   Q.  Is the purpose to resist moisture?
11   A.  Yeah.  Well now, we have to get into a
12  certain level, moisture level, for it to be able
13  to treat, yes.
14   Q.  Okay.  And is the purpose to repel
15  insects?
16   A.  Yes.
17   Q.  Prevent rot?
18   A.  Yeah.
19   Q.  You recognize this particular material
20  on this invoice?
21   A.  Yes.
22   Q.  Was this manufactured or handled or
23  processed by B&C Timbers?
24   A.  Not this particular load.
25   Q.  And do you know the origin of this

Cecil Gregory- 30(b)(6) - Gregory Trucking V-2                                    4/25/2019

| Page 70 |
|---|
| 1    particular load? |
| 2        A.  No, I don't know that.  L.P. Adams, no. |
| 3        Q.  No.  The origin, where it came from? |
| 4        A.  Oh, I don't know.  No. |
| 5        Q.  What is the business of BB&S Treated |
| 6    Lumber, do you know? |
| 7        A.  Well, they are, I'd say, a lumber |
| 8    wholesaler.  They probably – I don't know if they |
| 9    do any retail or not, but they treat lumber and |
| 10   they – |
| 11       Q.  With chemicals? |
| 12       A.  Yes. |
| 13       Q.  Does B&C Timbers do that? |
| 14       A.  No. |
| 15       Q.  Thank you. |
| 16           VIDEOGRAPHER:  Anybody?  No more |
| 17   questions? |
| 18           MR. TANGREDI:  I don't have any |
| 19   questions. |
| 20           VIDEOGRAPHER:  One second. |
| 21           MR. MEEHAN:   You were asked about |
| 22   the back haul from Eagle Logistics.  Was that in |
| 23   any way involve the transportation of any products |
| 24   for B&C Timbers? |
| 25       A.  No. |

| Page 71 |
|---|
| 1            MR. MEEHAN:  Thank you. |
| 2            VIDEOGRAPHER:  We're going off the |
| 3    record.  This will complete today's deposition. |
| 4    We're off the record at 10:23. |
| 5            WHEREUPON, at 10:23 a.m., deposition was |
| 6    adjourned. |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 72 |
|---|
| 1                CERTIFICATION |
| 2        I, BRENDA CARTER, Notary Public in and for the |
| 3    County of Alamance, State of North Carolina at Large, do |
| 4    hereby certify: |
| 5        That there appeared before me the foregoing witness |
| 6    at the time and place herein aforementioned; |
| 7        That the said witness was sworn by me to state the |
| 8    truth, the whole truth, and nothing but the truth, in |
| 9    said cause; |
| 10       That the testimony was taken before me and recorded |
| 11   by Stenomask, thereafter reduced to typewriting under my |
| 12   direct supervision, and the foregoing consecutively |
| 13   numbered pages are a complete and accurate record of all |
| 14   the testimony given by said witness; |
| 15       That the undersigned is not of kin, nor in any wise |
| 16   associated with any of the parties to said cause of |
| 17   action, nor their counsel, and that I am not interested |
| 18   in the event(s) thereof. |
| 19       IN WITNESS WHEREOF, I have hereunto set my seal this |
| 20   the 15th day of May, 2019. |
| 21 |
| 22 |
| 23 |
| 24                BRENDA CARTER |
| 25                NOTARY #:20043580030 |
| 26 |

| Page 73 |
|---|
| 1            WITNESS CERTIFICATION |
| 2        I, CECIL GREGORY, do hereby certify, |
| 3        That I have read and examined the contents of the |
| 4    foregoing pages of record of testimony as given by me at |
| 5    the times and place herein aforementioned; |
| 6        And that to the best of my knowledge and belief, the |
| 7    foregoing pages are a complete and accurate record of all |
| 8    the testimony given by me at said time, except as noted |
| 9    on the attached here (Addendum A). |
| 10   I have ____, Have not ____, made changes/corrections to |
| 11   be attached. |
| 12   _____ (Signature) |
| 13   I, _____, Notary Public |
| 14   for the County of _____, State of _____, |
| 15   do hereby certify: |
| 16       That the herein above named personally appeared |
| 17   before me this the ____ day of _____, 20____; |
| 18       And that I personally witnessed the execution of |
| 19   this document for the intents and purposes herein above |
| 20   described. |
| 21 |
| 22                NOTARY PUBLIC |
| 23 |
| 24 |
| 25   My Commission Expires:         (SEAL) |

Page 74

1            ADDENDUM A

2

3      Upon the reading and examination of my deposition

4   testimony as herein transcribed, I note the following

5   changes and/or corrections with accompanying reason(s)

6   for said change/correction:

7

8            *************************

9   Page    Line       Is Amended to Read

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26