# Tab C

UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MASSACHUSETTS
SPRINGFIELD, MA.
Civil Action No. 3:17-CV-30174-MAP

THOMAS FORBES, as he is the          )
Personal Representative of the       )
Estate of GEORGE J. FORBES,          )
                                     )
                    PLAINTIFF,       )
                                     )
v.                                   )
                                     )   V I D E O T A P E D
                                     )
GREGORY TRUCKING COMPANY, INC.;      )   D E P O S I T I O N
WILEY LENUE HOOKS, JR.;              )
GREGORY LEASING COMPANY, INC.;       )
BSG LEASING, INC.;                   )
B&C TIMBERS LLC; and                 )
BB&S ACQUISITIONS CORP.,             )
                                     )
                    DEFENDANTS.      )
                                     )
-------------------------------------

WILEY LENUE HOOKS, JR.


TAKEN AT:
THE HILTON GARDEN INN
The Dobbs Boardroom
1017 Gateway Crossing Drive
Statesville, NC  28677


Friday, April 26, 2019
9:12 A.M.

Brenda Carter
Court Reporter

Wyatt Legal Services, LLC
3936 Elizabeth Glen Way
Jamestown, NC 27282
(336) 510-8515

Wiley Lenue Hooks, Jr.                                          4/26/2019

2  (Pages 2 to 5)

## Page 2

ATTORNEY NOTES

| PAGE LINE | SUBJECT MATTER | RELATES TO | ACTION |
|-----------|----------------|------------|--------|

## Page 4

I N D E X

STIPULATIONS                              6
EXAMINATION
     By Mr. Dino Tangredi              8
     By Mr. Thomas Schuler           181
     By Mr. Jeffrey Meehan           188

ADJOURNMENT                             195
REPORTER CERTIFICATE                    196
WITNESS CERTIFICATION                   197
WITNESS ADDENDUM                        198

E X H I B I T S

| Name | Offered By | Identified |
|------|------------|------------|
| EXHIBIT ONE | Mr. Tangredi | 77 |
| (Federal Motor Carrier Safety Administration Compliance Manual) | | |
| EXHIBIT TWO | Mr. Tangredi | 86 |
| (Gregory Trucking fleet safety program) | | |
| EXHIBIT THREE | Mr. Tangredi | 89 |
| (Gregory Trucking Employee handbook) | | |
| EXHIBIT FOUR | Mr. Tangredi | 91 |
| (Gregory Trucking drug and alcohol information packet) | | |
| EXHIBIT FIVE | Mr. Tangredi | 103 |
| (Witness driver record) | | |
| EXHIBIT SIX | Mr. Tangredi | 117 |
| (Notice of schedule for disqualification and suspension of driver's license) | | |

## Page 3

APPEARANCES OF COUNSEL

Dino M. Tangredi, Esquire
THE MILES PRATT HOUSE
106 Mount Auburn Street
Watertown, MA  02472
Attorney for Plaintiff

Thomas P. Schuler, Esquire
LAW OFFICES OF STEVEN B. STEIN
P.O. Box 2903
Hartford, CT  06104-2903
Attorney for Defendant BB&S Acquisition Corp.

Matthew O'Connor, Esquire
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA  02210
Attorney for Defendants Gregory Trucking Company, Inc.,
Gregory Leasing Company, Inc., and BSG Leasing, Inc.
L. Jeffrey Meehan, Esquire
DOHERTY, WALLACE, PILLSBURY, MURPHY
1 Monarch Place, Suite 1900
Springfield, MA  01144-1900
Attorney for Defendant B&C Timbers, LLC

Dawn A. Hanzlik-Hexemer, Esquire
AMOS & KAPRAL, LLP
1331 N. Center Street
Hickory, NC  28601
Attorney for Defendant B&C Timbers, LLC

OTHER APPEARANCES
Cecil Gregory, Gregory Trucking Co. and Gregory Leasing Company
Herman Wyatt, Videographer

## Page 5

E X H I B I T S (Cont.)

| Name | Offered By | Identified |
|------|------------|------------|
| EXHIBIT SEVEN | Mr. Tangredi | 143 |
| (Bill of lading from BB&S) | | |
| EXHIBIT EIGHT | Mr. Tangredi | 146 |
| (Copies of mileage log book) | | |
| EXHIBIT NINE | Mr. Tangredi | 148 |
| (Bill of lading from G&G Forest Products) | | |

Wiley Lenue Hooks, Jr.                                    4/26/2019

3  (Pages 6 to 9)

---

Page 6

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Brenda Carter, Notary Public in and for the County of Alamance, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

---

Page 7

1      THE VIDEOGRAPHER: We are on the
2  record. The time now is 9:12. This is the video
3  deposition of Mr. Wiley Lenue Hooks, Jr., taken in
4  the matter of Thomas Forbes, as he is the Personal
5  Representative of the Estate of George J. Forbes,
6  Plaintiff, versus Gregory Trucking Company,
7  Incorporated; Wiley Lenue Hooks, Jr.; Gregory
8  Leasing Company, Incorporated; BSG Leasing,
9  Incorporated; B&C Timbers LLC; and BB&S
10  Acquisition Corp., Defendants, being heard in the
11  jurisdiction of the United States District Court
12  in the Western District of Massachusetts, in
13  Springfield, Mass., Civil Action Number 3:17-CV-
14  30174-MAP.
15      This deposition is being held at The
16  Hilton Garden Inn located at 1017 Gateway Crossing
17  Drive in Statesville, North Carolina. Today is
18  Friday, April the 26th, 2019.
19      My name is Herman Wyatt. I'm a
20  certified legal video specialist with Wyatt Legal
21  Services, LLC. The court reporter, also with
22  Wyatt Legal Services, is Brenda Carter. Would
23  counsel please introduce themselves for the
24  record?
25      MR. TANGREDI: Attorney Dino

---

Page 8

1  Tangredi for the plaintiffs.
2      MR. O'CONNOR: Matt O'Connor for
3  Wiley Lenue Hooks, Jr., Gregory Trucking Company,
4  Gregory Leasing Company, and BSG Leasing.
5      MR. MEEHAN: Jeffrey Meehan for B&C
6  Timbers, LLC.
7      MS. HANZLIK-HEXEMER: Dawn Hanzlik-
8  Hexemer, B&C Timbers, LLC.
9      MR. SCHULER: Thomas Schuler for
10  BB&S Acquisitions Corporation.
11      THE VIDEOGRAPHER: And the court
12  reporter may swear the witness and we may begin.
13      The witness, WILEY LENUE HOOKS, JR.,
14  being first duly sworn to state the truth, the
15  whole truth, and nothing but the truth, testified
16  as follows:
17      (9:12 a.m.)
18          EXAMINATION
19  BY MR. DINO TANGREDI:
20      Q.  Sir, could you tell us your full name?
21      A.  Wiley Lenue Hooks, Jr.
22      Q.  Mr. Hooks, thank you for coming today.
23      A.  You're welcome.
24      Q.  It's nice to meet you.
25      A.  Nice to meet you.

---

Page 9

1      Q.  Were you a little bit nervous about
2  coming here today?
3      A.  Well, a little apprehension, yeah.
4      Q.  Understandable.
5      A.  It's not like going to the amusement
6  park, so --
7      Q.  We're going to probably talk about some
8  uncomfortable issues --
9      A.  I understand.
10      Q.  -- some sensitive issues, and I don't
11  mean to make this difficult for you, okay?  Do you
12  know who I represent in this lawsuit?
13      A.  Yes, sir.
14      Q.  Who do I represent?
15      A.  The Forbes Estate.
16      Q.  Good.  So, I have a job I have to do for
17  them --
18      A.  I understand.
19      Q.  -- and I don't intend to try to
20  embarrass you or intimidate you at all.  Okay?
21      A.  Well, the facts are the facts.
22      Q.  Good.  You just took an oath.  What does
23  that oath mean to you?
24      A.  It means my word's my honor.
25      Q.  I had to take an oath as a lawyer.

---

Wiley Lenue Hooks, Jr.                                    4/26/2019

| Page 10 | Page 12 |
|---|---|

**Page 10**

1    A.  Uh-huh (yes).
2    Q.  I had to take an oath that says I won't
3  assert a falsehood in a courtroom.  This is just
4  like a courtroom.
5    A.  Yes, sir.
6    Q.  So, I want you to know I take that a
7  little seriously.
8    A.  I understand.
9    Q.  Good.  Do you think my clients blame you
10  entirely for what happened?
11    A.  I suppose so, yeah.  Yeah.
12    Q.  I don't know if it'll disappoint you,
13  but they don't.
14    A.  Oh, okay.  If they did, I would
15  understand why, yeah.
16    Q.  But they don't.
17    A.  Okay.
18    Q.  They've sued you, but they've sued other
19  individuals and corporations, as well.  Do you
20  know who else they've sued?
21    A.  No, I've seen the list.  I don't know
22  exactly who they all are, but I'm familiar with
23  the names.
24    Q.  My clients think that many others hold
25  responsibility in this case, not just you.

**Page 12**

1    Q.  Any kind of high blood pressure issues?
2    A.  Well, that was part of the reason for my
3  surgery.
4    Q.  If you don't mind, what was -- what did
5  you have --
6    A.  I had open heart surgery.
7    Q.  Okay.
8    A.  Triple bypass.
9    Q.  Back in November?
10    A.  November the 2nd.
11    Q.  You're doing well?
12    A.  Doing great.
13    Q.  Good.  Do you presently drink alcohol?
14    A.  No, I don't.
15    Q.  Did you stop drinking alcohol at some
16  point?
17    A.  July 27th, 2013.
18    Q.  You know the exact date?
19    A.  I do.
20    Q.  How come?
21    A.  Because the day I consciously woke up
22  and decided it was time to quit.
23    Q.  Had alcohol been a problem in your life
24  up to that point?
25        MR. O'CONNOR:  Objection.

| Page 11 | Page 13 |
|---|---|

**Page 11**

1    A.  Yes, sir.
2    Q.  They've sued Gregory Trucking and
3  Gregory Leasing and BSG Leasing and BB&S and B&C
4  Timbers.  They think some of these corporations
5  have some responsibility for what happened, too.
6  Do you understand that?
7    A.  I understand.
8    Q.  Good.  How is your overall health, as
9  you sit here today?
10    A.  Oh, it's good today.  Yeah.  I had open
11  heart surgery back in November, but my prognosis
12  is good.
13    Q.  Okay.  If you need to take a break for
14  any reason, just let us know, okay?
15    A.  Thank you.
16    Q.  Bathroom's around the corner.  You've
17  got a water.  Just call for a time-out.  It'll be
18  okay.
19    A.  Thank you.
20    Q.  All right?  When we talk -- when you
21  talk about your health being good, do you have any
22  issues with sleep apnea or anything like that?
23    A.  No.
24    Q.  Any diabetes?
25    A.  No.

**Page 13**

1    A.  No.  I mean, I just drank on my off time
2  more than I should have and so -- so, I quit.
3    Q.  Was it a cause of other kinds of
4  problems in your life, health problems?
5        MR. O'CONNOR:  Objection.
6    A.  Primarily probably.
7    Q.  Are you currently married?
8    A.  No, I'm not.
9    Q.  Have you ever been married?
10    A.  I have been.
11    Q.  Do you have any children?
12    A.  I don't.
13    Q.  Alcohol play any kind of a role in your
14  family life?
15    A.  No.
16    Q.  No?  Okay.  Have you used drugs in the
17  past?
18    A.  I have.
19    Q.  And have you stopped using drugs?
20    A.  I did.
21    Q.  Same time frame?
22    A.  Before.
23    Q.  Before?  Good.  Why did you become a
24  truck driver?
25    A.  Well, my father who was retired from

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 14

1  building the interstate system decided to start
2  running it with trucks and he bought a few trucks
3  and we started hauling freight and I decided to
4  jump in and help him and my mother run that
5  company and participate in it, so it was just a
6  natural progression kind of thing.
7      Q.  How old were you when you became a truck
8  driver?
9      A.  About 40-something, 41-42.
10     Q.  What did you do before that?
11     A.  I was a service technician.  I had a --
12  I was self-employed out in California.  Home
13  entertainment-type stuff, videos, audio stuff.
14     Q.  Do you consider yourself a professional
15  truck driver?
16     A.  I do.
17     Q.  Do you currently drive a truck?
18     A.  No, I don't.
19     Q.  Do you believe that a tractor trailer
20  truck driver has to have specialized skills?
21         MR. O'CONNOR:  Objection.
22     A.  I do.
23     Q.  Like what?
24     A.  Well, particularly in the flatbed
25  division, you need to know how to secure freight

Page 15

1  onto a truck, you need to know the capacity of the
2  truck, you need to know whether you're going to
3  use chains, straps.  I mean, there's a variety of
4  things you need to know to make sure you can haul
5  that load safely and efficiently.
6      Q.  There's training that goes into
7  preparing you to become a professional truck
8  driver --
9      A.  I --
10     Q.  -- right?
11     A.  I believe so.
12     Q.  Yeah.  Do you believe a professional
13  tractor trailer truck driver has to have
14  specialized knowledge, also?
15         MR. O'CONNOR:  Objection.
16     A.  It would help.
17     Q.  Like what?
18     A.  Well, like knowing the traffic patterns
19  in different cities and trying to avoid heavy
20  traffic in particular areas.  If I was going
21  through Atlanta, I'd try to -- because if you
22  avoid traffic, the law of averages says there's
23  less chance, there'll be less cars, of something
24  happening.  I mean, my running up to New England,
25  I scheduled myself so I could get up there at a

Page 16

1  particular hour and stop and get up in the morning
2  and proceed with my load and try to avoid the
3  traffic in Connecticut, which I couldn't stand, in
4  the morning.
5      Q.  I know what you're talking about.
6      A.  Yeah.  So, just planning, you know, as
7  far as making it easier on yourself and dealing
8  with the traffic, so --
9      Q.  It's also a lot of regulations for --
10     A.  There are.
11     Q.  -- truck drivers, aren't there?
12     A.  Yeah.  Yeah.
13     Q.  Do you believe a professional tractor
14  trailer truck driver has to have experience?
15         MR. O'CONNOR:  Objection.
16     A.  Well, it helps, yeah, with anything,
17  yeah.
18     Q.  How does a tractor trailer truck driver
19  get experience?
20     A.  Well, you know, there's training --
21  there's truck driver training schools, but other
22  than that, your experience comes from experience,
23  over time.  I mean, you live and learn.
24     Q.  And I'm just guessing, but did you get a
25  lot of experience with your dad sitting in the

Page 17

1  passenger's seat?
2      A.  That and the fact that I spent a lot of
3  time on aircraft carriers when I was younger and
4  that's a very intense environment and safety's
5  paramount and your life's on the line at any given
6  day.  One time, I heard it was the second
7  deadliest job in the world and you got 80
8  airplanes on four acres of deck and one wrong move
9  and you're dead, and I've seen it happen.
10     Q.  You were in the Navy?
11     A.  I was in the Navy.
12     Q.  What years?
13     A.  From '78 to '86.
14     Q.  It's the second deadliest job?
15     A.  I can't imagine what the first one is.
16     Q.  I was going to ask you if you know.
17     A.  Probably bomb disposal.
18     Q.  I think it might be oilrigs --
19     A.  If I had to take a --
20     Q.  -- or something.
21     A.  -- I guess, yeah.
22     Q.  Does a professional tractor trailer
23  truck driver need any special equipment to perform
24  their job?
25         MR. O'CONNOR:  Objection.

Wiley Lenue Hooks, Jr.                                    4/26/2019

| Page 18 |
| --- |

1    A.  Depends on what avenue you're pursuing.
2  If you're a van driver, not particularly.  If
3  you're hauling flatbeds, maybe a little more so.
4  If you're doing oversize loads, even more so.  You
5  know, there's several different divisions of
6  trucking out there, so --
7    Q.  And I understand you, working for
8  Gregory Trucking, used mostly, or almost
9  exclusively, flatbeds; is that right?
10    A.  That's 99.9 percent of all I've ever
11  done is flatbed.
12    Q.  So, what kind of special equipment did
13  you need for that?
14    A.  Chains, oversize load straps.  You need
15  to know, you know, how to secure a load, what it's
16  going to take to secure a load.  I mean, if you
17  got a piece of equipment on there, it may need to
18  have chains on it.  A load of lumber, you just
19  need to have nylon straps which are rated for that
20  particular job, so you need to know one from the
21  other.
22    Q.  And how did you learn how to do all of
23  that?
24    A.  Like I said, experience.  Watching and
25  learning, I mean, from my father.  The older guys

| Page 19 |
| --- |

1  that worked at Gregory over the years were very
2  influential in teaching me, you know, the various
3  skills needed, and I mean, there's always an
4  avenue of somebody older that's been there before
5  you that can teach you something, if you're
6  observant enough.
7    Q.  Is there a way to have to balance a load
8  on a flatbed?
9    A.  Well, yeah.
10    Q.  Yeah?
11    A.  You need to have it distributed right so
12  the weight's -- you know, all the axles are
13  proper.
14    Q.  In your experience, what kind of
15  personal characteristics make a good truck driver
16  -- tractor trailer truck driver?
17      MR. O'CONNOR: Objection.
18    A.  Dino, I've seen all kinds out there.  I
19  mean, it's just a gamut.  I mean, such is life.
20  You see people of all characters and qualities and
21  quirkiness out there, so -- I mean, you've got
22  some guys that some -- some can, some can't.  I
23  mean, you -- some guys become infinite, you know,
24  professionals, consummate professionals about what
25  they do.  Some of them fledge along and try to

| Page 20 |
| --- |

1  make it and some fall through the weeds.
2    Q.  Have you noticed any consistent
3  characteristic traits of the good ones?
4    A.  Characteristics, traits of the good ones
5  are, you know, attention to detail, you know, just
6  knowing through experience how to do it, I guess.
7    Q.  All right.  Do you expect that a
8  professional tractor trailer truck driver will
9  meet a higher standard of driving performance?
10    A.  Yes.
11      MR. O'CONNOR: Objection.
12    Q.  Higher --
13      MR. O'CONNOR: You can answer when
14  I say that --
15      THE WITNESS: Oh, okay.
16      MR. O'CONNOR: -- unless I tell you
17  not to.
18    Q.  We're going to keep talking.
19    A.  Gotcha.
20    Q.  He's got to do his --
21    A.  I got you.
22    Q.  All right.  Would you expect it to be a
23  higher standard of driving than the average
24  driver?
25      MR. O'CONNOR: Objection.

| Page 21 |
| --- |

1    A.  I personally believe so, yeah.
2    Q.  Do you believe that a professional
3  tractor trailer truck driver should observe,
4  recognize, and assess the behavior of other
5  motorists before the average driver?
6      MR. O'CONNOR: Objection.
7    A.  Ask me that again.
8    Q.  Do you believe that a professional
9  tractor trailer truck driver should observe,
10  recognize, and assess the behavior of other
11  motorists better than the average driver?
12      MR. O'CONNOR: Same objection.
13    A.  Yes.
14    Q.  Do you believe that a professional
15  tractor trailer truck driver should observe,
16  recognize, and assess -- I'm sorry, should respond
17  better than the average motorist?
18      MR. O'CONNOR: Objection.
19    A.  Yes.
20    Q.  Do you believe that a professional
21  tractor trailer truck driver should observe,
22  recognize, and assess potentially dangerous
23  driving situations better than the average driver?
24      MR. O'CONNOR: Objection.
25    A.  Yeah.

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 22

1    Q.  And should he respond to those dangerous
2   situations better than the average driver?
3          MR. O'CONNOR:  Objection.
4       A.  You would think so, yeah.  I mean, you
5   know --
6       Q.  Do you believe that a professional
7   tractor trailer truck driver should observe,
8   recognize, and assess hazardous driving conditions
9   on the road better than the average driver?
10         MR. O'CONNOR:  Objection.
11      A.  Yeah.
12      Q.  And should they respond better to those
13  hazardous conditions better than the average
14  driver?
15      A.  If you consider yourself a professional,
16  I would say yes.
17      Q.  Do you believe that a professional
18  tractor trailer truck driver should observe,
19  recognize, and assess the potential for a
20  collision before the average driver?
21         MR. O'CONNOR:  Objection.
22      A.  That's about impossible, I believe.  I
23  mean, it's -- I mean, I've been out there -- I got
24  probably close to two million miles out there and
25  you just never know what's going to happen at any

Page 23

1   given time, and you -- and it can happen so fast,
2   it's -- it'll blow your mind.
3       Q.  Okay.  Do you believe that a
4   professional tractor trailer truck driver should
5   observe, recognize, and assess the need for
6   preventative action necessary to avoid a crash
7   better than the average driver?
8          MR. O'CONNOR:  Objection.
9       A.  Yeah.
10      Q.  And should they respond to that
11  situation better than the average driver?
12         MR. O'CONNOR:  Objection.
13      A.  I -- yeah.  I would hope.
14      Q.  Do you believe that a professional
15  tractor trailer truck driver should observe,
16  recognize, and assess the situation at an
17  intersection better than the average driver?
18         MR. O'CONNOR:  Objection.
19      A.  Better than the average driver.
20  Observation skills are important, I would say, so,
21  you know.
22      Q.  But do you think a professional tractor
23  trailer truck driver should observe that and
24  assess it as they're coming into an intersection
25  better than the average driver?

Page 24

1       A.  That goes without --
2          MR. O'CONNOR:  Objection.
3       A.  -- saying about anybody being on the
4   road, wouldn't it?
5       Q.  I'm talking about a professional tractor
6   trailer truck driver.
7       A.  We all have a responsibility out on the
8   road, I agree, but, you know, assessing something
9   in a split second, I mean, that's, you know --
10      Q.  Well, I didn't say anything about a
11  split second.
12      A.  Well, I did.
13      Q.  Well -- try to answer my questions if
14  you can.
15      A.  Okay.  I'm sorry.
16      Q.  All right.  So, do you believe that a
17  professional tractor trailer truck driver --
18      A.  I -- I will say yes because I consider
19  myself a professional and I try to -- I've tried
20  to -- over the years, I've tried to maintain a
21  higher standard.  I really have, so I would say
22  yes.
23      Q.  And I'm not talking about you
24  specifically.
25      A.  Well, I understand, yeah.

Page 25

1       Q.  But it's specifically --
2       A.  What do I have to gauge it to other than
3   myself and my own experience?  I mean, I can't say
4   what Joe Schmoe's, you know, attitude about it
5   would be because some of them don't care.
6       Q.  Do you have expectations of other
7   professional tractor trailer truck drivers?
8       A.  Yes.
9       Q.  Are they a little more than you would
10  expect of me on the road, the average motorist?
11         MR. O'CONNOR:  Objection.
12      A.  No, every -- anybody on the road has a
13  responsibility.
14      Q.  No argument there.
15      A.  Yeah.
16      Q.  We all do.  But do you think tractor
17  trailer truck drivers, the professionals, are
18  better at it?
19         MR. O'CONNOR:  Objection.
20      A.  They should be.
21      Q.  Why?
22      A.  Because --
23         MR. O'CONNOR:  Objection.
24      A.  -- I got 80,000 pounds under me, and the
25  reaction time's a lot different than you in your

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 26

1   little Honda Accord or whoever, so that's what
2   I've taken into consideration my whole career is,
3   you know, and I do have two million miles under my
4   belt accident free. So, I think that qualifies
5   for something.
6       Q.  And what can happen with an 80,000-pound
7   vehicle if the driver of that vehicle isn't
8   careful?
9           MR. O'CONNOR: Objection.
10      A.  Why are we here?
11      Q.  Tragedy, right? Devastation, mayhem,
12  right?
13      A.  Exactly.
14      Q.  A lot more damage than I can potentially
15  cause in my Honda, as you say --
16          MR. O'CONNOR: Objection.
17      Q.  -- right?
18      A.  Yeah.
19      Q.  Potentially?
20      A.  Potentially, yeah.
21      Q.  Do you believe that tractor trailer
22  trucks are more difficult to stop than regular
23  passenger cars?
24          MR. O'CONNOR: Objection.
25      A.  Not if you know how to drive it.

