# Tab D

Daniel Kane
May 3, 2019

1              UNITED STATES DISTRICT COURT

2        IN THE WESTERN DISTRICT OF MASSACHUSETTS

3                   SPRINGFIELD, MA

4          CIVIL ACTION NO.:  3:17-CV-30174-MAP

5

6     *******************************************

7     THOMAS FORBES, as he is the Personal      *

8     Representative of the Estate of GEORGE    *

9     J. FORBES,                                *

10         PLAINTIFF                            *

11    v.                                        *

12    GREGORY TRUCKING COMPANY, INC.; WILEY     *

13    LENUE HOOKS, JR.; GREGORY LEASING         *

14    COMPANY, INC.; BSG LEASING, INC.; B&C     *

15    TIMBERS LLC.; and BB & S ACQUISITION      *

16    CORP.,                                    *

17         DEFENDANTS                           *

18    *******************************************

19

20    30(b)(6) DEPOSITION OF:  BB & S ACQUISITION

21            CORPORATION BY DANIEL KANE

22              CATUOGNO COURT REPORTING

23          155 South Main Street, Suite 201

24               Providence, Rhode Island

**Daniel Kane**
**May 3, 2019**

Page 2

1              May 3, 2019      10:00 a.m.

2

3                    Pauline L. Bailey

4                  Professional Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Daniel Kane**
**May 3, 2019**

```
 1   APPEARANCES:

 2        Representing the Plaintiffs:

 3        DINO M. TANGREDI, ATTORNEY AT LAW

 4        The Miles Pratt House

 5        106 Mount Auburn Street

 6        South Easton, MA   02375

 7        BY:  DINO M. TANGREDI, ESQ.

 8        (617) 926-0012

 9

10   Representing the Defendants:

11        LAW OFFICE OF STEVEN STEIN

12        P.O. Box 2903

13        Hartford, CT   06104-2903

14        BY:   THOMAS SCHULER, ESQ.

15        (413) 736-6366

16

17        DOHERTY WALLACE, PILLSBURY AND MURPHY, P.C.

18        One Monarch Place, Suite 1900

19        Springfield, MA   01144

20        BY:  L. JEFFREY MEEHAN, ESQ.

21        (413) 733-3111    FAX:  (413) 734-3910

22

23

24
```

**Daniel Kane**
**May 3, 2019**

1    Representing the Defendants:

2         MORRISON MAHONEY, LLP

3         250 Summer Street

4         Boston, MA  02210

5         BY:  MATTHEW R. O'CONNOR, ESQ.

6         (617) 737-8820    FAX:  (617) 342-4904

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Daniel Kane**
**May 3, 2019**

Page 5

1                          INDEX

2     WITNESS:                              DANIEL KANE

3                                       DIRECT   CROSS

4     By Mr. Tangredi                        8

5     By Mr. Meehan                                 152

6     By Mr. Schuler                                155

7     By Mr. O'Connor                              (None)

8

9

10    EXHIBITS                                  PAGE:

11    Exhibit 1, Deposition Subpoena..................8

12    Exhibit 2, Letter of March 21, 2019.............8

13    Exhibit 3, BB & S Website Printout.............18

14    Exhibit 4, E-mail with Court's Ruling..........26

15    Exhibit 5, Definitions.........................35

16    Exhibit 6, Response to Request for Production

17             Of Documents........................105

18    Exhibit 7, Invoice............................105

19    Exhibit 8, Answers to Interrogatories.........118

20    Exhibit 9, Responses to Second Request for

21             Production of Documents............120

22

23

24

Daniel Kane
May 3, 2019

1          THE VIDEOGRAPHER:  We are now back on

2     the record at 12:03 p.m.

3          MR. TANGREDI:  This is a separate

4     deposition.  Do we want to do a --

5          THE VIDEOGRAPHER:  Oh, yeah.

6          MR. TANGREDI:  -- an intro and start

7     a fresh?

8          THE VIDEOGRAPHER:  Okay.  Sorry.  For

9     this right now?  Okay.  Sure.  One moment.

10    So, with the read on again, the same read

11    on?

12         MR. TANGREDI:  Please.

13         THE VIDEOGRAPHER:  Okay.  Nothing

14    different about that, okay.  Wonderful.

15    Thank you.

16         We are now recording and on the

17    record.  My name is Dan Lohaus and I am a

18    certified legal video specialist for

19    Catuogno Court Reporting.  Today is May 3,

20    2019, and the time is 12:04 p.m.

21         This is the deposition of Daniel

22    Kane, a representative of BB & S

23    Acquisitions in the matter of Thomas Forbes,

24    et al, verse Gregory Trucking Company, Inc.,

**Daniel Kane**
**May 3, 2019**

 1              et al, in the United States District Court

 2              in the Western District of Massachusetts,

 3              case number 317-CV30174-MAP.

 4                   This deposition is being taken at

 5              Catuogno Court Reporting, located at 155

 6              South Main Street in Providence, Rhode

 7              Island on behalf of the plaintiff.

 8                   The court reporter is Pauline Bailey

 9              of Catuogno Court Reporting.

10                   Counsel will state their appearances

11              and the court reporter will administer the

12              oath.

13                   MR. TANGREDI:  Attorney Dino Tangredi

14              for the plaintiff.

15                   MR. SCHULER:  Thomas Schuler for BB &

16              S Acquisitions Corporation.

17                   MR. MEEHAN:  Jeffrey Meehan for B & C

18              Timbers.

19                   MR. O'CONNOR:  Matt O'Connor for

20              Gregory Trucking Company; Gregory Leasing

21              Company; BSG Leasing; and Wiley Lenue Hooks,

22              Junior.

23

24

**Daniel Kane**
**May 3, 2019**

```
 1              DANIEL KANE, WITNESS, after having
 2    first been properly identified and duly sworn,
 3    deposes and states as follows:
 4
 5        DIRECT EXAMINATION BY MR. TANGREDI:
 6
 7            MR. TANGREDI:  All right.  Let's mark
 8        a document, please.  Yes, please.  And the
 9        next document.
10            MR. MEEHAN:  What number is this
11        going to be?
12            MR. TANGREDI:  One.
13            MR. MEEHAN:  Okay.
14            MR. O'CONNOR:  Thank you.
15
16        (Exhibit 1, Deposition Subpoena, marked)
17
18        (Exhibit 2, Letter of March 21, 2019,
19    marked)
20
21        Q.    (By Mr. Tangredi)  Mr. Kane, my name
22    is Dino Tangredi.  I represent the plaintiff in
23    this case.  I want to go over a couple of ground
24    rules for the deposition to make our lives a little
```

**Daniel Kane**
**May 3, 2019**

1    easier and to make the woman's life easier who's

2    writing down everything that we're saying.

3                Have you ever given a deposition

4    prior to today?

5        A.    No, sir.

6        Q.    Okay.  So, there are some things that

7    make it go a little easier.  I ask that all of your

8    responses be verbal to help the stenographer record

9    it.

10       A.    Understood.

11       Q.    Thank you.  She's really good at what

12   she does, but if we're talking over each other, she

13   can't copy down what two people are saying at the

14   same time.  So, I'm going to work really hard to

15   make sure I let you fully answer before I ask you

16   the next question.

17       A.    Understood.

18       Q.    And I'd point out, I'd ask you to do

19   the same thing.  Okay?

20       A.    Yes, sir.

21       Q.    If you don't understand one of my

22   questions, that's probably my fault.  Please let me

23   know.  Okay?

24       A.    Yes, sir.

Daniel Kane
May 3, 2019

1      Q.    But if you do respond and you answer

2    a question, I'm going to presume you understood it;

3    is that fair?

4      A.    Yes, sir.

5      Q.    All right.  I don't want this to be

6    difficult for you in any way.  If you need to take

7    a timeout, take a break, you need to use the men's

8    room, you need to stretch, you've got a bad back,

9    something, just ask for a timeout.  We can do it.

10   With one exception, if I'm -- have a question

11   pending, I'd like to finish the question and the

12   answer.  Okay?

13     A.    Understood.

14     Q.    All right.  Unlike a typical

15   conversation your answers today are under oath.

16   Your answers here are just like in a court of law.

17   And under U.S. Code, Section 1621, anyone who has

18   taken an oath in any case who willfully states any

19   matter which he does not believe be true is guilty

20   of perjury and subject to the penalties which

21   include fines and/or imprisonment for up to five

22   years.

23          Do you understand that?

24     A.    Yes, sir.

**Daniel Kane**
**May 3, 2019**

 1          Q.    Good.  And according to 18 U.S. Code,

 2     1501, any corrupt interference with the orderly

 3     administration of law and justice, especially by

 4     influencing or furnishing false information is

 5     punishable by imprisonment.

 6                Do you understand that?

 7          A.    Yes, sir.

 8          Q.    Great.  You have some documents in

 9     front of you, Exhibits Number 1 and 2.

10          A.    I do.

11          Q.    Could you look at Exhibit Number 1

12     for me, and have you seen that exhibit before?

13          A.    Yes, sir.

14          Q.    Okay.  And have -- there are 25

15     enumerated topics I believe.  Let me just double

16     check.  29 enumerated topics.  Have you been

17     through each and every one of those topics?

18          A.    Yes, sir.

19          Q.    Okay.  And are you somebody who has

20     information to answer all of those inquiries?

21          A.    Yes, sir.

22          Q.    Okay.  And for the record, some have

23     been deemed by a judicial officer as questions we

24     -- I'm -- areas I'm not allowed to get into.  And

**Daniel Kane**
**May 3, 2019**

1    I'm going to try to respect both the spirit and the

2    intent of those directions.

3         A.    Understood.

4         Q.    What did you do to prepare for

5    today's deposition?

6         A.    Review all of the documents from the

7    initial timeframe that they were given to us and

8    just chronologically go through what we were

9    provided for -- or that was requested and provided

10   for the deposition.  And then, again, just to

11   understand the -- the questions that can be asked

12   and the questions that couldn't be asked.

13        Q.    Okay.  Did you look at -- could you

14   tell me what documents you actually saw in

15   preparation for today, in broad categories.

16        A.    Predominantly these documents that

17   you've provided.

18        Q.    Okay.  Have you seen the actual

19   Complaint in the lawsuit?

20        A.    Yes, I have.  I have not reviewed it

21   recently.

22        Q.    Have you seen the Answer to the

23   Complaint?

24        A.    No, I have not.

**Daniel Kane**
**May 3, 2019**

1       Q.    Okay.  Have you seen, are you

2   familiar with documents called interrogatories?

3       A.    I am as much as the -- the intent of

4   the deposition and the information that was given.

5             MR. SCHULER:  I think he's asking

6         about the written questions he sent earlier.

7             THE WITNESS:  Okay.

8             MR. SCHULER:  That's what

9         interrogatories are, that you answered.

10      Q.    (By Mr. Tangredi)  There's a great

11   example of if you don't know a word I used, let's

12   not just gloss over it.

13      A.    Okay.

14      Q.    Because sometimes they're important.

15   Interrogatories are official questions, written

16   questions that I send to BB & S, and BB & S answers

17   in writing, and provides back to me.  BB & S gets

18   to ask my client questions.  And my client answers

19   and gives them back to BB & S.  Have you seen the

20   interrogatories between BB & S and my client?

21      A.    No, sir.

22      Q.    Okay.  Earlier we went over a bunch

23   of documents.  In the course of this lawsuit I have

24   asked BB & S to provide me with certain documents.

**Daniel Kane**
**May 3, 2019**

1    Have you gone over all of the documents that were

2    provided to me by BB & S before today?

3          A.    Yes, sir.

4          Q.    Thank you.  Have you reviewed the

5    documents that I have sent to -- in response to BB

6    & S's inquiries for documents?

7          A.    Yes, sir.

8          Q.    Okay.  You've seen witness statements

9    of the crash?

10         A.    Yes, sir.

11         Q.    Okay.  Police reports?

12         A.    No, sir.

13         Q.    Okay.  Medical records?

14         A.    No, sir.  I've seen -- let me -- I've

15   just seen, it was based on an e-mail based on

16   information that was -- I don't know how to

17   describe it.  It was an update if you will.

18         Q.    Okay.  Who was it from or to, this

19   update?

20         A.    It was directed toward me, and it was

21   from Attorney Schuler's office.

22         Q.    Okay.  So --

23               MR. SCHULER:  To the extent that

24         there's anything contained in that

**Daniel Kane**
**May 3, 2019**

1        information I'm going to instruct you not to

2        talk about the substance of that -- of that

3        information.  But certainly entitled tell

4        him that you received it.

5        Q.    **(By Mr. Tangredi)  It's improper for**

6  **me or any lawyer to ask what you discussed with**

7  **your lawyer, for the most part.  Okay.  So, you --**

8  **you read some kind of document provided by your**

9  **lawyer.  Did you meet with anybody at BB & S to**

10  **prepare for this today?**

11       A.    Yes.

12       Q.    **Okay.**

13       A.    Attorney Schuler.

14       Q.    **All right.  At BB & S anybody who**

15  **works as an employee of BB & S?**

16       A.    No, sir.

17       Q.    **Okay.  All right.  Did you need to go**

18  **to any outside sources at BB & S to get information**

19  **to answer the questions I'm going to be asking you**

20  **here today?**

21       A.    Could you define outside sources.

22       Q.    **Yeah.  Sure.  Anybody within BB & S**

23  **that might have information that you wouldn't**

24  **normally have that I may be asking you today.**

**Daniel Kane**
**May 3, 2019**

Page 16

1      A.     Yes, sir.

2      Q.     **Okay.  Who -- who is that?**

3      A.     Paul Schultes.

4      Q.     **And who's Paul?**

5      A.     He's the controller.

6      Q.     **Okay.  And what does he do?**

7      A.     He basically handles the financial

8   end of it, but however, the insurances, human

9   resources, those aspects of the company he also

10  handles.

11     Q.     **Okay.  All right.  The first line of**

12  **questions is a little bit about what BB & S does.**

13  **Could you tell me what they do.**

14     A.     We actually treat lumber.  We put a

15  chemical into it that allows it to be used in an

16  exterior application with longevity.  The chemical

17  composition is made up primarily of copper and

18  mildewcides and fungicides.  We have a plant in

19  which we actually store the chemical.  We have

20  three autoclaves which actually we put the wood in,

21  and under pressure we treat it.  So, it goes from a

22  normal white state, that you would see any type of

23  wood for sale, to the green state that you see for

24  outdoor use.  We actually manufacture that.  We do

Daniel Kane
May 3, 2019

1    not manufacture lumber, but we put the chemical

2    into the wood to make it for use in an exterior

3    application.

4         Q.    Do you buy your lumber in its raw

5    form and then treat it?

6         A.    Yes, sir.

7         Q.    What do you do after you treat it?

8         A.    In raw form, where I'm still saying

9    it's a two by four.  It's a piece of lumber that

10   can be used.  What do we actually do to treat it?

11        Q.    No, that's probably more than I need

12   to know.  After you treat it, what do you do with

13   it, the lumber?

14        A.    The lumber?  Store it and sell it.

15        Q.    Okay.  Where do you store it?

16        A.    In our facility.

17        Q.    On your property?

18        A.    Correct.

19        Q.    Okay.  What town, do you have one

20   location?

21        A.    Yes, we do.  North Kingstown, Rhode

22   Island.

23        Q.    Is that also called Davisville?

24        A.    I would say an old name for it is

**Daniel Kane**
**May 3, 2019**

Page 18

1  Davisville.  However, it's technically North

2  Kingstown.

3  　　　　Q.　　Okay.  So, if I saw Davisville and

4  **North Kingstown it's really the same place?**

5  　　　　A.　　To certain people, yes.

6  　　　　Q.　　**Okay.**

7  　　　　A.　　Not to your GPS.

8  　　　　　　MR. TANGREDI:  All right.  So, let's

9  　　　　look at -- let's mark the next exhibit.

10  　　　　　　MR. MEEHAN:  Thank you.

11  　　　　　　MR. O'CONNOR:  Is this three?

12  　　　　　　MR. TANGREDI:  Three.

13

14  　　　　(Exhibit 3, BB & S Website Printout, marked)

15

16  　　　　Q.　　**(By Mr. Tangredi)  Mr. Kane, please**

17  **take a look at what's been marked as Exhibit Number**

18  **3, and let me know when you're done.  I'd ask that**

19  **you look at it in its entirety.**

20  　　　　A.　　(Witness viewing document.)

21  　　　　Q.　　**Did you have a chance to look at**

22  **Exhibit 3?**

23  　　　　A.　　Yes, sir.

24  　　　　Q.　　**Do you recognize it?**

Daniel Kane
May 3, 2019

Page 19

1   A. Yes, I do.

2   Q. What is it?

3   A. It is BB & S's website.

4   Q. And does it appear to be complete and

5 accurate as far as you know?

6   A. Yes, sir.

7   Q. Okay.  Have you seen the BB & S

8 website prior to today?

9   A. Yes, sir.

10   Q. And is this an accurate reflection of

11 what's on the BB & S website?

12   A. Yes, sir.

13   Q. And do you know how old this website

14 is, approximately?

15   A. Approximately, I think six years.

16   Q. Okay.  So, this would have been the

17 website that would have existed for BB & S in

18 August of 2016?

19   A. That is correct.

20   Q. Okay.  Thank you.  Is BB & S a

21 corporation?

22   A. Yes, sir.

23   Q. Is it a for-profit corporation?

24   A. Yes, sir.

**Daniel Kane**
**May 3, 2019**

1     Q.    Does it have a Board of Directors?

2     A.    No, sir.

3     Q.    Do you know if it has annual

4 meetings?

5     A.    Yes.

6     Q.    Do you know when the last one was?

7     A.    I do not.  I believe it was in

8 November.  I do not know the exact date.

9     Q.    Do you attend the annual meetings?

10    A.    No, sir.

11    Q.    Okay.  Does BB & S keep track of its

12 -- of its gross yearly income?

13    A.    Yes, sir.

14    Q.    Do you know what that figure is for

15 2016?

16    A.    I've got an approximate.  And that

17 would probably be $78,000,000.00.

18    Q.    Does BB & S keep track of its yearly

19 expenses?

20    A.    Yes, sir.

21    Q.    What were they in 2016?

22    A.    Approximately again 77,000 --

23 77,500,000.

24    Q.    Does BB & S have a yearly budget?

**Daniel Kane**
**May 3, 2019**

Page 21

1      A.    Yes, sir.

2      Q.    **Would you know the specific figures**

3   **for each item in the budget for 2016?**

4      A.    Not off the top of my head.

5      Q.    **Okay.  Does BB & S keep track of its**

6   **yearly shipping costs?**

7      A.    Yes, sir.

8      Q.    **Do you know what they were for 2016?**

9      A.    Not off the top of my head.

10     Q.    **Who would know?**

11     A.    Myself, I can find it within our --

12  our records.  And/or our -- our controller, Paul

13  Schultes.

14     Q.    **And does BB & S keep track of its**

15  **yearly profits?**

16     A.    Yes, sir.

17     Q.    **Do you know what that figure is for**

18  **2016?**

19     A.    Again, off the top of my head I

20  believe it was $1.5 million.

21     Q.    **How hard would it be to get the**

22  **figure for the annual yearly shipping costs for**

23  **2016?**

24     A.    Not difficult.

**Daniel Kane**
**May 3, 2019**

1        Q.    Okay.   Was BB & S aware in 2014 that

2   3,908 people were killed by large trucks in the

3   United States?

4             MR. SCHULER:   Objection.

5        A.    No, sir.

6        Q.    (By Mr. Tangredi)   Was BB & S aware

7   in 2015 that 4,094 people were killed by large

8   trucks --

9             MR. SCHULER:   Objection.

10       Q.    -- in the United States?

11       A.    No, sir.

12       Q.    (By Mr. Tangredi)   And was BB & S

13   aware in 2016 that 4,317 people were killed by

14   large trucks in the United States?

15            MR. SCHULER:   Objection.

16       A.    No, sir.

17       Q.    (By Mr. Tangredi)   Does -- does BB &

18   S know that these statistics are readily available

19   on-line for free on the Internet?

20            MR. SCHULER:   Objection.

21       A.    No, sir.

22       Q.    (By Mr. Tangredi)   Does BB & S know

23   what the National Highway Traffic Safety

24   Administration is?

Daniel Kane
May 3, 2019

Page 23

1          A.    No, sir.

2          Q.    Okay.   Does BB & S recognize what the

3    American Transportation Research Institute is?

4          A.    Yes, sir.

5          Q.    What is it?

6          A.    An institute that looks at every

7    aspect of traffic.

