# UNITED STATES DISTRICT COURT

## IN THE WESTERN DIVISION OF MASSACHUSETTS

### SPRINGFIELD, MA.

Civil Action No.17 CV  30174

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THOMAS FORBES, as he is the
Personal Representative of the
Estate of GEORGE J. FORBES,**
                    **PLAINTIFF**


**v.**


**GREGORY TRUCKING COMPANY,
INC., WILEY LENUE HOOKS, JR.,
GREGORY LEASING COMPANY, INC.
BSG LEASING, INC.,
B&C TIMBERS LLC,  and
BB&S ACQUISITION CORPORATION,**
                    **DEFENDANTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT BB&S ACQUISITION CORPORATION'S MOTION FOR SUMMARY JUDGEMENT


### LEAVE TO FILE EXCESS PAGES GRANTED 21 JANUARY 2020.


Dino M. Tangredi
BBO NO. 567928
The Miles Pratt House
106 Mount Auburn St
Watertown, MA. 02472
T:617.926.0012
masslaw@dinotangredi.com

## TABLE OF CONTENTS

A.  Standard of Review……………………………………………  1

B.  Summary of The Case …………………………………………...  1

C.  Issues Presented………………………………………..………  2

D.  Facts……..………………………………………………..  2

E.  Choice of Law Analysis………………………………………  7

F.  Background on F.M.C.S.A's Safety Rating System………………..  8


G.  Law…………………………………………………………..  10

   1.  Negligent Selection of a Contractor…………………………..  10

      a.  Negligence in Hiring or Retaining Unfit Persons in
         Massachusetts…………………………………………  10

      b.  Restatement (Second) of Torts § 411 (1965)………….  10

      c.  Restatement (Second) of Torts § 411 in Trucking cases..  11

         i.  Pre - § 411 cases…………………………………  11

         ii.  Restatement § 411 applied to "shippers"………….  11

         iii.  The Shippers Sophistication Matters……………....  12

         iv.  § 411 Standard:  Knew or Should Have Known….  12

         v.  Duty of Inquiry in Selecting a Competent Motor
           Carrier - Checking The Safety Statistics…………..  13

         vi.  Checking The Safety Statistics is Not Enough….....  14

         vii.  Continuing Duty…………………………………..  14

         viii.  § 411 and Proximate Cause..………………………  15

H.  Argument  15

   1.  Negligent Selection of a Contractor………………………….  15

   2.  Duty to Check The DOT's Safety Web Site…………………  17

   3.  Constructive Standard of Knowledge……………………..  19

I.  Law

    1    Statutory Employer……………………………………………….....    19

        a    History and Intent of The Statutory Employer Doctrine……    19

        b.    49 U.S.C.  § 14102 – Leased Motor Vehicles…………….    20

        c.  Employee/Employer Definitions……………………………    21

        d.  Post Delivery Negligence…………………………………….    21

J.  Argument

    1.  Statutory Employment…………………………………………….    22

    2.  Employer/Employee Relationship…………………………………..    24

K.  Law

    1.  Proximate Cause……………………………………………………    24

        a.  Proximate Cause Is a Determination For a Jury…………….    25

L.  Argument

    1.  Proximate Cause……………………………………………………    27

M.  Conclusion……………………………………………………… .    28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alford v. Major,* 470 F.2d 132 (7th Cir. 1972) ............................................. 29

*American Transit Lines v. Smith* 246 F.2d 86, 90, 91, (6th Cir. 1957) .................. 22

*American Trucking Ass'ns v. United States*, 344 U.S. 298, 73 S. ct. 307, 97 L. Ed. 337 (1953) ........................................................................................... 29

*Aponte-Santiago v. Lopez-Rivera,* 957 F.2d 40, 41 (1st Cir. 1992) ..................... 1

*Bays v. Summit Trucking*, 691 F.Supp.2d 725, 732 (D. W.D. Kentucky 2010) ......... 22

*Burleigh v. Alfa Laval, Inc.,* 313 F. Supp. 3d 343 (D. Mass. 2018) ..................... 7

*Greenwell v. Boatwright*, 184 F.3d 490, 491 (6th Cir. 1999) ............................. 22

*Hodges v. Johnson* 52 F.Supp. 448 (W.D. VA. 1943) ...................................... 22

*Jones v. C.H. Robinson Worldwide, Inc.,* 558 F.Supp2d 530, 643 (W.D. VA. 2008). 13, 14, 15, 17

*Klaxon Co. v. Stentor Electric Mnfct.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)..................................................................................... 7

*L.B. Foster Co. v. Hurnblad,* 418 F.2d 727,729 (9th Cir. 1969) ......................... 11, 12, 19

*Marshall v. Nugent,* 222 F.2d 604, 610 (1st Cir 1955) ..................................... 25, 26

*Puga v. About Tyme Transport, Inc.,* 227 F.Supp3d 760, 764  (S.D. Texas 2017) .... 21

*Riley v. AK Logistics, Inc.,* Case No. 1:15 CV 69 -JAR  (E.D. Mo. June 9 2017) ...... 13

*Rodriguez v. Ager,* 705 F.2d 1229 (10th Cir. 1983) ....................................... 29

*Shramm v. Foster,* 341 F.Supp.2d 536 (D.Md.2004) ....................................... 12, 13, 14, 17, 26

*Simmons v. King*, 478 F.2d 857,867 (5th Cir. 1973) ............................................. 24

*Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28
96 S. Ct. 229, 46 L. Ed. 2d 169 (1975) ......................................................... 29

*Zamalloa v. Hart,* 31 F.3d 911, 916 (9th Cir. 1994) ............................................. 24

**STATE CASES**

*Carson v. Canning*, 180 Mass. 461, 462 (1902) .......................................... 10

*Crocker v. Morales-Santana,* 854 N.W.2d 663, 668 (ND. 2014). ........ ................. 20

*Foley v. Boston Housing Auth.,* 407 Mass. 640, 646 (1990) .............................. 26

*Hudgens v. Cook Indus., Inc.*, 521 P.2d 813, 816 (OK., 1973) .......................... 13, 19,
26

*Jah v. Naphcare, Inc.,* 32 Mass. L. Rptr. 584, Mass. Super. Ct., Suffolk County,
March 31, 2015, Curren, J ................................................................. 15

*Joslin v. Idaho Times Pub. Co.,* 91 P.2d 386, 388 (Idaho, 1939) ........................ 11

*McNamara v. Mass. Port. Auth.,* 30 Mass.App.Ct. 716, 720 n.5 (1991) ................ 15, 16

*Mendez v. Northeast Capital Group, Inc.*, 91 Mass.App.Ct.1110 (2017)
(Mass. App. Ct. Rule 1:28) .............................................................. 15

*Molinari v. Royal Heights Constr. Co.,* 9 Mass. L. Rptr. 252, Mass. Super. Ct.,
Middlesex County, September 8 1998, McHugh, J. ...................................... 16

*National Trailer Convoy, Inc., v. Saul,* 375 P.2d 922, 923 (OK 1962) ................. 11

*Or v. Edwards*, 62 Mass. App. Ct. 475, 485 (2004) ...................................... 10, 24,
25, 26

*Puckrein v. ATI Transp., Inc.,* 897 A.2d 1034, 1042 (N.J. 2006) ........................ 12, 14,
15, 17

ii

*Risley v. Lenwell*, 129 Cal.App.2d 608, 277 P.2d 897 (1955) ........................... 11

*St. Paul Fire Ins. Co. v. Frankart,* 69 Ill. 2d 209, 219 (IL. 1977) ......................... 22

*Whalen v. Shivek,* 326 Mass. 142, 150 (1950) ............................................... 10

*Wright v. Kelleher,*  24 Mass.L.Rptr.495,  Mass. Super Ct., Worcester County,
September 10, 2008, Agnes, J ................................................................ 15

## STATUTES

49 C.F.R. § 385.5, 385.7 ..................................................................... 8

49 C.F.R. § 390.5 .............................................................................. 21, 22

49 U.S.C. 113 ................................................................................. 8

49 U.S.C. § 31144(b) ......................................................................... 8

49 U.S. Code § 14101 ........................................................................ 28

49 USC § 14102 .............................................................................. 20, 23

49 USC  § 14102(a)(4)........................................................................ 20

## RULES

Fed.R.Civ.P.56(c)   ........................................................................ 1

