Thomas Forbes as he is the Personal Representative of the Estate of George Forbes
v.
Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

# UNITED STATES DISTRICT COURT
# IN THE WESTERN DIVISION OF MASSACHUSETTS
# SPRINGFIELD, MA.

### Civil Action No.17 CV  30174

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THOMAS FORBES, as he is the**
**Personal Representative of the**
**Estate of GEORGE J. FORBES,**
                              **PLAINTIFF**

**v.**

**GREGORY TRUCKING COMPANY,**
**INC., WILEY LENUE HOOKS, JR.,**
**GREGORY LEASING COMPANY, INC.**
**BSG LEASING, INC.;  and**
**B&C TIMBERS LLC.**
                    **DEFENDANTS**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S MOTION IN LIMINE NO. 4
## ADMISSIBILITY OF COMPLIANCE REVIEWS

George (Joe) Forbes was killed when his pick-up truck was struck by a tractor trailer truck which ran a red light.  The tractor trailer truck was owned by Gregory Trucking Co. Inc., (Gregory) and operated by Gregory's employee - Wiley Lenue Hooks, Jr. (Hooks).   It is alleged Gregory negligently hired Hooks who had a pending criminal charge for driving while impaired (his 5th) when Gregory hired Hooks; and that Gregory was negligent in training and supervising Hooks, as well as negligently entrusting the driver with a tractor trailer truck.

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

1   The Plaintiff seeks a pre-trial order from the court regarding the admissibility

2   of compliance reviews performed by the Federal Motor Carrier Safety

3   Administration (FMCSA) upon Gregory Trucking Co., Inc.

4
5
6   **BACKGROUND ON COMPLIANCE REVIEWS**
7

8   FMCSA is an operating administration within the U.S. Department of

9   Transportation (DOT), and its primary mission is to reduce crashes, injuries,

10  and fatalities involving large trucks and buses.  See 49 U.S.C. § 31131; 49

11  U.S.C. § 1.86; _Floke v. DOT_, 136 F. Supp. 3d 138, 140 ( 1st Cir. 2015).

12

13   In The Motor Carrier Safety Act of 1984, Congress directed the Secretary

14  of Transportation to establish a procedure to 'determine whether an owner

15  or operator is fit to operate safely commercial motor vehicles…" 49 U.S.C.

16  § 31144.  The Secretary has delegated these responsibilities to FMCSA.  49

17  U.S.C. § 1.87.  To  implement this statutory directive, FMCSA created

18  "procedures to determine the safety fitness of motor carriers, to assign safety

19  ratings, to direct motor carriers to take remedial action when required, and

20  to prohibit motor carriers receiving a safety rating of 'unsatisfactory' from

21  operating a [commercial motor vehicle.]" 49 U.S.C. § 385.1 (a); _see_ 49

22  U.S.C. § 31144(b); _see generally_ 49 U.S.C. pt.385.

Page 2

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

1    FMCSA uses "compliance reviews" to determine the safety fitness of a

2    motor carrier  and assign a safety fitness rating. 49 U.S.C. § 385.3; 49 U.S.C.

3    pt. 385 app. B § I(a).  As part of a compliance review, an FMCSA safety

4    investigator will complete an in-depth, on site examination of a motor

5    carrier's operations and will review driver qualification files, records of duty

6    status, vehicle maintenance records, and other documents to determine

7    compliance. 49 U.S.C.  pt. 385 app. B §I(b); _Flat Creek Transp.  v. FMCSA,_

8    923 F.3d 1295, 1297-98 (11th Cir. 2019).

9

10   During a compliance review, FMCSA investigators document violations,

11   and the violations are categorized  into six factors.   Each factor is then

12   assigned a rating (satisfactory, conditional, or unsatisfactory) depending,  in

13   part, on violations of acute or critical regulations.  FMCSA has determined

14   that "[n]oncompliance with acute regulations and patterns of noncompliance

15   with critical regulations are quantitatively  linked to inadequate safety

16   management controls and usually higher than average accident rates."  Id. §

17   II(e).   Thus, FMCSA uses violations of acute and critical regulations to

18   determine a motor carrier's safety fitness. _Multistar Indus. v. DOT_, 707 F.3d

19   1045, 1049 (9th Cir. 2013).

20

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

1    A motor carrier with a final safety rating of "unsatisfactory" is prohibited

2    from operating a commercial motor vehicle in interstate or intrastate

3    commerce unless it takes corrective action to improve its overall safety rating

4    to ''conditional'' or 'satisfactory'' or successfully appeals its proposed

5    "unsatisfactory" rating through an administrative review with the FMCSA.

6    See 49 U.S.C. § 31144 (c), (e); 49 C.F.R. sec. 385.13(a), 385.15, 385.17.

7    *Sorreda Transport v. U.S Department of Transportation,* 980 F.3d 1,3 (1st

8    Cir. 2020.) (attached as Exhibit F.)

9

10
11
12    **FACTS**
13

14    Gregory Trucking Company, Inc., (Gregory) is an interstate motor carrier

15    that is subject to the Federal Motor Carrier Safety Administration's

16    (FMCSA) safety regulations.  On 8 February 2011 FMCSA conducted an

17    investigation of Gregory's operations and uncovered one hundred and

18    seventy-one (171) violations of FMCSA's safety regulations.  One-hundred

19    and nineteen (119) were deemed "critical[1]" safety regulations: thirteen (13)

---

[1]    Critical regulations are those "where noncompliance relates to management and/or operational controls.  These are indicative of breakdowns in a carrier's management controls." 49 U.S.C. pt. 385 app. B  § II(c).

PX~MIL~086

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes
v.
Gregory Trucking Company, Inc. et. al.
C.A. No. 3:17 – CV 30174-MAP

violations for alcohol and drug testing violations, one hundred and four (104) violations for failing to require drivers to prepare vehicle inspection reports, and two (2) violations for failing to maintain a medical examiner's certificate in the driver's qualifications file.

The following violations were admitted by the corporate representative from Gregory Trucking Co., Inc. in his deposition on 25 April 2019 (Attached hereto as Exhibit E):

Viol. #1.    §382.301(a): Using a driver before Gregory Trucking received a negative pre-employment controlled substance test result ;

Viol #9.     §391.23(a)   Failing to investigate a driver's background;

Viol #11.    §391.23 (e) (f) Failing to investigate the driver's alcohol and controlled substance history for the previous 3 years.

Viol # 12:   §391.25 (a) Failing to make inquiry into the driving record of each driver to the appropriate state agency in which the driver held a CDL at least once every 12 months; and

Viol #14:    §391.25 (b) Failing to review the driving record of each driver to determine whether that driver meets the minimum requirements for safe driving or is disqualified to drive.

(See List of violations attached hereto as Exhibit A.)

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes
v.
Gregory Trucking Company, Inc. et. al.
C.A. No. 3:17 – CV 30174-MAP

1  The FMCSA notified Gregory  that it was proposing an "unsatisfactory"

2  safety rating,  which would prohibit Gregory from operating commercial

3  motor vehicles in interstate commerce. ( See Exhibit A, p. 5)

4

5  On 29 March 2011 Gregory entered into a settlement agreement with the

6  U.S. Department of Transportation  (Attached hereto as Exhibit B.)  In the

7  settlement agreement Gregory  stipulated and admitted it committed the

8  violations (Settlement Agreement - Exhibit B, ¶6 and ¶9)  and agreed to pay

9  a fine of $4,060.

10

11  The Plaintiff's complaint alleges that Gregory Trucking Co., Inc. committed

12  the following offenses:

13      Count II:          Vicarious Liability for the negligence of its
14                         driver causing the wrongful death of George
15                         Forbes and requesting punitive damages;
16      Count IV:          Negligent Entrustment of a tractor trailer truck to
17                         its driver  causing the wrongful death of George
18                         Forbes and requesting punitive damages;
19      Count V:           Negligent Entrustment – violation of the
20                         FMCSRs  causing the wrongful death of George
21                         Forbes and requesting punitive damages; and

22

23

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

1  Count VI:          Negligent Hiring, training, retention, supervision

2                     causing the wrongful death of George Forbes and

3                     requesting punitive damages;

4
5
6
7  **LAWS AND RULES OF EVIDENCE**

8
9  <u>LAW</u>

10  A "court must uphold a decision of the FMCSA unless it is 'arbitrary,

11  capricious, an abuse of discretion, or otherwise not in accordance with law.'"

12  *Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier Safety Admin.,* 296

13  F.3d 1120, 1124 (D.C. Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)); cf. *Flock*

14  *v. U.S. Dep't of Transp.*, 840 F.3d 49, 54-55 (1st Cir. 2016).  "The scope of

15  review under the 'arbitrary and capricious' standard is narrow and a court is

16  not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs.*

17  *Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43

18  (1983); see also id. ("[T]he agency must examine the relevant data

19  and articulate a satisfactory explanation for its action including a

20  'rational connection between the facts found and the choice made.'" (quoting

21  *Burlington - 6 - Truck Lines v. United States,* 371 U.S. 156, 168 (1962))).

22  We accept an agency's findings so long as they are supported by

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

substantial evidence in the record as a whole.  See *Vieques Air Link, Inc. v. U.S. Dep't of Lab*., 437 F.3d 102, 104 (1st Cir. 2006)

The case of *R&B Transportation v. U.S. Department of Labor*, 618 F.3d 37 (1st Cir. 2010) held that F.M.C.S.A.  compliance reviews are admissible pursuant to the public records exception to the hearsay rule and as proof of a party's knowledge concerning its history of complying with the commercial motor carrier driving  regulations.  (Attached hereto as Exhibit D.)   In *R&B Transportation* the first circuit reviewed the admissibility of compliance reviews as evidence in an administrative law proceeding against a trucking company held responsible for unlawfully discharging a truck driver in its employment.

In upholding the U.S. Department of Labor's Administrative Review Board (ARB) decision that the compliance review was admissible evidence against the trucking company,  the First Circuit said:

> "We thus hold that it was not an abuse of the Administrative Law Judge's (ALJ's) broad discretion to admit the DOT reports (compliance reviews) not as character evidence but both pursuant to the 'public records and reports' hearsay exception and as proof of petitioners' knowledge concerning their history of complying with the driving regulation."

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

1   The Plaintiff acknowledges the first circuit was not applying the Federal

2   Rules of Evidence because the ALJ was bound by the rules of evidence in

3   administrative hearings before an ALJ. 29 CFR §18.101 (The ALJ Rules.)

4   However,  the ALJ Rules and the Federal Rules of Evidence are nearly

5   identical. (See chart attached hereto as Exhibit C.)

6

7

8   **ARGUMENT**

9

10  **Public Records Exception to the Rule Against Hearsay – F.R.E. 803(8)**

11  The compliance reviews should be admitted because they fall within the

12  public records/reports exception to the hearsay rule and to the extent they

13  reflect Gregory Trucking Co., Inc.'s knowledge of its obligation to hire

14  qualified drivers as well as the enforcement of applicable drug and alcohol

15  policies. *R&B Transportation v. U.S. Department of Labor*, 618 F.3d 37 (1st

16  Cir. 2010.)

17

18  Since the compliance review is a 'factual finding  from a legally authorized

19  investigation' and there is no evidence of a lack of trustworthiness  the

20  compliance reviews are admissible under FRE 803(8).

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

1   **Admissible as a 'Stipulation' by Gregory Trucking Co., Inc.**

2   Gregory Trucking Co., Inc. agreed to pay the penalties imposed by the U.S.

3   Department of Transportation and entered into a settlement agreement in

4   which it agreed that:

5

6        ¶6.   The parties stipulate the claim set forth in the above described

7              notice of claim is valid. (See attached hereto as Exhibit B); and

8        ¶9.   Execution of this settlement agreement will constitute

9              admission of the violations set forth in the agreement… (See

10             attached hereto as Exhibit B)

11

12  Therefore, the settlement agreement establishes a stipulation by Gregory

13  Trucking Co., Inc. and the compliance reviews are admissible.

14

15

16  **Admissible as a Party Admission Under F.R.E. 801(d)(2)**

17  In its deposition, Gregory Trucking Co., Inc., admitted it committed the

18  violations issued against it in the compliance review. (See transcript of

19  Gregory Trucking Co., Inc. attached hereto as Exhibit E.)  Therefore, as a

20  party admission the compliance reviews should be admitted.

Page 10

**Admissible to Evaluate Gregory's Competence as a Carrier**

Evidence of the violations in the earlier compliance review would be relevant in evaluating Gregory's competence as a carrier. *Jones v. C.H. Robinson Worldwide, Inc*., 558 F.Supp. 2d 630, 652 (2008).   Such evidence is admissible to establish Gregory's  knowledge of the FMCSA regulations including, but not limited to, regulations concerning the hiring qualifications, required contents of a driver's qualification file,  and the continuing duty to drug and alcohol test its tractor trailer drivers.

**Admissible Regarding Punitive Damages.**

One of the ways the Plaintiff can prove conduct necessary for a finding of punitive damages is to prove gross negligence.  Some of the common indicia of gross negligence are "voluntarily incurring an obvious risk, or… *persistence in a palpably negligent course of conduct over an appreciable period of time*." *Pruzynski v. Malinowski*, 338 Mass. 58, 60 (1958.)

**WHEREFORE**, The Plaintiff seeks a pre-trial ruling on the admissibility of the compliance review conducted on Gregory Trucking Co., Inc. in February 2011.

THOMAS FORBES, as he is the
Personal Representative of the
Estate of GEORGE J. FORBES

By: _/s/ Dino M. Tangredi_        **Dated:**

**Dino M. Tangredi**
**BBO No. 567928**
**The Miles Pratt House**
**106 Mount Auburn Street**
**Watertown, MA. 02472**
**T:    617-926-0012**
**F:    617.926.0016**
**masslaw@dinotangredi.com**

17103/limine-4-compliance review

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

Page 12

1    UNITED STATES DISTRICT COURT
2    IN THE WESTERN DIVISION OF MASSACHUSETTS
3                SPRINGFIELD, MA.

4
5                          Civil Action No.17 CV  30174
6
7    *********************************

8    THOMAS FORBES, as he is the
9    Personal Representative of the
10   Estate of GEORGE J. FORBES,
11              PLAINTIFF
12
13   v.
14
15   GREGORY TRUCKING COMPANY,
16   INC., WILEY LENUE HOOKS, JR.,
17   GREGORY LEASING COMPANY, INC.
18   BSG LEASING, INC.;
19   B&C TIMBERS LLC.;  and
20   BB&S ACQUISITION CORPORATION,
21              DEFENDANTS
22   *********************************
23
24
25
26
27          **EXHIBIT  A**
28
29      **COMPLIANCE  REVIIEW**
30
31
32
33

PX~MIL~095

PX~MIL~096

## UNITED STATES DEPARTMENT OF TRANSPORTATION

| US DOT # 94749 | Legal: GREGORY TRUCKING INC  FORMERLY G&G LUMBER |
| | Operating (DBA): |

**MC/MX #:** 622715        **Federal Tax ID:** 56-1802151 (EIN)

**Review Type:** Compliance Review (CR)

**Scope:** Principal Office     **Location of Review/Audit:** Company facility in the U. S.     **Territory:** E

| Operation Types | Interstate | Intrastate | |
|---|---|---|---|
| Carrier: | Non-HM | N/A | **Business:** Corporation |
| Shipper: | N/A | N/A | **Gross Revenue:** $2,809,595.00    for year ending: 12/31/2010 |
| Cargo Tank: | | N/A | |

### Company Physical Address:

179 LUMBER DRIVE
Union Grove, NC 28689

**Contact Name:** Martha Somers
**Phone numbers:** (1) 704- 539-5110     (2)       Fax 704-539-5296
**E-Mail Address:** gandglumber@yadtel.net

### Company Mailing Address:

P O  BOX 53
UNION GROVE. NC 28689-0053

### Carrier Classification

Authorized for Hire

### Cargo Classification

Logs, Poles. Beams, Lumber

Does carrier transport placardable quantities of HM?    No
Is an HM Permit required?    N/A

### Driver Information

| | Inter | Intra | |
|---|---|---|---|
| < 100 Miles: | | 2 | Average trip leased drivers/month: 0 |
| >= 100 Miles: | 21 | | Total Drivers: 23 |
| | | | CDL Drivers: 23 |

### Equipment

| | Owned | Term Leased | Trip Leased | | Owned | Term Leased | Trip Leased |
|---|---|---|---|---|---|---|---|
| Truck | 2 | 0 | 0 | Truck Tractor | 12 | 9 | 0 |
| Trailer | 0 | 67 | 0 | | | | |

Power units used in the U.S.:23
Percentage of time used in the U.S.:100

LG8VQQUS0GXAA



**GREGORY TRUCKING INC  FORMERLY G&G LUMBER**
U.S. DOT #: 94749

Review Date:
02/08/2011

## Part A

Questions about this report or the Federal Motor Carrier Safety or Hazardous Materials regulations
may be addressed to the Federal Motor Carrier Safety Administration at:

> 310 New Bern Avenue, Room 468
> Raleigh, NC  27601
> Phone: (919)856-4378     Fax: (919)856-4369

This report will be used to assess your safety compliance.

**Person(s) Interviewed**

Name: Martha Somers                              Title: Assistant Secretary
Name:                                             Title:

PX~MIL~098     Capri 6.8.0.11



**GREGORY TRUCKING INC  FORMERLY G&G LUMBER**
U.S. DOT #: 94749

Review Date:
02/08/2011

## Part B Violations

| 1 FEDERAL CRITICAL | Primary: 382.301(a) | Discovered 2 | Checked 3 | Drivers/Vehicles In Violation 2 | Checked 3 |
|---|---|---|---|---|---|

**Description**
Using a driver before the motor carrier has received a negative pre-employment controlled substance test result.
**Example**
b6, b7C hired or b6, b7C . Trip date, 10/13/10.

| 2 FEDERAL | Primary: 382.303(a) | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation | Checked |
|---|---|---|---|---|---|

**Description**
Failing to conduct post accident alcohol testing on driver following a recordable crash.
**Example**
b6, b7C was involved in a recordable crash on 1/26/11. b6, b7C received a ticket for a moving violation.

| 3 FEDERAL CRITICAL | Primary: 382.305(b)(1) | Discovered 3 | Checked 3 | Drivers/Vehicles In Violation | Checked |
|---|---|---|---|---|---|

**Description**
Failing to conduct random alcohol testing at an annual rate of not less than the applicable annual rate of the average number of driver positions
**Example**
Carrier had an average of 20.5 driving positions during calendar year 2010.  Carrier conducted zero random tests.  Driver
b6, b7C 12/15/10 - 12/17/10.

| 4 FEDERAL CRITICAL | Primary: 382.305(b)(2) | Discovered 8 | Checked 11 | Drivers/Vehicles In Violation | Checked |
|---|---|---|---|---|---|

**Description**
Failing to conduct random controlled substances testing at an annual rate of not less than the applicable annual rate of the average number of driver positions.
**Example**
Carrier had an average of 20.5 driving positions during calendar year 2010.  Carrier conducted two random tests.  Driver
b6, b7C 12/20/10.

| 5 FEDERAL | Primary: 382.501(a) Secondary: 382.215 | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 1 | Checked 1 |
|---|---|---|---|---|---|

**Description**
Driver performing safety sensitive function after engaging in conduct prohibited by subpart B.
**Example**
b6, b7C , tested positive for a controlled substances test on 5/03/10.  Driver Lane received a negative controlled substances test on 5/10/10.  Driver was not evaluated by a substance abuse professional.  Trip date, 9/01/10.

| 6 FEDERAL | Primary: 390.15(b) | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 2 | Checked 2 |
|---|---|---|---|---|---|

**Description**
Failing to maintain, for a period of three years after an accident occurs, an accident register.
**Example**
b6, b7C was involved in a recordable crash on 4/15/10.  Carrier does not maintain an accident register.

PX~MIL~099

Capn 6.8.0.11



**GREGORY TRUCKING INC  FORMERLY G&G LUMBER**
U.S. DOT # 94749

Review Date
02/08/2011

## Part B Violations

| 7 STATE | Primary: 391.21(a) | | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 1 | Checked 1 |
|---|---|---|---|---|---|---|
| | CFR Equivalent: 391.21(a) | | | | | |

**Description**
Using a driver who has not completed and furnished an employment application.
**Example**
b6, b7C    no employment application.  Trip date. 11/01/10.

| 8 FEDERAL | Primary: 391.21(a) | | Discovered 6 | Checked 6 | Drivers/Vehicles In Violation 6 | Checked 6 |
|---|---|---|---|---|---|---|

**Description**
Using a driver who has not completed and furnished an employment application.
**Example**
b6, b7C    no employment application.  Trip date. 12/05/10.

| 9 STATE | Primary: 391.23(a) | | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 1 | Checked 1 |
|---|---|---|---|---|---|---|
| | CFR Equivalent. 391.23(a) | | | | | |

**Description**
Failing to investigate driver's background.
**Example**
b6, b7C    11/01/10.

| 10 FEDERAL | Primary: 391.23(a) | | Discovered 6 | Checked 6 | Drivers/Vehicles In Violation 6 | Checked 6 |
|---|---|---|---|---|---|---|

**Description**
Failing to investigate driver's background.
**Example**
b6, b7C    4/15/10.

| 11 FEDERAL | Primary: 391.23(e)(1) | | Discovered 6 | Checked 6 | Drivers/Vehicles In Violation 6 | Checked 6 |
|---|---|---|---|---|---|---|

**Description**
Failing to investigate the driver's alcohol and controlled substances history for the previous 3 years.
**Example**
b6, b7C    10/13/10.

| 12 STATE | Primary: 391.25(a) | | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 1 | Checked 1 |
|---|---|---|---|---|---|---|
| | CFR Equivalent. 391.25(a) | | | | | |

**Description**
Failing to make an inquiry into the driving record of each driver to the appropriate State agencies in which the driver held a commercial motor vehicle operator's license at least once every 12 months.
**Example**
b6, b7C    11/01/10.

