Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

# UNITED STATES DISTRICT COURT
# IN THE WESTERN DIVISION OF MASSACHUSETTS
# SPRINGFIELD, MA.

Civil Action No.17 CV  30174

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THOMAS FORBES, as he is the**
**Personal Representative of the**
**Estate of GEORGE J. FORBES,**
                    **PLAINTIFF**
**v.**

**GREGORY TRUCKING COMPANY,**
**INC., WILEY LENUE HOOKS, JR.,**
**GREGORY LEASING COMPANY, INC.**
**BSG LEASING, INC.;  and**
**B&C TIMBERS LLC.**
                    **DEFENDANTS**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MOTION IN LIMINE NO. 11
## NO REFERENCE BY THE DEFENDANTS
## TO A PAST BANKRUPTCY

George (Joe) Forbes was killed when his pick-up truck was struck by a tractor trailer truck which ran a red light.  The tractor trailer truck was owned by Gregory Trucking Co. Inc., (Gregory) and operated by Gregory's employee - Wiley Lenue Hooks, Jr. (Hooks).   It is alleged Gregory negligently hired Hooks who had a pending criminal charge for driving while impaired (his 5th) when Gregory hired Hooks; and that Gregory was negligent in training and supervising Hooks, as well as negligently entrusting the driver with a tractor trailer truck.

The plaintiff asks the court to issue an order to all the defendants not to mention a prior bankruptcy.

As grounds therefore the Plaintiff states as follows:

1. at the deposition of Gregory Trucking Co., Inc., the deponent – Cecil Gregory – mentioned the bankruptcy of a predecessor corporation  to B&C Timbers, LLC. (deposition transcript attached);

2. at the deposition of B&C Timbers, LLC., the deponent – Brandon Gregory – mentioned bankruptcy of the predecessor corporation to B&C Timbers, LLC., (deposition transcript attached);

3. at the deposition of Gregory Leasing Co., Inc., the deponent – Cecil Gregory – mentioned the bankruptcy of a predecessor corporation  to B&C Timbers, LLC. (deposition transcript attached);

4. that such testimony is not relevant to any issue in the case, could induce sympathy for the Defendant(s),  and may improperly influence the juries decision as to damages.

WHEREFORE,  Counsel for the Plaintiff asks the court to issue an order to all the defendants not to mention a prior bankruptcy.

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

PX~MIL~268

1

2

3   **Dated:**

4

5   THOMAS FORBES, as he is the
6   Personal Representative of the
7   Estate of GEORGE J. FORBES
8
9   By: _/s/ Dino M. Tangredi_
10
11  **Dino M. Tangredi**
12  **BBO No. 567928**
13  **The Miles Pratt House**
14  **106 Mount Auburn Street**
15  **Watertown, MA. 02472**
16  **T:     617-926-0012**
17  **F:     617.926.0016**
18  **masslaw@dinotangredi.com**
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36  DMT/mlt
37  70103/LIMINE-11-BANKRUPTCY

Thomas Forbes as he is the Personal Representative of the Estate of George Forbes

v.

Gregory Trucking Company, Inc. et. al.

C.A. No. 3:17 – CV 30174-MAP

PX~MIL~269

Cecil Gregory- 30(b)(6) - Gregory Trucking                                      4/24/2019

12 (Pages 42 to 45)

Page 42

1    Q.  Okay.  Could you direct me to what
2    you're looking at?
3        A.  It says on the -- the last page --
4        Q.  Yeah.
5        A.  -- founded in 19 -- that should be '92
6    -- well, it shows '92 there.  As read, [as read]
7    "This company is operated with team drivers, top
8    of the line drivers" -- there's no team drivers.
9    No.
10       Q.  Okay.  What's a team driver?
11       A.  It would be two to a truck.
12       Q.  Has Gregory Trucking ever had team
13   drivers?
14       A.  Well, they's -- probably over the years.
15   When we first started going a pretty good distance
16   sometimes we'd send two.  But we hadn't probably
17   in the last 30 years.
18       Q.  Fair enough.  So do you -- did you say
19   somebody named Flattop created this Web site?
20       A.  Flattop.  That -- that's what his name
21   is.  He does all of our computer work.
22       Q.  Okay.  And do you know when Flattop did
23   this initially?
24       A.  No.
25       Q.  Know each time he ever did it?