Page 27

1       Q.  Do you believe tractor trailer trucks
2   are more difficult to steer than regular passenger
3   cars?
4       A.  Not really.
5           MR. O'CONNOR: Objection.
6       Q.  Do you believe tractor trailer trucks
7   are harder to drive than a regular passenger car?
8       A.  Second nature to me. I would say no.
9       Q.  Do you -- I'm sorry. Does the motoring
10  public have a reasonable expectation that a
11  tractor trailer truck will stop at all red lights?
12          MR. O'CONNOR: Objection.
13      A.  You could be riding a bicycle and expect
14  that, so --
15      Q.  How about all stop signs?
16          MR. O'CONNOR: Objection.
17      A.  Well, that's what it's -- that's what
18  it's for.
19      Q.  Do you believe that a tractor trailer
20  truck must look ahead of him on the road
21  for risks in order to prevent harm and protect
22  other motorists, pedestrians, cyclists, and anyone
23  using the roads?
24          MR. O'CONNOR: Objection.
25      A.  You drive 15 seconds ahead.

Page 28

1       Q.  How far?
2       A.  Fifteen seconds ahead.
3       Q.  How do you figure out 15 seconds ahead?
4       A.  You don't look right in front of the
5   truck. You look way out there.
6       Q.  Where you're going to be in 15 seconds?
7       A.  You know, yeah.
8       Q.  Okay. And depending upon how fast
9   you're going, that's a different distance all the
10  time, right?
11      A.  Absolutely.
12      Q.  Okay. And 15 seconds, is that the Smith
13  System of driving?
14      A.  That's just something I've always heard
15  --
16      Q.  Are you -- I'm sorry.
17      A.  I said I just take it as what I've been
18  -- that's something I've learned along the way.
19      Q.  Are you familiar with the Smith System
20  of driving?
21      A.  I'm being honest with you, no.
22      Q.  Have you ever heard of it?
23      A.  No. To be honest, no.
24      Q.  Do you agree that a tractor trailer
25  truck driver should not fix his or her attention

Page 29

1   on any one object for more than two seconds?
2       A.  Yeah --
3           MR. O'CONNOR: Objection.
4       A.  -- you need to be observant of
5   everything.
6       Q.  Do you agree that a tractor trailer
7   truck driver should constantly be scanning
8   forward, sideways, and behind them?
9       A.  Yeah.
10      Q.  Do you agree that a tractor trailer
11  truck driver should keep his or her eyes moving
12  every two seconds?
13      A.  Yeah.
14      Q.  And if a tractor trailer truck driver
15  has two choices, he must choose the safest choice
16  in order to prevent injury and protect others that
17  are using the roads?
18          MR. O'CONNOR: Objection.
19      A.  Ask that again?
20      Q.  If a tractor trailer truck driver has
21  two choices, does the tractor trailer truck driver
22  choose the safest choice when he's driving on the
23  roads?
24          MR. O'CONNOR: Objection.
25      A.  Without saying, yeah.

Wiley Lenue Hooks, Jr.                                        4/26/2019

9 (Pages 30 to 33)

| | Page 30 |
|---|---|

1       Q.  Do you agree that safety should always
2   be the number one concern of a tractor trailer
3   truck driver?
4           MR. O'CONNOR: Objection.
5       A.  Absolutely.
6       Q.  Do you agree that tractor trailer truck
7   drivers must follow all the rules of the road to
8   prevent injuries and protect people?
9           MR. O'CONNOR: Objection.
10      A.  Yes.
11      Q.  Do you believe that tractor trailer
12  truck drivers have a better view of what is in
13  front of them on the roads than a regular
14  passenger vehicle?
15          MR. O'CONNOR: Objection.
16      A.  Well, based on the looking ahead, yeah.
17      Q.  And --
18      A.  I mean --
19      Q.  -- do they --
20      A.  -- you'd be contradicting yourself if
21  you said no to that.
22      Q.  And do they have a better view because
23  they sit up higher?
24      A.  Somewhat, yeah.
25      Q.  Somewhat?

| | Page 31 |
|---|---|

1       A.  Somewhat. Depends on what's in front of
2   you. Another truck in front of you and, you know
3   --
4       Q.  I asked about a regular passenger
5   vehicle.
6       A.  Regular, but I believe you -- yeah,
7   obviously, you have a better viewpoint.
8       Q.  Do you agree that transportation of
9   goods by tractor trailer can be dangerous if it is
10  not done carefully?
11          MR. O'CONNOR: Objection.
12      A.  Yeah.
13      Q.  Why?
14      A.  Well, if you've got somebody that's
15  inexperienced not securing a load down or not
16  knowing how to handle a truck in a -- going around
17  a sharp curve, they end up on their side or
18  something comes off the trailer and -- there you
19  have it.
20      Q.  So, that's something that could happen
21  to the tractor trailer itself? What else could
22  happen?
23          MR. O'CONNOR: Objection.
24      A.  Ask that again.
25      Q.  Who are the potential victims that could

| | Page 32 |
|---|---|

1   be hurt if a tractor trailer truck isn't driven
2   carefully?
3           MR. O'CONNOR: Objection.
4       A.  The public.
5       Q.  Do you agree that could be other drivers
6   in cars?
7       A.  Well, yeah.
8       Q.  Cyclists on the roads?
9       A.  (Witness indicates affirmatively.)
10      Q.  Yes?
11      A.  We see it every day on the news, yeah.
12  Things happen.
13      Q.  Pedestrians walking?
14      A.  Well, yeah.
15      Q.  Do you agree that transportation of
16  goods by tractor trailer can be dangerous if not
17  done safely?
18          MR. O'CONNOR: Objection.
19      A.  Yeah.
20      Q.  Do you agree that transportation of
21  goods by tractor trailer can be dangerous if not
22  done competently?
23          MR. O'CONNOR: Objection.
24      A.  Yeah.
25      Q.  True or false, a motor carrier must

| | Page 33 |
|---|---|

1   choose a competent driver to drive its trucks?
2           MR. O'CONNOR: Objection.
3       A.  I don't -- true.
4       Q.  True?  True or false, a shipper must
5   choose a competent motor carrier to transport its
6   product?
7           MR. SCHULER: Objection.
8           MR. MEEHAN: Objection.
9           MR. O'CONNOR: Objection.
10      A.  That goes without saying, doesn't it?
11      Q.  So would that be a yes or a no?
12      A.  That would be --
13      Q.  A true or a false?
14      A.  -- true.
15      Q.  True?  Thank you.  True or false, a
16  motor carrier must choose a safe driver to drive
17  its trucks?
18          MR. O'CONNOR: Objection.
19      A.  Yeah.
20      Q.  True or false, a shipper must choose a
21  safe motor carrier to ship its product?
22          MR. MEEHAN: Objection.
23          MR. SCHULER: Objection.
24          MR. O'CONNOR: Objection.
25      A.  Yeah.

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 34

1     Q.  True or false, single tractor trailers
2  when fully loaded weigh as much as 80,000 pounds?
3     A.  Yeah.  True.
4     Q.  Is that the maximum allowed?
5     A.  No, it's not.
6     Q.  What's the maximum?
7     A.  With a permit, you can carry heavier
8  loads.
9     Q.  You need a special --
10    A.  But on the average, 80,000 is the normal
11 allowed on the road.
12    Q.  Okay.
13    A.  Without permit, 80,000's the limit.
14    Q.  Do you know why that figure is used,
15 80,000, why that's the cutoff?
16    A.  Well, if you can take a truck down the
17 road at 92,000 pounds for purchasing a permit, I
18 would say is just for revenue purposes because
19 what's the difference between 92,000 and 80,000
20 other than buying a permit, but if the capacity of
21 the brakes on the truck are suitable to handle 95
22 to 80 -- I'm not going to need be misquoted here,
23 but anyhow, with a permit you can carry more, but
24 80,000's the average, so --
25    Q.  Is it the average or the maximum?

Page 35

1           MR. O'CONNOR:  Objection.
2     A.  The maximum.  I've seen -- there was a
3  recorded load taken across Texas was a million
4  pounds, so --
5     Q.  Wow.
6     A.  Paid good money, I'm sure.
7     Q.  True or false, a motor carrier should
8  not entrust a tractor trailer truck to a driver it
9  knows or should know regularly violates federal
10 trucking safety regulations?
11          MR. O'CONNOR:  Objection.
12    A.  Ask that again.
13    Q.  Sure.  True or false, a motor carrier
14 should not entrust a tractor trailer truck to a
15 driver it knows or should know regularly violates
16 trucking safety regulations?
17          MR. O'CONNOR:  Objection.
18    A.  Well, it'd be idiotic to do it
19 knowingly.
20    Q.  Is that true or false then?
21    A.  That's true.
22    Q.  Thank you.  True or false, a shipper
23 should not entrust its product to a motor carrier
24 it knows or should know regularly violates federal
25 trucking safety regulations?

Page 36

1           MR. MEEHAN:  Objection.
2           MR. SCHULER:  Objection.
3           MR. O'CONNOR:  Objection.
4     A.  I'm not familiar with that part of it.
5  I really can't, you know --
6     Q.  You have --
7     A.  That's a whole 'nother realm.  That's
8  out of my wheelhouse, as they say.
9     Q.  How come?
10    A.  Because it is.  I'm a driver.  I load
11 the truck, I take the truck to a destination, I --
12 as far as what somebody chooses to do, I think
13 that's out of my realm.
14    Q.  But the keyword might be "should."  How
15 do you feel --
16    A.  Should.
17    Q.  -- about that?  A shipper --
18    A.  Philosophically, yeah.
19    Q.  Let me ask you again.
20    A.  Okay.
21    Q.  True or false, a shipper should not
22 entrust its product to a motor carrier it knows or
23 should know regularly violates federal trucking
24 safety regulations?
25    A.  If I --

Page 37

1           MR. MEEHAN:  Objection.
2           MR. SCHULER:  Objection.
3           MR. O'CONNOR:  Objection.
4     A.  If I knowingly knew, I wouldn't --
5  probably wouldn't choose them.
6     Q.  So, is that true or false?
7     A.  I would say true, if you have to have an
8  answer to that --
9     Q.  Thank you.
10    A.  -- uh-huh, okay.
11    Q.  True or false, before choosing a driver
12 to drive a tractor trailer truck, a motor carrier
13 should consider all available safety information
14 about the driver before allowing that driver to
15 drive a tractor trailer truck?
16          MR. O'CONNOR:  Objection.
17    A.  True.
18    Q.  True or false, before choosing a motor
19 carrier, a shipper should consider all available
20 safety information about that motor carrier before
21 allowing it to transport its product?
22          MR. MEEHAN:  Objection.
23          MR. SCHULER:  Objection.
24    A.  I would suppose so.  True.
25    Q.  Thank you.  True or false, a motor

Wiley Lenue Hooks, Jr.                                              4/26/2019

## Page 38

1    carrier should check the driving record of a
2    tractor trailer truck driver it employs on a
3    regular basis?
4           MR. O'CONNOR: Objection.
5       A.  I guess.
6       Q.  Why?
7       A.  It's part of the regulations of the
8    FMCSA.
9       Q.  Do you know how often?
10      A.  I don't right off the top of my head,
11   no.
12      Q.  Okay.  Do you agree that a shipper
13   should check the safety record of a motor carrier
14   it employs before --
15      A.  I don't know the regulations --
16          MR. MEEHAN: Objection.
17      A.  -- of anything to that, so I really -- I
18   really can't answer that.
19      Q.  Okay.  True or false, a motor carrier
20   with an unsafe track record increases the risk of
21   serious injury or death to everyone on the roads?
22          MR. O'CONNOR: Objection.
23          MR. MEEHAN: Objection.
24      A.  I don't know any stats on that myself.
25      Q.  Uh-huh (yes).  I didn't ask you if you

## Page 39

1    know stats.
2       A.  Well, I -- I can't --
3           MR. O'CONNOR: Objection.
4       A.  I don't have any information to answer
5    that, to be -- I mean, honestly --
6       Q.  Okay.
7       A.  -- so --
8       Q.  True or false, the Department of
9    Transportation Federal Motor Carrier Safety
10   Administration's safety rating system provides
11   shippers and anyone else who wants it with
12   information about which motor carriers are safe
13   and which ones are unsafe?
14          MR. O'CONNOR: Objection.
15          MR. SCHULER: Objection.
16      A.  That's true.
17      Q.  True or false, the Department of
18   Transportation Federal Motor Carrier Safety
19   Administration safety rating system provides
20   shippers with information about which motor
21   carriers have a record of being safe and unsafe?
22      A.  I don't know --
23          MR. O'CONNOR: Objection.
24      A.  -- if they provide that to carriers or
25   not.  I mean, you know, I can't answer that.  I

## Page 40

1    don't know.
2       Q.  It was -- the question was addressed
3    about shippers.
4       A.  About -- I have no idea if they have
5    access to the SAFER system or not.  I would
6    suppose they do, but I don't -- I can't answer
7    that.
8       Q.  Are you aware that the SAFER system is
9    available for free online to anyone?
10      A.  No.
11      Q.  No?  You're familiar with the SAFER
12   system?
13      A.  Yeah, but I didn't know who had access
14   to it.
15      Q.  Okay.  Have you ever gone on the SAFER
16   system?
17      A.  Well, yes, I have.
18      Q.  Okay.  How did you get access to it?
19      A.  Well, we had a motor carrier authority
20   and a DOT number for Hooks Trucking and so we used
21   to keep up with our own stuff.
22      Q.  True or false, a shipper should check
23   the safety rating of a truck company through one
24   of the Federal Motor Carrier Safety
25   Administration's websites before hiring a trucking

## Page 41

1    company?
2           MR. MEEHAN: Objection.
3           MR. SCHULER: Objection.
4       A.  I have no knowledge of how that works,
5    to be honest with you.
6       Q.  I didn't ask you if you had knowledge of
7    how it works.
8       A.  Okay.  Ask me the question again.
9       Q.  A shipper should check the safety rating
10   of a truck company through one of the Federal
11   Motor Carrier Safety Administration's websites
12   before hiring that trucking company?
13          MR. SCHULER: Objection.
14          MR. MEEHAN: Objection.
15      A.  They should.  I don't know.
16      Q.  Is there a greater danger on the
17   highways and roads than a fully loaded tractor
18   trailer?
19          MR. O'CONNOR: Objection.
20      A.  Do what?
21      Q.  Is there a greater danger on the roads
22   and highways than a fully loaded tractor trailer
23   truck?
24      A.  No.
25          MR. O'CONNOR: Objection.

Wiley Lenue Hooks, Jr.                                    4/26/2019

12 (Pages 42 to 45)

Page 42

1    A.  False.
2    Q.  That's false?
3    A.  Yeah.
4    Q.  That one wasn't a true/false.
5    A.  Oh.
6    Q.  It's just --
7    A.  Well, no.  I mean, you know, that
8    truck's no more dangerous than a car provided you
9    got a professional driver behind the wheel, I
10   would say.
11   Q.  A fully loaded tractor trailer is as
12   dangerous as a Toyota Prius on the highways?
13        MR. O'CONNOR:  Objection.
14   A.  A Prius can have an accident just as
15   much as a truck can.
16   Q.  I agree.
17   A.  A Prius can kill somebody just as much
18   as a truck can.
19   Q.  Okay.  I'm going to ask you some
20   questions about your employment history with
21   Gregory Trucking.
22   A.  Gotcha.
23   Q.  Okay?  When were you first hired by
24   Gregory Trucking?
25   A.  August -- well, I worked for them one

Page 43

1    time a long time ago.  I don't -- I really can't
2    answer that.
3    Q.  And I --
4    A.  Back in the early 2000s maybe.
5    Q.  And I'm going to insert for the record
6    at this point that Mr. Cecil Gregory has joined
7    us.
8    A.  Okay.
9    Q.  He's present for the deposition.  Mr.
10   Cecil Gregory is sitting in.
11   A.  Okay.
12   Q.  You don't recall when you first started
13   with Gregory Trucking?
14   A.  No.  I really don't.
15   Q.  Uh-huh (yes).
16   A.  I'd say 2003 maybe.
17   Q.  Okay.
18   A.  That was the same time my father had
19   some trucks and I used to just help out whenever I
20   could, so I can't say.
21   Q.  And I understand you worked for them,
22   Gregory Trucking, for a period and then you didn't
23   and then you went back to them?  Is that fair to
24   say?
25   A.  Yes, sir.  That's fair to say.

Page 44

1    Q.  Do you remember when -- what year you
2    went back to Gregory Trucking?
3    A.  August of 2014, I do believe.
4    Q.  Okay.  Had you ever been fired by
5    Gregory Trucking Company?
6    A.  No.
7    Q.  Have you ever been suspended by Gregory
8    Trucking Company?
9    A.  Not that I can recall.
10   Q.  And when I say "ever," I'm talking about
11   either the first time you worked for them or the
12   second time.
13   A.  Not that I recall.
14   Q.  Okay.  Ever been disciplined by Gregory
15   Trucking Company?
16   A.  Not that I can recall.
17   Q.  Do you know who hired you in 2014?
18   A.  Well, I'm not really sure, to be honest
19   with you.  They asked me to -- anyhow, they asked
20   me to do some work for them and then I kind of
21   worked into the -- being there, so -- I mean,
22   they're like -- they're neighbors of mine and I
23   just -- we're just on a friendly basis, "Could you
24   help me do this?" and I did and so I just kind of
25   worked my way into the job.

Page 45

1    Q.  So, back in 2014, did you fill out an
2    application for a job?
3    A.  I filled out all the proper paperwork.
4    Q.  Including an application?
5    A.  I --
6        MR. O'CONNOR:  Objection.
7    A.  -- believe so, yeah.
8    Q.  What other kind of paperwork?
9    A.  Well, they had to get a motor -- the
10   driving record and driver report, road test, you
11   know, all the pertinent stuff that was required.
12   Q.  In 2014, did you provide Gregory
13   Trucking with any documents?
14   A.  Yeah, you're required to.
15   Q.  Which ones?
16   A.  Medical certificate and driver's --
17   valid driver's license.
18   Q.  A valid driver's license?
19   A.  Yeah.  Well, yeah.
20   Q.  One of the things you mentioned a minute
21   ago was a driving record?
22   A.  Uh-huh (yes).
23   Q.  When you started working for Gregory
24   Trucking in 2014 did you provide Gregory Trucking
25   with a copy of your driving record?

Page 46

1    A.  I can't recall whether I provided it
2    with them or whether they got it from the State.
3    Q.  Uh-huh (yes).  Could you tell me what
4    you did at Gregory Trucking in the second phase
5    when you started working for them in 2014?  Tell
6    me what you had to -- what your job
7    responsibilities were.
8    A.  Hauling freight, hauling lumber.
9    Q.  Tractor trailer truck driver?
10   A.  Absolutely.  Yes, sir.
11   Q.  Anything else?
12   A.  No.
13   Q.  Okay.  Could you make your own hours?
14   A.  Well, no.  I mean, I just -- no.
15   Q.  Did you have an office?
16   A.  Well, yeah.
17   Q.  Where was it?
18   A.  I know what their P.O. box is.  I don't
19   know what the physical address is, but it's --
20   Q.  Was it --
21   A.  -- Gregory Trucking there.  I think it's
22   117 Lumber Drive, if I remember correctly.
23   Q.  So, there was an office on the property?
24   A.  Yes.
25   Q.  And did you have a desk in the office?

Page 47

1    A.  No.  My desk was behind the wheel.
2    Q.  Very good.
3    A.  That was my job.
4    Q.  Did you help market the business of
5    Gregory Trucking?
6    A.  No.
7    Q.  Did you advertise the business of
8    Gregory Trucking?
9         MR. O'CONNOR:  Objection.
10   A.  I suppose driving their truck with the
11   name on the side of it was advertisement, so I
12   guess you could say technically yes.
13   Q.  Uh-huh (yes).  Did you collect any money
14   from customers?
15   A.  No.
16   Q.  Did you collect any bills?
17   A.  Just the bill of lading, signed by the
18   customer delivered to.
19   Q.  You didn't deal with the money side of
20   it?
21   A.  No.
22   Q.  You didn't -- very good.  Did you sell
23   lumber?
24   A.  No.
25   Q.  Did you sign any contracts for Gregory

Page 48

1    Trucking?
2         MR. O'CONNOR:  Objection.
3    A.  No.
4    Q.  Did you go out and visit customers and
5    service customers?
6    A.  No.
7    Q.  Okay.  You drove a truck?
8    A.  I drove the truck.
9    Q.  I asked you about the Smith System of
10   driving.  Correct me if I'm wrong, you'd never
11   heard of that before, right?
12        MR. O'CONNOR:  Objection.
13   A.  Not that I can recall of right now,
14   unless it's referred to by something other than
15   the Smith System.
16   Q.  Were you ever given any kind of truck
17   fleet safety manual by Gregory Trucking?
18   A.  Yes.
19   Q.  Okay.  And did you keep that somewhere?
20   A.  I still have it.
21   Q.  Where do you keep it?
22   A.  Well, right now, it's in my room.
23   Q.  In where?
24   A.  It's in my possession.  I just ran
25   across it about a week ago going through some

Page 49

1    things.
2    Q.  Do you have it with you today?
3    A.  I didn't know you'd want it or I'd have
4    brought it.
5    Q.  No.  I didn't ask you to.
6    A.  Okay.  I'm just -- yeah.
7    Q.  So, you just found it recently?
8    A.  Yes, sir.
9    Q.  And did you also find an employee manual
10   from Gregory Trucking?
11   A.  It might've been in there.  I had a
12   bunch of paperwork together.  I had the manual.  I
13   had the FMCSA securement book that I was given and
14   a couple other items I can't recall.  I just
15   happened -- like I said, about a week or so ago,
16   come across them, so --
17   Q.  Did Gregory Trucking ever send you for
18   any kind of tractor trailer driving education,
19   either the first time you worked for them or the
20   second?
21   A.  No.
22   Q.  Did Gregory Trucking ever send you to
23   any kind of tractor trailer truck defensive
24   driving classes?
25   A.  No.

Wiley Lenue Hooks, Jr.                                      4/26/2019

---

Page 50

1    Q.  Did Gregory Trucking ever send you to
2  any kind of advanced tractor trailer truck driving
3  seminars or courses?
4    A.  No.
5    Q.  Any kind of education at all?
6    A.  It was more --
7        MR. O'CONNOR:  Objection.
8    A.  -- in-house.
9    Q.  Tell me what happened in house to --
10   A.  Well, I just had some older drivers that
11  would instruct us on things that we had asset to,
12  Mr. Don was one of them.  Mr. Don taught me a lot,
13  so --
14       MR. MEEHAN:  I'm sorry, I didn't
15  hear what you said.  Mr. who?
16   A.  Don.
17       MR. MEEHAN:  Bond?
18   A.  Don.
19       MR. O'CONNOR:  Don.  First name?
20   A.  Yeah.
21       MR. O'CONNOR:  Is it like a first
22  name?
23   A.  Barker.
24   Q.  What was -- do you know Don's last name?
25   A.  Barker.

---

Page 51

1    Q.  Barker?
2    A.  Yeah.  Taught me a lot.  It was
3  informal, but it was in-house.
4    Q.  What, did he take you out on the road
5  and show you things?
6    A.  No.
7    Q.  No?  Just kind of sitting around having
8  coffee?
9    A.  No, no.
10       MR. O'CONNOR:  Objection.
11   A.  You'd go in there -- I mean, my -- just
12  I used him as a source of information.  If I had
13  questions about things, I'd go in there and ask
14  him.  He'd been hauling lumber most all of his
15  life, hadn't he?  So, he was a source of
16  information.  My father had been around equipment
17  all of his life.  Like I said, he built
18  interstates for 39 years, and then he got into the
19  trucking industry.  So, my background's
20  mechanical, being around mechanics and mechanical
21  stuff.  You know, eight years on the flight deck
22  of an aircraft carrier, so -- so, if I had the
23  need to know something, I'd usually just, you
24  know, find an older gentleman who knew what I
25  needed to know and I'd ask him, so I've always

---

Page 52

1  looked at, you know, source of information, you
2  know, go to the pond if you need water.
3    Q.  Were there any other resources provided
4  to you at Gregory Trucking that you could go to
5  for the answer to questions you might have?
6        MR. O'CONNOR:  Objection.
7    A.  I just -- most any of them there.  I
8  mean, there was a lot of older gentlemen there who
9  -- plus the guys down at the shop.  I mean, we had
10  a very, you know -- there was a good source of
11  information there.
12   Q.  When you were there -- and is it fair to
13  say you were there between 2014 and 2016?
14   A.  Yes, sir.
15   Q.  All right.  When you were there for that
16  period of time between 2014 and 2016, was there a
17  consensus among the drivers as to who the best
18  driver was?
19       MR. O'CONNOR:  Objection.
20   A.  In my mind, I always was.
21   Q.  All right.  Good.
22   A.  I mean, I would hate to sound conceited,
23  but I -- other than what has happened that has
24  happened, I -- like I said, two million miles
25  accident free.