8          Q.    And how does BB & S integrate or use

9    information from the American Transportation

10   Research --

11         A.    We do not.

12         Q.    Okay.   Is BB & S aware of any reason

13   why the American Transportation Research Institute

14   may not be reliable?

15              MR. SCHULER:   Objection.

16         A.    No, sir.

17         Q.    (By Mr. Tangredi)   Is BB & S aware

18   that according to the American Transportation

19   Research Institute crash predictor model a driver

20   with a reckless driving violation on his driving

21   record is 65 percent more likely to be involved in

22   a future crash?

23              MR. SCHULER:   Objection.

24         A.    No, sir.

**Daniel Kane**
**May 3, 2019**

Page 24

1        Q.    (By Mr. Tangredi)   Does BB & S hire

2  motor carriers to ship its lumber?

3        A.    Yes, sir.

4        Q.    Does BB & S rely on truck companies

5  to deliver their lumber?

6        A.    Yes, sir.

7        Q.    Is BB & S familiar with the Federal

8  Motor Carrier Safety Administration?

9        A.    Yes, sir.

10        MR. SCHULER:  Objection.

11        Q.    (By Mr. Tangredi)   What is it?

12        A.    It's the federal government's arm

13  that oversees federal motor carriers, any type of

14  trucking inter and intrastate trucking.

15        Q.    Does BB & S know the primary mission

16  of the Federal Motor Carrier Safety Administration?

17        MR. SCHULER:  At this point I'm going

18      to object and instruct the witness not to

19      answer.  I'm going to refer to, and I'm

20      going to ask that we mark the -- the Court's

21      ruling dated April 16, 2019 as an exhibit,

22      which I think would be number four.  And the

23      basis for my instruction is if you look at

24      the Court's ruling, one of the issues was

**Daniel Kane**
**May 3, 2019**

1        the topics which were listed, number four,

2        number five, number six, number seven, and

3        number eight which relate to the existence,

4        the meaning, the purpose, and the

5        foreseeable consequences for dealing with

6        the federal, state, company and industry

7        rules, manuals, handbooks, policies,

8        procedures, laws, and regulations applicable

9        to the incident.  And the Court has ruled

10       with respect to those four topics which I

11       think is where we're -- where these

12       questions are heading, and where this

13       question directly relates to, the Court has

14       closed all inquiry with respect to that

15       topic for this deposition.

16             MR. TANGREDI:  I would simply respond

17       with acknowledging that that's an accurate

18       decision by the Court.  I am relying on 20,

19       Schedule A, 21H which indicates I'd be

20       inquiring about policies and procedures to

21       comply with the FMCSA's regs regarding

22       selecting a motor carrier.  I'm relying on

23       Schedule A, 21Q, which says the process

24       available to BB & S to check the safety

**Daniel Kane**
**May 3, 2019**

1     rating of any transportation company or

2     trucking company used to ship its product;

3     and Schedule A, 21V, the policies in place

4     to check the safety rating of transportation

5     companies and/or trucking companies that BB

6     & S uses or used since 2014, and the

7     requirements and criteria it uses or used

8     since 2014 to choose a transportation

9     company and/or trucking company.

10          MR. SCHULER:  Well, I think the Court

11    has -- has suggested that you are entitled

12    to ask questions with respect to 21H, which

13    would be limited to BB & S's policies and

14    procedures regarding the selection of motor

15    carriers to carry its products.  And 21 --

16    and 23B, which permits testimony regarding

17    the training and policies regarding BB & S

18    choosing a motor carrier to transport its

19    products.  To the extent that those

20    questions conform with 21H and 23B as

21    directed by the Court, I'll permit Mr. Kane

22    to answer.

23

24          (Exhibit 4, E-mail with Court's Ruling,

**Daniel Kane**
**May 3, 2019**

1    marked)

2

3              MR. TANGREDI:  If -- if we're going

4         to have a difference of opinion on -- on

5         many questions, what is your suggestion how

6         -- on how we proceed with the ones that you

7         feel are prohibited versus my different

8         interpretation?

9              MR. SCHULER:  Well, unfortunately

10        it's kind of hard for me to know exactly

11        where you're heading.  It seems that we need

12        to sort of see where these questions are

13        going and I'll sort of let you know kind of

14        what my thoughts are.  I don't know how

15        other -- how -- any other real way to

16        proceed to be honest with you.  It may be

17        cumbersome, but I think what...

18              MR. TANGREDI:  Do we want to allow

19        him to answer subject to an objection and a

20        ruling later as to whether or not it fits in

21        one of the clear-cut distinctions, which I

22        think we talked earlier were not clear?

23              MR. SCHULER:  Well, as a practical

24        matter I think that your suggestion is

**Daniel Kane**
**May 3, 2019**

Page 28

1        probably well taken, that perhaps you should

2        be, if you ask these questions with the

3        understanding that they're certainly

4        objected to.  And I think I made it pretty

5        clear what my position is.

6                MR. TANGREDI:  Very good.  And I am

7        going to try to limit -- I am going to limit

8        them to outside motor carriers.  And I'm not

9        going to direct any specific questions about

10       the motor carrier, the fleet at BB & S.  I'm

11       going to try my best to do that.

12       **Q.    (By Mr. Tangredi)  So, do you agree**

13   **that the Federal Motor Carrier Safety**

14   **Administration provides safety ratings for motor**

15   **carriers?**

16       A.    Yes.

17       **Q.    Do you agree that the Federal Motor**

18   **Carrier Safety Administration publishes these**

19   **safety ratings for free on its website?**

20                MR. SCHULER:  Objection.

21       A.    Yes.

22       **Q.    (By Mr. Tangredi)  Do you agree the**

23   **FMCSA is the sole determinant of the motor**

24   **carriers' safety ratings?**

**Daniel Kane**
**May 3, 2019**

1          MR. SCHULER:  Objection.

2     A.    Yes.

3     Q.    (By Mr. Tangredi)  Is BB & S familiar

4  with the Federal Motor Carrier Safety

5  Administration's motor carrier safety rating

6  system?

7     A.    Yes.

8     Q.    Okay.  Is BB & S familiar with the

9  FMCSA's CSA, that is the Compliance Safety

10  Accountability initiative?

11     A.    Yes.

12     Q.    What is it?

13     A.    It's a yearly timeframe in which the

14  federal government gets together with also state

15  DOTs and they do what is, I believe it's considered

16  a random check on large trucks.  Usually the first

17  week of June, and they go through and -- across the

18  country, the entire country, and they review the

19  trucks, the drivers, and their records.

20     Q.    And do you know where these

21  inspections are done?

22     A.    No, sir.

23     Q.    Okay.  Has BB & S used QC Mobile

24  Quick App to look into the safety rating of a motor

**Daniel Kane**
**May 3, 2019**

Page 30

1    carrier?

2         A.    No, sir.

3         Q.    **Does BB & S know what QC Mobile Quick**

4    **App is?**

5         A.    No, sir.

6         Q.    **Okay.  Does BB & S use the SAFER**

7    **System, that is the Safety and Fitness Electronic**

8    **Records?**

9         A.    Yes, sir.

10        Q.    **What does BB & S do with the SAFER**

11   **System?**

12        A.    We check our own DOT number to make

13   sure that the instances that are recorded there are

14   correct.  And that the -- after the timeframe that

15   if an infraction is on there, it falls off.  Double

16   checking the government.

17        Q.    **They need that.  Does it use the**

18   **SAFER System for any motor carriers it hires?**

19        A.    We are not required to.

20        Q.    **What makes you say that?**

21        A.    There's no mandate in the FMCSA

22   regulations anywhere that says that a -- anyone

23   needs to address a SAFER System at any point in

24   time.

**Daniel Kane**
**May 3, 2019**

1       Q.    Would there be an industry practice?

2       A.    Not that I'm aware of.

3       Q.    Is BB & S aware of the Safety

4 Management System?

5       A.    Under the FMCSA?

6       Q.    Yes.

7       A.    Yes, sir.

8       Q.    What is it?

9       A.    It is an -- loosely that I understand

10 it, it's an opportunity, how you're regulated,

11 either satisfactory, conditional, or unconditional.

12 And then have the ability for a carrier to move

13 within those, hopefully up.  If it's unconditional

14 you're put out of service I'm under the

15 understanding.  If it's satisfactory you can run,

16 and if it's even conditional you can run as a motor

17 carrier.

18       Q.    And do you know how the, excuse me,

19 the FMCSA's Safety Management System makes those

20 determinations on whether or not a motor carrier is

21 unsatisfactory, conditional, or satisfactory?

22           MR. SCHULER:  Objection.

23       A.    I have a vague understanding that

24 it's a condition of the indications or infractions

**Daniel Kane**
**May 3, 2019**

1      that are listed on their website.

2          Q.   (By Mr. Tangredi)  Does BB & S use

3      the Behavioral Analysis and Safety Improvement

4      Category rating system or the BASICS system?

5          A.   No, sir.

6          Q.   Is BB & S familiar with the BASICS

7      system?

8          A.   No, sir.

9          Q.   Okay.  So, is it fair to say that BB

10     & S is familiar with the SAFER System and the SMS

11     System?

12         A.   The SMS System?

13         Q.   The Safety Management System.

14         A.   Yes, sir.

15         Q.   Okay.  Was BB & S using both the

16     SAFER System and the SMS System back in 2016?

17         A.   Off the top of my head only the SAFER

18     System in 2016.

19         Q.   Okay.  And how would BB & S have

20     accessed the SAFER System in 2016?

21         A.   Via the FMCSA website, along with our

22     DOT number, in order to double check our status.

23         Q.   And would BB & S use it to check the

24     status of other motor carriers?

**Daniel Kane**
**May 3, 2019**

Page 33

```
 1        A.    No, sir.

 2        Q.    Why not?

 3        A.    We're not regulated to do so.

 4        Q.    What do you mean?

 5        A.    There's no direct rule, stipulation,

 6   paragraph, anything that says anybody has to.

 7        Q.    Okay.  You're not required to do it?

 8        A.    Correct.

 9        Q.    When you use the word regulated,

10   we're talking about the FMCSA's --

11        A.    Understood.

12        Q.    So, I get it.  Sure.  Does BB & S

13   have any reason to believe the FMCSA's safety

14   rating system for motor carriers is not accurate?

15              MR. SCHULER:  Objection.

16        A.    No, sir.

17        Q.    (By Mr. Tangredi)  Does BB & F (sic)

18   have any reason to believe the FMCS -- FMSCA's

19   safety rating system for motor carriers is not

20   accurate or reliable?

21              MR. SCHULER:  Objection.

22        A.    No, sir.

23        Q.    (By Mr. Tangredi)  Does BB & S have

24   any reason to believe the FMSCA's safety rating
```

**Daniel Kane**
**May 3, 2019**

Page 34

1    system, specifically the SAFER record website is

2    not accurate or reliable?

3              MR. SCHULER:  Objection.

4         A.   No, sir.

5         Q.   (By Mr. Tangredi)  I think you said

6    you go on it to check your own --

7         A.   Correct.

8         Q.   -- situation.

9         A.   Correct.

10        Q.   For BB & S.  And is it fair to say BB

11   & S has found it to be accurate and reliable as far

12   as its rating --

13             MR. SCHULER:  Objection.

14        Q.   -- for BB & S?

15        A.   Yes, sir.

16        Q.   (By Mr. Tangredi)  You mentioned the

17   three ratings that a motor carrier can get,

18   satisfactory, conditional, and unsatisfactory.  Do

19   you know what the definitions of any of them are?

20             MR. SCHULER:  Objection.

21             MR. O'CONNOR:  Objection.

22        A.   No, sir.

23        Q.   (By Mr. Tangredi)  Do you know if the

24   FMCSA provides companies rated as conditional with

Daniel Kane
May 3, 2019

Page 35

1    advice and materials to improve operations and

2    eliminate known problems and -- and obtain an

3    improved rating of satisfactory?

4        A.   Yes, sir.

5

6        (Exhibit 5, Definitions, marked)

7

8        Q.   (By Mr. Tangredi)  Mr. Kane, I'm

9    going to ask you to look at what's been marked as

10   Exhibit Number 5.  And I'll represent it's 34 pages

11   double-sided.  And it comes from 49 CFR, Section

12   390.5, definitions of certain terms we may be

13   using.  It goes alphabetical, and I'd ask you to

14   look, go to page 15 and look at the word shipper.

15   And I'd ask you to just read that out loud for us.

16       A.   (As read:)  Shipper means a person

17   who tenders property to a motor carrier or driver

18   of a commercial motor vehicle for transportation in

19   interstate commerce or who tenders hazardous

20   materials to a motor carrier or driver of a

21   commercial motor vehicle for transportation in

22   interstate or intrastate commerce.

23       Q.   Is BB & S a shipper according to what

24   you just read?

**Daniel Kane**
**May 3, 2019**

1        MR. SCHULER:  Objection.

2      A.    Yes.

3      Q.    **(By Mr. Tangredi)  Was it a shipper**

4    **in 2016?**

5        MR. SCHULER:  Objection.

6      A.    Yes.

7      Q.    **(By Mr. Tangredi)  What products does**

8    **BB & S ship?**

9      A.    Pressure treated lumber, composite

10   decking, and vinyl fence.

11     Q.    **And where does it ship them to?**

12     A.    Our customers.

13     Q.    **Continental United States?**

14     A.    Six states of New England.

15     Q.    **Limited to just the six states?**

16     A.    Occasionally New York.

17     Q.    **Okay.  And I think we've acknowledged**

18   **that BB & S hires motor carriers to deliver its**

19   **product?**

20     A.    Yes, sir.

21     Q.    **Are there certain circumstances in**

22   **which they hire motor carriers to deliver their**

23   **product?**

24        MR. SCHULER:  Objection.

**Daniel Kane**
**May 3, 2019**

1       A.      Could you define circumstance --

2       Q.      **Sure.**

3       A.      -- certain circumstances.

4       Q.      **(By Mr. Tangredi)   How is it**

5    **determined when a motor carrier is hired to deliver**

6    **your product?**

7               MR. SCHULER:   Objection.

8       A.      Traditionally it's volume.   The --

9    it's -- our product is a seasonal product.   And

10   during this time of the year in particular, April

11   May, June, we get very busy and we hire motor

12   carriers to haul our product.

13      Q.      **(By Mr. Tangredi)   How do you get**

14   **these motor carriers to haul your product?**

15      A.      Currently there's a long-standing

16   group of carriers that handle our outside business.

17   They were -- I've been with the company eight

18   years.   Most of them have been with the company

19   that long -- were prior to my joining the company.

20      Q.      **Do you know how many there are?**

21      A.      It fluctuates between six and 10.

22      Q.      **Can you name them.**

23      A.      I can name probably five of them.

24      Q.      **Go ahead.**

**Daniel Kane**
**May 3, 2019**

Page 38

1        A.      That would be Amy's Trucking; Family

2    Trucking; Bettencourt Trucking; Traveras, I don't

3    know his last name, Trucking; and we use Yankee

4    Pride Trucking.

5        Q.      So, I want to give you a new helpful

6    hint for this deposition.  You may remember

7    something that we talked about 20 questions ago,

8    and you go, oh, I was wrong, or I misspoke, or I

9    want to change, or I want add to it.  Feel free, at

10   any time to say hey, can I go back to a question --

11       A.      Understood.

12       Q.      -- I just thought of an answer.  So,

13   I know you said you may have six or eight outside

14   motor carriers.  You might think of their names.

15   If you do, please let us know.  Okay?

16       A.      Uh-huh.

17       Q.      Could you let us -- go through those

18   motor carriers and tell me where they're from, if

19   you know.

20       A.      Yes.  Bettencourt Trucking is out of

21   Stoughton, Massachusetts.  Amy's Trucking is out of

22   Pawtucket, I believe, Rhode Island.  I believe also

23   Family Trucking I know is out of Cranston, Rhode

24   Island.  And Traveras is out of Pawtucket also, I

Daniel Kane
May 3, 2019

Page 39

1    believe.  Yankee Pride is based in Damariscotta,

2    Maine.

3         Q.    Do all these motor carriers use their

4    own tractors and trailers when delivering BB & S

5    products?

6         A.    Yes.

7         Q.    Do you know the safety rating of the

8    outside motor carriers that BB & S uses?

9         A.    I'm not required to.

10        Q.    But do you know what they are?

11        A.    No, I do not.

12        Q.    Okay.  Do you know if BB & S uses any

13   motor carriers with a conditional rating?

14        A.    I do not.

15        Q.    Does BB & S only hire motor carriers

16   with a satisfactory rating?

17        A.    No, sir.

18        Q.    So, are you aware that there could be

19   motor carriers that BB & S is hiring that are rated

20   conditional?

21        A.    Could you repeat the question.

22        Q.    Sure.  I asked you if does BB & S

23   only hire motor carriers with a satisfactory

24   rating.  And I believe you said no; is that

**Daniel Kane**
**May 3, 2019**

Page 40

1    correct?

2         A.    Correct.

3         Q.    It's impossible to hire a carrier

4    with an unsatisfactory rating, correct?

5         A.    Correct.

6         Q.    Because they can't operate?

7         A.    Correct.

8         Q.    So, has BB & S hired motor carriers

9    they know have a conditional rating?

10        A.    And I -- my answer is I -- I don't

11   know.  Whereas I'm not required to find that

12   information, so I -- I am not aware.

13        Q.    So, how do you know that everybody

14   doesn't have a satisfactory rating?

15             MR. SCHULER:  Objection.

16        A.    I don't know that.

17        Q.    (By Mr. Tangredi)  All right.  So,

18   when I asked you if BB & S only hires motor

19   carriers with a satisfactory rating, you don't know

20   the answer to that?

21        A.    Correct.

22        Q.    Okay.  Back in August of 2016 --

23   strike that.  Has BB & S ever rejected a motor

24   carrier to work for them for any reason?

**Daniel Kane**
**May 3, 2019**

Page 41

1        A.    No, sir.

2        Q.    Would there be any reasons that BB &

3    S would reject a motor carrier who wanted to haul

4    their product?

5                MR. O'CONNOR:   Objection.

6                MR. SCHULER:   Objection.

7        A.    Yes, sir.

8        Q.    (By Mr. Tangredi)   What?

9        A.    Any flagrant violation that we could

10   see on the truck.

11       Q.    Okay.   As an example?

12       A.    If they came in with bald tires.

13       Q.    Okay.   Any other flagrant types of

14   things?

15       A.    That's the one that comes to mind.

16   It's the easiest one to spot.

17       Q.    Back in 2016 was BB & S aware that

18   there are unlicensed motor carriers operating in

19   interstate transportation?

20                MR. SCHULER:   Objection.

21       A.    No, sir.

22       Q.    (By Tangredi)   Back in 2016 was BB &

23   S aware that unregistered motor carriers were

24   operating in interstate transportation?

**Daniel Kane**
**May 3, 2019**

Page 42

1          MR. SCHULER:  Objection.

2      Q.   (By Mr. Tangredi)  Back in 2016 was

3  BB & S aware that unsafe motor carriers were

4  operating in interstate transportation?

5          MR. SCHULER:  Objection.

6      A.   No, sir.

7      Q.   (By Mr. Tangredi)  Back in August of

8  2016 was BB & S aware that uninsured motor carriers

9  were operating out there in interstate

10 transportation?

11         MR. SCHULER:  Objection.

12     A.   No, sir.

13     Q.   (By Mr. Tangredi)  Back in August of

14 2016 was BB & S aware that underinsured motor

15 carriers were operating in interstate

16 transportation?

17         MR. SCHULER:  Objection.

18     A.   No, sir.

19     Q.   (By Mr. Tangredi)  Okay.  Does BB & S

20 have any policies or procedures in place to check a

21 motor carrier trucking company's safety record or

22 rating before hiring that motor carrier to

23 transport its lumber?

24         MR. SCHULER:  Objection.

**Daniel Kane**
**May 3, 2019**

1    A.    We are not required to.

2    Q.    (By Mr. Tangredi)   Okay.   I

3  understand that.   But is there any policy or

4  procedure in place to check?

5    A.    No, sir.

6    Q.    Okay.   Is it the routine practice of

7  BB & S to check the safety rating of a motor

8  carrier before hiring it to transport its lumber?