## **MISCELLANEOUS**

Act of August 3, 1956, Pub.L. No. 84-957, 1956 U.S.C.C.A.N. 1163 .................     20

Behavior Analysis and Safety Improvement Categories (B.A.S.I.C.s.) ................     8, 9

Fixing America's Surface Transportation (FAST) Act ................................ .     9

Lueck and Brewster, "Compliance, Safety and Accountability: Evaluating a
New Safety Measurement System and Its Implications" December 2012 .............     9, 17

Motor Carrier Safety Improvement Act....................................................     8

National Academy of Sciences/Transportation Research Board, 2017 pp.2-18. .....     9

Restatement (Second) of Conflicts of Law § 6, § 145, 146 and 157 (1969).,............     7

Restatement (Second) of Torts § 411 (1965) ...............................................     10, 11, 12, 13, 15, 16, 19, 26

Safety and Fitness Electronic Records (SAFER) System ................................     5, 6, 8, 18

Safety Management System (SMS) ...........................................................     8, 9

The American Transportation Research Institute (ATRI) ................................     9

Transportation Research Board...............................................................     9

Volpe Transportation Systems Center 2014  .............................................     9

(70103/SJ-table authorities)

## LIST OF EXHIBITS

**Exhibits Submitted by BB&S**

A.   Tab A to Defendant BB&S Acquisition Corporation's Affidavit of Thomas P. Schuler to its Memorandum of Law In Support Of Its Motion for Summary Judgment (Document 110-1) Gregory Trucking (Cecil Gregory) Deposition of April 24, 2019, Vol. 1;

B.   Tab B to Defendant BB&S Acquisition Corporation's Affidavit of Thomas P. Schuler to its Memorandum of Law In Support Of Its Motion for Summary Judgment (Document 110-2) Gregory Trucking (Cecil Gregory) Deposition of April 25, 2019, Vol. 2;

C.   Tab C to Defendant' BB&S Acquisition Corporation's Affidavit of Thomas P. Schuler to its Memorandum of Law In Support Of Its Motion for Summary Judgment (Document 110-3) Wiley Lenue Hooks, Jr. Deposition of April 26, 2019;

D.   Tab D to Defendant' BB&S Acquisition Corporation's Affidavit of Thomas P. Schuler to its Memorandum of Law In Support Of Its Motion for Summary Judgment (Document 110-4) BB&S Acquisitions Corporation (Daniel Kane) Deposition of May 3, 2019;

**Plaintiff's Exhibits**

E.   Answers of Defendant, BB&S Acquisition Corp., To Plaintiff's Interrogatories;

F.   Log Book of Gregory Trucking Driver for August 22, 2016 to August 24, 2016 ;

G.   Tom Hall's trial testimony in *Commonwealth v. Hooks,* Pittsfield District Court, Docket No. 1627CR1462, January 19, 2018;

H.   Robert Hawboldt's trial testimony in *Commonwealth v. Hooks,* Pittsfield District Court, Docket No. 1627CR1462, January 19, 2018 ;

I.   Criminal Docket in *Commonwealth v. Hooks*, Pittsfield District Court, Docket No. 1627CR1754;

J.   Hilda Hall's trial testimony in *Commonwealth v. Hooks,* Pittsfield District Court, Docket No. 1627CR1462, January 19, 2018;

K.   Affidavit of Walter Guntharp;

L.   Police Officer Deanna Strout's trial testimony in *Commonwealth v. Hooks,* Pittsfield District Court, Docket No. 1627CR1462, January 19, 2018;

M.   Autopsy and Toxicology Report of George Forbes;

N.   North Carolina of Motor Vehicles Driving History of Wiley Lenue Hooks, Jr.;

O.   BB&S Treated Lumber of New England Bill of Lading of August 22, 2016;

P.   Response No. 34 to Defendant, BB&S Acquisition Corp.'s to Plaintiff's Request for Production of Documents;

Q.   BB&S Treated Lumber of New England website pages;

(170103/SJ-ex list)

1    A. <u>STANDARD OF REVIEW</u>

2    A motion for summary judgement will be granted when all the relevant pleadings, viewed in the

3    light most favorable to the non-moving party, present no genuine issue of material fact such that

4    the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56(c); <u>*Aponte-Santiago*</u>

5    <u>*v. Lopez-Rivera,*</u> 957 F.2d 40, 41 (1st Cir. 1992)

6

7    B. <u>SUMMARY OF THE CASE</u>

8    This is a diversity suit for wrongful death arising from a tractor trailer truck crash in Dalton, MA.

9    on 24 August 2016.  BB&S Acquisition Corporation (hereafter, BB&S) used Gregory Trucking

10    Co., Inc., (hereafter, Gregory) to deliver its lumber.  Wiley Lenue Hooks, Jr. (hereafter, the

11    Gregory driver) was an employee of Gregory that was driving the tractor trailer that killed George

12    Forbes.  At all relevant times Gregory had a "conditional" safety rating and safety deficiencies that

13    were readily ascertainable on a free web site created by the Federal Motor Carrier Safety

14    Administration (hereafter FMCSA.)     BB&S did not check the safety web site about Gregory

15    before using Gregory to deliver its lumber even though it knew of the safety web site and regularly

16    used it.  George Forbes was killed when the Gregory driver ran a red light while on a lumber

17    delivery for BB&S in the Gregory tractor trailer truck. Because BB&S used and dispatched the

18    Gregory driver without authorization from Gregory, the driver became the statutory employee of

19    BB&S.  Plaintiff's allegations against BB&S are for  1). Vicarious liability for the actions of the

20    Gregory driver. (Count II of Plaintiff's first amended complaint), 2). Negligent selection of a

21    contractor (Count VII of Plaintiff's first amended complaint), and 3). Lease Liability/Statutory

22    Employment of the Gregory driver. (Count IX of Plaintiff's first amended complaint).

23

1   C.   ISSUES  PRESENTED:

2   1.   Whether Massachusetts is the appropriate choice of law;

3   2.   Whether the Restatement (Second) of Torts § 411 applies in Massachusetts; and

4        whether BB&S was negligent in its selection of a contractor;

5   3.   Whether BB&S was the Statutory Employer of the Gregory driver; and

6   4.   Whether BB&S' negligence was a proximate cause of the crash.

7

8   D.   FACTS

9   B&C Timbers, LLC., (hereafter B&C) of North Carolina used Gregory to transport its lumber by

10  tractor trailer to BB&S in Rhode Island.  At the time it departed North Carolina on 22 August

11  2016, it was the intention of Gregory to deliver B&C's lumber to BB&S in Rhode Island and then

12  proceed with an empty tractor trailer to Monson, MA. to pick  up lumber on 23 August 2016 and

13  return to North Carolina. (Fact No. 1b, 6b.)[1]  The Gregory driver was an employee of Gregory.

14  (Fact No. 57a.)    It was planned as a simple three legged trip. (Fact No. 1b.)



15

16              The  intended itinerary of Gregory when it left North Carolina on 22 August 2016.

---

[1]        All references in Plaintiff's brief to a fact are denoted as "(Fact No.__.)" See Joint Statement of Material Facts accompanying this Memorandum setting out the Defendant's statement of material facts, Plaintiff's position on the Defendant's  factual assertions,  and Plaintiff's additional statement of material facts.

1   Sometime on 23 August 2016 - before arriving in Rhode Island - the Gregory driver called BB&S

2   and solicited it for a short-haul.[2] (Fact No. 1a.)  After receiving its inbound lumber delivery on 23

3   August 2016, BB&S made arrangements directly with the Gregory driver for a short-haul delivery

4   of its lumber to LP Adams, Co. Inc., (hereafter LP Adams) in Dalton, MA. (Fact No. 2a-b.)

5

6   According to the Gregory driver's logbook, the short-haul delivery of lumber to LP Adams was

7   made by the Gregory driver on 24 August 2016 between 7:00 - 8:00 A.M. (Fact No. 3c-d.)  After

8   leaving the yard at LP Adams the Gregory driver proceeded toward Monson, MA. for the pick-up

9   of lumber that was scheduled to occur the day before; (Fact No. 6.) however, while still in Dalton,

10  MA. the Gregory driver ran a red light and struck a pick-up truck driven by George Forbes.  (Fact

11  No. 43a -c.)  George Forbes died two days later from complications of multiple blunt force injuries

12  of the torso and extremities from the collision with the tractor trailer. (Fact No. 60a.)