PX~MIL~100



**GREGORY TRUCKING INC  FORMERLY G&G LUMBER**
U.S. DOT # 94749

| Review Date |
|---|
| 02/08/2011 |

## Part B Violations

| 13 FEDERAL | Primary: 391.25(a) | Discovered 2 | Checked 2 | Drivers/Vehicles In Violation 2 | Checked 2 |
|---|---|---|---|---|---|

**Description**
Failing to make an inquiry into the driving record of each driver to the appropriate State agencies in which the driver held a commercial motor vehicle operator's license at least once every 12 months
**Example**
b6, b7C     4/15/10.

| 14 FEDERAL | Primary: 391.25(b) | Discovered 5 | Checked 6 | Drivers/Vehicles In Violation 5 | Checked 6 |
|---|---|---|---|---|---|

**Description**
Failing to review the driving record of each driver to determine whether that driver meets minimum requirements for safe driving or is disqualified to drive.
**Example**
b6, b7C     12/05/10.

| 15 STATE | Primary: 391.51(b)(6)  CFR Equivalent: 391.51(b)(6) | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 1 | Checked 1 |
|---|---|---|---|---|---|

**Description**
Failing to maintain a list or certificate relating to violations of motor vehicle laws and ordinances required by 391.27.
**Example**
b6, b7C     11/01/10.

| 16 FEDERAL | Primary: 391.51(b)(6) | Discovered 2 | Checked 2 | Drivers/Vehicles In Violation 2 | Checked 2 |
|---|---|---|---|---|---|

**Description**
Failing to maintain a list or certificate relating to violations of motor vehicle laws and ordinances required by 391.27.
**Example**
b6, b7C     12/05/10.

| 17 STATE CRITICAL | Primary: 391.51(b)(7) | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 1 | Checked 1 |
|---|---|---|---|---|---|

**Description**
Failing to maintain medical examiner's certificate in driver's qualification file.
**Example**
b6, b7C     11/01/10.

| 18 FEDERAL CRITICAL | Primary: 391.51(b)(7) | Discovered 1 | Checked 6 | Drivers/Vehicles In Violation 1 | Checked 6 |
|---|---|---|---|---|---|

**Description**
Failing to maintain medical examiner's certificate in driver's qualification file
**Example**
b6, b7C     , medical certificate expired on 12/17/10.  Oral interview with driver indicates he thought he had another medical certificate that expired in August 2011, but he could not find it.  Driver renewed medical certificate on 2/08/11.  Trip date, 1/11/11.

PX~MIL~101



| GREGORY TRUCKING INC  FORMERLY G&G LUMBER<br>U.S. DOT #. 94749 | Review Date:<br>02/08/2011 |
|---|---|

### Part B Violations

| 19<br>FEDERAL | Primary: 391.51(c) | Discovered<br>1 | Checked<br>1 | Drivers/Vehicles<br>In Violation    Checked<br>1                   1 |
|---|---|---|---|---|

**Description**
Failing to keep driver qualification file for at least 3 years after termination of driver's employment.
**Example**
b6, b7C    terminated on b6, b7C   Trip date. 3.02.10.

| 20<br>FEDERAL | Primary: 396.3(b)(1) | Discovered<br>6 | Checked<br>6 | Drivers/Vehicles<br>In Violation    Checked<br>6                   6 |
|---|---|---|---|---|

**Description**
Failing to keep a maintenance record which identifies the vehicle, including make, serial number, year, and tire size.
**Example**
Trailer DKH1, trip date. 5.06.10.  No record of tire size.

| 21<br>FEDERAL | Primary: 396.3(b)(3) | Discovered<br>6 | Checked<br>6 | Drivers/Vehicles<br>In Violation    Checked<br>6                   6 |
|---|---|---|---|---|

**Description**
Failing to keep a record of inspection, repairs and maintenance indicating their date and nature.
**Example**
Trailer DKH1, trip date. 5.06.10

| 22<br>FEDERAL | Primary: 396.9(d)(3) | Discovered<br>4 | Checked<br>19 | Drivers/Vehicles<br>In Violation    Checked<br>3                   14 |
|---|---|---|---|---|

**Description**
Failing to maintain completed inspection form for 12 months from the date of inspection at the carrier's principal place of business.
**Example**
Driver b6, b7C    received a roadside inspection in the state of SC on 1/24 11.

| 23<br>STATE<br>CRITICAL | Primary: 396.11(a)<br><br>CFR Equivalent. 396.11(a) | Discovered<br>19 | Checked<br>61 | Drivers/Vehicles<br>In Violation    Checked<br>5                   6 |
|---|---|---|---|---|

**Description**
Failing to require driver to prepare driver vehicle inspection report.
**Example**
b6, b7C    . 11/19/10. unit #19. 11/23 10.

| 24<br>FEDERAL<br>CRITICAL | Primary: 396.11(a) | Discovered<br>85 | Checked<br>150 | Drivers/Vehicles<br>In Violation    Checked<br>6                   7 |
|---|---|---|---|---|

**Description**
Failing to require driver to prepare driver vehicle inspection report.
**Example**
b6, b7C    . unit #40. 12/23/10.

PX~MIL~102



| GREGORY TRUCKING INC  FORMERLY G&G LUMBER | Review Date: |
|---|---|
| U.S. DOT # 94749 | 02/08/2011 |

### Part B Violations

| 25 FEDERAL | Primary: 396.19(b) | | Discovered 1 | Checked 1 | Drivers/Vehicles In Violation 5 | Checked 5 |
|---|---|---|---|---|---|---|

**Description**
Failing to maintain evidence of inspector's qualifications.
**Example**
Unit #35, a 2000 Freightliner, inspected on 5/10 by C A Johnson. Trip date, 11/02/10.

| Safety Fitness Rating Information: | | |
|---|---|---|
| Total Miles Operated | 1,956,248 | OOS Vehicle (CR): 0 |
| Recordable Accidents | 2 | Number of Vehicle Inspected (CR): 0 |
| Recordable Accidents/Million Miles | 1.02 | OOS Vehicle (MCMIS): 2 |
| | | Number of Vehicles Inspected (MCMIS): 5 |

Your proposed safety rating is :

# UNSATISFACTORY

| Rating Factors | | Acute | Critical |
|---|---|---|---|
| Factor 1: | S | 0 | 0 |
| Factor 2: | U | 0 | 4 |
| Factor 3: | S | 0 | 0 |
| Factor 4: | U | 0 | 1 |
| Factor 5: | N | 0 | 0 |
| Factor 6: | S | - | - |

Effective date: The unsatisfactory rating will take effect 60 days after the date of a forthcoming official notice from the Federal Motor Carrier Safety Administration headquarters office in Washington, D.C.

PROHIBITION:   Under 49 USC sections 13905 (f)(1)(B) and 31144, and 49 CFR section 385.13 a motor carrier that receives a final safety rating of unsatisfactory is prohibited from operating a commercial motor vehicle in interstate and intrastate commerce and, if applicable, shall have its registration revoked unless and until such time the FMCSA determines the motor carrier is fit and the motor carrier has reinstated its registration

49 U.S.C. 31144 provides that the prohibition takes effect unless the motor carrier, within 60 days of the date of the forthcoming official notice, takes the necessary steps to improve the rating to conditional or satisfactory.

Unless the motor carrier receives an improved rating within 60 days from the date of the forthcoming official notice from Washington, D.C. the motor carrier will be subject to the prohibition in 49 CFR 385.13.

Administrative Review:  A motor carrier may appeal its proposed safety rating in a petition filed pursuant to 49 CFR section 385.15 if it believes that the rating is in error and there are factual and procedural issues in dispute.  Such appeals must be made within 90 days of the date of the proposed safety rating, but should be made within 15 days of the date of the safety rating notice to allow the FMCSA to issue a written decision before the prohibitions in 49 CFR 385.13 take effect. Appeals filed pursuant to section 385.15 should be addressed to: Chief Safety Officer, Federal Motor Carrier Safety Administration, 1200 New Jersey Ave., S.E., Washington, DC 20590.  The motor carrier will receive a written decision on the petition within 45 days from receipt of the petition by the Chief Safety Officer. (See 49 CFR 385.15 for additional details.)

Request for change in the rating: At any time, a motor carrier may request, in writing, a change in the rating by providing evidence of corrective actions to the Field Administrator for the FMCSA Service Center in which the carrier maintains its principal place of business. (See 49 CFR 385.17 for additional details).

(Note: Neither a petition to contest the rating nor a request for a change in the rating will delay the effective date of the rating, if unchanged.)
Null

PX~MIL~103





**GREGORY TRUCKING INC  FORMERLY G&G LUMBER**
U.S. DOT #: 94749

Review Date:
02/08/2011

## Part B Requirements and/or Recommendations

1. Ask employee if any pre-employment test conducted in the preceding two years resulted in a positive test or refusal to test.

2. Maintain completed inspection form for 12 months from the date of inspection at the carrier's principal place of business.

3. Ensure you conduct random alcohol and controlled substances testing within the reqired percentages each calendar year.

4. Document all maintenance performed on vehicles.  Document year, make, model, VIN, and tire size.  Keep complete records of all repairs made to vehicles.  Annual inspections must be kept for 14 months.  Document the inspector's qualifications.

5. Please Note:  The violations discovered during this compliance review may affect the civil penalty proposed in any subsequent Notice of Claim.  In addition, your history of prior violations of the Federal Motor Carrier Safety Regulations, Federal Hazardous Materials Regulations or the Federal Motor Carrier Commerical Regulations may also affect the civil penalty proposed in any subsequent Notice of Claim.  Your signature for receipt of this report acknowledges you understanding that the violations discovered by the FMCSA during this review/inspection may be used to calculate any civil penalty proposed as a result of this review.  Your signature is not an admission of the violations identified to you by the investigator.

6. This report contains citations of regulations that are deemed serious in nature and could result in penalties against your company and or your drivers.

7. Notice:  A pattern of and/or repeated violations of the same or related acute or critical regulations will cause the maximum penalties allowed by law to be assessed under Section 222 of the Motor Carrier Safety Improvement Act of 1999 (MCSIA).  A pattern of violations means two or more violations of acute and or critical regulations in three or more Parts of Title 49, Code of Federal Regulations discovered during any eligible investigation.  Repeated violations means violation(s) of an acute regulation of the same Part of Title 49, Code of Federal Regulations discovered in an investigation after one or more closed enforcement actions within a six year period and or violation(s) of a critical regulation in the same Part of Title 49, Code of Federal Regulations discovered in an investigation after two or more closed enforcement actions within a six year period.

8. The application for employment must be completed in accordance with Part 391, including the following information:

   The addresses at which the applicant has resided during the 3 years preceding the date on which the application is submitted and a list of all violations of motor vehicle laws or ordinances (other than violations involving only parking) of which the applicant was convicted or forfeited bond or collateral during the 3 years preceding the date the application is submitted.

9. Maintain an accident register.

10. Notice:  On October 1, 2005, the FMCSA published a final rule revising the hours-of-service regulations for commercial motor vehicle drivers.  Under the new rule, drivers may drive 11 hours after 10 consecutive hours off-duty, but may not drive beyond the 14th hour after coming on-duty.  Similar to existing rules, drivers may not drive after being on-duty for 60 hours in a seven-consecutive-day period or 70 hours in an eight-consecutive-day period.  This on-duty cycle may be restarted whenever a driver takes at least 34 consecutive hours off-duty.  A short-haul provision was also added allowing drivers of property carrying CMV's which do not require a Commercial Driver's License for operation within 150 air mile radius of thier normal work reporting location are not required to keep records of duty status (RODS).

    Carriers and commercial motor vehicle drivers are required to comply with the current hours-of-service rules through

PX~MIL~104 

Capn 6 8 0 11



| GREGORY TRUCKING INC  FORMERLY G&G LUMBER | Review Date: |
|---|---|
| U.S DOT #: 94749 | 02/08/2011 |

### Part B Requirements and/or Recommendations

September 30 2005. Compliance with October 1, 2005. Passenger-carrying motor carriers and drivers are not subject to the new maximum driving limits. For more information on these regulations, please access the FMCSA website at www.fmcsa dot gov.

11. If you believe the proposed rating is in error and there are factual and procedural issues in dispute, Part 385.15 outlines procedures for petitioning the FMCSA for an administrative review of these findings. Your petition should be addressed to L

Chief Safety Officer
FMCSA
1200 New Jersey Avenue, SE
Washington DC  20590

385.17
In addition, a request for a revised rating based on corrective actions may be made at any time. Part 385.17 outlines the procedures for such a request. The request must be made in writing, must describe the corrective action taken and must include other documentation that may be relied upon as a basis for the requested change. Address you written request to:

Darrell Ruban
FMCSA
Southern Service Center
1800 Century Blvd, Ste 1700
Atlanta, GA  30345
404) 327-7400

Chris Hartley
FMCSA
310 New Bern Ave, Ste 468
Raleigh, NC  27601

12. The website for the Federal Motor Carrier Safety Administration is www.fmcsa.dot.gov.

13. Notice:  Recurring violations of the same or related acute or critical regulations (violations of the same Part in Title 49 Code of Federal Regulations) that result in three enforcement actions within a six year period will cause the maximum penalties allowed by law to be assessed for the third enforcement action.

14. Request information form previous DOT regulated employers of driver applicant for the three years  prior to the date of application or transfer.

15. The employer of any employee who tests positive on a drug or alcohol test required under 49 CFR 382 and 49 CFR Part 655 shall notify the Division of Motor Vehicles in writing within five business days following the employer's receip of confirmation of a positive drug test. The notification shall include the driver's name, address, driver's license number, social security number, and results of the drug or alcohol test.

16. The Division Administrator will continue to consider preventibility when a motor carrier contests a proposed safety fitness rating. The motor carrier may deem that the recordable accident rate is not a fair means of evaluating its accident factor 6 on the Compliance Review. If so, the motor carrier must submit the compelling evidence within five calendar days to

Division Administrator
FMCSA
310 New Bern Ave, Ste 468
Raleigh, NC  27601

PX~MIL~105



Capri 6.8 0 11



**GREGORY TRUCKING INC  FORMERLY G&G LUMBER**
U.S. DOT #: 94749

Review Date:
02/08/2011

## Part B Requirements and/or Recommendations

Compelling evidence should include (but is not limited to) offical police accident reports and official insurance accident investigative reports.

17. All motor carriers and truck drivers are needed to fight against terrorism and hijacking. You could be a target. Protect yourself, your trucks, your cargo, and your facilities.

18. Obtain a copy of each driver's driving record and review it annually. Ensure driver has a valid CDL with no revocations suspensions.

19. Document the year, make, model, VIN, and tire size for each vehicle.

20. Drivers that test positive for controlled substances and or alcohol must be removed from safety sensitive positions immediatley. Drivers must be referred to and evaluated by a substance abuse professional. Drivers must complete the return-to-duty process prior to returning to a safety sensitive position.

21. Review cargo securement requirements with your drivers. Ensure all drivers are aware of the tie-down requirements.

22. Ensure that all drivers are fully and properly qualified before operating in interstate commerce. Maintain a complete file as required for each driver, documenting the qualification process.

23. Do not allow drivers to drive interstate unless they have been physically re-examined each 24 months.

24. Ensure that all drivers subject to pre-employment, random, reasonable cause, post accident, return to duty, and or follow-up controlled substance testing are tested as required by 49 CFR Parts 40 and 382 of the FMCSR.

25. Establish a systematic maintenance records program for all vehicles. Maintain a complete file for each subject vehicle, recording all repair, maintenance and inspection operations performed.

26. Review with your drivers periodically the procedures for doing pre-trip and post-trip inspections. Ensure that safety defects reported by drivers on their Vehicle Inspection Reports (VIR) are repaired before the vehicle is re-dispatched. Require drivers to prepare Vehicle Inspection Reports on a daily basis. Keep them on file for 90 days.

PX~MIL~106



Capn 8 9 0 11

1    **UNITED STATES DISTRICT COURT**
2    **IN THE WESTERN DIVISION OF MASSACHUSETTS**
3    **SPRINGFIELD, MA.**
4
5                                          **Civil Action No.17 CV  30174**
6
7    *************************************
8    **THOMAS FORBES, as he is the**
9    **Personal Representative of the**
10   **Estate of GEORGE J. FORBES,**
11                        **PLAINTIFF**
12
13   **v.**
14
15   **GREGORY TRUCKING COMPANY,**
16   **INC., WILEY LENUE HOOKS, JR.,**
17   **GREGORY LEASING COMPANY, INC.**
18   **BSG LEASING, INC.;**
19   **B&C TIMBERS LLC.;  and**
20   **BB&S ACQUISITION CORPORATION,**
21                        **DEFENDANTS**
22   *************************************
23
24
25
26
27              **EXHIBIT  B**
28
29   **SETTLEMENT AGREEMENT**
30
31
32
33

PX~MIL~107

PX~MIL~108

BEFORE THE
FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| GREGORY TRUCKING. CO. INC. | ) | Case No.  NC-2011-0078-US0609 |
| P. O. BXO 53 | ) | |
| UNION GROVE, NC 28689-0053 | ) | USDOT No. 94749 |

## SETTLEMENT AGREEMENT

The Parties to this agreement are:

GREGORY TRUCKING. CO. INC. (hereinafter called the **RESPONDENT**);
and

**The FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION** of the Department of Transportation (hereinafter called the **FMCSA**).

The Parties agree as follows:

1.   A.   The FMCSA has a pending claim against the **RESPONDENT** for violations of Federal statutes and regulations, including the Federal Motor Carrier Safety Regulations, (hereinafter referenced as FMCSRs), Hazardous Materials Regulations (hereinafter referenced as the HMRs) and/or the Federal Motor Carrier Commercial Regulations (hereinafter referenced as the FMCCRs) as follows:

In Case Number NC-2011-0078-US0609 the **FMCSA** has a claim for $4,060.00 against the **RESPONDENT** for the following violations:

382.501(a) - Driver performing safety sensitive function after engaging in conduct prohibited by subpart B.

391.51(b)(7) - Failing to maintain medical examiner's certificate in driver's qualification file.

382.305(b)(1) - Failing to conduct random alcohol testing at an annual rate of not less than the applicable annual rate of the average number of driver positions.

NC-2011-0078-US0609

B.   This claim was served to the **RESPONDENT** on March 7, 2011.

2.   The statutory basis for the claim as set forth and detailed in the above-referenced civil penalty proceeding is found in 49 USC Subtitle III, General and Intermodal Programs; 49 USC Subtitle IV, Interstate Transportation, Part B, Motor Carriers, Water Carriers, Brokers, and Freight Forwarders; 49 USC Subtitle VI, Motor Vehicle and Driver Programs, Part B, Commercial; including, but not limited to, 49 USC § 521 ("Civil Penalties"); 49 USC § 5123(c) ("Civil Penalty"); and 49 USC § 14901 ("General Civil Penalties").   Pursuant to the Federal Claims Collection Act of 1966, 31 USC Chapter 37, Subchapter II, and the regulations of the Federal Motor Carrier Safety Administration in 49 CFR Part 386, the parties desire to settle the claims.  This agreement for settlement of the claims is made pursuant to 49 C.F.R § 386.22.

3.   In consideration of the settlement of the above-described claim, and subject to the terms and conditions of this settlement agreement, **RESPONDENT** agrees to pay the FMCSA, and FMCSA agrees to accept the negotiated amount of **$3,200.00**, in eight (08) payment(s).  The parties stipulate this settlement agreement resolves only the claim set forth in Paragraph 1 of this settlement agreement.  Further, the parties stipulate nothing in this settlement agreement shall be construed to relieve or limit **RESPONDENT**'s duty to comply with all applicable United States Department of Transportation statutes and implementing regulations, including the FMCSRs, HMRs, and the FMCCRs.

4.   Payment may be made electronically through the SAFER website at https://safer.fmcsa.dot.gov , by selecting the "Online Fine Payment" option under the FMCSA Services section.  Alternatively, payments may be made by mailing a **cashier's check**, **certified check** or **money order** payable to the Federal Motor Carrier Safety Administration.  To expedite processing and ensure proper credit, checks should be annotated with the FMCSA Case Number. NOTE: **IT IS STRONGLY ADVISED THAT MAILED PAYMENTS ARE SENT IN A METHOD THAT IS TRACKABLE, I.E., CERTIFIED MAIL, FEDEX, UPS, ETC. IF PAYMENT IS SENT REGULAR MAIL AND IS LOST, IT WILL BE A LATE PAYMENT AND THE SETTLEMENT AGREEMENT WILL BE CONSIDERED A BREACH OF THE AGREEMENT WHICH WILL RESULT IN THE LOSS OF THE PAYMENT PLAN.** Payments are to be mailed to:

Federal Motor Carrier Safety Administration
Southern Service Center
1800 Century Blvd., NE, Suite 1700
Atlanta, GA 30345

NC-2011-0078-US0069

Payment is due on the dates indicated below:

The first payment of $400.00 is due no later than 04/28/2011.
The second payment of $400.00 is due no later than 05/28/2011.
The third payment of $400.00 is due no later than 06/28/2011.
The fourth payment of $400.00 is due no later than 07/28/2011.
The fifth payment of $400.00 is due no later than 08/28/2011.
The sixth payment of $400.00 is due no later than 09/28/2011.
The seventh payment of $400.00 is due no later than 10/28/2011.
The eighth payment of $400.00 is due no later than 11/28/2011.