Page 43

1        A.  I can't -- no, I don't.  He just said he
2    wanted to do one.  I think it's been fairly
3    recent.  I'm not sure.
4        Q.  Okay.  But other than team drivers, is
5    everything else --
6        A.  Yeah.  It seems to be in order there.
7    Yeah.
8        Q.  And --
9        A.  I mean --
10       Q.  -- please allow me to finish my
11   question.
12       A.  All right.
13       Q.  And then you can answer.  I know it's
14   hard.  Is everything in Exhibit Six accurate,
15   except for the team drivers?
16       A.  Yes.
17       Q.  And is everything in Exhibit Number Six
18   accurate since 2016 to the present, except for
19   team drivers?
20       A.  Yes.
21            (DEPOSITION EXHIBIT
22            NUMBER SEVEN WAS MARKED
23            FOR IDENTIFICATION)
24       Q.  Mr. Gregory, we're handing you Exhibit
25   Number Seven.  Will you take a look at that and

Page 44

1    let me know when you're done looking at it.
2            MR. O'CONNOR:  And I would just
3    make an objection to the line of questioning that
4    I assume is coming.  Again, this is a Web site not
5    of Gregory Trucking.  I mean, any questions you
6    want to ask him about reviewing the document is
7    fine.  But not on the topics listed itself and
8    it's not the company being deposed Web site.
9        A.  Well, it says here it started out with a
10   little wood mizer.  That -- that's not right.
11   Little wood mizer sawmill, that was -- that's
12   incorrect.  That would be on the back of the
13   second page.
14       Q.  [By Mr. Tangredi]  So before we get into
15   its contents and -- and what's in it, I just want
16   you to look at it and let me know when you're done
17   looking at it because I want to ask you if you
18   recognize what it is.  And then we'll perhaps talk
19   about what's in it.
20       A.  I would assume that this right here is a
21   G&G Forest Products' Web site.
22       Q.  Okay.  What is G&G Forest Products?
23       A.  Well, that's B&C.  The same thing.
24       Q.  It's the same as B&C Timbers LLC?
25       A.  No.  But it's B&C doing business as G&G

Page 45

1    Forest Products.
2        Q.  Okay.  They're interchangeable.  G&G and
3    B&C?
4        A.  Yes.  They want -- we wanted to keep the
5    G&G.  We had to let go of the lumber company, they
6    -- because that was already G&G because we had a
7    long history.  And we -- we were able to pick up
8    most of our customers and everything after the
9    bankruptcy stuff.
10       Q.  And does the G&G stand for Gregory &
11   Gregory?
12       A.  Yes.
13       Q.  And is that Cecil Gregory and Brandon
14   Gregory?
15       A.  No.
16       Q.  No.
17       A.  Cecil Gregory and Vance Gregory, my dad.
18       Q.  What was your dad's name?
19       A.  Vance.
20       Q.  Vance.  Got it.
21       A.  That started in 1973.
22       Q.  Okay.  And how about B&C Timbers, is the
23   "B" for Brandon and the "C" for Cecil?
24       A.  No.  It was for Brandon and Chester at
25   that time.  We was trying to get something started

PX~MIL~270

Cecil Gregory- 30(b)(6) - Gregory Trucking                    4/24/2019

13 (Pages 46 to 49)