---

Page 53

1    Q.  Uh-huh (yes).
2    A.  Couple fender-benders or whatever, but
3  --
4    Q.  So, other than some of the old-timers
5  and other drivers, any other resources available?
6  Were there any videos you could watch that Gregory
7  Trucking had available?
8    A.  I seem to think there was one.  I'm -- I
9  can't really say.
10   Q.  Any books?
11   A.  Well, yeah, we had all the federal books
12  that were available.
13   Q.  Did you ever go consult them?
14   A.  Well, the ones I had in my possession.
15  I mean, I did -- I mean, I'm not too proud to not
16  look up some information if I need to know it, and
17  you give me a -- you know, one of my things that I
18  learned in the military was that they provide you
19  with information.  If you use their information,
20  then at least you can go back to them and say,
21  "This is what you taught me."  So, if it's the
22  FMCSA then the -- the rules, you know, of the
23  FMCSA, if you get stopped by a DOT officer, he
24  can't really qualm when you tell him, well, you
25  know, 395.8 says X, Y, Z, so --

---

Wiley Lenue Hooks, Jr.                                            4/26/2019

| Page 54 |
|---|
| 1  Q.  Prior to going back to work at Gregory |
| 2  Trucking in 2014, had you worked as a professional |
| 3  tractor trailer truck driver? |
| 4     A.  I had. |
| 5     Q.  Let's go backwards from 2014 when you -- |
| 6     A.  Uh-huh (yes). |
| 7     Q.  -- started with -- could you just move |
| 8  backwards in time for about three or four years |
| 9  and tell me who you worked for? |
| 10    A.  I drove for myself and for my family.  I |
| 11 had my own truck at a period of time.  Actually, I |
| 12 had two at one point in time, so -- |
| 13    Q.  What was the name of your trucking |
| 14 company? |
| 15    A.  Hooks Trucking was my parents, and mine |
| 16 was Red Frog Logistics. |
| 17    Q.  Red Frog?  You had made a statement a |
| 18 few minutes ago that said two million miles with |
| 19 no accident.  Did you say -- |
| 20    A.  Well -- |
| 21       MR. O'CONNOR:  Objection. |
| 22    A.  -- fender-bender here and there, but, I |
| 23 mean, nothing major. |
| 24    Q.  In your time driving a tractor trailer |
| 25 truck, all the time you've driven, have you had |

| Page 55 |
|---|
| 1  any Department of Transportation reportable |
| 2  crashes? |
| 3       MR. O'CONNOR:  Objection. |
| 4     A.  I had a couple single -- vehicle |
| 5  accidents, things that happened, but they weren't |
| 6  -- it was due to another driver, so I, you know -- |
| 7     Q.  Do you know what a Department of |
| 8  Transportation reportable accident is? |
| 9     A.  No.  I mean, if you want the particulars |
| 10 and the specifics, I don't know what they qualify |
| 11 it as. |
| 12    Q.  Just for the times you were driving for |
| 13 Gregory Trucking, had you had any crashes? |
| 14       MR. O'CONNOR:  Objection. |
| 15    A.  I don't know.  Reportable?  I don't |
| 16 know. |
| 17    Q.  Let's forget the word "reportable" |
| 18 because that might have a specific meaning.  Any |
| 19 crashes while at Gregory Trucking? |
| 20    A.  Well, they would all be because it's -- |
| 21 I mean, according to the DOT, the FMCSA, any time |
| 22 there's an accident of any sort the DOT's to be |
| 23 called to investigate, so that's pretty much a |
| 24 commercial motor vehicle requirement, so -- |
| 25    Q.  So, while you were driving for Gregory |

| Page 56 |
|---|
| 1  Trucking at any time, the first time or the second |
| 2  time you worked for them, any crashes? |
| 3     A.  None that I can recall right now.  I'm |
| 4  not going to answer one way or the other and -- |
| 5     Q.  And let me say this to you at this |
| 6  point.  If for some reason you recall an answer of |
| 7  a question I asked you 10 minutes ago or an hour |
| 8  ago -- |
| 9     A.  Okay. |
| 10    Q.  -- and you want to go back and revisit |
| 11 it -- |
| 12    A.  Okay. |
| 13    Q.  -- you want to change an answer, you let |
| 14 me know.  Just say, "Hey, I just thought of |
| 15 something" -- |
| 16    A.  Okay. |
| 17    Q.  -- "about something" -- |
| 18    A.  Fair enough. |
| 19    Q.  -- "we talked about." |
| 20    A.  Fair enough. |
| 21    Q.  So, I understand you've been driving a |
| 22 long time and you might not recall every time you |
| 23 might've hit somebody's fender.  I know it's not |
| 24 easy -- |
| 25       MR. O'CONNOR:  Objection. |

| Page 57 |
|---|
| 1     Q.  -- to remember, and I'm not trying to |
| 2  commit you to an exact number.  Okay? |
| 3     A.  Well, I -- yeah, yeah. |
| 4     Q.  Okay. |
| 5     A.  Yeah. |
| 6     Q.  How did your relationship with Gregory |
| 7  Trucking end, your employment relationship end, |
| 8  after you were hired in 2014? |
| 9     A.  Well, the accident up in Pittsfield. |
| 10    Q.  What happened after that? |
| 11    A.  Well, they -- as of the accident, it was |
| 12 discovered that my license were not valid. |
| 13    Q.  Okay.  And what did Gregory Trucking do? |
| 14    A.  Well, they had to let me go. |
| 15    Q.  How did that happen? |
| 16    A.  Well, I didn't have a license, so I |
| 17 wasn't very useful as a truck driver to them. |
| 18    Q.  How did you know -- |
| 19    A.  I mean, that's -- that was my primary |
| 20 job with -- or that was my job with them, was |
| 21 driving trucks, so -- me without a license don't |
| 22 make me a truck driver anymore. |
| 23    Q.  Did someone tell you that you were no |
| 24 longer -- |
| 25    A.  Well, yeah. |

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 58

1    Q. -- going to be a --
2    A. Martha did.
3    Q. That's what I'm trying to get at.
4    A. Okay.
5    Q. Who told you and how did they tell you?
6    A. Martha did. She had the -- there was a
7    form there she asked me to fill out and said they
8    had to sever ties with me. I said, "I
9    understand." It was amicable.
10   Q. And when did --
11   A. Like I said, they're like neighbors to
12   me, you know. I mean, I live a mile from their
13   place.
14   Q. You've known the Gregorys for a long
15   time?
16   A. Quite a while.
17   Q. Both Cecil and Brandon?
18   A. Yes.
19   Q. And Martha?
20   A. And Martha.
21   Q. And Gayle?
22   A. And Gayle.
23   Q. And everybody else?
24   A. And Brent and George and Don Barker,
25   Eddie Campbell.

Page 59

1    Q. How long have you known the Gregorys?
2    A. Well, I've known them 20 years, easy,
3    since I moved back home. I was gone for a while,
4    then I moved back home. My dad was driving for
5    them and then I got on there and we bought the
6    trucks and so -- I've known them for 20 years,
7    easy.
8    Q. Did you socialize with the Gregorys?
9    A. Not other than work.
10   Q. Just work?
11   A. Yeah, just work.
12   Q. Ever go to any weddings?
13   A. I may have.
14   Q. Children's birthday parties?
15   A. No.
16   Q. No?
17   A. Been to a wedding or two probably.
18   Q. Hunting or fishing with the --
19   A. No.
20   Q. -- any of the Gregorys?
21   A. No.
22   Q. Okay. You ever go bowling, participate
23   in any kind of activity?
24   A. No.
25   Q. No? So, back to being let go --

Page 60

1    A. Yeah.
2    Q. -- from Gregory Trucking after the crash
3    in Dalton, you had to sign some paperwork?
4    A. Yeah.
5    Q. And did Martha -- is Martha the one that
6    gave you the bad news?
7    A. It was pretty -- it was obvious to me
8    and -- that it was going to happen. I mean, it
9    wasn't no -- it wasn't bad news. It was -- it was
10   just news. I mean, it was obvious.
11   Q. And when did that happen? When did
12   Martha give you this news?
13   A. Well, the accident was on the 24th, I
14   got back on the 26th, so Monday the 30th or
15   whatever is when I found out what had happened and
16   -- it might've been sometime that week. I don't
17   remember. It was --
18   Q. A few days after the crash?
19   A. A few days after, yes.
20   Q. That's fine. What did you do to support
21   yourself after that?
22   A. I've not done a whole lot since then.
23   Q. Going back to when you were first hired
24   in 2014, for the second time at Gregory Trucking,
25   you said you filled out an application, right?

Page 61

1    A. Yeah.
2    Q. Did you get a driving test?
3    A. Yeah.
4    Q. Who gave you a driving test?
5    A. Brandon.
6    Q. And did you get graded or marked or --
7    A. Well, we rode down to the planer.
8    Q. Where's that?
9    A. It's right on the property.
10   Q. How --
11   A. I mean, they knew my background.
12   Q. How far of a drive was it?
13   A. I don't know.
14   Q. I don't know how big the --
15   A. Half a mile?
16   Q. Okay. And did you have to do any
17   particular maneuvers for Brandon?
18   A. Well, not really. They knew I was
19   qualified. I mean, you know, I'd driven for them
20   before and --
21   Q. Did you -- were you informed if you'd
22   passed the driving test?
23   MR. O'CONNOR: Objection.
24   A. You know, I'm so -- I can't even -- you
25   know, I don't want to get -- I'm not going to

Page 62

1   pigeonhole myself into answering. It was -- you
2   know, they asked me to do this, I told them --
3   they knew I could. It was informal. I mean, like
4   I said, you know, we've known each other a long
5   time. They knew my experience. I mean, so --
6       Q. But was it a driving test or was it
7   giving him a lift down to the thing a half mile
8   away?
9           MR. O'CONNOR: Objection.
10      A. You know what? Probably half a dozen of
11  one, six of the other.
12      Q. What does that mean?
13      A. I mean half a dozen of one -- I mean,
14  I'm -- you know, if you want to say -- no, it was
15  not a qualified driving test. I'm not going to
16  sit here and make out like -- you know, parse
17  words over it.
18      Q. All right. Did you go for a drug and
19  alcohol test before --
20      A. Yes --
21      Q. -- being hired?
22      A. -- that's required, yes.
23      Q. Are you familiar with the drug and
24  alcohol policy of Gregory Trucking?
25      A. Zero tolerance.

Page 63

1       Q. Are you aware Gregory Trucking had been
2   cited for violating the drug and alcohol policy?
3           MR. O'CONNOR: Objection.
4       A. I'm not aware of that.
5       Q. After the crash in Dalton, did you ever
6   get a drug or alcohol test?
7       A. At my own request because they failed to
8   do it up there in Pittsfield/Dalton at the time.
9   I was expecting the DOT to roll in there like they
10  should have, but they never did, so as of Monday
11  by the time -- because Friday, waiting for the
12  truck to be released, I was under the -- I was
13  under the impression that the DOT was there
14  assessing the truck. Don't know why the Village
15  Towing had to -- but as of Monday first thing, I
16  went and told Martha that they failed to do that
17  up there and that I needed to go do one, like,
18  right away so I did. I went to Piedmont Health
19  and had a drug test done of my own volition.
20      Q. After the crash, is it your
21  understanding that a drug test has to be
22  performed?
23      A. Oh, yes.
24          MR. O'CONNOR: Objection.
25      A. I was the one waving the flag, because

Page 64

1   that was going to be in my benefit to have them
2   done, to do that, but the local cops -- I believe
3   they were the Dalton police officers on site.
4   Like I said, I was expecting the DOT to roll in
5   there because it was required and I believe
6   Massachusetts state law requires that the DOT come
7   to a commercial vehicle accident and no one ever
8   showed up, so it was just left upon the Dalton
9   Police Department, and I kept saying, "This needs
10  to be done."
11      Q. How long after the crash -- strike that.
12  After the crash, did you ever call back to Gregory
13  Trucking?
14      A. Well, yeah.
15      Q. How long after the crash did you make
16  that call?
17      A. I made it at the scene.
18      Q. Okay. And you told them there was a
19  wreck?
20      A. I told Martha that there had been an
21  accident.
22      Q. Do you know whose obligation it is to
23  get a drug and alcohol test for you?
24          MR. O'CONNOR: Objection.
25      A. It's the patrol's, as I understand.

Page 65

1       Q. And did you ever discuss it with the
2   patrol?
3       A. Yes, I did.
4       Q. What did they say?
5       A. I was the one who was asking where the
6   DOT was at. I wanted them there because I wanted
7   it to be recorded.
8       Q. And did the Dalton police ever give you
9   a drug or alcohol test at your request?
10      A. Nope. They did not.
11      Q. Okay. Were you detained at the police
12  station?
13      A. Briefly and then taken to an
14  arraignment.
15      Q. How much time between the crash and the
16  arraignment, approximately?
17      A. Couple hours.
18      Q. Okay.
19      A. Two hours.
20      Q. And were you released at the
21  arraignment?
22      A. I was.
23      Q. Was there a bail?
24      A. No.
25      Q. No? Do you know how long you have after

Page 66

1    a crash under the regulations to get a drug test
2    or an alcohol test?
3         MR. O'CONNOR: Objection.
4         A.  It's supposed to be done immediately.
5         Q.  Do you know if there's a limit of time
6    on it?
7         MR. O'CONNOR: Objection.
8         A.  It's supposed to be done immediately.
9    You're supposed to go from the scene to the -- to
10   a facility and be tested.
11        Q.  Where did you go after being released
12   from court?
13        A.  I went to the Econo Lodge in Pittsfield
14   area there.
15        Q.  Did Gregory Trucking assist you in
16   finding a place to get drug or alcohol tested?
17        MR. O'CONNOR: Objection.
18        A.  Yeah, they had a place when I got back
19   down here.
20        Q.  Back down here?
21        A.  Yeah.
22        Q.  While you were still up in
23   Massachusetts, did Gregory Trucking do anything to
24   help you get a drug or an alcohol test, set it up
25   for you?

Page 67

1         A.  Well, at the -- well, I can't recall.  I
2    mean, at that point in time, I was pretty
3    distraught after all that had gone on and going in
4    front of the Court and seeing, you know, the fact
5    that the accident had been -- had been, but I did
6    know the regulations and I wanted to adhere to
7    them, so, you know, for my benefit because that
8    was what was required.
9         Q.  If after you walked out of the
10   courthouse Gregory Trucking had instructed you to
11   go get a drug or an alcohol test would you have
12   done it?
13        A.  Yeah.
14        Q.  If they told you where to go and when to
15   be there, you would've done it?
16        MR. O'CONNOR: Objection.
17        A.  I was expecting the whole time for the
18   DOT to show up at any time.  I mean, I -- that was
19   standard SOP.  That was standard operating
20   procedures and why Massachusetts didn't adhere to
21   that, I don't know.  I was -- I mean, really.  I
22   was expecting it at any time.  I mean, that was on
23   a Wednesday and as of Friday hadn't heard anything
24   from them and was under the impression that they
25   were there Friday, but come to find out that

Page 68

1    wasn't the fact.
2         Q.  Are you familiar with Gregory Trucking's
3    policy on what to do after a crash?
4         A.  Well, yeah, we had a little crash book
5    that -- to get information, you know.  It's more
6    of a fender-bender kind of thing, but, you know,
7    this was a little more severe than a fender-
8    bender, so --
9         Q.  So, what is the process?  What's the
10   policy?
11        A.  Well, to notify the office and then take
12   it from there, you know.  I mean --
13        Q.  Any other requirements of you, the
14   driver involved?
15        A.  Well, we need to document all we can
16   for, you know -- there's going to be pertinent
17   information needing to be known in the accident of
18   any caliber, so, you know --
19        Q.  What did you do after to document the
20   crash?
21        A.  Well, as of the time when I turned my
22   license in to the officer and she ran my license,
23   I was pretty concerned with the occupant of the
24   vehicle, Mr. Forbes, and the -- you know, I was --
25   so, I was kind of engrossed in what was going on

Page 69

1    there, and then all of a sudden they came back to
2    her and told her my license had been suspended and
3    so the whole ball game changed.  At that point,
4    they put me in cuffs and put me in the back of her
5    squad vehicle, where I remained until they took me
6    to court for an arraignment.
7         Q.  Do you know what the Gregory Trucking
8    policy is to do at a crash site after a crash?
9         MR. O'CONNOR: Objection.
10        A.  Right now, I can't recall, to be honest
11   with you, but there is -- they have a procedure,
12   you know.
13        Q.  Uh-huh (yes).
14        A.  Notifying the office is pretty much
15   paramount the first thing you do, so --
16        Q.  And you notified the office?
17        A.  Immediately.
18        Q.  Did they tell you anything to do --
19        A.  Well --
20        Q.  -- at the crash site?
21        A.  -- after that, my phone was taken from
22   me and I couldn't get in touch with them until
23   later that day and then, you know, I was involved
24   in the -- you know, involved in the aftermath, you
25   know, it's pretty --

Wiley Lenue Hooks, Jr.                                    4/26/2019

19 (Pages 70 to 73)

---

Page 70

1      Q.  But before your phone was taken away,
2   did Gregory -- anybody at the office at Gregory
3   Trucking --
4      A.  It had just happened and I had notified
5   Martha and then -- I mean, within a short period
6   of time, I was detained and put in cuffs, so --
7   there wasn't any time for them to respond back to
8   me or if they did, you know, it was on my phone
9   and I didn't have my phone with me because it had
10  been taken.
11     Q.  While you were talking to the office
12  after the crash, did the police take the phone
13  away from you while you were in the middle --
14     A.  Well, I mean not took it away from me,
15  but once I had, you know -- I don't even know how
16  that went down to be honest with you.
17     Q.  So, after you reported the crash to the
18  office -- and is it Martha you spoke to?
19     A.  I did.
20     Q.  Did Martha give you any instructions on
21  what to do -- what she wanted you to do at the
22  crash scene?
23     A.  I don't remember.
24     Q.  Okay.
25     A.  Don't remember.

---

Page 71

1      Q.  Do you keep a copy of any kind of
2   instructions on what to do after a crash in the
3   truck?
4      A.  There was something in there, but I
5   can't recall what it is.  That's been a couple of
6   years ago.
7      Q.  When you say "something," what kind of
8   --
9      A.  There was --
10         MR. O'CONNOR:  Objection.
11     A.  -- a procedure handout or something.
12     Q.  Okay.
13     A.  You know, there was something in there.
14     Q.  Did you use it at all?
15     A.  Well, I had implemented the first step,
16  calling the office, and then, you know, the first
17  responders were there and so I was dealing with
18  that.  I was dealing with the accident as best as
19  I knew how because I'd never --
20     Q.  If you weren't detained by the police
21  and put in a car, what would you have done?
22         MR. O'CONNOR:  Objection.
23     A.  Followed the procedure.
24     Q.  Which is?
25     A.  I don't know.

---

Page 72

1      Q.  Okay.
2      A.  I don't have it here so I can go through
3   it with you, Mr. Dino.
4      Q.  Do you think it was in the truck?
5      A.  I know it was.
6      Q.  Okay.  How does Gregory Trucking keep in
7   touch with you while you're out on the road
8   driving the truck?
9      A.  Via cell phone.
10     Q.  Was it a company cell phone?
11     A.  No, it was mine.
12     Q.  It was your own?  Did you have to pay
13  for that yourself?
14     A.  I did.  It's a common thing nowadays.
15     Q.  And was there a requirement of when you
16  had to call in or did you have to call in at all?
17     A.  Well, when we were at -- when we were
18  able other than driving.  I didn't call -- I never
19  was on my phone while I was on the road.  So
20  usually at the end of the day or whenever I
21  stopped somewhere, I would take the time to call
22  in and let them know where I was at and check in,
23  tell them I delivered their load and, you know, in
24  general and such.
25     Q.  When you were driving for Gregory

---

Page 73

1   Trucking after 2014, was there any kind of blue
2   tooth or hands-free setup in any of the trucks?
3      A.  Well, yeah, yeah, yeah.
4      Q.  Was there a blue tooth or hands-free
5   setup in the truck that was involved in the crash?
6      A.  Well, I had my own blue tooth.  You
7   know, it's common to have your own.
8      Q.  You had your own?
9      A.  Well, yeah, for sanitation reasons, I
10  wore my own --
11     Q.  Why for --
12     A.  -- but I didn't have it on because I
13  don't get on the phone while I'm driving.  I mean,
14  I have it in case I need it, but I do not get on
15  the phone while I'm driving.
16     Q.  Even --
17     A.  Matter of fact, the last time I had been
18  on my phone was the night before when I had
19  checked in with Martha, and so for the next 12
20  hours I hadn't been on the phone at all.  I don't
21  like them.
22     Q.  You don't even use it hands-free --
23     A.  No.
24     Q.  -- while you're driving?
25     A.  No.

---

Wiley Lenue Hooks, Jr.                                            4/26/2019

| Page 74 |
| --- |

1    Q.  Okay.
2    A.  If I can pull into --
3    Q.  Good.
4    A.  -- rest areas --
5    Q.  Thank you.  I appreciate that.
6    A.  Yeah.
7    Q.  That's -- I wish more people did.  Are
8    you aware that some trucking companies have
9    installed speed governing devices to keep the
10   tractor trailer trucks from going over a certain
11   speed?
12   A.  I've heard that.
13   Q.  Does Gregory Trucking use any of that
14   technology?
15   A.  I think some of them may be governed.
16   I'm not sure.
17   Q.  Did you ever drive one that was?
18   A.  I don't know if it was just a slow truck
19   or if it had a governor on it.  Can't be honest.
20   Q.  Well, you're a professional truck
21   driver.  You know --
22   A.  I --.
23   Q.  -- if it's governed or not, don't you?
24        MR. O'CONNOR:  Objection.
25   A.  Not necessarily.  Some trucks just got

| Page 75 |
| --- |

1    more oomph than the other ones do.  I mean --
2    Q.  But what's a governor do on it?
3        MR. O'CONNOR:  Objection.
4    A.  Well, with the ACMs on trucks, you can
5    regulate how -- what their top speed is.
6    Q.  And did you ever drive one for Gregory
7    Trucking that had such a regulator on it?
8        MR. O'CONNOR:  Objection.
9    A.  To be honest with you, I don't know.  I
10   just drove the speed limit.
11   Q.  All right.  Are you aware that some
12   trucking companies have installed forward-facing
13   cameras in their traffic -- tractor trailer --
14   A.  I'm aware --
15   Q.  -- trucks?
16   A.  -- of that.  Yeah.
17   Q.  Okay.  Did you ever drive a Gregory
18   tractor trailer truck that had such a forward-
19   facing camera?
20   A.  No.
21   Q.  Are you aware that some truck companies
22   have installed lane departure warning devices in
23   the tractor trailer trucks?
24   A.  I've heard of that.
25   Q.  Did you ever drive a tractor trailer

| Page 76 |
| --- |

1    truck for Gregory Trucking that had a lane
2    departure warning device in it?
3    A.  I just kept the truck in the lane.
4    Q.  I appreciate that, too, but --
5    A.  Well, I don't know.  I -- not that I'm
6    aware of --
7    Q.  And being a professional --
8    A.  -- to be honest --
9    Q.  -- truck driver, you'd be aware of it,
10   wouldn't you?
11        MR. O'CONNOR:  Objection.
12   A.  Well, I don't even know how they
13   operate, to be honest with you.  I mean, I
14   understand the concept and the technology behind
15   it, but I -- I don't know how you would tell -- I
16   guess the wheel maybe vibrates or something.  I
17   don't know.
18   Q.  Are you aware that some trucking
19   companies have installed blind spot detection
20   equipment in their tractor trailer trucks?
21   A.  I've heard of it.
22   Q.  Did you ever drive a Gregory Trucking
23   tractor trailer with blind spot detection
24   equipment in it?
25   A.  No, not that I know of.

| Page 77 |
| --- |

1    Q.  Do those things we just talked about,
2    the blind spot detection, the lane departure, the
3    governor for the speed --
4    A.  Uh-huh (yes).
5    Q.  -- do those things make driving safer?
6        MR. O'CONNOR:  Objection.
7    A.  My personal opinion, no.
8    Q.  No?
9    A.  If you need that, you don't need to be
10   in the truck.
11   Q.  They say that's coming pretty soon,
12   isn't it?  Have you heard about driverless trucks?
13   A.  I hope to be on a island somewhere and
14   possibly not having to deal with it.
15   Q.  All right.  We're going to give her a
16   break for a second.
17   A.  Okay.
18        (DEPOSITION EXHIBIT
19        NUMBER ONE WAS MARKED
20        FOR IDENTIFICATION)
21   Q.  So, Mr. Hooks --
22   A.  Yes, sir.
23   Q.  I'm sorry.  Let's wait until she's got
24   her oxygen on.
25   A.  Okay.