9    A.    No, sir.

10    Q.    Does BB & S have any policies or

11  procedures in place to qualify a motor carrier

12  before hiring it to transport its lumber?

13         MR. SCHULER:   Objection.

14    A.    Yes.

15    Q.    (By Mr. Tangredi)   What are they?

16    A.    We ask for a W9 so they can get paid

17  and we can record that for tax purposes.   We look

18  for, as previously stated, a update copy, an in

19  term copy of their insurance policy and their

20  insurance limits, with their limits.   And we check

21  their DOT number to make sure that it is current.

22    Q.    Anything else?

23    A.    No, sir.

24    Q.    How do you check their DOT number?

**Daniel Kane**
**May 3, 2019**

Page 44

```
 1        A.    On the FMCSA website.

 2        Q.    Okay.  And that's the policy and

 3   procedure of BB & S to qualify a motor carrier

 4   before hiring them?

 5        A.    Usually, in addition to that, the

 6   carrier has either -- has hauled for inbound

 7   material or they've hauled for a competitor in

 8   which we can get or in which we see that carrier.

 9        Q.    I didn't follow you.  Explain that to

10   me.

11        A.    There's a certain group of carriers

12   within New England that haul lumber.  And certain

13   -- certain people are available year, after year,

14   after year, and that's what the folks that we've

15   been -- we're going to use.  And like I said

16   previously, we had a lot of these folks were in

17   business with BB & S prior to my getting there

18   eight years ago.  So, it's the same type of

19   situation.  We look for somebody that is either

20   consistently coming in, bringing inbound material

21   or that we have seen hauling and with the drivers

22   talking, that type of situation.  Again, this is a

23   long-term business that has been established with

24   these carriers.  So -- with the carriers we use.
```

**Daniel Kane**
**May 3, 2019**

1    Q.    Okay.

2    A.    I don't know if that answers the

3    question correctly.  It's kind of a situation in

4    particular where folks have hauled for us and if

5    somebody new comes in to haul for us, we usually

6    know them from another situation.  That is, inbound

7    material, or like I said, that they have hauled

8    other -- other pressure-treated lumber for our

9    competitors and have a -- have a longevity of doing

10   that.

11   Q.    Is it hard for BB & S to get an

12   outside carrier if they need one?

13   A.    No, sir.

14   Q.    Okay.  Can you think of a time when

15   BB & S had a load of lumber that needed to go out

16   and you couldn't get a motor carrier to take it?

17   A.    No, sir.

18   Q.    Okay.  So, before BB & S hires a

19   motor carrier, it qualifies it by taking its DOT

20   number, its insurance certificate, and there was

21   one other?

22   A.    W9.

23   Q.    W9.

24   A.    For tax purposes.  Yes, sir.

**Daniel Kane**
**May 3, 2019**

Page 46

1    Q.    In addition some less formal

2    experience with people?

3    A.    Absolutely.

4    Q.    Okay.  Is there a policy in writing

5    at all at BB & S talking about the criteria that

6    has to be met before hiring an outside motor

7    carrier?

8    A.    No, sir.

9    Q.    Okay.  Does BB & S require an outside

10   motor carrier to provide it with certain documents

11   other than what we talked about, the insurance

12   certificate and a W9?

13   A.    No, sir.

14   Q.    Okay.  So, before using a motor

15   carrier, BB & S verifies the motor carrier's DOT

16   number; is that true?

17   A.    Yes, sir.

18   Q.    Before using a motor carrier, does BB

19   & S check the truck company's BOC-3 filing?

20   A.    We are not required to.

21   Q.    Before using a motor carrier, does BB

22   & S verify that the truck company's licensing is

23   current?

24   A.    We're not required to.

Daniel Kane
May 3, 2019

Page 47

1      Q.     Before hiring a motor carrier, does

2  BB & S verify the truck company's insurance filings

3  are current directly from the insurer?

4      A.     I can't answer that in terms of I'm

5  not -- I am not sure who sends us the insurance

6  certificate.  I believe it is the insurer, the

7  insurance company, as the carrier will ask, they

8  will make the request to have it sent to us.

9      Q.     And we've established that before

10  using a motor carrier BB & S does not verify the

11  trucking company's safety rating; is that accurate?

12      A.     We are not required to.

13      Q.     Before using a motor carrier, does BB

14  & S check the motor carrier on-line for anything?

15            MR. SCHULER:  Objection.

16      A.     We are not required to.

17      Q.     (By Mr. Tangredi)  Is it the routine

18  practice of BB & S to check the QC Mobile Quick App

19  on motor carriers it hires --

20            MR. SCHULER:  Objection.

21      Q.     -- before hiring them?

22            MR. SCHULER:  Objection.

23      A.     We are not required to.

24      Q.     (By Mr. Tangredi)  And I understand

Daniel Kane
May 3, 2019

Page 48

```
 1   you're not required to.  Is it the routine practice

 2   of BB & S --

 3        A.    No, sir.

 4        Q.    Let me finish the question.

 5        A.    I'm sorry.

 6        Q.    That's okay.  Is it the routine

 7   practice of BB & S to check QC Mobile Quick Apps

 8   before hiring a motor carrier?

 9        A.    No, sir.

10        Q.    Is it the routine practice of BB & S

11   to check the SAFER website before hiring a motor

12   carrier?

13        A.    No, sir.

14        Q.    Is it the routine practice of BB & S

15   to check the Safety Management System before hiring

16   a motor carrier?

17        A.    No, sir.

18        Q.    And is it the routine practice of BB

19   & S to check the Behavioral Analysis and Safety

20   Improvement Category rating of a motor carrier

21   before hiring it?

22        A.    No, sir.

23        Q.    Does BB & S get solicited by trucking

24   companies to deliver BB & S's lumber?
```

**Daniel Kane**
**May 3, 2019**

Page 49

1     A.    Occasionally.

2     Q.    Okay.  When's the last time BB & S

3  hired a new trucking company that it hasn't used?

4     A.    Probably 18 months ago.

5     Q.    Okay.  Who was that?

6     A.    Off the top of my head I don't know

7  the name of the company.  However, I can't -- can't

8  put my finger on it.

9     Q.    Is BB & S still using that company?

10    A.    I am unsure.

11    Q.    Okay.  And has BB & S terminated a

12  relationship with a motor carrier in the last, how

13  long have you been with the company?

14    A.    Eight years.

15    Q.    In the eight years you've been there?

16    A.    Yes.

17    Q.    Okay.  Who?

18    A.    Braganza Trucking.

19    Q.    Anyone else?

20    A.    That's it.

21    Q.    Okay.  Where are they from?

22    A.    Out of Pawtucket.  I believe they're

23  out of business.

24    Q.    So, what was the reason for the

Daniel Kane
May 3, 2019

Page 50

1      termination of the relationship?

2          A.     The driver could not get along with

3      BB & S employees.

4          Q.     **They had one driver?**

5          A.     (Witness nodding.)

6          Q.     **Yes?**

7          A.     Yes.  I'm sorry.  And he owned the

8      company.  One truck, one driver.

9          Q.     **He was just a disagreeable truck**

10     **driver --**

11         A.     Yes, sir.

12         Q.     **Fair enough.  BB & S has access to**

13     **the Internet on site at BB & S?**

14         A.     Yes, sir.

15         Q.     **You have computers in the office?**

16         A.     We do.

17         Q.     **Okay.  Do you agree that a shipper**

18     **like BB & S should check the safety statistics of a**

19     **motor carrier before entrusting it with its product**

20     **for shipping?**

21             MR. SCHULER:   Objection.

22         A.     We're not required to.

23         Q.     **(By Mr. Tangredi)  Do you believe a**

24     **shipper like BB & S should check the safety**

**Daniel Kane**
**May 3, 2019**

1   statistics of a motor carrier before entrusting it

2   with its product for shipping?

3              MR. SCHULER:  Objection.

4        A.    No, sir.

5        Q.    (By Mr. Tangredi)  Do you believe

6   that a shipper like BB & S should know the safety

7   statistics of a motor carrier before entrusting it

8   with its product for shipment?

9              MR. SCHULER:  Objection.

10       A.    No, sir.

11       Q.    (By Mr. Tangredi)  Do you believe

12   that a shipper like BB & S should check the safety

13   evaluations of a motor carrier before entrusting it

14   with its product for shipment?

15             MR. SCHULER:  Objection.

16       A.    No, sir.

17       Q.    (By Mr. Tangredi)  Do you agree that

18   a shipper like BB & S should know the safety

19   evaluations of a motor carrier before entrusting it

20   with its product for shipment?

21             MR. SCHULER:  Objection.

22       A.    No, sir.

23       Q.    (By Mr. Tangredi)  Do you agree a

24   shipper like BB & S should look at the financial

**Daniel Kane**
**May 3, 2019**

Page 52

1   condition of a motor carrier before entrusting it

2   with its product for shipment?

3                MR. SCHULER:  Objection.

4        A.    No, sir.

5        Q.    (By Mr. Tangredi)  Do you agree that

6   a shipper like BB & S should know the financial

7   condition of a motor carrier before entrusting it

8   with its product for shipment?

9                MR. SCHULER:  Objection.

10       A.    No, sir.

11       Q.    (By Mr. Tangredi)  Do you agree a

12   shipper like BB & S should check to see that a

13   motor carrier has adequate and current insurance

14   before entrusting it with its product for shipment?

15       A.    Could you read that again.

16       Q.    Of course.  Do you agree that a

17   shipper like BB & S should check to see that a

18   motor carrier has adequate and current insurance

19   before entrusting it with its product for shipment?

20       A.    We have their insurance certificate

21   on file.  So, I believe that's yes.

22       Q.    Do you agree that a shipper like BB &

23   S should know that a motor carrier has adequate and

24   current insurance before entrusting it with its

**Daniel Kane**
**May 3, 2019**

Page 53

1    product for shipment?

2         A.    Yes.

3         Q.    Do you agree a shipper like BB & S

4    should maintain internal records about the motor

5    carriers it ships with?

6                   MR. SCHULER:   Objection.

7         A.    Could you define internal records.

8         Q.    (By Mr. Tangredi)   Does BB & S keep

9    any internal records on the motor carriers it ships

10   its products with?

11        A.    Yes.

12        Q.    And what are the internal records

13   that it keeps?

14        A.    The W9, insurance certificate, and

15   just DOT validation.

16        Q.    So, do you agree a shipper like BB &

17   S should maintain internal records about motor

18   carriers it ships with?

19        A.    Yes.

20        Q.    Do you agree a shipper like BB & S

21   should maintain internal records about motor

22   carriers to check that those motor carriers are not

23   manipulating their business practices to avoid an

24   unsatisfactory rating?

**Daniel Kane**
**May 3, 2019**

Page 54

1          MR. O'CONNOR:   Objection.

2     A.   No, sir.

3     Q.   (By Mr. Tangredi)  Do you agree a

4  shipper like BB & S should have a system in place

5  to check the safety record of motor carriers before

6  entrusting it with its product for shipment?

7          MR. SCHULER:  Objection.

8     A.   No, sir.

9     Q.   (By Mr. Tangredi)  What percentage of

10  BB & S lumber is shipped by tractor-trailer truck?

11     A.   96 percent.

12     Q.   What's the other -- how's -- what's

13  the other shipment method?

14     A.   Pick up.

15     Q.   Do you agree that shipping BB & S's

16  product by tractor-trailer truck is essential to

17  the business of BB & S?

18     A.   Yes.

19     Q.   Would you agree that without tractor-

20  trailer trucks BB & S wouldn't be in business?

21          MR. SCHULER:  Objection.

22     A.   It is most economical way to ship, so

23  I would have to say yes.

24     Q.   (By Mr. Tangredi)  Do you agree that

Daniel Kane
May 3, 2019

Page 55

1   when BB & S chooses a motor carrier to ship its

2   lumber with, the first consideration of BB & S as a

3   shipper should always be the safety of everyone on

4   the roads?

5           MR. SCHULER:  Objection.

6   A.    Yes, sir.

7   Q.    (By Mr. Tangredi)  Do you agree if a

8   motor carrier has been determined to be unsafe that

9   it is foreseeable that that motor carrier will be

10  involved in a crash on the highways?

11          MR. SCHULER:  Objection.

12          MR. O'CONNOR:  Objection.

13  A.    I'm not sure I can answer that

14  accurately.

15  Q.    (By Mr. Tangredi)  Do you agree that

16  if a motor carrier has been determined to be unsafe

17  that it is foreseeable that that motor carrier will

18  be in a crash?

19          MR. MEEHAN:  Objection.

20          MR. SCHULER:  Objection.

21          MR. O'CONNOR:  Objection.

22  A.    No, sir.

23  Q.    (By Mr. Tangredi)  Do you know the

24  name of the truck driver that killed George Forbes?

**Daniel Kane**
**May 3, 2019**

Page 56

1           A.    Yes, sir.

2           Q.    **What's his name?**

3           A.    Wiley Hooks.

4           Q.    **Was Mr. Hooks an employee of BB & S**

5    **at any time in August of 2016?**

6                 MR. SCHULER:   Objection.

7           A.    No, sir.

8           Q.    **(By Mr. Tangredi)  Was he ever an**

9    **employee of BB & S?**

10          A.    No, sir.

11          Q.    **Do you know who the employer of Wiley**

12   **Lenue Hooks was?**

13                **MR. O'CONNOR:   Objection.**

14          Q.    **(By Mr. Tangredi)  In August of 2016?**

15          A.    It is my understanding that he worked

16   for Gregory Trucking.

17          Q.    **Okay.  Was -- in August, specifically**

18   **on August 23, 2016 was Gregory Trucking Company a**

19   **motor carrier hired by BB & S?**

20          A.    Yes, sir.

21          Q.    **On that date, August 23, 2016 did BB**

22   **& S tell Mr. Hooks what route to drive to get to**

23   **Dalton, Mass.?**

24          A.    No, sir.

**Daniel Kane**
**May 3, 2019**

```
 1        Q.    Did BB & S instruct Mr. Hooks in any

 2   way where to get gas or fuel?

 3        A.    No, sir.

 4        Q.    Did BB & S provide Mr. Hooks with gas

 5   or fuel?

 6        A.    No, sir.

 7        Q.    Did BB & S on August 23, 2016 direct

 8   Mr. Hooks in any way?

 9        A.    No, sir.

10        Q.    Other than telling him his

11   destination?

12        A.    Correct.

13        Q.    Were there any time limits put on it?

14        A.    No, sir.  In getting back to that

15   question there in particular.

16        Q.    Good.

17        A.    It was understood it would be

18   delivered the following day at the time it was

19   loaded.

20        Q.    It was hoped.

21        A.    Correct.

22        Q.    Sure.  Have you ever driven a

23   tractor-trailer truck?

24        A.    No, sir.
```

**Daniel Kane**
**May 3, 2019**

Page 58

1      Q.      Do you supervise people who drive

2      tractor-trailer truck?

3              MR. SCHULER:  Objection.

4      A.      Yes, sir.

5      Q.      (By Mr. Tangredi)   Does driving a

6      tractor-trailer truck require special knowledge?

7      A.      Yes, sir.

8      Q.      What knowledge?

9      A.      I think the overall aspect of

10     understanding how large the vehicle is, how to

11     shift a vehicle, because all of the trucks that --

12     most trucks are 10 speed or -- or larger.  Most

13     folks aren't used to shifting a 10 speed

14     transmission.  And of course, understanding braking

15     with weight.

16     Q.      Sounds simplistic but why is that

17     special knowledge important?

18     A.      Like driving any vehicle you have to

19     understand how to stop it and what it takes, from

20     driving a Kia to a Ford pick-up truck.

21     Q.      Why is it important to know those

22     things?

23     A.      So as you can abide by the rules of

24     the road and -- and not create an accident.

**Daniel Kane**
**May 3, 2019**

1       Q.    **Does running a trucking company in**

2  **general require special knowledge?**

3           MR. SCHULER:  Objection.

4      A.    Yes, sir.

5       Q.    **(By Mr. Tangredi)  What kind of**

6  **knowledge?**

7      A.    Understanding of the FMCSA handbook.

8       Q.    **It's a big handbook, isn't it?**

9      A.    It is.

10      Q.    **Does driving a tractor-trailer truck**

11  **require skill?**

12          MR. SCHULER:  Objection.

13     A.    I don't believe any more skill than

14  it is to operate any other vehicle understanding

15  what vehicle you're in.

16      Q.    **(By Mr. Tangredi)  So, would you**

17  **agree it requires some level of skill?**

18      A.    Yes, sir.

19      Q.    **Are these skills important?**

20          MR. SCHULER:  Objection.

21     A.    Everyone's driving skills are

22  important whatever vehicle they're in.

23      Q.    **(By Mr. Tangredi)  Why?**

24      A.    To operate it safely.

Daniel Kane
May 3, 2019

Page 60

1      Q.    What could happen if somebody doesn't
2  have the proper skills and they're unsafe?
3             MR. O'CONNOR:  Objection.
4             MR. SCHULER:  Objection.
5      A.    We understand that an accident could
6  occur.
7      Q.    (By Mr. Tangredi)  And what kind of
8  things could happen in -- in an accident?
9             MR. SCHULER:  Objection.
10      A.    The entire gamut from just bent
11  vehicles to loss of life.
12      Q.    (By Mr. Tangredi)  Does driving a
13  tractor-trailer truck require experience?
14      A.    Yes, sir.
15      Q.    Why is experience important?
16             MR. SCHULER:  Objection.
17      A.    I believe experience gives you the
18  opportunity to understand what you're -- what
19  conditions you're driving in and what your
20  situation is, so as you can operate in accordance
21  to the rules of the road and be safe.
22      Q.    (By Mr. Tangredi)  Does transporting
23  lumber by tractor-trailer truck require special
24  equipment?

Daniel Kane
May 3, 2019

1          MR. SCHULER:   Objection.

2     A.    No, sir.

3     Q.    (By Mr. Tangredi)   Can lumber be

4   transported in a tractor-trailer truck?

5     A.    Please --

6     Q.    With sides?

7     A.    A box van?

8     Q.    Yeah.

9     A.    Yes, sir.

10    Q.    It's transported in boxes?

11    A.    Yes, sir.

12    Q.    Is it mostly transported on flatbeds?

13    A.    Yes, sir.

14    Q.    Does running a -- does loading a

15  tractor-trailer with lumber require special

16  equipment?

17    A.    Define special equipment, please.

18    Q.    Anything besides human beings.

19    A.    Yes, sir.

20    Q.    Like what?

21    A.    A forklift.

22    Q.    Humans I suppose could do it?

23    A.    Yes, they have in the past.

24    Q.    Just easier and do it faster and

**Daniel Kane**
**May 3, 2019**

Page 62

```
 1    better --
 2         A.    Much easier.
 3         Q.    -- with specialized equipment.  Does
 4    driving a tractor-trailer truck require a special
 5    license?
 6         A.    Yes, sir.
 7         Q.    Do you know what it is?
 8         A.    Yes, sir.
 9         Q.    What is it?
10         A.    CDL A.
11         Q.    Does BB & S believe that driving a
12    tractor-trailer truck can be dangerous?
13              MR. SCHULER:  Objection.
14         A.    We believe driving any vehicle can be
15    dangerous if not done properly.
16         Q.    (By Mr. Tangredi)  Including a
17    tractor-trailer?
18         A.    Including a tractor-trailer.
19         Q.    Does BB & S believe that a tractor-
20    trailer truck driver has to be careful?
21              MR. SCHULER:  Objection.
22         A.    BB & S believes all of their
23    employees have to be careful, including their
24    tractor-trailer drivers.
```

Daniel Kane
May 3, 2019

1       Q.   (By Mr. Tangredi)  And specifically

2   why do their tractor-trailer -- let's not talk

3   about --

4           MR. SCHULER:  Objection.

5       Q.   -- your drivers.  Tractor-trailer

6   drivers in general, why do they -- would you agree

7   they have to be careful?

8       A.   To avoid any type of accidents.

9       Q.   (By Mr. Tangredi)  Does BB & S

10  believe a tractor-trailer truck driver has to be

11  competent?

12          MR. SCHULER:  Objection.

13      A.   Could you define competent.

14      Q.   (By Mr. Tangredi)  Competent to drive

15  a tractor-trailer truck.