13

14  At the time the short-haul was arranged there was no communication between BB&S and Gregory

15  concerning the short-haul, the use of the Gregory truck, or the Gregory driver. (Fact Nos. 2b-e.)

16  BB&S made all the arrangements for the short-haul to Dalton, MA. directly with the Gregory

17  driver.  (Fact No. 2a.)  The Gregory driver did not have authority to bind Gregory to a contract.

18  (Fact No. 22c.)  The Gregory driver did not call into Gregory to get the OK for the short-haul.

19  (Fact No. 22a.)    The first that Gregory learned of the short-haul was when the Gregory driver

20  called Gregory after the crash. (Fact No. 2f.)  The dispatcher for the short haul was BB&S. (Fact

21  No. 11b.) Since the Gregory driver accepted the short-haul to Dalton without authorization from

22  Gregory or notifying Gregory, he was under BB&S' dispatch and operating under its control. (Fact

---

[2]      A short haul is a shipment of short duration or distance.

1    No. 14d.)  The short-haul was accompanied by a BB&S bill of lading identifying the quantity and

2    weight of the lumber and method of delivery. (Fact Nos. 53a-b.)  BB&S determined the price for

3    the short-haul. (Fact No. 10c.)   BB&S paid Gregory for the short-haul. (Fact No. 14e.)   BB&S,

4    Gregory, and the Gregory driver profited from the short-haul. (58a-c.)  The distance from Monson

5    to Dalton is approximately 75 miles. (Fact no. 59a.)  Gregory's truck  and the Gregory driver would

6    not have been in Dalton, MA. on 24 August 2016 except for the short-haul delivery of BB&S'

7    lumber to LP Adams. (Fact No. 69a.)

8

9    Six months before the fatal crash - on or about 23 February 2016 - the North Carolina Registry of

10   Motor Vehicles notified the Gregory driver in writing by U.S. Mail - that was properly addressed-

11   that as of 19 February 2016 his Commercial Driver's License was suspended for one year. (Fact

12   No. 12b.)    After the crash the Gregory driver was charged with motor vehicle homicide by

13   negligent operation, tried, convicted, and sentenced by the Pittsfield District Court. (Fact No.61a.)

14   Eye witnesses to the crash testified at the criminal trial that the Gregory driver had a red light; that

15   his head was down; that he was not making any motions with his hands or head; did not hit his

16   brakes; that the  tractor trailer was flying through the intersection at approximately 35-40mph; the

17   tractor trailer did not sound its horn or  brake or skid; the driver  appeared to be sleeping because

18   his head was down;  his face was pointing downwards; there were no frantic movements inside the

19   cab of the tractor trailer; and, the truck was not skidding out of control.  (Fact Nos. 43a-c.)

20

21   BB&S concedes it is a shipper. (Fact No. 1c).  BB&S has motor carrier authority and its own fleet

22   of tractor trailers to ship its lumber. (Fact No 27c.) BB&S also uses outside motor carriers to ship

23   its lumber. (Fact No 62a.)    Industry practice is for shippers to investigate a trucking company's

1   safety record prior to using it to transport its goods. (Fact No. 27e.)  This investigation is inclusive

2   of checking the SAFER[3] system regarding a motor carrier's safety performance in the areas of

3   maintenance, hours of service compliance, unsafe driving, driver fitness, and out of service rates.

4   (Fact No. 63a.)  BB&S concedes it is aware the FMCSA provides safety ratings of motor carriers

5   for free on-line. (Fact No. 64a.)  BB&S is aware of the SAFER system. (Fact No. 27b.)   In fact,

6   BB&S regularly checks its own DOT safety rating on the SAFER system to verify it accurately

7   reflects its own safety record. (Fact No. 27b.)  BB&S has no reason to question the accuracy or

8   reliability of the SAFER system or the FMCSA's safety rating system; (Fact No. 64b)   however,

9   when asked if BB&S uses the SAFER system to access safety information about outside trucking

10   companies it uses to transport its lumber,  BB&S admitted it does not. (Fact  No. 65a.)   BB&S

11   admits it does not have a policy or procedure in place to check the safety record of outside trucking

12   companies before it uses them. (Fact No. 30d.)  BB&S doesn't perform any kind of background

13   check on a motor carrier before using it. (Fact No. 30b.)  In the case of Gregory, the SAFER

14   snapshot that BB&S would have seen in August 2016 - if it had looked up "Gregory" on the free

15   safety website - before sending it on the short-haul to Dalton, MA. would have revealed:

16          • Gregory's safety rating was "conditional;"

17          • Gregory's out of service rate was double the national average;

18          • Gregory's unsafe driving score was nearly quadruple the acceptable rate;

19          • Gregory's vehicle maintenance score was nearly triple the acceptable rate;

20          • Gregory's score regarding compliance with hours of service was  a

21            borderline acceptable score; and

---

[3]   SAFER = Safety and Fitness Electronic Records System.  SAFER offers a trucking company's safety data and related services to the industry and public for free on the internet. https://safer.fmcsa.dot.gov

1    • Gregory had two (2) crashes.

2    (Exhibit K – Affidavit of Plaintiff's trucking safety expert – Walter Guntharp at
3    p.40, l.5)

| | Jun 24 2016 | Jul 22 2016 | Aug 26 2016 | Sep 23 2016 | Oct 28 2016 | Nov 25 2016 |
|---|---|---|---|---|---|---|
| SMS Version | 3.0.5 | 3.0.5 | 3.0.5 | 3.0.5 | 3.0.5 | 3.0.6 |
| **Status** | **Active** | **Active** | **Active** | **Active** | **Active** | **Active** |
| Carrier Operation | Interstate | Interstate | Interstate | Interstate | Interstate | Interstate |
| Number of Power Units | 6 | 6 | 6 | 6 | 6 | 6 |
| Number of Drivers | 6 | 6 | 6 | 6 | 6 | 6 |
| Number of Inspections | 21 | 21 | 21 | 21 | 21 | 22 |
| Number of Crashes | 2 | 2 | 2 | 2 | 3 | 3 |
| **Unsafe Driving** | | | | | | |
| On-Road Performance Measure Investigation Results | 3.93 | 3.93 | 2.33 | 2.10 | 2.10 | 2.10 |
| **Crash Indicator** | | | | | | |
| On-Road Performance Measure Investigation Results | Not Public | Not Public | Not Public | Not Public | Not Public | Not Public |
| **HOS Compliance** | | | | | | |
| On-Road Performance Measure Investigation Results | 2.02 | 2.02 | 3.20 | 3.29 | 3.34 | 3.78 |
| **Vehicle Maint.** | | | | | | |
| On-Road Performance Measure Investigation Results | 5.61 | 5.61 | 5.85 | 5.46 | 5.13 | 4.67 |
| **Drugs/Alcohol** | | | | | | |
| On-Road Performance Measure Investigation Results | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **HM Compliance** | | | | | | |
| On-Road Performance Measure Investigation Results | Not Public | Not Public | Not Public | Not Public | Not Public | Not Public |
| **Cargo-Related** | | | | | | |
| On-Road Performance Measure Investigation Results | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Driver Fitness** | | | | | | |
| On-Road Performance Measure | 0.28 | 0.28 | 0.28 | 0.29 | 0.31 | 0.15 |

4

5    Snapshot of the company safety profile on the SAFER system for Gregory.
6    What BB&S would have seen if it checked on 23 August 2016.
7

8    BB&S' only requirements in hiring an outside motor carrier in 2016 was to get a W2, establish the

9    carrier has an active DOT number, and see proof of insurance. (Fact No. 35a.)  If BB&S needed

10   to hire a motor carrier today, or at any time in the past, it would not hire a motor carrier that:

11        1.  it knew had a higher than average out of service rating for its trucks; (Fact No. 68a.)

1        2.  it knew had a higher than average rate for violating the hours of service regulations;

2            (Fact No. 68b.)

3        3.  it knew had a vehicle maintenance rating indicating it was worse than 60% of the other

4            motor carriers on the road; (Fact No. 68c.) and

5        4.  it knew had a higher than average unsafe driving rate. (Fact No. 68d.)