5.  Failure to pay in accordance with the terms of this settlement agreement and/or failure to comply with the terms and conditions of this settlement agreement shall be considered a breach of this settlement agreement and may result in the reinstatement of any penalties held in abeyance and may also result in the loss of any reduction in civil penalties asserted in the Notice of Claim, in which case the original amount asserted in the Notice of Claim (less any payments previously made) will be due immediately.  Failure to make an installment payment on schedule voids any payment plan set forth in this settlement agreement and the entire debt is payable immediately.  **If the entire amount is not paid within ninety (90) days of the missed due date for the installment payment, RESPONDENT will be prohibited from operating in interstate commerce and, if applicable, RESPONDENT's registration will be suspended or revoked in accordance with 49 CFR §§ 386.83 and 386.84.**  In addition, the remaining debt is subject to interest, penalties, and administrative charges at the maximum allowable rate and in accordance with FMCSA procedures.  Any payment(s) made after a breach of any term and/or condition of this settlement agreement, including failure to pay in accordance with the terms of this settlement agreement, will be applied toward the balance of the original amount claimed, and shall not affect any right of FMCSA to pursue any remedy for breach of this settlement agreement.

6.  The Parties stipulate the claim set forth in the above-described Notice of Claim is valid.  By signing this settlement agreement, **RESPONDENT** waives any right it may have to subsequently challenge the validity of such claim.  The Parties further stipulate this settlement agreement is a contract voluntarily entered into by the Parties which may be enforced.  **FMCSA may pursue any action for violations of the FMCSRs, HMRs, and/or the FMCCRs and/or for enforcement of this settlement agreement, and/or for recovery of the full penalty asserted in the Notice of Claim.**   Any forbearance by FMCSA in exercising any right or remedy under this settlement agreement or provided by law, including, without limitation, FMCSA's acceptance of late payment(s) or payment(s) in amounts less than the amount due, shall not act as a waiver of or preclude the exercise of any right or remedy hereunder or otherwise available by law, nor shall it in any way affect the validity of this settlement agreement or any part thereof.

7.  This settlement agreement is to be executed by the RESPONDENT and returned to FMCSA. This settlement agreement is not binding upon FMCSA until executed by the Field Administrator. Prior to the execution of this agreement by the Field Administrator, this agreement is an offer in compromise by the RESPONDENT and may not be withdrawn for a period of thirty (30) days after it is executed by the RESPONDENT. Upon execution of this settlement agreement by the Field Administrator, the settlement agreement will become the Final Agency Order in this proceeding. If this settlement agreement requires approval by the Assistant Administrator or the Administrative Law Judge, neither party may withdraw its consent to the settlement agreement for a period of thirty (30) days from the date the Field Administrator signs the Agreement, and the Settlement agreement becomes the Final Agency Order in this proceeding as provided by 49 CFR § 386.22(c)-(e).

8.  RESPONDENT acknowledges that it has received adequate notice of the FMCSA's claim and waives any and all rights it may have to further notice or to further details of the allegations that gave rise to the claim. Further, RESPONDENT expressly acknowledges that FMCSA had a reasonable basis in law and fact and was substantially justified in pursuing the claim against RESPONDENT.

9.  Execution of this settlement agreement will constitute admission of the violation(s) set forth in this agreement and these violations shall constitute prior offenses under 49 USC § 521(b)(2)(D), and/or 14901(e), and/or 5123(e), which will lead to higher penalties in future enforcement actions and adverse future Safe-Stat rankings.

10. This settlement agreement, including all enumerated conditions, shall apply to, be binding upon, and enforceable against RESPONDENT and RESPONDENT's successors and assigns, including but not limited to, subsequent purchasers, transferees, and/or successor entity(ies).

11. This settlement agreement may be executed in counterparts, all of which when taken together shall constitute a fully executed original. A facsimile signature on this settlement agreement shall constitute an original signature for purposes of execution.

12. This settlement agreement shall be considered jointly drafted by the Parties, and constitutes the final and exclusive agreement between the Parties in this proceeding. All prior and contemporaneous agreements, representations, negotiations and understandings of the Parties, oral or written, are hereby superseded. Notwithstanding this provision, the Notice of Claim, as referenced in Paragraph 1 of this settlement agreement, is incorporated by reference.

NC-2011-0078 (US669)

13. **RESPONDENT** hereby acknowledges, represents, and warrants that he or she or its representative has carefully read and understands this settlement agreement, all of its terms and conditions, and its final and binding effect, and has been afforded sufficient time and opportunity to review this settlement agreement with advisors or attorneys of his, her, or its choice, has had an opportunity to negotiate with regard to the terms of this settlement agreement, is fully competent to enter into this settlement agreement, and has signed this settlement agreement knowingly, freely, and voluntarily. Each signatory acting on behalf of a partnership, corporation, limited liability company, or other entity represents and warrants that he or she is authorized to act on behalf of, and bind the entity in the signing of this settlement agreement.

14. Should any provision of this settlement agreement be held invalid or illegal, such illegality shall not invalidate the whole settlement agreement, but, rather, the settlement agreement shall be construed as if it did not contain the invalid or illegal part, and the rights and obligations of the Parties shall be construed and enforced accordingly.

15. **RESPONDENT**, through this settlement agreement, specifies the facsimile number by which it will accept service of documents by facsimile, and agrees and consents to service by facsimile by FMCSA of any and all documents, including but not limited to correspondence, motions, pleadings, and orders, in, and related to the above-described civil penalty proceeding. **RESPONDENT** agrees that service of any document in, or related to the above-described matter by FMCSA to the facsimile number specified by **RESPONDENT** in this settlement agreement shall constitute valid service pursuant to 49 CFR § 386.6(b). **RESPONDENT** further agrees nothing in this settlement agreement shall require FMCSA to use facsimile service. FMCSA, at its discretion, may serve any document by any method set forth in 49 CFR § 386.6.

KC-2011-0078-US0609

MAR/29/2011/TUE 11:21 AM   SSC                    FAX No. 4043277349                    P. 008/009

GREGORY TRUCKING, CO. INC.
CASE # NC-2011-0078-US0609
By: _Prantha Damer  Assis Deastru 3/29/11_
    **COMPANY REPRESENTATIVE & TITLE**

Facsimile number for service to RESPONDENT:  704-539-5296

_**PLEASE FAX THE SIGNED AGREEMENT TO: (404) 327-7349**_

Kelly Gassett, Enforcement Technician
FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION
SOUTHERN SERVICE CENTER
1800 CENTURY BLVD., NE, SUITE 1700
ATLANTA, GA 30345

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION
SOUTHERN SERVICE CENTER

By: ____Darrell L. R___                    Date: _3/30/11_
    Darrell L. Ruban
    FIELD ADMINISTRATOR

NC-2011-0078-US0609

CERTIFICATE OF SERVICE

This is to certify that on March 29, 2011, the undersigned mailed or delivered, as specified, the designated number of copies of the Settlement Agreement to each of the parties listed below.

Each party listed below must receive the designated number of copies of each filing made in this proceeding in the future.

| | |
|---|---|
| MARTHA SOMERS<br>Gregory Trucking Inc. Formerly G&G Lumber<br>P.O. BOX 53<br>UNION GROVE, NC  28689-0053 | FAX # 7045395296 |
| Christopher Hartley, Division Administrator<br>Federal Motor Carrier Safety Administration<br>Southern Service Center<br>310 New Bern Avenue, Suite 468,<br>Raleigh, NC 27601 | One Copy<br>Internal Mail |
| Trial Attorney<br>Federal Motor Carrier Safety Administration<br>Southern Service Center<br>1800 Century Boulevard, Suite 1700<br>Atlanta, GA 30345 | One Copy<br>Personal Delivery |
| Motor Carriers Docket Clerk<br>Federal Motor Carrier Safety Administration<br>Southern Service Center<br>1800 Century Boulevard, Suite 1700<br>Atlanta, GA 30345 | One Copy<br>Personal Delivery |

Due Date _____

## FMCSA CIVIL PENALTY SETTLEMENT AGREEMENT WORKSHEET

DATE _3/24/2011_          USDOT # _94749_

CARRIER _Gregory Trucking Co Inc_

DBA _____

ADDRESS _PO 13 rt 28689_

_Union Grove NC 28689_

TEL # _704 5395110_

FAX # _704 539 5296_

CASE # _NC-2011-0078-US0689_

ENFORCEMENT SPECIALIST _Pat Hebler_

382- Posluv - 530
391 numlung mol - 710
382 - Remolsnialu - 2820

CLAIM LETTER DATE _____   ASSESSED AMOUNT $ _4060_
                                                      _860_
CONFERENCE DATE _____   SETTLED AMOUNT $ _3200_

NUMBER OF PAYMENTS _8_   START DATE _april 28, 2011_

CARRIER REPRESENTATIVE TITLE _Martha Somers, Sec/Trec_

NAME/TITLE OF SIGNING OFFICIAL _____

# UNITED STATES DISTRICT COURT
## IN THE WESTERN DIVISION OF MASSACHUSETTS
### SPRINGFIELD, MA.

Civil Action No.17 CV  30174

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THOMAS FORBES, as he is the**
**Personal Representative of the**
**Estate of GEORGE J. FORBES,**
                    **PLAINTIFF**

v.

**GREGORY TRUCKING COMPANY,**
**INC., WILEY LENUE HOOKS, JR.,**
**GREGORY LEASING COMPANY, INC.**
**BSG LEASING, INC.;**
**B&C TIMBERS LLC.;  and**
**BB&S ACQUISITION CORPORATION,**
                    **DEFENDANTS**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT  C

# FRE V. ALJ RULES

PX~MIL~117

PX~MIL~118

## FRE 404(b) Text

Crimes, Wrongs or other Acts. (1) Prohibited uses. Evidence of a crime, wrong, or other act is not Admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character. (2) Permitted Uses: notice in a criminal case. This evidence may be admissible for another purpose, such as providing motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any such evidence that the prosecution intends to offer at trial; and (B) do so before trial – or during trial if the court, for good cause, excused lack of pre-trial notice.

## FRE 803(8) Text

Exceptions to the Rule Against Hearsay. The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: (8) Public records. A record or statement of a public office if (A) it sets out:

## ALJ Rule No.  §18.404(b)Text

Other crimes, wrongs or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

## ALJ Rule No.  §18.803(8) Text

The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (8) Public Records and Reports. Records, reports statements, or data compilations, in any form, of public offices or agencies, setting forth: (i) The activities of the office or agency, or

(ii) Matters observed pursuant to duty imposed by law as to which matters there was a duty to report, or (iii) Factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness.

(i) the offices activities:  (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law enforcement personnel; (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness.

Case 3:17-cv-30174-MGM   Document 182-4   Filed 08/03/21   Page 41 of 114

# 29 CFR § 18.101 - Scope.

CFR      Table of Popular Names

## § 18.101 Scope.

These rules govern formal adversarial adjudications of the United States Department of Labor conducted before a presiding officer.

**(a)** Which are required by Act of Congress to be determined on the record after opportunity for an administrative agency hearing in accordance with the Administrative Procedure Act, 5 U.S.C. 554, 556 and 557, or

**(b)** Which by United States Department of Labor regulation are conducted in conformance with the foregoing provisions, to the extent and with the exceptions stated in § 18.1101. *Presiding officer,* referred to in these rules as *the judge,* means an Administrative Law Judge, an agency head, or other officer who presides at the reception of evidence at a hearing in such an adjudication.

 CFR Toolbox

<u>Law about... Articles from Wex</u>
<u>Table of Popular Names</u>

# 29 CFR § 18.404 - Character evidence not admissible to prove conduct; exceptions; other crimes.

CFR

## § 18.404 Character evidence not admissible to prove conduct; exceptions; other crimes.

**(a)** *Character evidence generally.* Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except evidence of the character of a witness, as provided in §§ 18.607, 18.608, and 18.609.

**(b)** *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

 CFR Toolbox

Law about... Articles from Wex

Table of Popular Names

PX~MIL~124

# 29 CFR § 18.803 - Hearsay exceptions; availability of declarant immaterial.

CFR

## § 18.803 Hearsay exceptions; availability of declarant immaterial.

**(a)** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

**(1)** *Present sense impression.* A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

**(2)** *Excited utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

**(3)** *Then existing mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

**(4)** *Statements for purposes of medical diagnosis or treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

**(5)** *Recorded recollection.* A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to

PX~MIL~125

have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly.

**(6)** *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term *business* as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**(7)** *Absence of entry in records kept in accordance with the provisions of paragraph (6).* Evidence that a matter is not included in the memoranda reports, records, or data compilations, in any form, kept in accordance with the provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

**(8)** *Public records and reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth -

   **(i)** The activities of the office or agency, or

   **(ii)** Matters observed pursuant to duty imposed by law as to which matters there was a duty to report, or

   **(iii)** Factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

**(9)** *Records of vital statistics.* Records or data compilations, in any form, of births, fetal deaths, deaths, or marriages, if the report thereof was made to a public office pursuant to requirements of law.

**(10)** *Absence of public record or entry.* To prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and

PX~MIL~126

preserved by a public office or agency, evidence in the form of a certification in accordance with § 18.902, or testimony, that diligent search failed to disclose the record, report, statement, or date compilation, or entry.

**(11)** *Records of religious organizations.* Statements of births, marriages, divorces, deaths, legitimacy, ancestry, relationship by blood or marriage, or other similar facts of personal or family history, contained in a regularly kept record of a religious organization.

**(12)** *Marriage, baptismal, and similar certificates.* Statements of fact contained in a certificate that the maker performed a marriage or other ceremony or administered a sacrament, made by a clergyman, public official, or other person authorized by the rules or practices of a religious organization or by law to perform the act certified, and purporting to have been issued at the time of the act or within a reasonable time thereafter.

**(13)** *Family records.* Statements of fact concerning personal or family history contained in family Bibles, genealogies, charts, engravings on rings, inscriptions on family portraits, engravings on urns, crypts, or tombstones, or the like.

**(14)** *Records of documents affecting an interest in property.* The record of a document purporting to establish or affect an interest in property, as proof of the content of the original recorded document and its execution and delivery by each person by whom it purports to have been executed, if the record is a record of a public office and an applicable statute authorizes the recording of documents of that kind in that office.

**(15)** *Statements in documents affecting an interest in property.* A statement contained in a document purporting to establish or affect an interest in property if the matter stated was relevant to the purpose of the document, unless dealings with the property since the document was made have been inconsistent with the truth of the statement or the purport of the document.

**(16)** *Statements in ancient documents.* Statements in a document in existence twenty years or more the authenticity of which is established.

**(17)** *Market reports, commercial publications.* Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations.

**(18)** *Learned treatises.* To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals,

PX~MIL~127

or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by official notice.

**(19)** *Reputation concerning personal or family history.* Reputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history.

**(20)** *Reputation concerning boundaries or general history.* Reputation in a community, arising before the controversy, as to boundaries of or customs affecting lands in the community, and reputation as to events of general history important to the community or State or nation in which located.

**(21)** *Reputation as to character.* Reputation of a person's character among associates or in the community.

**(22)** *Judgment of previous conviction.* Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment. The pendency of an appeal may be shown but does not affect admissibility.

**(23)** *Judgment as to personal, family, or general history, or boundaries.* Judgments as proof of matters of personal, family or general history, or boundaries, essential to the judgment, if the same would be provable by evidence of reputation.

**(24)** *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness to the aforementioned hearsay exceptions, if the judge determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

**(25)** *Self-authentication.* The self-authentication of documents and other items as provided in § 18.902.

**(26)** *Bills, estimates and reports.* In actions involving injury, illness, disease, death, disability, or physical or mental impairment, or damage to property, the following bills, estimates, and reports as relevant to prove the value and reasonableness of the charges for services, labor and materials stated therein and, where applicable, the necessity for furnishing the same, unless the sources of information or other circumstances indicate lack of trustworthiness, provided that a copy of said bill, estimate, or report has been served upon the adverse party sufficiently in advance of the hearing to provide the adverse party with a fair opportunity to prepare to object or meet it:

  **(i)** Hospital bills on the official letterhead or billhead of the hospital, when dated and itemized.

  **(ii)** Bills of doctors and dentists, when dated and containing a statement showing the date of each visit and the charge therefor.

  **(iii)** Bills of registered nurses, licensed practical nurses and physical therapists, or other licensed health care providers when dated and containing an itemized statement of the days and hours of service and charges therefor.

  **(iv)** Bills for medicine, eyeglasses, prosthetic device, medical belts or similar items, when dated and itemized.

  **(v)** Property repair bills or estimates, when dated and itemized, setting forth the charges for labor and material. In the case of an estimate, the party intending to offer the estimate shall forward with his notice to the adverse party, together with a copy of the estimate, a statement indicating whether or not the property was repaired, and, if so, whether the estimated repairs were made in full or in part and by whom, the cost thereof, together with a copy of the bill therefore.

  **(vi)** Reports of past earnings, or of the rate of earnings and time lost from work or lost compensation, prepared by an employer on official letterhead, when dated and itemized. The adverse party may not dispute the authenticity, the value or reasonableness of such charges, the necessity therefore or the accuracy of the report, unless the adverse party files and serves written objection thereto sufficiently in advance of the hearing stating the objections, and the grounds thereof, that the adverse party will make if the bill, estimate, or reports is offered at the time of the

PX~MIL~129

9/21/2020    29 CFR § 18 803 - Exception to the requirement of... of report | CFR | US Law | LII / Legal Information Institute

Case 3:17-cv-30174-MGM Document 182-4 Filed 08/03/21 Page 48 of 114

hearing. An adverse party may call the author of the bill, estimate, or report as a witness and examine the witness as if under cross-examination.

**(27)** *Medical reports.* In actions involving injury, illness, disease, death, disability, or physical or mental impairment, doctor, hospital, laboratory and other medical reports, made for purposes of medical treatment, unless the sources of information or other circumstances indicate lack of trustworthiness, provided that a copy of the report has been filed and served upon the adverse party sufficiently in advance of the hearing to provide the adverse party with a fair opportunity to prepare to object or meet it. The adverse party may not object to the admissibility of the report unless the adverse party files and serves written objection thereto sufficiently in advance of the hearing stating the objections, and the grounds therefor, that the adverse party will make if the report is offered at the time of the hearing. An adverse party may call the author of the medical report as a witness and examine the witness as if under cross-examination.

**(28)** *Written reports of expert witnesses.* Written reports of an expert witness prepared with a view toward litigation, including but not limited to a diagnostic report of a physician, including inferences and opinions, when on official letterhead, when dated, when including a statement of the expert's qualifications, when including a summary of experience as an expert witness in litigation, when including the basic facts, data, and opinions forming the basis of the inferences or opinions, and when including the reasons for or explanation of the inferences and opinions, so far as admissible under rules of evidence applied as though the witness was then present and testifying, unless the sources of information or the method or circumstances of preparation indicate lack of trustworthiness, provided that a copy of the report has been filed and served upon the adverse party sufficiently in advance of the hearing to provide the adverse party with a fair opportunity to prepare to object or meet it. The adverse party may not object to the admissibility of the report unless the adverse party files and serves written objection thereto sufficiently in advance of the hearing stating the objections, and the grounds therefor, that the adverse party will make if the report is offered at the time of the hearing. An adverse party may call the expert as a witness and examine the witness as if under cross-examination.

**(29)** *Written statements of lay witnesses.* Written statements of a lay witness made under oath or affirmation and subject to the penalty of perjury, so far as admissible under the rules of evidence applied as though the witness was then present and testifying, unless the sources of information or the method or circumstances of preparation indicate lack of

PX~MIL~130

9/21/2020                     29 CFR § 18.803 - Hearsay exceptions; availability of declarant immaterial | CFR | US Law | LII / Legal Information Institute

Case 3:17-cv-30174-MGM   Document 182-4   Filed 08/03/21   Page 49 of 114

trustworthiness provided that (i) a copy of the written statement has been filed and served upon the adverse party sufficiently in advance of the hearing to provide the adverse party with a fair opportunity to prepare to object or meet it, and (ii) if the declarant is reasonably available as a witness, as determined by the judge, no adverse party has sufficiently in advance of the hearing filed and served upon the noticing party a written demand that the declarant be produced in person to testify at the hearing. An adverse party may call the declarant as a witness and examine the witness as if under cross-examination.

**(30)** *Deposition testimony.* Testimony given as a witness in a deposition taken in compliance with law in the course of the same proceeding, so far as admissible under the rules of evidence applied as though the witness was then present and testifying, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination, provided that a notice of intention to offer the deposition in evidence, together with a copy thereof if not otherwise previously provided, has been served upon the adverse party sufficiently in advance of the hearing to provide the adverse party with a fair opportunity to prepare to object or meet it. An adverse party may call the deponent as a witness and examine the witness as if under cross-examination.