Page 46

1  back in -- at that time, we was -- the -- trying
2  to get the funding to preserve what I lost in 40
3  years when I went out and built the big mill in
4  Hickory, expanded and -- and borrowed a lot of
5  money and -- and run out. Things just changed and
6  I lost it. And we were trying to get -- save part
7  of the company because I've got kids and I've got
8  grandkids. And -- and Chester Godfrey -- that's
9  where that name -- name comes from -- the "C."
10 They -- they was several trying to help us. But
11 before anything ever happened, Salem Investment
12 Partners came in out of Charlotte. And they
13 worked with my son, Brandon, in order to keep
14 Union Grove. I lost Hickory total. And -- and me
15 and my wife lost everything. We had to go out
16 personally and all. But, you know, being able to
17 keep the little trucking going to help us. And
18 then we're freighting that for the lumber company
19 up there -- freight for that and then the others.
20 But, like I say, right now we've not been able to
21 keep the drivers or nothing else to do it all, so
22 they are using that -- some outside stuff too.
23 But that -- that "C" was that. But they had done
24 registered. I think, in the state of North
25 Carolina or something, so it had to be there.

Page 47

1  They tried several different names, but a lot of
2  them was gone. But we do have a good, strong
3  history. So they done the B&C doing business as
4  that, you know. And I'm there. And I try to do
5  everything I can to help if he has questions or
6  anything. But trucking is basically what I had.
7     Q.  Okay.  So G&G is Gregory and Gregory for
8  you and your dad?
9     A.  Yes.
10    Q.  Originally it was G&G Lumber.
11    A.  Yes.
12    Q.  That went bankrupt?
13    A.  Yes.
14    Q.  But you kept it on as G&G Forest
15 Products --
16    A.  No, we didn't keep it on.  I'd say we
17 start -- it was gone. And then they stepped up
18 after we got the financing. And they were able to
19 -- Carolina Farm Credit had me. Well, they worked
20 with my son and Salem Investment Partners to
21 preserve the Union Grove facilities. I mean, I
22 lost it. But at least that -- and now we do have
23 some kind of income now.
24    Q.  Okay. I want to ask you some questions
25 about transportating -- transporting goods by

Page 48

1  tractor-trailer. Okay?
2     A.  Okay.
3     Q.  Do you believe that transport --
4  transportation of goods by tractor-trailer can be
5  dangerous if it is not done carefully?
6         MR. O'CONNOR:  Objection.
7     A.  Yes. Any truck on the road if -- if
8  it's not done carefully is bad.
9     Q.  [By Mr. Tangredi]  Who could it be bad
10 to?
11    A.  It could be bad to the -- the truck
12 driver and bad to anybody else that's on the road.
13 But whether it be lumber, steel, dry box, or
14 whatever, you know, yes.
15    Q.  What could happen to people --
16       MR. O'CONNOR:  Objection
17 BY MR. TANGREDI:
18    Q.  -- if the truck driver -- tractor-
19 trailer truck driver isn't careful?
20       MR. O'CONNOR:  Objection.
21    A.  Well, there could be accidents, yes.
22    Q.  [By Mr. Tangredi]  What kind of injuries
23 could people get?
24       MR. O'CONNOR:  Objection.
25    A.  Well, from a small injury to death.

Page 49

1     Q.  [By Mr. Tangredi]  And everything in
2  between, right?
3     A.  Yes.
4     Q.  Okay.  Do you believe that
5  transportation of goods by tractor-trailer can be
6  dangerous if not done safely?
7        MR. O'CONNOR:  Objection.
8     A.  Yes.
9     Q.  [By Mr. Tangredi]  Okay.  Do you believe
10 that transportation of goods by tractor-trailer
11 can be dangerous if not done competently?
12       MR. O'CONNOR:  Objection.
13    A.  Yes.
14    Q.  [By Mr. Tangredi]  Do you believe that a
15 motor carrier must choose a competent driver to
16 drive its trucks?
17    A.  Yes.
18    Q.  Do you believe a motor carrier must
19 choose a qualified driver to drive its trucks?
20    A.  Yes.
21    Q.  And do you believe that a motor carrier
22 must choose a safe driver to drive its trucks?
23       MR. O'CONNOR:  Objection.
24    A.  Yes.
25    Q.  [By Mr. Tangredi]  True or false:

4:52:05

Cecil Gregory- 30(b)(6) - Gregory Trucking                                    4/24/2019

40 (Pages 154 to 157)