Wiley Lenue Hooks, Jr.                                      4/26/2019

21 (Pages 78 to 81)

---

**Page 78**

1    Q.  There we go.  So, Mr. Hooks, throughout
2  the deposition I'm going to be showing you
3  documents.
4    A.  Yes, sir.
5    Q.  First, we give them to her and she puts
6  a sticker on it.  Do you see that sticker?
7    A.  Yes, sir.
8    Q.  It says, "Exhibit 1," I assume?
9    A.  Gotcha.
10   Q.  And very often, after we've got a few of
11 these hanging around it's helpful to refer to them
12 by that sticker number.
13   A.  Absolutely.
14   Q.  All right?  Have you ever seen Exhibit
15 Number One?
16   A.  Well, yeah.
17   Q.  What is it?
18   A.  It's the Federal Motor Carrier Safety
19 Administration Compliance Manual.
20   Q.  And this is just the cover page, right?
21   A.  Yes, sir.  It's not the full volume, I
22 would take it.
23   Q.  Pretty thick tome, isn't it?
24   A.  Wouldn't be a lot of information if this
25 was it, so -- I'm sure it's about that big

---

**Page 79**

1  (witness indicates), so --
2    Q.  Phonebook, New York, Manhattan phonebook
3  kind of thick?
4    A.  Yeah, yeah.
5    Q.  All right.  And you've seen this before?
6    A.  Oh, yeah.
7    Q.  All right.
8    A.  Yeah.
9    Q.  And one of these were in existence at
10 Gregory Trucking if you --
11   A.  Oh, yeah.
12   Q.  -- needed?
13   A.  Yeah.
14   Q.  Okay.  And did they keep them current?
15   A.  Well, they send updates.  Yes, I imagine
16 they did, yeah.
17   Q.  And do you know if they were current if
18 -- did you ever go to use it while you were at
19 Gregory Trucking?
20   A.  Theirs, no, but I had one at home.  I
21 had my own copy.
22   Q.  Did you keep yours updated?
23   A.  I do.
24   Q.  Did you get a new --
25   A.  J. J. Keller.

---

**Page 80**

1    Q.  Did you get a new one every year?
2    A.  I got all the updates, plus it was
3  available online.  Well, actually, to be honest,
4  after a few years, I just went online because
5  that's where it was available, so --
6    Q.  And it's free?
7    A.  And it's free.  Yes.  That's my price.
8    Q.  Will you agree with me that the
9  regulations within the Federal Motor Carrier
10 Safety Administration manual, Exhibit One, those
11 are the minimum requirements required?
12        MR. O'CONNOR:  Objection.
13   A.  The minimums?  I -- I don't know that to
14 be true.
15   Q.  Okay.  Would you agree with me that as a
16 driver you have a duty to comply with the
17 regulations within this manual?
18        MR. O'CONNOR:  Objection.
19   A.  As best as possible.
20   Q.  Do any of the regulations say as best as
21 possible, do you know?
22        MR. O'CONNOR:  Objection.
23   A.  Well, no, but they -- no.
24   Q.  So, do you agree with me that as a
25 professional tractor trailer truck driver you're

---

**Page 81**

1  required to comply with these regulations that are
2  in the Federal Motor Carrier Safety Compliance
3  Manual?
4        MR. O'CONNOR:  Objection.
5    A.  Ask that again?
6    Q.  As a professional tractor trailer truck
7  driver, are you required to comply with the
8  Federal Motor Carrier Safety Administration
9  Compliance Manual?
10   A.  Yeah, you're required to, yes.
11   Q.  Okay.  Is a motor carrier like Gregory
12 Trucking required to comply with the regulations
13 in the Federal Motor Carrier Safety Administration
14 Compliance Manual?
15        MR. O'CONNOR:  Objection.
16   A.  I would suppose they would be, yeah.
17   Q.  Is safety important at Gregory Trucking?
18        MR. O'CONNOR:  Objection.
19   Q.  Was it important when you worked there?
20   A.  Yeah.
21        MR. O'CONNOR:  Objection.
22   Q.  On a scale of 1 to 10, how important was
23 it?
24        MR. O'CONNOR:  Objection.
25   A.  It was important.  Ten.

---

Wiley Lenue Hooks, Jr.                                    4/26/2019

22 (Pages 82 to 85)

Page 82

1    Q.  Are you aware of any tractor trailer
2    truck drivers that have been fired at Gregory
3    Trucking when you were there?
4    A.  No.
5    Q.  Did Gregory Trucking ever audit your log
6    books while you were driving for them after 2014?
7    A.  Weekly.
8    Q.  What would happen in an audit with your
9    log books?
10   A.  They would check to make sure they were
11   compliant.
12   Q.  Would you sit down with them and go over
13   them together or would you just --
14   A.  If necessary.
15   Q.  Did that ever happen?
16   A.  Yeah.  Martha was a stickler for that.
17   Q.  Did you sit down with her and go through
18   it together?
19   A.  Yeah.
20   Q.  Were there ever any discrepancies found
21   in your log books?
22   A.  Yeah.
23   Q.  Like what?
24   A.  Perfection is not my best suit.
25   Q.  Like what?

Page 83

1    A.  Occasionally, I mean, there'd be -- I
2    mean there's something in there.  I mean, it's a
3    manual log book and you, know -- I mean, I can't
4    think of anything in particular.  Mine were -- I
5    never had a lot of problems with my log books, but
6    upon occasion -- that was her job, was to look
7    them over and get back with us about, you know,
8    this ain't right, this ain't right, I need this
9    mileage, so, you know, that was part of her job to
10   check us out.
11   Q.  In your opinion, did Martha know what
12   she was doing --
13   A.  Oh, yes.
14   Q.  -- in auditing --
15        MR. O'CONNOR:  Objection.
16   Q.  -- your log book?
17   A.  Yes.
18   Q.  Martha understood the rules and the
19   regulations?
20   A.  Well, yeah.
21   Q.  And can you think of any discrepancies
22   that were discovered in any of your audits for
23   your log books?
24   A.  I mean, they're -- yeah, I mean they're
25   -- they came out with a 30-minute break you had to

Page 84

1    take within eight hours and, you know, of course
2    when they first implement something like that
3    there's a -- takes a little time to get used to
4    it, so she's like, "You need to start doing your
5    30-minute break at eight hours" or what -- you
6    know, she was -- she knew what she was -- Martha
7    knew what she was doing, and so she'd correct us,
8    you know, and say, "Okay.  Well, I need to be
9    better about," you know -- pay attention a little
10   better.
11   Q.  Is that called hours of service?
12   A.  Hours of service, yeah.
13   Q.  And is pretty strict requirements for
14   that?
15   A.  Yeah, you -- yeah.  I mean, you just got
16   to take 10 hours off every 24 hours.  You can't
17   drive and/or work over 14 hours.  Every eight
18   hours, you've got to take a 30-minute break.  I
19   mean, I still remember that stuff because it was
20   kind of drove into you.
21   Q.  While you were at Gregory Trucking after
22   2014 did Gregory Trucking conduct safety meetings?
23   A.  Yeah.
24   Q.  How often?
25   A.  I think they were monthly or quarterly.

Page 85

1    I don't know.  I forget.  It's been a couple years
2    now.
3    Q.  Did somebody run those safety meetings?
4    A.  Martha.
5    Q.  What would happen at the safety
6    meetings?
7    A.  Usually disseminate some information
8    having to do with what was required of the FMCSA.
9    I mean, there'd always be a different topic,
10   securement, hours of service, you know.  There
11   were several different areas they would, you know
12   --
13   Q.  Were minutes kept?  Did somebody keep a
14   record of those?
15   A.  I --
16        MR. O'CONNOR:  Objection.
17   A.  -- don't know.
18   Q.  Was attendance kept?  Did you ever sign
19   in?
20   A.  I think so.  I mean -- yeah, you had to
21   sign in.
22   Q.  Do you remember any of the topics that
23   were discussed at any safety --
24   A.  Securement was a big one.
25   Q.  Tell me a little bit --

**Page 86**

1     A.  Securing the load to the trailer.  I
2  mean, you can't go down the road without it
3  secured to the trailer, so that was pretty much
4  one of them that I remember right off the bat.
5     Q.  Anything else?
6     A.  My hours of service.  Those two come
7  into my mind right off the bat, so --
8     Q.  Have you heard of the American Trucking
9  Association?
10    A.  I have.
11    Q.  Would you agree with them that as of
12 2014 there was a truck driver shortage?
13    A.  I've heard that.
14    Q.  Do you believe that?
15    A.  I -- based on the recruitment out there
16 now, I would say yeah, I guess.
17         (DEPOSITION EXHIBIT
18          NUMBER TWO WAS MARKED
19          FOR IDENTIFICATION)
20    Q.  Mr. Hooks?
21    A.  Yes, sir.
22    Q.  Take a look at what's been marked as
23 Exhibit Number Two.
24    A.  Okay.
25    Q.  Please look at it thoroughly from

**Page 87**

1  beginning to end and let me know if you -- when
2  you're done, please.
3     A.  (Witness reviews document.)  I'm going
4  to let you know that I'm on medication that causes
5  my vision to be blurry, so this is -- I mean, I
6  can basically make it out, so --
7     Q.  I'll tell you what.  For a second, if
8  you want to not read.  I don't intend to ask you
9  specific questions --
10    A.  Well, I mean --
11    Q.  -- about what's in it.
12    A.  -- oh, you're not going to test me,
13 right?
14    Q.  Not going to test you --
15    A.  Okay.
16    Q.  -- but I'm going to ask you if you've
17 ever seen it before kind of a thing, and I don't
18 want you to stress your eyes if you're having
19 trouble.
20    A.  Oh, no.  I'm not going to, but okay, I'm
21 with you.  Okay.  I know what this is, yeah.
22    Q.  Okay.  What is it?
23    A.  It's a fleet safety program.
24    Q.  For who?
25    A.  Well, it says Gregory Trucking up at the

**Page 88**

1  top.
2     Q.  Okay.  Did you ever get a copy of this?
3     A.  I'm going to say not necessarily in this
4  format, but --
5     Q.  Did you get it in some other format?
6     A.  Well, I mean it was printed but as a
7  different -- probably a different layout than
8  this.
9     Q.  Yeah?  Do you remember when you got it?
10    A.  It was probably when they hired me
11 because that's one of the requirements.
12    Q.  And that would've been in 2014, when you
13 got hired?
14    A.  Probably, yeah.  Well, yeah.
15    Q.  Who --
16    A.  That was part of the hiring process.
17    Q.  Do you know who would've given it to
18 you?
19    A.  Martha would've.
20    Q.  All right.  Do you know if you signed
21 anything acknowledging that you received it?
22    A.  No, I don't know that to be a fact or
23 not.
24    Q.  And after you got it, did you read it?
25    A.  I probably went over it, yeah.  I mean,

**Page 89**

1  this looks like familiar stuff, the big test.  The
2  pre-trip inspection stuff I was familiar with, the
3  -- I think if there would've been something that I
4  hadn't been knowledgeable of I might probably
5  would've read it, but --
6     Q.  Was there a copy of it kept in the
7  trucks?
8     A.  In the truck?  I don't know.
9     Q.  Was it available in the office if you
10 needed access to it?
11    A.  They had files in the office, yeah,
12 probably, yeah.
13    Q.  Do you know if this specific fleet
14 safety program was available?
15    A.  Well, the one at the time was, I'm sure,
16 yeah.
17    Q.  Okay.
18    A.  Because that's where they handed it to
19 me was in the office.
20         (DEPOSITION EXHIBIT
21          NUMBER THREE WAS MARKED
22          FOR IDENTIFICATION)
23    Q.  Mr. Hooks, will you take a look at
24 Exhibit Number Three and -- again, I don't intend
25 to ask you any questions out of it, but --

Wiley Lenue Hooks, Jr.                                      4/26/2019

---

Page 90

1   A.  Okay.
2   Q.  -- if you just take a look at it and let
3   me know when you're done.
4       A.  (Witness reviews exhibit.)  Okay.
5   Q.  What is Exhibit Number Three?
6       A.  It's the employee handbook --
7   Q.  All right.  And did --
8       A.  -- for Gregory Trucking.
9   Q.  Thank you.  Did you ever get a copy of
10  that when you got rehired or hired in 2014?
11      A.  Yes, I did.
12  Q.  Do you actually remember getting a copy
13  of it?
14      A.  Yeah.
15  Q.  Okay.
16      A.  I mean, I gave the -- yeah.  Yeah.
17  Q.  Who would've given you a copy of that?
18      A.  Martha.
19  Q.  Okay.  Did you read it when you got it?
20      A.  I probably went through it.
21  Q.  And was a copy of it available --
22      A.  I mean, it wasn't this exact -- like I
23  said, the -- you know, this ain't the exact one I
24  had, but I mean this is -- looks like it's been
25  redone, but there was a copy of such and such, the

---

Page 91

1   rules, the dress codes, and all that, yeah.
2   Q.  Was a copy of the Gregory Trucking
3   employee handbook available in the office at
4   Gregory Trucking?
5       A.  I have no knowledge of that.
6   Q.  Okay.  If you needed access to it, how
7   would you do that?
8       A.  Ask Martha.
9   Q.  She'd get it for you?
10      A.  She would.
11  Q.  Or she'd have the answer to your
12  question?
13      A.  Martha pretty much provided us with the
14  things we needed.  She was very proficient.
15  Q.  All right.
16      A.  Very proficient.
17          (DEPOSITION EXHIBIT
18          NUMBER FOUR WAS MARKED
19          FOR IDENTIFICATION)
20  Q.  Mr. Hooks, I want you to take a look at
21  Exhibit Number Four and let me know when you're
22  done looking at that.
23      A.  (Witness reviews exhibit.)  Okay.
24  Q.  And what is Exhibit Number Four?
25      A.  It's a drug and alcohol information

---

Page 92

1   packet for Gregory Trucking.
2   Q.  And did you ever get a copy of this when
3   you started working for Gregory Trucking in 2014?
4       A.  I don't think it was this many pages,
5   but -- when we had the drug test done there was
6   some information given out.
7   Q.  Okay.  And does it look like Exhibit
8   Number Four, to your memory?
9       A.  It was drug and alcohol information.
10  Yeah.
11  Q.  But it was different than Exhibit Number
12  Four?
13      A.  Well, yeah.
14  Q.  Okay.  What's your understanding of the
15  Gregory Trucking drug and alcohol policy when you
16  got hired in 2014?
17      A.  Zero tolerance, I believe.
18  Q.  All right.
19      A.  It's what I understand.
20  Q.  Did Gregory Trucking offer employees
21  with assistance with drug or alcohol problems?
22      A.  I don't know.
23          MR. O'CONNOR:  Objection.
24      A.  I didn't -- it wasn't an issue I had to
25  cover with them.

---

Page 93

1   Q.  Did you ever ask anybody at Gregory
2   Trucking for any kind of help with drug or alcohol
3   issues?
4       A.  No (witness indicates negatively).
5   Q.  Did anybody at Gregory Trucking ever
6   come to you and ask you if you needed help with
7   drug or alcohol issues?
8          MR. O'CONNOR:  Objection.
9       A.  That just never was an issue.
10  Q.  Well, correct me if I'm wrong.  You
11  stopped drinking because it was an issue, right?
12      A.  Yeah.  Yeah, I woke up one day, I said,
13  "I need to quit drinking," and I quit.  I mean,
14  that was self-imposed, so --
15  Q.  Did you ever drink with Cecil or Brandon
16  Gregory?
17      A.  Nope.
18  Q.  Did they know you drank?
19      A.  I don't know.
20          MR. O'CONNOR:  Objection.
21  Q.  Okay.  Do you remember when you first
22  got your CDL license?
23      A.  Yeah.
24  Q.  When was it?
25      A.  '03, I believe.

---

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 94

1           MR. MEEHAN: I'm sorry?
2       A.  '03.
3       Q.  Did you go to one of those driving
4   schools to get it?
5       A.  No, sir (witness indicates negatively).
6       Q.  How did you get it?
7       A.  I went and took the driving test, I got
8   a permit, and 30 days later I went down and got
9   the -- my driver's license because I passed the
10  test. I've been around equipment all my life, so
11  it was second nature to me.
12      Q.  So, tell me about the testing process
13  when you took it to get your CDL. Was there a
14  written portion and then a --
15      A.  Well, it was the North Carolina State
16  Department of Motor Vehicle-required test that I
17  passed, so I passed the State's requirements.
18      Q.  Okay. So, I don't know what they are.
19  So, is it -- is there a written portion to it?
20      A.  Yes, there is.
21      Q.  Okay. And did you pass that?
22      A.  Yes, I did (witness indicates
23  affirmatively).
24      Q.  You took it, you -- did you pass it the
25  first time?

Page 95

1       A.  Yes, I did (witness indicates
2   affirmatively).
3       Q.  Excellent. And then after you passed
4   the written portion, do you take an actual driving
5   test?
6       A.  Yes, you do.
7       Q.  Okay. So, it's not much different than
8   a regular car license, other than it's a --
9       A.  Other than it's a tractor.
10      Q.  -- bigger vehicle?
11      A.  Yes, sir.
12      Q.  And did you pass your driving portion of
13  the test?
14      A.  Yes, I did (witness indicates
15  affirmatively).
16      Q.  Okay. And you were able to get a CDL
17  license after you passed the driving portion?
18      A.  That afternoon, I went down and got a
19  CDL.
20      Q.  Okay. Had your CDL ever been suspended
21  up until before the crash?
22      A.  Yes, they had (witness indicates
23  affirmatively).
24      Q.  When and for what?
25      A.  I don't know when the when is. I don't

Page 96

1   know the exact date.
2       Q.  Okay. How many times had it been
3   suspended?
4       A.  A couple.
5       Q.  And do you recall for what?
6       A.  For drugs.
7       Q.  And when you say "drugs," would that
8   have been discovered as a drug test?
9       A.  No.
10      Q.  No?
11      A.  No -- yeah, it was. It was (witness
12  indicates affirmatively).
13      Q.  Would those have been drug -- some kind
14  of drug test you had to take because of a result
15  of a crash?
16      A.  Nope. Just a random drug test.
17      Q.  So, truck drivers are subject to random
18  drug testing?
19      A.  Yes, they are.
20      Q.  And you were selected at random --
21      A.  Yes, I was.
22      Q.  -- and you tested positive?
23      A.  Yes, I did.
24      Q.  And how many times did that happen?
25      A.  Couple of times.

Page 97

1       Q.  And as a result of a positive drug test,
2   the first time, what happened?
3       A.  I had a get an assessment. I had a 30-
4   day civil suspension and then had to reapply and
5   pay a fine.
6       Q.  Okay. And how about the second time?
7       A.  Same thing.
8       Q.  Do you have any sense of when those
9   might've occurred, approximately? I'm not looking
10  for months and --
11      A.  '10, '11, '12.
12      Q.  Are you saying 2010?
13      A.  -- '10, 2011, 2012, somewhere in there.
14      Q.  And did they both happen within a period
15  of a --
16      A.  A year, I believe. I don't know.
17      Q.  Okay.
18      A.  A year apart maybe.
19      Q.  Okay. Has your CDL ever been suspended
20  for anything else?
21          MR. O'CONNOR: Objection.
22      A.  Not that I can recall of right now.
23      Q.  Okay. Now, I understand it was
24  suspended on the date of the crash?
25      A.  Yes, it was.

Wiley Lenue Hooks, Jr.                                      4/26/2019

26 (Pages 98 to 101)

| Page 98 |
| --- |

1      Q.  And do you know why?
2      A.  I still haven't really figured that out
3   because the day I renewed my license they had --
4   anyhow, they sent me my license anyhow. I didn't
5   know it was suspended. The State of North
6   Carolina sent them to me, so --
7      Q.  But after the crash you learned it was
8   suspended?
9      A.  I did, that day.
10     Q.  Have you ever found out why it was
11  suspended?
12     A.  Honestly, no. I mean, I have an idea,
13  but --
14     Q.  You never went to the authorities and
15  asked why?
16     A.  Well, after that, I got taken up to
17  Massachusetts where I was incarcerated for 15
18  months and since then, which has been just over a
19  year ago, I have been pretty much indigent and
20  trying to recover from this situation has been an
21  ordeal, so -- and I mean indigent to the
22  definition of indigent.
23     Q.  Does the registry of motor vehicles in
24  North Carolina charge you money to go in and ask
25  them questions?

| Page 99 |
| --- |

1         MR. O'CONNOR: Objection.
2      A.  No.
3      Q.  All right. You gave the impression that
4   you were sent back up to Massachusetts and
5   incarcerated, but you were actually in North
6   Carolina for quite some time after the crash,
7   weren't you?
8      A.  Yeah, they --
9         MR. O'CONNOR: Objection.
10     A.  -- released me up there, yeah, as we
11  already discussed.
12     Q.  And how long were you in North Carolina
13  before you went back up to --
14     A.  From August to January 5th of 2017.
15     Q.  That's about five months, right?
16     A.  Yes, it was.
17     Q.  So, you had been notified after the
18  crash that you didn't have a CDL or it had been
19  suspended and during those five --
20     A.  The day of the crash, yes, sir.
21     Q.  -- and during those five months that you
22  were in North Carolina you never asked anybody
23  why?
24         MR. O'CONNOR: Objection.
25     A.  No, I knew why, but it was a matter of

| Page 100 |
| --- |

1   what had happened between the period of February
2   the 12th of 2016 when I renewed my license and as
3   of August the 24th of 2016 when the accident
4   happened that I had no knowledge of my license
5   being suspended.
6      Q.  All right. So, now you say you know
7   why. Tell me why it was suspended at the time of
8   the crash.
9      A.  They said they had imposed a 30-day
10  revocation on February the 19th, that they said
11  they had notified me of which I never got notice
12  of and --
13     Q.  Who's they?
14     A.  The DMV is -- North Carolina Department
15  of Motor Vehicles.
16     Q.  We talked about prior crashes involving
17  tractor trailer trucks. Have you ever been
18  involved in a car crash with a passenger vehicle?
19     A.  Yeah, probably. I mean, not that I can
20  recall right now.
21     Q.  Just for verification, before I hand you
22  this next document, is your full name Wiley Lenue
23  Hooks, Jr.?
24     A.  Uh-huh (yes).
25     Q.  Could you say yes or no?

| Page 101 |
| --- |

1      A.  Yes, sir. It is.
2      Q.  Uh-huhs (yes) --
3      A.  I know you asked me --
4      Q.  -- are difficult to --
5      A.  That's a -- it's a southern thing.
6      Q.  -- transcribe.
7      A.  Okay.
8      Q.  And is your address 125 Mann Road,
9   Harmony, North Carolina?
10     A.  It was.
11     Q.  It was? Is that your current address?
12     A.  That's my mailing address as of right
13  now, yes, sir.
14     Q.  That's your official --
15     A.  Yes, sir. Yes, sir.
16     Q.  -- legal mailing address?
17     A.  Yes, sir.
18     Q.  And it's been that way for how long?
19     A.  Since I got out. I had my own place
20  prior to that, but -- but I use -- that's -- that
21  was our office and I used it as a mailing address
22  for a long time now.
23     Q.  Can you give me a sense of how long 125
24  Mann Road, Harmony, North Carolina has been your
25  legal mailing address?