16      A.   Yes.

17         MR. SCHULER:  Objection.

18      Q.   (By Mr. Tangredi)  Does BB & S

19  believe that the operation of tractor-trailer

20  trucks on the highways involves a risk of physical

21  harm unless it is skillfully and carefully done?

22         MR. SCHULER:  Objection.

23      A.   We believe that driving any vehicle

24  on a highway can create harm.

Daniel Kane
May 3, 2019

1     Q.   (By Mr. Tangredi)  Including a

2  tractor-trailer?

3     A.   Including a tractor-trailer.

4     Q.  Does BB & S believe it is the

5  responsibility of everyone using the highways --

6  strike that.  Does BB & S believe a shipper has to

7  select a careful and competent motor carrier?

8         MR. SCHULER:  Objection.

9     A.   Could you define careful and

10  competent.

11     Q.   (By Mr. Tangredi)  How would you

12  define it?

13     A.   They -- they have passed -- they have

14  handed in a W9, we have current insurance, their

15  DOT number is current and up-to-date, their

16  equipment is in good shape, and they have a

17  positive attitude.

18     Q.  Would they have to have -- would

19  their driver have to have a valid CDL license?

20     A.   Yes.

21     Q.  So, if those are the things that make

22  a motor carrier careful and competent do you agree

23  that a shipper has to select a careful and

24  competent motor carrier?

**Daniel Kane**
**May 3, 2019**

Page 65

1          MR. SCHULER:  Objection.

2      A.    I believe if they meet that criteria

3  they are the ones we want to hire.

4      **Q.    (By Mr. Tangredi)  Do you agree that**

5  **driving tractor-trailers on the roads of America**

6  **can be dangerous unless skillfully and carefully**

7  **done?**

8          MR. SCHULER:  Objection.

9      A.    Again, I believe driving any vehicle

10  on our highways if not skillfully done can be

11  dangerous.

12      **Q.    (By Mr. Tangredi)  Including tractor-**

13  **trailers?**

14      A.    Including tractor-trailers.

15      **Q.    True or false, the United States**

16  **Department of Transportation requires all**

17  **interstate trucking companies to be licensed?**

18          MR. SCHULER:  Objection.

19          MR. O'CONNOR:  Objection.

20      A.    Yes.

21      **Q.    (By Mr. Tangredi)  True or false,**

22  **once a trucking company is licensed by the United**

23  **States Department of Transportation it is given**

24  **authority to operate tractor-trailers in interstate**

Daniel Kane
May 3, 2019

1    **commerce?**

2        A.    If they meet all the criteria of the

3    DOT, yes, true.

4        **Q.    So, once they get a license they've**

5    **demonstrated that?**

6        A.    And we're defining license, we're

7    saying DOT number, correct?

8        **Q.    Yes.**

9        A.    Okay.  Yes, sir, true.

10       **Q.    Once they get that, that they've**

11   **demonstrated the minimum competency, correct?**

12       A.    To the federal government, correct.

13       **Q.    And they have authority to operate**

14   **tractor-trailer trucks?**

15       A.    Correct.

16       **Q.    The FMCSA is the Federal Motor**

17   **Carrier Safety Administration, true?**

18       A.    True.

19       **Q.    And they're a division of the United**

20   **States Department of Transportation, true?**

21       A.    True.

22       **Q.    Is it true that the FMCSA supervises**

23   **and inspects motor carriers that it licenses?**

24       A.    That's a tough one.  They're -- they

Daniel Kane
May 3, 2019

1    do not make annual trips to motor carriers to -- to

2    run through all their information that I know of.

3    They're -- I've seen them only do it in terms of

4    the CSA, which we've spoke about previously.  And

5    of course if a carrier has too many infractions,

6    then it comes up on their radar screen and then

7    they visit that carrier.

8         Q.    **True or false, the FMCSA supervises**

9    **and inspects motor carriers that it licenses?**

10                  MR. SCHULER:  Objection.

11        A.    True.

12        Q.    **(By Mr. Tangredi)  Okay.  I**

13   **understand what you're saying.  They don't**

14   **necessarily get there all the time, but they're**

15   **charged with that responsibility; is that fair to**

16   **say?**

17        A.    Correct.

18        Q.    **Good.  The FMCSA truck company safety**

19   **ratings are provided to anyone who wants them for**

20   **free on the Internet, true or false?**

21                  MR. SCHULER:  Objection.

22        A.    True.

23        Q.    **(By Mr. Tangredi)  True or false, the**

24   **safety ratings are determined in part by collecting**

Daniel Kane
May 3, 2019

Page 68

1     safety data at roadside inspections?

2              MR. SCHULER:  Objection.

3        A.    True.

4        Q.    (By Mr. Tangredi)  You mentioned

5   something about June.  Is there a time in June when

6   these inspections take place more frequently?

7        A.    Yes.

8        Q.    And -- and that's known and

9   advertised, isn't it?

10       A.    I'm not sure it's advertised but it

11  is known.

12       Q.    And I think we've established that

13  trucking companies are provided one of three safety

14  ratings by the FMCSA?

15       A.    Yes, sir.

16       Q.    The safest trucks are provided a

17  satisfactory rating; is that accurate?

18       A.    Define safest trucks.

19       Q.    (By Mr. Tangredi)  Well, there's no

20  higher rating than satisfactory, right?

21       A.    Correct.

22       Q.    Okay.  True or false, companies with

23  known systemic problems and risks are given a

24  conditional safety rating?

Daniel Kane
May 3, 2019

1          MR. SCHULER:  Objection.

2     Q.    (By Mr. Tangredi)  I don't know is an

3     answer.

4     A.    I don't know.  Thank you.

5     Q.    I don't want you to feel limited that

6     -- to my true or false if you don't know.

7               True or false, a conditional safety

8     rating indicates the truck company does not have

9     adequate safety management controls in place to

10    ensure compliance with the safety standards set by

11    the FMCSA?

12    A.    I do not know.

13              MR. O'CONNOR:  Objection.

14    Q.    (By Mr. Tangredi)  True or false, the

15    safety rating and data are updated monthly by the

16    FMCSA?

17    A.    I do not know.

18    Q.    True or false, the cost of a tragic

19    crash causing a death far outweigh the costs of

20    being proactive in preventing such tragedies?

21              MR. SCHULER:  Objection.

22              MR. MEEHAN:  Objection.

23              MR. O'CONNOR:  Objection.

24    A.    I do not know.

Daniel Kane
May 3, 2019

1        Q.    (By Mr. Tangredi)   True or false,

2    Gregory Trucking is a commercial motor carrier

3    supervised by the FMCSA?

4               MR. O'CONNOR:   Objection.

5        A.    True.

6        Q.    (By Mr. Tangredi)   True or false,

7    Gregory Trucking was given the safety rating of

8    conditional in 2011?

9               MR. SCHULER:   Objection.

10       A.    I do not know.

11       Q.    (By Mr. Tangredi)   True or false,

12   before hiring a motor carrier BB & S should

13   consider all available safety information about

14   that motor carrier?

15              MR. SCHULER:   Objection.

16       A.    I do not know.

17       Q.    (By Mr. Tangredi)   So, the question

18   asks should, not does.   So, if I asked you, do you

19   that believe before hiring a motor carrier BB & S

20   should consider all available safety information

21   about that motor carrier --

22              MR. SCHULER:   Objection.

23       Q.    -- do you agree with that?

24       A.    We are not required.   Is that an

Daniel Kane
May 3, 2019

                                              Page 71

1    answer?

2          Q.    (By Mr. Tangredi)   I understand

3    you're not required.   Should they consider, should

4    BB & S consider all available safety information

5    before hiring a motor carrier?

6                MR. SCHULER:  Objection.

7                MR. MEEHAN:  Objection.

8          A.    True.

9          Q.    (By Mr. Tangredi)   Do you agree that

10   before hiring a motor carrier BB & S should check

11   the SAFER website about that motor carrier?

12               MR. SCHULER:  Objection.

13               MR. MEEHAN:  Objection.

14               MR. O'CONNOR:  Objection.

15         A.    False.

16         Q.    (By Mr. Tangredi)   Do you agree

17   before hiring a motor carrier BB & S should check

18   the BASICS scores of a motor carrier on the

19   website?

20               MR. SCHULER: Objection.

21               MR. MEEHAN:  Objection.

22               MR. O'CONNOR:  Objection.

23         A.    False.

24         Q.    (By Mr. Tangredi)   Before entrusting

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**Daniel Kane**
**May 3, 2019**

1    its goods to a motor carrier should BB & S pick a

2    careful motor carrier to transport its goods?

3              MR. MEEHAN:  Objection.

4              MR. SCHULER:  Objection.

5              MR. O'CONNOR:  Objection.

6        A.    Can we define careful.

7        Q.    (By Mr. Tangredi)  You defined it

8    earlier.

9        A.    If they meet our criteria, true.

10       Q.    What's the heaviest load that BB & S

11   ships on a tractor-trailer?

12       A.    In which state?

13       Q.    Let's keep it to Rhode Island.

14       A.    Okay.  We have overweight permits in

15   Rhode Island and we can haul 51,000 pounds.

16       Q.    That's overweight?

17       A.    Correct.

18       Q.    And you have special permits to do

19   higher than 51,000?

20       A.    No, sir.

21              MR. SCHULER:  Objection.  The

22        question calls for ships.

23              THE WITNESS:  Oh.

24              MR. SCHULER:  Ships.  That's --

**Daniel Kane**
**May 3, 2019**

1    that's what he's asking for.

2         THE WITNESS:  Okay.

3    **Q.    (By Mr. Tangredi)  Let's go back.**

4    **Let's strike the last group of questions.  What is**

5    **the greatest weight that BB & S ships lumber on a**

6    **tractor-trailer?**

7         A.    44,000 pounds; 45,000 pounds,

8    depending on the equipment of the carrier that

9    comes in.  An aluminum trailer will allow you to

10   ship more weight versus a steel trailer.

11        **Q.    Is BB & S aware of a weight limit for**

12   **shipping?**

13        A.    Yes.

14        **Q.    What is the weight limit?**

15        A.    The trucker needs to tell us the

16   weight of his tractor and trailer, and then the

17   combined entity has to be at 80,000 pounds or less.

18        **Q.    Very good.  True or false, BB & S**

19   **should not choose a motor carrier it knows or**

20   **should know is unsafe?**

21             MR. MEEHAN:  Objection.

22             MR. SCHULER:  Objection.

23             MR. O'CONNOR:  Objection.

24        A.    True.

Daniel Kane
May 3, 2019

Page 74

1          Q.     (By Mr. Tangredi)   When entrusting

2      its goods, its lumber to a motor carrier, BB & S

3      should not choose a motor carrier it knows or

4      should know violates the federal trucking

5      regulations?

6                    MR. SCHULER:   Objection.

7                    MR. MEEHAN:   Objection.

8                    MR. O'CONNOR:   Objection.

9          A.     True.

10         Q.     (By Mr. Tangredi)   True or false, a

11     motor carrier with an unsafe track record increases

12     the risk of serious injury and death to everyone on

13     the roads?

14                   MR. SCHULER:   Objection.

15                   MR. MEEHAN:   Objection.

16                   MR. O'CONNOR:   Objection.

17         A.     False.

18         Q.     (By Mr. Tangredi)   True or false, the

19     DOT's safety rating systems provide shippers with

20     information about which motor carriers are

21     potentially unsafe?

22                   **MR. O'CONNOR:   Objection.**

23                   MR. SCHULER:   Objection.

24         A.     True.

**Daniel Kane**
**May 3, 2019**

```
 1          Q.    (By Mr. Tangredi)  If BB & S
 2     determined that a motor carrier had a track record
 3     for being unsafe would it hire that motor carrier
 4     and entrust it to deliver its product?
 5               MR. MEEHAN:  Objection.
 6               MR. SCHULER:  Objection.
 7          A.    No, we would not.
 8          Q.    (By Mr. Tangredi)  If BB & S
 9     determined that a motor carrier had an unsafe track
10     record and chose to hire that motor carrier and
11     entrust it to deliver its product, would that be
12     below the standard of care in the industry?
13               MR. MEEHAN:  Objection.
14               MR. SCHULER:  Objection.
15               MR. O'CONNOR:  Objection.
16          A.    Could you repeat the question,
17     please.
18          Q.    (By Mr. Tangredi)  Sure.  If BB & S
19     determined that a motor carrier had an unsafe track
20     record and chose to hire that motor carrier and
21     entrust it to deliver its product would that be
22     below the standard of care in your industry?
23               MR. SCHULER:  Objection.
24               MR. MEEHAN:  Objection.
```

Daniel Kane
May 3, 2019

1          MR. O'CONNOR:  Objection.

2     A.    I don't know.

3     Q.    (By Mr. Tangredi)  If BB & S knew a

4  motor carrier was not safe would it hire them to

5  ship its products?

6          MR. SCHULER:  Objection.

7          MR. MEEHAN:  Objection.

8          MR. O'CONNOR:  Objection.

9     A.    No, we would not.

10    Q.    (By Mr. Tangredi)  Back in August of

11 2016 did anyone at BB & S have responsibility to

12 determine if a motor carrier was properly licensed

13 before hiring it?

14         MR. SCHULER:  Objection.

15    A.    I believe we answered that with the

16 carriers that were coming in, we have their

17 information on file.

18    Q.    (By Mr. Tangredi)  Was it anyone's

19 responsibility, a specific person's responsibility?

20    A.    Okay.  Yes, sir.

21    Q.    To check that box off?

22    A.    Yes, sir.

23    Q.    Who is that person?

24    A.    Matt Harris.

**Daniel Kane**
**May 3, 2019**

Page 77

```
 1          Q.    Okay.  Back in August of 2016 did
 2    anyone at BB & S have responsibility to determine
 3    if a motor carrier had safe equipment before hiring
 4    that motor carrier?
 5          A.    No, sir.
 6          Q.    Back in August of 2016 did anyone at
 7    BB & S have responsibility to determine if a motor
 8    carrier was insured before entrusting it with its
 9    load for delivery?
10          A.    Yes, sir.
11          Q.    Who was -- who would that be?
12          A.    Matt Harris.
13          Q.    And back in August of 2016 did anyone
14    at BB & S have responsibility to determine a motor
15    carrier's safety rating before hiring it to deliver
16    its lumber?
17                MR. SCHULER:  Objection.
18          A.    No, sir.
19          Q.    (By Mr. Tangredi)  And back in August
20    of 2016 did anyone at BB & S have responsibility to
21    perform any kind of background check on a motor
22    carrier before hiring them?
23                MR. SCHULER:  Objection.
24          A.    No, sir.
```

**Daniel Kane**
**May 3, 2019**

Page 78

```
 1          Q.     (By Mr. Tangredi)   How are we doing
 2     on time?
 3                 THE VIDEOGRAPHER:  The time is 1:23.
 4                 MR. MEEHAN:  Do you want to --
 5                 MR. SCHULER:  Take maybe a 10 minute
 6          break.  Is that all right.
 7                 MR. TANGREDI:  Let's call it a lunch
 8          break, make it 30 minutes then?
 9                 MR. MEEHAN:  Okay.
10                 THE VIDEOGRAPHER:  We are now off the
11          record at 1:24 p.m.
12
13          (A recess was taken)
14
15                 THE VIDEOGRAPHER:  We are now back on
16          the record at 2:03 p.m.
17                 MR. TANGREDI:  Thank you.
18          Q.     (By Mr. Tangredi)   Mr. Kane, I want
19     to ask you some questions about your -- the
20     liability insurance policy that you have.  I
21     understand BB & S has a comprehensive general
22     liability policy with Travelers; is that right?
23          A.     Yes, sir.
24          Q.     And that's for $1,000,000.00?
```

**Daniel Kane**
**May 3, 2019**

Page 79

```
 1          A.    I believe so.
 2          Q.    And BB & S has an excess policy?
 3          A.    Yes, sir.
 4          Q.    Do you know who that is with?
 5          A.    I think it's with Everest.
 6          Q.    Excellent.  Has BB & S talked with
 7    Travelers about this case, the insurance company
 8    itself?
 9          A.    Other than supplying the initial
10    claim I am not aware of any other conversations.
11          Q.    Has Travelers sent BB & S any kind of
12    written correspondence about this case?
13          A.    Everything I've gotten has been
14    through Attorney Schuler's office.
15          Q.    Okay.  Anything directly from BB & S
16    -- I'm sorry, from Travelers to BB & S?
17          A.    No, sir.
18          Q.    Okay.  Does BB & S have its own
19    attorney besides Mr. Schuler?
20          A.    We have a corporate attorney, yes.
21          Q.    Is he aware of this case?
22          A.    Yes.
23          Q.    Okay.  And what is his name?
24          A.    It's a firm, Cameron, Mittleman right
```

**Daniel Kane**
**May 3, 2019**

Page 80

1     down the street here in Providence.

2          **Q.     And is there a specific attorney?**

3          A.     I work with Joe Anesta.  However, I'm

4     not sure if he's on this particular case.

5          **Q.     All right.  Is BB & S aware that the**

6     **driver of the tractor-trailer truck that killed**

7     **George Forbes could be considered an insured under**

8     **the Travelers insurance policy?**

9          A.     No, sir.

10         **Q.     You're not aware of that or have you**

11    **been told he is not?**

12         A.     I'm not aware.

13         **Q.     Okay.  Would that matter to BB & S?**

14                MR. SCHULER:  Objection.

15         A.     I don't know.

16         **Q.     (By Mr. Tangredi)` You're the guy.**

17         A.     I don't -- I'm not -- I would

18    probably say no, because it would increase our

19    comp. and it wasn't our liability.

20         **Q.     When you say increase your comp.,**

21    **what do you mean?**

22         A.     Every time they look at your

23    business, and as you know with the insurance

24    companies, it's -- they look at how much they pay

**Daniel Kane**
**May 3, 2019**

1    out versus how much you're paying in.  And they

2    index you, I believe is the word, your company, and

3    you're charged your premiums accordingly.  We work

4    very fervently on the Workers' Comp. side to keep

5    those down to be a safe company so we're -- our

6    Workers' Comp. premiums do not increase.

7         **Q.    So, you know this wouldn't have**

8    **anything to do with Workers' Compensation?**

9         A.    I do.

10        **Q.    Okay.  Is BB & aware that Mr. Hooks**

11   **could be considered an insured on their automobile**

12   **policies?**

13        A.    No, sir.

14        **Q.    Okay.  And that wouldn't matter if he**

15   **was --**

16              MR. SCHULER:  Objection.

17

18        **Q.    -- to BB & S?**

19        A.    Again, I don't know.

20        **Q.    (By Mr. Tangredi)  BB & S is**

21   **concerned with its premium and what it pays?**

22        A.    Correct.

23        **Q.    And wants to keep that as low as**

24   **possible?**

**Daniel Kane**
**May 3, 2019**

Page 82

```
 1        A.    Correct.
 2        Q.    If Mr. Hooks was considered an
 3   insured and covered for this, that might go --
 4   might go against your indexing?
 5              MR. SCHULER:  Objection.
 6        A.    I would assume.
 7        Q.    (By Mr. Tangredi)  Okay.  Has anyone
 8   from BB & S talked with anyone at Everest about
 9   this case?
10        A.    No, sir.
11        Q.    Tell me how it came about that BB & S
12   Acquisition used Gregory Trucking to transport
13   lumber from Rhode Island, its headquarters in Rhode
14   Island to L.P. Adams in Dalton, Mass. on August 23,
15   2016.
16        A.    Yes, sir.  Gregory Trucking had, over
17   the previous 24 months, maybe as much as 36 months,
18   had been delivering inbound stock to us, bought by
19   the truckload quantities out of the North Carolina
20   area.  And they were bringing the material to us.
21   So, we knew of them as a trucking company.  And
22   upon occasion they initially asked if they could do
23   some back hauls.  And this was probably a good two
24   years into the relationship.  At that point in time
```

**Daniel Kane**
**May 3, 2019**

Page 83

1   we asked them to furnish us with the criteria that

2   we previously stated, the W9, the insurance -- the

3   insurance policy, and their DOT number so that we

4   could check.

5          At -- at a point in time we used them

6   in 2015 for the first load that they hauled for us,

7   and it would be considered a back haul for them.

8   So, we had a long-standing opportunity to

9   understand that these folks were bringing in

10  material on a regular basis with no visible issues

11  with the trucks, driver was friendly, courteous and

12  performed his duties well when he was in our

13  facility.