6

7       E.  <u>CHOICE OF LAW ANALYSIS.</u>

8  A federal court sitting in diversity is required to follow the choice of law rules of the state in which

9  it sits. <u>*Klaxon Co. v. Stentor Electric Mnfct.,*</u> 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

10  The choice of law application becomes more difficult in situations where the Defendant's conduct

11  and the resulting injury occurred in different states. Restatement (Second) of Conflicts of Law §

12  145 comment e (1969).   In an action for personal injury, the local law of the state where the injury

13  occurred determines the rights and liabilities of the parties, unless, with respect to the particular

14  issue, some other state has a more significant relationship under the principles stated in § 6 to the

15  occurrence and the parties, in which event the local law of the other state will be applied.

16  Restatement (Second) of Conflicts of Law § 146 (1969).

17

18  Counsel for the Plaintiff, having applied the Restatement (Second) of Conflicts of Law §§ 6, 145,

19  146, and 157 (1969), and the  analysis used in <u>*Burleigh v. Alfa Laval, Inc.,*</u> 313 F. Supp. 3d 343

20  (D. Mass. 2018), concludes the law of Massachusetts applies because: 1). the crash occurred in

21  Massachusetts, 2). the injury occurred in Massachusetts, 3). the Plaintiff was a lifelong resident of

22  Massachusetts, and  4).  BB&S intended to – and did - deliver a load of lumber to a buyer in

23  Massachusetts and the Plaintiff was killed during that delivery.

1    F.  <u>BACKGROUND ON THE FMCSA's SAFETY RATING SYSTEM</u>
2
3    The FMCSA was established by the U.S. Department of Transportation on 1 January 2000,

4    pursuant to the Motor Carrier Safety Improvement Act of 1999 (49 U.S.C. 113.)   The primary

5    mission of the FMCSA is "to reduce crashes, injuries, and fatalities involving large trucks and

6    buses.[4]"   The FMCSA assigns safety fitness ratings to commercial motor carriers. 49 U.S.C. §

7    31144(b).  To do this, FMCSA inspectors perform periodic on-site compliance reviews in which

8    numerous safety factors are considered to determine the safety fitness of a motor carrier. 49 C.F.R.

9    § 385.5, 385.7.    From these reviews the FMCSA calculates an overall safety rating of

10   "satisfactory,[5]" "conditional,[6]" or "unsatisfactory[7]" *Id.* § 385.3.  Additionally, through the Safety

11   Management System (SMS), motor carriers receive scores in different safety categories – known

12   as Behavior Analysis and Safety Improvement Categories (BASICs.)   Theses scores are derived

13   from the results of roadside inspections, state traffic enforcement, and other data concerning a

14   motor carrier's compliance with regulations, as well as crash data.  The FMCSA – through the

15   Safety and Fitness Electronic Records (SAFER) System - offers a trucking company's safety data

16   to the public for free on its web site.

17

---

[4]     https://www.fmcsa.dot.gov/mission

[5]     Satisfactory: A safety rating received as the result of a compliance review. It means a motor carrier has  in
        place and functioning adequate safety management controls to meet the safety fitness standards prescribed
        in FMCSRs section 385.5 .

[6].    Conditional: A safety rating received as the result of a compliance review. It means a motor carrier does
        not have adequate safety management controls in place to ensure compliance with the safety fitness
        standard that could result in occurrences listed in the  Federal Motor Carrier Safety Regulations, Rules and
        Notices §385.5 (a) through (k).

[7].    Unsatisfactory: A safety rating received as the result of a compliance review.  It means a motor carrier
        does not have adequate safety management controls in place to ensure compliance  with the safety
        fitness standard which has resulted in occurrences listed in section 385.5 (a)-(k).

1   In depth studies commissioned by the U.S. Department of Transportation show that those

2   companies that exceed the thresholds are significantly more likely to be involved in a crash.  The

3   Volpe National Transportation Systems Center conducted evaluations of the effectiveness of the

4   safety rating systems. (Volpe Transportation Systems Center 2014.)    The results demonstrated

5   that the crash rates for carriers with above threshold percentile scores had significantly higher crash

6   rates than did carriers without above threshold scores. In December 2015, Congress passed the

7   Fixing America's Surface Transportation (FAST) Act.  This legislation authorized the FMCSA to

8   fund a study by the National Academy of Sciences in collaboration with the Transportation

9   Research Board to analyze the SMS methodology and its ability to discern between low and high

10  risk carriers. The National Academy of Sciences/Transportation Research Board issued its report

11  in July 2017.  One of the conclusions reached by that study was: "[T]he consensus  of our panel is

12  that the evaluations carried out by the FMCSA supports the judgment that six of the seven BASICs

13  are positively (sometimes very strongly) associated with future crash risk…" National Academy

14  of Sciences/Transportation Research Board, 2017 pp.2-18.

15

16  In December 2012, the research arm of the American Trucking Association - The American

17  Transportation Research Institute (ATRI) published a report in which it collected data from dozens

18  of shippers representing tens of billions of dollars of freight movement.  ATRI reported that 96.8%

19  of the shipper respondents indicated they monitor the CSA safety scores of motor carriers they

20  contract with.  Lueck and Brewster, "Compliance, Safety and Accountability: Evaluating a New

21  Safety Measurement System and Its Implications" December 2012.

22

23

G. <u>LAW</u>

1. <u>NEGLIGENT SELECTION OF A CONTRACTOR</u>

     a. <u>Negligence in Hiring or Retaining Unfit Persons in Massachusetts</u>

Negligence in hiring or retaining a person to perform given tasks who is unfit for the job was long

ago recognized as a ground of liability for the harmful effects of the choice upon related persons.

In <u>*Carson v. Canning*</u>, 180 Mass. 461, 462 (1902), Holmes, C.J., said, "The Plaintiff (who had

pledged goods with the Defendant pawnbroker) was allowed to recover on the grounds that the

absconding manager was an unfit man for his trust, and that the Defendant could and would have

found out if he had used ordinary care." <u>*Or v. Edwards*</u>, 62 Mass. App. Ct. 475, 483 (2004)(citing

<u>*Carson.*</u>); <u>*Whalen v. Shivek,*</u> 326 Mass. 142, 150 (1950) (Where the nature and circumstances of

the work to be performed are such that injury to others will probably result unless precautions are

taken, the employer is answerable for the failure of an independent contractor to take such

precautions.)


     b. <u>Restatement (Second) of Torts § 411 (1965).</u>

The Restatement (Second) of Torts § 411 (1965) states:

    §411. Negligence in Selection of Contractor

    An employer is subject to liability for physical harm to third persons caused by his failure
    to exercise reasonable care to employ a competent and careful contractor.

    (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully
       done, or

    (b) to perform any duty which the employer owes to third persons.

        Illustration 2. The A Company, engaged in logging operations, hires B Company
        to haul large logs over the public highway. With the exercise of reasonable care in
        making inquiry A Company could, but does not, discover that B Company's only
        available equipment consists of converted lumber trucks unsuitable for hauling

such large logs in safety and on which the logs cannot be securely fastened.  While such a truck of B Company is hauling the logs, they are displaced while rounding a curve, and one of them falls upon the passing
   automobile of C, injuring C. A Company is subject to liability to C.


   c.   Restatement (Second) of Torts § 411 in Trucking Cases

      i.   Pre - § 411 Trucking Cases


Long before § 411 was authored in 1965 courts applied the principles embraced by § 411 to trucking cases.  *Joslin v. Idaho Times Pub. Co.*, 91 P.2d 386, 388 (Idaho, 1939) ("It is often laid down as one of the conditions required to relieve the owner from liability for the negligent acts of an independent contractor employed by him, that he shall exercise due care to secure a competent contractor for the work, and that if he fails to exercise such care, he may be liable for the negligent acts of his contractor.");  *Risley v. Lenwell*, 129 Cal.App.2d 608, 277 P.2d 897 (1955) (The employer may be liable for any negligence of his own in connection with the work to be done. Where there is a foreseeable risk of harm to others unless precautions are taken, it is his duty to exercise reasonable care to select a competent contractor);  *National Trailer Convoy, Inc., v. Saul,* 375 P.2d 922, 923 (OK 1962) (Where a corporation engages another, as an independent contractor, to drive his truck in interstate commerce under its I. C. C. permit, it has the duty of engaging a competent driver.)