**(b)** [Reserved]

 CFR Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

PX~MIL~131

Case 3:17-cv-30174-MGM Document 182-4 Filed 08/03/21 Page 50 of 114



 instacart

G

d

Fc

so

**ACCESSIBILITY**

**ABOUT LII**

**CONTACT US**

PX~MIL~132

1  UNITED STATES DISTRICT COURT
2  IN THE WESTERN DIVISION OF MASSACHUSETTS
3  SPRINGFIELD, MA.

4
5  Civil Action No.17 CV  30174
6
7  ***********************************
8  THOMAS FORBES, as he is the
9  Personal Representative of the
10 Estate of GEORGE J. FORBES,
11  PLAINTIFF
12
13 v.
14
15 GREGORY TRUCKING COMPANY,
16 INC., WILEY LENUE HOOKS, JR.,
17 GREGORY LEASING COMPANY, INC.
18 BSG LEASING, INC.;
19 B&C TIMBERS LLC.;  and
20 BB&S ACQUISITION CORPORATION,
21  DEFENDANTS
22 ****************************************
23
24
25
26
27  **EXHIBIT  D**
28
29  **_R&B TRANSPORTATION   v._**
30  **_U.S DEPT. OF LABOR,_** **618 F.3D 37**
31  **(FIRST CIR. 2010)**
32

Page 4

PX~MIL~134

618 F.3d 37


R & B TRANSPORTATION, LLC; Paul Beaudry, Petitioners,

v.

UNITED STATES DEPARTMENT OF LABOR, ADMINISTRATIVE REVIEW
BOARD, Respondent.


No. 09-2148.


United States Court of Appeals,

First Circuit.


Heard April 6, 2010.

Decided Aug. 26, 2010.


[618 F.3d 38]


    COPYRIGHT MATERIAL OMITTED


[618 F.3d 39]


James F. Laboe, with whom Orr & Reno, P.A., was on brief for petitioners.


Ronald J. Gottlieb, Attorney, Office of Solicitor, with whom Deborah Greenfield,
Acting Deputy Solicitor of Labor, Joseph M. Woodward, Associate Solicitor for

Occupational Safety and Health, and Charles F. James, Counsel for Appellate Litigation, were on brief for respondent.

Before LYNCH, Chief Judge, TORRUELLA and BOUDIN, Circuit Judges.

[618 F.3d 40]

TORRUELLA, Circuit Judge.

Peter Mailloux ("Mailloux") filed an administrative complaint against R & B Transportation, LLC ("R & B"), and its owner, Paul Beaudry ("Beaudry") (collectively "Petitioners"), alleging that Mailloux was unlawfully discharged from his job as a commercial trucker for his adherence to federal safety standards. Mailloux sought relief under the employee protection provisions of Section 405 of the Surface Transportation Assistance Act of 1982 ("the STAA"), 49 U.S.C. § 31105.1 A final decision and order of the U.S. Department of Labor's Administrative Review Board ("ARB") determined that Mailloux's termination violated the STAA, and awarded backpay and other expenses. After careful review, we deny the petition.

I. Facts 2

A. Mailloux's Employment

Beaudry owns two trucking companies, R & B and Beaudry Enterprises. He also co-owns BAT Express, a third trucking company. These three entities share office space and drivers. Neither Beaudry Enterprises nor BAT Express is a party to this case.

In late-August 2004, Petitioners hired Mailloux as a driver of a commercial motor carrier, an over-the-road truck, to deliver loads on routes between New England and Florida.3 During the scope of his employment through December 17, 2004,4 Mailloux reported to Heather Bagley ("Bagley"), who was Beaudry's administrative assistant, that it was not possible to make various deliveries on time without violating the Federal Motor Carrier Safety Act, the Department of Transportation's ("DOT") hours of service regulation (the "driving regulation"), which restricts the number of hours drivers of commercial motor vehicles may work over a certain period of time. See 49 C.F.R. § 395.3(b)(2).5 Bagley informed Mailloux that the deliveries had already been scheduled and could not be changed.

[618 F.3d 41]

On December 17, 2004, Mailloux called Beaudry's home to inform Beaudry that he was unable to make a particular delivery from Florida on time both because he had a flat tire and because he had already driven the maximum allowable number of hours under the driving regulation. During this conversation, Beaudry told Mailloux to return the truck to R & B's facility in New Hampshire and Beaudry would inquire about arranging for Mailloux to be transported back to Florida. Mailloux responded, "I guess that means I'm fired." Beaudry said only "get the truck back up here" before the conversation ended. When Mailloux later spoke with a fellow R & B driver, the driver told Mailloux "yeah, you're fired."

B. OSHA Investigation and Testimony Before the ALJ

On December 20, 2004,6 Mailloux contacted the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") to report that he would soon be discharged from R & B and wanted to speak to someone. The following day, Mailloux was, according to the ALJ, "discharged."

Later, on December 27, 2004, Mailloux met with Christine Kidder ("Kidder"), an OSHA investigator, and told her that during his employment with R & B he was continually required to drive in excess of the driving regulation. During this interview, Mailloux informed Kidder that he routinely falsified his driving logs for R & B in order to provide the appearance that he was in compliance with the driving regulation.

After this initial interview with Mailloux, OSHA conducted an investigation of R & B, including an interview with Beaudry. When Kidder contacted Beaudry, he informed her that he had fired Mailloux due to his inability to properly plan his trips, which were costing the company time and money. During this interview, Kidder inquired whether R & B followed the driving regulation. Beaudry represented that he had never violated the driving regulation. Later, during the ALJ hearing, Beaudry testified that R & B submits written notices to drivers whose driving logs are false or violate the driving regulation. Beaudry further testified that he submitted such notices to Mailloux and ultimately fired him because he was driving in excess of the maximum hours allowable by the driving regulation.

Following her interview with Beaudry, Kidder contacted the DOT's Federal Motor Carrier Safety Administration ("FMCSA") and obtained compliance reviews and enforcement reports relating to R & B ("the DOT reports"). These reviews and reports are the investigative reports prepared by "an agent" 7 who visits a company to determine whether they are in compliance with the driving regulation. Based on an audit the FMCSA conducted of R & B and on Kidder's own review of the DOT reports, Kidder learned that Beaudry and all three of the companies in which he had an interest had previously

[618 F.3d 42]

been cited for violating the driving regulation.8 The most recent DOT report, dated April 12, 2005, showed R & B's violations of the driving regulation, as well as other DOT regulations, for the period August 23, 2004, to February 22, 2005, a time frame that included Mailloux's employment. Additionally, past DOT reports showed that R & B and the other two trucking companies in which Beaudry had an interest had previously been cited for violations on September 14, 2000; January 22, 2001; and June 14, 2001. Petitioners paid civil penalties associated with some of these violations.

As part of Kidder's investigation, she also interviewed Bagley, who informed her that R & B drivers routinely violated the driving regulation because they often could not otherwise complete their trips on time. Bagley stated that drivers would complain to her about driving in excess of the regulation, and the company consequently experienced high turnover. Bagley later testified to the ALJ in a deposition that when she hired drivers and they inquired about compliance with the

driving regulation, she would tell them that the company complied with the regulation, even though she knew Beaudry would soon have them driving in excess of it. Bagley also testified to the ALJ that Trish Patrick, Beaudry's daughter and employee, instructed Bagley to separate toll receipts from a truck driver's time log when they did not match in order to conceal violations of the driving regulation.

Scott Hill ("Hill"), another R & B driver, testified about his experience working for Petitioners. Like Mailloux, Hill worked for R & B from August 2004 until December 2004. Hill testified that, during his employment with Petitioners, he consistently made deliveries in excess of the driving regulation. Hill stated that he falsified his driving logs to make it appear as if he were driving within the legal limitations. Hill further testified that Beaudry met with him about his violations, and used Mapquest to illustrate how a driver could make his deliveries on time and still comply with the driving regulation. Hill also testified that Beaudry suggested that when Hill was driving in Florida he could log his driving hours as a local delivery, even though it was an interstate one. Hill additionally testified that he brought up the driving regulation issue with Beaudry. Hill stated he told Beaudry at one point that he needed "a break, I got to slow down, I want to run legal," and that Beaudry responded that he had "other drivers that will run." Hill testified that he stopped working for R & B on December 30, 2004, because he was exhausted.

II. Procedural History

A. OSHA Findings and Petitioners' Appeal (2006)

On January 9, 2006, OSHA issued its findings. OSHA determined that Petitioners violated the STAA by discharging Mailloux after his complaint to

Petitioners regarding his work hours. OSHA ordered Petitioners to pay Mailloux back wages from December 26, 2004, through February 27, 2005, the date on which he commenced his new employment.

The same day OSHA issued its findings, Petitioners appealed OSHA's order to the ALJ. Petitioners argued that Mailloux was terminated for performing poorly, violating the driving regulation, and failing to communicate with the company's dispatcher in a timely manner.

[618 F.3d 43]

B. ALJ's Recommended Decision and Order (2007)

Following a hearing, the ALJ issued a recommended decision and order on June 8, 2007. The ALJ observed that the DOT reports revealed that R & B's violations of the driving regulation existed before, during, and after Mailloux's employment with the company. The ALJ noted that the DOT reports suggested a pattern of violations associated with R & B's day-to-day operations. Additionally, the ALJ relied on these records and other evidence to find that Mailloux was terminated in violation of the STAA. The ALJ concluded that Mailloux was entitled to relief, which included reinstatement and compensatory damages, such as back pay, pursuant to 49 U.S.C. § 31105(b)(3)(A).9 Because Mailloux was not seeking reinstatement, the ALJ granted him back pay from December 17, 2004, the date of his termination, to February 27, 2005, when he obtained new employment, as well as travel expenses associated with the litigation. The ALJ's order suggested

that Petitioners compensate Mailloux in the amount of $9,946.80 plus interest for back pay,10 and $314.58 for reimbursed travel expenses. Pursuant to 29 C.F.R. § 1978.109(a), the ALJ's recommendation was automatically forwarded for review to the ARB.

C. ARB's Final Decision and Order (2009)

On June 26, 2009, the ARB issued its final decision and order. The ARB affirmed the recommendation by the ALJ and ruled that Mailloux had proven by a preponderance of the evidence that he had engaged in a protected activity (when Mailloux informed Beaudry during the December 17, 2004, telephone conversation that Mailloux could not complete the delivery then assigned to him without violating the driving regulation), that R & B was aware of the protected activity, and that R & B took an adverse employment action (the December 17, 2004, termination) against Mailloux because of it.

The ARB held that substantial evidence on the record supported the ALJ's factual findings, and that those findings were conclusive. The ARB also held that the ALJ did not abuse its discretion in admitting the DOT reports to which Kidder and a DOT representative testified, and that these reports were reliable indicators of R & B's actual violations of the driving regulation. Additionally, the ARB found that there was substantial evidence to support the ALJ's finding that R & B required its drivers to drive in excess of the driving regulation and that its drivers were not disciplined for hours of service violations.

[618 F.3d 44]

Furthermore, the ARB found substantial evidence in the record, including the fact that Beaudry did not have Mailloux's driver's log record indicating a violation of the driving regulation at the time he terminated him, to support the ALJ's finding of a causal connection between Mailloux's protected activity and his termination.

Petitioners had also argued that the ALJ erred in calculating Mailloux's daily average wage rate with R & B, asserting that Mailloux's actual start date was August 7, 2004, which, if used instead of August 25, 2004, would reduce his award for the 72-day period during which he was unemployed because it would increase the total number of days he worked and thus decrease his daily average wage rate. Nevertheless, because the ARB found that R & B did not properly raise this issue before the ALJ, the ARB declined to consider the issue on appeal and affirmed the recommended award.

D. Petition for Judicial Review (2009)

In August 2009, R & B and Beaudry timely petitioned this court to review the ARB's final decision and order. Petitioners' petition raises three issues. They argue that (1) evidence that R & B and other trucking companies owned by Beaudry had violated DOT regulations was improperly admitted by the ALJ into evidence; (2) the ARB erroneously upheld the ALJ's decision that a causal connection existed between Mailloux's protected activity and the adverse employment action against

him; and (3) the ARB erred in finding that substantial evidence existed in the record to justify the ALJ's decision regarding back pay.

III. Discussion

A. Standard/Scope of Review

"We review the ARB's final decision in accordance with the dictates of the Administrative Procedure Act, 5 U.S.C. § 701 et seq." Clean Harbors Envtl. Servs., Inc. v. Herman, 146 F.3d 12, 19 (1st Cir.1998). "The ARB's decision must be affirmed unless its legal conclusions are arbitrary, capricious, or otherwise not in accordance with law, or its factual conclusions are unsupported by substantial evidence." Id.; see also 5 U.S.C. § 706(2)("The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] (E) unsupported by substantial evidence...."). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." BSP Trans, Inc. v. United States Dep't of Labor, 160 F.3d 38, 47 (1st Cir.1998)(quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939) (citation and internal quotation marks omitted)).

B. The DOT Reportsi. Standard/Scope of Review

Since whether the ARB properly affirmed the ALJ's decision to admit the DOT reports is an evidentiary ruling, we review it for abuse of discretion. See, e.g., United States v. Richardson, 515 F.3d 74, 84 (1st Cir.2008); Curtin v. Office of Pers. Mgmt., 846 F.2d 1373, 1378-79 (Fed.Cir.1988); see also Barker v. Admin. Review Bd., 302 Fed.Appx. 248, 249 (5th Cir.2008)("An ALJ is granted broad discretion to make evidentiary determinations."). "An abuse of discretion occurs when a relevant factor deserving significant

[618 F.3d 45]

weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." United States v. DeCicco, 370 F.3d 206, 210 (1st Cir.2004) (citation and quotation marks omitted).

ii. Legal Framework

The Federal Rules of Evidence do not apply in APA proceedings. Instead, the rules of evidence in administrative hearings before an ALJ provide, in part, that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

29 C.F.R. § 18.404(b) (emphasis added). These rules of evidence also provide the following hearsay exception, concerning "[p]ublic records and reports": "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... [f]actual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." 29 C.F.R. § 18.803(a)(8).

iii. Analysis

The ARB held that the ALJ did not abuse its discretion in admitting the DOT reports, considering them within the "[p]ublic records and reports" hearsay exception and "only to the extent that they reflect R & B's knowledge of its obligations pursuant to the hours of service regulations." Petitioners argue that the ALJ improperly relied on the DOT reports as highly prejudicial character evidence that showed, besides R & B's knowledge of its legal obligations, which Petitioners claim was undisputed, that R & B was acting in conformity with its past violations of the driving regulation. Respondent counters that the DOT reports were properly admitted as "[p]ublic records and reports" and to show Beaudry's motive and knowledge in terminating Mailloux's employment.

First, Petitioners do not dispute that the DOT reports are "[f]actual findings resulting from an investigation made pursuant to authority granted by law." Petitioners do contend, however, that the DOT reports "indicate lack of trustworthiness." In making this claim, Petitioners cite to a New Jersey Superior Court case from 1988 that quotes a 1985 opinion from the Fifth Circuit stating that

"OSHA citations are the opinions of investigators and ordinarily do not 'carry with [them] the indicia of reliability that is inherent in government adopted safety standards.' " Millison v. E.I. du Pont de Nemours & Co., 226 N.J.Super. 572, 545 A.2d 213, 224 (1988)(alteration in original) (quoting Dixon v. Int'l Harvester Co., 754 F.2d 573, 581 n. 5 (5th Cir.1985)). In any event, as the ARB observed, R & B paid the penalties imposed by the DOT as a result of the admitted reports, the terms of which explicitly stated that such payments "constitute admission of the violation(s)." These admissions bolstered the trustworthiness of the DOT reports, supporting the ALJ's consideration of the reports as being within its discretion.11

[618 F.3d 46]

Second, Beaudry's knowledge in discharging Mailloux is, as discussed in Part III.C., relevant to the instant case. The DOT reports suggested that Beaudry knew or should have known of the driving regulation and R & B's failure to comply with it in the past. The DOT reports indicated that Beaudry knew or should have known he was not telling the truth when he told Kidder that he had never violated the driving regulation, which undermined his credibility when testifying. The Ninth Circuit has observed that, "[w]hen offered to prove knowledge, ... the prior act need not be similar to the charged act as long as the prior act was one which would tend to make the existence of the defendant's knowledge more probable than it would be without the evidence." United States v. Ramirez-Jiminez, 967 F.2d 1321, 1326 (9th Cir.1992). Here, the prior acts of Petitioners were their violations of the driving regulation. These acts would certainly be relevant as tending to show that Petitioners were aware of their obligations under the driving regulation, that their

employees were supposed to comply with it, and that Petitioners had repeatedly violated that regulation in the past.

We thus hold that it was not an abuse of the ALJ's broad discretion to admit the DOT reports not as character evidence but both pursuant to the "[p]ublic records and reports" hearsay exception and as proof of Petitioners' knowledge concerning their history of complying with the driving regulation. However, even if the ALJ abused its discretion here, any purported error was harmless in light of the other evidence against Petitioners, which was substantial, as discussed in the next Part. See Mekhoukh v. Ashcroft, 358 F.3d 118, 130 (1st Cir.2004) (reviewing an evidentiary ruling in the administrative law context for harmlessness).

C. The STAA Claimi. Legal Framework

"A prima facie case of unlawful termination under the STAA requires a showing that the employee engaged in protected activity, that the employee was subjected to adverse employment action, and that there was a causal connection between the protected activity and the adverse action." Clean Harbors Envtl. Servs., Inc., 146 F.3d at 21. "If a complainant makes out a prima facie case, the employer may rebut that showing with evidence of a legitimate, non-retaliatory reason for the adverse employment action. The burden then shifts back to the complainant to prove that the proffered reason is actually a pretext for unlawful retaliation." BSP Trans, Inc., 160 F.3d at 46; see also Day v. Staples, Inc., 555 F.3d 42, 53 (1st Cir.2009).

ii. Analysis

Mailloux engaged in protected activity when he informed Beaudry on December 17, 2004, that he refused to exceed the driving regulation to make a particular delivery on time. Because Mailloux was speaking to Beaudry, Petitioners knew of Mailloux's protected activity. Mailloux was then subjected to an adverse employment action when Beaudry terminated him during the same conversation. These three ALJ findings are undisputed. We thus consider whether substantial evidence supports the ARB's affirmance of the ALJ's conclusions that there was a causal connection between Mailloux's protected activity and the adverse action against

[618 F.3d 47]

him, and that Petitioners' proffered reason for the adverse action was actually a pretext for unlawful retaliation. We find that such substantial evidence exists.

Petitioners argue that Mailloux failed to prove a causal connection between his protected activity and termination. In so doing, they assert that substantial evidence in the record, including Beaudry's testimony, supports a determination that there was a legitimate, non-retaliatory reason for discharging Mailloux, and that the ARB erred in upholding the ALJ's contrary decision.

Petitioners submit that R & B diligently processes its drivers' paperwork and relies heavily upon them to provide accurate and timely information regarding their hours of duty. Petitioners also contend that Mailloux, of his own accord and without informing R & B, falsified his data logs due to his bleak financial situation, because if he had followed the driving regulation, Mailloux would have earned less money. Petitioners claim that R & B later uncovered these violations and informed Mailloux of them in order to compel him to conform to R & B's policy of requiring its drivers to comply with the driving regulation. Thus, Petitioners claim that, rather than as a result of his protected activity, Mailloux was terminated for a legitimate business purpose: because he refused to conform his conduct to the company's standards of properly logging driving time and keeping within the requirements of the driving regulation.

However, the ALJ specifically disbelieved Beaudry's testimony. First, the ALJ found that Beaudry's testimony that R & B required its drivers to comply with the driving regulation was undermined by the DOT reports. Second, the ALJ concluded that Beaudry was "lying" when he told Kidder that he had never received any previous citations from the DOT for hours of service violations.12 As the finder of fact and a witness to Beaudry's testimony, the ALJ's "credibility determinations are entitled to great deference." See P. Gioioso & Sons, Inc. v. OSHRC, 115 F.3d 100, 108 (1st Cir.1997). We have previously observed in another case involving alleged retaliation when an employee engaged in protected activity that a fact finder can find pretext for unlawful termination where "the employer's proffered explanation is unworthy of credence." See McDonough v. City of Quincy, 452 F.3d 8, 18 (1st Cir.2006) (quoting

Reeves v. Sanderson Plumbing Prods. Inc.,

530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000))(internal quotation marks omitted). The ALJ could thus find that Beaudry's testimony about Mailloux's on-the-job conduct was pretext for Mailloux's unlawful termination because the ALJ had found Beaudry's proffered explanation to be unworthy of credence.

Other evidence in the record further supports the ALJ's finding that Mailloux's termination was on account of his protected activity and not his non-compliance with the driving regulation. Bagley testified that Petitioners were aware that their drivers exceeded the hours allotted by the driving regulation, and, further, that they expected their drivers to do so. Hill testified that Petitioners regularly pressured their drivers to violate the driving regulation. Thus, based on the testimonies of Mailloux, Beaudry, Bagley, and Hill, and

[618 F.3d 48]

the DOT reports, we find that substantial evidence supports the findings that a causal connection existed between Mailloux's protected activity and the adverse employment action against him, and that Petitioners' proffered reason for terminating Mailloux was actually a pretext for unlawful retaliation.