Page 154

1   Q. The trailer was owned by B S G, correct?
2   A. Yes.
3   Q. On lease to Gregory Trucking. Gregory
4   Trucking connects tractor to trailer and puts
5   Wiley Lenue Hooks in as the driver. The truck is
6   loaded and driven to Rhode Island.
7   A. Yes.
8   Q. Excellent. And do you know how much
9   Gregory Trucking got paid to transport this lumber
10  from North Carolina to Rhode Island?
11  A. $1,800.
12  Q. Okay. How much did Gregory Trucking pay
13  Gregory Leasing for leasing the vehicle?
14  A. It's not been able to pay them anything.
15  Q. Didn't pay them anything?
16  A. No. No. We haven't in a while. We'd
17  like to get started -- it'd be good -- but we
18  haven't been able to.
19  Q. So Gregory Leasing Company leased a
20  tractor to Gregory Trucking for about a year for
21  no compensation?
22  A. Yes, it has.
23  Q. Did Gregory Trucking pay B S G anything
24  for leasing the trailer?
25  A. His -- no, not yet.

Page 155

1   Q. Okay. So B S G entered into a lease
2   agreement with Gregory Trucking to lease Gregory
3   Trucking a trailer for one year for no
4   compensation; is that correct?
5   MR. O'CONNOR: Objection to form.
6   A. Well, they -- there is a -- a price.
7   And when -- when B S G was first done, they was --
8   everybody was compensated. But after the
9   bankruptcy, we have not dug out enough to where we
10  can start doing it again.
11  Q. [By Mr. Tangredi] And the bankruptcy,
12  was it back like in 2013 or so?
13  A. Yeah. Somewhere in there.
14  Q. So at the time that B S G leased a
15  trailer to Gregory Trucking in 2016, Gregory
16  Trucking did not pay any compensation for that?
17  A. No.
18  Q. Okay. And they haven't since that time;
19  is that --
20  A. No.
21  Q. Tell me how it came about that Gregory
22  Trucking Company transported lumber from Rhode
23  Island -- BB&S in Rhode Island to L P Adams in
24  Dalton on August 23rd, 2016.
25  A. Well, Wiley -- or Buster, he had a

Page 156

1   backhaul already set up from us at Gregory
2   Trucking. And he had previously picked up some
3   short hauls from BB&S where it worked into where
4   it didn't hurt the time period. In other words,
5   he could get that and then it was extra money.
6   Extra money for him. And he'd still get
7   everything done in the same amount of time. And
8   so, you know, we did not know that he had taken
9   that until the accident. He had done it one other
10  time. And it's not a policy either. But when he
11  was with his dad and then his mother, they did all
12  this brokering -- or -- and he -- he -- he could
13  find backhauls. He was good with stuff like that.
14  If we had a little problem, he could tell us where
15  there was one at. He had ways of getting on
16  sites. But he had hauled some for BB&S on that.
17  And then it was a little extra money. So they --
18  when -- after he unloaded, I guess they said that
19  they had a short haul. And, you know, it -- it
20  wasn't a direct thing going towards the backhaul,
21  but I guess it was somewhere it didn't hurt.
22  Q. So you used some -- some terms, backhaul
23  and short haul. I don't know what those mean.
24  Could you -- could you explain backhaul and short
25  haul?

Page 157

1   A. Well, they had -- had one that's -- it
2   was maybe go within a 100 miles of their facility.
3   And so -- and it -- you know at 450, that was a
4   good freight rate. And then Wiley, he made some
5   extra money there. And then it helped us on our
6   expenses up there and back. And then -- and then
7   after he unloaded, he was going on to pick up his
8   backhaul coming back home.
9   Q. Okay. So let's -- let's back it up to
10  August 22nd when Mr. Hooks is in the tractor-
11  trailer truck in North Carolina with a load of
12  lumber for BB&S on it.
13  A. Yes.
14  Q. He's still in -- on Lumber Drive. He
15  hasn't left yet. His instructions -- or his
16  mission is to drive the load to BB&S in Rhode
17  Island, correct?
18  A. Yes.
19  Q. And when he left North Carolina on the
20  22nd of August, after that delivery, was he
21  supposed to do something?
22  A. He was -- well, he had a backhaul
23  already scheduled when he left North Carolina.
24  Yes.
25  Q. On the 22nd?