Wiley Lenue Hooks, Jr.                                    4/26/2019

| Page 102 |
|---|

1    A. Probably since 2010, I guess maybe.
2    Q. Okay. And --
3    A. 2011.
4    Q. -- is your date of birth February 12th,
5    1961?
6    A. It is.
7    Q. Are you 6'1" tall?
8    A. I still am.
9    Q. Blue hair? I'm sorry, blue eyes?
10   A. No. Yeah. I'm not that young to have
11   blue hair.
12   Q. Not yet.
13   A. No.
14   Q. All right. So, I'm going to ask you to
15   --
16        THE WITNESS: I'm going to need to
17   take a break soon.
18        MR. TANGREDI: This is probably a
19   good time to do it.
20        THE WITNESS: Well, that's just
21   what I thought.
22        MR. TANGREDI: One second.
23        VIDEOGRAPHER: All right, because
24   -- one moment. We're going off the record. The
25   time now is 10:44.

| Page 103 |
|---|

1        (Whereupon, a brief recess was taken from
2    10:44 a.m. to 10:57 a.m.)
3        (DEPOSITION EXHIBIT
4         NUMBER FIVE WAS MARKED
5         FOR IDENTIFICATION)
6        VIDEOGRAPHER: We're back on the
7    record. The time now is 10:57.
8    Q. (Mr. Tangredi) Thank you. Mr. Hooks?
9    A. Yes, sir.
10   Q. We just marked Exhibit Number Five. Do
11   you have that in front of you?
12   A. Yes, sir, I do.
13   Q. Have you had a chance to look at it?
14   A. I have.
15   Q. And do you recognize what that is?
16   A. It's mine, driving record.
17   Q. Okay. Have you seen it before?
18   A. Oh, yes, sir.
19   Q. Okay. And it's double-sided.
20   A. Uh-huh (yes).
21   Q. That's a yes?
22   A. Yes, sir.
23   Q. And would you agree it's nine pages?
24   A. Yes, sir.
25   Q. And at the bottom it's stamped with a

| Page 104 |
|---|

1    certification from the North Carolina Division of
2    Motor Vehicles; is that right?
3    A. Yes, sir, it is.
4    Q. All right. Have you had a chance to
5    look at it completely?
6    A. I'm in the process of doing that as we
7    speak.
8    Q. Okay.
9    A. (Witness reviews exhibit.) Okay.
10   Q. Do you see -- are you done?
11   A. Yes, sir.
12   Q. Take your time. I don't mean to rush
13   you.
14   A. Well, where do you reference to and I'll
15   --
16   Q. Maybe nothing.
17   A. Okay.
18   Q. But after you've looked at it
19   thoroughly, I want to know if it's an accurate
20   record of your driving history?
21        MR. O'CONNOR: Objection.
22   A. At initial glance, the best I can say is
23   yes.
24   Q. Okay. So then, what I think we're going
25   to do is go over the ones that are highlighted --

| Page 105 |
|---|

1    A. Okay.
2    Q. -- and typically these things work in
3    chronological order from back to front.
4    A. Yes, sir.
5    Q. So, if we go to the eighth page --
6    A. Okay.
7    Q. -- and we'll start at the bottom.
8    There's an entry date at the bottom of January
9    18th, 1978, and it says there was a conviction for
10   speeding. Do you see that?
11   A. Yes, sir.
12   Q. Okay. Is that accurate?
13        MR. O'CONNOR: Which page are we
14   on?
15        MR. TANGREDI: We're on page 8.
16        MR. O'CONNOR: So, it's nine pages
17   double-spaced, not nine -- not 18 pages, just for
18   my own record.
19        MR. TANGREDI: Nine pages double-
20   sided. We're on page 8.
21   Q. The first highlighted entry at the
22   bottom, January 18th, 1978?
23   A. Uh-huh (yes).
24   Q. That's a yes?
25   A. Yes.

Wiley Lenue Hooks, Jr.                                    4/26/2019

28 (Pages 106 to 109)

| Page 106 |
| --- |

1     Q.  Thank you.  And there's a conviction for
2  speeding there, correct?
3     A.  Yes, there is.
4     Q.  Okay.  The one above it, and is that
5  accurate?
6     A.  I -- it's on my record.  I've never
7  contested it.  I would have to say it is.
8     Q.  You anticipated my question.  Have you
9  ever contested anything on this record?
10    A.  I have never contested anything on this
11  record as of now.
12    Q.  What do you mean "as of now"?  I don't
13  understand that.
14    A.  Well, if I -- now that it's become such
15  a specific point of interest, if I find something
16  on here I might take it up with the State on a
17  later date and see if I can contest it if I feel
18  it needs --
19    Q.  Okay.
20    A.  -- to be -- if it's possible.
21    Q.  Okay.
22    A.  Fair enough?
23    Q.  That's more than fair.
24    A.  Okay.
25    Q.  All right.  So, back to page 8, the

| Page 107 |
| --- |

1  second entry that's highlighted.  It says May 3rd,
2  1980 --
3     A.  Uh-huh (yes).
4     Q.  -- driving -- that's a yes?
5     A.  Yes, sir.
6     Q.  It says -- there's a conviction for
7  driving while intoxicated.  Do you see that?
8     A.  Yes, sir, I do.
9     Q.  Was that accurate in May of 1980?
10    A.  The best I can recall, yes, sir.
11    Q.  Okay.  The next one above that, 5/19/90,
12  a conviction for driving while impaired.  Do you
13  see that?
14    A.  Yes, sir, I do.
15    Q.  And that was in Wilkes County?
16    A.  Yes, sir.
17    Q.  And is that accurate?
18    A.  That one is accurate.
19    Q.  We can go to page 7.  At the bottom, an
20  entry highlighted, 7/22/90, a conviction for
21  driving while impaired.  Do you see that?
22    A.  Yes, sir.
23    Q.  Is that accurate?
24    A.  Yes, sir.
25    Q.  All right.  The one above that, July

| Page 108 |
| --- |

1  13th, 1991, an offense for driving while your
2  license was suspended.  Do you see that?
3     A.  Yes, sir.
4     Q.  Is that accurate?
5     A.  Yes, sir.
6     Q.  Okay.  And we go up to the next
7  highlighted one, January 31st, 2003, a conviction
8  for refusing a chemical test.  Do you see that?
9     A.  Yes, sir.
10    Q.  And is that accurate?
11    A.  I don't really recall that one, to be
12  honest with you.
13    Q.  So, perhaps by going to the next one
14  above it that's highlighted, also January 31st,
15  2003, a conviction for driving while impaired.  Do
16  you see that one?
17    A.  Same date.  Yes, sir, I see that one.
18    Q.  And is that conviction for driving while
19  impaired accurate for January 31st, 2003?
20    A.  Yes, sir.
21    Q.  Okay.  So, if we go back down to the
22  refusing a chemical test, does that help you
23  understand what that might be?
24    A.  Well, yeah.  I mean, it does, but I
25  don't recall refusing the test.

| Page 109 |
| --- |

1     Q.  Okay.
2     A.  I mean, in all honesty, I don't
3  remember.
4     Q.  All right.  So, let's go to page 6.
5     A.  Okay.
6     Q.  The highlighted entry, July 27th, 2005,
7  a conviction for unsafe operation.  Do you see
8  that?
9     A.  Yes, sir.
10    Q.  Is that accurate?  Looks like it
11  might've been in Virginia?
12    A.  Yeah, it was in Virginia.  Yes, sir.
13    Q.  Okay.  And if we go up to the next entry
14  that's highlighted, 11/3/2007, a conviction for
15  speeding, and that looks like it might be in
16  Wisconsin.  Is that accurate?
17    A.  Yes, sir.
18    Q.  And if we just move a little bit to the
19  right, do you see where it says, "CMV," after the
20  highlighting ends?
21    A.  Yes, sir.
22    Q.  Does that mean commercial motor vehicle?
23    A.  Yes, sir, it does.
24    Q.  That means you were speeding in a
25  commercial motor vehicle at the time?

Wiley Lenue Hooks, Jr.                                    4/26/2019

---

Page 110

1    A. Yes, sir.
2    Q. Okay. I think the next highlighted
3  entry that I want to focus on is on page 4 at the
4  -- the lower one. Do you see that? The failed
5  medical certificate?
6    A. Yes, sir.
7    Q. And it looks like on 4/16/14 you may
8  have failed a medical certification for your CDL?
9    A. Yes, sir, that's --
10   Q. Did that --
11   A. -- when I --
12   Q. Did that happen?
13   A. Yes, sir, it did.
14   Q. What was the reason for the failure?
15   A. Failed a random drug test.
16   Q. The next entry above that, 7/27/13, it
17 says that there was an accident -- and I'm going
18 to get in trouble for this, Catawaba (sic) County?
19   A. Catawba.
20   Q. Catawba County.
21   A. Good try.
22   Q. But that was with a commercial motor
23 vehicle. Do you see that?
24   A. Yes, sir.
25   Q. And it -- further to the right, there

---

Page 111

1  was personal injury in that incident. Do you see
2  that?
3    A. Yes, sir.
4    Q. Is that accurate?
5    A. Yes, sir.
6    Q. All right. And above that, an entry of
7  10/8/2013, an accident in Iredell --
8    A. Yes, sir.
9    Q. -- County, with a CMV? That's a
10 commercial motor vehicle?
11   A. Yes, sir.
12   Q. Above that, an entry dated January 11th,
13 2014, an accident in Iredell County. Do you see
14 that?
15   A. Yes, sir.
16   Q. Was that accurate?
17   A. I don't -- I don't know.
18   Q. Okay.
19   A. To be honest with you, I don't know -- I
20 don't recall this.
21   Q. Okay. The entry above that, January
22 11th, 2014, do you see there's a conviction for an
23 improper or erratic lane change --
24   A. Uh-huh (yes). Yes, sir.
25   Q. -- in Iredell County? Is that accurate?

---

Page 112

1    A. I can't say.
2    Q. Okay.
3    A. I have no recollection.
4    Q. If we go to page 3, the entry at the
5  bottom that's highlighted, March 18th, 2015, with a
6  accident in Forsyth County, North Carolina, with a
7  commercial motor vehicle. Do you see that?
8    A. Yes, sir.
9    Q. Did that happen?
10   A. Yes, it did.
11   Q. And above that, also on 3/18/2015, a
12 conviction for failing to reduce speed with a
13 commercial motor vehicle. Do you see that?
14   A. Yes, sir.
15   Q. Is that accurate?
16   A. Yes, sir.
17   Q. And on page 2, at the bottom, the first
18 highlighted entry says February 19th, 2016, it
19 appears as though there's a disqualification,
20 civil revocation while operating a CMV. Do you
21 see that?
22   A. Yes, sir.
23   Q. And underneath it, it says 30-day civil,
24 a conviction occurred. Do you -- did that happen?
25   A. I'm not aware of that one.

---

Page 113

1    Q. Okay. Above that, on August 24th, 2016,
2  there was a stop sign violation up in
3  Massachusetts. Is that accurate?
4    A. Yes, sir.
5    Q. And on the next one up, an entry on July
6  27th, 2013, there's a conviction for driving while
7  impaired. Do you see that?
8        MR. O'CONNOR: Objection.
9    A. Yes, I do.
10   Q. And if I recall, that's the date you
11 gave us as your wake-up call with alcohol; is that
12 right?
13   A. Yes, sir.
14   Q. So, is that accurate, that entry?
15   A. Yes, it is.
16   Q. Okay. And if we just continue further
17 up, the last one, the entry's January 23rd, 2018,
18 it says there's a conviction for death by motor
19 vehicle in a commercial motor vehicle. Do you see
20 that?
21   A. Yes, sir.
22   Q. And that's the crash that happened up in
23 Dalton, right?
24   A. Yes, sir.
25   Q. Okay. Is it fair to say there's four

---

Page 114

1    OUI convictions on your record?
2    A. It's — yes, sir.
3    Q. Did you ever contest the OUI charges in
4    a criminal court? Just the OUIs? And do you call
5    them OUIs down here?
6    A. DUI.
7    Q. DUI.
8    A. The one, I did. I didn't — well, it's
9    irrelevant. What happened in the court happened
10   in the court and that's — it's recorded on here
11   and this is accurate, so —
12   Q. So, there's four convictions for DUI?
13   A. Yes, sir.
14   Q. Did you ever tell anybody at Gregory
15   Trucking that you had three convictions for DWI?
16   A. Our record was only seven years back, I
17   believe. No, I did not.
18   Q. So, when was the first time you worked
19   for Gregory Trucking approximately? I know we --
20   I'm not looking for exact dates.
21   A. Well, I started driving around here I
22   think in like year '03, but I drove in the
23   capacity of -- let me rephrase that. There was a
24   period of time to where we were hauling freight as
25   a carrier for Gregory. Now, I made — I'll be

Page 115

1    honest with you, I can't tell you which was which.
2    So, there's probably some blurred lines there as
3    far as when I was actually driving for my dad or
4    when I was driving for Gregory's Trucking, so --
5    but we -- that's where we got started, actually,
6    was hauling freight for Gregory, and there was a
7    period of time when we had this old blue truck. I
8    drove it for -- I can't really -- I can't
9    accurately answer that, but -- except for the 2014
10   to 2016, I could definitely say that I was working
11   as -- on their payroll.
12   Q. And we'll refer to that as the second
13   time you worked for --
14   A. Okay. Yes, sir.
15   Q. -- Gregory Trucking.
16   A. Gotcha.
17   Q. Do you know how many years the first
18   time you worked for Gregory Trucking lasted,
19   approximately?
20   A. Dino, I don't really recall what -- how
21   long I — I really don't know. It's just kind of
22   like we -- like I said, we were all neighbors and
23   friends and -- my nickname's Buster and they'd,
24   "Hey, Buster, could you do me a favor and take
25   this load in my truck?" and I would do it, and

Page 116

1    that -- or I had an old green International I
2    drove. You know, my dad had a couple, so, you
3    know, we just fulfilled the needs of what they
4    needed. They had a load going to Elizabeth City,
5    I would take it for them, so I -- you know, that's
6    about the most honest answer I can give you as far
7    as that goes —
8    Q. Fair --
9    A. — as far as the first time.
10   Q. Fair enough. Do you know if it was
11   months or years the first time? Does that -- can
12   we narrow it down to something like that? No?
13   A. I really can't.
14   Q. Okay.
15   A. I really --
16   Q. All right.
17   A. — can't.
18   Q. Fair enough.
19   A. I give you -- I'd give you some kind of
20   a indication if I could.
21   Q. How about this? They told us your
22   nickname was Buster? Do you got nicknames for
23   Cecil? Does Cecil have a nickname?
24   A. Cecil's Cecil, Brandon's Brandon --
25   Q. Okay.

Page 117

1    A. — and Martha's "The Boss."
2    Q. Ain't that the way it always is?
3    A. That's the way it is. We hold true to
4    that down here in the South.
5    Q. All right.
6    (DEPOSITION EXHIBIT
7    NUMBER SIX WAS MARKED
8    FOR IDENTIFICATION)
9    Q. Mr. Hooks, let me know -- do you have
10   Exhibit Number Six in front of you?
11   A. Yes, sir, I do.
12   Q. Okay. And do you know what that
13   document is?
14   A. It's official notice of schedule for
15   disqualification, suspension of my license.
16   Q. Okay. And when is it dated?
17   A. February the 19th, 2016.
18   Q. All right. You're right. Your eyes are
19   in tough shape today.
20   A. They are, thanks to medicine.
21   Q. Might it say the 23rd of February, 2016?
22   A. What was your question?
23   Q. The date on the letter, at the top.
24   A. Oh, I'm sorry. Well, yeah, okay. Yes,
25   sir, that's it. I was looking at the date down

Page 118

1   here.
2       Q.  Okay.  So, at the top of the letter,
3   it's dated February 23rd, 2016?
4       A.  February 23rd, 2016.
5       Q.  At the top where it's highlighted?
6       A.  Well, yes, that's what --
7       Q.  Okay.
8       A.  I said.
9       Q.  All right.
10      A.  Yes, sir.  That's what -- yes, sir.  I
11  see that.
12      Q.  And this is a letter addressed to Wiley
13  Lenue Hooks, Jr.?
14      A.  Yes, sir, it is.
15      Q.  And is it properly addressed?
16      A.  Yes, sir, it is.
17      Q.  ZIP code and everything?
18      A.  Yes, sir, it is.
19      Q.  Okay.  And who is this letter from at
20  the bottom?
21      A.  It's from the director of processing
22  services, Jeffrey Zimmerman.  Oh, the commissioner
23  of the DMV.
24      Q.  Of North Carolina?
25      A.  Yes, sir.

Page 119

1       Q.  All right.  Do you see the second
2   paragraph?
3       A.  Uh-huh (yes).  Yes, sir.
4       Q.  That's a yes?  It talks about the
5   effective date of the disqualification of your CDL
6   license, correct?
7       A.  Yes, sir, it does, the 19th of 2016,
8   February.
9       Q.  At 12:01 a.m. --
10      A.  Uh-huh (yes).
11      Q.  -- right after midnight?
12      A.  Yes, sir.
13      Q.  And when does the scheduled
14  disqualification end according to this letter?
15      A.  (Witness reviews exhibit.)
16      Q.  It's the next line and it's highlighted
17  in blue.
18      A.  Oh, disqualification ends -- well, see,
19  that blue's got me -- I can't see.
20      Q.  You saw it earlier.
21      A.  Oh, no, no, I was reading a 2016 date.
22  A year later, on 2017.  February 19th, 2017.
23      Q.  So, this is a letter notifying you that
24  for one year you were -- your CDL is disqualified,
25  correct?

Page 120

1       A.  Yes, sir.
2       Q.  Okay.  And at the bottom, it's certified
3   by the Department of Motor Vehicles of North
4   Carolina, right?
5       A.  Yes, sir.
6       Q.  All right.  Do you know how many people
7   were killed in crashes involving large trucks in
8   2016?
9       A.  No, sir --
10          MR. O'CONNOR:  Objection.
11      A.  -- I don't.
12      Q.  Do you know that information is
13  available for free online?
14      A.  Yes, sir, probably is.
15      Q.  Are you aware that a driver with a
16  reckless driving violation on his driving record
17  is a hundred and fourteen percent more likely to
18  be involved in a future crash?
19          MR. O'CONNOR:  Objection.
20      A.  No, sir, I'm not aware of that.
21      Q.  Do you know what the statistics are on
22  people with drunk driving convictions in getting
23  -- and the probability of future crashes?
24      A.  No, sir --
25          MR. O'CONNOR:  Objection.

Page 121

1       A.  -- I don't.
2       Q.  Okay.  Do you know that information is
3   available?
4       A.  Yes, sir, probably is.
5       Q.  I want to talk to you about the trip --
6       A.  While we're on this document here, could
7   I -- can I say something?
8          MR. O'CONNOR:  Just wait until he
9   asks a question.
10         THE WITNESS:  Okay.  Well -- okay.
11      Q.  Well, I don't have a problem answering
12  your question.  What's --
13      A.  Well, I'm --
14         MR. O'CONNOR:  That's not --
15      Q.  -- looking --
16         MR. O'CONNOR:  That's not really --
17  just wait until he asks a question.
18         THE WITNESS:  Okay.
19      Q.  Do you have any questions about Exhibit
20  Number Six, Mr. Hooks?
21      A.  I do.
22      Q.  What?
23      A.  Well, the fact that at the top, correct
24  me if I'm wrong or my vision's wrong, that's dated
25  February 23rd, 2016?

Wiley Lenue Hooks, Jr.                                    4/26/2019

32  (Pages 122 to 125)

Page 122

1    Q.  That's correct.
2    A.  Okay.  You got a letter dated on the
3  23rd for a revocation (ph) that's happening on the
4  19th.  Can you see where that makes no sense?
5  I've never seen this, by the way.  Now, this is
6  dated the 23rd, the 16th, and it says the
7  revocation -- you're sending a letter out after
8  the date of supposedly they're suspending my
9  license.
10   Q.  Okay.
11   A.  I'd like that to be noted.
12   Q.  There's about a four-day gap in there?
13   A.  Well, yeah.
14   Q.  Perhaps not including --
15   A.  After.
16   Q.  -- not --
17   A.  After the fact of the day of the
18  suspension.
19   Q.  I agree, and there's probably another
20  day or two of mailing before it got to you, right?
21   A.  Well, I've never seen this until right
22  now.
23   Q.  But you agree it's --
24   A.  I've heard of it.
25   Q.  -- probably addressed, right?