14         And prior to that delivery date, the

15  driver did approach our logistics manager and asked

16  if there was a back haul.  And he was told that we

17  did have one in that -- in that area that he was

18  trying to get out to.  And we -- the driver said he

19  would take it.  And we set up paperwork, and it was

20  loaded on his truck that afternoon after delivering

21  an inbound load from Yellow Pine Trading that

22  morning.

23         Does that answer your...

24  **Q.    Are you done?  I didn't --**

**Daniel Kane**
**May 3, 2019**

Page 84

```
 1        A.    Yes.

 2        Q.    Good.  Sure it does.  But I've got a

 3   lot of questions.

 4        A.    Okay.

 5        Q.    Sometimes you said they, sometimes

 6   you said we.

 7        A.    Okay.

 8        Q.    So, I want to try to straighten --

 9        A.    Sure.

10        Q.    -- get clear in my mind who they and

11   we might be.  But let's go back to over the course

12   I think you said of some time Gregory Trucking had

13   been bringing lumber inbound to BB & S?

14        A.    Correct.

15        Q.    Can you give me a sense of how long

16   or how frequently they came to BB & S?

17        A.    At least two to three times a month

18   during the busy season, and at least once a month

19   over the like December, January, February area.

20        Q.    Okay.  And for what period of time

21   were they coming at that frequency, a year, two

22   years, 10 years?

23        A.    At least two.  I know of 24 months in

24   particular.  And I'm thinking now because I saw
```

Daniel Kane
May 3, 2019

1    their truck this morning at our gate to unload,

2    that it's got to be upwards of three years now.

3         Q.    Okay.  Gregory Trucking, it's called

4    inbound, is bringing you lumber?

5         A.    Correct.

6         Q.    Is this untreated natural wood?

7         A.    Yes, sir.

8         Q.    And are you treating it and then

9    sending it out?

10        A.    Yes, sir.

11        Q.    Good.  Got it.  During this -- this

12   time period when -- when they would be regularly

13   coming inbound, is it fair to say you didn't start

14   giving -- BB & S didn't start giving them work to

15   deliver until about 2015?

16        A.    Correct.

17        Q.    All the other times prior to 2015

18   that Gregory Trucking came to BB & S with lumber,

19   would unload and leave unloaded; is that fair to

20   say?

21        A.    Yes, sir.

22        Q.    Okay.  And at some point in time BB &

23   S decided -- strike that.  Did BB & S approach

24   Gregory Trucking or did Gregory Trucking approach

**Daniel Kane**
**May 3, 2019**

Page 86

1    BB & S to do some hauling?

2        A.    Gregory Trucking approached BB & S.

3        Q.    Okay.  Were you involved in that

4    yourself?

5        A.    No, sir.

6        Q.    Okay.  Can you tell me how that

7    happened.

8        A.    It is my understanding that one of

9    their drivers approached Matt Harris in our

10   logistics office and asked about a back haul.

11       Q.    And this would have been the first

12   time before any back haul was ever given to Gregory

13   Trucking, right?

14       A.    Correct.

15       Q.    Okay.  So, a driver comes in, unloads

16   at BB & S, approaches somebody at BB & S and says

17   hey, you got any work for us?

18       A.    Correct.

19       Q.    And it was the driver that did that?

20       A.    Correct.

21       Q.    Okay.  And we've used the term short

22   haul a little bit.  Tell me what a short haul is.

23       A.    A short haul would probably be no

24   more than halfway back to where the driver was

**Daniel Kane**
**May 3, 2019**

Page 87

1    trying to get back to.  His home base.

2         Q.    Okay.  Would it -- would it have to

3    be on his route back to home base or could it send

4    him in an entirely new direction?

5         A.    It would be totally up to the driver

6    and/or the trucking company.

7         Q.    Okay.  A short haul doesn't mean

8    putting them back on the route to go home?

9         A.    Correct.

10        Q.    It's a haul of short distance?

11        A.    Correct.

12        Q.    Okay.  Do you have a sense of whether

13   or not that short distance is short distance in

14   time or short distance in mileage?

15        A.    No, sir.

16        Q.    Okay.  Is there any way to quantify

17   what short distance is, what makes something a

18   short haul?

19        A.    Unfortunately not for us because we

20   don't determine it.

21        Q.    I think you said you ship throughout

22   this New England states and sometimes into New

23   York?

24        A.    Correct.

**Daniel Kane**
**May 3, 2019**

Page 88

```
 1       Q.     Would anyplace you ship be considered
 2  a short haul?
 3       A.     Not necessarily because it's a
 4  delivery.  If somebody's looking specifically for a
 5  short haul, they're looking to get a revenue
 6  producing load in a shorter territory than or a
 7  shorter distance than fully all the way back.
 8       Q.     Okay.  Are there only short hauls and
 9  long hauls?
10       A.     No, sir.
11       Q.     No.  Is there middle, medium hauls?
12       A.     Not -- not necessarily in the logo of
13  the -- lingo, I should say, of the industry.  It's
14  just a matter of whether you're making a delivery
15  to a point and then trying to get back to that
16  other point, and then do I want the long haul back
17  or a short haul half back or less.
18       Q.     Okay.  Got it.  So, do you know who
19  first approached BB & S from Gregory Trucking the
20  first time to talk about short hauls?
21       A.     No, sir.
22       Q.     A driver?
23       A.     Correct.
24       Q.     Did -- what did BB & S do when they
```

**Daniel Kane**
**May 3, 2019**

1    learned that Gregory Trucking was interested in

2    short hauls?

3         A.    They --

4         Q.    For the first time.

5         A.    They requested all of the

6    information.

7         Q.    All of the --

8         A.    The filled -- the filled out W9, the

9    update and current insurance certification, and DOT

10   number that we could check.  And like previously

11   mentioned, this had been after easily a probably a

12   12 or 18 month period prior.

13        Q.    Where would BB & S actually get that

14   information from, would they get it from the truck

15   driver?

16        A.    No, sir.

17        Q.    Where would they get it?

18        A.    It would come from the trucking

19   company's home office.

20        Q.    Do you know where Gregory Trucking's

21   home office is?

22        A.    In North Carolina.

23        Q.    Okay.  Truck driver says hey, I'm

24   willing to do short hauls, BB & S says we've got to

Daniel Kane
May 3, 2019

Page 90

1    get the paperwork, we got to see if you qualify?

2         A.   Yes, sir.

3         Q.   BB & S requests information from

4    North Carolina, Gregory Trucking's headquarters?

5         A.   We'd actually request it through the

6    driver.  The driver would then stay, typically he

7    would call his office and say this is what BB & S

8    is looking for before they're even consider us to

9    give us a short haul.

10        Q.   Okay.  And would the Gregory Trucking

11   home office in North Carolina somehow transmit the

12   required information to BB & S?

13        A.   Yes, sir, typically by fax.

14        Q.   All right.  And is it fair to say

15   that the trip that Gregory Trucking drove from

16   Rhode Island to Dalton, Mass., L.P. Adams in

17   Dalton, Mass. on the 23rd is a short haul?

18        A.   Yes, sir.

19        Q.   Okay.  What is a dispatcher in the

20   trucking business?

21        A.   It has many definitions.  In our

22   definition for BB & S it's the gentleman who

23   assigns loads.

24        Q.   What does that mean?

**Daniel Kane**
**May 3, 2019**

1      A.    He will determine what trucking

2   companies will go where with what loads for BB & S

3   on specific dates.

4      **Q.    Okay.  Does BB & S have a single**

5   **dispatch person?**

6      A.    We have a proprietary (sic)

7   individual, and then a secondary when he's on

8   vacation.

9      **Q.    Okay.  Who's the -- the primary?**

10     A.    Primary is Matt Harris.

11     **Q.    And who's the backup?**

12     A.    Jorge Cardona.

13     **Q.    Okay.  Who dispatched the load of**

14  **lumber from BB & S in Rhode Island to L.P. Adams in**

15  **Dalton on August 23, 2016?**

16           MR. SCHULER:  Objection.

17     A.    Matt Harris.

18     **Q.    (By Mr. Tangredi)  Okay.  In regards**

19  **to that load that went from Rhode Island to L.P.**

20  **Adams in Dalton, Mass. on August 23, 2016, did**

21  **anyone from BB & S communicate with anyone at**

22  **Gregory Trucking besides the driver?**

23     A.    No, sir.

24     **Q.    Okay.  Did anyone at BB & S overhear**

**Daniel Kane**
**May 3, 2019**

Page 92

1     the driver communicate with anyone about the short

2     haul from Rhode Island to L.P. Adams in Dalton?

3          A.    No, sir.

4          Q.    Does anybody at BB & S know if the

5     driver communicated with anybody at Gregory

6     Trucking for that, regarding that short haul from

7     Rhode Island to L.P. Adams in Dalton, Mass.?

8          A.    No, sir.

9          Q.    Was that a no, nobody knows or nobody

10    heard?

11         A.    On both accounts.

12         Q.    On both accounts, okay.  Did Wiley

13    Lenue Hooks, the driver, tell anyone at BB & S he

14    had communicated with people back in North Carolina

15    at Gregory Trucking regarding the short haul?

16         A.    I do not know.

17         Q.    Who would that communication have

18    been with, if it happened?

19         A.    If it happened, it would more than

20    likely have been Matt Harris.

21         Q.    Okay.  Who did BB & S hire to ship

22    its lumber to L.P. Adams in Dalton, Mass. on 23,

23    August 2016?

24         A.    Gregory Trucking.

Daniel Kane
May 3, 2019

1       Q.    Okay.  Who sent BB & S a bill for

2  those services?

3       A.    Gregory Trucking.

4       Q.    And who did BB & S pay for those

5  services?

6       A.    Gregory Trucking.

7       Q.    All right.  Did BB & S know that when

8  Wiley Lenue Hooks was in their, you call it a yard?

9       A.    Yes, sir.

10       Q.    In your yard on August 23rd, that Mr.

11  Hooks was from North Carolina?

12       A.    I do not know.

13       Q.    Okay.  Would you know that the truck

14  was from North Carolina?

15       A.    Yes, sir.

16       Q.    And would BB & S know that the truck

17  was from North Carolina?

18       A.    If our people saw it, yes, we would.

19       Q.    Okay.  And BB & S knew Gregory

20  Trucking was headquartered out of North Carolina?

21       A.    Yes, sir.

22       Q.    Did you have any interaction with Mr.

23  Hooks on August 23, 2016?

24       A.    I did not.

**Daniel Kane**
**May 3, 2019**

Page 94

1          Q.     Would you normally be in the yard

2    dealing with truck drivers?

3          A.     I may pass them at the stairwell from

4    the logistics office to the upstairs office.

5          Q.     Why would truck drivers be in that

6    area?

7          A.     That's where Matt Harris has a desk.

8          Q.     Okay.   Does Matt Harris have a --

9    have a title?   We were talking about that -- that

10   hierarchy chart.

11         A.     Yes.

12         Q.     What is his title?

13         A.     Logistics manager or supervisor.   I'm

14   not sure what exactly it says on his card.

15         Q.     Did BB & S check Wiley Lenue Hooks's

16   logbook before hiring Gregory Trucking to do the

17   short haul to L.P. Adams in Dalton, Mass. on August

18   23, 2016?

19                MR. SCHULER:   Objection.

20         A.     We are not required.

21         Q.     (By Mr. Tangredi)   Did they check it?

22         A.     No, sir.

23         Q.     Did BB & S inquire of Wiley Lenue

24   Hooks about his hours of service and rest before

**Daniel Kane**
**May 3, 2019**

```
                                              Page 95
 1      hiring Gregory Trucking for the short haul to L.P.

 2      Adams in Dalton, Mass. on August 23, 2016?

 3                  MR. SCHULER:  Objection.

 4           A.    Should I say we -- we are not

 5      required or just say no, we did not?

 6           Q.    (By Mr. Tangredi)  If you want to say

 7      you're not required then I'll ask you if you did.

 8           A.    Okay.

 9           Q.    So --

10           A.    No.

11           Q.    -- did they?

12           A.    We did not.

13           Q.    Okay.  Did BB & S inquire about the

14      driver's health at all?

15           A.    No, we did not.

16           Q.    Did BB & S ask to see the driver's

17      medical card before the short haul to L.P. Adams?

18           A.    We are not required.

19           Q.    Did they check it?

20           A.    No, we did not.

21           Q.    Did they ask to see it?

22           A.    No, we did not.

23           Q.    Could they have?

24                  MR. SCHULER:  Objection.
```

**Daniel Kane**
**May 3, 2019**

Page 96

1      A.    Yes, we could have.

2      Q.    (By Mr. Tangredi)  Did BB & S ask the

3  driver about his experience in driving a tractor-

4  trailer truck before hiring him for the short haul

5  to L.P. Adams?

6                MR. SCHULER:  Objection.

7      A.    No, we did not.

8      Q.    (By Mr. Tangredi)  Could BB & S have

9  done that?

10                MR. SCHULER:  Objection.

11      A.    Yes, we could have.

12      Q.    (By Mr. Tangredi)  Did BB & S ask

13  about the driver's driving record before hiring

14  Gregory Trucking to deliver the short haul to L.P.

15  Adams?

16                MR. SCHULER:  Objection.

17      A.    No, we did not.

18      Q.    (By Mr. Tangredi)  Could BB & S have

19  done that?

20      A.    Yes, we could have.

21      Q.    Did BB & S ask about the driver's

22  accident history before hiring Gregory Trucking to

23  deliver the short haul to L.P. Adams?

24                MR. SCHULER:  Objection.

**Daniel Kane**
**May 3, 2019**

Page 97

1      A.    We are not required.

2      Q.    (By Mr. Tangredi)  Did they ask about

3  his accident history?

4      A.    No, we did not.

5      Q.    Could BB & S have done that?

6            MR. SCHULER:  Objection.

7      A.    Yes, we could have.

8      Q.    (By Mr. Tangredi)  Did BB & S ask

9  about the driver's history of traffic citations

10  before hiring Gregory Trucking to deliver the short

11  haul to L.P. Adams in Dalton, Mass.?

12            MR. SCHULER:  Objection.

13      A.    We are not required.

14      Q.    (By Mr. Tangredi)  Did they ask?

15      A.    No, we did not.

16      Q.    Could they have done that?

17            MR. SCHULER:  Objection.

18      A.    Yes, we could have.

19      Q.    (By Mr. Tangredi)  Did BB & S ask

20  about the driver's criminal record before hiring

21  Wiley Lenue Hooks and Gregory Trucking to deliver

22  the short haul to L.P. Adams in Dalton, Mass.?

23            MR. SCHULER:  Objection.

24      A.    We are not required.

**Daniel Kane**
**May 3, 2019**

```
                                                    Page 98
 1          Q.     (By Mr. Tangredi)   Did they?
 2          A.     No, we did not.
 3          Q.     Could they have?
 4          A.     Yes, we could have.
 5                 MR. SCHULER:  Objection.
 6          Q.     (By Mr. Tangredi)   Did BB & S inspect
 7     the tractor before hiring Gregory Trucking for the
 8     short haul to L.P. Adams in Dalton, Mass.?
 9                 MR. SCHULER:  Objection.
10          A.     No, we did not.
11          Q.     (By Mr. Tangredi)   Could BB & S have
12     done that?
13                 MR. SCHULER:  Objection.
14          A.     Yes, we could have.
15          Q.     (By Mr. Tangredi)   Did BB & S -- BB &
16     S ask to see the daily inspection log for the
17     tractor-trailer --
18                 MR. SCHULER:  Objection.
19          Q.     -- driven by Gregory Trucking for the
20     short haul to L.P. Adams in Dalton, Mass.?
21                 MR. SCHULER:  Objection.
22          A.     We are not required.
23          Q.     (By Mr. Tangredi)   And did you?
24          A.     No, we did not.
```

Daniel Kane
May 3, 2019

Page 99

1        Q.    Could they have?

2        A.    Yes, we could have.

3        Q.    Did BB & S see if the tractor had a

4   valid inspection sticker before hiring Gregory

5   Trucking to deliver the short haul to L.P. Adams in

6   Dalton, Mass.?

7              MR. SCHULER:  Objection.

8        A.    We are not required.

9        Q.    (By Mr. Tangredi)  Did it see it?

10       A.    No, we did not.

11       Q.    Could it have?

12       A.    Yes, we could have.

13       Q.    Did BB & S inspect the trailer before

14   hiring Gregory Trucking to deliver the short haul

15   to L.P. Adams in Dalton, Mass.?

16             MR. SCHULER:  Objection.

17       A.    We are not required.

18       Q.    (By Mr. Tangredi)  Did it?

19       A.    No, we did not.

20       Q.    Could it have?

21       A.    Yes, we could have.

22       Q.    Did BB & S inspect the tires on the

23   tractor or trailer that they hired to deliver the

24   short haul to L.P. Adams in Dalton, Mass.?

**Daniel Kane**
**May 3, 2019**

1       A.    We are not required.

2       Q.    **Did it inspect the tires?**

3       A.    No, we did not.

4       Q.    **Could it have?**

5       A.    Yes, we could have.

6             MR. SCHULER:  Objection.

7       Q.    **(By Mr. Tangredi)  Did BB & S inquire**

8  **about the condition of the tractor before hiring**

9  **Gregory Trucking to deliver the short haul to L.P.**

10 **Adams in Dalton, Mass.?**

11            MR. SCHULER:  Objection.

12      A.    We are not required.

13      Q.    **(By Mr. Tangredi)  Did it?**

14            MR. SCHULER:  Objection.

15      A.    No, we did not.

16      Q.    **Could it have?**

17            MR. SCHULER:  Objection.

18      A.    Yes, we could have.

19      Q.    **(By Mr. Schuler)  Did BB & S inquire**

20 **about the condition of the trailer before hiring**

21 **Gregory Trucking to deliver the short haul to L.P.**

22 **Adams in Dalton, Mass.?**

23            MR. SCHULER:  Objection.

24      A.    We are not required.

**Daniel Kane**
**May 3, 2019**

Page 101

1       Q.    (By Mr. Tangredi)   Did they?

2       A.    No, we did not.

3       Q.    Could they have?

4          MR. SCHULER:   Objection.

5       A.    Yes, we could have.

6       Q.    (By Mr. Tangredi)   Did BB & S ask to

7 see Wiley Lenue Hooks's CDL license before hiring

8 Gregory Trucking to deliver the short haul to L.P.

9 Adams in Dalton, Mass.?

10         MR. SCHULER:   Objection.

11       A.    We are not required.

12       Q.    (By Mr. Tangredi)   Did it?

13       A.    No, we did not.

14       Q.    Could it have?

15       A.    Yes, we could have.

16       Q.    Did BB & S give Wiley Lenue Hooks a

17 driving test before hiring him to deliver the --

18 before hiring Gregory Trucking to deliver the short

19 haul to L.P. Adams in Dalton, Mass.?

20         MR. SCHULER:   Objection.

21       A.    We are not required.

22       Q.    (By Mr. Tangredi)   Did they?

23         MR. SCHULER:   Objection.

24       A.    No, we did not.

**Daniel Kane**
**May 3, 2019**

Page 102

1          Q.     Could they have?

2                 MR. SCHULER:   Objection.

3          A.     Yes, we could have.

4          Q.     (By Mr. Tangredi)   Did BB & S discuss

5     its safety expectations with the tractor-trailer

6     driver before hiring Gregory Trucking to deliver

7     its short haul to L.P. Adams in Dalton, Mass.?

8                 MR. SCHULER:   Objection.

9          A.     We -- we are not required.

10         Q.     (By Mr. Tangredi)   Did it discuss its

11    safety expectations?

12         A.     No, we did not.

13                MR. SCHULER:   Objection.

14         Q.     (By Mr. Tangredi)   Could it have?

15                MR. SCHULER:   Objection.

16         A.     Yes, we could have.

17         Q.     (By Mr. Tangredi)   Did BB & S give

18    Gregory Trucking's driver any safety materials or

19    safety policies before it hired Gregory Trucking to

20    deliver its short haul to Dalton, Mass. at L.P.