      ii.   Restatement (Second) of Torts § 411 Applied to "Shippers"

Courts applying § 411 have easily extended this cause of action to the hiring of a motor carrier by a shipper.    In one of the earliest cases of shipper liability a shipper was held accountable by the 9th Circuit court of appeals when the motor carrier crashed and injured the plaintiff.  *L.B. Foster Co. v. Hurnblad,* 418 F.2d 727,729 (9th Cir. 1969) (Despite not having actual knowledge, the

1    shipper should have known the carrier did not provide reasonable highway equipment).   More

2    recently a New Jersey Supreme Court opinion outlined the elements of a negligent selection claim

3    against a shipper as follows: (1) the company that hauled the load was incompetent; (2) the harm

4    that resulted arose from the incompetence; and (3) the shipper knew or should have known of the

5    incompetence. *Puckrein v. ATI Transp., Inc.*, 897 A.2d 1034, 1042 (N.J. 2006).   The Federal

6    District Court of Maryland held a shipper liable for its negligent selection of a motor carrier and

7    established the duty of care in the selection of a motor carrier.   *Schramm v. Foster,* 341 F.Supp.2d

8    536, 551 (D.Md.2004). (See, infra, Plaintiff's brief - section v.)

9

10                   iii.    The Shipper's Sophistication Matters

11    When imposing liability against shippers under a negligent selection cause of action, the courts

12    will nearly always consider the sophistication of the shipper. The more sophisticated the shipper

13    in terms of the frequency of shipments, the role transportation and freight plays in their business,

14    and the size of its shipments, the more likely the courts are to place a higher duty on it for the

15    proper selection of a safe, fit, and competent motor carrier to haul its goods.   *L.B. Foster Co. v.*

16    *Hurnblad,* 418 F.2d 727,729 (9th Cir. 1969) (The trial court found it significant the shipper was

17    not merely a casual shipper and that the shippers sophistication is a consideration when

18    determining whether the Shipper should have known the carrier it selected was incompetent.)

19

20                   iv.    § 411 Standard: Knew or Should Have Known

21    The seminal cases applying § 411 set out the constructive knowledge standard.  See, *L.B. Foster*

22    *Co. v. Hurnblad,* 418 F.2d 727,729 (9th Cir. 1969) (Even though a shipper had no actual knowledge

23    the motor carrier did not provide reasonable highway equipment, *it should have known* [emphasis

1    added] in the exercise of reasonable care.);  *Hudgens  v. Cook Industries, Inc.,* 521 P.2d 813, 816

2    (1974) (The court found that where there is some evidence tending to show the shipper *knew or*

3    *should have known* [emphasis added] the carrier was incompetent and reasonable men might draw

4    conflicting conclusions, then whether or not the shipper negligently selected the carrier is a

5    question of fact for the jury.)

6

7              v.      Duty of Inquiry in Selecting a Competent Motor Carrier – Checking The
8                      Safety Statistics.
9

10   "In determining the appropriate amount of care a defendant must exercise in selecting an

11   independent contractor, *the finder of fact* [emphasis added] should consider that which a

12   reasonable man would exercise under the circumstances." *Jones v. C.H. Robinson Worldwide, Inc.,*

13   558 F.Supp2d. 530,  643 (W.D. VA. 2008)  citing Restatement (Second) of Torts § 411 comment

14   (c):

15              Comment C  …if the work is such as will be highly dangerous unless properly done and is
16              of sort which requires peculiar competence and skill for its successful accomplishment,
17              one who employs a contractor to do such work may well be required to go to considerable
18              pains to investigate the reputation of the contractor and, if the work is peculiarly dangerous
19              unless carefully done, to go further and ascertain the contractors actual competence.
20

21   The duty to use reasonable care in the selection of a motor carrier includes, at least, the subsidiary

22   duty to (1) check the safety statistics and evaluations of the carriers with whom it contracts

23   available through the FMCSA free web site.  Id. at 644, (citing *Schramm v. Foster,* 341 F.Supp.2d

24   536, 551 (D.Md.2004), (Fact No. 27f.))    In another case, *Riley v. AK Logistics, Inc.,* Case No.

25   1:15 CV 69 -JAR  (E.D. Mo. June 9 2017) the court denied a  motion for summary judgment on a

26   negligent hiring claim based in part on Plaintiffs presentation of an expert who opined  that reliance

27   on safety scores is part of the standard of care for hiring motor carriers.

1                      vi.      Checking The Safety Statistics is Not Enough

2    It is not enough for a shipper to simply check the safety statistics of a motor carrier. *Schramm v.*

3    *Foster,* 341 F.Supp.2d 536 (D.Md.2004) (The duty to use reasonable care in the selection of a

4    motor carrier includes, at least, the subsidiary duties (1) to check the safety statistics and

5    evaluations of the carriers with whom it contracts available on the databases maintained by

6    FMCSA, and (2) to maintain internal records of the persons with whom it contracts to assure they

7    are not manipulating their business practices in order to avoid unsatisfactory ratings.)   The

8    Maryland District court found this to be a reasonable duty in light of the relative ease and little

9    expense with which it could be done and the "critical federal interest in protecting drivers and

10   passengers on the nation's highways." *Id.* at 551.    In *Jones v. C.H. Robinson Worldwide, Inc.*

11   558 F.Supp.2d 630, 644 (W.D. VA. 2008),   the court noted the former head of the FMCSA (who

12   was the expert for the motor carrier) testified in her deposition that if it becomes known that a

13   motor carrier has a "conditional safety rating," further inquiry should be made with regard to the

14   information gathered during the FMCSA's compliance review and the carrier's plan for

15   improvement. *Id.* at 645.

16

17                      vii.     Continuing Duty.

18   The New Jersey Supreme Court established a continuing duty to inquire, finding that even if the

19   shipper made a reasonable inquiry of a carrier at the time of the initial hire, the duty did not end

20   there.  As the carrier continued to haul for the shipper there was a continuing duty to inquire into

21   the carrier's competence.    *Puckrein v. ATI Transport, Inc.,* 186 N.J. 563, 897  A.2d 1034, 1045

22   (N.J. 2006).

23

viii.   § 411 And Proximate Cause

In order to prevail on a negligent selection theory, it must be proved that the deficient characteristics, traits, and qualities which render the motor carrier incompetent are the same deficient characteristics, traits and qualities that proximately caused the subject crash. *Jones v. C.H. Robinson Worldwide, Inc.,* 558 F.Supp.2d 630, 648 (W.D. Va.,2008); *Puckrein,* 186 N.J. 563, 576, 897 A.2d 1034, 1045 (N.J. 2006); Restatement (Second) of Torts §411 (1965) comment (b).


H.  ARGUMENT

1.  Negligent Selection of a Contractor

BB&S asserts that "Massachusetts has not accepted § 411 of The Restatement (Second) of Torts (1965)" and that the Federal Court should not "blaze new trails in state law" (BB&S' memorandum of law at p.15).  However, while the § 411 trail is not well-trodden in Massachusetts, it has been marked and traveled.


Massachusetts has recognized the legal application of § 411. *Mendez v. Northeast Capital Group, Inc.*, 91 Mass.App.Ct.1110 (2017) (Mass. App. Ct. Rule 1:28). (Recognizing the Restatement (Second) of Torts § 411 (1965)).  The tort of negligent selection of an independent contractor appears to be a viable claim in Massachusetts, although there has been little discussion of it. *Jah v. Naphcare, Inc.,* 32 Mass. L. Rptr. 584, Mass. Super. Ct., Suffolk County, March 31, 2015, Curren, J. (complaint sufficient to state a plausible claim for negligent selection, which appears to be a viable claim in Massachusetts.); *Wright v. Kelleher,* 24 Mass.L.Rptr.495, Mass. Super Ct., Worcester County, September 10, 2008, Agnes, J. (Although there has been little discussion of this cause of action in Massachusetts, it has not been rejected…, citing *McNamara v. Mass. Port.*

1    *Auth.,* 30 Mass.App.Ct. 716, 720 n.5 (1991) (acknowledging a case brought under § 411 as a viable

2    claim but dismissing claim due to a lack of evidence);  See  also *Molinari v. Royal Heights Constr.*

3    *Co.,* 9 Mass. L. Rptr. 252, Mass. Super. Ct., Middlesex County, September 8 1998, McHugh, J.