D. The Back Pay Award

The ALJ noted in its recommended decision and order that Petitioners "have not challenged August 25, 2004 as [Mailloux's] initial start date." Moreover, the

ALJ found that Mailloux began work on August 25, 2004, based in part on an absence of any objection from Petitioners.

The ARB found that, as the ALJ noted, R & B did not raise before the ALJ any issue regarding or dispute concerning the calculation of Mailloux's back pay award. Consequently, based on its precedent declining "to consider issues or arguments raised for the first time on appeal," the ARB declined to consider the matter, finding both that R & B had waived this argument on appeal and that substantial evidence supported the ALJ's recommended back pay award. As a result, the ARB affirmed the ALJ's recommended back pay award.

Petitioners argue on appeal that the ALJ erred in determining that the start date of Mailloux's employment was August 25, 2004. Petitioners contend that their post-hearing brief, which the ALJ ordered on July 28, 2006, and which Petitioners filed on October 30, 2006, specifically addressed the issue of damages, and established Mailloux's start date as August 7, 2004.

Petitioners did explicitly raise this matter in its post-hearing brief. Under the "Statement of All Issues" in that brief, Petitioners claimed that Mailloux's employment with R & B spanned 133 days, which Petitioners reiterated in the "Statement of Facts" section of that brief and noted was based on an initial start date of August 7, 2004. However, despite the ALJ's instructions in its briefing order and warning about waiver,13 this statement was unaccompanied by any argumentation in this brief and is also not addressed in any way in Petitioners' December 8, 2006, response to the post-hearing reply brief. Only on appeal do

Petitioners proffer an argument for their proposed alternate start date: Mailloux signed a receipt for his copy of the Federal Motor Carrier Safety Regulations Pocket Book on that date, indicating he commenced employment then. As Petitioners, despite the ALJ's instructions and warning, did not specifically address in their post-hearing brief arguments concerning the back pay award, the ARB's legal ruling that they waived the matter was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2).

IV. Conclusion

For the reasons stated above, we deny review.

--------

Notes:

1. The STAA prohibits employers from taking adverse employment actions against employees, including drivers of commercial motor vehicles, who engage in certain protected activities. 49 U.S.C. § 31105(j). Specifically, the STAA provides, in relevant part:

(a) Prohibitions.

(1) A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because-

(A)(i) the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding ...

(B) the employee refuses to operate a vehicle because-

(i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security....

49 U.S.C. § 31105(a)(1)(A)(i)-(B)(i).

2. These facts are drawn from the factual findings of the Administrative Law Judge ("ALJ"), which the ARB affirmed.

3. Mailloux's exact start date is disputed and germane to the back pay issue, which Petitioners raise in this petition. See infra Part III.D.

4. The ALJ found that Mailloux was fired on December 17, 2004, a finding the ARB affirmed and is uncontested on appeal. Notwithstanding the ALJ's finding that Mailloux was "discharged" on December 21, 2004, and OSHA's order to Petitioners to pay Mailloux back wages from December 26, 2004, we thus adopt December 17, 2004, as Mailloux's undisputed termination date.

5. 49 C.F.R. § 395.3(b)(2) provides, in full:

(b) No motor carrier shall permit or require a driver of a property-carrying commercial motor vehicle to drive, nor shall any driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, for any period after ...

(2) Having been on duty 70 hours in any period of 8 consecutive days if the employing motor carrier operates commercial motor vehicles every day of the week.

6. The recommended decision and order of the ALJ indicates that Mailloux initially called the Occupational Safety and Health Administration ("OSHA") investigator on "December 20, 2005," and that the investigator conducted the interview with Mailloux on "December 27, 2005." However, it is clear from the record that these events occurred on their respective dates in 2004.

7. The record does not indicate what sort of "agent" conducted this investigation.

8. The fact that these three companies share office space and drivers is, according to testimony the Division Administrator of the DOT's FMCSA provided to the ALJ, the reason their compliance with the driving regulation was jointly reviewed.

9. 49 U.S.C. § 31105(b)(3)(A), concerning "Filing complaints and procedures," provides, in full:

(3)(A) If the Secretary of Labor decides, on the basis of a complaint, a person violated subsection (a) of this section, the Secretary of Labor shall order the person to-

(i) take affirmative action to abate the violation;


(ii) reinstate the complainant to the former position with the same pay and terms and privileges of employment; and


(iii) pay compensatory damages, including backpay with interest and compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.


10. The ALJ calculated this wage rate loss using the following figures. Mailloux worked for a total of 108 days between his start date on August 25, 2004, and his end date on December 17, 2004. During that time, he earned $14,919.66, which, when divided by 108, yielded a daily wage rate of $138.15. Given that Mailloux was out of work for 72 days between his end date with R & B and the start date of his new employment on February 27, 2005, his daily wage of $138.15 multiplied by 72 days out of work yielded the $9,946.80 wage rate loss.


11. Petitioners argue that their payment of the DOT penalties should not be taken as an admission of the underlying violations because, Petitioners claim, they paid the penalties merely "in an effort to avoid litigation and to resolve the outstanding disputes." This argument is unavailing because Petitioners' reason for paying the penalties is irrelevant to their constructive admission.


12. Although Kidder clarified on cross examination that Beaudry had actually said that he never violated the regulations-not that he received no citations-the ALJ's logic and conclusion here are still valid: because Beaudry's payment of the fines constituted an admission of the underlying violations, the testimony by Kidder on which the ALJ based the finding that Beaudry was lying did in fact support this finding.

13. In its July 28, 2006 briefing order, the ALJ stated that each brief shall include an argument "addressing each issue in a separately numbered section." Furthermore, the ALJ noted that "issues or arguments not specifically addressed in the brief will be deemed to have been waived."

--------...

R & B Transp. LLC v. United States Dep't of Labor, 618 F.3d 37 (1st Cir. 2010)

PX~MIL~158

1   **UNITED STATES DISTRICT COURT**
2   **IN THE WESTERN DIVISION OF MASSACHUSETTS**
3   **SPRINGFIELD, MA.**
4
5                                   **Civil Action No.17 CV  30174**
6
7   **************************************
8   **THOMAS FORBES, as he is the**
9   **Personal Representative of the**
10  **Estate of GEORGE J. FORBES,**
11                          **PLAINTIFF**
12
13  **v.**
14
15  **GREGORY TRUCKING COMPANY,**
16  **INC., WILEY LENUE HOOKS, JR.,**
17  **GREGORY LEASING COMPANY, INC.**
18  **BSG LEASING, INC.;**
19  **B&C TIMBERS LLC.;  and**
20  **BB&S ACQUISITION CORPORATION,**
21                      **DEFENDANTS**
22  **************************************
23
24
25
26
27              **EXHIBIT  E**
28
29  **DEPOSITION OF GREGORY TRUCKING**
30              **CO., INC.**
31

PX~MIL~159

PX~MIL~160

UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MASSACHUSETTS
SPRINGFIELD, MA.

Civil Action No. 3:17-CV-30174-MAP

THOMAS FORBES, as he is the )
Personal Representative of the )
Estate of GEORGE J. FORBES, )
) 
       PLAINTIFF )    V I D E O T A P E D
v. )
) 30(B)(6)
)
GREGORY TRUCKING COMPANY, INC.; ) D E P O S I T I O N
WILEY LENUE HOOKS, JR.; )
GREGORY LEASING COMPANY, INC.; )
B S G LEASING, INC.; )
B&C TIMBERS LLC; and )
BB&S ACQUISITIONS CORP., )
)
       DEFENDANTS )
)
-------------------------------------

□ ORIGINAL

CECIL GREGORY - Vol 2
30(B)(6) GREGORY TRUCKING CO.

TAKEN AT:
THE HILTON GARDEN INN
The Dobbs Boardroom
1017 Gateway Crossing Drive
Statesville, NC  28677

Thursday, April 25, 2019

9:04 A.M.

Brenda Carter
Court Reporter

Wyatt Legal Services, LLC
3936 Elizabeth Glen Way
Jamestown, NC 27282
(336) 510-8515

U.S. DOT #: 91710

Cecil Gregory 30(b)(6) Gregory Trucking - Vol 2        Page 11

1         Q.    Okay.  So, this document, is this -- do

2    you see in the far right top corner, it says,

3    "Review Date"?

4         A.    2/08 to 2/11.

5         Q.    Okay.  And is this the compliance review

6    list of violations for Gregory Trucking as a

7    result of that review?

8         A.    I've seen them, but I guess this is the

9    same thing, probably not the very same paper or

10   something, but I did look at them.  I was in

11   Newton in Catawba County for three or four years

12   there and, you know, I knew this was going on, but

13   I was not there when all this was taking place.

14        Q.    Let's go over a few of the violations,

15   okay?

16        A.    Yes.

17        Q.    If you see at the top, and I think I've

18   highlighted it for you, number 1, it says,

19   "Description," and it says, "Using a driver before

20   the motor carrier has received a negative pre-

21   employment control substance test result."  Is

22   that what it says?

23        A.    Yes.

24        Q.    And is that what Gregory Trucking was

25   found --

1          A.    Yes, I --

2          Q.    -- in violation of?

3          A.    I asked about that and the boy rode with

4     a driver on a 80-mile run and then he went and

5     tested and we never hired him though.

6          Q.    So, that was a violation against --

7          A.    Yes.

8          Q.    -- Gregory Trucking?  Okay.  Let's look

9     at the next one that I highlighted.  Failing to

10    conduct post-accident alcohol testing on driver

11    following a reportable crash.  Was Gregory

12    Trucking found in violation of that?

13         A.    It says that.  I don't recall that one

14    period there.  I don't --

15         Q.    Then we'll go to the next page and the

16    next highlighted violation, number 9, failing to

17    investigate drivers' backgrounds.  Gregory

18    Trucking was found in violation of that, correct?

19         A.    Yes.

20         Q.    Number 11, failing to investigate the

21    drivers' alcohol and controlled substances history

22    for the previous three years.  Gregory Trucking

23    was found in violation of that by the U.S.

24    Department of Transportation?

25         A.    Yes.

```
1        Q.   And number 12, failing to make an

2   inquiry into the driving record of each driver to

3   the appropriate state agencies in which the driver

4   held a commercial motor vehicle operator's license

5   at least once every 12 months.  Gregory Trucking

6   was found in violation of that?

7        A.   I'll say yes.  I mean, I know that we

8   were cited on three different violations.  That's

9   what they -- you know, there's more here than what

10  they fined us for, yes.

11       Q.   I'm just going over a few of them.

12  Let's look at number 14, the next highlighted one.

13  Failing to review the driving record of each

14  driver to determine whether that driver meets

15  minimum requirements for safe driving or is

16  disqualified to drive.  Gregory Trucking was found

17  in violation of that by the United States

18  Department of Transportation, correct?

19       A.   Yes.

20       Q.   The next one, failing to maintain a list

21  or certificate relating to violations of motor

22  vehicle laws and ordinances required by Section

23  391.27, and Gregory Trucking was found in

24  violation of that, correct?

25       A.   Yes.
```

PX~MIL~164

Wyatt Lec                              zabeth Glen Way, Jamestown, NC 27282 (336) 510-8515

# UNITED STATES DISTRICT COURT
# IN THE WESTERN DIVISION OF MASSACHUSETTS
# SPRINGFIELD, MA.

Civil Action No.17 CV 30174

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THOMAS FORBES, as he is the
Personal Representative of the
Estate of GEORGE J. FORBES,
PLAINTIFF**

v.

**GREGORY TRUCKING COMPANY,
INC., WILEY LENUE HOOKS, JR.,
GREGORY LEASING COMPANY, INC.
BSG LEASING, INC.;  and
B&C TIMBERS LLC.
DEFENDANTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT F
# SORREDA v. U.S.   D.O.T

PX~MIL~166

980 F.3d 1

**SORREDA TRANSPORT, LLC, Petitioner,**
v.
**UNITED STATES DEPARTMENT OF TRANSPORTATION; United States, Respondents.**

No. 20-1125

**United States Court of Appeals, First Circuit.**

November 9, 2020

Keith A. Mathews and Associated Attorneys of New England on brief for petitioner.

Joy K. Park, Senior Trial Attorney, Department of Transportation, Heather Eilers-Bowser, Chief Counsel, Charles J. Fromm, Deputy Chief Counsel, Sue Lawless, Assistant Chief Counsel for Litigation, Cynthia Campise, Trial Attorney, Federal Motor Carrier Safety Administration, Steven G. Bradbury, General Counsel, Paul M. Geier, Assistant General Counsel for Litigation and Enforcement, and Peter J. Plocki, Deputy Assistant General Counsel for Litigation and Enforcement, on brief for respondents.

Before* Lynch, Circuit Judge, and Saris,** District Judge.

LYNCH, Circuit Judge.

Sorreda Transport, LLC ("Sorreda") challenges a final decision of the Federal Motor Carrier Safety Administration ("the FMCSA"), an agency within the United States Department of Transportation that regulates the trucking industry in the United States. The FMCSA determined that Sorreda's business safety rating is "unsatisfactory." Sorreda argues that the FMCSA's investigation and resulting decision was arbitrary and capricious under the Administrative Procedure Act ("the

[980 F.3d 3]

APA"), 5 U.S.C. § 706(2)(A), and so the agency's decision should be set aside. The FMCSA's

findings are supported by substantial evidence and its determination that Sorreda's business safety rating was unsatisfactory was neither arbitrary nor capricious under the applicable regulations. We deny the petition for review.

I.

Sorreda is a small, interstate trucking company owned by Evangeline Sebor and located in Bedford, New Hampshire. In May 2019, the FMCSA initiated a compliance review of Sorreda after receiving two complaints through its consumer complaint database. The FMCSA completed its investigation in August 2019, which included a two-day investigation at Sorreda's place of business and additional requests and subpoenas for records. In September 2019, the FMCSA issued a notice informing Sorreda of its proposed unsatisfactory rating, which resulted from an acute violation in one safety factor (General) and critical violations in two other safety factors (Driver and Operational).

Specifically, the FMCSA investigators found that (1) Sorreda had falsified a road test for one of its drivers (General), see 49 C.F.R. §§ 390.35, 391.51(a), (2) it had not obtained several drivers' motor vehicle records within the timeframe required by regulation and had failed to maintain medical examiner's certificates in several of its drivers' qualification files as required by regulation (Driver), see id. § 391.51(a), (b)(2), (b)(7), and (3) it had failed to maintain and to retain accurate and true time records for several of its drivers and had failed to install an electronic logging device to record those entries as required by regulation (Operational). See id. §§ 395.1(e), 395.8(a). The critical violations as to the second and third safety factors resulted in unsatisfactory safety ratings for those two factors, and unsatisfactory safety ratings in two factors automatically results in an overall unsatisfactory safety rating. Id. § 385 app. B.III.A(b). A motor carrier with a final safety rating of unsatisfactory is prohibited from operating a commercial motor vehicle in interstate or intrastate commerce unless it takes corrective action to improve its overall safety rating to conditional or satisfactory



PX~MIL~168

or it successfully appeals its proposed unsatisfactory rating through an administrative review with the FMCSA. See 49 U.S.C. § 31144(c), (e) ; 49 C.F.R. §§ 385.13(a), 385.15, 385.17.

Sorreda chose not to take immediate corrective action and instead appealed the proposed unsatisfactory rating to the FMCSA. In November 2019, the FMCSA issued a final order denying Sorreda's petition for administrative review and concluding that Sorreda had failed to prove by a preponderance of the evidence that the FMCSA had erred in assigning it an unsatisfactory rating.

Sorreda filed a timely petition for review in this Court pursuant to 28 U.S.C. §§ 2342(3)(A), 2343 - 44.

II.

A "court must uphold a decision of the FMCSA unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier Safety Admin., 296 F.3d 1120, 1124 (D.C. Cir. 2002) (quoting 5 U.S.C. § 706(2)(A) ); cf. Flock v. U.S. Dep't of Transp., 840 F.3d 49, 54-55 (1st Cir. 2016). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ; see also id.

[980 F.3d 4]

("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) )). We accept an agency's findings so long as they are supported by substantial evidence in the record as a whole. See Vieques Air Link, Inc. v. U.S. Dep't of Lab., 437 F.3d 102, 104 (1st Cir. 2006) ("[W]e 'accept the findings and inferences drawn by the ALJ, whatever they may be, unless they are

irrational,' and respect his or her 'prerogative in the first instance to ... make credibility assessments....' " (all but first alteration in original) (quoting Bath Iron Works Corp. v. U.S. Dep't of Lab., 336 F.3d 51, 56 (1st Cir. 2003) )); see also 5 U.S.C. § 706(2)(E).

Sorreda first argues that the FMCSA inappropriately found that Sorreda had failed to obtain and to maintain motor vehicle records in several of its drivers' qualification files. Sorreda concedes, however, that it did not obtain the required motor vehicle records and place them in the driver qualification files for at least two of its drivers within the thirty-day period required by regulation. See 49 C.F.R. §§ 391.23(a) - (b), 391.51(a), (b)(2).

Furthermore, the agency was correct that the plain language of the "good faith" exception to the motor vehicle record requirement does not apply to Sorreda's situation because the motor vehicle records for the two drivers at issue did in fact exist and were eventually received by Sorreda, just not within the timeframe set by regulation. See id. § 391.23(b) (providing that "[i]f no motor vehicle record is received from the State or States required to submit this response, the motor carrier must document a good faith effort to obtain such information, and certify that no record exists for that driver in that State or States" (emphasis added)). It does not matter that the agency chose to charge Sorreda with a critical violation ( § 391.51(b)(2) ) rather than a lesser available non-critical violation ( § 391.23(b) ). Placing the motor vehicle record in and maintaining the motor vehicle record in the driver's qualification file are separate regulatory requirements, and we typically do not question the agency's enforcement discretion. See Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); Mass. Pub. Int. Rsch. Grp., Inc. v. U.S. Nuclear Regul. Comm'n, 852 F.2d 9, 19 (1st Cir. 1988) ; see also 5 U.S.C. § 701(a)(2) (providing that



"agency action ... committed to agency discretion by law" is unreviewable under the APA).

Sorreda next argues that the FMCSA acted arbitrarily in finding that Sorreda had failed to maintain the required medical examiner's certificates in several of its drivers' qualification files. See 49 C.F.R. § 391.51(a), (b)(7). It argues that the agency erred in crediting the FMCSA investigators' version of events rather than Sorreda's.[1] We respect the agency's credibility determination and conclude that it is supported by substantial evidence in the record. Both investigators attested that medical examiner's certificates were missing from several of the drivers' physical qualification files that Sebor

[980 F.3d 5]

had provided. They also attested that, while Sebor had shown the investigators an unauthenticated photograph of one of the driver's medical examiner's certificates on her cell phone, she at no time during the compliance review mentioned she maintained that driver qualification information electronically. They further attested that they requested copies of the medical examiner's certificates from Sebor and she never provided them. The failure to provide evidence at the time of the compliance review that Sorreda maintained medical examiner's certificates in the drivers' qualification files was sufficient to find that it had violated § 391.51(b)(7).[2]

Finally, Sorreda argues that the FMCSA arbitrarily found it had violated 49 C.F.R. § 395.8(a)(1)(i) by failing to install or requiring drivers to record their duty status on an electronic logging device. Sorreda argues that it was exempt from this requirement under the "short-haul exemption." See id. § 395.1(e). To qualify for this exemption from § 395.8, the motor carrier must satisfy several requirements, including "maintain[ing] and retain[ing] for a period of 6 months accurate and true time records showing" the drivers' hours of duty. Id. § 395.1(e)(2)(v). During the compliance review, FMCSA investigators examined a sample of sixty driver time records and found that all sixty time records

were not true and accurate. These records pertained to three drivers. On appeal the FMCSA considered only the twenty-four violations related to one driver, Matthew White, whom Sorreda fired for violation of various policies after only three months of employment. Because these twenty-four violations constituted at least ten percent of the sixty documents reviewed, the FMCSA found they were sufficient to establish a "pattern of noncompliance" with § 395.8(a)(1)(i), resulting in an "unsatisfactory" rating. See id. § 385 app. B.II(g)–(h), B.II.C(b) (defining "pattern of noncompliance with a critical regulation"). The FMCSA did not address the accuracy of the other two drivers' records.

Sorreda concedes that one of its drivers submitted inaccurate records of his duty status numerous times, which was sufficient to find that Sorreda did not qualify for the short-haul exemption and so was required to have its drivers record their duty status on an electronic logging device. Sorreda cannot avoid its obligation to comply with the FMCSA's safety regulations by shifting the blame to its employee for its noncompliance. See In re Berg Grain & Produce, Inc., Docket No. FMCSA-2010-0278, 2015 WL 6848568, at *3-4 (Nov. 5, 2015). Nor does it matter that the FMCSA could have charged Sorreda with a different regulatory violation for "mak[ing] a false report in connection with a duty status." 49 C.F.R. § 395.8(e). Sorreda still violated § 395.8(a)(1)(i) and this enforcement decision was within the agency's discretion. See Heckler, 470 U.S. at 831, 105 S.Ct. 1649 ; Mass. Pub. Int. Research Grp., Inc., 852 F.2d at 19.