Brandon B Gregory-B&C Timbers 30(b)(6)

4/25/2019

12 (Pages 42 to 45)

## Page 42

1 order to ensure the viability of our natural
2 resources for generations to come." Did I read
3 that fully?
4   A. Yes.
5   Q. Okay. Why is it important to management
6 to do that?
7   A. To be a good company.
8   Q. What makes them a good company? How
9 does that make them a good company?
10   A. Well, you -- I mean, we're burning
11 sawdust for, you know -- with the heater kilns and
12 not gas. I don't know.
13   Q. What is a socially responsible corporate
14 leader?
15   A. I don't know.
16   Q. The next page, underneath the picture,
17 the second sentence, "The Gregory family has been
18 a presence in the timber and lumber industry in
19 Union Grove, North Carolina, for decades where
20 they worked diligently to build a successful
21 lumber business and give back to the community".
22 Did I read that right?
23   A. Yes.
24   Q. All right. What does the Gregory family
25 do to build a successful lumber business and give

## Page 43

1 back to the community? What do they do to give
2 back to the community?
3   A. Provide jobs for the local people there.
4 We try to donate to various things going on in the
5 community. But that's, you know, about it.
6   Q. Can you tell me a specific donation that
7 B&C Timbers has made since 2016?
8   A. Nothing large because we -- we haven't
9 been able to, but small things, Union Grove
10 Ruritan. I mean, if they have a breakfast or, you
11 know, something like that.
12   Q. Does B&C Timbers write a corporate check
13 --
14   A. Yes.
15   Q. -- for this thing -- for these kinds of
16 things?
17   A. Yes.
18   Q. Okay. And can you think of a specific
19 one that has been written since 2016?
20   A. Not really.
21   Q. And the next page, please? Oh, it
22 actually starts on the previous page at the
23 bottom. "Though there have been difficult
24 economic times, Brandon and Cecil have weathered
25 the storm through hard work, dedication, and

## Page 44

1 determination to persevere regardless of the
2 circumstances or odds"? Did I read that
3 correctly?
4   A. Yes.
5   Q. What storms have Brandon and Cecil
6 weathered?
7   A. I mean, it's -- it goes -- it's the
8 storm before G&G Forest Products.
9   Q. What was the storm?
10   A. G&G Lumber, you know, went through a
11 bankruptcy, you know. I didn't -- you know,
12 Cecil, my dad, owned G&G Lumber and built a new
13 sawmill and expanded, things went south in a
14 hurry. It took longer, it cost more, then the,
15 you know, economy failed and they -- you know,
16 they took it all, so we had to find a lender. We
17 couldn't find lending, nobody to loan any money,
18 Salem stepped in. It's high-interest money. So,
19 I guess that's the storm we got -- you know, got
20 beat down bad and we're trying to come back.
21   Q. When did G&G Lumber go bankrupt?
22   A. I'm not exactly sure on a date. 2012,
23 something like that.
24   Q. Approximately somewhere --
25   A. Approximately --

## Page 45

1   Q. -- in there?
2   A. -- '12, '13. I'm not sure.
3   Q. And did G&G Forest Products come out of
4 that?
5   A. When we -- after the bankruptcy, B&C
6 Timbers bought, you know -- bought the assets back
7 from the bank.
8   Q. Okay. The next paragraph, "Since the
9 beginning, with a little miser" -- is that miser?
10 Is that what it -- a miser sawmill? -- "in the
11 woods in the early 1970s, the company has always
12 endeavored to embrace new technology, create new
13 products, improve quality, and expand operations
14 so as to better serve their diversified customer
15 base"? Did I read that right?
16   A. Yes.
17   Q. It says that it embraces new technology.
18 We talked a little bit about that earlier. What's
19 the new technology that B&C is embracing?
20   A. Well, right now, I'm trying to, you know
21 -- looking at a grade mark reader to enhance the
22 -- through the planer mill. We've got a sorter
23 system and computerized system there. There's a
24 lot of stuff could be done there. Just not been
25 able to do it.