Page 123

1    A.  Well, yes, sir, it is.
2    Q.  Okay.  Very good.
3    A.  Okay.  That's all I wanted --
4    Q.  Okay.
5    A.  -- to say.
6    Q.  Yeah.  No, that's fair.  So, let's talk
7  about the trip, the day before the crash --
8    A.  Yes, sir.
9    Q.  -- in Dalton.  I understand you had made
10  a delivery to BB&S up in Rhode Island of some
11  lumber; is that --
12   A.  Yes, sir.
13   Q.  And that date was August 23rd, 2016,
14  right?
15   A.  Yes, sir.
16   Q.  Okay.  Tell me how it came about --
17  well, let me ask you this.  Prior to that date,
18  August 23rd, 2016, had you ever made a delivery to
19  BB&S in Rhode Island?
20   A.  Yes, sir, I have.
21   Q.  Do you know approximately how many
22  times?
23   A.  In what period of time, a year?
24   Q.  Well, let's say in the -- since 2014
25  when you started working at Gregory for the second

Page 124

1  time?
2    A.  How many times I delivered to BBS.
3  Well, we went up there on a regular basis, so I
4  went there at least once a month, maybe twice a
5  month, so 24, you know.  I knew my way there.
6    Q.  Okay.  Davisville, Rhode Island; is that
7  --
8    A.  Davisville, Rhode Island, yes, sir.
9    Q.  And were they -- all the trips, and
10  we'll say approximately once a month, were all
11  those trips driving B&C Timbers' lumber?
12   A.  I was hauling lumber.  I don't know
13  whose lumber it was.
14   Q.  Fair enough.  Did it come from the
15  Gregory compound yard --
16        MR. O'CONNOR:  Objection.
17   Q.  -- in Harmony?
18   A.  Well, all I can honestly say is it was
19  loaded on a trailer on a truck that I was supposed
20  to be driving.  I can't tell you where that lumber
21  came from, just it was loaded on that truck.
22   Q.  And you'd show up at -- in Harmony at
23  the Gregory compound --
24   A.  They'd tell me that there was a load and
25  bill of ladings and I would look -- well, they

Page 125

1  told me where it was going to, so --
2    Q.  Okay.  Do you know what the business of
3  BB&S is?
4    A.  It's a pressure treating outfit.
5    Q.  And --
6    A.  Pressure treat lumber.
7    Q.  And is something special done to regular
8  lumber to make it pressure treated?
9        MR. O'CONNOR:  Objection.
10   A.  It's put in a vessel and it's pressure
11  treated.  I mean, I'm a truck driver.  I haul a
12  lot of lumber, but I know when it used to be a
13  tree but it's called lumber now because they cut
14  it up, so --
15   Q.  All right.  And do you know if BB&S has
16  its own tractor trailer trucks?
17   A.  I believe they do.
18   Q.  Okay.  Did you ever see them there?
19   A.  You know, I've saw trucks coming in and
20  out.  I'm sure I saw a truck with BBS on it, but I
21  can't attest to straight truck, tractor trailer or
22  what it was.  I saw trucks with their names on it.
23   Q.  So, it's my understanding, and correct
24  me if I'm wrong, that when you left North Carolina
25  on August 22nd intending to go to Rhode Island,

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 126

1   after Rhode Island you were going to go to Monson
2   and pick up some lumber and drive it back to North
3   Carolina?
4       A.  Funny cycle, ain't it?  Take trees up,
5   bring trees back.
6       Q.  Cycle.  So, when you left North
7   Carolina, it was a simple three-legged trip that
8   you were planning to take?
9       A.  Yes.
10      Q.  North Carolina to Rhode Island, Rhode
11  Island to Monson, Monson back home --
12      A.  Yes, sir.
13      Q.  -- to North Carolina?  Somehow when you
14  got to Rhode Island, something happened where you
15  were given a load to take to Dalton?
16      A.  Yes, sir.
17      Q.  Tell me how that came about.
18      A.  I asked the dispatcher up there if he
19  had any short loads, which I did upon occasion
20  because I understand the productivity of a truck
21  and if I can put another load in there it'd put
22  more money in my pocket, put money into covering
23  the operation of the truck, and it fit into my
24  schedule.
25      Q.  So --

Page 127

1       A.  I called Matt, he had a load going to
2   Dalton, and I told him I'd take it because I
3   could.
4       Q.  So, when you say you called Matt --
5       A.  Uh-huh (yes).
6       Q.  -- did you -- who's Matt?
7       A.  He's a dispatcher at BBS.
8       Q.  Okay.  Did you call him on a phone?
9       A.  I did.
10      Q.  Okay.  You didn't talk to him
11  personally?
12      A.  No, I'd usually call and I liked
13  planning in advance and I'd stop and get breakfast
14  and in the process I'd call and leave him a
15  message and/or speak to him.  I'd tell him I was
16  going to be there at such time and I had time if
17  he had -- he knew we -- well, I ain't going to say
18  he knew, but we, on a regular basis, went to
19  Monson, so he had -- they haul short loads of
20  lumber to -- in New England and I knew there was a
21  possibility of getting a short load, so -- it
22  happened, not frequently, but upon occasion, and
23  so he said he had one going to Dalton.  I looked
24  at my map.  It worked, so I told him I'd take it.
25      Q.  So, do you recall calling Matt before

Page 128

1   getting to BB&S?
2       A.  Yeah, because I tried to plan in advance
3   and if he had a load that was available, he knew
4   he had a truck for it, then a dispatcher -- if you
5   got a load and you find a truck that's going that
6   way and it takes it off of one of your trucks that
7   you can use for something else, then it works for
8   everybody.
9       Q.  So, did you call him sometime during the
10  22nd, do you think, August 22nd?
11      A.  I called him -- well, you know what?  I
12  don't know.  I just know that most times I'd call
13  him in advance because he would know I'd be on my
14  way.  I could say, "I'm going to be there in about
15  three hours.  If you have a load going somewhere,
16  tell me when I get there and/or if you have one
17  now I'll commit to it," so -- I believe in
18  planning in advance.
19      Q.  Sounds like efficiency.
20      A.  Yes.  It works better that way.
21      Q.  When you called Matt, did he tell you he
22  had a load for you?
23      A.  I don't know if he told me then or when
24  I arrived.  I don't remember.  All I remember is
25  that I ended up with a load going to Dalton.

Page 129

1       Q.  You had made these kind of arrangements
2   with Matt prior -- previously?
3       A.  It didn't always happen, but upon
4   occasion.  I mean, like I said, it was efficient
5   use of a truck, plus it put more money in my
6   pocket, so --
7       Q.  How many times do you think you got
8   these -- and I'm going to call it a short haul?
9   Is that right phrase?
10      A.  Yes, sir.
11      Q.  -- a short haul from BB&S?
12      A.  In a year's time, I might've got four.
13      Q.  Okay.
14      A.  It wasn't often, but I would -- you
15  know, if you go fishing, you cast and see what you
16  can catch, so I was always casting.
17      Q.  Did Matt at BB&S, the -- is he a
18  dispatcher?
19      A.  I would suppose that would be his title.
20      Q.  Did he know you were from North
21  Carolina?
22      A.  Well, he saw me on a regular basis, so
23  he knew -- yeah, he knew me.
24      Q.  And the truck you were driving had North
25  Carolina designation on it, license plates?

Page 130

1   A.  Yes, sir.
2   Q.  Yeah?  And it said Gregory Trucking on
3  the side of it?
4   A.  It did.
5   Q.  North Carolina?
6   A.  It did.
7   Q.  So, you got to BB&S and you -- your
8  truck was unloaded, lumber was unloaded, right?
9   A.  Yes, sir.
10   Q.  And they had a load for you to take to
11  Dalton, Massachusetts, right?
12   A.  Yes, sir.
13   Q.  Who arranges for the -- how much to
14  charge for the trip from Rhode Island to Dalton?
15   A.  People other than me.
16   Q.  Do you know which people did that?
17   A.  No.
18   Q.  Okay.  Did you ever call back to Gregory
19  Trucking and talk to anybody there that you were
20  going to do this short haul?
21   A.  Prior to loading it, I'm not sure, but I
22  knew I had the -- probably, because, I mean, I
23  don't do things without at least checking. I
24  mean, I knew I had the -- I knew it fit my
25  schedule, I knew it was possible, I knew it

Page 131

1  covered his costs in paying me, and -- but I do
2  know that night when I was in Chicopee I called
3  Martha and checked in with her, but other than if
4  I had done it that day, I don't know.  You know, I
5  -- in the process of unloading the truck and then
6  moving to a staging area and loading the truck and
7  then getting the bill of ladings and securing the
8  load and checking my log book and -- I mean, you
9  know, that's -- driving a truck's just not sitting
10  behind a steering wheel.
11   Q.  There's more and more to do.
12   A.  Well, yeah.
13   Q.  Regulations.
14   A.  Yes, sir.
15   Q.  Is it your custom and practice that you
16  would call back to Gregory Trucking to let them
17  know you were gong to take a short haul?
18   A.  Probably.  I mean, I don't -- I didn't
19  want to do things without them knowing.  I mean --
20  but if push came to shove and I knew it wasn't
21  going to be a problem, I would make that call.
22   Q.  And in the past it was never a problem?
23   A.  Never -- no.
24   Q.  Were you ever denied permission to do a
25  short haul?

Page 132

1   A.  No.  If it fit into my schedule, and
2  they knew I knew my schedule and, you know, as
3  long as it didn't hinder his business, you know,
4  delivering his lumber or picking up a back haul,
5  like I said, if you go into New England, freight's
6  -- it's a peculiar area to go to because it's one
7  way in, one way out, so you pretty much got
8  relegated routes and freight that comes in and out
9  of there and so you just work with what you have
10  to work with, play your cards as they're dealt.
11   Q.  You've made these -- this trip a few
12  times for --
13   A.  Oh.
14   Q.  -- BB&S to L.P. Adams?
15   A.  No.
16   Q.  No?
17   A.  No, that was a one-shot deal.
18   Q.  Okay.
19   A.  I mean, I'd gone to other places, but
20  not particularly L.P. Adams.
21   Q.  You're familiar with the geography
22  between Rhode Island, Dalton, and Monson?
23   A.  Oh, yeah.
24   Q.  Okay.  Would you agree with me that when
25  you leave Rhode Island you have to pass Monson to

Page 133

1  get to Dalton?
2   A.  Yep.
3   Q.  And then you'd backtrack to Monson back
4  towards Rhode Island?
5   A.  Yes, sir.
6   Q.  But the distance between Dalton and
7  Monson --
8   A.  Well, you got to look at the dollars
9  involved in it and whether it's profitable or not.
10   Q.  But you don't get involved in that,
11  right?
12   A.  Well, I mean, I -- I ran my own trucks.
13  I mean, I know how to make a dollar.
14   Q.  Okay.
15   A.  You know, I wouldn't take a load that
16  was going to, you know, not make money.
17   Q.  So, did you talk to anybody in Rhode
18  Island about the load that was going from Rhode
19  Island to Dalton, about the financial part of it,
20  how much Gregory Trucking would charge?
21   A.  I knew.
22   Q.  You knew the amount?
23   A.  Yeah.
24   Q.  How did you know?
25   A.  Well, I had done it before.  I knew what

Wiley Lenue Hooks, Jr.                                        4/26/2019

| | Page 134 |
|---|---|
| 1 | they paid per mile. |
| 2 | Q. Okay. |
| 3 | A. I mean, they have a rate you go by. I |
| 4 | mean, you know, and most people will -- you'll -- |
| 5 | you know, two dollars a mile minimum, I'm going to |
| 6 | say, so based on a hundred and twenty mile run, if |
| 7 | you're making four ninety-five you're making |
| 8 | money. |
| 9 | Q. Okay. |
| 10 | A. I'm just saying -- those are |
| 11 | hypothetical numbers, but -- |
| 12 | Q. I get it. |
| 13 | A. So, in your head, you know, you do the |
| 14 | quick math and you go, "Well, okay. I'm going to |
| 15 | make money on this. They're going to make money |
| 16 | on this, cover the cost of fuel" and, you know, it |
| 17 | just makes it profitable. |
| 18 | Q. So, is it -- was it discussed or |
| 19 | assumed, in Rhode Island? |
| 20 | MR. O'CONNOR: Objection. |
| 21 | MR. SCHULER: Objection. |
| 22 | A. I don't know. |
| 23 | Q. Okay. |
| 24 | A. It was assumed. That's all -- |
| 25 | Q. Based on -- |

| | Page 135 |
|---|---|
| 1 | A. That's about the honest answer I can |
| 2 | give you. |
| 3 | Q. And is it fair to say it was assumed |
| 4 | based on past practices? |
| 5 | MR. SCHULER: Objection. |
| 6 | MR. O'CONNOR: Objection. |
| 7 | A. Yeah. Based on that, yeah. |
| 8 | Q. All right. But you don't get involved |
| 9 | with the finances? |
| 10 | MR. O'CONNOR: Objection. |
| 11 | A. No, I -- no. Well, you know what, Dino? |
| 12 | If I may call you Dino. I mean, I've ran -- I've |
| 13 | run my own trucks, I've run my parents' trucks. I |
| 14 | mean, certain -- some things may overlap with each |
| 15 | other, but they're -- I mean, I don't go out here |
| 16 | and take someone else's equipment and not do what |
| 17 | I expect to do with my own. I mean, I -- I'm not |
| 18 | going to go out here and lose money for Cecil. I |
| 19 | mean, I'm going to go out here and make it |
| 20 | profitable as I can running his truck. He's |
| 21 | paying me and if I find a filler load like that, |
| 22 | well it's going to, you know -- it's because I'm |
| 23 | not going to make it there today to load, but I |
| 24 | can make it to Chicopee to stay tonight, so it's |
| 25 | -- it all works out, so -- maybe I'm making the |

| | Page 136 |
|---|---|
| 1 | assumption that -- I'm under the assumption that, |
| 2 | you know, as long as I'm making money for |
| 3 | everybody, everybody's going to be happy in the |
| 4 | end. |
| 5 | Q. There's a good question. So, you made a |
| 6 | little more money with this back haul, correct? |
| 7 | MR. O'CONNOR: Objection. |
| 8 | A. Of course. |
| 9 | Q. Okay. |
| 10 | A. I didn't do -- I don't do nothing for |
| 11 | free. |
| 12 | Q. Some of us do. |
| 13 | MR. O'CONNOR: Objection. |
| 14 | Q. So, you made money on the back haul from |
| 15 | Rhode Island to Dalton, right? |
| 16 | A. Yeah, I got paid my fee, yeah. |
| 17 | Q. Sure. Gregory Trucking made some money |
| 18 | on the back haul from Rhode Island to Dalton, |
| 19 | correct? |
| 20 | A. I wouldn't have done it if they hadn't |
| 21 | have made money, too. |
| 22 | Q. All right. And BB&S' lumber was getting |
| 23 | delivered and they were probably making money on |
| 24 | the short haul -- |
| 25 | MR. SCHULER: Objection. |

| | Page 137 |
|---|---|
| 1 | Q. -- correct? |
| 2 | A. We can assume that. |
| 3 | Q. It's a fair assumption, right? |
| 4 | A. Fair assumption, yeah. |
| 5 | Q. Okay. What kind of paperwork would you |
| 6 | -- if any, would you have left Rhode Island with |
| 7 | on the way to Dalton? |
| 8 | A. A bill of lading. You wouldn't leave |
| 9 | town without it. I mean, that's their -- |
| 10 | Q. What is a -- |
| 11 | A. -- that's their required document if the |
| 12 | DOT was to pull you over is, amongst all the |
| 13 | registrations and log books and everything, |
| 14 | they're going to ask you for a bill of lading for |
| 15 | that load on your truck, so -- |
| 16 | Q. And -- |
| 17 | A. -- required. |
| 18 | Q. For those of us who don't know, a bill |
| 19 | of -- |
| 20 | A. Bill of lading. |
| 21 | Q. -- lading would be what? |
| 22 | A. A bill from the shipper to who is a |
| 23 | consignee, a description of the load. |
| 24 | Q. So, who is the shipper in the case of |
| 25 | the transportation from Rhode Island to Dalton? |

Page 138

```
1           MR. SCHULER: Objection.
2      A.  I -- to be honest with you, I can't
3   answer that question because sometimes XYZ may
4   ship a load for somebody else called kind of a
5   blind bill of lading, so I'll be honest with you,
6   I can't say who that was. It's not a uncommon
7   practice, so --
8      Q.  Okay.
9      A.  It's just one of those things you do.
10     Q.  So, other than the bill of lading, would
11  there be any other paperwork that you would leave
12  Rhode Island with to go to L.P. Adams in Dalton,
13  Mass., with?
14     A.  All that would be required for them
15  would be a bill of lading.
16     Q.  All right. Prior to leaving BB&S in
17  Rhode Island to go to Dalton, did BB&S in Rhode
18  Island check your log book before you left?
19          MR. SCHULER: Objection.
20     A.  No.
21     Q.  Did BB&S give you a driving test before
22  you left BB&S to go to Dalton?
23          MR. SCHULER: Objection.
24     A.  Not required.
25     Q.  I didn't ask you that.
```

Page 139

```
1      A.  Okay. No.
2      Q.  Did BB&S ask you any questions about
3   your driving ability before you left to go to
4   Dalton?
5          MR. SCHULER: Objection.
6      A.  No.
7      Q.  Did BB&S ask you to -- ask to see your
8   CDL license before you left to go to Dalton?
9          MR. SCHULER: Objection.
10     A.  No.
11     Q.  Did BB&S ask you if you had a valid CDL
12  before you left Rhode Island to go to Dalton?
13     A.  No.
14     Q.  Did anyone at BB&S ask you about your
15  driving record before you left BB&S to go to
16  Dalton?
17          MR. SCHULER: Objection.
18     A.  No.
19     Q.  Did BB&S ask you any questions about
20  Gregory Trucking's safety record before you left
21  Rhode Island to go to Dalton?
22          MR. SCHULER: Objection.
23     A.  No.
24     Q.  Did BB&S inspect the truck you were
25  going to drive to Dalton?
```

Page 140

```
1           MR. SCHULER: Objection.
2      A.  No.
3      Q.  Did BB&S ask you about the condition of
4   the truck before you left BB&S to go to Dalton?
5          MR. SCHULER: Objection.
6      A.  No.
7      Q.  Did BB&S ask to see any maintenance
8   records regarding the truck before you left Rhode
9   Island to go to Dalton?
10          MR. SCHULER: Objection.
11     A.  No.
12     Q.  Did BB&S ask to see the tractor
13  trailer's vehicle registration before you left to
14  go to Dalton?
15     A.  No.
16          MR. SCHULER: Objection.
17     Q.  Did BB&S ask to see the tractor trailer
18  insurance certificate before you left to drive to
19  Dalton?
20          MR. SCHULER: Objection.
21     A.  No.
22     Q.  Did BB&S talk to anyone at Gregory
23  Trucking that you're aware of?
24          MR. O'CONNOR: Objection.
25          MR. SCHULER: Objection.
```

Page 141

```
1      A.  Not that I'm aware of.
2      Q.  Did BB&S ask you to talk to anyone at
3   Gregory Trucking before you left for Dalton?
4          MR. SCHULER: Objection.
5      A.  No.
6      Q.  Did anybody at BB&S tell you how much --
7   when you had to get that load delivered by?
8          MR. SCHULER: Objection.
9      A.  No.
10     Q.  Did anybody at BB&S tell you how to get
11  to Dalton, what route to take?
12          MR. SCHULER: Objection.
13     A.  No.
14     Q.  Was that entirely up to you?
15     A.  It was at my discretion.
16     Q.  How would you determine a route to
17  Dalton, Mass., if you had never been there?
18     A.  Well, I do something a lot of young
19  people can't do, is read a map and take into
20  account the traffic around there because Boston
21  gets congested, and I -- my experience is I know
22  enough roads around there that I can take an
23  alternate route if need be, so --
24     Q.  So, you consider that whole area Boston?
25          MR. O'CONNOR: Objection.
```

| Page 142 | Page 144 |
|---|---|
| 1   A. Isn't it! I thought Boston started at | 1   A. Based on my signature, it has been two |
| 2   the 91 interstate. | 2   years ago, I would say yes, it's accurate. |
| 3   Q. Washington above, right? | 3   Q. So, you see at the top, it says, "Sold |
| 4   A. Exactly. | 4   to"? |
| 5   Q. Do you agree that the only reason you | 5   A. Sold to, yes, sir. |
| 6   and the Gregory Trucking tractor trailer truck | 6   Q. And it's L.P. Adams, right? |
| 7   were in Massachusetts on August 24th was to | 7   A. Yes, sir. |
| 8   deliver BB&S' lumber? | 8   Q. And it says, "Delivered to"? |
| 9         MR. SCHULER: Objection. | 9   A. Yes, sir. |
| 10        MR. O'CONNOR: Objection. | 10   Q. And it's L.P. Adams, right? |
| 11   A. No. | 11   A. Yes, sir. |
| 12   Q. No? Why don't you agree with that? | 12   Q. What's it say at the top? |
| 13   A. To deliver the — I was delivering | 13   A. BB&S Treated Lumber of New England. |
| 14   Gregory's — I mean, I was delivering lumber to | 14   Q. Do you have an opinion as to who the |
| 15   BB&S. | 15   shipper is? |
| 16   Q. Right. But on August 24th -- | 16        MR. O'CONNOR: Objection. |
| 17   A. Yes | 17        MR. SCHULER: Objection. |
| 18   Q. -- you were in Dalton, Mass., right? | 18   A. Well — BB&S. |
| 19   A. I was. | 19   Q. Okay. What can you tell us about this |
| 20   Q. Do you agree the only reason you were in | 20   load, the items listed? |
| 21   Dalton, Mass., was to deliver the lumber that you | 21   A. It's just a load of typical pressure |
| 22   got at BB&S? | 22   treated lumber, a variety of different sizes. |
| 23        MR. SCHULER: Objection. | 23   Q. Okay. And each page has a total weight |
| 24        MR. O'CONNOR: Objection. | 24   on it. Do you see that? |
| 25   A. Yeah. | 25   A. Yes, sir. |

| Page 143 | Page 145 |
|---|---|
| 1   Q. Is that the only reason you would've | 1   Q. If we look at the second page, it says, |
| 2   been in Dalton, Mass., that day? | 2   "Total weight." Does that mean a hundred twenty |
| 3        MR. SCHULER: Objection. | 3   pounds? That's not a hundred twenty thousand |
| 4        MR. O'CONNOR: Objection. | 4   pounds, is it? |
| 5   A. I suppose so, yeah. | 5   A. No. |
| 6   Q. You had no intentions of going to | 6   Q. No? |
| 7   Dalton, Mass., that day, did you? | 7   A. No, because it was a legal load. |
| 8   A. No, I did not. | 8   Q. And this was one load from Rhode Island |
| 9   Q. You were there specifically to deliver a | 9   to Dalton, Mass.? |
| 10   short haul from BB&S to L.P. Adams, right? | 10   A. Yes, it was. |
| 11   A. Yes, sir. | 11   Q. And I understand you spent the night at |
| 12        MR. SCHULER: Objection. | 12   a truck stop in Chicopee? |
| 13   Q. Okay. | 13   A. Chicopee. Pride Truck Stop, Chicopee. |
| 14        (DEPOSITION EXHIBIT | 14   Q. I grew up about three miles from there. |
| 15         NUMBER SEVEN WAS MARKED | 15   I know it well. Do you sleep in the truck? |
| 16         FOR IDENTIFICATION) | 16   A. Yes, sir, I do. |
| 17   Q. I'd like you to -- Mr. Hooks, please | 17   Q. There's a motel right there, as well, |
| 18   take a look at Exhibit Number Seven. | 18   right? |
| 19   A. (Witness reviews exhibit.) Yes, sir. | 19   A. It's tore down. |
| 20   Q. Do you recognize that? | 20   Q. Tore down? It wasn't there then? |
| 21   A. Well, it's got my signature on there, so | 21   A. They disposed of the rats, so — |
| 22   I would say yes. Looks like a bill of lading. | 22   Q. Not a good place, the hotel? |
| 23   Q. Okay. Does it look like the bill of | 23   A. I have a truck with a comfortable |
| 24   lading that might've gone along with the trip from | 24   sleeper on it, so I don't — that's where I sleep. |
| 25   Rhode Island to Dalton, Mass., to help you -- | 25   I've been on the road for quite a while, so — |

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 146

1          (DEPOSITION EXHIBIT
2          NUMBER EIGHT WAS MARKED
3          FOR IDENTIFICATION)
4     Q. Mr. Hooks, I think we're on Exhibit
5  Number Eight?
6     A. Yes, sir.
7     Q. Take a look at that and let me know when
8  you're done, please?
9     A. Yes, sir. (Witness reviews exhibit.)
10    Q. Do you recognize Exhibit Number Eight?
11    A. I do. It's copies of my log book.
12  Mine.
13    Q. And is that your handwriting?
14    A. It is.
15    Q. Okay. So, let's just -- Exhibit Number
16  Eight is three pages, correct?
17    A. Yes, sir.
18    Q. And is it fair to say it covers the
19  dates of 8/22, 8/23, and 8/24 of 2016 --
20    A. Yes, sir.
21    Q. -- and that there's an entry for each
22  date on each page?
23    A. Yes, sir.
24    Q. Okay. This is a standard manual
25  driver's --

Page 147

1     A. Looseleaf log book, yes, sir.
2     Q. Okay. And this essentially memorializes
3  your trip from North Carolina to Rhode Island to
4  Dalton, right?
5     A. Yes, sir.
6     Q. And do you sign each page?
7     A. Yes, sir, I do.
8     Q. And above your signature, it says you
9  certify these entries are true and correct; is
10  that right?
11    A. Yes, sir.
12    Q. Are they all true and correct?
13    A. Yes, sir.
14    Q. Okay. You had a chance to look at them?
15    A. Well, I filled it out, you know. Yeah,
16  it was -- yes, sir.
17    Q. So, on the first page, just help me
18  figure out in the remarks section what you wrote.
19  It looks like "PTI" is the first one?
20    A. Pre-trip inspection.
21    Q. Okay. Got it. And then the next one
22  says what?
23    A. Clear Brook. Took a break in Clear
24  Brook, Virginia.
25    Q. All right.

Page 148

1     A. West Virginia state line.
2     Q. And then the next one is where?
3     A. Mahwah, New Jersey.
4     Q. Okay. I think I can read all the
5  others. Okay. I notice you're still looking at
6  your logs. Is there anything you want to talk
7  about on there?
8     A. Oh, no.
9     Q. Okay.
10    A. Just stuff --
11    Q. No problems with the logs? They're
12  accurate?
13    A. No, sir.
14    Q. Okay.
15         (DEPOSITION EXHIBIT
16         NUMBER NINE WAS MARKED
17         FOR IDENTIFICATION)
18    Q. I'm going to show you what's marked as
19  Exhibit Number Nine.
20    A. Okay.
21    Q. Do you recognize Exhibit Number Nine?
22    A. Yep.
23    Q. What is that?
24    A. It's a bill of lading from G&G Forest
25  Products.