21    Adams?

22                MR. SCHULER:   Objection.

23         A.     We are not required.

24         Q.     (By Mr. Tangredi)   Did they?

**Daniel Kane**
**May 3, 2019**

Page 103

1        A.    No, we did not.

2        Q.    **Could they have?**

3        A.    Yes, we could.

4              MR. SCHULER:   Objection.

5        Q.    **(By Mr. Tangredi)   Did BB & S ask the**

6   **tractor-trailer driver any questions before hiring**

7   **Gregory Trucking to deliver the short haul to L.P.**

8   **Adams in Dalton, Mass.?**

9              MR. SCHULER:   Objection.

10       A.    No, we did not.

11       Q.    **(By Mr. Schuler)   Could BB & S have**

12  **done this?**

13             MR. SCHULER:   Objection.

14       A.    Yes, we could have.

15       Q.    **(By Mr. Tangredi)   Do you agree that**

16  **the only reason Gregory Trucking was in**

17  **Massachusetts on August 24, 2016 was to deliver BB**

18  **& S's lumber to L.P. Adams?**

19             MR. SCHULER:   Objection.

20             MR. O'CONNOR:   Objection.

21       A.    No, I do not.

22       Q.    **(By Mr. Tangredi)   Okay.   Do you have**

23  **information that they would have been in Dalton,**

24  **Mass. for something else?**

**Daniel Kane**
**May 3, 2019**

Page 104

1          MR. SCHULER:  Objection.

2     A.   No, I had information that he had a

3     secondary pickup in Monson, Mass.

4          Q.   (By Mr. Tangredi)  Okay.  Do you know

5     the geography of Massachusetts?

6     A.   I do.

7          Q.   Monson and Dalton?

8     A.   Are in 30 miles from each other or

9     less.

10         Q.   Would it be fair to say that Monson

11    lies in between BB & S's yard and Dalton,

12    Massachusetts?

13         MR. SCHULER:  Objection.

14    A.   Yes, it would.

15         Q.   (By Mr. Tangredi)  Do you agree that

16    the only reason Gregory Trucking would be in

17    Dalton, Massachusetts on August 24, 2016 was to

18    deliver BB & S's lumber to L.P. Adams?

19         MR. SCHULER:  Objection.

20    A.   Yes, I do.

21         Q.   (By Mr. Tangredi)  Do you believe

22    that if Gregory Trucking was not in Dalton,

23    Massachusetts on August 24, 2016 George Forbes

24    would still be alive?

**Daniel Kane**
**May 3, 2019**

```
 1              MR. SCHULER:  Objection.
 2              MR. O'CONNOR:  Objection.
 3        A.    I don't know.

 4

 5        (Exhibit 6, Responses to Request for
 6   Production of Documents, marked)

 7

 8        (Exhibit 7, Invoice, marked)

 9

10        Q.    (By Mr. Tangredi)  Sir, we've just
11   marked a document called Exhibit Number 6.  Would
12   you take a look at that and let me know when you've
13   -- when you're done looking at it.
14        A.    Yes, sir.
15        Q.    Have you had a chance to look at
16   Exhibit Number 6 and Exhibit Number 7?
17        A.    I have.
18        Q.    Is it fair to say Exhibit Number 7 is
19   the same as Number 6 with some information not
20   blocked out?
21        A.    Yes, sir.
22        Q.    And it also looks like Seven might
23   have one less signature on it; is that --
24        A.    That is correct.
```

**Daniel Kane**
**May 3, 2019**

Page 106

1    Q.    -- is that accurate?   Okay.

2    A.    That is correct.

3    Q.    **But everything else would be the**

4    **same?**

5    A.    Correct.

6    Q.    **Is it fair to say Exhibit Number 7 is**

7    **just easier to read?**

8    A.    Yes, it actually is part of a five-

9    part form.   And the reason you can read the Exhibit

10   Number 7 easier is that is the top copy that Mr.

11   Hooks signed when he picked the load up.   And this

12   is actually the remainder copies that were signed

13   by L.P. Adams and then sent back to us.

14   Q.    **And when you say these, you mean --**

15   A.    I'm sorry.   Exhibit 6.

16   Q.    **-- Exhibit Number 6?   Okay.**

17   A.    Yes, sir.

18   Q.    **Got it.   So, you anticipated my**

19   **question.   I was going to ask you to explain how,**

20   **what this form is and -- and how it's used.   So,**

21   **take -- let's take it from the top.**

22   A.    Yes, sir.

23   Q.    **We're at BB & S in Rhode Island, and**

24   **is it fair to say that Exhibit Number 7 is created?**

Daniel Kane
May 3, 2019

1          A.     Absolutely.  Yes, sir.

2          **Q.     And it's in some kind of carbon paper**

3    **type form?**

4          A.     Yes.

5          **Q.     And it's five parts?**

6          A.     A five-part form, correct.

7          **Q.     Got it.  And you take it from there.**

8    **Tell me what happens with this document now.**

9          A.     Exhibit Number 7 is the top copy.

10   When the -- when any driver returns back with a

11   pick ticket, which will break down what actually

12   goes on his truck, to the logistics office, Matt

13   Harris will take that and he will input the

14   information into our Ponderosa computer system.  At

15   which time it'll fill out the quantities that

16   you'll see under quantities shipped on Exhibit 7.

17              If it is an outside carrier as this

18   was, the driver will sign the top copy.  It will

19   transfer onto all the other copies.  The top copy

20   will be taken off and will be kept at BB & S in our

21   office to be matched up for a payable on the

22   trucking end of this situation.  It will also be

23   used for invoicing.

24              The Exhibit 6 is the second page of

**Daniel Kane**
**May 3, 2019**

Page 108

1    that five-part form and that is what you can see

2    has been signed also by somebody at L.P. Adams.

3    L.P. Adams gets one of the copies, the driver gets

4    a copy, and the trucking company gets a copy for

5    the five copies.

6        **Q.    Okay.  In looking at Exhibit Number 7**

7    **can you tell when this was created?**

8        A.    Yes, sir.

9        **Q.    When was it created?**

10       A.    In the top right-hand corner it says

11   8/23/16, 4:02 p.m.

12       **Q.    Okay.  What is the date above that**

13   **invoice date, pick date?**

14       A.    Pick date is when we actually took

15   the order, when the actual pick ticket was created.

16       **Q.    Tell me how that happens.**

17       A.    Customer calls in, places his order

18   with the items you see on this, on Exhibit 7.  It

19   is usually manually written down by a customer

20   service rep within our office, then inputs it into

21   that Ponderosa computer system.  That generates the

22   pick ticket which is handed to one of the shippers,

23   and when we -- qualified shipper.  It's our

24   gentleman who is on a forklift who picks these

**Daniel Kane**
**May 3, 2019**

1    different items in our yard, stages the load, and

2    then gets it ready to go on a truck.

3        Q.    Okay.  So, is it fair to say that

4    Exhibit Number 7 was ordered by L.P. Adams on

5    August 22, 2016?

6        A.    Yes, sir.

7        Q.    Okay.  And BB & S knew they had to

8    get this delivered to L.P. Adams in Dalton, Mass.

9    as early as August 22nd, correct?

10       A.    No, sir.

11       Q.    No?

12       A.    We typically give the customer a

13   window of time, 48 to 72 hours and say you -- it

14   will be delivered in, depending on what our

15   schedule is, they will be told.

16       Q.    I probably asked a bad question.  BB

17   & S knew since August 22nd that this load had been

18   ordered?

19       A.    Yes, sir.

20       Q.    And needed to get delivered?

21       A.    Yes, sir.

22       Q.    Is there anything on Exhibit Number 7

23   that indicates when it had to be delivered by?

24       A.    No, sir.

**Daniel Kane**
**May 3, 2019**

1    Q. **Okay.  Are there time -- some times**
2 **when somebody needs it like yesterday?**
3    A. Yes, sir.
4    Q. **Okay.  And -- and would that be**
5 **indicated in any way on a form?**
6    A. Typically handwritten.
7    Q. **Okay.  Rush?**
8    A. Uh-huh.
9    Q. **Okay.  Something like that?**
10    A. Uh-huh.  Or my signature.
11    Q. **Okay.  Your uh-huhs --**
12    A. Yeah.
13    Q. **-- are hard for her.**
14    A. Yeah.
15    Q. **We won't know if they're uh-huh --**
16    A. Yes, sir.
17    Q. **So, you got it, you understand.**
18 **Okay.  I got it.  Exhibit Number 7, can that only**
19 **come from BB & S, that copy?**
20    A. Yes, sir.
21    Q. **Okay.  So, if I told you I got that**
22 **from L.P. Adams, would I be wrong?**
23    A. The identical form with that
24 signature with everything listed out I would say,

**Daniel Kane**
**May 3, 2019**

Page 111

1    correct, you are incorrect.

2         Q.    Okay.  Can you tell if this -- how

3    much this entire shipment weighed?

4         A.    We have a weight factor on the bottom

5    of Exhibit 7.  However, there's one other thing

6    that I don't know if we checked at the time.  The

7    wood in the -- in certain times is wetter and

8    heavier and we have a internal freight calculation

9    for a range, if you will.  And then we, during the

10   driest times will reduce that factor by a

11   percentage.  And it's, you know, it's just about

12   taking a load to a scale, weighing it, bringing it

13   back, that type of situation, so we understand what

14   we're up against.  So, I would say that -- that --

15   the weight of that that was -- the weight of the

16   product was 46,783.  However, I would, in the same

17   time, stipulate that that was on an approximation

18   based on our system.  It's not a bona fide accurate

19   CAT scale weight.

20        Q.    Okay.  And there are three pages to

21   Exhibit 7.  Does each page have its own weight?

22        A.    Yes, sir.

23        Q.    Okay.  So, the next page is 120

24   pounds and --

**Daniel Kane**
**May 3, 2019**

Page 112

```
 1        A.    Correct.

 2        Q.    -- then the third is 420 pounds?

 3        A.    That is correct.

 4        Q.    But is the -- is the weight, the

 5   total weight on the first page of Exhibit 7, does

 6   that include all three pages?

 7        A.    No, it does not.

 8        Q.    Okay.  Got it.  That's just page one?

 9        A.    Correct.

10        Q.    Good.  When the truck carrying the

11   load that we're talking about in Exhibit 7 left BB

12   & S --

13        A.    Yes, sir.

14        Q.    -- does it get on an actual scale

15   before leaving and we get a more accurate weight?

16        A.    No, it does not.

17        Q.    Okay.  Do you agree that Gregory

18   Trucking was transporting the load in invoice

19   number seven, six and seven in furtherance of the

20   business of BB & S Acquisition Corporation?

21             MR. SCHULER:  Objection.

22             MR. O'CONNOR:  Objection.

23        A.    Could you...

24        Q.    (By Mr. Tangredi)  Of course.  Do you
```

**Daniel Kane**
**May 3, 2019**

1    agree that Gregory Trucking was transporting the

2    loads in invoices numbers six and seven in the

3    furtherance of the business of BB & S Acquisition

4    Corporation?

5              MR. SCHULER:  Objection.

6         A.    Yes, sir.

7         Q.    (By Mr. Tangredi)  Okay.  Do you

8    agree that the transportation of the load to L.P.

9    Adams by Gregory Trucking on August 23, 2016 was

10   within the time limits directed by BB & S?

11             MR. SCHULER:  Objection.

12        A.    Could you define time limits.

13        Q.    (By Mr. Tangredi)  Sure.  The load

14   that was delivered in Exhibits 6 and 7, did BB & S

15   put any kind of time limits on when this had to be

16   delivered?

17        A.    No, we did not.

18        Q.    Okay.  Is it fair to say it was

19   understood it would be delivered as soon as

20   possible?

21             MR. SCHULER:  Objection.

22        Q.    In --

23        A.    I would --

24        Q.    (By Mr. Tangredi)  Go ahead.

**Daniel Kane**
**May 3, 2019**

Page 114

1          A.     I would say as soon as it was

2     allowable following -- the driver following the

3     rules of service, hours of service.

4          Q.     **If he was out of hours of service he**

5     **would have to comply with resting before he**

6     **actually drove it?**

7          A.     Correct.

8          Q.     **Good -- good correction.  I get it.**

9     **You're right.  All right.  Do you agree that the**

10    **load delivered to L.P. Adams that is contained**

11    **within Exhibits 6 and 7 BB & S was moving these**

12    **goods in interstate transportation for profit?**

13               MR. SCHULER:  Objection.

14         A.     Yes, sir.

15         Q.     **(By Mr. Tangredi)  And do you agree**

16    **that BB & S did in fact profit from the delivery to**

17    **L.P. Adams on August 24, 2016?**

18               MR. SCHULER:  Objection.

19         A.     Yes, sir.

20         Q.     **(By Mr. Tangredi)  Do you agree that**

21    **a trucking company must use only qualified drivers**

22    **to prevent crashes and protect all of us from**

23    **injury and death on the highways?**

24               MR. SCHULER:  Objection.

**Daniel Kane**
**May 3, 2019**

Page 115

```
 1              MR. O'CONNOR:  Objection.
 2        A.    I don't believe I'm qualified to
 3   answer that.
 4        Q.    (By Mr. Tangredi)  It's a -- it's a
 5   belief.  Do you believe that a trucking company
 6   must use only qualified drivers to prevent crashes
 7   and protect all of us from injury and death?
 8              MR. SCHULER:  Objection.
 9              MR. O'CONNOR:  Objection.
10        A.    On the basics of qualified, the basic
11   understanding of qualified, yes, I do.
12        Q.    (By Mr. Tangredi)  Okay.  You agree a
13   trucking company must use at least the minimally
14   qualified driver?
15        A.    Yes.
16              MR. SCHULER:  Objection.
17        Q.    (By Mr. Tangredi)  Do you agree that
18   a shipper must choose a competent and careful
19   trucking company to ship its goods to prevent
20   disaster on the highways?
21              MR. MEEHAN:  Objection.
22              MR. SCHULER:  Objection.
23              MR. O'CONNOR:  Objection.
24        A.    Could you please --
```

**Daniel Kane**
**May 3, 2019**

1      Q.      (By Mr. Tangredi)   Sure.

2      A.      Actually no, not rephrase or

3    describe, if you will, your inference on competent

4    and...

5      Q.      Well, did we -- you defined careful

6    and competent earlier.

7      A.      Uh-huh.

8      Q.      So, let's use your -- your

9    definitions of careful and competent.

10               MR. SCHULER:  Objection.

11               MR. O'CONNOR:  Objection.

12     Q.      (By Mr. Tangredi)   Do you agree a

13   shipper must choose a careful and competent

14   trucking company to ship its goods to prevent

15   disaster on the highways?

16               MR. MEEHAN:  Objection.

17               MR. SCHULER:  Objection.

18               MR. O'CONNOR:  Objection.

19     A.      I'm unsure if disaster on a highway

20   is preventable.

21     Q.      (By Mr. Tangredi)   Was the crash that

22   killed George Forbes preventable?

23               MR. SCHULER:  Objection.

24               MR. O'CONNOR:  Objection.

**Daniel Kane**
**May 3, 2019**

Page 117

```
 1          A.    I don't believe I have all the

 2     information to make that judgment.

 3          Q.    (By Mr. Tangredi)  Do you believe

 4     tractor-trailer drivers must follow the safety

 5     rules of the road to prevent crashes?

 6               MR. O'CONNOR:  Objection.

 7               MR. SCHULER:  Objection.

 8          A.    I believe all drivers, including

 9     tractor-trailer drivers must.

10          Q.    (By Mr. Tangredi)  And why?

11          A.    To prevent accidents.

12          Q.    And you'd agree that accidents, the

13     repercussions could be anything from damage to

14     vehicles to death?

15          A.    Yes, sir.

16          Q.    At the time that BB & S hired Gregory

17     Trucking for the short haul on August 23, 2016, BB

18     & S had documentation showing that Gregory Trucking

19     was a duly licensed motor carrier; is that fair to

20     say?

21          A.    Yes, it is.

22          Q.    And Gregory Trucking was hired by BB

23     & S to deliver lumber from BB & S in Rhode Island

24     to L.P. Adams in Dalton, correct?
```

**Daniel Kane**
**May 3, 2019**

1          A.     Correct.

2          Q.     When BB & S hired Gregory Trucking to

3    deliver a load of lumber to L.P. Adams in Dalton,

4    Mass., did BB & S know who owned the tractor the

5    load was being pulled by?

6          A.     No, we did not.

7          Q.     When BB & S hired Gregory Trucking to

8    deliver a load of lumber to L.P. Adams in Dalton on

9    August 23, 2016, did BB & S know who owned the

10   trailer the load was loaded onto?

11         A.     No, we did not.

12

13         (Exhibit 8, Answers to Interrogatories,

14   marked)

15

16         Q.     (By Mr. Tangredi)  Sir, I'm going to

17   ask you to take a look at Exhibit Number 8.

18         A.     (Witness viewing document.)

19         Q.     Do you recognize Exhibit Number 8?

20         A.     I do.

21         Q.     And what is it?

22         A.     It's Answers to the Defendant's -- to

23   the Plaintiff's Interrogatories.

24         Q.     These are BB & S's answers to written

**Daniel Kane**
**May 3, 2019**

1   questions that my office sent to BB & S; is that

2   right?

3        A.    Correct.

4        Q.    Okay.  In the -- on the second to

5   last or the last page I guess, is that your

6   signature?

7        A.    That is my signature.

8        Q.    And do you remember signing these?

9        A.    I do.

10       Q.    And it's dated 31st of July, 2018

11   above your signature?

12       A.    That is correct.

13       Q.    Is that on and about when you signed

14   them?

15       A.    That is on when I signed them.

16       Q.    Okay.  And did you read each and

17   every one of these answers to interrogatories?

18       A.    I have.

19       Q.    And you looked at the answers?

20       A.    I have.

21       Q.    And they're all accurate and

22   complete?

23       A.    Yes, sir.

24       Q.    Okay.  I want to just direct your

**Daniel Kane**
**May 3, 2019**

Page 120

1      attention to number 14 if you would.

2           A.    Yes, sir.

3           Q.    And it asks, "Before the crash in

4      Dalton, Mass., on 24, August 2016 how and when did

5      BB & S Acquisition Corporation last check the

6      safety rating of, and the only one that really we

7      need to talk about is A, Gregory Trucking Company.

8                 And BB & S's answer is, "BB & S

9      requires a copy of the carrier's insurance

10     certificate, a W9, and review of their DOT number

11     from Gregory Trucking."  Is that what it -- is that

12     what it says?

13          A.    Yes, sir.

14          Q.    Okay.  And that's consistent with

15     what you've been saying here today in your

16     deposition; is that right?

17          A.    That is correct.

18          Q.    All right.

19

20          (Exhibit 9, Responses to Plaintiff's Second

21     Request for Production of Documents, marked)

22

23          Q.    (By Mr. Tangredi)  Could you take a

24     look at Exhibit 9 and let me know when you're done

**Daniel Kane**
**May 3, 2019**

Page 121

1    looking at that.

2          A.     (Witness viewing document.)

3          Q.     And sir, do you recognize what we've

4    marked as Exhibit Number 9?

5          A.     Yes, sir.

6          Q.     Okay.  And that's BB & S's Responses

7    to the Plaintiff's Second Request for the

8    Production of Documents, correct?

9          A.     Correct.

10         Q.     Okay.  If you look at number four,

11   there was a request made for the insurance

12   certificates on file with BB & S Acquisition

13   Corporation up to and including 24, August 2016 for

14   Gregory Trucking; Gregory Leasing; B & C Timbers;

15   and BSG Leasing.  And the response is:  "None.  BB

16   & S did not retain or keep a copy of the insurance

17   certificate up to August 24, 2016 for Gregory

18   Leasing, B & C -- excuse me, B & C Timbers; or BSG

19   Leasing."

20                Is that what it says?

21         A.     Yes, sir.

22         Q.     Okay.  Does it address the insurance

23   certificate for Gregory Trucking?

24         A.     It appears not.

**Daniel Kane**
**May 3, 2019**

Page 122

1       **Q.   The first word in the response to**
2   **number four, it says none.  Would none apply to the**
3   **Gregory Trucking?**
4       A.   I would assume it does.
5       **Q.   That's how I understood it.  Because**
6   **the others don't matter, the others we're not**
7   **interested in.  We're interested in the insurance**
8   **certificate for Gregory Trucking that BB & S**
9   **Acquisition retained.**
10      A.   Correct.
11      **Q.   And at the time of answering or**
12  **responding to this request for documents, that**
13  **insurance certificate had been destroyed; is that**
14  **correct?**
15      A.   Correct.  As it was out of date.
16      **Q.   Okay.  Did BB & S -- when did BB & S**
17  **first learn about the crash that killed George**
18  **Forbes?**
19      A.   When we received the initial
20  Complaint from your office.
21      **Q.   Do you know the date?**
22      A.   I do not.
23      **Q.   Fair to say it was in sometime in**
24  **2018?**

**Daniel Kane**
**May 3, 2019**

Page 123

1          A.     That is correct.

2          Q.     I think.

3          A.     Agreed.

4          Q.     Did BB & S check the safe stat record

5     of Gregory Trucking before shipping the load of BB

6     & S lumber to L.P. Adams in Dalton, Mass. on August

7     23, 2016?