4    (recognizing the tort of negligent selection of a contractor).  Importantly, neither *McNamara* nor

5    *Molinari* stand for the proposition that § 411 is not valid in Massachusetts.

6

7    The facts of this case strike at the heart of the competency issue in a trucking case involving

8    negligent selection of a motor carrier.   Under § 411 an employer is subject to liability for physical

9    harm to third persons caused by his failure to exercise reasonable care to employ a competent and

10   careful contractor to do work which will involve a risk of physical harm unless it is skillfully and

11   carefully done.  BB&S believes driving a tractor trailer truck on the highways involves a risk of

12   physical harm unless it is skillfully and carefully done. (Fact No. 71a.) BB&S agrees that driving

13   a tractor trailer truck on the roads of America can be dangerous unless skillfully and carefully

14   done. (Fact No. 71b.)  BB&S agrees driving a tractor trailer truck requires special knowledge.

15   (Fact No. 71c.)  BB&S agrees that driving a tractor trailer truck requires some level of skill. (Fact

16   No. 71j.)  BB&S acknowledges that driving a tractor trailer truck requires a special license. (Fact

17   No.71d.)  BB&S believes that driving a tractor trailer can be dangerous. (Fact No.71e.)   BB&S

18   believes that a tractor trailer driver has to be careful. (Fact No. 71f.)   BB&S believes that a tractor

19   trailer driver has to be competent. (Fact No. 71g.)

20

21   The very deficiencies that made Gregory an unsafe motor carrier – unsafe driving and hours of

22   service compliance - are the same deficiencies that caused the crash in Dalton, MA. on 24 August

23   2016.  (Fact No. 77a.)

1  H.  ARGUMENT
2
3      2.  Duty to Check The DOT's Safety Web Site.
4
5  4,317 people were killed by large trucks in 2016. (Fact No.74a.)  It is because of these tragic deaths

6  that the courts have imposed, at least, the subsidiary duty to check the safety statistics and

7  evaluations available through the free FMCSA web site. *Jones v. C.H. Robinson Worldwide, Inc.*

8  558 F.Supp.2d. 630, 644 (W.D. VA. 2008) citing *Schramm v. Foster,* 341 F.Supp.2d 536,551

9  (D.Md.2004).  Plaintiff's trucking safety expert  - Walter Guntharp - opines the BB&S violated

10  industry practices by failing  to make any investigation into the safety record of Gregory before

11  contracting with the Gregory driver to deliver the load to Dalton, MA. (Fact No. 27g.)  Plaintiff's

12  expert goes further to opine that the conscious decision by BB&S to ignore common safety

13  practices simply because there was no regulation requiring such action is an incredible violation

14  of industry expectations of a safe shipper and that this attitude represents a conscious and reckless

15  indifference for the safety of the motoring public. (Fact No. 27h.)  Indeed, a study commissioned

16  by the trucking industry shows 96.8% of shippers monitor the CSA safety scores of motor carriers

17  they contract with.  Lueck and Brewster, "Compliance, Safety and Accountability: Evaluating a

18  New Safety Measurement System and Its Implications" December 2012.   Some courts have

19  imposed an additional duty on defendants to maintain internal records of the carriers with whom

20  it contracts to assure they are not manipulating their business practices in order to avoid

21  unsatisfactory ratings. *Schramm* at 551.  These duties of inquiry are continuing throughout the

22  shipper carrier relationship. *Puckrein v. ATI Transp., Inc.*, 897 A.2d 1034, 1042 (N.J. 2006).

23

1   BB&S believes that when it chooses a motor carrier to ship its lumber, its first consideration should

2   always be the safety of everyone on the roads. (Fact No. 71h.)   BB&S believes that it should

3   consider all available safety information about a motor carrier before hiring it. (Fact No. 71i.)

4   BBS acknowledges it knows the FMCSA provides safety ratings for motor carriers for free online.

5   (Fact No. 64a.)   BB&S uses the SAFER system to check its own DOT number about its fleet to

6   make sure it's accurate and infractions are timely removed.  (Fact No.27b.)   BB&S knows the

7   FMCSA's rating system provides shippers with information about which motor carriers are

8   potentially unsafe. (Fact No.72a.)   BB&S has no reason to believe the FMCSA's SAFER system

9   is not accurate and reliable. (fact No.27d.)  BB&s agrees it would not use a motor carrier it knows

10  or should know is unsafe. (Fact No.73a.)

11

12  In the present matter, BB&S' policy to qualify an outside motor carrier before hiring it to transport

13  its lumber was to merely check its DOT number, get a W9 form and ask for a copy of its insurance

14  policy. (Fact No. 35a.) And, in this case, it cannot produce the insurance agreement it claims it had

15  for Gregory. (Fact No. 29a.)  The indifference demonstrated by BB&S is a classic example of legal

16  nonfeasance in that BB&S acknowledges the SAFER safety web site - and actually uses it to check

17  itself; (Fact 27b.) however,  it chooses not to check the safety record of any outside motor carrier

18  it uses to deliver its lumber. (Fact No.65a.)

19

20  BB&S confirms it would not select a motor carrier with a higher than average out of service rate,

21  that violated the hours of service regulations, which did not maintain its vehicles in a roadworthy

22  manner, or was documented to have unsafe drivers.  (Fact Nos. 68a-d.)   All of these violations –

23  and more - were documented against Gregory at the time BB&S used it for the short-haul to Dalton,

1    MA. and would have been seen on the SAFER website – if B&S had bothered to look it up.  (Fact

2    No. 67a.)   In the circumstances of this case it was not just foreseeable that using an unsafe motor

3    carrier and driver would result in serious injury or death on the roads, it was probable (Fact No.

4    78a.)

5

6    BB&S is clearly a sophisticated shipper with annual revenues over $78m. (Fact No. 1d.)   It relies

7    heavily on transportation by tractor trailer truck to deliver its lumber throughout New England.

8    (Fact No. 1e.)  In fact, it acknowledged it would be out of business if it weren't for tractor trailer

9    trucks. (Fact No. 1f.)  Therefore, it is just to impose upon BB&S a duty for the proper selection of

10   a safe, fit, and competent motor carrier to haul its goods – for everyone's safety.

11

12   H.  <u>ARGUMENT</u>

13

14      3.  <u>Constructive Standard of Knowledge.</u>

15

16   BB&S suggests that actual knowledge should be the standard when applying § 411 (BB&S' brief

17   at 16); however, BB&S' analysis adopts - by borrowing - the standard applied to an entirely

18   separate tort cause of action - negligent entrustment.  There is no need to poach a standard because

19   the Restatement (Second) of Torts § 411 instructs on the appropriate standard, (See illustration 1,

20   supra at §2b).  Furthermore, the cases apply a constructive knowledge standard.  <u>*L.B. Foster Co.*</u>

21   <u>*v. Hurnblad,*</u> 418 F.2d 727,729 (9th Cir. 1969);  <u>*Hudgens v. Cook Industries, Inc.,*</u> 521 P.2d 813,

22   816 (1974)

23

24      I.  LAW

25      1   <u>Statutory Employer</u>
26          a.   <u>History and Intent of The Statutory Employer Doctrine</u>

1    In the first half of the twentieth century, interstate motor carriers sought to immunize themselves

2    from liability for negligent drivers by leasing tractors and trailers and nominally classifying the

3    drivers as independent contractors.  _Crocker v. Morales-Santana,_ 854 N.W.2d 663, 668 (2014).

4    In 1956, Congress amended federal law to require interstate motor carriers to assume full direction

5    and control of leased vehicles.  Act of August 3, 1956, Pub.L. No. 84-957, 1956 U.S.C.C.A.N.

6    1163 (currently codified at 49 USC § 14102(a)(4)).  The amendments were intended to ensure that

7    interstate motor carriers would be fully responsible for the maintenance and operation of leased

8    equipment and the supervision of drivers, thus protecting the public and providing financial

9    responsibility for motor carrier accidents. Id. 668.

10

11            b.  <u>49 U.S.C.  § 14102.  Leased Motor Vehicles.</u>

12

13   49 U.S.C.  § 14102.  Leased Motor Vehicles.