The FMCSA's findings and conclusions are supported by substantial evidence in the record and its decision denying Sorreda's petition for review is not arbitrary or capricious.[3]

Petition for review denied.

--------

Notes:



* While this case was submitted to a panel that included Judge Torruella, he did not participate in the issuance of the panel's opinion. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

** Of the District of Massachusetts, sitting by designation.

1 The investigators state that they had requested the missing medical examiner's certificates but never received them, while Sorreda asserts that Sebor had offered to provide copies of the missing medical examiner's certificates to the investigators but they refused the offer.

2 It is irrelevant that Sorreda submitted the medical examiner's certificates as part of its administrative appeal of the FMCSA's decision because that does not prove they were maintained in the drivers' qualification files at the time of the compliance review.

3 This does not mean that Sorreda's business is shut down permanently. It can still rectify the identified deficiencies in its safety standards and request a change in its safety rating at any time pursuant to 49 C.F.R. § 385.17.

--------



# UNITED STATES DISTRICT COURT
# IN THE WESTERN DIVISION OF MASSACHUSETTS
# SPRINGFIELD, MA.

### Civil Action No.17 CV  30174

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THOMAS FORBES, as he is the**
**Personal Representative of the**
**Estate of GEORGE J. FORBES,**
       **PLAINTIFF**

**v.**

**GREGORY TRUCKING COMPANY,**
**INC., WILEY LENUE HOOKS, JR.,**
**GREGORY LEASING COMPANY, INC.**
**BSG LEASING, INC.;  and**
**B&C TIMBERS LLC.**
       **DEFENDANTS**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT G
# JONES  v. C.H. ROBINSON

PX-MIL-174-A

PX-MIL-174B

**558 F.Supp.2d 630**
**Winford Dallas JONES, Plaintiff,**
v.
**C.H. ROBINSON WORLDWIDE, INC.,**
**Defendant.**
**Civil Action No. 7:06CV00547.**
**United States District Court, W.D.**
**Virginia, Roanoke Division.**
**June 10, 2008.**

Page 631

COPYRIGHT MATERIAL OMITTED

Page 632

COPYRIGHT MATERIAL OMITTED

Page 633

Gary Clay Hancock, Timothy Edmond Kirtner, Gilmer, Sadler, Ingram, Sutherland & Hutton, Pulaski, VA, for Plaintiff.

Paul C. Kuhnel, Robert Michael Doherty, Wooten Hart PLC, Roanoke, VA, for Defendant.

*MEMORANDUM OPINION*

GLEN E. CONRAD, District Judge.

This personal injury action arose out of a serious accident involving two tractor-trailers. This matter is before the court on the plaintiffs motion for partial summary judgment, the defendant's motion for summary judgment, the plaintiffs motion in limine, the defendant's motion in limine, the defendant's motion to exclude the testimony of Thomas M. Corsi, Ph.D., the defendant's motion in limine to permit evidence regarding plaintiffs settlement with AKJ, and the defendant's motion in limine to exclude evidence regarding proposed safety ratings for AKJ. Although the court announced its findings in open court in order to permit the parties to prepare for the imminent trial date, the court announced that it would file a memorandum opinion in support of its oral findings and

conclusions. The parties' motions will be addressed in turn.

*FACTUAL BACKGROUND*

On the night of September 12, 2004, the plaintiff, Winford Dallas Jones, a West Virginia resident, was traveling southbound on I-81 in Wythe County in a tractor-trailer owned by his employer. Traveling northbound was a tractor-trailer owned by AKJ Enterprises, Inc. ("AKJ"), which was driven by Kristina Arciszewski. As the two tractor-trailers approached one another from opposite directions, Arciszewski's tractor-trailer abruptly crossed the median and struck Jones's tractor-trailer head-on. Arciszewski died at the scene, and Jones suffered serious injuries, including a concussion and multiple fractures in his right arm and left leg.

Jones filed this diversity action on September 11, 2006. The following individuals and/or entities were named as defendants: Loretta D'Souza, a Florida resident and

Page 634

the personal representative of Arciszewski's estate; AKJ, the Georgia trucking company which owned the tractor — trailer that Arciszewski was driving; Elson and Dionnie Bolar, the owners of AKJ; and C.H. Robinson Worldwide, Inc., a Minnesota motor carrier broker with whom AKJ had a contractual relationship and which has offices in Norfolk, Richmond, and Roanoke, Virginia. The complaint included the following claims: negligence, negligent hiring and supervision, negligent entrustment, violations of the Federal Motor Carrier Act, and violations of the Federal Motor Carrier Regulations.

None of the parties save C.H. Robinson Worldwide, Inc. ("Robinson") were served. Ultimately, the plaintiff voluntarily dismissed defendants Loretta D'Souza, AKJ, and Elson and Dionnie Bolar. Robinson then filed a motion to dismiss all the claims against it. The court granted the motion with regard to the plaintiffs claims under the Federal Motor Carrier Act and the



Federal Motor Carrier Regulations. The remaining claims (negligence under a theory of respondeat superior, negligent hiring and supervision, and negligent entrustment of an activity) survived the motion to dismiss. Robinson has also filed a third party complaint against AKJ and Elson and Dionnie Bolar in which it requests indemnification under the Contract Carrier Agreement signed by the parties.

After conducting extensive discovery, Robinson filed a motion for summary judgment with regard to all the remaining claims, Jones filed a motion for partial summary judgment with regard to the claims of negligent hiring and supervision and negligent entrustment assuming that the court determines that AKJ and Arciszewski were independent contractors of Robinson, Robinson filed several motions in limine with regard to the exclusion of evidence at trial, and the plaintiff filed a motion in limine with regard to the exclusion of evidence at trial. Jones also requested the court to find as a matter of law that Arciszewski was negligent in causing the accident. The parties appeared before the court at a hearing on all of these motions.

### *DISCUSSION*

### I. *Motions for Summary Judgment*

### A. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610 (4th Cir.1985). When a motion for summary

judgment is supported by affidavits or other evidence as provided for in Rule 56, the opposing party may not rest upon the allegations in the pleadings and must, instead, present evidence showing that there is a genuine issue for trial. If the adverse party fails to present such evidence, summary judgment, if appropriate, should be entered. Fed.R.Civ.P. 56(e); *Atkinson v. Bass,* 579 F.2d 865, 866 (4th Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 615, 58 L.Ed.2d 679 (1978).

### B. Negligence of Kristina Arciszewski

As previously stated, Kristina Arciszewski was the driver of the AKJ tractor

Page 635

trailer which struck the plaintiffs vehicle when the AKJ vehicle crossed over the median on 1-81. Jones asks the court to find that Arciszewski was negligent in the operation of the tractor-trailer involved in this accident and that her negligence was a proximate cause of the collision. The plaintiff contends that, because there is no evidence to indicate that he was negligent or that there was any cause for the crash other than the negligence of Arciszewski, the court should find as a matter of law that Arciszewski negligently caused the accident in which he was injured. Robinson has noted no opposition to the plaintiff's motion.

Eyewitness accounts indicate that Arciszewski's tractor-trailer suddenly left its lane of travel and crossed the median, striking the tractor-trailer driven by Jones head-on. *See* Plaintiffs Memorandum in Support of Motion for Summary Judgment, Exhibits 2-4. In fact, one witness stated that she observed Arciszewski attempt to exit the interstate prior to the collision and abruptly re-enter the highway from the exit ramp without signaling. *See* Plaintiffs Memorandum in Support of Motion for Summary Judgment, Exhibit 2. The Police Crash Report for this incident also indicates that "[i]t appears that the main causative factor of the crash was error or inattention of the driver of Vehicle # 1," and that Arciszewski was a new driver for the company,



PX~MIL-174-D

thus "inexperience might have also been a contributing factor." *See* Plaintiffs Memorandum in Support of Motion for Summary Judgment, Exhibit 1.

The court concludes that the evidence clearly establishes that Arciszewski was at fault in causing the accident that resulted in the plaintiffs injuries. The eyewitnesses all indicated in their affidavits that the tractor trailer driven by Arciszewski abruptly crossed over the median without warning and struck the tractor trailer being driven by Jones. There is no evidence to indicate that the plaintiff, or any person or instrumentality other than Arciszewski, was at fault in any way. Therefore, the court concludes as a matter of law that Arciszewski was negligent and that her negligence was a proximate cause of the accident.

### C. Negligence/Respondeat Superior

Jones has alleged that AKJ and Arciszewski were agents, servants or employees of Robinson, that Arciszewski was negligent in operating the tractor-trailer which was involved in the accident, and that Robinson is, therefore, subject to vicarious liability for that negligence. The defendant contends, however, that it is not subject to vicarious liability in this instance because AKJ and Arciszewski were independent contractors, not employees, of Robinson.

The April 19, 2001 Contract Carrier Agreement between Robinson and AKJ contains the following relevant provisions:

1.  SERIES OF SHIPMENTS AND ROBINSON'S DISTINCT NEEDS

... Carrier agrees to provide service designed to meet the unique, distinct and continuing transportation service needs of Robinson and its Customers, which include but are not limited to the following: providing flexible contract freight rates which may be amended through a simplified notice provision; providing Certificate of Insurance to Robinson; Carrier's agreement to issue invoices to and to accept payment from

Robinson, rather than from the shipper or receiver; participating with Robinson to use various means of communications and transmitting information to permit the tracking and tracing of shipments accepted by Carrier; and the occasional

Page 636

granting of other business considerations.

. . .

### 4. CARRIER'S SERVICE WARRANTIES

. . . Carrier agrees that neither Robinson nor its Customer is responsible for paying the involved driver's salary, wages, compensation or charges, nor are either responsible for Workmen's Compensation coverage or any taxes based on salary, wages or compensation. Carrier agrees to provide and maintain the necessary equipment and to provide all fuel and pay all expenses necessary to operate the equipment, and Carrier agrees that in no instance shall Robinson or its Customer be responsible for any of the expenses. Carrier represents that the transportation will be performed without violating local, state or federal laws or regulations, and that Carrier has complied and will comply with all laws and regulations of local, state and federal authorities and regulatory bodies having jurisdiction over the operation of its vehicles.

. . .

6.  INDEPENDENT CONTRACTOR The Parties understand and agree that the relationship of Carrier to Robinson hereunder is solely that of an independent contractor, and that Carrier shall and does employ, retain, or lease on its own behalf all persons operating motor vehicles transporting commodities under this Contract, and such persons are not employees or agents of Robinson or its Customers. It is further understood and agreed that all drivers of motor vehicles and persons employed in connection with the transportation of commodities under this Contract are subject to the direction, control and

fastcase

PX~MIL~174-E

supervision of Carrier, and not of Robinson or its Customers. Carrier represents and agrees that such employees are and will at all times be covered by adequate workmen's, compensation insurance as provided by law.

The plaintiff does not now dispute the authenticity of this agreement. The court had previously indicated that, if the agreement proved to be authentic, it had doubts as to whether the plaintiffs claim for negligence could go forward. *See* Memorandum Opinion dated Sept. 11, 2007 at 7 n. 2, 2007 WL 2688332.

Robinson contends that, based on the Contract Carrier Agreement, AKJ was an independent contractor and also maintains that Robinson had no control over AKJ or its drivers' driving times, compensation, routes, discipline issues, or any other aspects of hauling a load. Robinson also notes that it had no power to fire any driver hired by AKJ, including Arciszewski. Therefore, Robinson concludes that, because it had no control over the details of AKJ's business or its drivers, AKJ was an independent contractor of Robinson, and Robinson cannot be held vicariously liable for the negligence of AKJ or its drivers.

Jones responds that Robinson is not simply a freight broker, but acts as a third party logistics company. At her deposition, Annette Sandberg, the defendant's expert, explained the distinction as follows:

Q. Do you draw a distinction between third-party logistics providers and brokers?

A. Yes, I do.

Q. Tell me what the distinction is in your mind.

A. The distinction in my mind is a broker has a much narrower focus than a third-party logistics provider. A broker simply brokers a load from a shipper to a carrier to get to an end source, so they're just that — that

Page 637

pass off; whereas a third-party logistics company typically handles many more issues, so they will handle more than just the brokering of the load. They may handle some customer relations to make sure that if the shipper has a customer that needs material at a certain point in time, they try to coordinate those two points and make sure that the customer, the end customer, is happy, so that the shipper doesn't have to do a lot of that interaction with the end customer. So they are a much broader based focus and service entity than just simply a broker....

Q. So the third-party logistics provider is more involved in the actual process of making sure the load gets where it needs to be on time; is that fair to say?

A. If that's what they've offered. It depends on the specific contract that the logistics provider has with a shipper as to the services that they've asked for.

· · ·

Q. Something you sort of implied but I don't think I've asked you very directly. Do you consider C.H. Robinson to be a third-party logistics provider?

A. Yes, I do.

*See* Plaintiff's Memorandum in Support of Motion for Summary Judgment, Exhibit 16 at 18-19, 36. Jones notes that Robinson would typically arrange the dates and times for pickup and delivery, obtain the pickup and delivery addresses, communicate any specific limitations or directions as to the loading or unloading of cargo, communicate any time sensitivity issues for the load, and provide directions for transport of the load to the carrier and its drivers. Such communications were included on the Carrier Load Confirmation form that was sent from Robinson to the carrier for each load. These confirmation forms specifically state that they amend the Contract Carrier Agreement with that



PX~MIL~174F

particular carrier with regard to the rates charged for each shipment as well as directions and any special warehouse notes. The plaintiff contends that these requirements and communications indicate a high level of control by Robinson over AKJ and its drivers, including Arciszewski.

Jones also notes that Robinson required all drivers to call in to Robinson (1) when dispatched to pick up a load; (2) when the driver arrived at the pick up address; (3) when the trailer was loaded and the freight checked by the driver; (4) during the actual transport of the load for status updates; and (5) when the driver arrived at the delivery address. Drivers also called in to report any problems or issues that arose during the transport of the load, including equipment problems, traffic or delays, or needs for advances through Robinson's T-Chek System.[1] In addition, Robinson had the ability to terminate a carrier's right to transport a load, or "bounce" the load. Finally, Jones contends that Robinson exercised control over small carriers like AKJ because they were more financially dependent on Robinson through the T-Chek System, as well as its Quick Pay plan, than larger carriers would have been.[2] Therefore, based upon all of

Page 638

the foregoing factors, Jones concludes that, notwithstanding the provisions of the Contract Carrier Agreement, AKJ and its drivers were employees, not independent contractors, of Robinson because of the level of control Robinson was able to exercise over AKJ's activities.

On the other hand, Robinson contends that it did not exercise significant control over the operations of AKJ. Robinson claims that requesting status updates for shipments and communicating pickup and delivery instructions from its shipping customers to its carrier simply does not indicate that it was taking control of AKJ's operations. Robinson also notes that the funds received by AKJ or its drivers under the T-Chek system were simply advances on their fee for a particular load to cover expenses incurred while transporting that load.[3] Robinson next

asserts that when it "bounces" a load, it is simply transferring that load to a carrier who can complete a delivery from one who cannot. Robinson further contends that there is no evidence that it acted in the capacity of a third-party logistics company with respect to the particular load at issue in this case, and notes that Ms. Sandberg also testified that the services offered to a particular shipper could vary depending upon that shipper's needs.

In determining whether an entity is an independent contractor or employer of another, a court must examine the following factors: (1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power of control. *See Hadeed v. Medic-24, Ltd.,* 237 Va. 277, 377 S.E.2d 589, 594-95 (Va.1989). The fourth factor, power of control, is determinative. *Id.* However, the employer need not actually exercise this control; the test is whether the employer has the power to exercise such control. *McDonald v. Hampton Training Sch. for Nurses,* 254 Va. 79, 486 S.E.2d 299, 301 (Va.1997).

In this case, the court finds that, regardless of whether Robinson was acting as a third party logistics company or solely as a freight broker with regard to the subject load, Robinson did not exercise a sufficient degree of control over AKJ so as to convert their contractual relationship to one of employer-employee. The Contract Carrier Agreement plainly states that AKJ was acting as an independent contractor of Robinson. A similar agreement was construed in the case of *Schramm v. Foster,* 341 F.Supp.2d 536 (D.Md.2004). As in the instant action, Robinson had acted as the broker of the load at issue in *Schramm* and was likewise a defendant in that case. Specifically, Robinson brokered a load with carrier Groff Brothers who used driver Foster to transport the load. 341 F.Supp.2d at 540. En route, Foster failed to yield the right of way at a stop sign and caused a collision with another vehicle. *Id.* at 541. The injured driver of the other vehicle filed an action against the driver, Groff Brothers, and Robinson for negligence, negligent entrustment, negligent hiring and supervision, and violations of



Px~MIL~ 174G

the Federal Motor Carrier Act and Federal Motor Carrier Safety Regulations. *Id.* at 540-41.

In *Schramm,* Robinson admitted that it was a third-party logistics company which provided one point of contact service to shippers. *Id.* at 541-42. Groff Brothers

Page 639

had also entered into a Contract Carrier Agreement with Robinson which was in effect at the time of the accident. *Id.* at 542. The plaintiff in *Schramm* argued that Robinson exercised a significant degree of control over Groff Brothers by directing its driver to pick up and deliver the load at particular times, giving him directions from the pickup to the delivery destination, giving him instructions regarding the load, requiring him to use load locks on the trailer, and requiring him to call when he picked up the load as well as during the trip. The Court found that "both the written agreement and the conduct of the parties belie plaintiffs arguments." *Id.* at 543. The agreement contained an independent contractor provision which appears to be substantially identical to that included in the agreement between Robinson and AKJ. Ultimately the court granted summary judgment to Robinson on the negligence claim holding as follows:

Robinson did not have the power to fire Foster or to control his activities in transit. The only thing Robinson had a right to control was the ultimate result — the delivery of the load to its final destination in New Jersey. The fact that Robinson instructed Foster on incidental details necessary to accomplish that goal is not enough to subject Robinson to liability for Foster's negligent acts during the course of the shipment when Robinson had no control over Foster's movements.

*Id.* at 546.

Similarly, here Robinson did arrange pickup dates and times, provided pickup and delivery addresses to the carrier, communicated information from the shipper regarding the

loading and unloading of cargo, provided other directions regarding the transportation of the load, and required drivers to call in to report the status of shipments. However, all of these activities were directed toward the incidental details required to accomplish the ultimate purpose for which Robinson had been hired by its shippers — the delivery of a load to its proper destination in a timely fashion. Although Robinson could "bounce" a load from a particular carrier, it did so primarily when that carrier could not complete a delivery for whatever reason. There is no evidence to indicate that Robinson could terminate a particular driver, or that it asked carriers to do so, or that Robinson controlled the details of the carrier's operations, such as its drivers' schedules during a trip, particular routes, or compensation plans. Furthermore, although AKJ may have received funds through Robinson's T-Chek system, the court finds that such advance payments on the carrier's fee do not indicate that Robinson exercised any heightened level of control over AKJ or its operations. Therefore, the court concludes that AKJ was an independent contractor of Robinson and that, as a result, Robinson cannot be held liable for the negligence of AKJ or its driver, Arciszewski, under a theory of respondeat superior.

### D. Negligent Hiring of an Independent Contractor

1. The Applicability of a Claim for Negligent Hiring of an Independent Contractor to the Hiring of a Carrier by a Freight Broker

Virginia law recognizes a claim for the negligent hiring of either an employee or an independent contractor. The plaintiff has asserted a claim for negligent hiring of an employee, or, in the alternative, negligent hiring of an independent contractor. Because the court has now found that AKJ was an independent contractor, not an employee, of Robinson, the court will address only the latter claim.

Page 640



Px~MIL~ 174 H

The general rule is that "one who employs an independent contractor is not liable for injuries to third parties resulting from the contractor's negligence." *MacCoy v. Colony House Builders, Inc.,* 239 Va. 64, 69, 387 S.E.2d 760, 762 (1990). However, the Virginia Supreme Court has recognized an exception to this rule for the negligent hiring of an independent contractor. 239 Va. at 69, 387 S.E.2d 760; *Philip Morris v. Emerson,* 235 Va. 380, 368 S.E.2d 268 (1988). In the latter case, Philip Morris had engaged a contractor to dispose of the unknown contents of several cylinders which it had discovered buried on its property. 235 Va. at 390, 368 S.E.2d 268. The contractor had developed a device to use in opening and sampling the contents of such cylinders before neutralizing and disposing of the substance inside. *Id.* Philip Morris hired the contractor on the basis of his representations regarding the device and a brochure describing the contractor's experience. *Id.* However, the Philip Morris employee who hired and supervised the contractor failed to make any investigation into the contractor's reputation or experience and did not ascertain whether he had ever used the device successfully. *Id.* at 392, 368 S.E.2d 268. When the contractor employed his device, the highly toxic chemical contained in the cylinders escaped from the device, resulting in the death of the contractor and serious injuries to the plaintiffs. *Id.* at 393, 368 S.E.2d 268.

The Court noted that it had previously alluded to a "rule of liability for negligent hiring of an incompetent independent contractor" and explicitly adopted the principles set forth in the Restatement (Second) of Torts § 411 which recognize a defendant's:

liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor ... to do work which will involve a risk of physical harm unless it is skillfully and carefully done.