O M I T

O M I

14:54

1:52:02

OMI T

Brandon B Gregory-B&C Timbers 30(b)(6)                          4/25/2019

27 (Pages 102 to 105)

Page 102

1  A.  Yes.
2  Q.  Do you know approximately when it was?
3  A.  I don't.
4  Q.  Was it within the last six months?
5  A.  Yes.
6  Q.  Okay.  Where was it held?
7  A.  Just in the office.
8  Q.  And who else attended?
9  A.  Me and Martha.  I mean, it's --
10  Q.  Okay.  What business was discussed?
11  A.  Really just the fact that you've -- I
12  think you've got to have a -- keep up with the
13  minutes.
14  Q.  And do minutes actually exist?
15  A.  I -- I don't know what -- you know, it's
16  just what you -- she has a paper.  We could look
17  at the last paper.  I don't really remember.
18  Q.  Did you see her physically writing notes
19  during your meetings?
20  A.  Yes, I mean, it's just --
21  Q.  Do you as the president ever review
22  those minutes?
23  A.  No.
24  Q.  How many corporate meetings have you had
25  since incorporation in 2014, do you know?

Page 103

1  A.  I don't know.
2  Q.  More or less than three?
3  A.  I think more than three.
4  Q.  Does B&C Timbers pay dividends?
5  A.  No.
6  Q.  And how many checking accounts does B&C
7  Timbers have?
8  A.  One.
9  Q.  And then, we saw that check earlier,
10  right?
11  A.  Yes.
12  Q.  That's the only account B&C Timbers has?
13  A.  Yes.
14  Q.  And is it set up like that back in 2016?
15  A.  Yes.
16  Q.  Now, G&G Forest Products was -- am I
17  correct to say that that followed the bankruptcy
18  of G&G Lumber Company?
19  A.  Yes.
20  Q.  And G&G Forest Products bought the
21  assets from the bank of G&G Lumber?
22  A.  Yes.
23  Q.  Okay.  How long was G&G Lumber in
24  business?
25  A.  From 1973 'til 2012 or '13, whenever it

Page 104

1  filed.
2  Q.  Okay.  And do you know where the office
3  for G&G Lumber was?
4  A.  It was at the 179 Lumber Drive.
5  Q.  In Harmony?
6  A.  Yes.
7  Q.  You've referenced Martha a couple of
8  times.  Are you related to Martha?
9  A.  Yes.
10  Q.  How?
11  A.  She's my aunt.
12  Q.  She's your aunt?  Would she be your
13  father, Cecil's, sister?
14  A.  Yes.
15  Q.  Who's Sylvia Gregory?
16  A.  My mother.
17      (DEPOSITION EXHIBIT
18      NUMBER EIGHT WAS MARKED
19      FOR IDENTIFICATION)
20  Q.  We've just marked a document called
21  Exhibit Number Eight.  Would you take a look at
22  all of that and let me know when you're done?
23  A.  (Witness reviews document.)  Do you want
24  me to read the whole thing?
25  Q.  If you want.  I'm going to ask you some

Page 105

1  questions just -- not about --
2  A.  If you're going to ask me questions
3  about it, I'll just --
4  Q.  I don't think I'm going to ask you
5  questions about the body of the letter.
6  A.  Okay.
7  Q.  I'm going to ask you questions about the
8  address on the letter, and if I do ask you
9  questions about the body of the letter, I'll give
10  you as much time as you need --
11  A.  Okay.
12  Q.  -- to read it.  Is that fair?
13  A.  Yes.
14  Q.  Okay.  The second page is the actual
15  letter, and it's addressed to B&C Timbers at Post
16  Office Box 99, Union Grove, North Carolina 28689.
17  Is that the correct address --
18  A.  Yes.
19  Q.  -- for mailing?  And it was sent by
20  certified mail, and if we look at the cover page,
21  you can see the address and the certified mail
22  slips?
23  A.  Uh-huh (yes).
24  Q.  Is that a yes?
25  A.  Yes.