Page 149

1     Q. Okay. To who?
2     A. To Yellow Pine Trading.
3     Q. And is it -- where is it being shipped?
4     A. BB&S.
5     Q. In Rhode Island?
6     A. To North Kingstown, Rhode Island.
7     Q. Is it in Davisville or North Kingstown?
8         MR. O'CONNOR: Objection.
9     Q. Do you know?
10    A. They're like twins, I guess.
11    Q. It's all Boston?
12    A. It's Boston. Yeah, yeah.
13    Q. Okay.
14    A. That's above that 95 marker, so --
15    Q. Down at the bottom it says, "Buster."
16  Is that your handwriting?
17    A. No.
18    Q. No? Do you recognize the signature to
19  the left of "Buster"?
20    A. No, I don't.
21    Q. Would that be signed by somebody up in
22  BB&S in Rhode Island?
23    A. Somebody received it, yes, sir.
24    Q. Okay. Do you know what the weight of
25  the truck would be for the bill of lading, Exhibit

Page 150

1  Number Nine?
2      A.  I don't know.  I don't recall right off
3  my head, but there's a scale on the yard and we
4  leave there we can check it and make sure it's
5  legal so that way we don't have to worry about
6  anything.
7      Q.  Would that have been --
8      A.  So, it was under 80,000 pounds.
9      Q.  You know that for sure?
10     A.  Oh, yeah.
11     Q.  Okay.
12     A.  Yeah.  I didn't document it, but I'd
13  weigh it and as long as it was -- if it was 79999,
14  it was legal, so --
15     Q.  Going back to your logs for a quick
16  second --
17     A.  Yeah.
18     Q.  -- Exhibit --
19     A.  Yes, sir.
20     Q.  -- Number Eight --
21     A.  Yes, sir.
22     Q.  -- it looks like you did a pre-
23  inspection?  It's noted on each page?
24     A.  Yes, sir.  It's required.
25     Q.  Okay.  And there aren't any issues with

Page 151

1  the truck noted in your pre-inspection, is there?
2      A.  No, sir.
3      Q.  Okay.  Did you have any problems with
4  that truck driving it from North Carolina to Rhode
5  Island?
6      A.  Not that I -- well, no, sir.
7      Q.  Okay.  Did you have any problems,
8  mechanical problems with that truck driving it
9  from Rhode Island to Dalton, Mass.?
10     A.  No, sir.
11     Q.  Everything was working fine on the
12  vehicle?
13     A.  It seemed to be, yes, sir.
14     Q.  If it -- if there was something wrong,
15  you'd be required to note -- to put a note, right?
16         MR. O'CONNOR:  Objection.
17     A.  Yeah, depending on the severity of it,
18  take it to get it fixed or make note of it.  Yes,
19  sir.
20     Q.  So, on the way from Rhode Island to
21  Dalton, the brakes worked fine?
22     A.  They seemed to, yeah.
23     Q.  And on the way from Rhode Island to
24  Dalton, the steering was good?
25     A.  I believe so, yeah.

Page 152

1      Q.  On the way from Dalton -- I mean from
2  Rhode Island to Dalton, were there any problems
3  with the tires?
4      A.  No, sir.
5      Q.  On the trip from Rhode Island to Dalton,
6  were there any problems with the windshield or
7  visibility?
8      A.  No, sir.
9      Q.  Okay.  After the crash, you've told us
10  you were arrested by the Dalton police --
11     A.  Yes, sir.
12     Q.  -- brought to the police station and
13  booked; is that right?
14     A.  I don't know if I was booked.  They just
15  -- they just told me why I had to go on down.  I
16  don't think I was booked because from -- they took
17  me from there to the courthouse for an arraignment
18  --
19     Q.  From --
20     A.  -- best I can recall.
21     Q.  From where to the courthouse?
22     A.  From the Dalton Police Department.
23     Q.  So, from the crash scene, the Dalton
24  police took you to Dalton police station?
25     A.  Yes, sir.

Page 153

1      Q.  From the police station, you were taken
2  to court?
3      A.  In Pittsfield, yes, sir.
4      Q.  In Pittsfield?  And you were released
5  after court?
6      A.  Yes, sir, I was.
7      Q.  Okay.  And when you were released from
8  court, in Pittsfield Court, were you given a date
9  to return to Pittsfield Court?
10     A.  I don't remember.  I believe I was.
11     Q.  Well, you've been to court before,
12  right?
13     A.  Yeah.
14         MR. O'CONNOR:  Objection.
15     Q.  Okay.
16     A.  We've done established that.
17     Q.  They usually give you a date to come
18  back --
19     A.  Yes, sir.
20     Q.  -- right?
21     A.  Yes, sir.
22     Q.  So, did Pittsfield give you a date to
23  return to Pittsfield Court?
24     A.  I don't --
25         MR. O'CONNOR:  Objection.

Wiley Lenue Hooks, Jr.                                        4/26/2019

Page 154

1      A. -- remember.
2      Q. Okay.  Did you have a lawyer in the
3    Pittsfield Court?
4      A. No, I did not.
5      Q. Okay.  How did you get back to North
6    Carolina?
7      A. I came back with George and Dwight
8    (ph).
9          MR. MEEHAN:  I'm sorry, I didn't
10   hear the last name.
11     A. George and Dwight.  Dwight.  D-W-I-G-
12   H-T, Dwight?
13         MR. TANGREDI:  Don't worry, Jeff.
14   I'm going to ask.
15     Q. What is that?
16     A. Dwight.  That's the guy's name.
17     Q. Oh.  It's a person?
18     A. Yeah.
19     Q. I didn't know if -- okay.
20     A. Okay.
21     Q. Did --
22     A. George Campbell and Dwight -- I don't
23   remember his last name.
24     Q. What was Dwight doing up in the
25   Pittsfield area?

Page 155

1      A. They came up to get the truck.
2      Q. Okay.  So, after court, you went to the
3    -- I think you said Econo Lodge?
4      A. Yes, sir.
5      Q. Did you spend the night?
6      A. Yes, sir.
7      Q. Okay.  And then, Dwight and somebody
8    else -- George --
9      A. George Campbell.
10     Q. -- drove up, picked you up?
11     A. Well, they came up with equipment to
12   retrieve the truck and trailer.
13     Q. Okay.
14     A. They have their own equipment for
15   recovery.
16     Q. So, who were Dwight and George?
17     A. They --
18     Q. I know -- we gave their names.
19     A. They worked at the shop and -- at G&G.
20     Q. Okay.  And when you say "G&G" --
21     A. Gregory Trucking.
22     Q. Okay.
23     A. I'm sorry.
24     Q. They're employees of Gregory Trucking?
25     A. Yeah.

Page 156

1      Q. Is -- one's a mechanic or are they both
2    mechanics?
3      A. Well, Dwight was a driver.
4      Q. Driver?  And George was a mechanic?
5      A. He was a mechanic, slash, driver.  He
6    was handy.
7      Q. So, they drove to the Econo Lodge,
8    picked you up?
9      A. No, I met them at Village Towing.
10     Q. Which is where the wreck was towed?
11     A. Yeah, it was right down the hill from
12   the Econo --
13     Q. The tractor and the trailer was towed?
14     A. Yes, sir.
15     Q. Okay.  Did you ever go back to
16   Pittsfield Court when you were told to return to
17   Pittsfield Court?
18     A. No, I didn't.
19     Q. Why not?
20     A. Well, at the time my father was dying of
21   cancer and that and other things, it just -- time
22   slipped by me and my father -- I was dealing with
23   my mother and my father dying and --
24     Q. Okay.  Did you ever call the Pittsfield
25   Court to let them know that you were having some

Page 157

1    family difficulties?
2      A. No, I did not.
3      Q. Did you ever reach out to a Pittsfield
4    lawyer to let them know you were having some
5    difficulties and couldn't get there?
6          MR. O'CONNOR:  Objection.
7      A. No, I did not.
8      Q. How did you eventually go back to
9    Pittsfield Court?
10     A. I found out there was a warrant for my
11   arrest and so I went to the Highway Patrol down
12   here in Statesville and turned myself in.
13     Q. And what did they do?
14     A. They detained me until the --
15   Massachusetts arranged for my transportation.
16     Q. How long did that take?
17     A. Eighty-seven days.
18     Q. To come get you in North Carolina?
19     A. Yeah.
20     Q. Efficiency.
21     A. I went to Waco, Texas, to make it to
22   Massachusetts.  You figure that one out.
23     Q. Only the government, right?
24     A. Well, yes, I love this country.
25   Efficiency's not its best quality, so --

Wiley Lenue Hooks, Jr.                                           4/26/2019

Page 158

1    Q.  You comfortable talking about the crash
2  itself?
3    A.  I -- yeah, I mean it's -- it what it is,
4  you know.  It's nothing that you'll ever forget,
5  so --
6    Q.  Why don't you tell us what happened?
7    A.  Well, I had delivered at L.P. Adams and
8  I was leaving to go to Monson.  I was going down,
9  I believe it's Hubbard Avenue, which turns into
10  Division or whatever -- evidently the two towns
11  divide right there at that intersection -- and I
12  was headed down the road.  The road goes straight,
13  but it turns into a yield onto South Street or
14  whatever it is to the right, and then the road
15  curves to the left to the signal light there.
16          There was a box truck in front of me and
17  it was obstructing my view.  I was driving the
18  speed limit, just trucking along, and right as we
19  came up to the intersection, which I was not
20  familiar with, when that truck cleared the
21  intersection it was actually a yield onto that
22  road and there was a lady -- there was a dog come
23  running out and the -- but the thing that people
24  misconstrued is the -- I was looking straight
25  ahead because the road -- actually if you look at

Page 159

1  a map, the road to the intersection where the
2  actual light was does a left oblique and then it's
3  right there, and by the time that truck had
4  cleared the intersection there was a sign there
5  for an 11'1" which is a low clearance and, you
6  know, the lady -- I saw the dog and then I saw the
7  lady come out from behind the shadow with a leash,
8  so the dog -- and that's part of my training, to
9  look ahead for stuff, you know, to try to be aware
10  of what's going on, and when I saw the 11'1" sign
11  I had to turn to the left and I -- you know, I
12  went through the intersection.  State's evidence,
13  there's skid marks but something went wrong and I
14  ended up hitting Mr. Forbes.
15    Q.  Anything else you want to -- when you
16  left L.P. Adams, you were heading for Monson; is
17  that right?
18    A.  Yes, sir.
19    Q.  Did you plot your itinerary, your
20  course, before leaving L.P. Adams?
21    A.  I was following my GPS, which I rarely
22  do.
23    Q.  And where is the GPS?  Is it on your
24  phone?
25    A.  It's on a mount.  Yes, it's on my phone,

Page 160

1  but it has a mount.
2    Q.  Is it a separate GPS device separate
3  from your phone?
4    A.  No, it's a part of the Google mapping
5  software I use.
6    Q.  Okay.  So, had you plotted the course on
7  your GPS before --
8    A.  Well, I had come in town on Highway 20
9  and it was early in the morning.  It was about --
10  almost 7:00 when this all transpired and knowing
11  how a little metropolitan gets, I was going to try
12  to divert around the traffic and not be a part of
13  the traffic, and so I thought I was -- going
14  around the east side of town was my -- yeah, I
15  plotted my course, so --
16    Q.  And plotting a course with a tractor
17  trailer truck is different than a passenger car;
18  is that right?
19    A.  You have truck routes.
20    Q.  And a lot of that is because of
21  overpasses --
22    A.  Overpasses --
23    Q.  -- and heights?
24    A.  -- restrictions, residential areas.
25    Q.  So, you knew that before you left L.P.

Page 161

1  Adams, right?
2    A.  Well, it was obvious that was a truck
3  route because they had a sign, you know, warning
4  trucks of the 11'1" clearance, so --
5    Q.  But did you think you were going to go
6  that way initially?
7    A.  No.
8    Q.  Then I misunderstood.  I thought you had
9  to steer away from that area at the last minute.
10  Not the last minute, but --
11    A.  Well, on that street, the road veers
12  into a yield and the actual signal light's like a
13  left oblique and then it's right there.  You're
14  right on it.  There's no warning that that
15  signal's there.  It's just the flow of traffic.
16  If I -- I had a map downloaded.  I was -- I wish
17  I'd have brought it now because it would've made
18  sense to everybody, but the way the flow of
19  traffic went, the way that intersection was laid
20  out, it seemed as though it just all flowed into
21  that -- I think it's called South Street.
22    Q.  Are you saying there was no sign prior
23  to the intersection telling you there was an
24  intersection coming up?
25    A.  Actually, no, because the signal light,

Page 162

1    that road traveling straight turns into a yield
2    with the low clearance sign, and there's -- no,
3    there's no warning of the intersection.
4         Q.   No signage before you get to it telling
5    you there's a traffic light coming up?
6         A.   No, because the -- because this flows --
7    this free flows into a yield and the traffic
8    lights, actually you have to make a left turn to
9    the traffic light.
10        Q.   How long were you looking at the dog?
11        A.   A brief second. I mean, I wasn't
12   looking at the dog. The dog was in my field of
13   view. Okay? The intersection goes straight, and
14   the signal light's to the left, so the field of
15   the -- the dog's in my field of vision, and then
16   once that box truck had cleared the intersection
17   there's a -- there's the yield sign and there's
18   the 11'1", my truck's 12'6", so to take an evasive
19   action I turned to the left and got on the brakes
20   and the State's evidence shows the skid marks,
21   something went awry.
22        Q.   Do you know what direction, compass
23   direction, you were heading just prior to the
24   crash?
25        A.   I'd have to say west, west-northwest.

Page 163

1         Q.   Did you get hurt at all in the crash?
2         A.   No, sir.
3         Q.   Can you think of any actions you
4    could've taken that would've prevented that crash?
5              MR. O'CONNOR: Objection.
6         A.   No, sir.
7         Q.   Do you recall the witnesses at your
8    criminal trial who testified about their
9    observations just before the crash?
10        A.   Yes, sir, I do.
11        Q.   Do you recall that the witnesses
12   testified that your head was down as you entered
13   the intersection?
14        A.   Yes, sir --
15             MR. O'CONNOR: Objection.
16        A.   -- I do.
17        Q.   Do you disagree with that?
18        A.   Yes, I do. How can a man with his head
19   down and the skid marks not be applying the
20   brakes? I mean, you know, I never got a chance on
21   the stand up there, which I regret, but, you
22   know --
23        Q.   But you had that chance, didn't you?
24             MR. O'CONNOR: Objection.
25        A.   I -- yeah, I guess I did.

Page 164

1         Q.   You were given the opportunity to
2    testify in your criminal case if you wanted,
3    weren't you?
4              MR. O'CONNOR: Objection.
5         A.   I don't think -- I've never had a
6    criminal case like this, so --
7         Q.   Well, you've had a couple of others.
8    How was this one different?
9              MR. O'CONNOR: Objection.
10        A.   Your traffic courts is a lot different
11   from being, you know, negligent, homicide.
12        Q.   But driving while impaired is criminal,
13   right --
14        A.   It is.
15        Q.   -- in North Carolina? All right. So,
16   you've --
17        A.   I'm not going to contest that.
18        Q.   Okay.
19        A.   My wrongs are wrong.
20        Q.   So, I've been provided with some partial
21   portions of letters you wrote from jail in
22   Massachusetts, and one of them mentions, I think,
23   an Ashley Briggs. Does that sound familiar to
24   you?
25        A.   Yeah.

Page 165

1         Q.   Who is Ashley Briggs?
2         A.   Somebody tried to contact me up there
3    and correspond with me and visit with me. I don't
4    know what the relevance of this is. I mean --
5         Q.   Do you object? Is that --
6         A.   I don't object. I mean --
7         Q.   So --
8              MR. O'CONNOR: If a witness can
9    object.
10        A.   I mean, for the outcome of this
11   deposition --
12        Q.   Well, there seems to be an inference
13   that I have something to do with Ashley Briggs, so
14   I --
15        A.   Well, I was -- that's the impression I
16   got, and I may have been wrong because I -- you
17   know, I was being asked to consider some things
18   and -- which -- if I give you any kind of answer
19   it'll only be speculation. That's what I thought.
20   Yeah --
21        Q.   Okay.
22        A.   -- that's what I thought. Did you not
23   know Ashley Briggs?
24        Q.   I don't know Ashley Briggs.
25        A.   Well, you should Google her then --

Wiley Lenue Hooks, Jr.                                    4/26/2019

---

Page 166

1    Q.  I did.
2    A.  -- because she might be a nice gal.
3    Q.  I've tried.  Well, from your
4    description, she was attractive?
5    A.  She was.
6    Q.  Did she actually come there?
7    A.  Once.
8    Q.  And she actually -- you sit down with
9    her?
10   A.  Once.
11   Q.  We'll talk in facts, not speculation.
12   A.  Yeah.
13   Q.  Was she alone?
14   A.  Yeah.  I suppose.
15   Q.  You didn't see anybody else?
16   A.  No.  Just my lawyer.
17   Q.  I'm sorry?
18   A.  Just my attorney.
19   Q.  She was with your attorney?
20   A.  No, no, no.  I said other than that.
21   Q.  Okay.  So, this Ashley Briggs came and
22   visited you alone?  Did you meet with her alone?
23   A.  No, there's guards in there.
24   Q.  Okay.  When you meet with your lawyer,
25   you can meet with your lawyer alone, right?

---

Page 167

1    A.  Well, yes.  Yeah.
2    Q.  Okay.  So, any other visitor you meet in
3    the presence of guards, right?
4    A.  Yeah.
5    Q.  And do you know if people have to sign
6    in if they come to visit you?
7    A.  I suppose.
8    Q.  Okay.  So, if Ashley visited you, there
9    would be a record at the jail that you had a
10   visitor that date and time, right?
11        MR. O'CONNOR:  Objection.
12   A.  You know, I don't know where this -- I
13   mean, I -- I just -- you know.
14   Q.  What did you and Ashley discuss?
15   A.  That was a fabricated story.
16   Q.  Thank you for your honesty.
17   A.  I was distraught at the time.  I really
18   -- I don't even know why I did that.  I really
19   don't.  It's a fabricated story.  It's all lies
20   and it has nothing to do with nothing.  I guess in
21   a way I was trying to get -- I mean, Cecil and his
22   company and his sister and his son have always
23   been straight-up and nice to me and I was
24   distraught.  I was.  So, I -- that's a fabricated
25   story.  That is, and I'm sorry, Cecil.  So, that

---

Page 168

1    has nothing to do with nothing.  It was all
2    fabricated.
3    Q.  So, I understand being distraught, I do.
4    A.  Okay.  I mean, I've had my --
5        MR. O'CONNOR:  Just --
6    A.  Anyhow.
7        MR. O'CONNOR:  Just wait for him to
8    ask a question.
9        THE WITNESS:  Okay.
10   Q.  So, what was the purpose -- your purpose
11   in fabricating that story?
12   A.  You know --
13        MR. O'CONNOR:  Objection.
14   A.  -- the other day when the -- I was aware
15   that you had them, I was like, you know, sometimes
16   you look back in the past and you go, "What the
17   hell was I thinking," you know.  I pretty much try
18   to be honest with people and I don't know what I
19   was trying to gain out of it.  I really don't.
20   There was nothing to gain.  I was just feeling
21   sorry for myself and the fact that I was in there
22   and, you know, the lawyer -- my lawyer had said
23   that -- well.  You know, just to -- I don't know.
24   Let's get past this.
25   Q.  Okay.

---

Page 169

1    A.  I fabricated it.  I fabricated it and I
2    apologize to whoever.
3    Q.  You're a man of your word and a man of
4    your oath, so thank you.  I understand while you
5    were in jail in Massachusetts that some people
6    from North Carolina sent you some canteen money?
7    A.  They did.
8    Q.  Do you know who sent it to you?
9    A.  Actually, no, because the way I got it
10   -- well, I mean, I know Martha sent me some.  I
11   don't know if it was for a holiday or whatever,
12   but -- yeah.
13   Q.  Do you know how much money was sent from
14   North Carolina to you while you were in jail in
15   Mass.?
16   A.  In total?
17   Q.  Yeah.
18   A.  You know, my mother handed me an
19   envelope not long ago and I have not looked
20   through it, so -- the honest answer, no, I don't.
21   Q.  Okay.
22   A.  Do you?
23   Q.  No, not yet.
24   A.  I'm just curious.
25   Q.  I don't know.  No.

---

Wiley Lenue Hooks, Jr.                                          4/26/2019

44 (Pages 170 to 173)

| Page 170 |
| --- |

1    A.  See how much I owe my mom.
2    Q.  But they keep track of that stuff.
3    A.  Yeah, they do, they do.  There's a
4    record of everything --
5    Q.  Yeah.
6    A.  -- ain't there?
7    Q.  And there is, usually.  How did you get
8    paid by Gregory Trucking?
9    A.  Percentage of the load.
10   Q.  Every time?
11   A.  Every time.
12   Q.  Did you have any input into what loads
13   you would get?  Did you have any input in what
14   loads you would get or was it random?
15   A.  I never argued with Cecil.  Whatever he
16   needed, I'm -- you know, I'm at his disposal.  I
17   drive his truck.  Where he tells me to go, I go.
18   Q.  I mean --
19   A.  I suppose I could've ask sometimes, but
20   I never took advantage of that situation if it did
21   exist.
22   Q.  So, when you say a percentage of the
23   load, is it a percentage of the charge?
24   A.  I guess so.  I mean, it's a little
25   different on -- I mean, they paid me well, you

| Page 171 |
| --- |

1    know.  I was happy with it.
2    Q.  Okay.  Do you know what it came out to
3    per hour approximately?
4    A.  I haven't got a clue.
5    Q.  Do you know what the average truck
6    driver's salary was in the time frame of 2014 to
7    2016?
8        MR. O'CONNOR:  Objection.
9    A.  The average nationwide?
10   Q.  Yeah.
11   A.  I would probably say about 60, 70,000 a
12   year.
13   Q.  Do you -- did you fit within that range?
14   A.  I suppose so.  I'm being honest with
15   you, I don't --
16   Q.  Okay.  Did you work 40 hours a week for
17   Gregory Trucking --
18   A.  I did.
19   Q.  -- between 2014 and 2016?
20   A.  Probably, yeah.
21   Q.  Okay.  You feel as though you were
22   fairly paid?
23   A.  I enjoyed working with them.
24   Q.  Did you feel as though you were fairly
25   paid?

| Page 172 |
| --- |

1    A.  Oh, yes, sir.
2    Q.  Okay.
3    A.  Yes, sir.  I'll always take more, but --
4    Q.  Well, were you willing to take
5    substantially less --
6    A.  No.
7    Q.  -- than the average truck driver?
8    A.  I mean -- no, I mean, I'm -- you know,
9    at the end of the day if I make -- what I'm
10   making's happy with me, I'm happy with it, and so
11   --
12   Q.  Did --
13   A.  I mean, I don't go in doing any
14   comparisons with anybody.
15   Q.  Did you have any other sources of income
16   in 2016 other than Gregory Trucking?
17   A.  No.
18   Q.  And by "any other sources," I mean even
19   people --
20   A.  I understand.  No.
21   Q.  Not in -- not necessarily income you
22   earned, but did anybody else help you out
23   financially perhaps?
24   A.  No.
25   Q.  Okay.  Do you agree that a trucking

| Page 173 |
| --- |

1    company must use only qualified drivers to prevent
2    crashes and protect us all from injury and death?
3        MR. O'CONNOR:  Objection.
4    A.  Yes.
5    Q.  Do you agree that a shipper must choose
6    a competent and careful trucking company to ship
7    its goods to prevent disaster on the highways?
8        MR. SCHULER:  Objection.
9        MR. MEEHAN:  Objection.
10       MR. O'CONNOR:  Objection.
11   A.  I --
12   Q.  Again?
13   A.  Yeah.
14   Q.  Do you agree that a shipper must choose
15   a competent and careful trucking company to ship
16   its goods to prevent disaster on the highways?
17       MR. MEEHAN:  Objection.
18       MR. O'CONNOR:  Objection.
19       MR. SCHULER:  Objection.
20   A.  Yeah.
21   Q.  Was that a --
22   A.  Yes.
23   Q.  -- yes?  Thank you.
24   A.  Yes.
25   Q.  Do you agree that tractor trailer

| Page 174 | Page 176 |
|---|---|

**Page 174**

1  drivers must follow the safety rules of the road
2  to prevent crashes and protect us all from injury
3  and death?
4      A. Yes.
5          MR. O'CONNOR: Objection.
6      Q. Do you know if Gregory Trucking was a
7  member of any trucking organizations?
8      A. I have no idea.
9      Q. Did you ever see any trucking magazines
10  in the office?
11      A. Yes.
12      Q. From where?
13      A. I -- there's a variety of them. I can't
14  specify any particular one.
15      Q. Okay. Do you know who Martha Somers was
16  employed by?
17      A. No.
18      Q. Do you know who Martha Somers performed
19  work for?
20          MR. O'CONNOR: Objection.
21      A. No (witness indicates negatively). I
22  mean, you -- no.
23      Q. Did you get paid by check all the time
24  by Gregory Trucking?
25      A. I did.