8                   MR. SCHULER:  Objection.

9          A.     We were not required.

10         Q.     (By Mr. Tangredi)  Did it check it?

11         A.     No, we did not.

12         Q.     Could it have?

13                  MR. SCHULER:  Objection.

14         A.     Yes, we could have.

15         Q.     (By Mr. Tangredi)  Did BB & S check

16    the BASICS scores of Gregory Trucking before

17    shipping the load of BBS -- BB & S lumber to L.P.

18    Adams in Dalton, Mass. on August 23, 2016?

19                  MR. SCHULER:  Objection.

20         A.     We are not required.

21         Q.     (By Mr. Tangredi)  Did it?

22                  MR. SCHULER:  Objection.

23         A.     We did not.

24         Q.     (By Mr. Tangredi)  Could it have?

**Daniel Kane**
**May 3, 2019**

Page 124

1          MR. SCHULER:  Objection.

2     A.     Yes, we could have.

3     Q.     (By Mr. Tangredi)   Did BB & S check

4  the SAFER website of Gregory Trucking before

5  shipping the load of BB & S lumber to L.P. Adams in

6  Dalton, Mass. on August 23, 2016?

7          MR. SCHULER:  Objection.

8     A.     We are not required.

9     Q.     (By Mr. Tangredi)   Could it have?

10          MR. SCHULER:  Objection.

11    A.     We could have.

12    Q.     (By Mr. Tangredi)   Did it?

13          MR. SCHULER:  Objection.

14    A.     No, we did not.

15    Q.     (By Mr. Tangredi)   Was BB & S aware

16  Gregory Trucking had a conditional safety rating by

17  the Federal Motor Carrier Safety Administration

18  before shipping the load of BB & S lumber to L.P.

19  Adams in Dalton, Mass. on August 23, 2016?

20          MR. SCHULER:  Objection.

21    A.     No, we did not.

22    Q.     (By Mr. Tangredi)   It was asking if

23  you were aware they had a conditional rating.  You

24  weren't?

**Daniel Kane**
**May 3, 2019**

Page 125

1          A.     We were not.

2          Q.     Thank you.  Could BB & S have

3    discovered that?

4                 MR. SCHULER:  Objection.

5          A.     Yes, we could have.

6          Q.     (By Mr. Tangredi)  If they had, would

7    they have used Gregory Trucking --

8                 MR. SCHULER:  Objection.

9          Q.     -- for that load?

10                MR. O'CONNOR:  Objection.

11         A.     Unsure.

12         Q.     (By Mr. Tangredi)  Okay.  Was BB & S

13   aware Gregory Trucking had a conditional safety

14   rating with the Federal Motor Carrier Safety

15   Administration since 2011 before they shipped their

16   load of lumber to L.P. Adams in Dalton, Mass. on

17   August 23, 2016?

18                MR. SCHULER:  Objection.

19         A.     We were not aware.

20         Q.     (By Mr. Tangredi)  Was BB & S aware

21   that in August of -- strike that.  Was BB & S aware

22   in August of 2016 that Gregory Trucking had a

23   compliance review by the United States Department

24   of Transportation in 2011?

**Daniel Kane**
**May 3, 2019**

Page 126

1              MR. SCHULER:  Objection.

2       A.    No, we did not.

3       Q.    (By Mr. Tangredi)  Is BB & S aware of

4   what a compliance review is?

5              MR. SCHULER:  Objection.

6       A.    Yes, we are.

7       Q.    (By Mr. Tangredi)  Was BB & S aware

8   that the 2011 compliance review of Gregory Trucking

9   revealed that Gregory Trucking was using drivers

10  before it received a negative preemployment

11  controlled substance test result?

12             MR. SCHULER:  Objection.

13             MR. O'CONNOR:  Objection.

14      A.    No, we did not.

15      Q.    (By Mr. Tangredi)  Was BB & S aware

16  that the 2011 compliance review of Gregory Trucking

17  revealed that Gregory Trucking failed to conduct

18  post crash alcohol testing on drivers following a

19  recordable crash?

20             MR. SCHULER:  Objection.

21             MR. O'CONNOR:  Objection.

22      A.    No, we did not.

23      Q.    (By Mr. Tangredi)  Was BB & S aware

24  that the 2011 compliance review of Gregory Trucking

Daniel Kane
May 3, 2019

Page 127

1    showed Gregory Trucking failed to investigate

2    drivers' backgrounds before giving them tractor-

3    trailer trucks to drive?

4              MR. SCHULER:   Objection.

5              MR. O'CONNOR:   Objection.

6         A.    No, we did not.

7         Q.    (By Mr. Tangredi)  Was BB & S aware

8    that the 2011 compliance review revealed that

9    Gregory Trucking had failed to investigate the

10   drivers' alcohol and controlled substance history

11   for the previous three years before hiring those

12   drivers?

13             MR. O'CONNOR:   Objection.

14             MR. SCHULER:   Objection.

15        A.    No, we did not.

16        Q.    (By Mr. Tangredi)  Was BB & S aware

17   in -- that the 2011 compliance review of Gregory

18   Trucking revealed that Gregory Trucking failed to

19   inquire into the driving records of its drivers?

20             MR. SCHULER:   Objection.

21             MR. O'CONNOR:   Objection.

22        A.    No, we did not.

23        Q.    (By Mr. Tangredi)  Was BB & S aware

24   that the 2011 compliance review revealed Gregory

**Daniel Kane**
**May 3, 2019**

Page 128

1    Trucking had failed to review driving records to

2    determine whether its drivers meet the minimum

3    requirements for safe driving?

4                    MR. SCHULER:  Objection.

5                    MR. O'CONNOR:  Objection.

6          A.    No, we did not.

7          Q.    (By Mr. Tangredi)  Okay.  Did BB & S

8    ever check in any way the safety record of Gregory

9    Trucking before shipping its lumber with Gregory

10   Trucking to L.P. Adams in Dalton, Mass. on August

11   23, 2016?

12                   MR. O'CONNOR:  Objection.

13         A.    No, we did not.

14         Q.    (By Mr. Tangredi)  Did BB & S ever

15   check to see if Gregory Trucking had a written

16   safety plan in place to address its safety issues

17   before shipping its lumber with Gregory Trucking to

18   L.P. Adams in Dalton, Mass. on August 23, 2016?

19                   MR. SCHULER:  Objection.

20         A.    We were not required to.

21         Q.    (By Mr. Tangredi)  Was it aware?

22         A.    No, we weren't aware.

23         Q.    Did it ever check Gregory Trucking's

24   safety plan?

**Daniel Kane**
**May 3, 2019**

Page 129

1        MR. SCHULER:  Objection.

2        A.    No, sir.

3        Q.    (By Mr. Tangredi)  Before hiring

4    Gregory Trucking on August 23, 2016 was BB & S

5    aware that on June 7, 1990 in Wilkes County, North

6    Carolina, Wiley Lenue Hooks pled guilty to driving

7    while impaired?

8        MR. SCHULER:  Objection.

9        A.    No, sir.

10       Q.    (By Mr. Tangredi)  Was BB & S aware

11   that on August 23, 1990 in Wilkes County, Wiley

12   Lenue Hooks pled guilty to driving while impaired

13   for a second time?

14       MR. SCHULER:  Objection.

15       A.    No, sir.

16       Q.    (By Mr. Tangredi)  Is BB & S aware

17   that in May of 1998 in Duval, Florida, Wiley Lenue

18   Hooks was placed on probation for burglary?

19       MR. SCHULER:  Objection.

20       MR. O'CONNOR:  Objection.

21       A.    No, sir.

22       Q.    (By Mr. Tangredi)  Is BB & S aware

23   that on April 2, 2003 in Iredell County, North

24   Carolina, Wiley Lenue Hooks was guilty of driving

**Daniel Kane**
**May 3, 2019**

Page 130

1    with an expired registration?

2            MR. SCHULER:  Objection.

3        A.    No, sir.

4        Q.    (By Mr. Tangredi)  Is BB & S aware

5    that on May 8, 2003 in Iredell County, North

6    Carolina, Wiley Lenue Hooks was guilty of another

7    driving while impaired?

8            MR. O'CONNOR:  Objection.

9            MR. SCHULER:  Objection.

10       A.    No, sir.

11       Q.    (By Mr. Tangredi)  And that he

12   possessed marijuana on that occasion?

13           MR. SCHULER:  Objection.

14       A.    No, sir.

15       Q.    (By Mr. Tangredi)  Is BB & S aware

16   that on 7/23/2003 in Iredell County, North

17   Carolina, Wiley Lenue Hooks was guilty of passing a

18   worthless check and fined?

19           MR. O'CONNOR:  Objection.

20           MR. SCHULER:  Objection.

21       A.    No, sir.

22       Q.    (By Mr. Tangredi)  Was BB & S aware

23   that on July 23, 2013 in Catawaba County, North

24   Carolina, Wiley Lenue Hooks was charged for the

Daniel Kane
May 3, 2019

Page 131

1     fourth time with driving while impaired?

2                    MR. SCHULER:   Objection.

3                    MR. O'CONNOR:   Objection.

4          A.    No, sir.

5          Q.    (By Mr. Tangredi)   Is BB & S aware

6     that on March 22, 2016, approximately five months

7     before the crash that killed George Forbes, that

8     Wiley Lenue Hooks's CDL was revoked for driving

9     while impaired?

10                   MR. O'CONNOR:   Objection.

11                   MR. SCHULER:   Objection.

12         A.    No, sir.

13         Q.    (By Mr. Tangredi)   Would you want to

14    be driving on a highway anywhere near Wiley Lenue

15    Hooks while he was driving a tractor-trailer truck?

16                   MR. SCHULER:   Objection.

17                   MR. O'CONNOR:   Objection.

18         A.    I can't answer that.

19         Q.    (By Mr. Tangredi)   Would you want

20    your loved ones driving anywhere near that guy?

21                   MR. O'CONNOR:   Objection.

22                   MR. SCHULER:   Objection.

23         A.    I can't answer that.

24         Q.    (By Mr. Tangredi)   If BB & S needed

**Daniel Kane**
**May 3, 2019**

Page 132

```
 1    to hire a motor carrier today or any time in the
 2    past, would be BBS hire a motor carrier that it
 3    knew had a conditional safety rating by the FMCSA?
 4                MR. SCHULER:  Objection.
 5                MR. O'CONNOR:  Objection.
 6          A.    Yes.
 7          Q.    (By Mr. Tangredi)  Would they require
 8    any additional information from that motor carrier
 9    before hiring them with a conditional safety
10    rating?
11                MR. SCHULER:  Objection.
12                MR. O'CONNOR:  Objection.
13          A.    No, sir.
14          Q.    (By Mr. Tangredi)  If BB & S needed
15    to hire a motor carrier today or at any time in the
16    past would they hire a motor carrier that it knew
17    had two reportable DOT crashes in the two years
18    before hiring them?
19                MR. SCHULER:  Objection.
20                MR. O'CONNOR:  Objection.
21          A.    Could you repeat that.
22          Q.    (By Mr. Tangredi)  Sure.  If BB & S
23    needed to hire a motor carrier today or at any time
24    in the past would BB & S hire a motor carrier that
```

**Daniel Kane**
**May 3, 2019**

Page 133

1    it knew had two reportable Department of

2    Transportation crashes within the previous two

3    years?

4              MR. SCHULER:  Objection.

5         A.    I'm trying to understand how that

6    impacts their rating.  And if that would drop them

7    into a unsatisfactory.  If it was conditional, they

8    can still run.  If it's unsatisfactory, they can't

9    run, so that's a -- I don't possess all of the

10   information in order to answer that question.

11        Q.    (By Mr. Tangredi)  So, forgetting

12   their rating, if BB & S knew a motor carrier had

13   been involved in two reportable crashes in the two

14   years prior, would BB & S hire that motor carrier?

15             MR. SCHULER:  Objection.

16             MR. O'CONNOR:  Objection.

17        A.    Conditionally, to understand if we

18   knew of the accidents and we had the -- an

19   opportunity to understand them, that would be the

20   condition of whether or not we would hire them.

21        Q.    (By Mr. Tangredi)  So, yes, assuming

22   you knew that they were involved in two crashes?

23        A.    And I'm saying assuming we knew all

24   the circumstances.

**Daniel Kane**
**May 3, 2019**

Page 134

```
 1        Q.    Okay.  So --
 2        A.    If -- if -- if somebody brake-
 3   checked them and they ran into them, and the -- and
 4   the car has to be towed, it's a reportable
 5   accident.  So --
 6        Q.    So, is it fair to say it depends?
 7        A.    Yes, it is very fair to say it
 8   depends.
 9        Q.    And BB & S -- would BB & S, if they
10   knew there were two crashes in the past two years,
11   want to get additional information before making a
12   decision?
13        A.    If we were aware, yes.
14        Q.    And to be fair to that motor carrier,
15   those reportable crashes could have nothing to do
16   with that motor carrier?
17        A.    Or that driver.
18        Q.    Or that driver.  If BB & S needed to
19   hire a motor carrier today or at any time in the
20   past, would BB & S hire a motor carrier that it
21   knew had a higher than average unsafe driving rate?
22             MR. O'CONNOR:  Objection.
23             MR. SCHULER:  Objection.
24        A.    No, we would not.
```

**Daniel Kane**
**May 3, 2019**

Page 135

```
 1        Q.    (By Mr. Tangredi)  If BB & S needed
 2   to hire a motor carrier today or any time in the
 3   past, would BB & S hire a motor carrier that it
 4   knew had a crash indicator rating of being worse
 5   than 79 percent of all other motor carriers?
 6              MR. SCHULER:  Objection.
 7              MR. O'CONNOR:  Objection.
 8        A.    Again, that would have to understand
 9   the circumstances of the two questions previously.
10        Q.    (By Mr. Tangredi)  Do you know that
11   motor carriers are rated on their crash indicator?
12        A.    Yes.  I believe the crash indicator
13   also indicates miles driven, trucks, and number of
14   trucks in the -- in the fleet.
15        Q.    Okay.  And is it -- would you agree
16   that the rating given for crash indicator is based
17   on all tractor-trailer commercial vehicles?
18        A.    Yes, sir.
19        Q.    And may -- there's some formula that
20   they figure out?
21        A.    Correct.
22        Q.    So, if somebody was in the 79
23   percentile, do you know what that means?
24        A.    I do.
```

**Daniel Kane**
**May 3, 2019**

Page 136

1       Q.     What does that mean?  Just so we're
2   clear.
3       A.     Their -- their amount.  The
4   infractions are the amounts are in that percentile
5   of only 11 -- 21 percent are worse than them.
6       Q.     Fair -- good.  I agree.  Would BB & S
7   hire somebody who is in that percentile for crash
8   indicator?
9              MR. O'CONNOR:  Objection.
10             MR. SCHULER:  Objection.
11      A.     No, sir.
12      Q.     (By Mr. Tangredi)  If -- and that
13  percentage of crash indicator, we're talking about
14  79 percent.
15      A.     Correct.
16      Q.     If BB & S needed to hire a motor
17  carrier today or at any time in the past, would BB
18  & S hire a motor carrier that it knew had a higher
19  than average rate of violations of hours of service
20  regulations?
21             MR. SCHULER:  Objection.
22      A.     Again, this is a bit -- if it's a
23  motor carrier, it's multiple trucks, multiple
24  drivers.  And if multiple drivers can be cited for

**Daniel Kane**
**May 3, 2019**

1    out of hours, then is it indicative of the

2    individual that you consistently see.  So, I'm just

3    saying that...

4         Q.   (By Mr. Tangredi)  Are carriers rated

5    or are drivers rated?

6         A.   The drivers are rated.  The driver is

7    responsible for the log.  The carrier is not

8    responsible for the log.

9         Q.   So, these safety ratings that you

10   have access to --

11              MR. SCHULER:  Objection.

12        A.   Correct.

13        Q.   -- are these safety ratings rating

14   the motor carrier or drivers?

15        A.   I'm assuming that they're rating the

16   motor carrier based on that's the only entity that

17   they can hook to the DOT number that gives you the

18   opportunity to look at it in -- in totality.

19        Q.   Can you -- do you know what hours of

20   service?

21        A.   Yes.

22        Q.   Explain it to us.

23        A.   It's basically a driver is allowed X

24   amount of hours to drive, and X amount of hours to

**Daniel Kane**
**May 3, 2019**

Page 138

1  either move the truck, work on the truck, tarp the
2  truck, that type of stuff.  So, he'll have -- and
3  there's also exclusions to it.  There's a bad
4  weather exclusion.  So, if the driver has 11 hours
5  of drive time in a day, but he's caught in a
6  snowstorm and he can't get to anyplace safe and he
7  has to drive another hour, hour and-a-half because
8  he's in traffic that's bumper-to-bumper, he'll have
9  an exclusion and his log will be notated that way.

10        The driver typically has 60 hours a
11 week that he can drive.  And there's a percentage
12 of hours, and I'm not sure what that total is that
13 he's allowed to work on either A, tarping the
14 truck, moving the truck, transferring a trailer,
15 those type of aspects of his job.

16        **Q.    Is it fair to say the Federal Motor**
17 **Carrier Safety Administration has determined that**
18 **drivers should only be driving a certain amount of**
19 **hours per week?**

20        A.    Yes, sir.

21        **Q.    And do you know the reason why they**
22 **decided to do that?**

23             MR. O'CONNOR:  Objection.

24        A.    Yes, sir.

**Daniel Kane**
**May 3, 2019**

1        Q.    (By Mr. Tangredi)   Why?

2        A.    Fatigue.

3        Q.    What happens with a fatigued driver?

4        A.    They tend to have incidents,

5  accidents.

6        Q.    So, if a motor carrier had a higher

7  than average rate of violations of hours of service

8  regulations would BB & S hire that motor carrier?

9        A.    No, sir.

10       Q.    If BB & S needed to hire a motor

11  carrier today or at any time in the past, would BB

12  & S hire a motor carrier that it knew had a vehicle

13  maintenance rating indicating it was worse than 60

14  percent of the other motor carriers on the road?

15           MR. SCHULER:  Objection.

16           MR. O'CONNOR:  Objection.

17       A.    Could you repeat.

18       Q.    (By Mr. Tangredi)   Sure.  If BB & S

19  needed to hire a motor carrier today or at any time

20  in the past, would BB & S hire a motor carrier that

21  it knew had a vehicle maintenance rating indicating

22  it was worse than 60 percent of the other motor

23  carriers on the road?

24           MR. SCHULER:  Objection.

**Daniel Kane**
**May 3, 2019**

Page 140

1      A.    No, sir.

2          Q.    (By Mr. Tangredi)   Why not?

3      A.    Two schools of thought.  First one is

4  that they don't take care of their trucks.  The

5  second school of thought is that there's no need to

6  take -- no need to use the guy that's in the same

7  lane that's constantly getting in -- when I say

8  lane, traveling the same lane from say North

9  Carolina to Rhode Island and keeps getting caught

10  in the same area.  Evidently there's somewhere

11  where he gets picked up and on a regular basis.  Or

12  if he -- if he gets caught, doesn't fix and gets

13  caught for the same thing there's no reason to use

14  them.

15         Q.    Why?

16     A.    Safety.

17         Q.    Safety of who?

18     A.    Of any one of us in the public.

19         Q.    If BB & S needed to hire -- strike

20  that.  Let me ask you, do you know what out of

21  service rate means?