14

15       (a) General Authority of Secretary. The secretary may require a motor carrier providing
16           transportation subject to jurisdiction under subchapter I of chapter 135 that _uses_ (emphasis
17           added) motor vehicles not owned by it to transport property under an _arrangement_
18           (emphasis added)  with another party to:

19

20       (1) make the arrangement in writing signed by the parties specifying its duration and the
21           compensation to be paid by the motor carrier;

22

23       (2) carry a copy of the arrangement in each motor vehicle to which it applies during the
24           period the arrangement is in effect;

25

26       (3) inspect the motor vehicle and obtain liability and cargo insurance on them; and

27

28       (3) have control of and be responsible for operating those motor vehicles in compliance
29           with requirements prescribed by the secretary on safety of operations and equipment,
30           and with other applicable law as if the motor vehicles were owned by the motor carrier.

31

1    "It is the fact of '*use*' that triggers the vicarious liability imposed by the Motor Carrier Act.  Once

2    the Plaintiff satisfies the threshold requirement of '*use*' the statute set out above, goes on to

3    prescribe four categorical requirements that accompany that carrier's '*use*' in order to make it

4    lawful.  The requirements are separate from, and in addition to, the imposition of statutory liability

5    in the third and fourth requirements.  Thus, the duties to inspect and insure the vehicle and to

6    control and be responsible for its operation exists whether or not there is a written lease." *Puga v.*

7    *About Tyme Transport, Inc.,* 227 F.Supp3d 760, 764  (S.D. Texas 2017). (*"arrangement"* as used

8    in the statute does not require a lease)

9

10              c.   Employee/Employer Definitions

11   The federal regulations define "employee" as any individual, other than an employer, who is

12   employed by an employer and who in the course of his or her employment directly affects

13   commercial motor vehicle safety.  Such term includes a driver of a commercial motor vehicle

14   (including an independent contractor while in the course of operating a commercial motor vehicle),

15   a mechanic, and a freight handler.  An "employer" is defined as any person engaged in a business

16   affecting interstate commerce who owns or leases a commercial motor vehicle in connection with

17   that business, or *assigns* (emphasis added) employees to operate it.  49 C.F.R. § 390.5 .  "Motor

18   Carrier" means a for hire motor carrier or a private motor carrier.  The term includes a motor

19   carrier's agents, officers, and representatives as well as employees responsible for hiring,

20   supervising, training, or *dispatching* (emphasis added) of drivers … 49 C.F.R. § 390.5.

21

22              d.   Post Delivery Negligence

1  It is the nature of the trucking business that drivers will make deliveries and return with no further

2  load or assignment.   These drivers are still, however, using the truck in the business of the

3  company." *Bays v. Summit Trucking*, 691 F.Supp.2d 725, 732 (D. W.D. Kentucky 2010) (tractor

4  trailer driver still in the employ of the party he delivered goods for when he caused injury while

5  driving home with an empty tractor trailer.) (Citing *Greenwell v. Boatwright*, 184 F.3d 490, 491

6  (6th Cir. 1999) (adopting the reasoning of *St. Paul Fire Ins. Co. v. Frankart,* 69 Ill. 2d 209, 219

7  (1977).

8  In *Hodges v. Johnson* 52 F.Supp. 448 (W.D. VA. 1943) the court rejected the argument that an

9  empty truck returning from a delivery of lard was not in the service of the shipper as it was the

10  shipper that put the entire trip in motion.  In *American Transit Lines v. Smith* 246 F.2d 86, 90, 91,

11  (6th Cir. 1957), it was said:  If the motor carrier cannot delegate its responsibility to an independent

12  contractor for the period of delivering the load, neither can it delegate its responsibility for that

13  part of the trip which necessarily must be made after the load is delivered. It is the motor carrier

14  that has put the entire trip in motion.

15

16  J.  <u>ARGUMENT</u>

17

18  1. <u>Statutory Employment</u>

19

20  BB&S is a motor carrier with its own DOT number.  (Fact No.27b.)  BB&S leased or owned a

21  fleet of nine (9) tractor trailer trucks in 2016. (Fact  No. 75a.)  BB&S made the *"arrangements"*

22  for the short-haul directly with the Gregory driver and without communicating with Gregory. (Fact

23  Nos. 2a &2b.)   BB&S was the dispatcher[8] of the short-haul. (Fact No. 11b.)  BB&S *"used"* a

---

[8]     Dispatcher is covered within the official FMCSA definition of "motor carrier" CFR 49 CFR 390.

1   tractor trailer it did not own for the short-haul. (Fact No. 42.)   The bill of lading accompanying

2   the delivery to LP Adams was created by BB&S and indicated the method of delivery was "our

3   truck." (Fact No. 53b.)   Gregory was unaware of the *"arrangement"* for the short-haul until after

4   the crash when the Gregory driver called to inform Gregory of the crash. (Fact No. 2f.)   Since

5   Gregory had no knowledge of the short-haul, it was BB&S that exercised direction and control

6   over the Gregory driver concerning the short-haul.   BB&S did not retain Gregory, engage Gregory,

7   contract with Gregory, or purchase the services of Gregory for the short-haul. (Fact No. 2a-f.)

8

9   Therefore, under 49 U.S.C. § 14102,  BB&S - as a *"motor carrier"* that made *"arrangements"*

10   for *"using"* a motor vehicle it did not own to provide transportation - was required to inspect the

11   motor vehicle and obtain liability and cargo insurance on them, and have control of and be

12   responsible for operating those motor vehicles in compliance with requirements prescribed by the

13   secretary on safety of operations and equipment and with other applicable law as if the motor

14   vehicles were owned by the motor carrier.  It is undisputed BB&S did not inspect the tractor trailer

15   it used for the short-haul to Dalton, MA. or check the qualifications of the driver, or otherwise

16   comply with the Federal Motor Carrier Safety Regulations as required under 49 U.S.C. § 14102.

17   (Fact No.37a.)

18

19   Plaintiff's trucking safety expert has opined that if the Gregory driver contracted individually to

20   take the short-haul, he would have been working as the statutory employee of BB&S and been

21   subject to all the screening requirements associated with employment. (Fact No. 30f.)  BB&S has

22   proffered no expert opinions on this – or any other – issue presented in its motion for summary

23   judgment.

J   ARGUMENT

   2   Employer/Employee Relationship

In the trucking industry, it is accepted that a driver can have more than one employer. *Zamalloa v. Hart,* 31 F.3d 911, 916 (9th Cir. 1994); *Simmons v. King*, 478 F.2d 857,867 (5th Cir. 1973).   Under these circumstances BB&S is the "employer" as it is engaged in a business affecting interstate commerce (Fact No. 79a.)  and, BB&S "assigned" an "employee" to operate a motor vehicle – that employee being the Gregory driver. (Fact No. 3b)

K.  LAW

   1.  PROXIMATE CAUSE

"It is well understood that negligent actors in innumerable contexts are not to be held  to account for all the consequences of their delicts however remote; a sense of due proportion between the fault and the compensation to be exacted, together with pragmatic social considerations, call for reasonable limits on boundaries on the liability.  These have been expressed in terms of so-called 'proximate cause' which turns on foreseeability." *Or v. Edwards*, 62 Mass. App. Ct. 475, 485 (2004) (Wrongful death action against a landlord who negligently used the services of a custodian who murdered a tenant).  The *Or* court provides an illustrative explanation of the limits of liability, a.k.a. proximate cause, as follows:

> The jury tries to reproduce the picture of what a reasonable person, as of the moment before the negligent act, would have foreseen as the likely harmful consequences of that act; alongside this picture the jury is to set the picture of the actual happening, and then to observe, in a general sense, how far the harm in fact experienced resembles any of the harms reasonably to have been foreseen. *Id.* 487.