235 Va. at 399, 368 S.E.2d 268. The Court noted that Philip Morris had failed to undertake any investigation into the contractor's

"competence to perform an admittedly dangerous task." *Id.* Specifically, the Court found that

The slightest inquiry would have revealed A-Line's inexperience. A perusal of a contractor's self-serving brochure is not sufficient to discharge an employer's duty of reasonable care to employ a contractor who is competent to perform a dangerous task. There can be no doubt that [the contractor's] incompetence was the ultimate cause of the losses claimed in this case. There is no conflict in the evidence of Saddington's failure to investigate.

*Id.* at 400, 368 S.E.2d 268. Therefore, the Court held that "Philip Morris is liable as a matter of law because of its own negligence in selecting and retaining A-Line as an independent contractor under the facts and circumstances of this case." *Id.* at 399, 368 S.E.2d 268.

Robinson first contends that the holding in *Philip Morris* should be limited only to the type of dangerous or ultra-hazardous activity described in that case and not to a more routine situation, such as the transport of a load of cable reels which is at issue here.[4] The plaintiff responds that

Page 641

the Court in *Philip Morris* did not limit its holding to ultra-hazardous activities, but noted that it could apply to any "work which will involve a risk of physical harm unless it is skillfully and carefully done." *Id.* at 399, 368 S.E.2d 268. Illustration 5 to the Restatement (Second) of Torts § 411, the section adopted by the Virginia Supreme Court in *Philip Morris,* describes a situation involving an activity which is not ultra-hazardous but which would nevertheless involve a risk of physical harm unless skillfully and carefully done as follows:

A, a builder, employs B, a teamster, to haul material through the streets from a nearby railway station to the place where A is building a house. A knows that B's trucks are old and in bad condition and that B habitually employs inexperienced and inattentive drivers. C is run



over by a truck carrying A's material and driven by one of B's employees. A is subject to liability to C if the accident is due either to the bad condition of the truck or the inexperience or inattention of the driver.

The plaintiff points to this illustration, which is factually similar to the instant case, as an example of an activity that is not ultra-hazardous, but nevertheless involves a risk of physical harm as described in the Restatement. The plaintiff also asserts that it is well known that the operation of a tractor-trailer on a public highway involves just such a risk of harm, as evidenced by requirements that drivers of tractor-trailers must possess special commercial driver's licenses and specialized knowledge and that carriers must comply with numerous federal and state regulations and possess valid operating authority from the Federal Motor Carrier Safety Administration ("FMCSA"). *See also, Schramm, supra,* 341 F.Supp.2d at 553 (noting that the transportation business is "heavily tinged with the public interest").

Although the court has not identified any Virginia cases discussing a claim for negligent hiring of an independent contractor in the context of the selection of a carrier by a broker or a shipper, there have been several cases in other jurisdictions which have found that § 411 of the Restatement does apply to such situations. Applying Washington state law, the Court in *L.B. Foster Co. v. Hurnblad,* 418 F.2d 727 (9th Cir.1969) considered § 411 in the context of a case where the plaintiffs' automobile was struck by a tractor-trailer. The plaintiffs ultimately filed suit against the driver and the owner of the tractor-trailer, as well as the company which arranged the shipment and the shipper itself. After a jury found for the plaintiffs, the shipper alone appealed the judgment. 418 F.2d at 728. The Court found that the shipper could be liable if its "negligent selection of an incompetent independent contractor to do work which involves a risk of physical harm to others unless skillfully and carefully done was a proximate cause of the accident." *Id.* at 729 (citing § 411 of the Restatement). Without specifically citing § 411,

the Supreme Court of Oklahoma has likewise held that:

> Where there is foreseeable [sic] risk of harm to others unless precautions are taken, it is the duty of one who is regularly engaged in a commercial enterprise which involves selection of motor carriers as an integral part of the business, to exercise reasonable care to select a competent carrier. Failure to exercise

Page 642

> such care may create liability on the part of the employer for the negligence of that carrier.

*Hudgens v. Cook Indus., Inc.,* 521 P.2d 813, 816 (Okl.1973).

The Supreme Court of New Jersey has also applied § 411 to a case involving the selection of a carrier by a shipper. In *Puckrein v. ATI Transport, Inc.,* 186 N.J. 563, 897 A.2d 1034 (N.J.2006), the Court first noted that there are "three exceptions to the general rule that principals are not liable for the actions of independent contractors: (1) where the principal retains control of the manner and means of doing the work subject to the contract; (2) where the principal engages an incompetent contractor; or (3) where the activity constitutes a nuisance per se." 186 N.J. at 574, 897 A.2d 1034. Finding that the second exception applied, the Court pointed to the language of § 411 and noted that "[t]he notion of liability for hiring an incompetent contractor is derived from basic negligence principles." *Id.* at 575, 897 A.2d 1034.

The court agrees that the Virginia Supreme Court would extend the cause of action of negligent hiring of an independent contractor to this situation involving the selection of a carrier by a freight broker or third party logistics company such as Robinson. It is true that the activity for which the contractor was engaged in *Philip Morris* involved a dangerous toxic chemical. Yet, the Court adopted the language in § 411 of the Restatement without specifically limiting its application to ultra-hazardous



Px~MIL~ 174 J



activities. The hiring of an independent contractor to perform an ultra-hazardous activity more closely falls within the third exception to the general rule for a nuisance per se, as noted in *Puckrein, supra,* rather than the exception for the hiring of an incompetent independent contractor. In fact, such inherently dangerous activities were discussed elsewhere in the Court's opinion in *Philip Morris,* where it set forth a separate and distinct basis for liability for the employer of an independent contractor in a situation where the work involved "a peculiar, unreasonable risk of physical harm to others unless special precautions were taken." *Philip Morris, supra,* 235 Va. at 401, 368 S.E.2d 268. Therefore, the court believes that the Virginia Supreme Court would apply § 411 of the Restatement to any situation involving the hiring of an independent contractor where the work will involve a risk of physical harm unless it is skillfully and carefully done.

The court also agrees that the operation of a tractor-trailer upon the public highways does involve such a risk of physical harm. The likelihood of this risk is reflected in the federal government's licensing requirements to ensure that commercial truck drivers have the necessary skills to operate a tractor-trailer. Other courts applying § 411 have easily extended this cause of action to the hiring of a carrier by a shipper, the situation described in Illustration 5 to § 411 as previously set forth. Therefore, the court concludes that the plaintiffs claim for negligent hiring of an independent contractor is viable under the facts of this case.

2. The Defendant's Duty of Inquiry in Selecting a Competent Carrier

The court's conclusion with regard to the viability of this cause of action does not end the necessary inquiry with regard to the parties' motions for summary judgment on this claim, however. In order to succeed on a claim for negligent hiring of an independent contractor, the plaintiff must also be able to prove that "the contractor was, in fact, incompetent or unskilled to perform the job for which he/she was hired, that the harm that resulted

Page 643

arose out of that incompetence, and that the principal knew or should have known of the incompetence." *Puckrein,* 186 N.J. at 576, 897 A.2d 1034. Section 411 of the Restatement defines a competent and careful contractor as one "who possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary." Restatement (Second) of Torts § 411 comment (a). Furthermore, the harm that resulted to the plaintiff must have arisen out of the particular quality of the independent contractor which made it negligent for the employer to select that contractor to perform the work. Restatement (Second) of Torts § 411 comment (b). Finally, in determining the appropriate amount of care that a defendant must exercise in selecting an independent contractor, the finder of fact should consider "that which a reasonable man would exercise under the circumstances." Restatement (Second) of Torts § 411 comment (c).

In their motions for summary judgment, the parties do not appear to specifically dispute that AKJ was an incompetent carrier or that Arciszewski was an incompetent driver. The parties also agree that Robinson did not conduct any investigation into AKJ's safety and fitness as a carrier beyond ascertaining that it was insured, that it had a conditional safety rating, and that it had valid operating authority from the FMCSA. Instead, the dispute between the parties focuses upon the appropriate duty of inquiry that was required of Robinson under the facts of this case. Robinson contends that there is no evidence to demonstrate that it either knew or should have known that AKJ would be likely to be involved in a collision such as that involved in this case. Instead, Robinson alleges that it made all appropriate inquiries prior to hiring AKJ to carry the subject load by determining that AKJ was properly insured and had valid operating authority from the FMCSA. On the other hand,



PX-MIL-174 K

Jones argues that Robinson should have conducted an investigation into AKJ's safety program and its safety ratings which would have disclosed that AKJ was an at risk carrier and was likely to be involved an accident.

Robinson was aware that AKJ had received a "conditional" rating from the FMCSA prior to assigning the subject load to AKJ. A carrier can be rated satisfactory, conditional, or unsatisfactory. A conditional rating indicates that the FMCSA considers that the carrier does not have adequate safety management controls in place. The Contract Carrier Agreement required AKJ to maintain a rating of "satisfactory."

The FMCSA maintains a public website which includes several different categories of safety information. The information available includes the SafeStat database which reports scores for carriers across different Safety Evaluation Areas ("SEAs"). The SEAs are broken down into the following categories: Accident SEA, Driver SEA, Vehicle SEA, and Safety Management SEA. Carriers may receive a score from 0 to 100, with 0 being the best and 100 being the worst. Carriers are scored on a bell curve such that there will always be carriers at either end of the curve regardless of their level of safety. A score greater than 75 is considered deficient. If a carrier receives a cumulative score of 225 to 350, it receives a "B" rating which is considered "at risk" by the FMCSA. AKJ possessed a "B" rating (overall score of 322.32) and was in the bottom 3% of the motor carriers in the country with regard to its Driver SEA

Page 644

(97.8) and Vehicle SEA (97.09) scores. The plaintiff notes that studies published on the FMCSA website indicate that there is a correlation between deficient SEAs and crash rates. Information retained on the FMCSA website also indicated that AKJ's insurance coverage had been cancelled eight times from 2001 to 2004 and that AKJ had previously been cited by the FMCSA for numerous violations of federal safety regulations.

In addition to AKJ's deficient safety rating and SafeStat scores, the plaintiff notes that Robinson's internal Express system contained information regarding problems with its various loads, including those carried by AKJ. Spreadsheets including this data for AKJ indicate specific problems over the three years Robinson did business with the carrier, including incidents of equipment or vehicle breakdowns of varying degrees of severity, incidents where drivers were pulled over or vehicles were taken out of service for regulatory violations, and two different tractor trailer accidents (including one roll over). In many cases, however, these spreadsheets do not describe the causes of the equipment or vehicle breakdowns or of the two accidents.

The plaintiff's argument in support of its motion for summary judgment on the negligent hiring" claim is that Robinson was under a duty to ensure that it used reasonable care in selecting carriers; that it should have been alerted to safety problems with AKJ because of the carrier's conditional rating and the various incidents reported in the Express system; that in fulfilling its duty it should have checked the SEA scores that were publicly available on the FMCSA website; that those scores would have demonstrated that AKJ was a safety risk and would have resulted in Robinson's refusal to hire AKJ for the subject load; and, finally, that Robinson's failure to properly investigate AKJ's poor safety record was the proximate cause of the accident in that its record would have indicated a high likelihood of a tractor-trailer crash such as the one that caused the plaintiffs injuries. In further support of his argument, Jones asserts that AKJ acted negligently in hiring Arciszewski; a novice tractor-trailer driver who had received her commercial driver's license only two months prior to the accident, for this load, which had been designated as "hot," or in need of urgent delivery. The plaintiff contends that this negligence in hiring, of which Robinson could have been aware generally based on AKJ's SEA scores, resulted in the collision in which he was injured.

In *Schramm v. Foster*, 341 F.Supp.2d 536 (D.Md.2004), the Court permitted a claim for



PX-MIL- 174 L

negligent hiring of an independent contractor to go to the jury. The plaintiffs were injured in a collision between their pick-up truck and a tractor trailer driven by Foster. As noted, *supra,* the plaintiffs then filed an action against the driver and his employer, Groff Brothers Trucking, LLC, as well as Robinson, which had hired Groff Brothers to transport the load for Robinson's shipper customer. In describing the duty of care required in selecting such a carrier, the Court held that:

I believe that [Robinson's] self-pro-claimed status as a `third party logistics company' providing `one point of contact' service to its shipper clients is sufficient under Maryland law to require it to use reasonable care in selecting the truckers whom it maintains in its stable of carriers. This duty to use reasonable care in the selection of carriers includes, at least, the subsidiary duties (1) to check the safety statistics and evaluations of the carriers with whom it contracts available on the SafeStat database maintained

Page 645

by FMCSA, and (2) to maintain internal records of the persons with whom it contracts to assure that they are not manipulating their business practices in order to avoid unsatisfactory SafeStat ratings.

*Id.* at 551. The Court based the "common law duty upon third party logistics companies to use reasonable care in selecting carriers" upon the "critical federal interest in protecting drivers and passengers on the nation's highways," Robinson's recognition of the importance of a good safety record by requiring a rating of "satisfactory" in the Contract Carrier Agreement (a contract provision that was breached by the carrier in *Schramm* because it was a new company that did not yet have a rating), and Robinson's active interjection of itself into the relationship between shipper and carrier. *Id.* at 552-53. Another important factor to the Court was that Robinson had advertised to its shipping customers that it maintained a liability insurance policy to pay any

damages that exceeded the carrier's own insurance coverage. *Id.* at 552.[5]

The plaintiffs expert, Thomas M. Corsi, Ph.D., has also opined that Robinson should have reviewed the publicly available SafeStat data in deciding whether to hire AKJ.[6] Dr. Corsi has also stated that the Driver SEA and Vehicle SEA scores are "accurate measures of both a carrier's driver and vehicle performance," and that if Robinson had reviewed this data, it would have determined that "hiring this carrier compromised safe operating practices." The plaintiff contends that this public data has been available since 1999, is heavily relied upon by the FMCSA to target unsafe motor carriers for investigation, and, according to Dr. Corsi, is the most reliable, up to date means of evaluating the safety performance of a particular carrier. Jones further contends that even the defendant's expert, Annette Sandberg, Esq., the head of the FMCSA at the time of the accident, testified at her deposition that if a third party logistics provider became aware that a carrier had received a conditional rating, it should inquire with regard to the information gathered during the FMCSA compliance review and the carrier's plan for improvement. *See* Plaintiffs Memorandum in Support of Motion for Partial Summary Judgment, Exhibit 16 at 112-17, 122-23.

With regard to the alleged duty to consult the SafeStat data available on the FMCSA website, Robinson contends that there was no such common law duty, notwithstanding the Court's holding in *Schramm,* At the time of the instant collision, according to Robinson, the FMCSA had posted the following warning on the front page of its website with regard to the SEAs:

Because of State data variations, FMCSA cautions those who seek to use the SafeStat data analysis system in ways not intended by FMCSA. Please be aware that use of SafeStat for purposes other than identifying and prioritizing carriers for FMCSA and state

Page 646

fastcase

*Px~M1L~174.M*

safety improvement and enforcement programs may produce unintended results and not be suitable for certain uses.

At her deposition, Ms. Sandberg testified that this warning came about because the FMCSA became aware that businesses were using the SEAs for commercial or business purposes and should not have been doing so. Instead, according to Ms. Sandberg, the SEAs were primarily intended to be an enforcement tool.

The Court in *Schramm* had also noted that the FMCSA website containing the SafeStat information contained this disclaimer but nevertheless held that "[w]here, as here, one party (Robinson) knows from information provided to it by the other (Groff Brothers) that the latter is in breach of a contractual provision whose very purpose is to protect the safety of innocent third parties, a duty of inquiry necessarily is implied." 341 F.Supp.2d at 552. Furthermore, a duty of further inquiry was implied where the carrier's SafeStat scores were marginal, even though not unsatisfactory. *Id.* In the case at hand, AKJ was also in breach of the contractual provision requiring it to maintain a satisfactory rating.

Robinson acknowledges that the Court in *Schramm* recognized that the warning was posted on the website and nevertheless found a common law duty to check the SafeStat scores during the carrier selection process. Robinson claims that the crucial difference between this case and *Schramm,* however, is that Robinson now has an expert in the person of Ms. Sandberg, whose testimony was not available in *Schramm,* who has offered an explanation of the agency's policy behind the warning, as stated previously, and who will make clear that the FMCSA was expressly warning companies against the very use recommended in *Schramm* and by the plaintiff here. Thus, Robinson contends that it should not be held to a higher standard than other freight brokers in the industry and should not be required to ignore the very warning placed upon the FMCSA website regarding the use of the SafeStat scores.

The court believes that Robinson did hold itself out as a third party logistics provider in general and with regard to the subject load. Ms. Sandberg, the defendant's own expert, testified at her deposition that she considers Robinson to be a third party logistics provider. With regard to the subject load, the evidence indicates that the AKJ drivers, including Arciszewski's driving partner, called in to report on the progress of the load and that Robinson had provided detailed instructions regarding the delivery. Furthermore, the court agrees with the reasoning set forth by the Court in *Schramm* regarding Robinson's active interjection of itself into the relationship between shipper and carrier, and its choice "to do business in a context heavily tinged with the public interest." *Id.* at 553. Therefore, the court finds that Robinson did have a duty to investigate the fitness of AKJ prior to hiring it to carry the subject load on the public highways.

Nevertheless, the court finds that there is a conflict in the evidence regarding the appropriate inquiry Robinson should have undertaken in this case. Although there were some indications of safety problems in the data available to Robinson on its Express system, it is not clear whether these problems were unusual in comparison to those experienced by other carriers used by Robinson. It is also true that AKJ had a conditional safety rating, and as a result, was in breach of the Contract Carrier Agreement. Ms. Sandberg appeared to indicate in her deposition testimony that such a rating should have

Page 647

prompted some form of additional inquiry on the part of Robinson. The defendant asserts, however, that Ms. Sandberg's comments were made in response to certain hypothetical questions and should not be taken to necessarily apply to a proper evaluation of AKJ. Therefore, there remains a dispute regarding the true import of Ms. Sandberg's comments.

With regard to the SafeStat scores, Dr. Corsi has testified that Robinson should have looked into AKJ's scores and other information available



on the FMCSA website. However, there remains the issue of the warning on the website, as well as Ms. Sandberg's comments regarding the reason for that warning. The court also notes that the evidence indicates that the FMCSA website included information about the removal from public view of the Accident SEA and the overall SafeStat score based upon their lack of reliability. As the plaintiff points out, this section of the website states that the Driver SEA, Vehicle SEA and Safety Management SEA scores would remain publicly available and "will continue to provide valuable help to carriers measuring their own safety performance, *shippers determining a carrier's reliability,* and insurance underwriters assessing a carrier's risk level." (Emphasis supplied). Furthermore, Ms. Sandberg also stated in her deposition that the SafeStat scores could be helpful to those in private industry, such as Robinson, given that they understood that the data were not perfect.

Given these discrepancies in Ms. Sandberg's testimony, the disagreement between the experts with regard to the effect of the warning page on the FMCSA website, and the inconclusive nature of the data available in the Express system, the court concludes that the question of whether Robinson breached the appropriate duty of inquiry in selecting a competent carrier must be submitted to the jury. *See also, Hudgens v. Cook Indus., Inc.,* 521 P.2d 813, 816 (Okl.1973) (holding that where "there is competent evidence tending to show that such employer knew, or in the exercise of reasonable care should have known, that the independent contractor was not such a [competent] driver, and reasonable men might draw conflicting conclusions on the matter, then whether or not the employer was negligent in the discharge of his duty to select a competent contractor becomes a question to be determined by the trier of fact").

3. The Causation Element of a Claim for Negligent Hiring of an Incompetent Carrier

Regardless of whether Robinson knew or should have known that AKJ was an incompetent carrier, the defendant next asserts that there is

simply no evidence to indicate that Robinson knew or should have known that the subject crash could result from that incompetence. As previously stated, before a plaintiff can succeed on a claim of negligent hiring of an incompetent independent contractor, he must prove not only that the contractor was incompetent and that the employer knew or should have known of that incompetence, but that the contractor's incompetence was a proximate cause of his injuries.

With regard to the incidents noted in the Express system, Robinson contends that many of them were totally unrelated to AKJ's propensity to be involved in a crash. Of all the problems reported, only two involved crashes, neither involving injuries, which took place approximately two years prior to the instant collision. Neither of them involved circumstances similar to those involved in the instant collision. Jones responds that based upon AKJ's poor overall safety record, it would

Page 648

have been foreseeable that a tractor trailer driven by an AKJ driver would be involved in a crash.

Robinson argues that, in order to show causation, there must be some close nexus between the past incidents and the present claim. In support of this argument, Robinson cites *Interim Personnel of Central Virginia, Inc. v. Messer,* 263 Va. 435, 559 S.E.2d 704 (2002) which involved a claim for negligent hiring of an employee, not an independent contractor, and examined whether the trial court properly submitted the issue of foreseeability to the jury. The Court noted that "the precise injury need not be foreseen by a defendant. It is sufficient that an ordinary, prudent person ought, under the circumstances, to have foreseen that an injury might probably (not possibly) result from the negligent act." 263 Va. at 442, 559 S.E.2d 704. The Court then went on to hold that:

In the present case, the mere fact that East had been convicted twice of DUI, had failed to pay



PX-MIL-174 0

fines or attend counseling, and had been declared an habitual offender, would not place a reasonable employer on notice or make it foreseeable that East would steal a truck, operate the stolen vehicle during non-business hours for his own frolic, and cause an accident on the open highway distant from the environs of his job.