Page 58

1    A.  No.
2    Q.  -- have it?  Do you know why?
3    A.  No.
4    Q.  Did you ever ask?
5    A.  No (witness indicates negatively).
6    Q.  Does Gregory Leasing keep track of its
7    costs since 2016?
8    A.  Does Gregory Leasing keep -- no.
9    Q.  Does Gregory Leasing have any costs
10   since --
11   A.  They do not have any costs.  No.
12   Q.  -- since 2016?
13   A.  No.
14        (DEPOSITION EXHIBIT
15        NUMBER FOUR WAS MARKED
16        FOR IDENTIFICATION)
17   Q.  Mr. Gregory, please take a look at
18   Exhibit Number Four.
19   A.  Okay.
20   Q.  And Exhibit Number Four is a request for
21   all financial statements regarding Gregory Leasing
22   for 2016, and attached to it is a document.  Do
23   you see the document attached to it?
24   A.  Yes.
25   Q.  Is that all the financial information

Page 59

1    for Gregory Leasing for 2016?
2    A.  Yes.
3    Q.  Is that the only financial statement?
4    A.  Yes.
5    Q.  And have you seen this before?
6    A.  I guess when I give it to the accountant
7    or sent it in with my stuff.
8    Q.  Have you seen it before today?
9    A.  (Witness reviews document.)  No.
10   Q.  You haven't seen it before?
11   A.  No, I don't think I've seen -- yeah, I
12   mean, I probably got this and I put it with my tax
13   papers and sent it off.
14   Q.  If Gregory Leasing knew it was leasing a
15   tractor to a motor carrier who used unqualified
16   drivers, would it still lease a tractor to that
17   motor carrier?
18        MR. O'CONNOR:  Objection.
19   A.  If it -- repeat it, please.
20   Q.  If Gregory Leasing knew it was leasing a
21   tractor to a motor carrier who was using
22   unqualified drivers, would it still lease tractors
23   to that motor carrier?
24   A.  No.
25        MR. O'CONNOR:  Objection.

Page 60

1    Q.  Was the tractor in the crash in Dalton,
2    Mass., on August 24th, 2016, declared a total
3    loss?
4    A.  No.  I mean, we didn't turn it in for
5    anything because we don't carry collision on it.
6    Q.  Who doesn't carry collision on it?
7    A.  Gregory Trucking.  Gregory Leasing does.
8    Q.  So, there was no insurance for the
9    damage to the tractor that was in the crash, is
10   that accurate?
11   A.  Yes.
12   Q.  Since Gregory Trucking was responsible
13   for that crash --
14        MR. O'CONNOR:  Object.
15   Q.  -- has Gregory Leasing sought any kind
16   of legal action against Gregory Trucking for the
17   loss?
18        MR. O'CONNOR:  Objection.
19   A.  No.
20   Q.  Who sustained the loss, the financial
21   loss on that truck?
22   A.  Well, Gregory Trucking repaired it, but
23   that's their responsibility once they take it, the
24   insurances and the upkeep.
25   Q.  And Gregory Leasing as the owner of that

Page 61

1    truck is satisfied with the work Gregory Trucking
2    did?
3    A.  Yes.
4    Q.  Who paid for gas for any tractors used
5    by Gregory Trucking?
6    A.  Who --
7    Q.  -- paid for gas or diesel?
8    A.  Who pays for the diesel?
9    Q.  Yeah.
10   A.  Gregory Trucking.
11   Q.  Who pays all the other expenses on the
12   truck?
13   A.  Gregory Trucking.  They're all separated
14   by truck.
15   Q.  Who owned the trailer that the Gregory
16   Leasing tractor was pulling at the time of the
17   crash in Dalton?
18   A.  B S G.
19   Q.  How did that get arranged?
20   A.  That was done up, I think, in two-oh-
21   five or somewhere in there where they was -- we
22   was needing several trailers, or two-oh-six, and B
23   S G bought 15 or 20-some trailers or something
24   like that and put them on and then we paid into
25   them, and then after the bankruptcy, all that, and