**Page 175**

1      Q. Did they ever give you cash?
2      A. Never. Only if they were advancing
3  money for tolls that was part of the job.
4      Q. What other money -- what other things
5  would Gregory Trucking pay for on a trip, say, to
6  Rhode Island?
7      A. Well, they paid for the tolls and fuel
8  and I mean just regular expenses. Any expense
9  that wasn't deemed my responsibility.
10      Q. What I'm trying to designate. Let's say
11  for example food. Did you pay for your own food?
12      A. Yeah, that was my responsibility.
13      Q. That was your responsibility?
14      A. Yes, sir.
15      Q. If you chose to stay at a motel, was
16  that your responsibility?
17      A. If it was deemed business, no, they paid
18  it and I mean -- but rarely -- our runs rarely
19  involved that, so -- but the times that I did have
20  to lay over once or twice, that's happened.
21      Q. Well, the trip that we talked about from
22  North Carolina to Rhode Island to Dalton to Monson
23  back to North --
24      A. No, I stayed in the truck.
25      Q. You normally sleep in the truck?

**Page 176**

1      A. Yes, sir. It's a equipped truck with a
2  sleeper.
3      Q. Do you have the option to stay at a
4  hotel?
5      A. It's a nice truck, a nice sleeper, good
6  mattress, I don't see why --
7      Q. All right. Can you cook inside your
8  truck?
9      A. I can't cook, period.
10      Q. You got a refrigerator?
11      A. Well, yeah.
12      Q. Shower?
13      A. No.
14      Q. Some of them do.
15      A. They do. They have washers and dryers
16  in them now.
17      Q. Did you ever do any work for Brandon
18  Gregory at B&C Timbers?
19          MR. O'CONNOR: Objection.
20      A. No.
21      Q. You had mentioned earlier that Brandon
22  had given you your test drive?
23      A. Well, I mean, way back when. You know,
24  the -- okay. The 2014 to 2016 period that we're
25  -- seems to be like the primary thing we're

**Page 177**

1  talking about, Brandon -- Brandon took care of the
2  planer and this, that, and the other thing. I
3  mean, so -- that's a good question. I don't know.
4      Q. What do you mean?
5      A. I mean, that's a family-run business,
6  you know. They -- you've got the trucking and --
7  I don't -- the trucking's all I know of, I mean,
8  to be honest. If you want an honest assessment,
9  B&C or B&G or whoever, G&G, I know G&G took care
10  of taking trees and making them into lumber and
11  Gregory Trucking took care of hauling that to its
12  destination, so that's --
13      Q. And you --
14      A. -- all I really know.
15      Q. And you drove?
16      A. And I drove.
17      Q. Who was in charge?
18          MR. O'CONNOR: Objection.
19          MR. MEEHAN: Objection.
20      A. You know, I'm not going to answer that
21  question.
22      Q. Why not?
23          MR. O'CONNOR: Objection.
24      A. Because at any given time, I mean, you
25  got Cecil and Brandon and Martha. The three of

Wiley Lenue Hooks, Jr.                                    4/26/2019

46  (Pages 178 to 181)

---

**Page 178**

1    them, if they said jump I jump. I mean, I did
2    what they said. They were good people, you know.
3    We -- it was nice to work in that environment.
4         Q.   All right. Did you ever -- prior to
5    2014, did you ever apply for a job as a tractor
6    trailer truck driver and get refused because of
7    your driving record?
8         A.   No.
9         Q.   Did you ever apply to any other tractor
10   trailer -- strike that. Did you ever -- before
11   2014, did you apply to any motor carriers to be a
12   tractor trailer truck driver?
13        A.   Not that I can recall.
14        Q.   Okay.
15        A.   I mean, I had a couple -- no. No.
16        Q.   When you left Rhode Island to go to
17   Dalton, who dispatched you?
18             MR. SCHULER: Objection.
19             MR. O'CONNOR: Objection.
20        A.   You'd have to elaborate on that a little
21   bit. I mean --
22        Q.   What is a dispatcher?
23             MR. O'CONNOR: Objection.
24        A.   A dispatcher's a person who lines loads
25   up with trucks.

---

**Page 179**

1         Q.   The short haul between Rhode Island and
2    Dalton?
3         A.   I initiated it and Matt agreed to it and
4    I took it.
5         Q.   Okay. So, would there be a dispatcher
6    in that situation?
7         A.   I guess Matt would be.
8             MR. SCHULER: Objection.
9         Q.   Okay. Why do you say that?
10        A.   Well, he dispatched -- he knew about the
11   loads coming out of BBS.
12        Q.   Okay. On your driver's logs that we
13   have, I think it's Exhibit Number Eight.
14        A.   Yes, sir.
15        Q.   I'm not going to ask you to look at it,
16   but are you supposed to put your mileage on those
17   logs?
18        A.   It's not mandatory.
19        Q.   It's not mandatory?
20        A.   No, sir. The DOT wouldn't hit you for
21   it if they inspected it.
22        Q.   Are there supposed to be post-trip
23   inspection notations on your logs?
24             MR. O'CONNOR: Objection.
25        A.   I don't know.

---

**Page 180**

1         Q.   Okay.
2         A.   In all my years of having log books
3    audited by the DOT, I've never been hit with that.
4    So, if it is, it's not enforced by the DOT federal
5    -- on a federal level.
6         Q.   What have you been hit with?
7             MR. O'CONNOR: Objection.
8         A.   Hours of service. I mean, occasionally
9    you go over a little bit and they'll -- I mean,
10   they can, you know, nitpick you for anything, so
11   --
12        Q.   The night before the crash, I know you
13   said you stayed in Chicopee --
14        A.   Yes, sir.
15        Q.   -- at the Pride --
16        A.   Yes, sir.
17        Q.   -- station? Did you get a good night's
18   sleep?
19        A.   Yes, sir, I did.
20        Q.   How do you normally sleep? Pretty well?
21        A.   I do.
22        Q.   Were you tired the next morning?
23        A.   No, sir. I slept a little over 12
24   hours, I believe.
25        Q.   What time did you get up to drive to

---

**Page 181**

1    Dalton from Chicopee?
2         A.   Well -- you know, I try to get up in
3    time to slumber around a little bit and have
4    coffee, so -- you know, it was about an hour's
5    trip there, so --
6         Q.   They have a good little diner over
7    there.
8         A.   They do. They do.
9         Q.   Just before the crash, did you see that
10   the traffic light was red?
11             MR. O'CONNOR: Objection.
12        A.   No, sir (witness indicates negatively).
13        Q.   Did you see the traffic light at all?
14        A.   No, sir (witness indicates negatively).
15             MR. TANGREDI: I think I'm done,
16   but there may be some other questions.
17             EXAMINATION
18   BY MR. THOMAS SCHULER:
19        Q.   Mr. Hooks, we met before. My name is
20   Tom Schuler, and I represent BB&S. I have a few
21   questions for you, sir.
22        A.   Yes, sir.
23        Q.   Now, am I correct that the accident
24   occurred in Dalton with Mr. Forbes after you had
25   completed your delivery of BBS product to L.P.

---

Wiley Lenue Hooks, Jr.                                      4/26/2019

47 (Pages 182 to 185)

| Page 182 | Page 184 |
|---|---|

**Page 182**

1  Adams?
2      A.  Yes, sir.
3      Q.  Okay.  And when you delivered that
4  product to L.P. Adams, you were doing work to
5  further the business of Gregory Trucking, correct?
6      A.  Yes, sir.
7          MR. O'CONNOR:  Objection.
8      Q.  Okay.  And now -- and I think you
9  indicated in your log that -- which I think is in
10  front of you as Exhibit Eight.  I think you
11  indicate in the log, it says, "Unload."  Is that
12  the notation that you made after you completed a
13  load?
14      A.  Well, I'm going to -- that's probably
15  not the most accurate, because at the time I had
16  left there I hadn't -- you have a time frame that
17  you can update your log book.  Like every four
18  hours it has to be updated, so the time that
19  that's filled out on there probably doesn't
20  accurately indicate the actual time because I
21  think the accident was like 6:43, but I was within
22  the realm of the time frame of updating my log,
23  but once the accident had occurred, I caught this
24  up because that's what they like you to do when
25  they come to audit your book --

**Page 183**

1      Q.  Okay.
2      A.  -- because as I said, I was expecting
3  the DOT to show up, so --
4      Q.  Okay.  So, you made that entry,
5  "Unload," at some point after the accident?
6      A.  Yeah, probably.
7      Q.  Okay.  And when you went to L.P. and
8  Adams, you -- what did you do?  Did you hand over
9  the bill of lading to them and let them inspect
10  the load that you were delivering?
11      A.  Shipping/receiving, you give them the
12  bill of lading and they'll -- they give you
13  instructions to pull around here, unstrap here, do
14  whatever, so you go in -- yeah, that's what you do
15  to get instructions from them on what to do.
16      Q.  And when you signed the bill of lading
17  at the bottom where it says -- has your name there
18  on Exhibit Seven?
19      A.  Yes, sir.
20      Q.  You see?  What's the purpose of that?
21  What does that signify to you, sir?
22      A.  That's my signature claiming that I
23  picked the load up.  That's for the records --
24      Q.  Okay.
25      A.  -- of the shipper.

**Page 184**

1      Q.  Okay.  So, that's -- that just indicates
2  --
3      A.  That's just indicating that I have
4  received that load and I accepted it.
5      Q.  Okay.  And when you delivered the load
6  to L.P. and Adams, did that complete the work that
7  you were doing, delivering the BBS product?
8      A.  Yes, sir.
9          MR. O'CONNOR:  Objection.
10      Q.  And is it fair to say that the job that
11  you did short hauling lumber, BBS lumber for
12  Gregory Trucking, was completed when you made that
13  delivery to L.P. Adams?
14          MR. O'CONNOR:  Objection.
15      A.  Yes, sir.
16      Q.  And that was before the accident with --
17  the unfortunate accident with Mr. Forbes?
18      A.  Yes, sir.
19      Q.  Okay.  And I think you told us that
20  after you made that delivery you input some data
21  into your GPS to give you directions to go to your
22  next activity, which was to go pick up something
23  at -- in Monson?
24      A.  Yes, sir.
25      Q.  Okay.  And when you were -- when you

**Page 185**

1  left the L.P. and Adams lot and you were driving,
2  you were -- your intention was to head to Monson
3  to pick up the load at Eagle Logistics?
4      A.  Yes, sir.
5      Q.  Okay.  And were you working at that
6  point when you're driving toward Monson, after
7  your delivery to L.P. Adams?  At that point, were
8  you working to -- on the job for product at Eagle
9  Logistics?
10          MR. O'CONNOR:  Objection.
11      A.  Not that I understand.
12      Q.  Okay.  Well, you're on your way to
13  Monson, correct?
14      A.  It's kind of like you're free and clear
15  at this point in time until you -- I mean, I'm not
16  -- I haven't obligated to hauling anybody's load.
17  I don't have a bill of lading for a load on that
18  truck, so I'm not contracted to anybody.
19      Q.  Well, let me ask you a different way.
20      A.  Okay.
21      Q.  You weren't doing any business
22  delivering any product for BB&S when you were on
23  your way to Monson after you --
24      A.  Oh, no.
25      Q.  -- made a delivery?

Wiley Lenue Hooks, Jr.                                    4/26/2019

Page 186

1    A.  Yeah, correct.
2    Q.  Okay.
3    A.  Correct.
4    Q.  And you weren't doing any business for
5  BB&S when the unfortunate accident with Mr. Forbes
6  --
7    A.  Correct.
8    Q.  -- occurred, correct?  And as best you
9  can recall, let me ask you this, did you speak at
10  all with Martha to give a status as to what you
11  were up to or what you were doing when you got to
12  the Pride in Chicopee, Mass.?
13           MR. O'CONNOR:  Objection.
14    A.  Yeah.
15    Q.  All right.  What did you tell Martha?
16    A.  I told her I had -- I was, you know,
17  bedding down for the night in Chicopee --
18    Q.  Okay.
19    A.  -- so they would know where I -- what my
20  location was, so --
21    Q.  Did you have any discussion with Martha
22  about the fact you were delivering a short haul to
23  L.P. and Adams on that phone call?
24    A.  Probably.  I mean, I'm -- I didn't do
25  things without letting them know what I was doing,

Page 187

1  but then again, there were times where, like I
2  said, I had, you know -- had picked up stuff just
3  to -- I would let them know after the fact, but I
4  knew it was okay.
5    Q.  Okay.  Do you have a specific memory of
6  speaking to anybody at Gregory Trucking when you
7  were at BB&S to tell them you were doing the short
8  haul?
9    A.  I do not.  I do not.
10    Q.  Do you have a specific memory of telling
11  Martha when you were in Chicopee --
12    A.  Yes.
13    Q.  -- at the Pride station --
14    A.  Yes, I do.  I do.  Yes, I do.
15    Q.  Let me ask the complete question.  Do
16  you have a specific memory of telling Martha that
17  you were engaged in a short haul up to Dalton when
18  you spoke to her in Chicopee?
19    A.  Yeah, because she kept track of what we
20  were doing, so yeah, I'm sure I -- yeah, I'm sure
21  I made her aware of that, yeah.
22    Q.  Okay.
23           MR. SCHULER:  I don't think I have
24  any other questions.  Thank you very much.
25           THE WITNESS:  Okay.

Page 188

1           EXAMINATION
2  BY MR. JEFFREY MEEHAN:
3    Q.  Mr. Hooks, my name is Jeff Meehan.  I
4  represent B&C Timbers.
5           (Off record exchange.)
6           Mr. Hooks, as I just indicated, my name
7  is Jeffrey Meehan.  I represent B&C Timbers, LLC,
8  doing business as G&G Forest Products.  I have a
9  few questions.
10    A.  Yes, sir.
11    Q.  With regard to your driving -- your
12  commercial driver's license in February of 2016,
13  when it was reissued, the new license, did you
14  provide Gregory Trucking with a copy of that?
15    A.  I did.
16    Q.  Okay.  And was there any restrictions on
17  that?
18    A.  There was not.
19    Q.  And with regard to the revocation of
20  that license for a year, did you testify you'd
21  never received notice of that?
22    A.  I hadn't ever seen that paper until just
23  now.  I knew of it, because it had came about that
24  they had said that they suspended my license on
25  the 19th, but as you see in that letter, it was

Page 189

1  indicated that letter was 02/23.  I mean, that's
2  after the revocation --
3    Q.  Right.
4    A.  -- of the 19th, so that -- that, to me,
5  makes no sense right now.
6    Q.  Okay.
7    A.  But I did get my hard copy.  I believe I
8  got it on the 22nd and I took it straight over to
9  Martha because I -- having the fact that my
10  parents had been in business and I had been in
11  business, driving records are imperative, I mean,
12  you know, that that stuff be kept up with, so
13  Martha was a stickler about keeping up with stuff,
14  so I took -- I immediately took them to her.
15  Because as soon as I got the temporary, I took
16  that to her.  The day I got that, I was leaving on
17  a load, so the day I got my temporary certificate,
18  I immediately took it to Martha and gave her a
19  copy of that, and when my hard copy came in, after
20  the revocation that the State said they sent out,
21  I gave her a copy of that, so up until the
22  accident I had no idea that was my license were
23  revoked.
24    Q.  Okay.  You've confused me a little bit
25  with the temporary and the final --

## Page 190

1       A. Well, they give you a temporary. It's a
2   20-day certificate, along with your old license.
3   Until the new one comes in, that's your license.
4       Q. And that renewed in February of 2016,
5   correct?
6       A. My birthday, yep.
7       Q. Did you have to pay a fee for that?
8       A. Seventy-five dollars.
9       Q. Okay. And the first you knew that it
10  had been revoked was at the scene of the accident
11  per the --
12      A. Yes, sir.
13      Q. -- police department?
14      A. Yes, sir. The officer down in Dalton
15  notified me of it. Now, I want it to be known
16  that she -- initially, when she ran my license and
17  came back and we were checking them, Mr. Forbes
18  being taken out of the vehicle, it was all well
19  and good and she told me as soon as this happened
20  if I could make some arrangements to get out of
21  there I was free to go, and it wasn't about 15
22  minutes later when -- I heard a radio squawk over
23  there and she came over to me and asked me -- she
24  said, "Your license are good, but your CDLs are
25  revoked," which I've never heard of such a thing,

## Page 191

1   so that's how that went down, and that's when she
2   put me in handcuffs.
3       Q. Talking about Officer Dina Stroud, at
4   the scene --
5       A. Yeah, that's her.
6       Q. Okay.
7       A. Stroud, yeah.
8       Q. And was your understanding that your
9   regular driver's license was still valid but your
10  CDL was revoked?
11      A. That's what she told me, which I'd never
12  heard such a thing.
13      Q. Did you get more than one license or did
14  you just have a --
15      A. No, sir.
16      Q. So, you --
17      A. This day and age, it ain't like, you
18  know --
19      Q. So, as I understand it, you have a
20  license -- or had a license with an ordinary --
21      A. The license they took was the license
22  that the State of North Carolina sent to me --
23      Q. Okay.
24      A. -- after the fact that they said they
25  had revocated my license.

## Page 192

1  .     Q. Okay. But the license that you had
2   issued in February of 2016 was a driver's license
3   issued by the Department of Motor Vehicles of the
4   State of North Carolina with an endorsement for
5   CDL?
6       A. Yes, sir.
7       Q. Okay. And, by the way, do you know why
8   your license was revoked in February of 2016?
9       A. It might have -- I have suspicions, but
10  I'm not sure. I mean, I think it had to do with
11  the thing in 2013.
12      Q. What thing in 2013?
13      A. But that -- the one that was on my
14  driving record, but they -- but like I said, from
15  the time they -- from the time I renewed my
16  license on my birthday to the 22nd, the 19th
17  happened a week after my birthday and they said
18  they revoked my license and then they sent it to
19  me anyhow. That's what always has baffled me,
20  that in the process of them sending my license,
21  you're telling me their records didn't show that
22  they had revoked my license?
23      Q. So, do I understand that your thinking
24  is that your license was revoked because of
25  something that happened three years before in

## Page 193

1   2013?
2       A. I --
3           MR. O'CONNOR: Objection.
4       A. I don't know, to be honest with you. I
5   don't know.
6       Q. Okay. Okay.
7       A. I mean, you know, I was -- I had a valid
8   -- all I know is I went to the DMV, I got a valid
9   driver's license, and they sent it to me.
10      Q. Okay. Now, the lumber that you hauled
11  for Gregory Trucking that emanated from B&C
12  Timbers, was it treated lumber?
13      A. The load I took to Davisville?
14      Q. Yes.
15      A. No, it was not.
16      Q. Okay. And did you completely unload
17  that load in Davisville, also known as North
18  Kingstown, Rhode Island?
19      A. Yes, I did.
20      Q. Was any of the lumber that you delivered
21  to Dalton, did it come from B&C Timbers, also
22  known as G&G Forest Products?
23      A. Say that again?
24      Q. Did any of the lumber that you delivered
25  to L.P. Adams in Dalton, Massachusetts, come from

Wiley Lenue Hooks, Jr.                                    4/26/2019

50 (Pages 194 to 197)

| Page 194 |
|---|

1    B&C Timbers, also known --
2        **A. No.**
3    Q.  -- as G&G Forest Products?
4        **A. No, it did not.**
5    Q.  So, you'd completely unloaded that
6    vehicle in Davisville?
7        **A. Completely unloaded.**
8    Q.  And did your delivery on behalf of -- or
9    for B&C Timbers' goods conclude in Davisville,
10   Rhode Island?
11       **A. Yes, it did.**
12           **MR. O'CONNOR:  Objection.**
13   Q.  Were you, in going to Dalton, acting on
14   any purpose or mission of B&C Timbers, also known
15   as G&G Forest Products?
16       **A. No, sir (witness indicates negatively).**
17   Q.  Did you receive any direction with
18   regard to that delivery from Brandon Gregory?
19       **A. No, I did not (witness indicates**
20   **negatively).**
21           MR. MEEHAN:  That's all I have.
22   Thank you.
23           MR. O'CONNOR:  I don't have any
24   questions.
25           MR. TANGREDI:  I'm good.

| Page 195 |
|---|

1            VIDEOGRAPHER:  We're going off the
2    record.  The time now is 12:32.  This completes
3    today's deposition.
4            WHEREUPON, at 12:32 p.m., deposition was
5    adjourned.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 196 |
|---|

1            CERTIFICATION
2        I, BRENDA CARTER, Notary Public in and for the
3    County of Alamance, State of North Carolina at Large, do
4    hereby certify:
5        That there appeared before me the foregoing witness
6    at the time and place herein aforementioned;
7        That the said witness was sworn by me to state the
8    truth, the whole truth, and nothing but the truth, in
9    said cause;
10       That the testimony was taken before me and recorded
11   by Stenomask, thereafter reduced to typewriting under my
12   direct supervision, and the foregoing consecutively
13   numbered pages are a complete and accurate record of all
14   the testimony given by said witness;
15       That the undersigned is not of kin, nor in any wise
16   associated with any of the parties to said cause of
17   action, nor their counsel, and that I am not interested
18   in the event(s) thereof.
19       IN WITNESS WHEREOF, I have hereunto set my seal this
20   the 20th day of May, 2019.
21
22
23
24           BRENDA CARTER
25           NOTARY #:20043580030

| Page 197 |
|---|

1            WITNESS CERTIFICATION
2        I, WILEY LENUE HOOKS, JR., do hereby certify,
3        That I have read and examined the contents of the
4    foregoing pages of record of testimony as given by me at
5    the times and place herein aforementioned;
6        And that to the best of my knowledge and belief, the
7    foregoing pages are a complete and accurate record of all
8    the testimony given by me at said time, except as noted
9    on the attached here (Addendum A).
10   I have ____, Have not ____, made changes/corrections to
11   be attached.
12   _____ (Signature)
13   I, _____, Notary Public
14   for the County of _____, State of _____,
15   do hereby certify:
16       That the herein above named personally appeared
17   before me this the ____ day of _____, 20____;
18       And that I personally witnessed the execution of
19   this document for the intents and purposes herein above
20   described.
21           _____
22           NOTARY PUBLIC
23
24
25   My Commission Expires:        (SEAL)

Wiley Lenue Hooks, Jr.

4/26/2019

Page 198

1          ADDENDUM A

2

3     Upon the reading and examination of my deposition

4     testimony as herein transcribed, I note the following

5     changes and/or corrections with accompanying reason(s)

6     for said change/correction:

7

8        **************************

9     Page    Line        Is Amended to Read

10    ___  ___   _____

11    ___  ___   _____

12    ___  ___   _____

13    ___  ___   _____

14    ___  ___   _____

15    ___  ___   _____

16    ___  ___   _____

17    ___  ___   _____

18    ___  ___   _____

19    ___  ___   _____

20    ___  ___   _____

21    ___  ___   _____

22    ___  ___   _____

23    ___  ___   _____

24    ___  ___   _____

25    ___  ___   _____

26