22     A.    (Witness nodding.)

23         Q.    What does that mean?

24     A.    I believe it's a percentage of time

**Daniel Kane**
**May 3, 2019**

Page 141

1      that you -- versus the miles or hours that you have
2      logged that your truck or trucks have been placed
3      out of service.  So, once you're placed out of
4      service it can be as simple as a chafed air line.
5      And they will not let you move because the air
6      actuates the brakes in a trailer, a chafed air line
7      in the trailer.  It may take somebody four to six
8      hours to get, I know when I call road service at
9      Penske, it's -- it takes easily four hours for a
10     turnaround by the time he's out there fixed and the
11     driver's back on the road.  So, that, if he's put
12     out -- if a truck is put out of service it's then
13     calculated how long he's out of service before he's
14     back in service.  I believe there's an 800 number
15     he calls and he says he's back in service and he
16     has a timeframe to send a mechanic's note back to
17     the DOT.  And that's how that's calculated.  So,
18     there can be, like I said, as simple as if a DOT
19     cop chooses to put somebody out of service for no
20     mudflap or all the way to a chafed air line, to a
21     broken air line, it's amount of time that's
22     calculated to the total number of miles or hours
23     truck for that company drives.
24          **Q.     Does a tractor-trailer truck being**

**Daniel Kane**
**May 3, 2019**

Page 142

```
 1    out of service mean it's not moving goods?
 2         A.    Correct.  It cannot move.
 3         Q.    A shipper wants its goods moved,
 4    right?
 5         A.    Correct.
 6         Q.    If BB & S needed to hire a motor
 7    carrier today or at any time in the past, would BB
 8    & S hire a motor carrier that it knew had a higher
 9    than average out of service rating for its trucks?
10              MR. SCHULER:  Objection.
11              MR. O'CONNOR:  Objection.
12         A.    No, sir.
13         Q.    (By Mr. Tangredi)  Why not?
14         A.    We don't want to be caught in that,
15    the web of being out of service.
16         Q.    Downtime?
17         A.    Downtime.
18         Q.    Okay.  If BB & S needed to hire a
19    motor carrier today or at any time in the past,
20    would BB & S hire a motor carrier that it knew used
21    drivers who did not have current commercial
22    drivers' licenses?
23              MR. SCHULER:  Objection.
24         A.    No, sir.
```

**Daniel Kane**
**May 3, 2019**

1          Q.     (By Mr. Tangredi)   If BB & S needed

2     to hire a motor carrier today or at any time in the

3     past, would BB & S hire a motor carrier that it

4     knew had a conditional rating by the FMCSA for the

5     previous four and-a-half years and did nothing to

6     attempt to improve it?

7                    MR. O'CONNOR:   Objection.

8                    MR. SCHULER:   Objection.

9          A.     Whereas we're not required to -- to

10    find and understand, but that's not the question,

11    the question is if we did know.

12         Q.     (By Mr. Tangredi)   Thank you.

13         A.     I would say yes.   And if I could add,

14    it's -- there's a tremendous amount of conditional

15    trucking companies out there that do operate safely

16    on the roads.

17         Q.     And BB & S would hire them?

18         A.     Correct.

19         Q.     Would you agree that if they got a

20    conditional rating in the first place they were

21    deficient in some way?

22                    MR. O'CONNOR:   Objection.

23                    MR. SCHULER:   Objection.

24         A.     I don't know what brings the

**Daniel Kane**
**May 3, 2019**

1    conditional rating upon.  My understanding within

2    my career has been that most companies,

3    unfortunately most companies are in that.  There's

4    -- there's very few in that satisfactory level, not

5    very few, there's a smaller percentage.  And that

6    more people are in conditional because of

7    circumstances within the -- the gamut or the

8    methodology of how the FMCSA goes about figuring

9    that out.

10         Q.    **(By Mr. Tangredi)  Carriers that are**

11   **rated conditional are not satisfactory to the**

12   **FMCSA, correct?**

13         A.    Correct.

14               MR. O'CONNOR:  Objection.

15         Q.    **(By Mr. Tangredi)  Is BB & S a member**

16   **of any trucking organizations?**

17         A.    No, sir.

18         Q.    **Do you know the date of the crash**

19   **that killed George Forbes?**

20         A.    I believe it was August 16, 2016.

21         Q.    **And I think I asked you this.  When**

22   **did BB & S first learn about the death of George**

23   **Forbes?**

24         A.    With the notification from your

**Daniel Kane**
**May 3, 2019**

 1    office via the Complaint.

 2         **Q.    The lawsuit?**

 3         A.    The lawsuit, yes, sir.

 4         **Q.    After BB & S learned of the death of**

 5    **George Forbes did it do anything to investigate the**

 6    **death of George Forbes?**

 7         A.    Other than going on the Internet to

 8    just research any information of the actual crash,

 9    just a report that it had happened.  We had never

10    heard anything from our customer, from L.P. Adams.

11    We did not hear anything -- we did not hear

12    anything from Gregory Trucking.  And then when we

13    got the Complaint, it was forwarded on and all the

14    information then flowed through the folks at

15    Travelers and Attorney Schuler's office.

16         **Q.    Does BB & S understand the**

17    **allegations against it from the Complaint?**

18         A.    Yes, sir.

19         **Q.    What is BB & S's understanding of the**

20    **allegations against BB & S?**

21         A.    Negligent hiring of a -- of the

22    transportation company.  And I'm sorry, it slips my

23    -- my mind on the other.  I think there was two

24    aspects of it that were in the initial --

**Daniel Kane**
**May 3, 2019**

```
 1          Q.     Okay.

 2          A.     -- lawsuit filing.

 3          Q.     Does BB & S believe it played any

 4     role in the death of George Forbes?

 5          A.     No, sir, we do not.

 6          Q.     Has BB & S done anything to change

 7     its policies in hiring motor carriers since

 8     learning of the death of George Forbes?

 9                 MR. SCHULER:  Objection.

10          A.     No, sir, we have not.

11          Q.     (By Mr. Tangredi)  Is BB & S still

12     using Gregory Trucking?

13                 MR. SCHULER:  Objection.

14          A.     No, sir, we are not.

15          Q.     (By Mr. Tangredi)  I understand

16     Gregory Trucking made a delivery to BB & S today.

17          A.     That is correct.

18          Q.     So, Gregory Trucking still delivers

19     to BB & S?

20          A.     That is correct.

21          Q.     And but BB & S no longer uses Gregory

22     Trucking?

23                 MR. O'CONNOR:  Objection.

24                 MR. SCHULER:  Objection.
```

**Daniel Kane**
**May 3, 2019**

1          A.    That is correct.

2          Q.    **(By Mr. Tangredi)   Why did BB & S**

3     **stop using Gregory Trucking?**

4               MR. SCHULER:   Objection.

5               MR. O'CONNOR:   Objection.

6          A.    Due to litigation.

7          Q.    **(By Mr. Tangredi)   Do you know how**

8     **the crash actually happened?**

9          A.    I believe from what I read that

10    unfortunately Mr. Hooks drove through an

11    intersection.   I believe his light was red and he

12    hit Mr. Forbes in the driver's side door of his

13    Toyota pick-up truck.

14         Q.    **Do you know the name of the**

15    **intersection?**

16         A.    I do not.

17         Q.    **Do you know what time the crash**

18    **occurred?**

19         A.    I believe it was fairly early

20    morning.   Eight, between maybe eight or 9:00 a.m.,

21    if my memory serves me.

22         Q.    **Do you know how old George Forbes was**

23    **when he died?**

24         A.    I believe he was 61.

Daniel Kane
May 3, 2019

Page 148

1      Q.    Do you know the cause of death of
2  George Forbes?
3              MR. O'CONNOR:  Objection.
4              MR. SCHULER:  Objection.
5      A.    From what I understand it was
6  internal injuries.
7      Q.    (By Mr. Tangredi)  In its answer to
8  the Complaint, BB & S says that Mr. Forbes was
9  partially responsible for the crash.  Could you
10  tell me what Mr. Forbes did --
11             MR. SCHULER:  Objection.
12     Q.    -- that makes him partially
13  responsible for the crash?
14     A.    If I remember correctly Mr. Forbes
15  was not wearing a seatbelt.
16     Q.    (By Mr. Tangredi)  Does BB & S
17  deliver to L.P. Adams early in the morning
18  typically?
19     A.    I would say when we -- when it is
20  available to us, yes.
21     Q.    Is it desirable?
22             MR. SCHULER:  Objection.
23     Q.    (By Mr. Tangredi)  Why do you say
24  when it's available to you?

Daniel Kane
May 3, 2019

Page 149

1        A.    If -- if the driver has the hours,

2    can do or make that stop, yes, then it is.

3        Q.    **Why?**

4        A.    The customer likes early deliveries.

5        Q.    **Does BB & S like early deliveries?**

6        A.    It -- it does not matter to us as

7    much as just trying to accommodate a customer.

8    Sometimes you can, sometimes you can't.

9        Q.    **I get it.  Early delivery they've got**

10   **more time to move it.**

11       A.    Put it away.

12       Q.    **Got it.  Is BB & S aware that the**

13   **Dalton Public Schools were in session on August 24,**

14   **2016?**

15       A.    We were not.

16       Q.    **Is BB & S aware that school buses**

17   **with children inside them pass through the same**

18   **intersection where George Forbes was killed at 7:00**

19   **a.m.?**

20       A.    We did not.

21       Q.    **Is BB & S aware there's a school bus**

22   **stop 300 feet close to that intersection?**

23       A.    We did not.

24       Q.    **Was BB & S aware that there are**

**Daniel Kane**
**May 3, 2019**

1    crosswalks at this intersection?

2        A.    We did not.

3        Q.    Is BB & S aware pedestrians use those

4    crosswalks, at the intersection where George Forbes

5    was killed, every morning?

6        A.    We did not.

7        Q.    Was BB & S aware cyclists go through

8    the intersection every morning where George Forbes

9    was killed?

10       A.    We did not.

11       Q.    Is BB & S aware that public

12   transportation buses travel through the

13   intersection where George Forbes was killed every

14   morning at about 7:00 a.m.?

15       A.    We did not.

16       Q.    Is BB & S aware that hundreds of cars

17   and trucks pass through the intersection where

18   George Forbes was killed in the early morning

19   hours?

20       A.    We did not.

21       Q.    Can you tell me three things that BB

22   & S could have done differently --

23             MR. SCHULER:  Objection.

24       Q.    -- to have prevented the death of

**Daniel Kane**
**May 3, 2019**

Page 151

1    **George Forbes?**

2                    MR. SCHULER:   Objection.

3            A.    I don't see what we could have done

4    differently having the information we had at the

5    time.

6            **Q.    (By Mr. Tangredi)   Does BB & S**

7    **believe it could have had more information at the**

8    **time?**

9                    MR. SCHULER:   Objection.

10           A.    Yes, sir.

11           **Q.    (By Mr. Tangredi)   Did you understand**

12   **all of my questions?**

13           A.    I have, sir.

14           **Q.    Did I give you a fair chance to**

15   **answer all of my questions?**

16           A.    I believe you have.

17                   MR. SCHULER:   Objection.

18           **Q.    (By Mr. Tangredi)   Is there any**

19   **question I asked you for which you want to go back**

20   **and revisit?**

21           A.    No, sir.

22           **Q.    Is there any question I asked you you**

23   **want to go back and change an answer?**

24           A.    No, sir.

**Daniel Kane**
**May 3, 2019**

Page 152

1      Q.    Is there anything I asked you for
2    which you want to go back and add to?
3      A.    No, sir.
4      Q.    Is there anything I did not ask you
5    that you would like to address?
6      A.    No, sir.
7      Q.    Have you answered all of my questions
8    truthfully?
9      A.    I have, sir.
10     Q.    Thank you, Mr. Kane.
11            MR. TANGREDI:  I have no further
12          questions.  Others may.
13            MR. O'CONNOR:  I don't have any
14          questions.
15            MR. MEEHAN:  I have -- I have a
16          question.
17
18          CROSS-EXAMINATION BY MR. MEEHAN:
19
20     Q.    If I might, Mr. Kane, my name again
21    is Jeff Meehan.  I represent B & C Timbers.  And my
22    first question is, from whom did BB & S purchase
23    the lumber that was delivered to your facility in
24    North Kingstown on August 23, 2016?

Daniel Kane
May 3, 2019

Page 153

1          A.     Yellow Pine Trading.

2          Q.     **Was there any direct contractual**

3    **transaction between BB & S and B & C Timbers?**

4          A.     No, sir.

5          Q.     **Did BB & S make payment to Yellow**

6    **Pine for the lumber that was delivered by Mr. Hooks**

7    **on August 23, 2016?**

8          A.     Yes, sir.

9          Q.     **The material that was sent to L.P.**

10   **Adams, was that material that had been purchased**

11   **from Yellow Pine?**

12         A.     I am unsure.  It could have been.  I

13   buy different sizes from Yellow Pine Timber.

14         Q.     **Okay.**

15         A.     Yellow Pine Trading.  I'm sorry.

16         Q.     **Was the shipment that was**

17   **commissioned by BB & S for delivery to L.P. Adams,**

18   **was that in any -- was done for any purpose of B &**

19   **C Timbers?**

20         A.     No, sir.

21         Q.     **Did you receive any bill of lading or**

22   **delivery ticket from B & C Timbers with respect to**

23   **the load of lumber delivered to BB & S on August**

24   **23, 2016?**

**Daniel Kane**
**May 3, 2019**

Page 154

 1          A.    No, sir.

 2          Q.    Did I understand that at some point

 3   in your career you worked for Penske?

 4          A.    No, sir.

 5          Q.    Oh, I thought I -- I misunderstood.

 6          A.    No, I -- we've used them exclusively

 7   right now for our trucking, for our personal fleet.

 8          Q.    In other words -- I'm a little bit

 9   confused.  You still hire outside trucking

10   companies?

11          A.    Correct.

12          Q.    For as needed?

13          A.    Correct.

14          Q.    But the bulk of your trucking occurs

15   through Penske?

16          A.    No, sir.

17          Q.    Okay.  Could you explain, please.

18          A.    Absolutely.  We own our own small

19   private fleet and we lease the trucks and the

20   trailers from Penske.  They allow us to use their

21   facilities for fueling, they allow us to use them

22   for road service.  They just -- it makes a neat,

23   clean package in order to have your trucks, you

24   don't have to have a tire guy, you don't have to

**Daniel Kane**
**May 3, 2019**

Page 155

```
 1    have a mechanic, you don't have to have all those

 2    different things.  They handle that.  So, they

 3    handle that.  And then we use our outside carriers

 4    in addition to deliver lumber all through the six

 5    states of New England.

 6                 MR. MEEHAN:  Okay.  That's all I

 7         have.  Thank you.

 8                 MR. SCHULER:  I just have a couple of

 9         questions for you, Mr. Kane.

10

11         CROSS-EXAMINATION BY MR. SCHULER:

12

13         Q.    Take a look, if you could, at Exhibit

14    6.  I'm directing your attention to the BB & S

15    invoice.

16         A.    Yes, sir.

17         Q.    And there's two signatures it would

18    appear on -- on the document in Exhibit 6.  Do you

19    see that?

20         A.    I do.

21         Q.    Okay.  One appears to be down in the

22    lower left-hand corner looks like a some sort of a

23    pen.  Do you see that?

24         A.    I do.
```

Daniel Kane
May 3, 2019

Page 156

1        Q.    Okay.   And there's a second signature

2    that you see, it looks like with some sort of a

3    marker?

4        A.    I see that.

5        Q.    It's darker.   What does the -- what

6    does the presence of the two signatures signify to

7    you at BB & S with respect to the product that was

8    delivered to L.P. Adams?

9        A.    The -- the signature, the lower

10   signature that you mentioned that looks like pen,

11   is the driver, because that is -- we can actually

12   read a bit of that, and we do have that on the copy

13   on Exhibit 7 also, which is the printed copy that

14   stayed within the office at BB & S.   And that the

15   signature on Exhibit 6 is most definitely somebody

16   from L.P. Adams.   That is signifying that they have

17   received all of the items on that ticket.   And as

18   you can see in Exhibit 6, all three tickets are

19   signed by both the driver and the employee of L.P.

20   Adams.   So, he would have been empty and they would

21   have received all of that material.

22       Q.    Okay.   And when that delivery was

23   completed as you just described to L.P. Adams by --

24   that delivery was made by Gregory Trucking; is that

Daniel Kane
May 3, 2019

Page 157

1    correct?

2         A.    That is correct.

3         Q.    Okay.  And when that delivery was

4    completed and that delivery was made to L.P. Adams,

5    had -- had business that BB & S had with Gregory

6    Trucking, did that make it -- was that -- that

7    signify that was completed?

8              MR. O'CONNOR:  Objection.

9         A.    Absolutely.

10        Q.    (By Mr. Schuler)  Okay.  And do you

11   know when in relation to that completed delivery

12   this accident took place, before or after the

13   accident -- or before or after the delivery?

14        A.    The delivery was made before the

15   accident.

16        Q.    Okay.  And at the time that the

17   accident occurred, was Gregory Trucking engaged in

18   any business on behalf of BB & S?

19        A.    No, sir.

20              MR. O'CONNOR:  Objection.

21              MR. SCHULER:  I don't have any other

22        questions.  Thank you.

23              THE VIDEOGRAPHER:  All in agreement

24        to go off the record?

Daniel Kane
May 3, 2019

1              MR. MEEHAN:  Sure.

2              THE VIDEOGRAPHER:  We are now off the

3        record at 3:26 p.m.

4

5        (Deposition concluded at 3:26 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Daniel Kane**
**May 3, 2019**

Page 159

1              I, PAULINE L. BAILEY, Commissioner,

2     do hereby certify that, Daniel Kane, appeared

3     before me and satisfactorily identified himself on

4     the 3rd day of May, 2019, at Catuogno Court

5     Reporting, 155 South Main Street, Suite 201,

6     Providence, Rhode Island, and was by me duly sworn

7     to testify to the truth and nothing but the truth

8     as to his knowledge touching and concerning the

9     matters in controversy in this cause; that he was

10    thereupon examined upon his oath and said

11    examination reduced to writing by me; and that the

12    statement is a true record of the testimony given

13    by the witness, to the best of my knowledge and

14    ability.

15              I further certify that I am not a

16    relative or employee of counsel/attorney for any of

17    the parties, nor a relative or employee of such

18    parties, nor am I financially interested in the

19    outcome of the action.

20

21              WITNESS MY HAND this 13th day o

22    2019.

23    Pauline L. Bailey              My commission ex

24    Commissioner                        April 30, 2020

**Daniel Kane**
**May 3, 2019**

```
 1              UNITED STATES DISTRICT COURT

 2          IN THE WESTERN DISTRICT OF MASSACHUSETTS

 3                    SPRINGFIELD, MA

 4           CIVIL ACTION NO.:  3:17-CV-30174-MAP

 5

 6      *****************************************

 7   THOMAS FORBES, as he is the Personal    *

 8   Representative of the Estate of GEORGE  *

 9   J. FORBES,                              *

10        PLAINTIFF                          *

11   v.                                      *

12   GREGORY TRUCKING COMPANY, INC.; WILEY   *

13   LENUE HOOKS, JR.; GREGORY LEASING       *

14   COMPANY, INC.; BSG LEASING, INC.; B&C   *

15   TIMBERS LLC.; and BB & S ACQUISITION    *

16   CORP.,                                  *

17        DEFENDANTS                         *

18      *****************************************

19

20

21        I, DANIEL KANE, do hereby certify, under

22   the pains and penalties of perjury, that the

23   foregoing testimony is true and accurate, to the

24   best of my knowledge, and belief.
```

**Daniel Kane**
**May 3, 2019**

Page 161

```
 1        WITNESS MY HAND, this      day of          ,

 2    2019.

 3                          _____

 4                          DANIEL KANE

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Daniel Kane**
**May 3, 2019**

```
                                                        Page 162
 1                        CORRECTION SHEET

 2    DEPONENT:          30(B)(6) BB & S Acquisition Corp.

 3                       By Daniel Kane

 4    CASE:             Forbes, et al v. Gregory Trucking,

 5                       et al

 6    DATE TAKEN:       May 3, 2019

 7    ************************************************

 8    PAGE   / LINE / CHANGE OR CORRECTION AND REASON

 9    ************************************************

10    _____/_____/_____

11    _____/_____/_____

12    _____/_____/_____

13    _____/_____/_____

14    _____/_____/_____

15    _____/_____/_____

16    _____/_____/_____

17    _____/_____/_____

18    _____/_____/_____

19    _____/_____/_____

20    _____/_____/_____

21    _____/_____/_____

22    _____/_____/_____

23    _____/_____/_____

24    _____/_____/_____
```