1   More than 60 years ago Magruder, Chief Judge, for the U.S. Court of Appeals for the First Circuit

2   addressed the temporal aspect of proximate cause:

3   > The adjective 'proximate,' as commonly used in connection with cause, is perhaps
4   > misleading, since to establish liability it is not necessarily true that the defendant's culpable
5   > act must be shown to have been the next or immediate cause of the Plaintiff's injury.  In
6   > many familiar instances, the defendant's act may be more remote in the chain of events..."
7   > *Marshall v. Nugent,* 222 F.2d 604, 610 (1st Cir 1955).
8

9   In *Marshall* the Defendant's truck negligently ran Plaintiff's car off the road into a snowbank.

10  Nobody was injured at that moment in time. Defendant stopped to help the Plaintiff tow his car

11  out of the snowbank.  Plaintiff positioned himself up the road from the towing operation to warn

12  approaching cars about the road blockage ahead. Plaintiff was injured when he was struck by an

13  approaching car. The Court upheld the jury's finding of negligence against the defendant holding

14  that one is liable for the harmful consequences that result from the creation of unreasonable risk,

15  i.e., risk that is foreseeable and is the immediate cause of the plaintiff's injury. The assigning of

16  such liability is a question for the trier of fact.  Nearly fifty years later the Massachusetts Appeals

17  Court incorporated the foreseeability analysis of *Marshall* in *Or v. Edwards,* 62 Mass. App. Ct.

18  475 (2004) when the court upheld a trial judges instruction to the jury on the issue of proximate

19  cause.  The *Or* court said:

20  > "...[t]he jury could find it was within the range of reasonable foreseeability that the
21  > defendants' failings to make due inquiries about the unfit Vao Sok, especially as combined
22  > with entrusting him with mission and keys, created a likelihood of types of harm to others
23  > of which one came about..." Id. 488
24

25          a.   Proximate Cause Is a Determination For a Jury

26  It is a basic tenant of tort law that the issue of proximate cause is an element for a jury to determine.

27  As Judge Magruder eloquently stated in *Marshall*:

1    "When an issue of proximate cause arises in a borderline case, as not infrequently happens,
2    we leave it to the jury with appropriate instructions.  We do this because it is deemed wise
3    to obtain the judgment of the jury, reflecting as it does the earthy viewpoint of the common
4    man – the prevalent sense of the community – as to whether the causal relation between
5    the negligent act and the Plaintiff's harm which in fact was a consequence of the tortuous
6    act is sufficiently close to make it just and expedient to hold the Defendant answerable in
7    damages.  That is what the courts have in mind when they say the question of proximate
8    causation is one of fact for the jury. It is similar to the issue of negligence, which is left to
9    the jury as an issue of fact. Even where on the evidence the facts are undisputed, if fair
10   minded men might honestly and reasonably draw contrary inferences as to whether the
11   facts do or do not establish negligence, the court leaves such issues to the determination of
12   the jury. *Id.* 611

13

14   The Massachusetts Appeals court in *Or* stated:

15

16   Each element of the tort presents itself normally as an issue of fact;  there is proper
17   reluctance to withdraw the issue from the jury or to nullify the jury's finding and, as the
18   court noted in *Foley v. Boston Housing Auth.,* 407 Mass. 640, 646 (1990), such invasion
19   of the jury's function is justifiably "rare."  Juries have a special place and value when it
20   comes to handling the issue of limitation on liability (proximate cause), for here community
21   standards – conceptions about what is right – should and inevitably do play their part.
22   *Id.* 490.

23

24   Although Massachusetts courts have not decided the issue, other courts have held that where  there

25   is some evidence tending to show the shipper knew or should have known that the motor carrier

26   was incompetent and reasonable men might draw conflicting conclusions, then whether or not the

27   shipper negligently selected the carrier is a question of fact for the jury. *Hudgens v. Cook Indus.,*

28   *Inc*., 521 P.2d 813, 816 (OK., 1973); *Schramm v. Foster,* 341 F.Supp.2d 536 (D.Md.2004)(Court

29   permitted a claim for negligent hiring of an independent contractor – a motor carrier - to go to the

30   jury).  The Restatement (Second) of Torts §411 supports the proposition that in determining the

31   appropriate amount of care that a defendant must exercise in selecting a contractor, the finder of

32   fact should consider "that which a reasonable man would exercise under the circumstances."

33   Comment (c).

L. ARGUMENT

   1. Proximate Cause

Defendant claims there can be no proximate cause between BB&S' negligent selection of a motor carrier and the death of George Forbes because the death occurred after the delivery had been made at LP Adams in Dalton, MA.  Defendant fails to understand a core principle of proximate cause is that its limits of liability are set only by the reasonably foreseeable consequences of the negligent act, not a clock or calendar.

In the instant case, a reasonable person could find it was within the range of reasonable foreseeability that BB&S' failings to make the due inquires about the unfit Gregory, especially as combined with entrusting it on the highways to deliver its lumber, created a likelihood of types of harms to others of which one came about. Or, supra at 488.

The risks created by the negligence of BB&S in selecting a verifiably and demonstrably unsafe motor carrier and setting it out upon the highways among the motoring public did not cease when BB&S' product was delivered to LP Adams in Dalton, MA..   Had BB&S, Gregory, and the Gregory driver not engaged in the interstate commercial joint venture to deliver lumber to LP Adams in Dalton, MA., (Fact Nos. 58a-c, & 79a.)   Gregory would not have been in Dalton and involved in the fatal crash. (Fact No. 69a.)

BB&S' position that the trip was over when its lumber was dropped at LP Adams accounts for only the first half of the diversion that BB&S set Gregory upon.  It conveniently ignores that the entirety of the trip to Dalton was incomplete until Gregory returned back to Monson, MA.  The

1   deadhead miles from Dalton to Monson were the direct result of BB&S' inappropriately

2   dispatching Hooks on the Dalton load. (Fact No. 76a.)



3

4   It is undisputed that BB&S' lumber was delivered to LP Adams in Dalton, MA. immediately prior

5   to the fatal crash. (Fact No. 6.)   However, it is the nature of the trucking business that drivers will

6   make deliveries and return with no further load or assignment. (Fact No. 70a.)   This concept was

7   confirmed when the president of Gregory conceded in his deposition that if he sent one of his

8   trucks to New York for a delivery and it returned to North Carolina empty, the job was not over

9   until the truck arrived back in North Carolina.  (Fact No. 3a.)

10

11   M. <u>CONCLUSION</u>

12   The transportation of freight in large trucks involves inherent risks of fatal and injury crashes with

13   significant personal, economic, and societal costs. As a result of these inherent risks 49 U.S. Code

14   § 14101 specifies that *"motor carriers"* shall provide safe and adequate service and equipment

15   and facilities. The United State Supreme Court recognized that the strict regulatory scheme

16   imposed on authorized carriers was designed to provide a financially responsible party to stand

behind any interstate trucking operation which negligently injures members of the traveling public.

*American Trucking Ass'ns v. United States*, 344 U.S. 298, 73 S. ct. 307, 97 L. Ed. 337 (1953).   See

also *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28 96 S.

Ct. 229, 46 L. Ed. 2d 169 (1975);  *Alford v. Major,* 470 F.2d 132 (7th Cir. 1972);  *Rodriguez v.*

*Ager,* 705 F.2d 1229 (10th Cir. 1983).


The Nation continues to experience significant impact from large truck fatal and injury crashes.

One hope for improvement is for shippers to be vigilant in their efforts to ensure that the motor

carriers they select are competent to operate in a safe and efficient manner.


**WHEREFORE,** in light of BB&S' sophistication as a shipper and motor carrier, its

acknowledgment of the highway dangers posed in shipping by tractor trailer, its recognition of the

foreseeable consequences that can arise therefrom, its knowledge of the systems in place to vet

motor carriers for safety before hiring them,  its complete indifference to utilize those systems

when using outside motor carriers, and its disregard for  the proper procedures to subcontract a

motor carrier,  a fact question exists as to whether BB&S:


1.  should be accountable under Massachusetts law;

2.  failed to exercise reasonable care to select a careful and competent contractor;

3.  was the statutory employer of the Gregory driver; and.

4.  was the proximate cause of the fatality.

Dated: *21 FEB. 2020*

THOMAS FORBES, as he is the
Personal Representative of the
Estate of GEORGE J. FORBES

By: */s/ Dino M. Tangredi*

**Dino M. Tangredi**
**BBO No. 567928**
**The Miles Pratt House**
**106 Mount Auburn Street**
**Watertown, MA. 02472**
**T:     617-926-0012**
**F:     617.926.0016**
**masslaw@dinotangredi.com**

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon each party
appearing pro se and the attorney of record for each other party on February 21, 2020___
by:

___    U.S. mail
___    In hand
✓    E-mail
___    Fax

70103/SJ-BB&S-MEMO-Final-5