*Id.*

The court agrees that Jones must demonstrate the necessary causal connection between the particular quality or qualities of AKJ that made it an incompetent carrier and the crash in which plaintiff was injured. While the court believes that the causation element is not particularly strong in this case, the court does find that the plaintiff has proffered evidence sufficient to withstand summary judgment. The evidence demonstrates that AKJ received its conditional safety rating from the FMCSA based, in part, upon driver hiring issues. The reasons behind the rating, including the particular violations, were available on the FMCSA website. Robinson does not dispute that it was aware of AKJ's conditional rating and yet did no further investigation into AKJ's safety practices. In addition, AKJ's Driver SEA and Vehicle SEA scores, also publicly available on the website, indicated that it was at the low end of the curve in terms of driver and vehicle safety issues. The evidence also shows that Arciszewski was an inexperienced driver who had just obtained her commercial driver's license, that AKJ paired her for the trip with a driver whose commercial driver's license had been recently suspended, and that the crash report indicated that inexperience could have been a factor in the accident. It is possible that the finder of fact could determine that AKJ's negligent driver hiring and safety procedures, of which Robinson should have been aware, were a proximate cause of the crash which is the subject of this case. On the other hand, the evidence regarding the actual cause of the crash is sparse, and it is also possible that the finder of fact could determine that, regardless of AKJ's incompetence, the subject crash was not the result of that incompetence. Therefore, the court will deny both parties' motions for summary judgment with regard to the plaintiffs claim for

negligent hiring of an independent contractor and will submit these issues to the jury at trial.

### E. Negligent Entrustment

In its previous Memorandum Opinion, the court noted that the Virginia Supreme Court had not addressed a claim for negligent entrustment of an activity, but found that Virginia would adopt § 308 of the Restatement (Second) of Torts which states as follows:

Page 649

It is negligent to permit a third person to use a thing *or to engage in an activity* which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

*See* Memorandum Opinion dated Sept. 11, 2007 at 11 n. 5 (emphasis added). At the previous hearing on the defendant's motion to dismiss, the plaintiff had indicated that there was a possibility that the rolls of wire that were being carried by AKJ could have been more dangerous than the average load because of their propensity to shift during travel. The court made its prior ruling that Virginia would recognize a cause of action for the negligent entrustment of an activity based upon the understanding that it would apply only to an activity that would require the handling of a thing that was somehow dangerous in and of itself, in light of the language in the Restatement. At this point in the proceedings, the plaintiff is no longer making the argument that the subject load was inherently dangerous, and there is no evidence in the record to indicate that the load of rolls of wire was more dangerous than the average load. As a result, the defendant's motion for summary judgment has been granted with regard to the plaintiffs claim for negligent entrustment.[7]

### II. *Defendant's First Motion in Limine*

The defendant asks the court to exclude the following evidence at trial:



fastcase

*Px~M12~174 P*

1. Any evidence relating to predecessor entities and/or successor entities to AKJ;

2. Any evidence of prior problems or conduct by AKJ other than evidence of crashes and/or personal injuries;

3. Any evidence or testimony by Virginia State Trooper K. Scott Clark regarding the cause of the crash; and

4. Any reference and/or evidence as to Robinson's overall revenue, monetary allocation, or profit per load.

These issues will be discussed in turn.

## A. Evidence Relating to Predecessor and/or Successor Entities

Bolar Trucking Express, Inc. was a predecessor corporation to AKJ that did business with Robinson until April 2001. AKJ Logistics, LLC was a successor corporation to AKJ that did business with Robinson for a short time period beginning in June, 2005, well after the date of the subject accident. Robinson contends that any evidence related to driver or safety incidents for these entities should be excluded because they are not parties to this matter, that it would have no bearing on whether Robinson was negligent in assigning the subject load to AKJ in 2004, that evidence related to Bolar Enterprises is too remote in time to be relevant, and that the entities are not fungible with AKJ simply because they were operated by the same people.

The plaintiff responds that Robinson knew that Bolar Enterprises and AKJ were directly related and that any actual knowledge Robinson had with regard to the safety practices of Bolar Enterprises should also apply to those of AKJ. The plaintiff also contends that Bolar Enterprises,

Page 650

like AKJ, had "severe" safety issues. With regard to AKJ Logistics, the plaintiff argues that its failure after Robinson removed it from

Robinson's contract carrier program indicates the extent to which these reformulations of the same trucking company were dependent upon Robinson and, therefore, the level of control Robinson could exercise over carriers like AKJ. The plaintiff also asserts that he has no intention of offering any evidence regarding AKJ Logistics to show that AKJ itself was incompetent.

With regard to AKJ Logistics, based upon the court's ruling that AKJ was an independent contractor, not an employee, of Robinson, there would be no need for the plaintiff to present evidence going to the level of control Robinson exercised over AKJ. Therefore, the defendant's motion has been granted to the extent that the plaintiff will not be permitted to offer evidence related to any successor entity of AKJ.

The court agrees that Robinson's knowledge of the safety practices of Bolar Enterprises could be relevant to demonstrate its knowledge of AKJ's safety practices in that Robinson was aware that the same principals were involved in both entities. Therefore, the defendant's motion has been denied in that the plaintiff may introduce evidence relating to Bolar Enterprises insofar as that evidence pertains to safety on the public highways. General evidence regarding other driver or vehicle issues experienced by Bolar Enterprises will not be permitted, however.

## B. Evidence of Problems or Conduct by AKJ Other Than Evidence of Crashes and/or Personal Injuries

The defendant asserts that, for evidence of prior incidents and problems noted in its Express system to be admissible, they should have occurred under substantially the same or similar circumstances, including resulting personal injury, as the subject accident. In support of this proposition, Robinson cites *Roll `R' Way Rinks v. Smith,* 218 Va. 321, 237 S.E.2d 157 (1977), a premises liability case, in which the Court held that a party may introduce evidence of other similar accidents to demonstrate notice or actual knowledge of a defective condition provided that "the plaintiff shows that those prior accidents or



occurrences happened at substantially the same place and under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue, or by the acts of the same person." 218 Va. at 325, 237 S.E.2d 157. *See also, Jones v. Ford Motor Co.,* 263 Va. 237, 255, 559 S.E.2d 592, 601 (2002) (holding that evidence of similar accidents may be admissible to prove notice or knowledge if "the prior incident occurred under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue") (internal citations omitted).

The plaintiff contends that the cases cited by the defendant address notice of a static or physical defect, whereas he intends to offer evidence of prior conduct or problems to demonstrate notice of, or the existence of, "a propensity, pattern, or characteristic of a person or entity." The plaintiff asserts that he does not intend to introduce this evidence to demonstrate negligence on the part of AKJ, but to prove a propensity on the part of AKJ with regard to its poor hiring and safety record and to show that Robinson should have been on notice of this propensity, which should then have prompted further inquiry by Robinson.

The court agrees that this case is not precisely akin to a premises liability action, as in *Roll 'R' Way Rinks,* or an automobile

Page 651

products liability action, as in *Jones,* in that the plaintiff need not be limited to presenting evidence of prior incidents which are precisely identical to the collision at issue here. Nevertheless, the plaintiff is limited to presenting evidence of AKJ's incompetence only insofar as it relies upon that particular form of incompetence to demonstrate that Robinson was negligent in hiring AKJ to carry the subject load or that this particular quality of which Robinson knew or should have known resulted in the subject crash. Therefore, the plaintiff may introduce evidence of prior conduct or problems of AKJ only insofar as

they relate to the ability of AKJ's drivers to carry their loads safely upon the public highways.

**C. Evidence or Testimony by Trooper Clark Regarding the Cause of the Accident**

Robinson next contends that Trooper Clark, the officer who investigated the accident, should not be permitted to testify regarding the cause of the accident because he has not been designated as an expert and he previously stated that he had no opinion regarding the cause of the crash. The defendant does not object to the trooper's testimony with regard to his observations of the scene of the accident. The plaintiff responds that he is content to rely upon the Police Crash Report, as well as Trooper Clark's testimony with regard to his investigation and findings. Given these representations, the court will take the defendant's motion regarding testimony by Trooper Clark under advisement pending his appearance as a witness at trial.

**D. References and/or Evidence Regarding Robinson's Finances**

Robinson asserts that, because the plaintiff does not seek punitive damages in this case, evidence regarding its net worth is not permissible. Furthermore, the defendant asserts that testimony regarding its overall revenues, its allocation of spending to its various divisions, and its profits per load would be unduly prejudicial.

The plaintiff responds that he intends to introduce evidence regarding Robinson's size and the number' of loads it transports in a given year to demonstrate to the jury the importance for such a third party logistics company to exercise reasonable care in the selection of carriers. Jones also asserts that he intends to introduce evidence of the small amount of Robinson's resources that are allocated to the department responsible for safety monitoring compared with its overall resources to demonstrate its general disregard for carrier safety issues.

The court agrees that evidence related to the defendants' overall revenues, monetary



PX~M12~174 R

Jones v. C.H. Robinson Worldwide, Inc., 558 F.Supp.2d 630 (W.D. Va. 2008)

allocation, and profit per load would be unduly prejudicial and that such evidence will generally not be permitted. If, however', the defendant relies at trial upon financial constraints to justify its decision not to engage in a more thorough review of AKJ's safety record, the plaintiff would be permitted to introduce such financial evidence in rebuttal.

### III. *Defendant's Motion in Limine to Permit Evidence Regarding Plaintiffs Settlement with AKJ*

Robinson requests the court to take judicial notice of the fact that AKJ had a $1,000,000 insurance policy in effect at the time of the crash and that the plaintiff received a settlement of $756,231.10 in the related interpleader action filed in this court. *See Canal Ins. Co. v. AKJ Enters.*, No. 7:05CV00312. The information regarding the settlement is available in the Final Order entered in the interpleader action on August 6, 2007.

Page 652

Robinson contends that the evidence regarding AKJ's insurance policy directly relates to the plaintiffs claims that AKJ was having financial difficulties in that AKJ had actually purchased insurance in an amount 25% higher than the minimum required under federal guidelines. The defendant also states that evidence of this insurance policy goes to one of Robinson's self-identified criteria in approving a carrier for its contract carrier program. With regard to the existence of the insurance policy, the plaintiff contends that this fact would not speak to whether AKJ was in financial difficulties because federal law required AKJ to maintain insurance. The plaintiff also notes that the policy could have been cancelled at any time after the accident. Nevertheless, the plaintiff does not object to the introduction of this evidence if relevant at trial. The court finds that information concerning the insurance carried by AKJ at the time of the accident could be relevant if the plaintiff raises the issue of AKJ's financial viability. Therefore, if the plaintiff does introduce evidence on that

subject, the defendant would be permitted to introduce evidence regarding AKJ's insurance policy.

With regard to the plaintiffs settlement from AKJ, Robinson claims that, because AKJ would be considered a joint tortfeasor, Robinson would be entitled to a setoff for any damages awarded to the plaintiff in the amount of the plaintiffs settlement with AKJ. The plaintiff does not dispute that this evidence would be admissible in the damage phase, but he contends that it should not be permitted at the liability phase because it has no bearing on Robinson's negligence in hiring AKJ. The court notes that the trial of this matter has been bifurcated with the jury to decide the issue of negligence, and the court to determine the amount of damages to which the plaintiff is entitled, if any. Therefore, the court finds that Robinson may not present evidence regarding the earlier settlement during the liability phase of the trial, but may present that evidence during the damage phase should the case proceed to that point.

### IV. *Defendant's Motion in Limine to Exclude Evidence Regarding Proposed Safety Ratings for AKJ*

Robinson requests the court to prohibit the plaintiff from introducing any evidence regarding a proposed "unsatisfactory" rating for AKJ. In May 2003, the FMCSA proposed a rating of "unsatisfactory" after performing a compliance review of AKJ. After AKJ apparently addressed some of FMCSA's concerns, AKJ later received a "conditional" safety rating. Robinson notes that the plaintiff has referred to this lower rating as further evidence of Robinson's negligence in hiring AKJ for the subject load. However, Robinson contends that there was no evidence that it was, or should have been, aware of the proposed rating. According to Ms. Sandberg, the defendant's expert, only the final rating has any regulatory significance. Therefore, Robinson concludes that it was under no duty to consider a proposed rating until and unless it became final.



Px~MIL~ 174 8

Jones v. C.H. Robinson Worldwide, Inc., 558 F.Supp.2d 630 (W.D. Va. 2008)

The plaintiff contends that evidence of the earlier compliance review, which was based upon violations of various safety regulations by AKJ, would support its position that AKJ possessed numerous documented safety deficiencies, was charged with violations of many of the same regulations in the follow-up review, and had a propensity to operate its business in an unsafe manner. The plaintiff also asserts that Ms. Sandberg's opinion that a proposed rating has no significance is based upon her short three year period as head of the FMCSA and should not be determinative.

Page 653

The court finds that evidence of violations in the earlier compliance review would be relevant in evaluating AKJ's competence as a carrier. Furthermore, although Robinson may not have immediately been aware of the prior rating, once it learned of the conditional rating AKJ received, Robinson could have discovered information relating to violations from the earlier evaluation based upon a review of the information on the FMCSA website as it related to AKJ. Therefore, the plaintiff will be permitted to adduce evidence regarding the proposed safety ratings for AKJ.

### V. *Plaintiff's Motion in Limine*

The plaintiff initially contended that Robinson should not be permitted to introduce into evidence the warning page from the FMCSA website because it seemingly was a copy of what appeared on the website in 2008, not in 2004. The plaintiff asserts that Robinson should only be permitted to introduce an authenticated copy of any warning that actually did appear on the website at the time of the subject collision. At the hearing on this matter, Robinson introduced the correct page from 2004 which contained the proper warning language. That language was identical to that on the website in 2008. As a result, the plaintiffs motion in limine is rendered moot.

### VI. *Defendant's Motion to Exclude the Testimony of Thomas M. Corsi, Ph.D.*

The plaintiff has indicated that he intends to introduce at trial the testimony and expert report of Thomas M. Corsi, Ph.D. Dr. Corsi is a Professor of Logistics and Co-Director of the Supply Chain Management Center at the Robert H. Smith School of Business at the University of Maryland where he has worked since 1976. The plaintiff intends to present Dr. Corsi as an expert witness to testify regarding the carrier selection standards a broker should have applied in this case.

Robinson asks the court to exclude Dr. Corsi's testimony in its entirety. In support of this request, Robinson first contends that Dr. Corsi is an academic with no real experience in the freight broker industry or the regulatory aspects of the trucking industry. The court notes, however, that Dr. Corsi was educated and currently teaches in the field of logistics, has authored over 100 articles and three books on logistics and transportation, has worked as a consultant with the Department of Transportation since 1980 where he has evaluated safety regulations and safety performance of carriers, has worked with the Volpe National Transportation Center to implement the SafeStat methodology for the evaluation of the safety performance of carriers, and has participated in a task force to evaluate compliance reviews for the FMCSA. As a result, the court finds the defendant's arguments with regard to Dr. Corsi's credentials to be without merit.

Robinson next argues that Dr. Corsi has based his opinion that a broker should not select any carrier in the bottom 25th percentile on any SEA score upon the program of the Department of Energy for selecting carriers for materials such as hazardous nuclear waste. Robinson also notes that Dr. Corsi testified at his deposition that he had conducted informal internet searches over the weekend prior to his deposition and found several websites of freight brokers who advertise their use of the FMCSA statistics in selecting carriers. Dr. Corsi also testified that not all the brokers whose websites he visited included descriptions of their carrier selection standards. Dr. Corsi admitted that none of these websites described a program as rigorous




defendant's motion in limine to exclude the testimony of Thomas M. Corsi, Ph.D. has been granted in part and denied in part.

The Clerk of Court is hereby directed to send certified copies of this memorandum opinion to all counsel of record.

---------------

Notes:

1. The T-Chek System allows carriers and/or their drivers to obtain advances from Robinson for the cost of fuel or other necessities. Such advances are deducted from the total owed to the carrier by Robinson.

2. The Quick Pay plan allows carriers who signed up with Robinson to obtain a very quick turnaround on payment for transporting loads in exchange for a percentage of the total. AKJ apparently participated in both the TChek System and the Quick Pay plan.

3. The T-Chek system is also administered by a separate corporation, a wholly-owned subsidiary of Robinson, and counts as its customers carriers that may not haul loads for Robinson but desire access to cash advances during the transport of a load for another shipper or broker.

4. Robinson also points out that the defendant in *Philip Morris* was on-site and closely monitoring the disposal firm while it engaged in its activities. Robinson contends that it did not directly supervise or control AKJ's operations. The court finds, however, that such an argument would be more properly directed to a claim of negligent retention of an independent contractor, which was specifically discussed in *Philip Morris,* rather than to a negligent hiring claim. The court previously found that the plaintiff's complaint does not properly assert a claim for negligent retention. *See* Memorandum Opinion dated Sept. 11, 2007 at 7 n. 3. Therefore, the court does not find Robinson's assertions with regard to its lack of direct supervision of AKJ to be relevant to an analysis of the claim at hand.

5. The plaintiff also refers to this advertisement in his motion for partial summary judgment. Robinson has responded that the statement was included in a 2002 brochure, was inelegantly worded even at that time, and is irrelevant in this case because there is no evidence that Robinson used the brochure after 2002 or that the shipper of the subject load relied upon such statements when contracting with Robinson. This factual dispute with regard to one of the key factors to the *Schramm* court, which this court also finds relevant, supports the notion that the parties' motions for summary judgment should be denied.

6. Robinson has filed a motion to exclude all of Dr. Corsi's testimony and his report which will be discussed, *infra.*

7. Robinson has also asked the court to revisit its previous finding that negligent entrustment applies to an activity. In light of the court's ruling on this claim, the court does not find it necessary to address the parties' arguments on this issue, but notes again that at least one Virginia court has cited § 308 with approval. *See Stanley v. Williams,* 42 Va. Cir. 400, 401 (Va.Cir.Ct.1997).

---------------

Px~MIL-174 ✓

Jones v. C.H. Robinson Worldwide, Inc., 558 F.Supp.2d 630 (W.D. Va. 2008)

Page 654

as that followed by the Department of Energy, which he apparently considers a model for the industry. Therefore, Robinson concludes that Dr. Corsi "employed no substantive data or methodology at all in forming his opinion" as required by Federal Rule of Evidence 702, and failed to demonstrate that he relied upon the information of a kind reasonably relied upon by experts in this field as required by Federal Rule of Evidence 703. Finally, Robinson asserts that Dr. Corsi has offered no evidence regarding the standard of care for carrier selection in 2004.

According to the plaintiff, however, Dr. Corsi will not be offered to testify regarding an industry wide custom or practice in place in 2004. Instead, Dr. Corsi will present his opinions regarding the reliability of the SafeStat methodology, the SEA scores, and the reliability of the FMCSA safety ratings given to carriers and, based upon this information, will present his opinion regarding the type of data that would be of most assistance to a company in evaluating a carrier for fitness, *i.e.*, the SafeStat data publicly available on the FMCSA website, along with insurance data, financial issues, and any actual knowledge possessed by a broker. The plaintiff notes that the federal court in *Schramm* required the consideration of such data, thus providing authority for Dr. Corsi's opinions.

The court is compelled to agree that Dr. Corsi should not be permitted to specifically quantify the group of carriers that should have been considered acceptable or unacceptable based upon their SEA scores or any other measure. In addition, Dr. Corsi will not be permitted to testify with regard to any opinion he has formed with regard to carrier selection practices based upon the rather informal internet survey he performed immediately prior to his deposition testimony. Nevertheless, Dr. Corsi has extensive experience with the SafeStat methodology, the information available on the FMCSA website, and the relationship of this data to tractor-trailer accidents. Therefore, he will be permitted to testify regarding the safety related information

that was available to freight brokers in 2004 as well as its meaning and reliability.

The defendant has also argued that Dr. Corsi's testimony cannot overcome the FMCSA's own warning on its website that the SafeStat data should not, in fact, be used for commercial purposes. Robinson notes that the court in *Schramm* did not have the benefit of Ms. Sandberg's testimony regarding the nature of this warning and may have decided the case differently otherwise. The court finds, however, that these points simply highlight the differences of opinion between the two experts involved in this case that, must be resolved by the finder of fact. Certain SafeStat data does remain available on the FMCSA website, regardless of the warning, and these statistics must have some meaning to the industry. The plaintiff is entitled to present qualified expert testimony so as to communicate its version of these issues to the jury. Except as otherwise noted, Dr. Corsi will be permitted to be qualified and testify as an expert in this case.

### CONCLUSION

For the foregoing reasons, and as stated in an order entered following the hearing and oral rulings on these motions, the plaintiffs motion for summary judgment has been granted with regard to the negligence of Kristina Arciszewski and denied in all other parts; the defendant's motion for summary judgment has been granted with regard to plaintiff's claims for negligence and negligent entrustment and denied with regard to the plaintiffs claim for negligent hiring; the plaintiffs motion in

Page 655

limine has been denied as moot; the defendant's motion in limine has been granted in part, denied in part, and taken under advisement in part; the defendant's motion in limine to exclude evidence regarding proposed safety ratings for AKJ has been denied; the defendant's motion in limine to permit evidence regarding plaintiffs settlement with AKJ and insurance coverage has been granted in part and denied in part; and the



PX-MIL-#174 U